# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EL PUENTE,

CORALATIONS,

CENTER FOR BIOLOGICAL DIVERSITY,
   378 N. Main Ave.
   Tucson, AZ 85702,

         *Plaintiffs*,
   *v.*

U.S. ARMY CORPS OF ENGINEERS,
   441 G St. NW
   Washington, DC 20314,

LIEUTENANT GENERAL SCOTT A.
   SPELLMON, Chief of Engineers
   and Commanding General, Army
   Corps of Engineers,
   441 G St. NW
   Washington, DC 20314,

GINA RAIMONDO, Secretary of Commerce,
   1401 Constitution Ave, NW
   Washington, D.C. 20230,

NATIONAL MARINE FISHERIES
   SERVICE,
   1315 East-West Highway
   Silver Spring, MD 20910-3225,

DEBRA HAALAND, Secretary of Interior
   1849 C Street NW
   Washington, DC 20240,

U.S. FISH AND WILDLIFE SERVICE
   1849 C Street NW
   Washington, DC 20240,

         *Defendants*.

Case No.: 22-2430

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.       San Juan Bay on Puerto Rico's northern coast serves important cultural, ecological, economic, and historical functions for the region. On the shores of the bay are densely populated neighborhoods and Puerto Rico's largest port. Congress recognized San Juan Bay as an estuary of "national significance," *see* 33 U.S.C. § 1330, with ecological values that support fisheries, tourism, wildlife, and protection against tropical storms. Two historic landmarks span the inlet of San Juan Bay—Castillo de San Felipe del Morro (El Morro) and Fortín San Juan de la Cruz (El Cañuelo)—which are preserved for their heritage and cultural values.

2.       Now, an expansive federal dredging project threatens to harm San Juan Bay, nearby communities, and El Morro.

3.       The U.S. Army Corps of Engineers' ill-conceived San Juan Bay Dredging Project will deepen and widen shipping channels for massive vessels. The primary purpose of dredging is for larger tankers of liquified natural gas (LNG) and petroleum to transit the bay.

4.       In 2015, the Corps announced it would prepare an Environmental Impact Statement for the project, but it ultimately finalized a less robust Environmental Assessment that ignored a full array of environmental impacts. In August 2018, the Corps erroneously determined that the San Juan Bay Dredging Project would have no significant environmental impacts.

5.       The Corps' environmental review omitted analysis of environmental damage from LNG tanker traffic, a new LNG import terminal, and fossil fuel imports. Near the port, overburdened environmental justice communities in Puerto Nuevo, Guaynabo, and Cataño will be exposed to risks from LNG explosions, oil spills, and pollution. The Corps failed to examine the health impacts of breathing smog, particulate matter, mercury, and hazardous air pollution. The LNG tankers would deliver the highly volatile fuel to a newly constructed LNG import

terminal that threatens the safety and health of residents. The Dredging Project increases LNG imports to fuel power plants whose emissions will worsen air pollution and climate change.

6.      The Corps ignored how its decision locked in a fossil fuel pathway for Puerto Rico. While the Corps planned the San Juan Bay Dredging Project, Hurricanes Irma and Maria wiped out power and services throughout Puerto Rico. As it recovered, strong support grew for Puerto Rico to transition its energy utilities away from imported fossil fuels—including enactment of a law requiring 100 percent renewable energy by 2050. The Dredging Project impairs this transition and hampers a move away from fossil fuels.

7.      The Corps' Environmental Assessment also overlooked and underestimated other environmental damage from the Dredging Project.

8.      For example, the Environmental Assessment failed to evaluate the impacts of its plan to enlarge the dredging footprint by 15 acres and transport the dredged materials to Condado Lagoon Estuarine Reserve. Disposing dredged materials in Condado Lagoon threatens to contaminate and degrade this reserve.

9.      The Environmental Assessment also discounted harms to historic landmarks and cultural resources like El Morro, which is part of a World Heritage Site, and Old San Juan.

10.     Additionally, the Environmental Assessment ignored damage to infrastructure, water quality, and coral reefs from sediment. It ignored, for example, the effects of dumping more than two million cubic yards of dredged material in the ocean.

11.     Sediment will also degrade critical habitat and kill corals that are protected under the Endangered Species Act and provide coastal storm protection to San Juan. The Corps claimed there would be no damage to corals from dredging but arbitrarily limited its analysis of

impacts to a 150-meter zone. However, a similar Corps' dredging project in Florida killed a half-million corals with damage extending as far as 3,000 meters—20 times that zone.

12.     Compounding these problems, the Corps, the National Marine Fisheries Service (NMFS), and the Fish and Wildlife Service (FWS) failed to consult adequately on the impacts of the Dredging Project on endangered and threatened species, in violation of the Endangered Species Act (ESA).

13.     Plaintiffs El Puente, CORALations, and the Center for Biological Diversity bring this action challenging the Corps' actions under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*; the ESA, 16 U.S.C. §§ 1531–44; and the Administrative Procedure Act (APA), 5 U.S.C. § 702.

14.     Plaintiffs seek an order from this court vacating the Corps' invalid environmental documents and ordering completion of ESA consultation on endangered and threatened species. Plaintiffs also seek an order requiring the Corps prepare a supplemental Environmental Assessment or full Environmental Impact Statement that provides a complete analysis of the Dredging Project's impacts and considers alternatives and robust environmental safeguards. Pending completion of the ESA and NEPA documents, Plaintiffs seek to enjoin the Corps from soliciting bids for the Dredging Project, entering into dredging contracts, or any further implementation of the Dredging Project.

## JURISDICTION & VENUE

15.     The Court has jurisdiction over this matter under the ESA's jurisdictional provision, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331, because this case presents a federal question under the laws of the United States. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202,5 U.S.C. §§ 701–706, and 16 U.S.C. § 1540(g).

16.     Venue in this Court is proper under 28 U.S.C. § 1391. This action is brought

against an agency of the United States and officers of the United States acting in their official

capacities, and Defendants the Corps, Department of Commerce, and Department of Interior are

headquartered in the District of Columbia.

17.     Plaintiffs provided 60-days' notice of intent to file this suit pursuant to the citizen

suit provision of the ESA, 16 U.S.C. § 1540(g), by letter to Defendants dated June 13, 2022.

Defendants have not taken action to remedy their continuing violations by the date of this

complaint's filing. Therefore, an actual controversy exists between the parties under 28 U.S.C.

§ 2201.

## PARTIES

18.     El Puente de Williamsburg, Inc. is a nonprofit organization with offices in Puerto

Rico and Brooklyn, New York. In New York, El Puente founded the Community Alliance for the

Environment and co-founded the New York City Environmental Justice Alliance. Its Puerto Rico

program, Latino Climate Action Network, is comprised of a group of Puerto Rican residents

concerned about the impacts of air pollution and climate change in Puerto Rico. In 2013, El

Puente lead a campaign that fostered the Governor's signature on five Executive Orders in

support of climate mitigation and adaptation that, taken collectively, lead all stateside governors'

actions regarding climate change policy and paved the way for the approval of Act 33-2019, the

Puerto Rico Climate Change, Mitigation, Adaptation, and Resiliency Act. El Puente seeks to

build community sustainability through strategies to mitigate and plan for climate change. The

organization works with communities affected by Hurricane Maria and other environmental

crises by providing support and resources, including supplies and efforts to transform

communities to sustainable solar energy. Through community organizing and policy advocacy,

El Puente promotes environmental justice and climate change preparedness and prevention. El

Puente has long made efforts to address planning for climate change, sea level rise, food security, water availability, and the impacts of power generation on climate change. The San Juan Bay Dredging Project further entrenches the Puerto Rican energy system's reliance on fossil fuels, which El Puente actively worked against.

19.     El Puente brings this action on behalf of itself and its members, many of whom live near or regularly visit San Juan Bay. Some El Puente members are residents of the communities closest to the port and LNG terminal facilities, including the Sabana and Amelia Barrios of the Municipality of Guaynabo. Barrio Sabana borders Puerto Nuevo Bay, opposite the site of the LNG terminal, placing homes and families within 500 meters of the terminal's operations. The risks of an oil spill or LNG tanker accident occurring are of grave concern to the residents of the Barrio Sabana and El Puente members. El Puente's mission and work is frustrated by the San Juan Bay Dredging Project. El Puente's members' enjoyment of their neighborhoods, coast, and bay are adversely affected by the vessels, port activities, traffic, fossil fuel refining, and power generation. El Puente and its members have also suffered informational and procedural harms from the federal government's actions and omissions.

20.     For example, one of El Puente's members is an anthropologist who grew up and currently lives in San Juan, close to the San Juan Bay and the Condado Lagoon. Since childhood he has regularly visited these areas for recreation and work. His enjoyment of these areas, which includes things like, photography, walking, swimming, sailing, eating out, and visiting friends among other activities, are affected by the continuing deterioration of the air quality in Cataño and the changes in the landscape from a culturally astonishing and ecologically diverse space to a polluted and industrialized one. The smell of the fossil-fueled related activities in the neighborhoods closest to the plants causes him respiratory discomfort, nausea, and headaches.

Increasing the importation of LNG will only increase these harms, forcing him to change his lifestyle to avoid the affected areas. He has also been a consultant and member of the Scientific and Technical Advisory Committee of the San Juan Bay National Estuary Program. Therefore, the project's impacts on Condado Lagoon and the species that are part of this ecosystem harm his interests in it, especially after all the efforts to clean the lagoon and bring it back to a healthy state. As an anthropologist interested in the conservation of Puerto Rican heritage and cultural landscapes, the Dredging Project impairs those interests from its potential to harm underwater and coastal resources due to the dredging activities themselves and the erosion caused by the larger vessels. His informational and procedural interests were also frustrated because he, even as a resident of San Juan, lacked adequate information about the project and its potential impacts. The size and significance of this project should have had more public participation and discussion because San Juan Bay is the most important port in Puerto Rico and whatever happens there affects the economy, tourism, food security, and energy of the entire island territory. Finally, as a resident of Puerto Rico, he finds this project goes against federal and local public policy regarding climate change and Puerto Rico's goal of transitioning entirely to renewable energy. Increasing LNG imports also goes completely against the national goal to reduce fossil fuels.

21.     CORALations is an award-winning coral reef conservation organization based on the island of Culebra, Puerto Rico. The nonprofit organization was founded in San Juan, Puerto Rico, in 1995. CORALations maintains an annual membership base of about 500 people throughout Puerto Rico, including fishermen and others concerned with water quality and conservation of the archipelago's environment. CORALations' mission has three components: to conserve, nurture, and educate. In the interest of conservation, CORALations comments on the

sustainability of proposed development projects in the coastal zone, litigates coastal clean water issues, and comments on endangered species and fisheries legislation. Through past clean water litigation, CORALations was responsible for the implementation of stricter clean water standards for all of Puerto Rico's waters as well as the implementation of an overdue anti-degradation policy. CORALations has a longstanding interest in coral conservation, including partnering on the first successful staghorn coral farming and transplantation project to enhance coral conservation in U.S. Caribbean waters. CORALations also conducts surveys and research about coastal development, coral reef ecosystem health, and water quality in Puerto Rico. CORALations conducts extensive educational outreach efforts in Puerto Rico, including an ocean explorers group (Exploradores Marinos) and educational summer camp.

22.    CORALations brings this action on behalf of itself and its members, some of whom live in San Juan or visit San Juan Bay estuary for enjoyment of the natural environment. Members of CORALations have viewed, studied, and enjoyed elkhorn and staghorn corals and their habitat on numerous occasions, and intend to do so again in the future. They are concerned over the degraded status of the coral reef system in Puerto Rico, including the dwindling amount of habitat available for growth of elkhorn and staghorn corals. CORALations' members have visited San Juan Bay, the coast, and Condado Lagoon for research, observation, and enjoyment of corals, reef fish, seagrasses, manatees, and other wildlife in the estuary. They regularly engage in activities in the areas affected by the San Juan Bay Dredging Project. CORALations and its members depend on public disclosure of information and opportunities to participate in decisions about federal activities that impact Puerto Rico's corals and the marine environment.

23.    For example, one of CORALations' members has an apartment in Old San Juan. She has academic, professional, recreational, and conservation interests in coral reefs and the

human communities that depend on them. She has a degree in zoology and professional experience in forensic and environmental toxicology. She is motivated in part to conserve local reefs by researching the larval fish and corals that reefs can provide to damaged and depleted reefs hundreds of miles away. She works with fishermen to protect their joint interests in healthy coral reefs and abundant reef fish, including by partnering on projects to farm corals for later out-planting to help replenish natural reefs. Her interests in fisheries and coral reef habitat are harmed by the Dredging Project. Her work interests and support of fishermen, who depend on natural resources for their sustenance, will be adversely impacted by dredging, pollution, and vessel traffic. The environmental effects from the LNG terminal and shipping diminish the health and natural resources of the fisheries and habitat she works to protect. This Dredging Project highlights for her the Corps' failure to achieve sustainable coastal zone management objectives, including those related to water quality and social justice. She is particularly harmed by the Corps' plan to dump dredge waste in the designated estuarine reserve area of Condado Lagoon. Her interests in coral health and social justice are injured by the Corps' failure to consider alternatives to dumping dredge waste in Condado Lagoon and the ocean.

24.     Plaintiff Center for Biological Diversity is a nonprofit organization that advocates for the protection of threatened and endangered species and their habitats. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, sea birds, invertebrates, and fish are properly protected, including from threats from pollution, vessel traffic, and habitat destruction. The Center has more than 89,000 members, including members who live in Puerto Rico. The Center has a longstanding interest in the conservation of threatened corals, manatees, and sea

turtles in Puerto Rico, including efforts to protect them under the ESA. For example, the Center petitioned to protect elkhorn and staghorn corals under the Act, and it also has undertaken legal work to secure critical habitat protections and recovery plans for corals. The Center has also worked to protect habitat for other Caribbean wildlife and to reduce the risks to whales from vessel noise and ship strikes.

25.     The Center brings this action on behalf of itself and its members, some of whom live near or regularly visit San Juan Bay and Puerto Rico's coast to observe wildlife, boat, swim, snorkel, beachcomb, sightsee, and take pictures. Center members derive recreational and aesthetic enjoyment from their activities in these areas. Their enjoyment depends on the health and condition of the environment and wildlife that migrate through and live in the area—corals, whales, sea turtles, sea birds, manatees, and fish. They also benefit from the beauty of the San Juan Bay Estuary, its habitat, and clean air and water.

26.     For example, one Center member lives on the outskirts of San Juan and is harmed by the San Juan Bay Dredging Project and its impacts on wildlife and their habitat. He advocates for wildlife and has interests in the conservation and restoration of the San Juan Bay estuary. He is an avid bird watcher and goes to the San Juan Bay estuary to observe birds — including the Caribbean roseate tern that preys on estuary fish. This summer, he will go to San Juan Bay to bird watch and look for other wildlife, and he plans to regularly return in the future. He enjoys the natural beauty of the San Juan Bay estuary, its mangroves, and its fish and bird habitat. This member also has an affinity for manatees, and although he has yet to see a rare manatee in San Juan Bay, he knows they inhabit the estuary and hopes to see one there. The Dredging Project will suspend sediment and contaminants in the Bay that harm the Center member's interests in the estuary's birds and their prey; manatees; and other wildlife. In the past, he has witnessed the

harmful impacts of water pollution on Puerto Rico's birds and wildlife, and such the loss of animals has caused him profound sorrow. The loss of water quality and habitat that will be caused by the San Juan Bay Dredging Project thus injures the Center member's interests in the estuary's wildlife.

27.    Plaintiffs commented on the Corps' notice of its intent to prepare an Environmental Impact Statement and Draft Environmental Assessment for the San Juan Bay Dredging Project. The comments described concerns about the environmental effects of the proposal—including adverse impacts of dredging and vessels on wildlife, water quality, and pollution—and highlighted deficiencies of the environmental review. Plaintiffs' and their members' interests have been, are, and will be directly, adversely, and irreparably affected by the Defendants' violations of law. They have also suffered procedural and informational injuries from Defendants' actions and inactions. If Defendants had properly considered the environmental impacts from the Dredging Project as NEPA, ESA, and CWA require, they may have decided not to pursue the project or required measures that mitigate its harms, better preserving the public health, wildlife, water quality, recreation, and enjoyment in which Plaintiffs have interests. Plaintiffs' members will continue to be harmed by Defendants' unlawful actions until and unless this Court provides the relief prayed for in this Complaint.

28.    Defendant U.S. Army Corps of Engineers is a United States agency that regulates dredging activities in the navigable waters of the United States. It is the lead federal agency for the San Juan Bay Dredging Project. The Corps prepared the Environmental Assessment and Finding of No Significant Impact for the project. The Corps is responsible for its compliance with federal environmental laws, including NEPA, the Clean Water Act, and APA.

29.     Defendant Lieutenant General Scott A. Spellmon is sued in his official capacity as the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. Lieutenant General Spellmon is the federal official with the ultimate authority and responsibility for ensuring the Corps' compliance with federal environmental laws, including NEPA, the Clean Water Act, ESA, and APA, and he has authority to grant the relief requested in this complaint.

30.     Defendant Gina Raimondo is the Secretary of the Department of Commerce and is sued in her official capacity. The Commerce Department is responsible for conserving most marine species under the ESA. Secretary Raimondo is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Commerce Department and its agencies comply with all applicable laws and regulations, including the ESA and APA.

31.     Defendant National Marine Fisheries Service is an agency of the Department of Commerce. NMFS is the agency to which the Secretary of Commerce has delegated the authority to conserve most endangered and threatened marine species under the ESA.

32.     Defendant Debra Haaland is the Secretary of the Department of the Interior and is sued in her official capacity. The Interior Department is responsible for conserving most terrestrial and freshwater species under the ESA. Secretary is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Interior Department and its agencies comply with all applicable laws and regulations, including the ESA and APA.

33.     Defendant Fish and Wildlife Service is an agency of the Department of the Interior. FWS is the agency to which the Secretary of the Interior has delegated the authority to conserve most endangered and threatened terrestrial and freshwater species under the ESA.

## STATUTORY BACKGROUND

### National Environmental Policy Act (NEPA)

34.     NEPA is the nation's "basic national charter for protection of the environment," seeking to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(a)–(b) (2018).[1]

35.     NEPA mandates that federal agencies prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires that agencies take a "hard look" at the environmental impacts of their actions.

36.     The environmental review must discuss a proposed action's direct, indirect, and cumulative effects. 40 C.F.R. §§ 1502.16, 1508.9(b). It must include a reasonable range of alternatives, 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b), and provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

37.     Additionally, connected actions must be considered together. 40 C.F.R. § 1508.25(a)(1). Actions are connected if they "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

38.     Federal agencies must consider environmental justice in their activities under NEPA. Exec. Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 16, 1994).

---

[1] All NEPA regulations cited herein are to the 2018 edition of the Code of Federal Regulations that was in effect when the Corps issued its Environmental Assessment and Finding of No Significant Impact for this project.

39.     An agency may prepare an Environmental Assessment to determine whether the environmental impact of a proposed action may be "significant" and thus warrant preparation of an EIS. 40 C.F.R. §§ 1501.3, 1501.4(b)–(c).

40.     An agency's Environmental Assessment must discuss the need for the proposal, alternatives, and the environmental impacts of the proposed action and its alternatives. 40 C.F.R. § 1508.9. The Environmental Assessment must analyze not only the direct impacts of a proposed action, but also its indirect and cumulative impacts. *Id*. §§ 1508.7, 1508.8, 1508.25. The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id*. § 1508.8(a). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur. *Id*. § 1508.7. NEPA requires an analysis of all reasonable alternatives, even those not within the jurisdiction of the lead agency.*Id.* § 1502.14. The existence of a viable but unexamined alternative in an Environmental Assessment renders it inadequate.

41.     Actions with an impact on public health, endangered species, or unique geographic areas, or the presence of other factors may indicate that a project's impacts are significant and warrant an EIS. 40 C.F.R. § 1508.27(b). An agency may only issue a Finding of No Significant Impact for actions with absolutely no significant effects. *See* 40 C.F.R. § 1508.13. If an action *may* have a significant effect on the environment, or if there are substantial questions as to whether it may, an EIS must be prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3.

42.     NEPA requires that an agency "shall" supplement its environmental analysis when the "agency makes substantial changes in the proposed action that are relevant to

environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1).

### Clean Water Act

43.     Congress passed the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress added the National Estuary Program to the Act to identify "nationally significant estuaries that are threatened by pollution, development, or overuse" and promote their conservation and management because "maintaining the health and ecological integrity of these estuaries is in the national interest." 33 U.S.C. § 1330 note (1987) (Water Quality Act, Pub. L. No. 100–4, §317(a), 101 Stat. 61).

44.     The Clean Water Act prohibits the discharge of dredged material into waters of the United States unless the discharge complies with the requirements in Section 404 of the Act. 33 U.S.C. §§ 1311(a), 1344; *see* 33 C.F.R. § 336.1(a) (Section 404 of the Act "governs the discharge of dredged or fill material into waters of the U.S.").

45.     For federal dredging projects sponsored by the Corps and authorized by Congress, the Corps does not need to issue itself a 404 permit if it demonstrates in an Environmental Impact Statement submitted to Congress that the project will comply with the Section 404(b)(1) Guidelines. 33 U.S.C. § 1344(r). The 404(b)(1) Guidelines are statutorily required regulations that set the environmental criteria for evaluating and permitting discharges of dredged materials. 33 U.S.C. § 1344(b)(1).

46.     The 404(b)(1) Guidelines prohibit the discharge of dredged material "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a).

47.     The 404(b)(1) Guidelines mandate that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). Effects contributing to significant degradation include adverse effects on human health or welfare; special aquatic sites; life stages of aquatic life and other water dependent wildlife; aquatic ecosystem diversity, productivity, and stability; and recreational, aesthetic, and economic values. *Id.*

48.     The Corps must make findings that any discharge complies with the 404(b)(1) Guidelines while taking several factors into consideration, including suspension of particles and contaminants; harm to threatened or endangered species; adverse effects on wildlife and prey; smothering or other harm to seagrass beds and coral reefs; and impacts to fisheries, recreation, and aesthetics. 40 C.F.R. Part 230.

49.     The 404(b)(1) Guidelines require the Corps to take steps to "minimize potential adverse impacts of the discharge on the aquatic ecosystem," 40 C.F.R.. § 230.10(d), including *inter alia*, "locating and confining the discharge to minimize smothering of organisms," *id.* § 230.70(a), containing the discharge to prevent sources of pollution, *id.* § 230.72(c), and avoiding disposal sites with unique habitats. *Id.* § 230.75(c).

### Endangered Species Act

50.     The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

51.     Toward those goals, section 7(a)(2) requires that every federal agency "insure that [its] action is . . . not likely to jeopardize the continued existence" of threatened or endangered species or result in the destruction or adverse modification of their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

52.     The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6). The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. *Id.* § 1532(20). "Critical habitat" is habitat identified as essential to the conservation of a threatened or endangered species and requiring special management. *Id.* § 1532(5).

53.     For actions that may affect threatened or endangered species, agencies must consult with expert wildlife agencies—NMFS for marine species and FWS for terrestrial and freshwater species—on the impacts of the proposed action on listed species and their critical habitat. 16 U.S.C. § 1536(a)(2). Section 7(a)(4) also requires that every federal agency confer with the Services on the effects of its actions on species and habitat that are proposed for ESA protections. 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10.

54.     In fulfilling the consultation process, the Services "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). An agency may engage in informal consultation if the action is not likely to adversely affect a listed species or its critical habitat, and the Services concur in writing. 50 C.F.R. § 402.13. Otherwise, it must pursue formal consultation that results in a biological opinion.

55.     A biological opinion must include a summary of the information upon which the opinion is based; an evaluation of "the current status and environmental baseline of the listed species or critical habitat;" "effects of the action;" and "cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(1)–(3).

56.     Through the consultation process, if the Services conclude that the proposed action will not jeopardize the species, then the biological opinion must include an incidental take

statement that specifies the amount or extent of incidental take of the species, mitigation measures to minimize the impact, reporting requirements, and any other terms and conditions with which the action agency must comply. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

57.    After completion of consultation, the action agency and Services must review the ongoing impacts of the action and reinitiate consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," among other triggering events. 50 C.F.R. § 402.16. Both the action agency and the Services have a duty to reinitiate consultation. *Id*. The ESA specifies that consultation must typically be completed within ninety days of its initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e).

### Administrative Procedure Act

58.    Judicial review of federal agency action is governed by the APA. 5 U.S.C. §§ 701–706. Courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Under the Act, a person may also seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

### THE CORPS UNDERESTIMATED THE DAMAGE OF DREDGING SAN JUAN BAY

#### San Juan Bay Estuary Is a Cultural Heritage Site, Home to Coastal Communities, and Biological Gem

59.    San Juan Bay is a gateway to Puerto Rico with historic landmarks, El Morro and El Cañuelo, spanning the inlet that are part of the National Park System. El Morro is part of the San Juan National Historic Site that together with La Fortaleza is a UNESCO World Heritage Site—one of only eleven cultural sites in all the United States and its territories considered to be

of Outstanding Universal Value. These National Parks preserve the natural and cultural treasures of Puerto Rico, including the forts, castles, and city walls that protected Old San Juan.

60.     Puerto Rico's busiest port is in San Juan Bay. Vessels carrying goods, tourists, and petroleum products transit through the area. San Juan Bay provides storm protection and economic opportunities for coastal communities, including ecotourism and recreational activities. More than 1.5 million people live in the eight municipalities that surround the San Juan Bay Estuary. The coastal economy is connected to the Bay and its health.

61.     Congress designated San Juan Bay Estuary—a 3,400-acre ecosystem of connected rivers, bays, and lagoons—as a National Estuary due to its "national significance." *See* 33 U.S.C. § 1330. Biodiversity thrives in this unique freshwater-meets-saltwater ecosystem. The sensitive wetlands, mangroves, and estuarine habitats are home to an array of birds, fish, and plants.



Figure 1. Image of San Juan Bay. Source: Google Earth

62.     This urban watershed is home to many threatened and endangered animals that are federally protected under the ESA—sea turtles, manatees, corals, fish, and birds. Imperiled seabirds include threatened roseate terns and endangered yellow-shouldered blackbirds.

63.     Four types of endangered and threatened sea turtles occur in the area, including hawksbill, green (both North Atlantic and South Atlantic populations), leatherback, and loggerhead. Sea turtles nest on the sandy beaches of the San Juan Bay Estuary. Hawksbill sea turtles are critically endangered because their population has declined by 80 percent this century. Seagrass beds provide important sea turtle foraging grounds. Sea turtles are threatened by coastal development in Puerto Rico; and they are also at risk from entanglement in fishing gear, illegal trade, climate change, and vessel collisions.

64.     Threatened manatees swim the waters of San Juan Bay and forage on seagrasses in Condado Lagoon and elsewhere. There are fewer than 500 manatees in the Puerto Rico population. Injuries from vessels are a leading cause of manatee deaths. Sublethal injuries from vessels can have long term consequences on manatee fitness and survival, and many manatees have scars from vessel strikes.

65.     Several species of threatened corals lace the entrance of San Juan Bay and its lagoons. For example, threatened elkhorn and staghorn corals, which were the Caribbean's dominant reef building corals, have declined 90 percent in 30 years. Also in the area are pillar, mountainous star, boulder star, rough cactus, and lobed star corals—which are listed as threatened—and some have proposed critical habitat abutting the shipping channel.



Figure 2. ESA-listed species: West Indian manatee (C.S. Rogers (NOAA); elkhorn coral (J.P. Zegarra, FWS); staghorn coral (J.P. Zegarra, FWS); hawksbill sea turtle (D. Stansbury, FWS).

66.     One of the magical sites in San Juan Bay is Condado Lagoon, with its coral reefs, mangrove forests, and seagrass beds. The area was protected as the Condado Lagoon Estuarine Natural Reserve in 2013. Puerto Rico Law 112 (2013). The Condado Lagoon Reserve has important habitat that provides foraging, breeding, and nursing areas for a diverse array of wildlife. The lagoon provides birthing and foraging habitat for manatees, and hundreds of species of birds, fish, reptiles, amphibians, corals, and other invertebrates thrive there. Numerous small, ecologically friendly businesses also depend on the clean water and wildlife in Condado Lagoon Reserve.

67.     The natural and cultural values of San Juan Bay abound, and their importance cannot be overstated. The efforts of the National Estuary Program, a federally funded

management program, have restored water quality and wildlife habitat across more than 550 acres of the San Juan Bay Estuary.

### The Corps' San Juan Bay Dredging Project

68.     In 2015, the Corps initiated the San Juan Bay Dredging Project to attract larger vessels for oil and LNG, cargo, cruise ships, and opportunities for economic development. These massive vessels require deeper depths and wider channels to maneuver.

69.     If allowed to proceed, the Project will remove 2.2 million cubic yards of seafloor sediments to deepen and widen several shipping channels in San Juan Bay. Dredging will occur year-round and last approximately 14 months.



Figure 3. Depiction of the San Juan Bay Dredging Project and Terminals.

70.     In 2015, the Corps announced it would prepare an Environmental Impact Statement for the San Juan Bay Dredging Project. However, it ultimately prepared a less robust Environmental Assessment.

71.     In September 2017, shortly after the Corps issued a draft Environmental Assessment for the Project, Hurricane Maria ravaged Puerto Rico. Winds and floods wiped out power, water, communications, and other services to nearly every resident. It was Puerto Rico's most devastating hurricane on record. The hurricane caused extensive damage and destruction to homes, roads, and buildings across the island. It took an entire year to restore electricity to all homes that were blacked out by the hurricane.

72.     With basic public services disrupted and the challenges of caring for basic needs, most people in Puerto Rico were unable to comment on the Dredging Project or monitor or engage in the decisionmaking process. The Corps did not consult with the communities affected by the project, including environmental justice communities on the west side of San Juan Bay.

73.     Less than one year after Hurricane Maria, with many of the island's residents still reeling from its effects, the Corps released a final Environmental Assessment and Finding of No Significant Impact for the San Juan Bay Dredging Project in August 2018. Upon signing the Chief's Report, Lieutenant General Todd Semonite heralded the speed of the analysis as "SETTING THE PACE!!!"

**The Flawed Environmental Assessment and Finding of No Significant Impact**

74.     The Corps produced a hasty environmental review that failed to take a hard look at the environmental effects of dredging San Juan Bay. The agency made decisions that run counter to the record and failed to consider important information.

<u>The Scope of the Environmental Assessment Omitted the Harmful Effects of LNG
Development and Dredge Disposal in Condado Lagoon Reserve</u>

75.     The Corps' environmental review failed to analyze the environmental effects of

LNG development, including an LNG terminal built to receive the larger LNG tankers, and

disposal of dredged materials in Condado Lagoon Reserve.

76.     Since the Environmental Assessment and Finding of No Significant Impact for

the San Juan Bay Dredging Project, additional parts of the project have emerged: (1) a new LNG

terminal was constructed in 2020; and (2) the Corps threatened to expand dredging in San Juan

Bay and dump the dredge spoils in the Condado Lagoon Reserve. These new developments are

part-and-parcel of the San Juan Bay Dredging Project and should have been considered in the

Environmental Assessment. As should have the Corps and Port's additional dredging activities

for operation, maintenance, and berthing, and the ocean dumping of dredge spoils.

77.     First, approval of the San Juan Bay Dredging Project contributed to the

construction of a new LNG terminal at the port in 2020, the effects of which were not adequately

examined in the Corps' environmental review.

78.     The Corps failed to analyze the foreseeable effects of the new LNG terminal and

increased LNG imports stemming from the channel expansion. The Corps knew that LNG

development—including a new LNG terminal, LNG imports, and LNG use at power

plants—were linked to its project. Thus, the environmental effects should have been thoroughly

analyzed in the Environmental Assessment, which then would have required the preparation of

an EIS.

79.     The Dredging Project would allow LNG tankers to deliver the highly volatile fuel

to the LNG terminal in the southwestern portion of the Bay and to other fossil fuel terminals.

Since approval of the Dredging Project, New Fortress Energy completed construction of its LNG

24

terminal without a permit. The neighboring community, some less than a mile from the terminal, has expressed opposition to the Dredging Project and increased LNG transportation.

80.     The LNG tankers post-dredging will carry about six times the capacity of vessels that can currently access the port. In August 2020, Puerto Rico's Energy Board required a rapid integration of renewable energy in its Integrated Resource Plan, which governs how utilities will supply the electric system. Dredging that increases LNG tankers, LNG terminals, and LNG plants in San Juan Bay is contrary to the legally mandated Renewable Portfolio Standard adopted in the Integrated Resource Plan. Experts have shown that rooftop solar power in Puerto Rico would outperform a gas electric system.

81.     The dredging to enable LNG tankers perpetuates and increases Puerto Rico's dependence on fossil fuels for power. Power generation from LNG will pollute neighborhoods near the power plants in Puerto Nuevo, Cataño, and Guaynabo—including low-income and overburdened communities with a significant Black population. The Environmental Assessment failed to adequately consider the direct and indirect adverse effects of LNG tankers and terminals on the environment, public health, safety, and environmental justice.

82.     Second, the Corps' plan to expand the footprint of dredging from the shipping channel and discharge it in Condado Lagoon Reserve was omitted from the Environmental Assessment. The Corps proposed to dredge an additional 15-acre area adjacent to the San Juan Bay Dredging Project to transport it to Condado Lagoon for dumping the dredge spoils. The Corps states that it is doing so to fill depressions and create seagrass habitat. However, it failed to examine the numerous environmental harms that could also result.

83.     The San Juan Bay National Estuary Program, for which restoration of Condado Lagoon is a main priority, raised significant concerns about the Corps' proposal. This included

concerns about water quality, the suitability of dredged material, potential damage to seagrasses, and harm to fish and wildlife. The Puerto Rico Planning Board also determined that the Corps had not proven the project would be consistent with its Coastal Zone Management Program. At minimum, a more scientifically rooted and comprehensive environmental review is needed to explore impacts and alternatives and to avoid unintended and undesirable consequences.

84.     These two actions were dependent on the San Juan Bay Dredging Project and are part of the same action, and therefore should have been evaluated in the same environmental review. Instead, the Corps has improperly segmented the projects and thus precluded a comprehensive review of their combined environmental effects by the public and decisionmakers.

   Larger Vessels Intensify the Harmful Effects of Shipping Traffic

85.     The Corps failed to consider the environmental effects of the larger vessels using the deeper and wider shipping channel.

86.     The Corps failed to examine the environmental impacts of oil spills, leaks, and LNG explosions from these massive vessels. Given that a primary purpose of the project is to facilitate larger oil and LNG tankers, it was arbitrary for the Corps to ignore the risk these larger tankers will have an oil spill or LNG explosion.

87.     The risks of LNG transport became clear in June 2022 in Texas, when an explosion at a major LNG terminal resulted in a 450-foot high fireball that lasted five to seven seconds and a fire that burned for 30 minutes. The explosion resulted from a gas leak. The nearby residents were not evacuated or warned about the incident. The fire led to excess emissions of carbon monoxide, nitrous oxides, particulate matter, sulfur dioxide, and volatile organic compounds, according to an incident report filed with the Texas Commission on Environmental Quality.

88.     If the volatile LNG gas leaks from a tanker, terminal, or pipeline, it can create a low-lying vapor cloud. The gas is asphyxiating and can expand into neighborhoods and ignite if it touches a spark or flame source.

89.     The communities around San Juan Bay have experienced explosions before. In 2009, the Cataño oil refinery exploded. Flames and smoke filled the air and the fire burned for days. Nearby residents were exposed to toxic pollution and odors. Many homes were evacuated, schools closed, and people missed work. The explosion also caused an oil spill that killed wildlife, damaged wetlands, and harmed public health.

90.     The Corps not only failed to consider the environmental impacts like these that larger LNG vessels will have, but it also completely ignored the increase in vessel traffic that will result from an expanded shipping channel. The Environmental Assessment incorrectly assumes, without evidence, that vessel traffic will decrease. Its failure to analyze the potential for an increase in vessel traffic and its concomitant effects on wildlife and their habitat from noise, air, and water pollution is arbitrary and capricious.

91.     The larger vessels this project is designed to accommodate will increase pollution in San Juan Bay, yet the Corps failed to quantify or discuss the effects of the increased pollution from larger vessels. Bigger vessels will contribute more air, noise, and water pollution to San Juan Bay and the waters of Puerto Rico. The Environmental Assessment completely overlooked the additional underwater noise pollution the project will add, which will disturb and harass marine mammals.

92.     The Environmental Assessment also improperly ignores the increased probability of vessels hitting wildlife. Vessel collisions are a primary source of injury and death of whales

and manatees. Larger and faster vessels are more likely to harm marine mammals than smaller and slower vessels.

The Corps Failed to Assess Public Health and Environmental Justice Impacts

93.     The Environmental Assessment lacks an examination of the project's pollution impacts near the port. Instead, the Corps erroneously concluded the San Juan Bay Dredging Project would reduce onshore effects.

94.     Expanding the shipping channel means not only massive vessels, but also more petroleum products, cargo transport, and cruise ship pollution. The Corps had a duty to analyze the related environmental, health, and public safety effects of the increased pollution and traffic since the primary purpose of the project is to open port access for larger vessels carrying fossil fuels.

95.     LNG and oil tankers will crowd the fossil fuel terminals during offloading and cause noise, air, and other pollution near the residential areas of the Sabana Sector of Guaynabo. The larger tankers bring more LNG and greater risks related to gas volatility, explosions, and public health impacts.

96.     The Corps failed to consider the environmental impacts of these activities that will increase air pollution and degrade the environment. For example, refining and power generation from oil and LNG imports emit hazardous air pollutants—formaldehyde, benzene, toluene, hexane, and styrene—that cause eye, nose, and throat irritation; shortness of breath; fatigue; nausea; dizziness; and skin problems. Particulate matter pollution also increases the risk of severe COVID infections.

97.     Additionally, the industrial expansion will pollute low-income, environmental justice communities that have already been overburdened by pollution from the port traffic and petroleum terminals. The Corps only analyzed impacts to environmental justice communities in a

one-mile-radius circle drawn around the cruise ship slips, which missed entire affected communities on the west side of San Juan Bay.



Figure 4. Environmental Justice Communities in One-Mile Radius of San Juan Harbor Vessel Slips (Source: Draft Environmental Assessment, figure 2.18)

98.     The dredging will be near an electrical utility's seawater intake infrastructure. Increased suspended sediment from the Dredging Project risks reducing the generating units' condenser water system's efficiency, thereby reducing generation capacity with the potential for power outages and adverse public safety consequences.

99.     The Corps disregarded its duties to take a hard look at both the environmental justice and indirect effects of the San Juan Bay Dredging Project.

The Environmental Assessment Ignored Harms Corals and Other Wildlife

100.     The Corps wrongly discounted the impacts of the San Juan Bay Dredging Project on threatened and endangered wildlife.

101.    Here, the Corps determined that adverse effects to corals "will be insignificant." However, the Corps failed to consider significant impacts that dredging will have on several species of coral protected under the ESA. Historic dredging of the shipping channel removed and killed corals that had once existed there; nonetheless, listed corals and their habitat persist adjacent to the channel and along nearby shorelines. The San Juan Bay Dredging Project will suspend sediment in the water and smother corals and their habitat with significant, detrimental harm to these imperiled animals. The Corps relied on old information from dredging between 1980 and 2007 for its decision, yet the agency knew that the 2013 to 2015 Port Miami dredging resulted in extensive coral mortality and sediment cover. Notably, the Corps supplemented its environmental review for Port Everglades dredging to apply the lessons learned from Port Miami.

102.    Further, the Corps erroneously discounted the adverse effects because the closest mapped corals and critical habitat are beyond what the agency defined as a 150-meter zone of impact. Monitoring from Port Miami documented impacts on corals up to 20 times beyond that zone. The Corps ignored evidence in the record that the project will harm corals.

103.    The Corps' conclusion that the project has no significant impacts on marine mammals, sea turtles, birds, fish, and habitat is also flawed. Dredges can suck up and kill sea turtles and their seagrass food. Underwater noise interferes with the ability of marine mammals to communicate, forage, and breed. The Corps determined there would be "no effect" or positive effects on birds, but it disregarded harm to birds from artificial lighting and loss of prey. It also failed to examine effects on threatened roseate terns and endangered yellow-shouldered blackbirds. Overall, the Corps' cursory and inadequate environmental review led to Finding of No Significant Impact that is unsupported. The Environmental Assessment discounted the

potential for the San Juan Bay Dredging Project to harm marine mammals, sea turtles, birds, fish, and habitat.

### San Juan Bay Shipping Expansion Threatens Historic Landmarks

104.     The Environmental Assessment determined there would be no significant impacts to cultural or historic resources. There are two National Parks that protect Puerto Rico's historic landmarks at the entrance to San Juan Bay, which are also a designated UNESCO World Heritage Site. Called "the Guardians of the Caribbean," these forts—Castillo San Felipe del Morro (El Morro) and Castillo San Cristobal—have guarded San Juan Bay for hundreds of years. Underwater cultural resources in San Juan Bay also hold buried and undocumented shipwrecks and other cultural artifacts.

105.     These historic landmarks are at risk from erosion and structural damage from expanding the shipping channel and traffic from larger vessels. The Dredging Project will hasten damage, weathering, and erosion of the coast and structures. Underwater shipwrecks and other cultural resources are also at risk from widening the channel. The Corps discounted potential impacts to cultural and historic resources from the San Juan Bay Dredging Project.

106.     Not only does the Dredging Project risk erosion of cultural and historic resources, but also an increase of wave action and changes to sea level near residential areas around San Juan Bay. In comments, the Army Corps was asked to consider the effects of climate change on the coast and future projections relating to increases in sea level, coastal erosion, and wave-action.

107.     El Puente sought federal records on this subject under the Freedom of Information Act to understand the potential impacts of the Dredging Project on cultural resources. However, the responsive records were extensively redacted. The response thus omitted information essential to the public understanding the whole impact of the Dredging Project.

The Corps Failed to Consider Reasonable Alternatives

108.    The Environmental Assessment failed to consider a reasonable range of alternatives. The Corps considered the preferred action, a no-action alternative, and different dredging depths with no meaningful difference in their environmental impacts. The alternatives were so similar (comparing dredging in one-foot increments from 41- to 45-foot depths) that the Corps determined that the environmental effects were substantially the same. This is the result of the Corps' failure to include a true alternative that would be better for the environment and communities.

109.    The Corps should have considered a smaller project alternative, an alternative that incorporated additional mitigation for wildlife, habitat, and public health, and a renewable energy alternative that prioritized public health and the environment over bigger LNG and oil tankers. For example, the Puerto Rico Energy Public Policy Act mandates that the Commonwealth obtain 40 percent of its electricity from renewable resources by 2025, 60 percent by 2040, and 100 percent by 2050. The Corps was obligated to consider an alternative sensitive to and compatible with Puerto Rico's energy and environment goals.

The Corps Failed to Supplement Its Environmental Assessment

110.    The Corps has not supplemented the San Juan Bay Dredging Project's Environmental Assessment or prepared an EIS to consider the changed scope of activities and new information about significant impacts. For example, the Corps should have supplemented its Environmental Assessment when it proposed to expand dredging for Condado Lagoon Reserve disposal and in light of the new LNG terminal. Additionally, it should have supplemented the review with lessons learned about coral impacts from Port Miami dredging and other new studies on vessel noise, strikes, and other significant environmental impacts from dredging and shipping.

**The Corps Failed to Comply with the Clean Water Act**

111.    The Corps' decision to dump dredged material into the ocean and Condado

Lagoon Estuarine Reserve violates the Clean Water Act's 404(b)(1) Guidelines. The Corps has

failed to adopt the least environmentally damaging practicable alternative. A smaller project and

more robust mitigation were practicable and would reduce adverse environmental damage. For

example, the use of sediment curtains and requiring new seals on barges could reduce coral

smothering, but the Corps did not mandate either.

112.    Additionally, the discharge of 2.2 million cubic yards of dredged material will

significantly degrade water quality. The Corps' studies of composite core samples from the

navigation channel indicate the presence of toxins. When dumped at ocean sites, the associated

toxins may become concentrated as they move through the food chain. Suspended fine

particulate matter can transport associated toxins for miles.

113.    The discharge of dredged materials will harm threatened and endangered species,

including smothering coral reefs, and it will damage habitat and pollute a nationally significant

estuary. The Dredging Project will also degrade the recreational and economic values of San

Juan Bay.

114.    The Corps also did not prepare an Environmental Impact Statement as required by

the law for projects without a federal Clean Water Act permit. 33 U.S.C. § 1344(r).

**The Flawed Endangered Species Consultations Violate the ESA**

115.    The Corps' and Services' consultations on the impacts of the Dredging Project on

threatened and endangered species violate the ESA. The agencies failed to use the best available

science and erred in concluding that the Dredging Project is not likely to adversely affect ESA-

listed corals, manatees, or nesting sea turtles. They also completely failed to consult on the

Dredging Project's impacts to the threatened roseate tern and endangered yellow-shouldered blackbird.

116.    For its consultation on marine species, NMFS issued a 2018 Biological Opinion that purported to examine the effects of the Dredging Project and authorized the Corps to harm or kill hawksbill, green, and loggerhead sea turtles, and it concluded that the Dredging Project was not likely to adversely affect leatherback sea turtles, seven ESA-listed corals, Nassau groupers, scalloped hammerhead sharks, giant manta rays, blue whales, fin whales, sei whales, or sperm whales.

117.    FWS engaged in informal consultation and concurred with the Corps' conclusion that the Dredging Project was not likely to adversely affect manatees. Separately, FWS also determined the Dredging Project was not likely to adversely affect nesting sea turtles. The 2018 Concurrence Letter did not make determinations for threatened roseate terns or endangered yellow-shouldered blackbirds.

118.    First, the scope of the agency action considered in the consultation was improper. Second, the agencies underestimated the impacts of dredging on listed species and relied on speculative mitigation to conclude the Dredging Project was not likely to adversely affect species.

<u>The Services Unlawfully Defined the Action and Truncated Its Effects Analysis</u>

119.    The consulting agencies misleadingly limited the scope of the Dredging Project to only include impacts from the specific dredging activities.

120.    The Corps' description of the project's purpose is to accommodate larger, deeper-draft vessels, particularly for petroleum and LNG tankers. However, the Services excluded the vessel traffic and fossil fuel shipping from their analysis. By omitting the Dredging Project's purpose—to permit fully-loaded petroleum tankers, LNG tankers, and new LNG terminals—the

2018 Biological Opinion and Concurrence Letter are arbitrary and capricious. The dangers of accidents such as larger oil spills and LNG explosions should have been evaluated, as well as the increase in pollution from these larger fossil-fuel tankers.

121.    The limited scope of the action that the Services analyzed also omitted impacts of the Corps' proposal to expand dredging by 15 acres and depositing it in Condado Lagoon. Placing sediment in Condado Lagoon will increase turbidity and harm corals and their habitat. Condado Lagoon is critical habitat for elkhorn and staghorn corals and proposed critical habitat for boulder star coral. Further, dumping dredge spoils near the endangered leatherback and hawksbill sea turtle nesting beaches can disturb nesting females and change the composition of the sandy nesting habitat.

122.    The Service's definition of the action as limited to dredging itself also means that it overlooked the risks of larger vessels and traffic on listed species. Despite knowing that injury and death from vessel strikes is a threat to sea turtles and manatees, and that noise pollution from shipping overlaps with the sensitivity range of sea turtle hatchlings, the Services failed to consider the impacts from the larger ships for which the Corps is expanding the shipping channels in San Juan Bay.

123.    Vessel collisions are the greatest threat to the threatened Antillean manatee, which is regularly seen in San Juan Bay. FWS nonetheless failed to analyze the potential harm from the post-construction increase in vessel traffic in its Concurrence Letter.

124.    Nearly 200 endangered leatherback sea turtles were struck and killed by vessels in U.S. Atlantic and Gulf of Mexico waters between 2008 and 2017. Increasing the size of vessels amidst endangered leatherback sea turtle nesting sites increases the risk of vessel strikes and decreases their ability to reproduce. Dorado Beach, Puerto Rico's most important leatherback sea

turtle nesting site, and Condado Lagoon, also home leatherback nesting beaches, are near the entrance to San Juan Bay. Moreover, NMFS failed to consider the impacts of shipping noise on leatherback sea turtles. The increased noise pollution from vessel traffic and dredging harms marine habitat of endangered leatherback sea turtles. Hatchlings are also vulnerable to underwater noise. The omission of the risk of ship strikes and increasing ocean noise from shipping invalidates NMFS's conclusions that the Dredging Project is not likely to adversely affect endangered leatherbacks.

125.    NMFS found that the Dredging Project "may affect" green, hawksbill, and loggerhead sea turtles, which are also vulnerable to vessel strikes and disturbance from noise pollution, but it did not analyze the increased vessel strike risk and noise pollution from larger ships that will result from the Dredging Project.

Defendants Inadequately Assessed the Direct Impacts of Dredging on
Listed Species in San Juan Bay

126.    The agencies' consultations failed to consider the best available science and inadequately examined the harmful impacts of sedimentation and artificial lighting from dredging on ESA-listed species.

127.    NMFS improperly discounted the potential impacts on listed corals and their habitat. The Dredging Project's sediment will harm and kill threatened corals in San Juan Bay, Condado Lagoon, and under the transport path to the ocean dumping sites. The best available science that shows that the sediment plume and dispersion from dredging can harm and kill corals. Significant negative impacts to threatened corals include smothering, reduced feeding, and depleted energy reserves that lower calcification rates and reproductive output.

128.    However, NMFS improperly relied on speculative future mitigation measures to reach its conclusion on corals. It requires a turbidity monitoring plan to be developed prior to

construction, and if monitoring shows excessive turbidity, the Corps will implement some

unspecified mitigation measures. Based on information and belief, the Corps has not completed a

turbidity monitoring plan, nor has it made specific and binding plans to mitigate the negative

impacts on corals of sedimentation. Monitoring showed extensive coral damage from the Corps'

recent dredging and dredge spoil disposal activities in Honolulu, Hawaii, and the Port of Miami.

And this damage occurred even with monitoring in place. Thus, NMFS's reliance on a plan to

make a plan is invalid.

129.    For sea turtles, NMFS lacked the proper environmental baseline. The 2018

Biological Opinion failed to accurately describe the current snapshot of sea turtle health,

especially for endangered hawksbill sea turtles. Puerto Rico has one of two primary nesting sites

for the endangered hawksbill sea turtles, making it especially important for the species'

conservation. NMFS failed to consider other human activities in the action area that increase risk

to sea turtles. While the Biological Opinion notes incidental sea turtle take in commercial

fisheries, it does not quantify the estimated number of sea turtles killed in other dredging projects

in San Juan Harbor—including in 2017—or in the region. Nor does it include a specific

accounting of other Corps-permitted activities in Puerto Rico that contribute to sea turtle decline,

like development of beaches.

130.    The Services omitted analysis of the harmful impacts of artificial lighting for the

Dredging Project that will alter bird behavior, cause corals to be more susceptible to bleaching,

and disorient sea turtles. Increases in artificial lighting can adversely affect birds' behavior,

community composition, and cause stress. Roseate tern and yellow-shouldered blackbirds

exposed to artificial lighting may extend daytime behaviors into the night, experience

disorientation, and suffer decreased prey detection and navigation capacity.

131.    For corals, artificial light spurs a stress response, lowers photosynthesis performance, interferes with reproduction, and alters corals' chlorophyll and algae density parameters. In some cases, high light exposure interacts with warm water to trigger mass bleaching events.

132.    The lighting is dangerous for sea turtles, and it may disorient sea turtles approaching nesting beaches and sea turtle hatchlings going seaward. Artificial lighting ranked as the third highest threat to nesting and hatching sea turtles in the wider Caribbean Region. Yet FWS failed to consider the impact of artificial lighting from the dredges' 24-hour operations on sea turtles.

## FIRST CLAIM FOR RELIEF

### VIOLATIONS OF NEPA FOR ISSUING AN INADEQUATE ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT

133.    Paragraphs 1–132 are incorporated from this Complaint.

134.    The Corps' San Juan Bay Dredging Project is a major federal action within the meaning of NEPA.

135.    The Corps' Environmental Assessment and Finding of No Significant Impact are inadequate under NEPA because the agency failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of its decision before acting.

136.    The Corps segmented its environmental analysis and failed to examine connected actions.

137.    The Corps lacked sufficient evidence and adequate analysis of the environmental impacts of the project to support its ultimate Finding of No Significant Impact.

138.    The Environmental Assessment violates NEPA's requirement that the Corps consider a reasonable range of alternatives to the action.

139.    The Environmental Assessment and Finding of No Significant Impact are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, 42 U.S.C. § 4332(2)(C), E; 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, in violation of the APA. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

## VIOLATIONS OF NEPA FOR FAILURE TO PREPARE AN EIS

140.    Paragraphs 1–139 are incorporated from this Complaint.

141.    The Corps violated NEPA because it failed to prepare an EIS fully analyzing the environmental impacts of the San Juan Bay Dredging Project, including impacts to ESA-listed sea turtles, corals, and marine mammals and to public health and environmental justice from the Project's impacts. The agency's decision implicates several NEPA significance factors for when an EIS is required: it may have adverse impacts; it may affect geographically unique areas; it involves highly uncertain or unique or unknown risks; it has cumulatively significant impacts; it may cause loss or destruction of significant scientific, cultural, or historical resources; and it may adversely affect threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

142.    The Corps' failure to prepare an EIS constitutes an agency action unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. § 706(1). Alternatively, the Corps' authorization of the San Juan Bay Dredging Project without first preparing an EIS is arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. *Id*. § 706(2).

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF NEPA FOR FAILURE TO SUPPLEMENT NEPA

143.    Paragraphs 1–142 are incorporated from this Complaint.

144.    The Corps violated NEPA because it failed to supplement its NEPA analysis or prepare a new NEPA analysis in light of new information, in violation of NEPA, 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.9(d), and contrary to the standards of the APA. 5 U.S.C. § 706(1), (2)(A), (2)(D).

## FOURTH CLAIM FOR RELIEF

## VIOLATIONS OF THE CLEAN WATER ACT

145.    Paragraphs 1–144 are incorporated from this Complaint.

146.    The Corps violated the Clean Water Act because it did not prepare an Environmental Impact Statement and opted instead to only do an Environmental Assessment. 33 U.S.C. § 1344(r); 33 C.F.R. § 336.1(a).

147.    The Corps violated Clean Water Act Section 404(b)(1) and its implementing regulations. The San Juan Bay Dredging Project fails to ensure that related discharges will not have an unacceptable adverse impact on water quality or the environment. 40 C.F.R. Part 230.

148.    The Corps failed to comply with the Act's prohibition on a discharge into waters of the United States if there is a "practicable alternative" to the proposed discharge that would have a less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a).

149.    The Corps' failure to comply with 40 C.F.R. Part 230 is arbitrary and capricious, an abuse of discretion, not otherwise in accordance with law, and without observance of procedures required by law within the meaning of the APA. 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

## VIOLATIONS OF THE ESA AND APA:
## UNLAWFUL ESA CONSULTATION BY NMFS

150.    Paragraphs 1–149 are incorporated from this Complaint.

151.    The 2018 Biological Opinion and "not likely to adversely affect" determination are final agency actions within the meaning of the APA.

152.    NMFS's 2018 Biological Opinion is arbitrary, capricious, and contrary to law in that it is not based on the best scientific and commercial data available; fails to properly define the environmental baseline and cumulative effects; unlawfully defines the action and fails to consider the effects of the action; and otherwise fails to conduct a proper jeopardy analysis in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

153.    The 2018 Biological Opinion for green sea turtles (North Atlantic distinct population segment and South Atlantic distinct population segment), loggerhead sea turtles, and hawksbill sea turtles is arbitrary, capricious, and contrary to law in that its incidental take statement fails to include to include an amount or extent of take from vessel strikes by larger ships using the deepened channel; "reasonable and prudent measures" that minimize the impact of incidental take on these species from commercial ships using the deepened channel in San Juan Bay; and "terms and conditions" to implement those reasonable and prudent measures, in violation of the ESA and APA. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); 5 U.S.C. § 706(2)(A).

154.    NMFS's "not likely to adversely affect" determination is arbitrary, capricious, and contrary to law in that it is not based on the best scientific and commercial data available, in violation of the ESA and the APA. NMFS entirely ignored relevant factors; failed to analyze and develop projections based on information and methodology that was available; and relied on speculative future mitigation measures in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

155.    Because NMFS concurred with the Corps' "not likely to adversely affect"
determination for leatherback sea turtles and seven ESA-listed corals, it did not engage in formal
consultation and failed to properly determine whether the action, in combination with the
environmental baseline and cumulative effects, will jeopardize the species, in violation of the
ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).
Additionally, NMFS violated the ESA and APA because it failed to prepare an incidental take
statement that would have required that impacts to the species be minimized through mandatory
terms and conditions, which would have included monitoring and reporting requirements. 16
U.S.C. § 1536(b); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

## SIXTH CLAIM FOR RELIEF

### VIOLATIONS OF THE ESA AND APA:
### UNLAWFUL ESA CONSULTATION BY FWS

156.    Paragraphs 1–155 are incorporated from this Complaint.

157.    FWS's 2018 Concurrence Letter is a final agency action within the meaning of
the APA.

158.    The 2018 Concurrence Letter is arbitrary, capricious, and contrary to law in that
it is not based on the best scientific and commercial data available. FWS entirely ignored
relevant factors and failed to analyze and develop projections based on information and
methodology that was available, in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2);
50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

159.    Because FWS concurred with the Corps' "not likely to adversely affect"
determination, it did not engage in formal consultation and failed to properly determine whether
the action will jeopardize the manatee and leatherback sea turtle, in violation of the ESA and the
APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A). Additionally, FWS

violated the ESA and EPA because it failed to prepare an incidental take statement that would have required that impacts to the species be minimized through mandatory terms and conditions, which would have included monitoring and reporting requirements. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

## SEVENTH CLAIM FOR RELIEF

## VIOLATIONS OF THE ESA: FAILURE TO CONSULT AND CONFER

160.   Paragraphs 1–159 are incorporated from this Complaint.

161.   The Corps and FWS failed to consult on the effects of the Dredging Project on the roseate tern and yellow-shouldered blackbird.

162.   The ESA and its implementing regulations require the Corps to complete consultation taking any action that may affect a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

163.   Dredging and transporting dredge spoils to ocean dump sites suspends sediment that smothers corals. Placing sediment in Condado Lagoon will increase turbidity and harm corals and their habitat.

164.   The Corps and NMFS failed to confer on the effects of the Dredging Project on the proposed critical habitat for Caribbean boulder star coral, lobed star coral, mountainous star coral, pillar coral, and rough cactus coral.

165.   The Corps and NMFS must confer on any activity that is likely to result in the destruction or adverse modification of critical habitat proposed to be designated. 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10.

166.   Accordingly, Defendants are required to complete section 7 consultation and conference on the Dredging Project's effects on these species. In the absence of completion of

section 7 consultation and conference, Defendants are in violation of their duties under the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2), (a)(4); 50 C.F.R. §§ 402.10, 402.14.

## EIGHTH CLAIM FOR RELIEF

### VIOLATIONS OF THE ESA: UNLAWFUL RELIANCE ON THE 2018 BIOLOGICAL OPINION, NMFS'S NOT LIKELY TO ADVERSELY AFFECT DETERMINATION, AND FWS'S CONCURRENCE LETTER

167.    Paragraphs 1–166 are incorporated from this Complaint.

168.    The Corps unlawfully relied on the 2018 Biological Opinion, NMFS's "not likely to adversely affect" determination, and FWS's Concurrence Letter. By relying on NMFS's and FWS's legally flawed determinations for sea turtles, manatees, corals, or their critical habitats, the Corps is failing to ensure that it is not likely to jeopardize the continued existence of these species or result in the destruction or adverse modification of their critical habitat in violation of section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

## NINTH CLAIM FOR RELIEF

### VIOLATIONS OF THE ESA: FAILURE TO REINITIATE AND COMPLETECONSULTATION

169.    Paragraphs 1–68 are incorporated from this Complaint.

170.    The Corps retains ongoing discretionary control and involvement over the Dredging Project. The Corps' management and authorization of the Dredging Project constitute agency "action" subject to consultation under section 7 of the ESA. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.02, 402.03.

171.    New information reveals that NMFS's 2018 Biological Opinion and "not likely to adversely affect" determination and FWS's Concurrence Letter are flawed for the reasons explained herein, including the expansion of the Dredging Project and the fact that recent dredging projects had a greater impact on corals than the Corps anticipated. NMFS's 2018

Biological Opinion and "not likely to adversely affect" determination and FWS's Concurrence Letter cannot and do not relieve the Corps of its independent duty to avoid jeopardy and destruction or adverse modification of critical habitat.

172.    The duty to reinitiate consultation lies with the Corps, NMFS, and FWS. Thus, each of these agencies is in violation of section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2).

173.    The Corps, NMFS, and FWS have failed to reinitiate and complete consultation on the impacts of the Dredging Project on green (North Atlantic and South Atlantic populations), loggerhead, hawksbill, and leatherback sea turtles; seven ESA-listed corals (including critical habitat); Antillean manatees; roseate terns; and yellow-shouldered blackbirds. This violates section 7(a)(2) of the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.16.

174.    The refusal to reinitiate and complete consultation on the impacts of the Dredging Project on these threatened and endangered species and their critical habitats despite new evidence of impacts from these activities in a manner or to an extent not previously considered constitutes arbitrary and capricious agency action, agency action "unlawfully withheld or unreasonably delayed," and/or agency action made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(1), (2)(A), (2)(D).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

1.    Declare that the Corps' Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

2.    Declare that the Corps' failure to prepare an EIS violates NEPA, its implementing regulations, and the APA;

3.    Declare that the Corps' failure to supplement its environmental analysis violates NEPA, its implementing regulations, and the APA;

4.      Declare that the Corps is in violation of the Clean Water Act;

5.      Declare that Defendants violated the ESA and its implementing regulations by failing to ensure that the Dredging Project will neither jeopardize the continued existence of threatened or endangered species nor destroy or adversely modify species' critical habitat;

6.      Declare that the Corps', NMFS's, and the FWS's failure to reinitiate and complete consultation violates the ESA and APA;

7.      Order Defendants to reinitiate and complete consultation by a date certain on the impacts of the Dredging Project on green, hawksbill, loggerhead, and leatherback sea turtles; the seven ESA-listed species of corals, the manatee, roseate tern, and yellow-shouldered blackbird;

8.      Order Defendants to complete conference on the Dredging Project's impacts on proposed critical habitat for the Caribbean boulder Star Coral, lobed star coral, mountainous star coral, pillar coral, and rough cactus coral;

9.      Vacate and set aside the Environmental Assessment and Finding of No Significant Impact the Corps issued for the Dredging Project;

10.     Order the Corps to prepare a supplemental Environmental Assessment or EIS in compliance with NEPA that includes an Environmental Justice Assessment;

11.     Vacate the Corps' Biological Assessments, NMFS's 2018 Biological Opinion and "not likely to adversely affect" determination, and the FWS's 2018 Concurrence Letter;

12.     Order the Corps to cease pursuing dredging contracts or any further implementation of the Dredging Project pending completion of the Environmental Assessment or EIS and ESA section 7 consultations;

13.     Award Plaintiffs their costs of this action, including reasonable attorneys' fees; and

14.     Grant such other relief as this Court deems just and proper.


Dated:  August 16, 2022.                          Respectfully submitted,


                                                   /s/ *Catherine Kilduff*

                                                  Catherine Kilduff, DC Bar No. 1026160
                                                  Julie Teel Simmonds, DC Bar No. CO0091
                                                  Miyoko Sakashita, DC Bar No. CA00061
                                                  CENTER FOR BIOLOGICAL DIVERSITY
                                                  1212 Broadway, Suite 800

Oakland, CA 94612
(510) 844-7100
ckilduff@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org
miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs*