**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EL PUENTE, et al.,

       *Plaintiffs*,

   v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

       *Defendants*.

Case No.: 1:22-cv-02430-CJN

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

    I.     San Juan Bay's Cultural, Ecological, Economic, and Historical Qualities ........... 3

    II.    The San Juan Bay Dredging Project ....................................................... 4

    III.   The Corps' Review Minimized the Project's Impacts ............................... 5

STANDARD OF REVIEW .......................................................................................... 8

PLAINTIFFS HAVE STANDING ............................................................................... 8

ARGUMENT ................................................................................................................ 9

    I.     The Plain Language of the Clean Water Act Mandates the Corps Prepare an Environmental Impact Statement ................................................. 9

    II.    The Environmental Assessment Is Inadequate ..................................... 12

          A.    The Environmental Assessment Omitted Connected Actions ................. 13

               1.    LNG Infrastructure Depended on Deepening and Widening the Channel .................................................. 14

               2.    Dredging Begets More Dredging ................................... 16

          B.    The Environmental Justice Analysis Contained Fatal Errors ................. 17

          C.    The Air Pollution Analysis Was Inadequate ............................. 22

          D.    The Corps' Conclusion of No Effects on Corals Contradicted the Science .................................................. 24

               1.    The evidence disproves the Corps' 150-meter impact zone for corals .......................................... 25

               2.    A promise of a monitoring plan is not enough ................. 28

3. The Corps' arbitrary analysis of coral impacts also violates the  Clean Water Act 404(b)(1) guidelines.................... 29

E. The Environmental Assessment Dismissed Risks to Historic Resources ................................................................... 30

F. The Environmental Assessment Ignored Seabed Damage and Omitted Risks of Oil Spills and LNG Accidents .............................. 33

G. The Cumulative Impacts Analysis Is Inadequate...................................... 35

H. The Alternatives Analysis Does Not Pass Muster .................................... 36

III. NEPA Required the Corps to Prepare an Environmental Impact Statement .................................................................... 38

IV. The Determinations that the Project Is Not Likely to Adversely Affect Species Under the Endangered Species Act Violate the Law .................. 42

A. The Fisheries Service Failed to Use the Best Available Science on Dredging Effects on Corals.................................................. 44

1. The Unwritten Monitoring Plan Does Not Ensure Against Harm to Corals ........................................................ 45

2. The Agency's Post-Hoc Rationalizations Are Unpersuasive........................................................................ 48

B. The Fish and Wildlife Service Unlawfully Determined the Project Is Not Likely to Adversely Affect Manatees................................ 49

C. The Corps Unlawfully Relied on the Service's Flawed Consultations.......................................................................... 51

V. The Corps Unlawfully Failed to Confer on Coral Proposed Critical Habitat.................................................................... 52

VI. The Court Should Vacate the Finding of No Significant Impact, Environmental Assessment, and "Not Likely to Adversely Affect" Determinations ...................................................................... 54

CONCLUSION.................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs,*
606 F.Supp. 2d 121 (D.D.C. 2009) .................................................................. 37

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 54

*ALLTEL Corp. v. FCC,*
838 F.2d 551 (D.C. Cir. 1988) ........................................................................ 47

*Am. Bird Conservancy v. FCC,*
516 F.3d 1027 (D.C. Cir. 2008) ...................................................................... 53

*\*Am. Rivers v. FERC,*
895 F.3d 32 (D.C. Cir. 2018) ................................................................... passim

*Bd. of Cty. Comm'rs of Rocky Mt. Wild v. Bureau Land Mgmt.,*
584 F.Supp. 3d 949 (D. Colo. 2022) ............................................................... 53

*Bd. of Miss. Levee Comm'rs v. U.S. EPA,*
674 F.3d 409 (5th Cir. 2012) .......................................................................... 10

*California v. Bernhardt,*
No. 4:18-cv-05712-YGR, 2020 WL 4001480 (N.D. Cal. July 15, 2020) ............... 21

*Cape Fear River Watch v. U.S. Army Corps of Eng'rs,*
No. 7:21-CV-138-FL, 2022 WL 4468268 (E.D.N.C. Sep. 26, 2022) ................... 40

*Cent. Bank of Denver v. First Interstate Bank,*
511 U.S. 164 (1994) ...................................................................................... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ...................................................................................... 54

*City of Phoenix v. Huerta,*
869 F.3d 963 (D.C. Cir. 2017) ........................................................................ 31

*Conner v. Buford,*
848 F.2d 1441 (9th Cir. 1988) ........................................................................ 45

*Cottonwood Env't. Law Ctr. v. U.S. Forest Service,*
789 F.3d 1075 (9th Cir. 2015) ........................................................................ 52

*Ctr. for Biological Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) .......................................................................... 46

*Ctr. for Biological Diversity v. Ross*,
480 F.Supp. 3d 236 (D.D.C. 2020) ........................................................... 54

*Ctr. for Biological Diversity v. Salazar*,
804 F.Supp. 2d 987 (D. Ariz. 2011) ......................................................... 46

*\*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ................................................................ 14

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ....................................................................... 20, 48

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ............................................................... 37, 40

*Env't Def. Fund, Inc. v. U.S. Army Corps. of Eng'rs*,
492 F.2d 1123 (5th Cir. 1974) .................................................................. 37

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
401 F.Supp. 2d 1298 (S.D. Fla. 2005) ...................................................... 15

*Friends of the Earth v. Laidlaw Env't. Servs., Inc.*,
528 U.S. 167 (2000) .................................................................................... 9

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) .................................................................. 48

*Gov't of Man. v. Salazar*,
691 F.Supp. 2d 37 (D.D.C. 2010) ............................................................ 35

*Gov't of the Province of Manitoba v. Norton*,
398 F.Supp. 2d 41 (D.D.C. 2005) .............................................................. 8

*Grand Canyon Tr. v. FAA*,
290 F.3d 339 (D.C. Cir. 2002) ........................................................ passim

*Great Old Broads for Wilderness v. Kempthorne*,
452 F.Supp. 2d 71 (D.D.C. 2006) ............................................................ 35

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
80 F.Supp. 2d 1137 (W.D. Wash. 2000) ................................................... 45

*Hammond v. Norton*,
370 F.Supp. 2d 226 (D.D.C. 2005) ........................................................... 14

*High Country Conservation Advocates v. U.S. Forest Serv.*,
52 F.Supp. 3d 1174 (D. Colo. 2014) ......................................................... 33

*Humane Soc'y of the U.S. v. Dept. of Comm.,*
   432 F.Supp. 2d 4 (D.D.C. 2006) ................................................................. 28

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ............................................................................. 9

*La. Env't. Action Network v. U.S. EPA,*
   955 F.3d 1088 (D.C. Cir. 2020) ............................................................. 11

*Louisiana v. Lee,*
   758 F.2d 1081 (5th Cir. 1985) ............................................................... 33

*Massachusetts v. U.S. EPA,*
   549 U.S. 497 (2007) ........................................................................... 10

*Mayo v. Jarvis,*
   177 F.Supp. 3d 91 (D.D.C. 2016) .......................................................... 52

*Monongahela Power Co. v. Marsh,*
   809 F.2d 41 (D.C. Cir. 1987) ............................................................... 12

*Mont. Env't. Info. Ctr. v. U.S. Office of Surface Mining,*
   274 F.Supp. 3d 1074 (D. Mont. 2017) .................................................. 16

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ......................................................................... 8, 51

*Nat. Res. Def. Council v. Houston,*
   146 F.3d 1118 (9th Cir. 1998) ............................................................. 48

*Nat. Res. Def. Council v. Rauch,*
   244 F.Supp. 3d 66 (D.D.C. 2017) ........................................................ 47

*Nat. Res. Def. Council, Inc. v. Callaway,*
   524 F 2d. 79 (2nd Cir. 1975) ............................................................... 36

*Nat. Res. Def. Council, Inc. v. Herrington,*
   768 F.2d 1355 (D.C. Cir. 1985) ........................................................... 13

*Nat. Res. Def. Council, Inc. v. Winter,*
   518 F.3d 658 (9th Cir. 2008), *rev'd on other grounds,* 555 U.S. 7 (2008) .............. 40

*Nat'l Parks Conservation Ass'n v. Jewell,*
   62 F.Supp. 3d 7 (D.D.C. 2014) ........................................................... 43

*\*Nat'l Parks Conservation Ass'n v. Semonite,*
   916 F.3d 1075 (D.C. Cir. 2019) ................................................. 32–33, 39

*New Fortress Energy Inc. v. FERC,*
 36 F.4th 1172 (D.C. Cir. 2022) ............................................................... 15

*New York v. Nuclear Regul. Comm'n,*
 681 F.3d 471 (D. C. Cir. 2012) ............................................................... 34

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
 402 F.3d 846 (9th Cir. 2004) ............................................................... 34

*Pres. Our Island v. U.S. Army Corps of Eng'rs,*
 No. C08-1353RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009) ...................... 47, 50, 51

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989) ............................................................... 21

*Russello v. United States,*
 464 U.S. 16 (1983) ............................................................... 11

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.,*
 255 F.Supp. 3d 1035 (D. Mont. 2017) ............................................................... 52

*Sierra Club v. Flowers,*
 423 F.Supp. 2d 1273 (S.D. Fla. 2006),
 *vacated as moot* 526 F.3d 1353 (11th Cir. 2008) ............................................... 45, 52

*Sierra Club v. Mainella,*
 459 F.Supp. 2d 76 (D.D.C. 2006) ............................................................... 32

*Sierra Club v. Peterson,*
 717 F.2d 1409 (D. C. Cir. 1983) ............................................................... 13, 38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
 255 F.Supp. 3d 101 (D.D.C. 2017),
 *vacated on other grounds*, 985 F.3d 1032 (D.C. Cir. 2021) ........................... 20, 22

*Surf & Env't Conservation Coal. v. Dep't of the Army,*
 322 F.Supp. 2d 126 (D.P.R. 2004) ............................................................... 30

*Tenn. Valley Auth. v. Hill,*
 437 U.S. 153 (1978) ............................................................... 42

*Thomas v. Peterson,*
 753 F.2d 754 (9th Cir. 1985) ............................................................... 49

*Union Neighbors United, Inc. v. Jewell,*
 831 F.3d 564 (D.C. Cir. 2016) ............................................................... 37

*Utahns for Better Transp. v. U.S. Dept. of Transp.*,
  305 F.3d 1152 (10th Cir. 2002) ................................................................ 37, 38

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
  6 F.4th 1321 (D.C. Cir. 2021) ........................................................................ 18

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) .......................................................................... 52

*Wild Va. v. U.S. Forest Serv.*,
  24 F.4th 915 (4th Cir. 2022) ........................................................................... 28

*WildEarth Guardians v. Bernhardt*,
  502 F.Supp. 3d 237 (D.D.C. 2020) ........................................................... 23, 35

*WildEarth Guardians v. Zinke*,
  368 F.Supp. 3d 41 (D.D.C. 2019) ................................................................... 23

## Statutes

5 U.S.C. § 706(2) ............................................................................................. 54

5 U.S.C. § 706(2)(A) .......................................................................................... 8

*16 U.S.C. § 1536(a)(2) ............................................................................ passim

*16 U.S.C. § 1536(a)(4) ................................................................................... 53

16 U.S.C. § 1536(b)(4) ..................................................................................... 44

16 U.S.C. § 1540(g)(1)(A) .................................................................................. 8

33 U.S.C. § 1251(a) .......................................................................................... 12

33 U.S.C. § 1311(a) .......................................................................................... 12

33 U.S.C. § 1330 .............................................................................................. 39

33 U.S.C. § 1344(b) .......................................................................................... 29

*33 U.S.C. § 1344(r) ................................................................................. passim

*42 U.S.C. § 4332(2)(C) ........................................................................ 12, 38, 42

42 U.S.C. § 4332(2)(C)(iii) ......................................................................... 12, 36

42 U.S.C. § 4332(2)(E) ............................................................................... 12, 36

54 U.S.C. § 100101 ...................................................................................................30

**Other Authorities**

2 Env't & Energy L. & Pol'y J. 5 (2007).................................................................. 34

Eric Hull, *Missing the Boat on Protecting Human Health and the Environment*,
   81 Temp. L. Rev. 1035, 1036 (2007)............................................................. 22, 23

Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb 11, 1994) ...................................... 18

Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv.,
   Endangered Species Consultation Handbook (1998) ...................................... 43, 53

P.R. Law 17 (2019) ....................................................................................................... 1

**Regulations**

40 C.F.R. pt. 230 ........................................................................................................ 12

40 C.F.R. § 230.1(d) ................................................................................................... 29

40 C.F.R. § 230.11(c) ................................................................................................. 29

40 C.F.R. § 230.44 ...................................................................................................... 29

40 C.F.R. § 1500.1(a) .................................................................................................. 12

40 C.F.R. § 1500.1(b) .................................................................................................. 12

40 C.F.R. § 1501.4(a)–(c) ............................................................................................ 10

40 C.F.R. § 1502.14 ..................................................................................................... 36

40 C.F.R. § 1508.25(a)(1) ............................................................................................ 14

40 C.F.R. § 1508.25(a)(1)–(2) ..................................................................................... 14

40 C.F.R. § 1508.27 ..................................................................................................... 38

40 C.F.R. § 1508.27(b) ................................................................................................ 39

40 C.F.R. § 1508.27(b)(7) ............................................................................................ 35

40 C.F.R. § 1508.7 ............................................................................................. 12, 14, 35

40 C.F.R. § 1508.8 ....................................................................................................... 12

40 C.F.R. § 1508.9 .................................................................................................... 10

40 C.F.R. § 1508.9(b) ......................................................................................... 12, 36

46 C.F.R. § 153.40 .................................................................................................... 34

50 C.F.R. § 402.03 .................................................................................................... 54

50 C.F.R. § 402.10 ...................................................................................................... 8

50 C.F.R. § 402.10(a) ............................................................................................... 53

50 C.F.R. § 402.12 .................................................................................................... 43

50 C.F.R. § 402.12(d) ........................................................................................... 8, 43

50 C.F.R. § 402.14(b) ............................................................................................... 43

**Federal Register Notices**

51 Fed. Reg. 19,926 (June 3, 1986) ......................................................................... 43

82 Fed. Reg. 16,668 (Apr. 5, 2017) ............................................................... 7, 49, 51

82 Fed. Reg. 44,639 (Sept. 25, 2017) ......................................................................... 4

82 Fed. Reg. 46,820 (Oct. 6, 2017) ............................................................................. 4

85 Fed. Reg. 76,302 (Nov. 27, 2020) ............................................................ 8, 24, 53

**Legislative History**

122 Cong. Rec. 16552 (1976) (Wright Amendment) .................................................. 11

155 Cong. Rec. 25853 (2009) (statement of Rep. Rangel) .......................................... 34

H.R. 3199, 95th Cong. (1997) (enacted) .................................................................... 11

S. 1952, 95th Cong. (1997) ........................................................................................ 11

Section 404 of the Federal Water Pollution Control Act Amendments of 1972:
    Hearings Before the S. Comm. on Pub. Works, 94th Cong. 226 (1972) .................. 11

\* Cases and authorities on which Plaintiffs chiefly rely.

## INTRODUCTION

At the center of this controversy is a massive federal dredging project that will deepen and widen shipping channels allowing large oil and liquefied natural gas (LNG) tankers access to San Juan Bay, Puerto Rico. When conceived by the U.S. Army Corps of Engineers, a big federal project to import foreign oil and LNG to Puerto Rico matched the Commonwealth's energy generation plans. These plans went awry when—during the public comment period on the dredging project—Hurricanes Irma and Maria struck Puerto Rico. The storms caused blackouts, flooding, fatalities, and food and water shortages throughout Puerto Rico. With basic needs unmet and broken power and communication services, the storms severely hampered public participation in the Corps' process. It took months to restore electricity and exposed the centralized system's vulnerability. In the aftermath, the Corps pushed through final approvals for the dredging project. In 2019, a Puerto Rico law sought energy independence and reform of the "vertically integrated monopolistic" electric power system by committing to achieve 40 percent renewable energy by 2025 and 100 percent by 2050. P.R. Law 17 (2019). Now, dredging the Bay to import oil and LNG on large tankers is inconsistent with Puerto Rico's energy plans. But undeterred, the Corps wants to start dredging this summer.

The Corps plans to dredge San Juan Bay day-and-night for one year to remove 2.2 million cubic yards of seafloor and dump it in the ocean. The project will harm the Bay's neighborhoods and wildlife, and it locks-in Puerto Rico's dependence fossil fuel imports from Nigeria, Trinidad, Canada, and Baltic states. USACE_000156. Yet the agency failed to evaluate these threats in an environmental impact statement—as required by the plain language of the Clean Water Act, 33 U.S.C. § 1344(r)—despite the Corps' original announcement that it would prepare one. USACE_007577.  Instead, the Corps fast-tracked an environmental assessment with major errors and omissions that violate the National Environmental Policy Act (NEPA).

The flawed environmental assessment does not take a hard look at the dredging project's environmental impacts. Importantly, it ignores the effects of constructing and operating an LNG terminal to receive routine imports by large LNG tankers. It also omits the project's effects on environmental justice communities in Cataño and Guaynabo—already overburdened by air pollution from the port and power plants—that are closest to the tanker channel, oil docks, and LNG terminal and thus most likely to be exposed to pollution. Those communities were neither considered, nor able to participate in the decision-making process.

The Corps underestimated the toll the project would take on marine life, especially coral reefs that protect the coast from storms and erosion. The environmental assessment contradicts evidence that the dredging project will damage corals. The Corps only evaluated impacts within a 150-meter zone when it knew that dredging could harm corals far beyond that zone. A few years prior, a Corps' dredging project smothered and likely killed a million corals, with harm that extended up to 15 kilometers away. NMFS_00678.

The Corps also failed to address the National Park Service's concerns that the project may accelerate erosion of iconic historic landmarks like Castillo San Filipe del Morro (El Morro) and degrade Spanish-era cultural resources that date back to the 1500s. These and other topics in the environmental assessment lack sufficient analysis, which also means that the agency overlooked possible mitigation that would better protect neighborhoods and wildlife.

Finally, the Fish and Wildlife Service and National Marine Fisheries Service greenlighted the project despite serious flaws with their analyses of the impacts of the project on threatened and endangered animals, including corals and manatees. Their conclusions contradict the best available scientific information and thus violate the Endangered Species Act.

In sum, Defendants' unlawful actions and inactions violate the statutory requirements of the Clean Water Act, NEPA, and the Endangered Species Act. The Court should grant Plaintiffs' motion for summary judgment and vacate and remand the agencies' decisions. A renewed opportunity for communities in Puerto Rico and decisionmakers to have a meaningful and comprehensive environmental review of the dredging project will go a long way toward preventing damage to the environment.

**STATEMENT OF FACTS**

**I.      San Juan Bay's Cultural, Ecological, Economic, and Historical Qualities**

San Juan Bay on Puerto Rico's northern coast serves important cultural, ecological, economic, and historical functions for the region. It is a critical part of the estuary system, with various lagoons, channels, and a canal linking to the Bay. USACE_000073. San Juan Bay is also a Puerto Rico's largest port. Answer ¶ 1, ECF No. 14. On the shores of the Bay are densely populated neighborhoods, including the cities of Old San Juan, Guaynabo, and Cataño. USACE_000108.

Two historic landmarks that span the inlet of San Juan Bay are preserved for their heritage and cultural values: Castillo de San Felipe del Morro (El Morro) and Fortín San Juan de la Cruz (El Cañuelo). USACE_002643; Answer ¶ 1. The San Juan National Historic Site adjacent to the bay is also recognized as a United Nations' World Heritage Site for outstanding universal value. Answer ¶ 59.

Coral and seagrass are a vital part of the region's ecosystem, providing habitat for a vast array of marine life and protecting the coast from erosion and storms. NMFS_00935. Corals, including seven listed under the Endangered Species Act, fringe the mouth of the Bay and form a barrier reef along the north shore. USACE_000037. While elkhorn corals used to be the dominant reef building coral in Puerto Rico, they have declined more than 90 percent since the

1980s. USACE_010336. Threatened manatees form mating herds and feed on seagrass in San

Juan Bay, which past dredging has negatively impacted. USACE_000074, 024439.

## II.    The San Juan Bay Dredging Project

The Corps failed to take all of this into consideration when it approved the San Juan Bay

Dredging Project that will deepen and widen shipping channels for massive vessels. *See*

USACE_000004. The primary purpose of dredging is for large, long-range oil and LNG tankers

to transit the bay. *Id.* The Corps plans to dredge 2.2 million cubic yards of seafloor in San Juan

Bay, USACE_000139; USACE_000033–34, *with dredges working around-the-clock for a year.*

USACE_000034; USACE_000165. The Corps will transport the dredged material with barges or

"scows" that leak sediment (USACE_000178) to dump it two miles offshore (USACE_000139;

USACE_000143), traveling over the corals and their critical habitat that line Puerto Rico's north

shore (USACE_000037) on the way.

Although the Corps initially announced it would prepare an environmental impact

statement (USACE_007577), it opted instead for an abbreviated environmental assessment

without explanation. During the Corps' public comment period on the draft assessment,

Hurricanes Irma and Maria hit Puerto Rico. USACE_002530; Answer ¶ 71. The hurricanes

caused widespread blackouts; food and water scarcity; flooding and landslides; and other public

safety hazards. President Trump declared two major federal disasters. 82 Fed. Reg. 44,639 (Sept.

25, 2017); 82 Fed. Reg. 46,820 (Oct. 6, 2017). The hurricanes and aftermath severely impeded

the ability of local people to participate in the Corps' process. *See e.g.,* USACE_002302 (noting

"limited communications/electricity" after the hurricanes).

Nonetheless, the Corps released a final environmental assessment less than a year after

the hurricanes, on August 1, 2018. USACE_00028–1284. The Corps also issued a finding of no

significant impacts. USACE_000003. Upon signing the Chief's Report, Lieutenant General Todd Semonite heralded the speed of the analysis as "SETTING THE PACE!!!" USACE_000008.

The dredging to deepen the channel has not begun, but the Corps anticipates it may issue a notice to proceed with dredging as early as June 21, 2023. Prop. Br. Sched., ECF No. 16.

### III.    The Corps' Review Minimized the Project's Impacts

The Corps omitted and discounted information that minimizes the Project's effects on environmental justice, historic resources, air quality, and wildlife. USACE_000028 et seq.

The Corps only examined environmental justice impacts within a one-mile radius from the centerline of the San Juan municipality—rather than encompassing the Dredging Project itself. USACE_002661. This excluded communities on the southwestern shore of the Bay, like the cities of Cataño and Guaynabo. *See* id. Guaynabo is in non-attainment of the EPA's national air quality standards for particulate matter from pollution from power plants, industrial facilities, motor vehicles, and major San Juan emitters. USACE_002636.

Direct impacts on neighborhoods include increased air, noise, and water pollution. *See, e.g.,* USACE_000180 (air emissions from dredge's diesel engines and larger commercial vessels with greater emission potential); USACE_000182 (ambient noise level increase within 150m of sensitive receptors). Because the purpose of the Dredging Project is to allow large, long-range oil and LNG tankers to navigate San Juan Bay, USACE_000055, it will concentrate tankers near the oil and LNG terminals unloading on the southwestern shore. USACE_002672. Gas provides less energy than liquids per unit of volume, so LNG imports must be *double* the volume of fuel oil imports to reach the power generation needs per day. USACE_000181. The Corps calculated an increase of 3.9 million pounds of carbon dioxide pollution from the tankers importing LNG to Puerto Rico. USACE_000180 (39.4 -35.5 million pounds). However, when analyzing impacts of the Project, the Corps forecasted fewer vessel calls and thus fewer impacts. *Id.*

The environmental assessment concludes the Dredging Project would have no significant impacts on wildlife despite inapposite facts. The Project will remove several feet of the seabed—in total 2.2 million cubic yards—including the invertebrate communities that filter the Bay and improve water quality. USACE_000074. Hopper dredging will kill and injure threatened and endangered sea turtles. NMFS_00051. Seven threatened corals inhabit the fringing reefs at the mouth of San Juan Bay, including near at least one dredge area known as Cut-6, USACE_000037, and dredging and disposal of dredged material are "the most well-known sources" of sediment that kills and smothers corals. NMFS_00969. Atlantic *Acropora* corals, including elkhorn and staghorn coral, are "much more susceptible to increases in water turbidity than some other coral species." USACE_015089.

The dredge operation itself is a major underwater construction activity, followed by almost a thousand trips to dump dredged material offshore. USACE_001648. A hopper dredge operates like a vacuum sucking up material from the seafloor, USACE_000172, with water and sediment overflowing from the dredge into the water. USACE_000176. The Corps will then transport the dredged material two miles offshore and dump it at an ocean disposal site. USACE_000139; USACE_000143. All barges, or scows, that transport dredged sediment leak. USACE_000178. Yet the environmental assessment states that impacts from "sedimentation as a result of construction activities are not anticipated." USACE_000167.

In contrast, a similar dredging project at the Port of Miami injured and killed hundreds of thousands, and likely up to a million, corals. NMFS_00690. A review of the Miami dredging prepared for the Army Corps in 2017 found that before dredging, agencies inaccurately believed "dredging would not create turbidity or a sedimentation problem." NMFS_00704. Like here, the Corps and other agencies held that belief "despite strong evidence that dredged material may be

advected over large distances (kilometers) as a result of tidal currents, wind-driven circulation, and wave-driven circulation." *Id.*

The Corps engaged in Endangered Species Act consultation on the San Juan Bay Dredging Project with the National Marine Fisheries Service (Fisheries Service) and the Fish and Wildlife Service. In 2018, the Fisheries Service, which has jurisdiction over most marine species, published a biological opinion that concluded the project may adversely affect hawksbill, green, and loggerhead sea turtles through injuries and death from hopper dredge interactions. NMFS_00022; NMFS_00051. Within that document, the Fisheries Service determined and concurred with the Corps that the Dredging Project may affect, but is not likely to adversely affect corals, whales, and other species. NMFS_00016–21. It also concluded that impacts on coral critical habitat from dredging and disposal would be discountable, *id.*, even though sediment on reef habitat prevents baby corals from settling and growing. NMFS_00969.

In 2018, the Fish and Wildlife Service concurred with the Corps' finding that the Project may affect, but it was not likely to adversely affect manatees. FWS_00026–30; FWS_00047–51. San Juan Bay has preferred habitat for manatees that include manatee transit areas designated for dredging. FWS_00062. Manatees feed on seagrass, and the widening of the channel for LNG tankers may kill the seagrasses manatees feed upon "due to dredging activities, slumping [of the sides of the channel] and increased erosion from ship wakes." *Id.* In addition, the Fish and Wildlife Service has recognized that the primary threat to Puerto Rico's manatees is collisions with vessels, 82 Fed. Reg. 16,668, 16,673 (Apr. 5, 2017), and that the post-construction vessel traffic threatens manatees by increasing the risk of vessel strikes. FWS_00073.

The Corps did not confer with the Fisheries Service on proposed critical habitat for boulder star, lobed star, mountainous star, pillar, and rough cactus corals in San Juan Bay, which

occurs near the inlet and along the north shore, and on the path to the disposal site. *See* 85 Fed.

Reg. 76,302 (Nov. 27, 2020); 50 C.F.R. § 402.10. Despite the extensive overlap of the proposed

critical habitat with the Project in San Juan Bay, *see* Clauser Decl. Ex. 1, the Corps said the

impact would be similar to the other corals' critical habitat outside the Bay. USACE_024467.

## STANDARD OF REVIEW

The Administrative Procedure Act directs the Court to "hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision

is arbitrary if it "entirely failed to consider an important aspect of the problem" or "offered an

explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Ass'n of the*

*U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts "must thoroughly review

an agency's decision and may not 'rubber stamp' decisions that are inconsistent with statutory

mandate." *Gov't of the Province of Manitoba v. Norton*, 398 F.Supp. 2d 41, 53–54 (D.D.C.

2005) (citation omitted). As the D.C. Circuit has explained, "because NEPA is addressed to all

federal agencies and Congress did not entrust administration of NEPA to [Defendants] alone,"

"the court owes no deference to [Defendants'] interpretation of NEPA or the CEQ regulations[.]"

*Grand Canyon Tr. v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002)

The Endangered Species Act provides a private right of action for violations of the Act.

16 U.S.C. § 1540(g)(1)(A). The Endangered Species Act requires agencies to "use the best

scientific and commercial data available" when consulting on the impacts of an agency action on

listed species and their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(d).

## PLAINTIFFS HAVE STANDING

Plaintiffs' suit meets the three-part test for standing under Article III of the U.S.

Constitution: injury, causation, and redressability. *Friends of the Earth v. Laidlaw Env't. Servs.,*

*Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiffs' members have protectable aesthetic, recreational, scientific, spiritual, informational, and other interests in San Juan Bay, its coastal environment, and wildlife. *See* Rivera-Collazo Decl. ¶¶ 8, 21, 22; Villaverde Decl. ¶¶ 8–11, 22–23; Gonzalez García Decl. ¶¶ 6–11. These members have suffered, and, without judicial redress, will continue to suffer, concrete and particularized injuries to these interests caused by Defendants' unlawful actions and inactions and ongoing violations of law. A favorable decision from this Court will redress these injuries. *Laidlaw*, 528 U.S. at 180–85.

Plaintiffs also meet the three-part test for associational standing to represent their members' interests. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). As non-profit environmental advocacy organizations, Plaintiffs have standing to sue on their members' behalf. First, these members would have standing to sue in their own right. *Laidlaw*, 528 U.S. at 181. Second, their interests in protecting the environment of San Juan Bay are germane to Plaintiffs' organizational purposes. *Id.*; Cintrón Moscoso Decl. ¶¶ 4–5; Lucking Decl. ¶¶ 2–3; Galvin Decl. ¶¶ 3–6. Finally, neither the claims asserted nor the relief requested require the participation of individual members. *Hunt*, 432 U.S. at 342–43.

## ARGUMENT

### I.    The Plain Language of the Clean Water Act Mandates the Corps Prepare an Environmental Impact Statement

The Corps failed to prepare an environmental impact statement as the plain language of the Clean Water Act requires. 33 U.S.C. § 1344(r). Congress created a narrow exception to the Act's requirement for a dredge and fill permit for Congressionally authorized federal projects, so long as the agency prepares an environmental impact statement that considers the Clean Water Act's guidelines:

> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise

subject to regulation under this section . . . if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an *environmental impact statement* for such project pursuant to the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.] and such *environmental impact statement* has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

33 U.S.C. § 1344(r) (emphasis added). Here, the Corps violated that provision by not preparing an environmental impact statement. Answer ¶¶ 110, 114. Consistent with this plain language, the Fifth Circuit has held that the Corps failed to comply with the requirements of section 404(r) even when it submitted a non-final environmental impact statement to Congress. *Bd. of Miss. Levee Comm'rs v. U.S. EPA*, 674 F.3d 409, 419–20 (5th Cir. 2012) (holding that "the administrative record fails to show that an [environmental impact statement] that satisfied the Environmental Act and section 404(b)(1) was submitted to Congress.")

Although the Corps announced it would prepare an environmental impact statement, USACE_007577, it instead only prepared an environmental assessment—an abbreviated and less robust analysis under NEPA. 40 C.F.R. §§ 1508.9, 1501.4(a)–(c) (2018).[1] An environmental assessment in lieu of an environmental impact statement is impermissible here where the Corps sought an exemption from Clean Water Act permitting. The Corps' approach is "divorced from the statutory text" and thus unlawful. *Massachusetts v. U.S. EPA*, 549 U.S. 497, 532 (2007).

The legislative history confirms the plain meaning of section 404(r), demonstrating that Congress intended to require an environmental impact statement. A proposed, 1976 version of a

---

[1] Changes to NEPA regulations went into effect on September 14, 2020, and May 20, 2022. All regulations cited herein refer to those that were in effect at the time the Corps finalized its environmental assessment and feasibility report.

Clean Water Act amendment allowed either an environmental impact statement or environmental

assessment:

> [T]he discharge of dredged or fill material as part of . . . a Federal or federally
> assisted project authorized by Congress is not prohibited by or otherwise subject
> to regulation under this Act if the effects of such discharge have been included in
> an environmental impact statement *or environmental assessment* for such project
> pursuant to the provision of the National Environmental Policy Act of 1969 and
> such environmental impact statement *or environmental assessment* has been
> submitted to Congress . . .

122 Cong. Rec. 16552 (1976) (Wright Amendment) (emphasis added). After debates about the

need for exempted projects to meet environmental standards and testimony about the lack of

guidance for using an environmental impact statement or environmental assessment (*see, e.g.*,

Section 404 of the Federal Water Pollution Control Act Amendments of 1972: Hearings Before

the S. Comm. on Pub. Works, 94th Cong. 226, 592, 598, 751 (1972)) a later amendment that

required an environmental impact statement became law in 1977. The Wright Amendment and

another bill, S. 1952, 95th Cong. (1997), both included the environmental assessment option. But

Congress chose instead to enact H.R. 3199, 95th Cong. (1997) (enacted), which specified an

environmental impact statement is required. When Congress modifies legislation, it indicates an

intent to change the statute. *Russello v. United States*, 464 U.S. 16, 23–24 (1983). Congress knew

which language would allow an environmental assessment and opted to require an environmental

impact statement. *See Cent. Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176–77

(1994).

 The Clean Water Act's purpose further confirms the plain meaning of section 404(r). *See*

*La. Env't. Action Network v. U.S. EPA*, 955 F.3d 1088, 1098 (D.C. Cir. 2020) (looking to

statute's "overall structure and purpose" to confirm its plain meaning). The Clean Water Act

seeks to "to restore and maintain the chemical, physical, and biological integrity of the nation's

waters" and "eliminate[ ]" water pollution. 33 U.S.C. § 1251(a). To accomplish these goals, the

Act broadly prohibits the discharge of any pollutant by any person. *Id.* § 1311(a). While the Act

contains exceptions to this overall prohibition, such exceptions are typically only granted upon

issuance of a permit to discharge and after careful review to ensure, *inter alia*, compliance with

the Clean Water Act's 404(b)(1) guidelines. 40 C.F.R. pt. 230. The requirement to complete an

environmental impact statement aimed to uphold Congress' environmental goals for projects

exempted from permitting. "Of central importance in the House debates was the assurance that

consideration and acceptance of the environmental impact statement by Congress would be

'equivalent to' review under the Section 404(b)(1) guidelines." *Monongahela Power Co. v.

Marsh*, 809 F.2d 41, 51 (D.C. Cir. 1987) (quoting and citing legislative history).

Since the Corps' environmental assessment does not meet the 404(r) requirements—only

an adequate environmental impact statement will suffice—summary judgment for Plaintiffs is

appropriate.

## II.    The Environmental Assessment Is Inadequate

Even if the Corps need only prepare an environmental assessment, its environmental

assessment and accompanying finding of no significant impact fail to comply with NEPA. NEPA

"is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Agencies

must take a "hard look" at the environmental impacts of their actions to ensure informed

decisionmaking and public participation. *See id.* § 1500.1(b). An environmental assessment must

analyze all direct, indirect, and cumulative impacts of the action. *Id.* §§ 1508.7, 1508.8. NEPA

requires agencies to fully disclose all potential environmental impacts of an action, 42 U.S.C.

§ 4332(2)(C), including "ecological . . . aesthetic, historic, cultural, economic, social, [and]

health" effects. 40 C.F.R. § 1508.8. The environmental assessment must also include a

reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b).

The D.C. Circuit uses a four-part inquiry to evaluate the adequacy of an environmental assessment and finding of no significant impact:

> (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) . . . whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D. C. Cir. 1983) (additional citations omitted). Under this test, the Corps' environmental assessment "will pass muster only if it undertook a 'well-considered' and 'fully informed' analysis of the relevant issues and opposing viewpoints." *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (citation omitted).

Here, the Corps' environmental assessment falls far short of the "hard look" NEPA requires. *Id*. at 50 (ordering an environmental impact statement because the agency "just shrugged off" potentially significant impacts). The environmental assessment has numerous problems: (a) it fails to consider connected actions, (b) the environmental justice analysis omits affected communities, (c) it fails to quantify air emissions, (d) it lacks adequate examination of impacts to historic resources, (e) it discounts harm to endangered species, (f) it omits the effects of seabed removal and tanker accidents, (g) it misses cumulative effects, and (h) it omits less harmful alternatives. This Court should hold the Corps' inadequate environmental assessment unlawful and grant Plaintiffs' motion for summary judgment for any one of the reasons described below.

### A.     The Environmental Assessment Omitted Connected Actions

The environmental assessment fails to evaluate a suite of connected actions, including new LNG infrastructure and additional San Juan Bay dredging. USACE_021684. As a result, the truncated scope of analysis underestimates the adverse effects of the project.

Under NEPA, an agency acts unlawfully when it "divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *see also* 40 C.F.R. §§ 1508.7, 1508.25(a)(1)–(2). Actions are connected if they "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or are "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1).

Here, the Corps impermissibly failed to examine (1) the onshore infrastructure receiving LNG tankers and (2) additional dredging in the Bay for anchoring and berthing. By segmenting the environmental review these connected, contemporaneous, closely related, and interdependent projects evaded collective analysis. Here, the LNG infrastructure and additional dredging expand the scope and scale of the project like the *Delaware Riverkeeper* case. In that case, the D.C. Circuit required impacts from four pipeline upgrades be analyzed together. *Del. Riverkeeper,* 753 F.3d at 1313–18; *see also Hammond v. Norton*, 370 F.Supp. 2d 226, 253 (D.D.C. 2005) (agency "improperly segmented its analysis" by not addressing connected actions).

### 1.    LNG Infrastructure Depended on Deepening and Widening the Channel

The Dredging Project and LNG infrastructure are inextricably linked and interdependent. *See, e.g.,* USACE_001968; USACE_001724 ("The Federal Navigation Project, which includes the Army terminal widening and deepening, is of outmost [sic] importance and hence required for both permitting and the cost benefit of this [LNG terminal] project"). Indeed, the Corps engineered the widening and flares of one navigation channel, known as the Army Terminal Channel, for LNG vessels. USACE_001558; *c.f.* USACE_001560 (cruise and container ships

can already navigate San Juan Bay). Channel widening is "necessary to reliably receive LNG vessels in San Juan Harbor." USACE_000115.

The record shows a long, intertwined history. For example, there were discussions about the LNG infrastructure permitting, timing, and location, including a map showing the planned location of the LNG terminal on the southwestern shore. USACE_006511–18. The LNG infrastructure has no independent utility without the dredging, which is necessary for most LNG tankers to navigate the Bay. USACE_000115 (the world's fleet of available LNG tankers is too large without dredging). One communication laid plain the interdependence of the federally authorized projects, saying that "[the Corps] decision makers are most concerned about the $350 million LNG infrastructure investment that the study assumes will ONLY take place in the case that a federal navigation project is constructed." USACE_001722 (emphasis in original). Both projects were planned to be constructed around the same time, and both require federal approvals. *See* USACE_001722 ("[t]he Federal Energy Regulatory Commission (FERC) has the ultimate approval for a terminal in San Juan harbor for receiving, storing and gasification of Liquefied Natural Gas (LNG)").[2] Yet the environmental assessment here is silent on the impacts of LNG infrastructure—including a new dock, unloading facilities, pipelines, storage tanks, and regasification facilities. USACE_001722.

NEPA does not allow segmentation of a project where, as here, the project is a catalyst for a larger development. *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F.Supp. 2d 1298, 1315–17 (S.D. Fla. 2005) (holding that the Corps unlawfully segmented its environmental review of filling wetlands for a road by excluding consideration of a development).

---

[2] In *New Fortress Energy Inc. v. FERC*, 36 F.4th 1172 (D.C. Cir. 2022), the D.C. Court of Appeals denied a petition challenging FERC's jurisdiction over the San Juan LNG terminal.

The missing analysis should have considered the construction and operation of the five-acre LNG terminal. Added environmental impacts that the Corps should have examined include noise, light, and air pollution from construction; dock construction displacing or harassing manatees or injuring or killing corals and mangroves; and air pollution from the regasification facility and trucks. *See, e.g.,* USACE_008041 (an environmental firm with significant LNG import experience concluded "the environmental issues that are most likely to result in a high consequence impacts are those impacting coral reefs and mangroves"). The risk and effects of hazardous incidents such as vapor clouds and fires at the LNG terminal also warrant evaluation. USACE_008043 (noting "significant uncertainty about the applicable methodology to determine impacts on the public of vapor dispersion and thermal radiation").

Inconsistently, the Corps accounted for the benefits of the LNG infrastructure but ignored the harms. The environmental assessment notes "benefits attributable to the Recommended Plan are generated from [transportation savings, maneuverability of cruise vessels, and] power generation cost reduction benefits in the 'with LNG conversion' future with-project condition." USACE_000035. The Corps' reliance on the benefits from LNG conversion facilitated by its action shows the connection to dredging. *Mont. Env't. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F.Supp. 3d 1074, 1098 (D. Mont. 2017) (agency cannot place "thumb on the scale by inflating the benefits of the action while minimizing its impacts.").

## 2.    Dredging Begets More Dredging

The environmental assessment also omits an analysis of additional dredging plans connected to the Dredging Project—at the same time and with the same dredge. First, the Coast Guard will dredge a proposed safety zone for vessels in the central part of the Bay called Anchorage Area F, and the Corps will maintain it. USACE_004044; USACE_004054. The Corps initially planned to expand Anchorage Area F as part of its San Juan Bay Dredging Project

(USACE_004272), but it severed that part after a survey in that area revealed historical artifacts. USACE_000184; USACE_001646 (State Historic Preservation Office approved so long as Anchorage F removed). At the public meeting, the Fish and Wildlife Service sought to clarify that "[t]he Coast Guard will piggyback on the Corps of Engineers' dredging projects, since they are going to have the dredge down here;" and the Corps confirmed. USACE_002500. The Corps cannot avoid analyzing the impacts of additional dredging in the area by handing Anchorage Area F off to another federal agency.

Second, the Dredging Project begets additional dredging at the docks. With larger tankers soon able to navigate the Bay, the record indicates that private parties will seek Corps' approval to deepen the Sabana approach for a liquid gas port. USACE_001347. Similarly timed berthing dredging is also planned for Guaynabo Oil Dock, Panamerican Dock, and Old San Juan Piers. USACE_005669; USACE_005762; USACE_005766–69; USACE_005770–73. Dredging the shipping channels set in motion a cascade of additional dredging to suit the larger vessels and/or because the dredge would be in town. The environmental impacts of additional dredging include increased construction pollution; seabed destruction; harassment of wildlife; sediment dispersion and disposal; and erosion. *See* USACE_012229; USACE_019173–93; USACE_001347 (dredging this area may cause "slumping and increased erosion from ship wakes"). The Corps must examine the environmental effects of these connected actions together.

### B.    The Environmental Justice Analysis Contained Fatal Errors

The environmental assessment fails to examine harmful impacts on overburdened environmental justice communities. Compounding this problem, the public comment period took place while Hurricanes Irma and Maria ravaged Puerto Rico. USACE_001554. The poor timing of the Corps' process meant that many people lacked access and ability to participate. *See e.g.,* USACE_002303 (noting that "the island is dealing w/ a life and death crisis and the public living

there has limited communications/electricity, so I'm wondering if a reasonable extension is in the works so that all stakeholders have equal and fair opportunity for comment"). Widespread power outages afflicted Puerto Rico for months, and many people—especially disadvantaged populations—struggled for basic services and food. Nonetheless, the Corps rapidly finalized the environmental assessment post-hurricane. *See, e.g.,* USACE_000008 ("SETTING THE PACE"); USACE_005815 (emphasizing the compressed schedule); USACE_001715 (planning to get post-decision data because of the schedule). This resulted in a disproportionate, adverse impact on the participation of environmental justice populations in the proposed action, exacerbating the problems with the Corps' inadequate environmental justice analysis.

Executive Order 12,898 directs that, "[t]o the greatest extent practicable and permitted by law," agencies "shall make achieving environmental justice part of [their] mission by identifying and addressing . . . disproportionately high and adverse human health or environmental effects of [their] . . . activities on minority populations and low-income populations." Exec. Order No. 12,898, 59 Fed. Reg. 7629, at § 1-101 (Feb 11, 1994). It further charges agencies to avoid excluding participation of disadvantaged populations and create strategies to ensure greater public participation. *Id*. at § 2-2. A faulty environmental justice analysis renders an agency's NEPA evaluation unlawful. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330–31 (D.C. Cir. 2021).

The Corps' flawed environmental justice analysis omitted communities near the oil and LNG docks. *See id.* (two-mile radius area chosen for analysis was arbitrary). "[T]he region of interest for environmental justice analysis was determined to be the area within a one-mile radius of the project." USACE_000804. The Corps picked a one-mile radius with a majority White population, but it omitted most of the project area—notably excluding the environmental justice

neighborhoods in Cataño and Guaynabo. USACE-000804–05. Citing the first map below, the

Corps concluded that there are no disproportionate effects, claiming the affected population is

only 25 percent minority. USACE_000805. But the Corps' one-mile radius (USACE_0000804

(Figure 1 below)) fails to consider Guaynabo neighborhoods Sabana, Amelia, and Vietnam,

which rank in the 95th percentile of minority populations for Puerto Rico (depicted in the

circled-area in Figure 2 below (Environmental Protection Agency, EJScreen (Jan. 16, 2023),

www.epa.gov/ejscreen; *see also* USACE_024693)).



Figure 1. USACE_0000804

Figure 2. Environmental Protection Agency, EJScreen (Jan. 16, 2023), www.epa.gov/ejscreen

The Corps had a similar problem in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, in which the court held that the agency arbitrarily confined its analysis to a zone without a minority population. 255 F.Supp. 3d 101, 137–38 (D.D.C. 2017) (the court was "hard pressed to conclude that the Corps' selection of a 0.5-mile buffer was reasonable."), *vacated on other grounds*, 985 F.3d 1032 (D.C. Cir. 2021).  Additionally, here the Corps enlarged its zone of analysis in its new seagrass mitigation project assessment (USACE_024693), which further demonstrates the flaws of the 2018 environmental justice analysis.[3]

---

[3] The Corps cannot cure its substantial errors with an appendix to an environmental assessment on a different project. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct. 1891,

Environmental justice communities will bear the brunt of the harm from the Dredging Project. The absence of demographic information for the southwest shore shows that the Corps did not take a hard look. Overburdened minority and low-wealth neighborhoods in Cataño and Guaynabo—including barrios Sabana, Vietnam, and Amelia—are closest to the oil and LNG terminals and the two power plants they service, yet not mentioned. *Compare* USACE_000066, *with* Figure 2 (map showing neighborhoods). Guaynabo and Cataño already suffer from poor air quality and non-attainment of standards due to "pollution from power plants, industrial facilities, motor vehicles, and major San Juan emitters." USACE_000094. The Corps should have analyzed whether these neighborhoods face disproportionate impacts.

Specifically, the environmental assessment should have evaluated the pollution from diesel-powered dredging adjacent to Guaynabo's minority and low-income populations. The conclusory statement that there is little potential for adverse impacts, USACE_000186–88, falls short of the hard look required by NEPA. *See California v. Bernhardt*, No. 4:18-cv-05712-YGR, 2020 WL 4001480, at *34 (N.D. Cal. July 15, 2020) (the agency "must not only disclose . . . that certain communities and localities are at greater risk, but must also fully assess these risks"). The Corps should have also examined the exposure of Sabana residents to pollution, oil spills, and LNG accidents—including fires and explosions. These tankers will concentrate on the southwestern shore by the petroleum terminals. USACE_000157 (tankers will transit Army Terminal Channel to Army Terminal Basin to call on oil and LNG terminals). The environmental

---

1908 (2020) (agency decision must rest on the original reasoning, not a post hoc elaboration). Any attempt to rely on this appendix defeats NEPA's key aims to inform the public and agency of the dredging project's effects *before* the agency's decision to approve the project. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 353 (1989). Moreover, the "analysis" in that appendix is entirely conclusory despite the project's disproportionate effects on minority and low-income populations.

assessment anticipates zero LNG tankers without the project compared to routine deliveries after the project—and double the volume of LNG needed compared to oil deliveries. USACE_000064 (Table 2-5); USACE_000181; USACE_000187 (no change in cargo, "with the exception of LNG (which increases)"). The bigger tankers risk larger oil spills, explosions, and other accidents than the current fleet. USACE_002313–15. Like this case, in *Standing Rock,* the environmental assessment discussed the construction of the project (an oil pipeline), but its examination of the environmental justice effects of an oil spill lacked the hard look required. *Standing Rock*, 255 F.Supp. 3d at 140.

### C.    The Air Pollution Analysis Was Inadequate

The environmental assessment fails to, but needed to, disclose the total air pollution impacts of its action. The Corps used a flawed comparative analysis of air pollution rather than evaluating the total air pollution. USACE_000180 (discounting emissions dispersed by trade winds and offset by the LNG conversion air quality benefits). The environmental assessment loosely notes up to a 10 percent increase of air emissions without disclosing the quantity, the method, or the effects of that pollution. USACE_000180. The example of carbon dioxide emissions increasing by 3.9 million pounds is insufficient as only one among many air pollutants of concern—particulate matter, sulphur oxides, nitrogen oxides, etc. *Id.*

The environmental assessment should have disclosed the aggregate air emissions and their effects on health. Even if the Corps' dubious prediction of fewer vessels holds, the record nonetheless indicates that there will be double the volume of LNG imported compared to oil, and larger horsepower vessels that produce more emissions. USACE_000180–81. Vessels are among the largest sources of air pollution. Eric Hull, *Missing the Boat on Protecting Human Health and the Environment*, 81 Temp. L. Rev. 1035, 1036 (2007). They emit particulate matter and smog that contribute to health problems such as asthma, respiratory illness, cancer, and premature

death. *Id*. at 1039–40. Neighborhoods adjacent to ports, like Guaynabo, often struggle with poor air quality. *Id.* at 1036, 1045.

NEPA requires disclosure of cumulative pollution impacts; an incremental comparison is insufficient. *Grand Canyon Tr.*, 290 F.3d at 345–46. In a case about a replacement airport, the D.C. Circuit held that the agency's noise pollution analysis, comparing an old with a new airport, violated NEPA. *Id*. Here, like that case, the Corps' relied on a comparative analysis, using it to claim an overall decrease in air toxics and pollution. USACE_000187. The Corps should have considered the total pollution. *See WildEarth Guardians v. Zinke*, 368 F.Supp. 3d 41, 71 (D.D.C. 2019) (holding agency was required to quantify and forecast aggregate air emissions from oil and gas development); *WildEarth Guardians v. Bernhardt*, 502 F.Supp. 3d 237, 249–253 (D.D.C. 2020) (same).

Moreover, the Corps incorrectly assumed that Puerto Rico must rely on foreign fossil fuels for power generation when it said LNG imports would benefit air quality. Air pollution standards require Puerto Rico to change its power generation, USACE_000094, which could include a shift to renewable sources. Far from reducing emissions, the Dredging Project locks-in fossil fuel imports that have greater air pollution than renewable alternatives. The Corps did not consider record evidence that renewable energy is viable and economically competitive in Puerto Rico. USACE_002397; USACE_002409–11. Importantly, power-outages from Hurricanes Irma and Maria shifted policy and public opinion, setting Puerto Rico on a path toward renewable and distributed power generation. Post-hurricane political will has changed Puerto Rico's previous goal that capped renewable energy at 20 percent (USACE_007600), to achieving 40 percent by 2025 and 100 percent renewable energy generation by 2050. Puerto Rico Energy Public Policy

Act, Act No. 17-2019. In sum, the Corps should not have compared air emissions to old, dirty sources, but instead quantified and disclosed the impacts of all direct and indirect air pollution.

**D.      The Corps' Conclusion of No Effects on Corals Contradicted the Science**

The Corps' conclusion that the Dredging Project will have no significant impacts on corals is arbitrary. This conclusion contradicts ample evidence that dredging will harm and kill corals, including those listed under the Endangered Species Act. While the environmental assessment acknowledges that hopper dredges and scows leak sediment plumes, USACE_000176–77, it fails to examine the harm of that sediment on corals. The record shows that sediment smothers corals and blocks sunlight, causing death, starvation, disease, and stress. NMFS_00020. Sediment also prevents new, baby corals from settling and growing on the reef. *Id.* Critical habitat for elkhorn and staghorn coral has been designated across the harbor entrance and along Puerto Rico's north shore. USACE_013989; USACE_021700. Critical habitat has also been proposed for five additional corals in San Juan Harbor, Condado Lagoon, and along the coast. 85 Fed. Reg. 76,302 (Nov. 27, 2020). The Corps knew, but did not heed, the lessons taught in the Port of Miami, a deepening and widening dredging project that extensively harmed and killed corals beyond what the agency anticipated.



Figure 3. Final (FCH, yellow) and proposed critical habitat (PCH, purple) for threatened corals near San Juan Bay. Clauser Decl. Ex. 1 (Source: National Marine Fisheries Service, Critical Habitat Mapper, www.fisheries.noaa.gov/resource/map/national-esa-critical-habitat-mapper).

### 1.    The evidence disproves the Corps' 150-meter impact zone for corals

The Corps limited its evaluation to an erroneous 150-meter impact zone, relying on old data that have been proven wrong. *See* USACE_000167; USACE_000176 (data from four old projects from 1981 to 2010). Therefore, the Corps disregarded coral harms ostensibly because hardbottom habitat for corals and coral critical habitat are outside that 150-meter zone. *See* USACE_000138 (mapped hardbottom and coral critical habitat occur 456 and 762 meters, respectively, from the closest dredge cut).

A similar Corps' dredging project to deepen and widen the Port of Miami channel between 2013 and 2015 likely killed more than a million corals, with damage reaching as far as an estimated 10 to 15 kilometers from the channel—100 times the 150-meter impact zone the

Corps used in its analysis here. NMFS_00691. Monitoring reports documented the death of

entire coral colonies, USACE_007035–36, and significant partial mortality to corals at all

monitoring sites (100, 200, 300, 500, and 700 meters from dredging. NMFS_00783. Scientific

analysis of those monitoring data and sediment plumes indicated that "at least half a million

corals were lost within 500 m of the channel *as a result of dredging activities*." NMFS_00690

(emphasis added). The scientists estimated that dredging sediment "buried > 25% of the reef as

far as 3 km away, doubled coral partial mortality from sediment 5–10 km away, and had

potential impacts as far as 15 km from the dredged channel." *Id.* See, for example, the sediment

plume and buried corals pictured below.



Representative photographs of sediment plumes and benthic impacts.
**(A)** Sediment plumes spread from dredging activity in the channel on 2013-12-30 (photo: Google Earth).
**(B)** Sediment covers the benthos on the NIR reef<250m from the channel on 2015-01-30, with the tops of gorgonians protruding from ~7 cm of sediment (photo: R Silverstein).
**(C)** A colony of *A. cervicornis* is partially buried in sediment 150m from the channel on the NIR in September 2014 (photo: Coastal Systems International).

Figure 4. NMFS_00682 (photos D, E, & F omitted)

Although it was aware of the problem, the Corps did not take the hard look that NEPA

requires. The environmental assessment is silent about the mass die-off of corals from the Miami

dredging, and it is silent about the potential for a larger impact zone. The Fisheries Service raised

concerns at a meeting, noting the need to take a hard look at lessons learned from Miami:

> There was significant scow leakage and issues with overflow with the hopper
> dredges which contributed to the sedimentation effects on the reefs. The transit to
> [Offshore Dredged Material Disposal Site] travels close to some of those reef
> areas around the mouth of the harbor and NMFS is concerned that scow leakage
> during transit could lead to sedimentation and turbidity impacts to those reefs and
> possibly to ESA-listed corals if present.

USACE_001708; *see also* USACE_005677 ("no modeling had been done to determine how the

dredged material disperses through the water column after release"). It was also a concern during

the comment period:

> As the Corps learned during the deepening and widening of the port channels at
> the Port of Miami, sedimentation from harbor improvement projects can spread
> great distances away from the dredging locations, harming corals and other
> marine species. At the Port of Miami, dredged material migrated hundreds of
> meters away from the dredging and blasting sites. This sedimentation smothered
> corals, causing widespread total and partial coral mortality by preventing
> photosynthesis, filtering, and increasing the risk of stress-related diseases.

USACE_001206. The Miami dredging "created sediment plumes with an extent up to ~228

km$^2$." NMFS_00679; *see also* NMFS_00773. A report prepared for the Corps detailed major

incorrect assumptions, including the faulty 150-meter impact zone, that lead to coral damage in

Miami. NMFS_00701. Nonetheless, when examining the dredging project here, the final

environmental assessment does not address the overwhelming data from Miami showing that

effects on corals extend far beyond 150-meters.

The environmental assessment does not even address the conflict between the mass die-

off of corals from its Miami dredging and its conclusion here that adverse effects on corals will

be insignificant. USACE_000177. This is analogous to *Humane Society,* a case in which the

agency sought a research permit for endangered sea lions but did not make a convincing case in

its environmental assessment that it addressed evidence showing research-related deaths could

exceed acceptable limits. *Humane Soc'y of the U.S. v. Dept. of Comm.,* 432 F.Supp. 2d 4, 17–19 (D.D.C. 2006); *see also Am. Rivers*, 895 F.3d at 50 (underestimating project's harm to fish based on old data "far too thin a reed on which to rest a conclusion"); *Wild Va. v. U.S. Forest Serv*., 24 F.4th 915, 928 (4th Cir. 2022) (agencies "erroneously failed to account for real-world data suggesting increased sedimentation along [a] Pipeline route").

### 2.     A promise of a monitoring plan is not enough

The Corps will point to a promise of a future monitoring plan, but the D.C. Circuit has rejected such an approach. *Am. Rivers,* 895 F.3d at 54 ("Given the exceptional importance of maintaining minimum dissolved oxygen levels to the aquatic ecosystem, it was irrational for the Commission to cast those significant environmental impacts aside in reliance on some sort of mitigation measures, which the Commission was content to leave as 'TBD.'"). The Corps relies on a plan to make a plan with only loosely defined ideas. USACE_000178.

Moreover, evidence in the record shows why a promise of a plan without precise guardrails for corals is insufficient. The Corps claims it will investigate a leaking scow if a sensor detects a one-foot loss of sediment. USACE_004096. But, for the 977 scow trips the project entails (USACE_001648), the Fisheries Service noted concerns that "[o]ne foot of loss per trip, or more, could amount to a significant amount of sediment on the reef there." USACE_001709. The Corps also said that it will avoid harm to corals by pausing activities when turbidity exceeds 7 NTU (Nephelometric Turbidity Units, a measure of cloudiness) *above background*. Yet the Fisheries Service indicated that 7 NTU is the *absolute* threshold for corals—not relative to background levels. USACE_001714; *see also* NMFS_00693 (limit should be *less than* 7 NTU). Consequently, before triggering a pause in activity, turbidity would exceed 7 NTU—the level beyond which harms corals because the Bay's waters are periodically cloudy

with background levels between 7 and 9 NTU. *See* USACE_001718. Also concerning is that the

mouth of San Juan Bay, inhabited by the most vulnerable corals, cannot be monitored:

> It is a standard practice for the Corps to monitor sedimentation associated with
> dredging projects where corals and coral habitats are adjacent to the project area,
> when the area can be safely monitored by divers. This has been standard practice
> for more than 30 years (CSA 1981; CSA 2007; CSA 2007a). As previously stated,
> the areas adjacent to the outer entrance channel are very high energy surf zones
> that are not safe for human divers.

USACE_004138–39; *see also* NMFS_00020 ("[Endangered Species Act]-listed corals may be

found near the vessel disposal routes, particularly near the mouth of [San Juan Harbor] and may

be affected by sedimentation and turbidity associated with dredging and leakage from disposal

vessels"). Additionally, a report prepared for the Corps about Miami dredging faulted the

monitoring plan for being too loosely defined. NMFS_00722–27. Despite these known problems,

the Corps left the monitoring plan "TBD." *Am. Rivers,* 895 F.3d at 54.

### 3. The Corps' arbitrary analysis of coral impacts also violates the Clean Water Act 404(b)(1) guidelines

The Corps also failed to comply with the Clean Water Act's 404(b)(1) guidelines that

seek to ensure discharges do not harm coral reefs. 33 U.S.C. § 1344(b), (r). According to the

Corps' guidelines, "degradation or destruction of special aquatic sites [including coral reefs], . . .

is considered to be among the most severe environmental impacts." 40 C.F.R. §§ 230.1(d),

230.44. The guidelines require the Corps to consider the loss of coral reef values, including how

discharges "can adversely affect colonies of reef building organisms by burying them [and] . . .

by reducing light penetration through the water," noting that "[c]oral organisms are extremely

sensitive" to such effects. *Id.* § 230.44. The guidelines also require consideration of "the grain

size of the material proposed for discharge, the shape and size of the plume of suspended

particulates, the duration of the discharge and resulting plume . . . ." *Id.* § 230.11(c).

The Corps' consideration of the dredging and transit plume's effects on coral reefs was inadequate. The Corps prepared an appendix with its 404(b)(1) evaluation. USACE_001110–24. Yet, the only statement about corals in the 404(b)(1) evaluation is "[i]n or near the affected area are critical habitat Acroporid corals [sic] . . . the proposed action may affect but is not likely to adversely affect . . . stony corals." USACE_003832. This short coral reef evaluation in the environmental assessment fails to meet the 404(b)(1) regulatory requirements.

The Corps' dredging has previously smothered corals in Puerto Rico and violated the 404(b)(1) guidelines. *Surf & Env't Conservation Coal. v. Dep't of the Army*, 322 F.Supp. 2d 126, 138 (D.P.R. 2004). In 2000, a federal inspection of Arecibo Harbor dredging revealed that "dredge material was spilling into the adjacent sea and forming a plume that extended several hundred yards [more than 150-meters] east of the disposal area." *Id*. at 135. It left sediment "over an area that previously contained a coral hard-ground community." *Id*. Yet in its environmental review the Corps never evaluated the beach disposal site and consequent effects on corals and other wildlife. *Id*. at 138. The court held that the Corps ignored the fundamental precepts of the 404(b)(1) guidelines. *Id*. The Court should hold the same here.

### E. The Environmental Assessment Dismissed Risks to Historic Resources

The environmental assessment does not adequately evaluate impacts to cultural resources, including historic landmarks. The National Park Service (NPS)—charged with conserving the scenery and historic objects of the San Juan National Historic Site (54 U.S.C. § 100101)—expressed concerns with the Dredging Project:

> The NPS recommends that the [environmental impact statement] include analysis of the potential for the proposed undertaking to adversely affect San Juan National Historic Site and affiliated areas. In particular we are concerned about potential impacts from increased wave energy and erosion from changed channel configurations and increased shipping traffic to the existing structural integrity and current riprap which protects the sites. The proposed undertaking could result in changes in shipping traffic due to the deeper channel, as well as sediment

transport. The NPS is concerned that sediment transport changes will result in increased erosion and potential effects on the long-term structural integrity of NPS resources.

USACE_007241. The National Park Service requested that the Corps model these potentially significant impacts, and it also asked the Corps to evaluate climate change impacts to historic resources in combination with deepening. USACE_007241–42.

Far from modeling or examining these adverse impacts, the environmental assessment summarily claims deepening would *reduce* shoreline impacts by "reducing the number of vessels and increasing the range of tides during which vessels can transit the harbor," thus it concludes the Dredging Project will have no adverse impacts to historic properties. USACE_000184. But elsewhere in the environmental assessment, the Corps admits, "there is a potential for larger ship wakes due to increased horsepower." USACE_000161. However, nowhere does the environmental assessment contain any analysis of the impacts of those larger ship wakes.

The Corps attempts to dismiss erosion from ship wakes as negligible by comparing it to that caused from waves and wind fails because NEPA requires that effects on historic resources be disclosed, not compared. *Grand Canyon Tr.*, 290 F.3d at 345. Even if wind and waves cause erosion, the additive contribution of larger ship wakes should have been examined. Moreover, the Environmental Protection Agency expressed concerns that the environmental assessment lacked analysis of wave impacts in light of sea level rise and frequent storms such as Hurricanes Irma and Maria. USACE_000023.

The Corps also erroneously determined there would be no effect on the viewshed of historic properties. USACE_000184; *see City of Phoenix v. Huerta*, 869 F.3d 963, 972 (D.C. Cir. 2017) (changes in flight patterns above historic resources required further NEPA analysis, despite the State Historic Preservation Office's concurrence of no significant impacts). Even if San Juan Bay has a long history of shipping, the environmental assessment fails to consider the

influx of massive LNG and long-range oil tankers. These tankers will pass El Morro and El Cañuelo, spoiling the historical Spanish colonial aesthetics of and from the San Juan National Historic Site (Figure 5). The Historic Site preserves Spanish fortifications built in the 1500s (USACE_000098; USACE_000104), that are an integral part of Puerto Rican culture and identity.  Large fossil fuel tankers will mar the experience of seeing them—even from far across the Bay—for both residents and visitors alike, not only due to the massive tankers themselves, but also from the noise and light pollution they will bring. The Corps claims the Dredging Project has a low probability of impacting visitor experience—but its conclusory statements are not based on a hard look at the impacts as NEPA requires. *Sierra Club v. Mainella*, 459 F.Supp. 2d 76, 108 (D.D.C. 2006).



Figure 5. USACE_004084

The D.C. Circuit recently required an environmental impact statement for the aesthetic and visual impacts that transmission towers would have on historic and cultural resources of the James River, a nationally significant water trail. *Nat'l Parks Conservation Ass'n v. Semonite*,

916 F.3d 1075, 1086-87 (D.C. Cir. 2019). The omission of an analysis of these impacts renders the environmental assessment inadequate.

F.     **The Environmental Assessment Ignored Seabed Damage and Omitted Risks of Oil Spills and LNG Accidents**

The environmental assessment fails to examine dredging's direct harm to seabed life. The project will excavate several feet of seabed, including benthic organisms and their habitat. USACE_000134 ("Complete removal of benthic infauna and epifauna"). Notably, the Corps will widen by 100 feet and flare the channel in an area adjacent to seagrass beds. USACE_000030; USACE_007013. Even though the channel will be widened, the environmental assessment irrationally concludes that the effects on the seabed environment are "[n]ot anticipated to be different from performing maintenance dredging." USACE_000134. In a cursory paragraph, the Corps acknowledges "[d]irect catastrophic impacts" to seabed fauna, but quickly discounts those harms. USACE_000168. Such flippant treatment fails to meet the hard look required by NEPA. *See Louisiana v. Lee*, 758 F.2d 1081, 1085–86 (5th Cir. 1985) (holding Corps violated NEPA for inadequately considering dredging effects on benthic fauna that would "continue a course of environmental disruption.")

The environmental assessment also omits analysis of vessel traffic. The Corps' consideration of vessel traffic for the project's benefits, USACE_000115, is inconsistent with its omission of the harms from vessel traffic. *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp. 3d 1174, 1191 (D. Colo. 2014) (it is arbitrary to quantify the benefits of a project and not explain the harms). Underlying that omission is the rationale that the project will reduce vessel traffic, but the Corps cannot deny increases in greater horsepower vessels, larger long-range oil tankers, and LNG tankers. At minimum, the environmental assessment needed to discuss impacts of these bigger vessels.

The Corps failed to consider that larger long-range oil tankers risk bigger oil spills and LNG tankers risk explosions. The Coast Guard classifies oil, diesel, and LNG as hazardous liquids for maritime shipment. 46 C.F.R. § 153.40. The environmental assessment has no mention of LNG accidents, and the only time it mentions "oil spill" is noting a "risk reduction for fuel oil spills." USACE_000181. However, it is common sense that a larger oil tanker has the potential for a higher volume oil spill resulting in greater damage. *See e.g.*, USACE_002313; USACE_013740 (sea turtle oil spill risks); USACE_009008 (seabird oil spill risks).

LNG tankers present a risk of catastrophic accidents. *See* USACE_008043. LNG is a flammable, hazardous liquid with serious public safety concerns—risks of inextinguishable pool fires that spread as they burn and asphyxiating vapor clouds prone to ignite into explosions. *See, e.g.,* 2 Env't & Energy L. & Pol'y J. 5, 17 (2007). To the nearby neighborhoods, the risks are reminiscent of an incident at a petroleum terminal in 2009, in which a vapor cloud ignited and burned for days, causing toxic smoke and evacuations in San Juan. 155 Cong. Rec. 25853 (2009) (statement of Rep. Rangel). Yet, the environmental assessment is silent on LNG accidents.

NEPA requires an analysis of the effects from large oil and LNG tankers. For example, in *Ocean Advocates*, the Ninth Circuit held that the Corps' environmental assessment for an oil terminal violated NEPA because it did not take a hard look at the vessel traffic and potential impact of oil spills. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 871 (9th Cir. 2004). In that case, like here, the Corps claimed that a new pier would reduce the vessel traffic and chance of an oil spill, but the Court held that such analysis was unsatisfactory. *See also New York v. Nuclear Regul. Comm'n,* 681 F.3d 471, 482 (D. C. Cir. 2012) (agency's environmental assessment insufficiently examined the risk of leaks, pool fires, and other accidents).

### G.     The Cumulative Impacts Analysis Is Inadequate

The Corps also violated NEPA by failing to analyze *any* cumulative impacts to wildlife,

air or water quality, public health, historic resources, or environmental justice, and by providing

only a brief mention about moving buoys and Anchorage Area F. Cumulative effects are those

resulting from the "incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency . . . or person undertakes" them.

*Grand Canyon Tr.*, 290 F.3d at 341 (quoting 40 C.F.R. § 1508.7); *see* 40 C.F.R. § 1508.27(b)(7)

(defining "significantly"). As the D.C. Circuit emphasized:

> [A] meaningful cumulative impact analysis must identify (1) the area in which the
> effects of the proposed project will be felt; (2) the impacts that are expected in
> that area from the proposed project; (3) other actions—past, present, and
> proposed, and reasonably foreseeable—that have had or are expected to have
> impacts in the same area; (4) the impacts or expected impacts from these other
> actions; and (5) the overall impact that can be expected if the individual impacts
> are allowed to accumulate.

*Great Old Broads for Wilderness v. Kempthorne*, 452 F.Supp. 2d 71, 84 (D.D.C. 2006) (quoting

*Grand Canyon Tr.*, 290 F.3d at 342).

The cumulative impacts analysis does not satisfy these requirements. It omits the

cumulative effects of constructing and operating LNG infrastructure and dredging berthing areas.

*See supra* Connected Actions at 13. Even if these are not connected actions (which they are),

they are reasonably foreseeable projects with cumulative effects on air, water, and noise

pollution in San Juan Bay that must be disclosed and analyzed. The effects of the Corps' Río

Puerto Nuevo Flood Control project and its additional dredging and disposal should also be

considered. USACE_001538. Looking at a project in isolation from other water projects is not

the hard look NEPA requires. *Gov't of Man. v. Salazar*, 691 F.Supp. 2d 37, 47 (D.D.C. 2010);

*see also WildEarth Guardians v. Bernhardt*, 502 F.Supp. 3d at 249–53 (cumulative impacts of

leases need to be disclosed). While the Corps mentions the Coast Guard's Anchorage Area F

expansion, its conclusion that the effects are minimal runs contrary to the facts that significant

historic artifacts are likely in that area. USACE_000189.

Cumulative effects should also consider damage from past projects. *Am. Rivers*, 895 F.3d

at 55 (holding an environmental assessment inadequate for the "scant attention to those past

actions that had led to and were perpetuating the Coosa River's heavily damaged and fragile

ecosystem"). Here, the record shows that past dredging projects already had removed corals and

historic resources. USACE_002033; USACE_000184 (past dredging likely removed potentially

significant submerged cultural resources). The Corps uses this to justify why there are no

significant impacts now, but to the contrary, the agency should have examined how the additive

effects of this project deepen those harms. *Am. Rivers*, 895 F.3d at 55.

### H.   The Alternatives Analysis Does Not Pass Muster

The Corps failed to consider a reasonable range of alternatives. Alternatives are required

by NEPA and Clean Water Act 404(b)(1) guidelines.

NEPA requires environmental assessments to include a reasonable range of alternatives,

42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b). The analysis must "rigorously explore

and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. While an agency is

not obliged to consider every alternative to every aspect of a proposed action, the agency must

"consider such alternatives to the proposed action as may partially or completely meet the

proposal's goal." *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F 2d. 79, 93 (2nd Cir. 1975).

The Clean Water Act mandates that an agency adopt the least environmentally damaging

practicable alternative. The 404(b)(1) guidelines prohibit activities "if there is a practicable

alternative to the proposed discharge which would have less adverse impact on the aquatic

ecosystem." 40 C.F.R. § 230.10(a); *see All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*,

606 F.Supp. 2d 121, 129–30 (D.D.C. 2009) (Corps was arbitrary in failing to "explain why there is no less-damaging practicable alternative").

The alternatives here were nearly identical—dredging depths of 41, 42, 43, 44, and 45 feet—and lacked exploration of more environmentally beneficial alternatives (except the requisite "no action" alternative). USACE_000131. Thus, the Corps considered an unreasonably narrow range of alternatives that precluded its "intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Env't Def. Fund, Inc. v. U.S. Army Corps. of Eng'rs*, 492 F.2d 1123, 1135 (5th Cir. 1974); *see also Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 577 (D.C. Cir. 2016) (agency failed to look at alternatives that would be more protective of endangered bats); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877–78 (9th Cir. 2022) (agency made incorrect assumptions and failed to consider reasonable alternatives).

The Corps should have considered a smaller project footprint. The Corps' failure to evaluate a smaller project is like the deficiencies the Tenth Circuit found in *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1188–89 (10th Cir. 2002). There the court held that the Corps acted unlawfully under the Clean Water Act guidelines when it eliminated practicable alternatives for a proposed freeway, such as a narrower median or right-of-way, because the alternatives met part of the project purpose even if they did not allow for all of the amenities or utilities the applicant desired. *Id*.

The Corps should have also considered alternatives with robust environmental mitigation. For example, bubble curtains can reduce sedimentation and noise; seasonal and night-time restrictions on dredging could avoid seasonal coral spawning, aggregations of manatees, sea turtles or whales, and improve visibility; and avoiding hopper dredges would reduce sediment

plumes. *See, e.g.*, USACE_002316 (comment recommending coral relocation); NMFS_00783 (study recommending avoiding coral spawning season); USACE_003590 (Fish and Wildlife Service recommending bubble curtain for manatees).

Without any of consideration of true alternatives—plus a complete absence of an evaluation to determine the least damaging one (USACE_001124)—the Corps insufficiently considered the 404(b)(1) guidelines and failed to adopt the least environmentally damaging practicable alternative. *Utahns*, 305 F.3d at 1188–89.

## III.    NEPA Required the Corps to Prepare an Environmental Impact Statement

The Corps needed to prepare an environmental impact statement, not only to meet the requirements of 404(r), but also because NEPA requires it for federal actions with significant impacts. The agency never explained its change to an environmental assessment after it announced it would prepare an environmental impact statement (USACE_007577), and nothing in the record supports it.

The Act mandates that federal agencies prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If an action has effects that *may* be significant, an agency must prepare an environmental impact statement before the action is taken. *Id.*; *Sierra Club v. Peterson*, 717 F.2d at 1415; *Am. Rivers*, 895 F.3d at 38 (citing 42 U.S.C. § 4332(2)(C)). Here, the action more than meets this threshold for an environmental impact statement for its effects on public health and safety, cultural resources, endangered species, and cumulative impacts.

Under NEPA, significance is determined by the context and intensity of an agency's action. 40 C.F.R. § 1508.27. The context relates to the "affected region, the affected interests, and the locality," while intensity is the severity of the impacts. *Id*. Intensity considers ten factors, among them are the effects on public health and safety, the "[u]nique characteristics of the

geographic area," the effects on endangered species, and cumulative impacts. *Id.* at § 1508.27(b).

"Implicating any one of the factors may be sufficient to require development of an

[environmental impact statement]." *Semonite*, 916 F.3d at 1082 (citing *Grand Canyon Tr.*, 290

F.3d at 347).

The context is significant here because Congress designated the San Juan Bay Estuary—a

3,400-acre ecosystem of connected rivers, bays, and lagoons—as a National Estuary due to its

"national significance." *See* 33 U.S.C. § 1330. Additionally, the affected region includes the San

Juan National Historic Site, which boasts many significant historical properties.

USACE_000104–05; *see, e.g., Semonite,* 916 F.3d at 1082 (noting that historically-saturated

context qualifies as significant).

Additionally, the Corps' action implicates at least four intensity factors. *First, public*

*health and safety* will be adversely affected by air pollution and risk of oil and LNG accidents.

Heavily populated cities—San Juan, Guaynabo, and Cataño—surround the Bay, and

environmental justice communities nearest the petroleum terminals are already overburdened by

industrial pollution. The project's diesel-powered dredging and larger vessels will increase air

pollution. USACE_000180. The new LNG terminal will also contribute to air pollution. *See*

USACE_001722. Since now oil tankers arrive partly filled (light loaded) and there are zero LNG

vessels (USACE_000064 (Table 2-5), USACE_000112), the project endangers public safety by

risking larger oil spills from large long-range tankers and LNG accidents, including explosions.

*Second, the project's proximity to numerous historic and cultural resources* warrants an

environmental impact statement. *See, e.g., Semonite*, 916 F.3d at 1087. The area of potential

effects includes shipwrecks and six significant historic properties, including iconic El Morro and

El Cañuelo. USACE_000103–05; Answer ¶ 1. These historic landmarks and other Old San Juan

buildings are part of the San Juan National Historic Site and are inscribed as a UNESCO World Heritage Site for their Outstanding Universal Value. Answer ¶¶ 1, 59. The National Park Service raised concerns that the project would adversely affect the historic properties—including erosion, climate change, and viewshed impacts. USACE_007241. There are also several shipwrecks in the Bay, including ones that may be significant and eligible for protection as historic properties. USACE_000103 ("shipwreck site in the vicinity of Buoy R-4 appeared to be potentially significant"). Past dredging has damaged and required removal of historically significant shipwrecks. USACE_000103. The project's threat to historic resources combined with past damage from dredging warrants an environmental impact statement.

*Third, threats to threatened and endangered species* include dredge operations injuring and killing sea turtles, dredging smothering corals, and vessels colliding with manatees. Hopper dredges suck up endangered sea turtles and kill or maim them. USACE_000170, 172. Importantly, the Corps concluded that "hopper dredging is likely to adversely affect loggerheads, greens, and hawksbills." *Id*. A finding of adverse effects on a threatened or endangered species "is *prima facie* evidence that an [environmental impact statement] should have been prepared." *Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th at 879; *Nat. Res. Def. Council*, *Inc. v. Winter*, 518 F.3d 658, 692 (9th Cir. 2008), *rev'd on other grounds*, 555 U.S. 7 (2008). The Corps had the same violation for a North Carolina dredging project. *Cape Fear River Watch v. U.S. Army Corps of Eng'rs*, No. 7:21-CV-138-FL, 2022 WL 4468268 (E.D.N.C. Sep. 26, 2022). There, the Corps' conclusion that dredging impacts on sea turtles were insignificant conflicted with a federal biological opinion that found hopper dredges would likely have an adverse effect. *Id.* at *9. The court held the Corps failed to provide a rational connection, failed to consider an important aspect of the problem, and failed to take a hard look. *Id*.



Figure 6. USACE_021474.

Seven corals listed under the Endangered Species Act are also in harm's way from the sediment plume created by dredging and leaky scows used to transport the spoils for disposal. Sediment will smother listed corals and cause death, stress, starvation, and impaired reproduction. USACE_004132–33. A similar dredging project in Miami likely killed more than a million corals. NMFS_00691.

The project also increases the risk that vessels will harm manatees in San Juan Bay. USACE_001355–56 (San Juan Bay has a high shelter value for manatees and high motorized watercraft threats). Vessels are the primary threat to manatee survival, and in 2006 a large vessel killed five manatees in San Juan Bay. USACE_001356, NMFS_00195; *see* USACE_014436 (the most notable threat in Puerto Rico is collisions with watercraft), USACE_014440 (projects should be reviewed to address manatee-boat collisions). The project facilitates larger and faster vessels that are more deadly, and it introduces LNG tankers to an area where manatees congregate. FWS_00072 (37 manatee sightings in 2017).

*Fourth, there are cumulative effects* of numerous overlapping federal actions in San Juan Bay. Not only will effects flow from the dredging project, but the combined human and environmental effects are also exacerbated by (1) construction of the LNG terminal and regasification facility, USACE_001722; (2) expansion of Anchorage Area F, USACE_000067; (3) Sabana approach dredging, USACE_001347; (4) berthing area dredging; and (5) the Río Puerto Nuevo Flood Control Project, USACE_001538 (row 3).These simultaneous projects in the Bay all require federal approval, are reasonably foreseeable, and add to the cumulative effects of the Dredging Project. For example, the Río Puerto Nuevo Flood Control Project requires disposal of 2,600,000 cubic yards of silty sand and fines offshore at the ocean dumping site, USACE_001660–61, which will also risk sedimentation of corals during transport and deposit. *See* NMFS_00982 ("Turbidity and sedimentation are two of the most widely recognized threats to coral reefs.").

In short, where, as here, "significant effects *could* result, the agency must prepare an environmental impact statement." *Am. Rivers*, 895 F.3d at 38 (citing 42 U.S.C. § 4332(2)(C)) (emphasis added). The Corps' failure to do so is unlawful.

## IV.   The Determinations that the Project Is Not Likely to Adversely Affect Species Under the Endangered Species Act Violate the Law

In enacting the Endangered Species Act, Congress made the deliberate decision "to give endangered species priority over the 'primary missions' of federal agencies" to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–185 (1978). To meet this mandate, agencies must consult with expert wildlife agencies for actions that may affect threatened or endangered species or their critical habitat. 16 U.S.C. § 1536(a)(2). The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," thus formal consultation

is easily triggered. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986); *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F.Supp. 3d 7, 12–13 (D.D.C. 2014) ("The 'may affect' threshold for triggering the consultation duty . . . is low." (citation omitted)).

For major construction activities, the agency prepares a biological assessment to determine whether a project is likely to adversely affect listed and proposed species and designated and proposed critical habitat, 50 C.F.R. § 402.12, which the Corps did here. USACE_002539–2558 (for the Fish and Wildlife Service); USACE_004077–4192 (for the Fisheries Service). If the project is not likely to adversely affect any listed species or critical habitat, the agency may proceed with informal consultation, a process that concludes with a written concurrence from the Fisheries Service and/or Fish and Wildlife Service, depending on the species. 50 C.F.R. § 402.14(b). A "not likely to adversely affect" determination is only available when effects on listed species are "discountable, insignificant, or completely beneficial." Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook, at 3-12 (1998) ("Consultation Handbook"). "Discountable" effects are "extremely unlikely to occur," and "insignificant" effects "relate to the size of the impact" and should never amount to any harm to a species. *Id*. at 3-12 to 3-13. In contrast, a "likely to adversely affect" conclusion, which requires formal consultation, is appropriate "if any adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions." *Id.* at 3-13. The consultation process, whether formal or informal, must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(d).

Here, the agencies failed to use the best available science in concluding that the Dredging Project was not likely to adversely affect imperiled corals and manatees, and they ended the

process with informal consultation. In doing so, the agencies have deprived these species of the protections Congress intended the formal consultation process to provide, including measures to minimize harm to imperiled species. *See* 16 U.S.C. § 1536(b)(4).

### A.     The Fisheries Service Failed to Use the Best Available Science on Dredging Effects on Corals

The Fisheries Service's decision that the Dredging Project is "not likely to adversely affect" seven threatened corals listed under the Endangered Species Act or elkhorn and staghorn critical habitat failed to use the best scientific and commercial data available as the Endangered Species Act requires. 16 U.S.C. § 1536(a)(2). Specifically, the Fisheries Service's conclusion contradicts record evidence that documented hundreds of thousands of corals, including threatened corals, dying from similar dredging at the Port of Miami, even at great distances from dredging. NMFS_00678 (more than "560,000 corals were killed within 0.5 km [of dredging], with impacts likely extending over 5–10 km"); NMFS_00697 (Corps' recent Florida projects "negatively impacted hundreds of acres of coral"). A likely source of sediment was the disposal doors in the barges not sealing properly and leaking. NMFS_00782; *see also* USACE_000178 ("historical documentation from dredging projects for the last 50-years show that all scows leak to some extent."). Similarly, the Fisheries Service anticipated that each of the Dredging Project's 977 scow trips, USACE_001647–48, could leak a seemingly small amount—"[o]ne foot of loss per trip, or more"—but in total, they "could amount to a significant amount of sediment on the reef there." USACE_001709.

The record shows that the Fisheries Service recognized the importance of the Port of Miami data and corals' vulnerability to sedimentation, but it did not make a decision consistent with these facts. *See, e.g.,* USACE_001708 (discussing sedimentation impacts to corals considering "lessons learned" from the Port of Miami). A scientific paper on the Port of Miami,

authored by multiple Fisheries Service scientists, stated that "[n]umerous dredging projects have resulted in widespread environmental effects on coral reef communities." NMFS_00771. Plus, the final rule listing the corals as threatened identified dredging as an activity that may affect the corals. USACE_009562. In fact, elkhorn and staghorn corals are "much more susceptible to increases in water turbidity than some other coral species." USACE_015089. Even though listed corals are "found near the vessel disposal routes, particularly near the mouth of [San Juan Harbor and] may be affected by sedimentation and turbidity associated with dredging and leakage from disposal vessels," the Fisheries Service concluded the project "is not likely to adversely affect" threatened corals. NMFS_00019–20.

The record does not reveal a rational basis for the Fisheries Service's conclusion. *See Sierra Club v. Flowers*, 423 F.Supp. 2d 1273, 1379 (S.D. Fla. 2006) (remanding concurrence letter with instructions to formally consult), *vacated as moot* 526 F.3d 1353, 1359 (11th Cir. 2008)). The Endangered Species Act requires the Fisheries Service to use the "best scientific and commercial data available" in its consultation. 16 U.S.C. § 1536(a)(2). This command means the "agency 'cannot ignore available biological information or fail to develop projections' which may indicate potential conflicts between the proposed action and the preservation of endangered species." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F.Supp. 2d 1137, 1150 (W.D. Wash. 2000) (quoting *Conner v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

### 1.    The Unwritten Monitoring Plan Does Not Ensure Against Harm to Corals

The only way the Fisheries Service could plausibly make a not-likely-to-adversely-affect determination was to rely on mitigations to prevent harm to corals, but there is no mitigation plan in place. The Fisheries Service admits sedimentation from the Dredging Project could have significant negative impacts to corals, including smothering corals, reducing feeding, and

depleting energy reserves that leads to lower calcification rates and reproductive output.
NMFS_00020. Accordingly, its determination relies on a promise by the Corps to develop a plan
for turbidity monitoring near listed corals and critical habitat, which will trigger adaptive
management measures only after turbidity reaches deadly levels. NMFS_00020–21. The
Fisheries Service cannot rely on a plan to make a mitigation plan to avoid formal consultation.
*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743–47 (9th Cir. 2020) (an agency may
not rely on uncertain mitigation measures to support its conclusions in an Endangered Species
Act consultation); s*ee also Ctr. for Biological Diversity v. Salazar*, 804 F.Supp. 2d 987, 1001–02
(D. Ariz. 2011) (an agency cannot rely on "measures that are not reasonably specific nor
reasonably certain to occur" or "not even identified" to support its conclusion in consultation).

      Moreover, the portions of the to-be-planned monitoring plan that are known are
inadequate to ensure corals are unharmed. First, the proposed trigger for management at 7 NTUs
*above background* will not prevent coral harm. *See* NMFS_00693. To avoid deleterious effects,
the maximum allowable turbidity near coral reefs during short-term construction events should
be 7 NTU *or less*. NMFS_00020. Because the background level of turbidity is already high
where the corals are, and likely from human sources, any additional turbidity will have harmful
effects. *See, e.g.,* USACE_001718 (noting background turbidity levels in 2007 of 9.81 NTU and
in 2017 of 7.01 NTU); NMFS_00881–927 (documenting sources of sediment affecting corals off
Puerto Rico's north shore); NMFS_00693 (turbidity should not exceed 7 NTU above
background). Therefore, by the time dredging exceeds 7 NTU above background levels, harm to
corals would have already occurred—which would militate against a "not likely to adversely
affect" determination. Here, the agency's irrational turbidity limit—which provides the basis for
its not-likely-to-adversely-affect decision—is unlawful. "And not even the most deferential

standard of review can save an agency action for which the agency can articulate no reasoned basis." *Nat. Res. Def. Council v. Rauch*, 244 F.Supp. 3d 66, 94 (D.D.C. 2017) (citing *ALLTEL Corp. v. FCC*, 838 F.2d 551, 562 (D.C. Cir. 1988)).

Second, the not-likely-to-adversely-affect determination relies on outdated and generic measures from 2011 that failed to prevent leaking scows in Miami. NMFS_0022 ("[Corps] will also adhere to the conditions in the February 1, 2011, [Site Monitoring and Management Plan] including all conditions that apply to transit of the disposal vessels"); USACE_013195–98; NMFS_00143. These conditions—"scows suspected of leaking *must* be inspected before using the scow again" and "[i]f any leaks are found, they *must* be repaired prior to using the scow again" (NMFS_00143)—are similar to the measures that did not work in Miami, i.e. "if a scow is determined to be leaking, use of that scow will cease and repaired promptly." NMFS_00723. The Fisheries Service failed to heed the lessons learned from the Port of Miami to update mitigation requirements, like using real-time turbidity loggers for rapid assessment of dredge plumes. NMFS_00757. It also failed to quantify the reduction in harm that these generic conditions provided. *See Pres. Our Island v. U.S. Army Corps of Eng'rs*, No. C08-1353RSM, 2009 WL 2511953, at *10 (W.D. Wash. Aug. 13, 2009) (requiring the informal consultation to quantify the harm reduction from a dock extension into deep water to avoid eelgrass bed disturbance).

Warranting further concern, in 2021 the Corps observed at least four unlisted coral species directly adjacent to the dredging planned at Cut-6. USACE_024518. This suggests that the habitat could be suitable for protected corals and harmed by dredging. Yet no monitoring plan that considers this habitat is in the record, or apparently in development, because the record is void of any Fisheries Service communications to the Corps about corals since 2018.

## 2.    The Agency's Post-Hoc Rationalizations Are Unpersuasive.

The Fisheries Service cannot cure its errors with a Memorandum to File drafted a month after Plaintiffs' complaint. NMFS_00001–03. The Memorandum offers a post-hoc rationalization of the differences between San Juan Bay and Port of Miami to justify its failure to examine the best available science. NMFS_00001–02. But an unsigned Memorandum buttressing their earlier position—long after Plaintiffs' Endangered Species Act sixty-day notice letter and after litigation commenced—should not be afforded weight or deference. An agency's "post-hoc assessments" do not satisfy the procedural consultation mandates. *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1128–29 (9th Cir. 1998); *see also Gerber v. Norton*, 294 F.3d 173, 184 (D.C. Cir. 2002) (rejecting an approach in which after the complaint is filed, "the agency may simply thank [plaintiffs] for their specificity and announce that it has nonetheless reached the same conclusion").

Additionally, counsel's characterization of this Memorandum in litigation as a "Reinitiation of Consultation Memorandum," Certif. of Admin. Rec. ¶ 2, ECF No. 15-4, is not only confusing, but it also gives short shrift to the Endangered Species Act's procedural duties. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) ("Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation."). The Memorandum contains neither the word "reinitiation" nor the word "consultation," yet, in litigation, Defendants described it as a "determination that reinitiation of consultation under Section 7 of the Endangered Species Act is not required." Certif. of Admin. Rec. ¶ 2, ECF No. 15-4. Further, the Memorandum is narrow in scope—limited to analysis of one scientific paper, Cunning et al. 2019—and does not live up to the rigor required of consultation aimed at protecting endangered species. The consultation process is vitally important to the overall purpose of the Endangered Species Act. *See Thomas v. Peterson*, 753

F.2d 754, 764 (9th Cir. 1985) ("the strict substantive provisions of the [Act] justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions").

### B.   The Fish and Wildlife Service Unlawfully Determined the Project Is Not Likely to Adversely Affect Manatees

The Fish and Wildlife Service's not likely to adversely affect determination failed to analyze important sources of mortality and behavior disturbance for manatees: noise pollution and vessel strikes (collisions). Manatees are known to transit the action area and feed on seagrass nearby: during a few months of San Juan Harbor maintenance dredging in 2017, 16 manatees were spotted, with 13 individuals observed within a 100 feet perimeter. FWS_00072.

The Fish and Wildlife Service's analysis omitted key threats to manatees. The Fish and Wildlife Service failed to acknowledge that watercraft "collision is now considered the greatest threat to manatees in Puerto Rican waters." 82 Fed. Reg. 16,668, 16,673 (Apr. 5, 2017) (citing scientific studies). The relevant measures relied upon to make the not likely to adversely affect determination include marine mammal observers during dredge operations, lighting requirements for nighttime operations to permit observation of manatees, cessation of operations if a manatee is observed, speed limits in waters of 10 feet or less during dredge operations, and manatee collision or injury reporting requirements. FWS_00048–49. These requirements—even if optimally implemented—fail to prevent take of manatees through noise pollution and vessel strikes, and fail to protect seagrass beds where manatees feed. The determination that relied on these measures was thus arbitrary and capricious.

Based on the available records, noise pollution from the Dredging Project is likely to harass and disturb manatees. The record shows that the noise pollution from dredging will exceed levels that harass and harm marine mammals. USACE_000179 ("Noise levels in excess

of 120 dB, or the Level B Criterion for harassment, could be exceeded depending on the type of dredging equipment used."). These thresholds were developed to inform Endangered Species Act consultations. USACE_006236. The average noise level range for a hopper dredge is 143 dB; clamshell/bucket dredges' range is 150 to 162 dB. USACE_004128 (Table 3). Accordingly, the dredging is likely to harass and potentially harm manatees.

The Fish and Wildlife Service's concurrence letter recognized noise as a potential effect of the Project, FWS_00073, but was silent about related impacts to manatees, like potential displacement from areas to feed or reproduce. The Corps cited studies that the noise pollution "area of influence" was 100 m (328 ft) from the source. USACE_000181. Thus, the mitigation measures that require operations to shut down if a manatee comes within 50 feet of the active construction site during daytime hours, FWS_00074, will not prevent this harm. *See Pres. Our Island*, 2009 WL 2511953, at *8, *13–14 (formal consultation should have taken place on the effects of noise impacts on juvenile salmon and killer whales).

Manatee injuries and deaths from vessel strikes are likely to increase because of the Dredging Project, are not mitigated by the Corps, and contradict the Fish and Wildlife Service's not-likely-to-adversely-affect determination. Documented vessel strikes in San Juan Bay include four males and one female adult Antillean manatees—a reproductive unit called a "mating herd"—found dead in August 2006 due to a large boat strike. FWS_00071. The agency stated that a potential effect of the widening and deepening of the San Juan Bay Harbor is a "post-construction increase in commercial boat traffic." FWS_00047. At minimum, there will be larger oil and LNG tankers using the channel in the same area where the manatees aggregate; "petroleum tankers and LNG tankers transiting the Army Terminal Channel . . . are the main sources of project benefits." USACE_002544. These vessels will increase the risk of ship strike,

which is the greatest threat in Puerto Rico's waters to manatees. 82 Fed. Reg. at 16,673. Larger vessels also account for a disproportionate number of ship strikes, especially fatal ship strikes, due to their size and reduced maneuverability. USACE_002310.

The Fish and Wildlife Service recognized that the Project risks destroying seagrass "due to dredging activities, slumping [of the sides of the channel,] and increased erosion from ship wakes." FWS_00062. Expansion of the turning basin may impact 69 acres of sea grasses. FWS_01392. The Fish and Wildlife Service failed to assess the harm to manatees from losing this source of food. *See* USACE_002554 ("Seagrass and other submerged aquatic vegetation (SAV) in the Bay provide suitable foraging habitat" for manatees); *Pres. Our Island*, 2009 WL 2511953, at *10 (the consultation had to quantify the project's effect on seagrass to determine impacts to juvenile salmon). Further, the Fish and Wildlife Service expected the "Condado Fill proposed [mitigation] . . . would compensate for these potential impacts." FWS_00057. The Corps subsequently abandoned the plan for Condado fill, USACE_024430–33, so this cannot be the basis for the not-likely-to-adversely-affect determination.

The Fish and Wildlife Service should not be able to avoid formal consultation and make a not-likely-to-adversely-affect determination when it fails to consider important effects of the dredging on manatees. *See, e.g.*, *State Farm*, 463 U.S. at 43 (agency decision is arbitrary if it "entirely failed to consider an important aspect of the problem").

### C.    The Corps Unlawfully Relied on the Service's Flawed Consultations

The Corps, the action agency that is authorizing the Dredging Project, is in violation of its substantive obligations under the Endangered Species Act section 7(a)(2) because it continues to rely on the invalid and unlawful not likely to adversely affect determinations by the Services.

Section 7(a)(2) imposes an ongoing, substantive duty on an action agency to ensure against jeopardy so long as the agency maintains discretionary control over its action.

*Cottonwood Env't. Law Ctr. v. U.S. Forest Service*, 789 F.3d 1075, 1086–87 (9th Cir. 2015). An agency cannot rely on an invalid Endangered Species Act consultation to satisfy this substantive obligation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). Yet that is just what the Corps has done here.

For the reasons described above, the Fisheries Service's and Fish and Wildlife Service's not-likely-to-adversely-affect determinations for the Dredging Project are invalid. The Corps' reliance on these flawed documents is unlawful. *See Sierra Club v. Flowers*, 423 F.Supp. 2d at 1376 (holding the agency's "written concurrence" conclusion lacked a rational basis and the Corps erred when it chose to rely on that concurrence); *Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F.Supp. 3d 1035, 1063 (D. Mont. 2017) (holding that action agency's reliance on invalid Endangered Species Act consultation was arbitrary); *Mayo v. Jarvis*, 177 F.Supp. 3d 91, 146 (D.D.C. 2016) (same).

## V.     The Corps Unlawfully Failed to Confer on Coral Proposed Critical Habitat

The Corps failed to confer on the impacts of the Dredging Project on proposed critical habitat in Puerto Rico for five threatened corals. USACE_021697–98 (in "2021 the USACE coordinated with . . . the NMFS Southeast Regional Office in St. Petersburg, Florida, to focus on the species listed in Table 3-1," but not proposed coral critical habitat); *see also* Clauser Decl. Ex. 1 (Figure 3 above depicting proposed coral critical habitat). Even though the Corps "coordinated with" and "contacted" the Fisheries Service over impacts to protected species in 2021, USACE_021697–98, no evidence exists in the record of the Corps conferring on impacts to proposed coral critical habitat.

The Endangered Species Act mandates that each agency "shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any [proposed species] or result in the destruction or adverse modification of [proposed] critical habitat." 16

U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10(a); *Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1034 (D.C. Cir. 2008) (quoting and citing same). The purpose of the conference is to identify and resolve potential conflicts "at an early stage in the planning process." 50 C.F.R. § 402.10(a); *Bd. of Cty. Comm'rs of Rocky Mt. Wild v. Bureau Land Mgmt.,* 584 F.Supp. 3d 949, 974 (D. Colo. 2022).

The proposed critical habitat for Caribbean boulder star coral, lobed star coral, mountainous star coral, pillar coral, and rough cactus coral exists in much of the Dredging Project area, including areas in San Juan Harbor and along the north shore of San Juan in the Atlantic Ocean. Clauser Decl. Ex. 1 (Figure 3). As discussed above, small increases in sedimentation from dredging and leakage from disposal vessels can significantly reduce coral recruitment and survivorship; negatively affect larval settlement and recruitment; and impede fragment reattachment. NMFS_00021; 85 Fed. Reg. at 76,307–08 (harms from sediments), 76,316 (channel dredging and offshore disposal of spoils has "the potential to affect the essential feature of the five corals' critical habitat"). Activities in and near proposed critical habitat require the Corps to confer with the Fisheries Service because the Dredging Project is likely to "[a]ppreciably diminish the value" of the proposed critical habitat, meaning that it is likely "to considerably reduce the capability of . . . proposed critical habitat to satisfy requirements essential to both the survival and recovery of a listed species." Consultation Handbook at x, 4-36.

The Corps cannot assume that the not-likely-to-adversely-affect determination in place for designated critical habitat would apply to the proposed critical habitat, which is much closer to the dredging. The past determination depended on the fact that "the nearest coral critical habitat is approximately 2,500 ft from the active dredging area," NMFS_00021, which is not the case for the proposed critical habitat that surrounds dredging areas. Additionally, the transit route

to the offshore disposal site crosses over the proposed critical habitat, which extends much farther offshore than pre-existing critical habitat. *See* Figure 3.

Even though the proposed rule designating critical habitat published after the Chief's Report, this does not save the Corps because it continued to consult on impacts to endangered species through 2021. *Compare* USACE_021697–98 (the Corps initiated informal consultation with the Fisheries Service on impacts to corals in 2021), *with* Answer ¶ 164 (admitting no conference on the effects of the Project on proposed critical habitat and averring that the critical habitat was proposed three years after the Project decision); *see* 50 C.F.R. § 402.03 (duty consult exists as long as "there is discretionary Federal involvement or control"). The Endangered Species Act requires the Corps to confer on the Project's impacts to proposed critical habitat. Defendants admitted that they did not.

## VI.     The Court Should Vacate the Finding of No Significant Impact, Environmental Assessment, and "Not Likely to Adversely Affect" Determinations

The APA mandates "[t]he reviewing court shall . . . hold unlawful and set aside agency action" that violates the law. 5 U.S.C. § 706(2). Vacatur is the presumptive remedy for agency actions held contrary to law. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971). The burden is on the agencies to show anything less than vacatur is warranted. *Ctr. for Biological Diversity v. Ross*, 480 F.Supp. 3d 236, 240, 244–45 (D.D.C. 2020). Although the D.C. Circuit has recognized a narrow exception to this default remedy, *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), there is no reason to depart from the presumptive remedy here.

//

//

//

**CONCLUSION**

The Corps should have completed a comprehensive environmental impact statement as required by the text of the Clean Water Act. 33 U.S.C. § 1344(r). Instead, its environmental assessment has substantial gaps and errors that underestimate the project's detrimental effects, and the agencies' determinations on endangered species rubberstamp those unfounded conclusions. For the reasons described in this brief, the Court should grant Plaintiffs' motion and vacate the agencies' decisions. Unabated, these decisions will harm communities, corals, and the climate.

Dated:  January 27, 2022.                    Respectfully submitted,

                                             s/ *Catherine Kilduff*
                                             Catherine Kilduff, DC Bar No. 1026160

                                             s/ *Miyoko Sakashita*
                                             Miyoko Sakashita, DC Bar No. CA00061

                                             CENTER FOR BIOLOGICAL DIVERSITY
                                             1212 Broadway, Suite 800
                                             Oakland, CA 94612
                                             (510) 844-7100
                                             ckilduff@biologicaldiversity.org
                                             miyoko@biologicaldiversity.org

                                             *Attorneys for Plaintiffs*