**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

EL PUENTE, et al.,

   *Plaintiffs,*

  v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

   *Federal Defendants.*

Civ. No. 1:22-cv-02430-CJN

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

     Under Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Federal Defendants cross-move for summary judgment in the above-captioned action. This cross-motion is based on the accompanying memorandum, the administrative record, and all argument or evidence that may be presented at any hearing on the cross-motion. For the reasons provided in the accompanying memorandum, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment, and dismiss Plaintiffs' Complaint with prejudice.

Dated: February 24, 2023

Respectfully Submitted,

United States Department of Justice
Environment & Natural Resources Division
TODD KIM, Assistant Attorney General

*/s/ Michelle M. Spatz*
Michelle M. Spatz, Trial Attorney
D.C. Bar No. 1044400
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-9741
Email: michelle.spatz@usdoj.gov

Christopher C. Hair, Trial Attorney
PA Bar # 306656
United States Department of Justice
Natural Resources Section
4 Constitution Square
150 M Street, NE, Suite 3.1004
Washington, D.C. 20002
Telephone (202) 305-0420
Email: christopher.hair@usdoj.gov

Sarah Izfar, Trial Attorney
D.C. Bar No. 1017796
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0490
Email: sarah.izfar@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

EL PUENTE, et al.,

    *Plaintiffs,*

  v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

    *Federal Defendants.*

Civ. No. 1:22-cv-02430-CJN

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

LEGAL BACKGROUND .......................................................................................................2

    I.     Clean Water Act .......................................................................................................2

    II.    National Environmental Policy Act .......................................................................3

    III.   Endangered Species Act .........................................................................................4

FACTUAL BACKGROUND ...................................................................................................5

    I.     The Corps' Navigation Mission and Congressional Study Authority ...................5

    II.    Proposed San Juan Harbor Project .........................................................................6

         A.    CWA and NEPA Compliance ...................................................................7

         B.    ESA Consultation .......................................................................................8

    III.   San Juan Ocean Dredged Material Disposal Site ..................................................9

STANDARD OF REVIEW ....................................................................................................10

ARGUMENT ..........................................................................................................................11

    I.     The SJH Project Complies with the CWA ..........................................................11

         A.    The MPRSA, not the CWA, governs the deposit of dredged material into the ODMDS .......................................................................................11

         B.    Section 1344(r) has no application here ..................................................12

         C.    The Corps complied with the Clean Water Act .......................................14

    II.    The Corps complied with NEPA's requirements .................................................16

         A.    The SJH Project's purpose is to deepen and widen shipping channels into San Juan Harbor, not import foreign oil ...........................................16

         B.    NEPA does not require the Corps to consider unrelated energy and dredging projects as "connected actions." .................................................17

         C.    The Corps adequately considered reasonable alternatives ......................20

         D.    The Corps' environmental justice analysis is adequate ...........................22

E.    The Corps adequately considered the environmental impacts of the SJH Project..........................................................................26

1.    Cumulative Effects....................................................................26

2.    Air Quality................................................................................28

3.    Threatened or Endangered Corals.............................................30

4.    Cultural and Historic Resources ..............................................33

5.    Vessel Accidents.......................................................................34

III.    The Corps properly determined that no Environmental Impact Statement was necessary ...................................................................................35

IV.    The agencies fulfilled their ESA Section 7 consultation obligations ..................38

A.    NMFS reasonably determined that the SJH Project is not likely to adversely affect ESA-listed corals or their designated critical habitat......38

1.    The SJH Project is different from the 2013 Port of Miami dredging project and involves significantly less potential for harm to corals ............................................................................39

2.    NMFS reasonably determined that reinitiation of ESA Section 7 consultation is not required for ESA-listed corals and critical habitat......................................................................44

3.    The Turbidity Monitoring Plan serves as a safeguard against harm to ESA-listed corals and their critical habitat.....................46

B.    FWS reasonably determined that the SJH Project is not likely to adversely affect the Antillean manatee ....................................................52

1.    The record does not support a conclusion that noise pollution will harm manatees ..................................................................52

2.    Vessel strikes are expected to decrease as a result of the SJH Project ......................................................................................54

3.    The San Juan Harbor is not a significant source of seagrass.........56

C.    The Corps lawfully relied on its ESA Section 7 consultations with NMFS and FWS ............................................................................57

V.    The Corps has no duty to confer on a proposed critical habitat designation that was issued two years after ESA Section 7 consultation was completed........58

VI.   Vacatur of the SJH Project decisional documents is not warranted and, should the Court grant any relief, Federal Defendant request supplemental briefing on remedy ............................................................................................ 60

CONCLUSION ............................................................................................................ 62

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ......................................................................... 60, 61

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
    462 U.S. 87 (1983) .......................................................................................... 10

*Better Gov't Ass'n v. Dep't of State,*
    780 F.2d 86 (D.C. Cir. 1986) ........................................................................... 25

*Board of Mississippi Levee Commissioners v. E.P.A.,*
    674 F.3d 409 (5th Cir. 2012) ........................................................................... 13

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974) ........................................................................................ 10

*Carolina Fisheries Ass'n v. Gutierrez,*
    518 F. Supp. 2d 62 (D.D.C. 2007) .................................................................. 10

*Citizens Against Burlington, Inc. v. Busey,*
    938 F.2d 190 (D.C. Cir. 1991) ......................................................................... 21

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .................................................................................. 10, 57

*City of Alexandria v. Slater,*
    198 F.3d 862 (D.C. Cir. 1999) ......................................................................... 21

*City of Bos. Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ................................................................... 17, 20

*City of Tacoma, Wash. v. FERC,*
    460 F.3d 53 (D.C. Cir. 2006) .................................................................... 57, 60

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004) ................................................................... 23, 25

*Coal. On Sensible Transp., Inc. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987) ........................................................................... 17

*Conservation Force v. Salazar,*
    811 F. Supp. 2d 18 (D.D.C. 2011) .................................................................. 45

*Conservation Force, Inc. v. Jewell,*
    733 F.3d 1200 (D.C. Cir. 2013) ....................................................................... 45

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) ......................................................................... 49

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) .............................................................. 3, 4, 19, 28, 29, 35

*Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ................................................................................37

*Env't. Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) ..............................................................................37

*Fed. Power Comm'n v. Idaho Power Co.*,
  344 U.S. 17 (1952) ................................................................................................60

*Grand Canyon Trust v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002) ..............................................................................27

*Hüls Am. Inc. v. Browner*,
  83 F.3d 445 (D.C. Cir 1996) ...........................................................................10, 50

*Indian River Cnty. v. U.S. Dep't of Transp.*,
  945 F.3d 515 (D.C. Cir. 2019) ................................................................................3

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1980) .........................................................................................11, 25

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) ................................................................................32

*Minisink Residents for Env'l Pres. & Safety v. FERC*,
  762 F.3d 97 (D.C. Cir. 2014) ................................................................................28

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................10, 25, 39

*N.C. Fisheries Ass'n v. Gutierrez*,
  550 F.3d 16 (D.C. Cir. 2008) ................................................................................60

*Nat. Res. Def. Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ..................................................................61

*Nat. Res. Def. Council, Inc. v. EPA*,
  25 F.3d 1063 (D.C. Cir. 1994) ..............................................................................28

*Nat'l Parks Conservation Ass'n v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) ............................................................................36

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ..............................................................................37

*New York v. E.P.A.*,
  413 F.3d 3 (D.C. Cir. 2005) .......................................................................8, 24, 60

*Parks Conservation v. U.S. Forest Serv.*,
  177 F. Supp. 3d 1 (D.D.C. 2016) ..........................................................................38

*Pres. Our Island v. U.S. Army Corps of Eng'rs*,
  2009 WL 2511953 (W.D. Wash. Aug. 13, 2009) ..................................................54

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
 898 F.2d 1410 (9th Cir. 1990) ........................................................................ 57, 58

*Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers,*
 No. CV 20-3817 (CKK), 2022 WL 5434208 (D.D.C. Oct. 7, 2022) ................................ 15, 16

*Riverkeeper Network v. FERC,*
 753 F.3d 1304 (D.C. Cir. 2014) ............................................................... 17, 18, 20

*Robertson v. Methow Valley Citizens Council,*
 490 U.S. 332 (1989) ........................................................................................ 32

*Save the Yaak Comm. v. Block,*
 840 F.2d 714 (9th Cir. 1988) .............................................................................. 37

*Sierra Club v. FERC,*
 827 F.3d 36 (D.C. Cir. 2016) ......................................................................... 27, 37

*Sierra Club v. FERC,*
 867 F.3d 1357 (D.C. Cir. 2017) .......................................................................... 26

*Sierra Club v. U.S. Dep't of Interior,*
 990 F.3d 898 (5th Cir. 2021) ............................................................................. 49

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,*
 255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................................... 26

*Theodore Roosevelt Conservation P'ship v. Salazar,*
 616 F.3d 497 (D.C. Cir. 2010) ............................................................................ 33

*Utahns for Better Transportation v. U. S. Department of Transportation,*
 305 F.3d 1152 (10th Cir. 2002) ........................................................................... 15

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
 435 U.S. 519 (1978) ............................................................................ 3, 38, 39, 40

*Weinberger v. Catholic Action of Haw.,*
 454 U.S. 139 (1981) ........................................................................................ 20

*Wildlife v. Salazar,*
 698 F. Supp. 2d 141 (D.D.C. 2010) ....................................................................... 32

**Statutes**

16 U.S.C. § 1362(18) ......................................................................................... 53

16 U.S.C. § 1531(b) ........................................................................................... 4

16 U.S.C. § 1532(15) .......................................................................................... 4

16 U.S.C. § 1536(a)(2) ........................................................................................ 4

33 U.S.C. § 1341 .............................................................................................. 8

33 U.S.C. § 1341 ............................................................................................. 14

33 U.S.C. § 1344(r) .................................................................................................12

33 U.S.C. § 1411 ....................................................................................................3

33 U.S.C. § 1412(a) ................................................................................................3

33 U.S.C. § 1412(c)(3) ..........................................................................................51

33 U.S.C. § 1413 ..................................................................................................3, 9

33 U.S.C. § 1413(e) .............................................................................................3, 9

33 U.S.C. §§ 1344 ..............................................................................................2, 11

42 U.S.C. § 4332(2)(B) ..........................................................................................3

42 U.S.C. § 4332(2)(B)-(C) ...................................................................................3

42 U.S.C. §§ 4321 - 4370m-12 ..............................................................................3

42 U.S.C. §§ 4332(2)(e)(iii) ..................................................................................20

5 U.S.C. § 706(2)(A) .............................................................................................10

*Water Resources Development Act of 2018*,
   Pub. L. No. 115-270, 132 Stat. 3765 (2018) .....................................................7

**Regulations**

33 C.F.R. § 230.7(a) ..............................................................................................12

33 C.F.R. § 328.3 ....................................................................................................2

33 C.F.R. § 336.1(a) ...............................................................................................3

33 C.F.R. § 336.2 ..................................................................................................11

33 C.F.R. 1413(b) ...................................................................................................3

33 C.F.R. Part 320 ..................................................................................................2

33 C.F.R. Pt. 325 ..................................................................................................13

40 C.F.R. § 1501.4(e) .............................................................................................4

40 C.F.R. § 1501.7 ..................................................................................................7

40 C.F.R. § 1502.14 ..........................................................................................21, 22

40 C.F.R. § 1508.1(g)(2) ...............................................................................29, 31, 32

40 C.F.R. § 1508.25(a)(1) .....................................................................................17

40 C.F.R. § 1508.27 ..............................................................................................36

40 C.F.R. § 1508.9(a) .............................................................................................4

40 C.F.R. § 1508.9(b) ...........................................................................................20

40 C.F.R. § 228.4-228.6 ........................................................................................... 9

40 C.F.R. § 230.10(a) ............................................................................................... 14

40 C.F.R. § 230.2 ....................................................................................................... 3

40 C.F.R. § 230.2(b) ............................................................................................. 3, 11

40 C.F.R. §§ 230.1(d) ............................................................................................... 15

40 C.F.R. Part 230 ...................................................................................................... 2

43 C.F.R. § 46.420(b) ............................................................................................... 21

50 C.F.R. § 402.01(b) ................................................................................................. 4

50 C.F.R. § 402.10(a) ............................................................................................... 59

50 C.F.R. § 402.13(a) ............................................................................................. 5, 6

50 C.F.R. § 402.13(a)-(b) ......................................................................................... 49

50 C.F.R. § 402.13(c) ........................................................................................ passim

50 C.F.R. § 402.14 .................................................................................................... 44

50 C.F.R. § 402.14(a) ................................................................................................. 4

50 C.F.R. § 402.14(b)(1) .......................................................................................... 38

50 C.F.R. § 402.14(g)(8) .......................................................................................... 48

50 C.F.R. § 402.14(m)(1) .................................................................................... 45, 58

50 C.F.R. § 402.16 .................................................................................................... 44

50 C.F.R. § 402.16(a) ................................................................................... 40, 45, 59

50 C.F.R. § 402.16(a)(2) .................................................................................... passim

50 C.F.R. § 424.16(c)(2) .......................................................................................... 59

50 C.F.R. §§ 402.13-402.14 ................................................................................. 4, 44

59 Fed. Reg. 7,629 (Feb. 11, 1994) ................................................................... 22, 23

79 Fed. Reg. 6,545 (Feb. 4, 2014) .......................................................................... 40

80 Fed. Reg. 60,657 (Oct. 7, 2015) ........................................................................... 7

84 Fed. Reg. 44,976 (Aug. 27, 2019) ...................................................................... 48

85 Fed. Reg. 43,304 (July 16, 2020) ......................................................................... 4

85 Fed. Reg. 76,302 (Nov. 27, 2020) ................................................................. 58, 59

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| CWA | Clean Water Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish & Wildlife Service |
| LNG | Liquified Natural Gas |
| MPRSA | Marine Protection, Research, and Sanctuaries Act of 1972 |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| ODMDS | Ocean Dredged Material Disposal Site |
| SJH Project | San Juan Harbor, Puerto Rico Navigation Improvements Project |

## INTRODUCTION

The United States Army Corps of Engineers ("Corps") designed the San Juan Harbor, Puerto Rico Navigation Improvements Project ("SJH Project") in response to Congress's direction to develop navigation improvements to increase the harbor's security, safety, and efficiency, in accordance with the Corps' operating principles for environmental protection. Due to current depth restrictions of the San Juan Harbor channels, many vessels are forced to load less product than they are designed to carry, in order to reach the terminal in a process called "light loading." This practice results in increased vessel transits through the harbor to transport the same amount of cargo. Other vessels, such as cruise ships, experience restricted maneuverability within the existing harbor depths and therefore face increased transit time. The SJH Project proposes widening and deepening certain channels to reduce "light loading," increase maneuverability, and reduce overall vessel congestion (thereby increasing efficiency and reducing the risk of vessel collisions with marine life). The project does not require any changes to Puerto Rico's method of energy production, nor does it foreclose the possibility of making such changes.

The SJH Project complies with the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA"). The Corps took the requisite "hard look" at the environmental impacts of the project under NEPA and prepared an Environmental Assessment ("EA") which analyzed, among other things, potential impacts to corals, air quality, cultural and historic resources, and any surrounding minority or low-income populations. Based on a thorough analysis of the project's potential impacts, including the consideration of public comments on the draft EA, the Corps determined that the SJH Project will not have significant environmental impacts. Additionally, although the Corps was not required to obtain a permit under Section 404 of the CWA (which Plaintiffs mistakenly contend applies), the Corps did comply with the applicable and more stringent standards of the Marine Protection,

Research, and Sanctuaries Act of 1972 ("MPRSA") with respect to disposal of dredged material and duly complied with Section 404 of the CWA when analyzing alternatives. The Corps also fulfilled its consultation obligations under Section 7 of the ESA by consulting with both the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("FWS") on the impacts of the SJH Project to ESA-listed species and critical habitat. Both expert wildlife agencies determined that the project is not likely to adversely affect the ESA-protected species or habitat at issue in this case.

The Corps' compliance with NEPA, the CWA, and the ESA is well supported by the administrative record. Because Plaintiffs fail to show any clear error in the agencies' well-reasoned analyses supporting the SJH Project, the Court should afford deference to the agencies' expertise and grant summary judgment to Federal Defendants.

## LEGAL BACKGROUND

### I.  Clean Water Act

Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into "navigable waters," defined as "waters of the United States." *See* 33 U.S.C. §§ 1344 (Section 404 program); 1362(7) (defining navigable waters); 33 C.F.R. § 328.3 (definition of "waters of United States"). Section 404 of the CWA, *id.* § 1344, authorizes the Corps to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met. *Id.* §§ 1311(a); 1344. The Corps issues these permits to both private entities and other federal agencies under the guidance and requirements imposed by its regulations, 33 C.F.R. Part 320, as well as the CWA Section 404(b)(1) Guidelines developed by the Environmental Protection Agency ("EPA") and the Corps, codified at 40 C.F.R. Part 230. When the Corps itself seeks to undertake a project that will cause a discharge, the Corps follows "all

applicable substantive legal requirements" under Section 404, including an application of the Section 404(b)(1) Guidelines. 33 C.F.R. § 336.1(a); 40 C.F.R. § 230.2(b).

For discharges into the ocean and into territorial seas, the Corps applies more stringent standards under the MPRSA and its implementing regulations. 33 U.S.C. § 1413, 40 C.F.R. § 230.2. Section 101 of the MPRSA, 33 U.S.C. § 1411, prohibits dumping any material into the ocean or territorial sea without a permit. Under Section 102 of the MPRSA, 33 U.S.C. § 1412(a), EPA may designate sites for ocean dumping. As approved here, the Corps uses EPA-designated ocean dumping sites to the maximum extent feasible. 33 C.F.R. 1413(b). Under Section 103(e) of MPRSA, 33 U.S.C. § 1413(e), in connection with federal projects involving dredged material, the Corps may "in lieu of the permit procedure," issue regulations.

## II.   National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321 - 4370m-12, requires federal agencies to give "appropriate consideration" to environmental impacts before undertaking major actions. 42 U.S.C. § 4332(2)(B)-(C). NEPA requires the government to "take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019) (internal citation omitted). It also tasks the Council on Environmental Quality ("CEQ") with promulgating implementing regulations. 42 U.S.C. § 4332(2)(B). NEPA is "essentially procedural," designed to ensure "fully informed and well-considered decision[s]" by federal agencies. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

Under NEPA, agencies may prepare an EA if the proposed action would not clearly require the production of an Environmental Impact Statement (commonly referred to as an "EIS"). *Dep't*

*of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1501.4(a)-(b)).[1] An EA is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (alterations in original) (quoting 40 C.F.R. § 1508.9(a)). If, after conducting an EA, the agency determines that an EIS is not required under the applicable regulations, "it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757-58 (citing 40 C.F.R. § 1501.4(e), 1508.13).

## III.   Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). ESA Section 7(a)(2) directs each agency to ensure, in consultation with the appropriate "consulting agency" (NMFS or FWS), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2).[2] Consultation is required if the agency proposing the action determines that the action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a).

If consultation is required, the "action agency" may request either formal or informal consultation. *See* 50 C.F.R. §§ 402.13-402.14. Informal consultation "is an optional process that

---

[1] CEQ issued new implementing regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the challenged administrative actions were subject to previous regulations, all citations herein are to the version of the regulations in effect at the time of the relevant decisions.

[2] Depending on the species in question, either the Secretary of the Interior or the Secretary of Commerce is responsible for implementing the ESA as the consulting agency. 16 U.S.C. § 1532(15). The Secretary of the Interior administers the ESA through FWS, and the Secretary of Commerce administers the ESA through NMFS. 50 C.F.R. § 402.01(b).

includes all discussions, correspondence, etc., between the [consulting agency] and the [action] agency . . . designed to assist the [action] agency in determining whether formal consultation . . . is required." 50 C.F.R. § 402.13(a). "If during informal consultation it is determined by the [action] agency, with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* at § 402.13(c).

## FACTUAL BACKGROUND

### I.     The Corps' Navigation Mission and Congressional Study Authority

Part of the Corps' mission statement is to provide safe, reliable, efficient, and environmentally sustainable waterborne transportation systems for movement of commerce, national security, and recreation. USACE_000032. In September 2006, the U.S. House of Representatives adopted House Resolution 2764, which authorizes the Secretary of the Army to determine the feasibility of providing navigation improvements at San Juan Harbor, Puerto Rico to increase security, safety, and efficiency, in accordance with the Corps' environmental operating principles. USACE_000032, 54.

Charged with the task of investigating and addressing navigational inefficiencies in San Juan Harbor, the Corps conducted a study that identified several navigation problems. The problems included: difficult wind and wave conditions, limited channel and turning basin widths, and insufficient federal channel depths. USACE_000033. The federal channels serving San Juan Harbor's major terminals are currently authorized to depths ranging from -30 to -40 feet. *Id.* These depths require existing petroleum product tankers to light load, which results in additional transits to provide the required quantities of gasoline, jet fuel, diesel fuel, and other petroleum products for the island. *Id.* This practice increases the risk of vessel collisions with marine life, *see*

USACE_002555, and requires vessel operators to forgo potential transportation cost savings available from the economies of scale associated with existing and larger ships drafting deeper, USACE_000033. For cruise ships, the limiting channel depths restrict maneuverability for turn-and-go movements, ultimately increasing transit time within the Harbor. *Id.*

## II.     Proposed San Juan Harbor Project

To address the problems identified above, the Corps proposed the SJH Project to widen and deepen certain inner harbor channels in San Juan Harbor. The Corps analyzed various alternatives and, in August 2018, recommended a plan expected to yield the greatest economic benefits and transportation efficiencies. USACE_000033. The recommended plan involved (i) deepening several channels, including Anegado Channel, the Army Terminal Channel, and the Army Terminal Turning basin; (ii) widening Army Terminal Channel from 350 feet to 450 feet; and (iii) expanding San Antonio Channel by 1,050 feet. USACE_000034. The SJH Project is not aimed to increase the capacity of the harbor to process cargo, but rather to enable the port to handle the current cargo rates more efficiently. USACE_000153.

At the time of the Corps' study, the estimated cost of the SJH Project was $54,042,000 and its projected benefits were $60,097,000 if the Puerto Rico Electric Power Authority converted its San Juan power plants from diesel fuel to liquified natural gas ("LNG"), or $2,041,000 if it continued to use diesel fuel. USACE_000034-35. The Corps also analyzed a base plan, involving the placement of 2.2 million cubic yards of dredged materials into the existing Ocean Dredged Material Disposal Site ("ODMDS") as well as options involving the placement of suitable dredged material elsewhere if it would provide a beneficial use to the environment (such as restoring seagrass habitat or improving water quality). USACE_000034.

Following the environmental review processes discussed below, the SJH Project was ultimately recommended by the Chief of Engineers in August 2018, USACE_000004-8, authorized by Congress in October 2018 under Section 1401(1) of the Water Resources Development Act of 2018, Public Law 115-270, and approved by the Corps in November 2018, USACE_000001-3.

**A. CWA and NEPA Compliance**

In October 2015, pursuant to 40 C.F.R. § 1501.7, the Corps published a Notice of Intent in the Federal Register notifying the public of the Corps' intent to prepare an EIS for the SJH Project. *See* 80 Fed. Reg. 60,657 (Oct. 7, 2015). Also in October 2015, the Corps sent an information letter and planning meeting invitation to resource agencies and special interest groups and, separately, mailed meeting information to interested parties. USACE_000201. In November 2015, the Corps held a scoping meeting at the Puerto Rico Convention Center in San Juan. *Id.* During the meeting, the Corps solicited views and comments regarding environmental and cultural resources, study objectives, and other important features and/or concerns in the project's study area.

In August 2017, the Corps issued a draft Integrated Feasibility Report and EA to the public and requested public comments during a public review period through September 2017. USACE_000191-92; USACE_000202; USACE_002319. The Integrated Feasibility Report and EA were finalized in August 2018. USACE_000028. That combined document addressed the comments received by the Corps, USACE_001125, and recommended proceeding with the proposed SJH Project. USACE_000206. Based on the Final EA, including stakeholder and public input, the Corps determined that the preparation of an EIS was not required because the recommended plan would not significantly affect the human environment. USACE_000003 (Finding of No Significant Impact ("FONSI")). On February 2, 2022, Puerto Rico's Environmental

Quality Board issued the Corps the requisite water quality certificates associated with the SJH Project pursuant to 33 U.S.C. § 1341. USACE_028572-79.

Recently, in January 2023, the Corps supplemented its EA for the SJH Project. USACE_024434. The Supplemental EA evaluated only the dredging of a new area as an additional sand source for seagrass mitigation associated with the construction of the Puerto Nuevo Channel. USACE_024439. Ultimately, the Corps decided against the additional dredging and instead decided that all dredged material will be placed in the ODMDS. USACE_024449.

**B. ESA Consultation**

In July 2017, pursuant to ESA Section 7, the Corps submitted a Biological Assessment to NMFS, providing the Corps' assessment of potential effects of the SJH Project on ESA-listed species and designated critical habitat within NMFS's area of purview. NMFS_00177-292. The Corps requested formal consultation with NMFS on certain species and a written concurrence with its effects determination for other species (i.e., informal consultation). NMFS_00177. As is relevant here, the Corps requested a written concurrence with its determination that the SJH Project is "not likely to adversely affect" seven ESA-listed threatened corals (including: Elkhorn coral (*Acropora palmata*); Staghorn coral (*Acropora cervicornis*); Pillar coral (*Dendrogyra cylindrus*); Lobed star coral (*Orbicella annularis*); Mountainous star coral (*Orbicella faveolata*); Boulder star coral (*Orbicella franksi*); Rough cactus coral (*Mycetophyllia ferox*)) and designated critical habitat for Elkhorn and Staghorn corals.[3] In May 2018, NMFS issued a Biological Opinion, which included a written concurrence with the Corps' finding that the project is not likely to adversely

---

[3] Despite identifying green sea turtles, loggerhead sea turtles, hawksbill sea turtles, and leatherback sea turtles in their Fifth Claim for Relief (asserting ESA and APA violations for "unlawful ESA consultation by NMFS"), ECF No. 1 ¶¶ 150-155, Plaintiffs do not assert any ESA argument on those species in their Motion for Summary Judgment. *See New York v. E.P.A.*, 413 F.3d 3, 20 (D.C. Cir. 2005) (A party waives arguments that it fails to raise in its opening brief.).

affect the ESA-listed corals or their critical habitat, NMFS_00004-154, thereby concluding the ESA Section 7 consultation process.

In August 2017, the Corps submitted a separate Biological Assessment to FWS, providing its assessment on the SJH Project's potential impacts to the ESA-listed threatened Antillean manatee (*Trichechus manatus*) and requesting informal consultation under ESA Section 7. FWS_01349-68. In June 2018, FWS provided a written concurrence with the Corps' finding that the SJH Project is not likely to adversely affect the manatee. FWS_00047-51.

**III.    San Juan Ocean Dredged Material Disposal Site**

The San Juan Harbor requires periodic maintenance dredging every five to seven years—with or without the SJH Project—to maintain authorized depths. USACE_000067, 91. Historically, the Corps has placed dredged material removed from San Juan Harbor in the ODMDS, which is located "approximately 2.2 nautical miles north-northwest of the entrance to San Juan Harbor," and is approximately one square mile in size. USACE_000067; *see also* USACE_019590-693 (1988 FEIS discussing history of ODMDS). ODMDS sites are designated by EPA through notice-and-comment rulemaking in the Federal Register. 40 C.F.R. § 228.4-228.6. Because the ODMDS is a depositary for ocean-dredged material, its use is governed by MPRSA, and it is managed and monitored under a Site Management and Monitoring Plan (USACE_013098-013148), pursuant to Section 103 of the MPRSA, 33 U.S.C. § 1413. The management plan ensures the control of turbidity and scow leakage when transporting dredged materials. USACE_000091.[4]

---

[4] This ODMDS has been used for dredged material disposal activities since 1975 and was last used in 2017. *Id*.; *see also* USACE_00773-74. The Corps does not expect that the SJH Project would require expanding the ODMDS. *Id*.; *see also* USACE_000160. The Corps would evaluate any potential expansion of the ODMDS or any new areas to deposit dredged materials in accordance with Section 103 of the MPRSA. *Id*. *See also* USACE_000160.

## STANDARD OF REVIEW

Judicial review of final agency action under the CWA, NEPA, and ESA is governed by the "arbitrary or capricious" standard set forth in the Administrative Procedure Act ("APA"), which requires courts to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under this standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court's only role in applying this standard is to determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *N. Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) ("Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'") (citation omitted). Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citations omitted).

A reviewing court "will give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'" *Hüls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir 1996) (citation omitted); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of facts, a reviewing court must generally be at its most deferential."). "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original

matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1980).

**ARGUMENT**

**I.      The SJH Project Complies with the CWA.**

**A.      The MPRSA, not the CWA, governs the deposit of dredged material into the ODMDS.**

Plaintiffs fundamentally misapprehend the challenged federal action, which approved the dredging of San Juan Harbor. The initial construction of the SJH Project will place all dredged material in the ODMDS, which the MPRSA, not the CWA, governs. USACE_001111; 40 C.F.R. § 230.2(b), 33 C.F.R. § 336.2. At this time, the Corps is not proceeding with the deposit of dredged material in Condado Lagoon, which is a disposal option that requires compliance with CWA, Section 404, 33 U.S.C. § 1344. In the future, the Corps may consider this disposal option, which would deposit dredged material in certain areas for "beneficial use" such as fish and wildlife habitat creation and ecosystem restoration. USACE_000140-41. But in the Supplemental Environmental Assessment, the Corps concluded that it will not be pursuing that option at this time and would not do so, if at all, until certain criteria are met and additional NEPA analysis, which will include additional CWA analysis, is completed. USACE_024430-33, 70-71.

Plaintiffs do not challenge the Corps' compliance with the MPRSA, and the record reflects that the Corps complied fully with its obligations under that act. As part of its evaluation, the Corps prepared a Dredged Material Management Plan Preliminary Assessment. USACE_000761-87 (App'x B to EA). The Corps evaluated dredging alternatives that included discharges of dredged and fill material into the ODMDS. USACE_000775 (identifying alternatives). As part of its consideration of depositing dredged material in the ODMDS, the Corps obtained EPA's concurrence in accordance with Section 103 of the MPRSA. USACE_000195; USACE_006717

11

(Corps Request); USACE_006722-880 (MPRSA Section 103 Report); USACE_006501 (EPA concurrence); USACE_000782. The Corps has since updated its analysis and again received EPA's concurrence. USACE_029806 (Corps Request); USACE_029807-948 (Final MPRSA Section 103 Report); USACE_025892-927 (EPA Concurrence). Thus, in proceeding with the deposit of dredged material in the ODMDS, the Corps was obligated to and duly complied with the MPRSA.

> **B.    Section 1344(r) has no application here.**

Plaintiffs' misplaced reference to Section 1344(r) of the CWA has no relevance here. *See* Pls.' Mot. for Summ. J. 10-12, ECF No. 20 ("Pls.' Br."). First, nothing in Section 1344(r) (or anywhere else in the CWA) mandates, as Plaintiffs appear to suggest, that an EIS be prepared for all federal projects. Under Section 1344(r):

> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise subject to regulation under this section . . . if information on the effects of such discharge . . . is included in an environmental impact statement for such project pursuant to [NEPA] and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

33 U.S.C. § 1344(r). The statutory provision does not require preparation of an EIS; rather, it provides a narrow exception that permits discharges for Congressionally authorized federal projects *where an EIS is prepared* and submitted to Congress and other specific conditions are met. Indeed, federal projects involving solely an EA are common,[5] and comply with CWA Section 404. *See, e.g.*, 33 C.F.R. § 230.7(a) ("Most permits will normally require only an EA."); *see also*

---

[5] As explained below, *infra* Argument Section III, the Corps' explained its rationale for preparing an EA instead of EIS, and its decision was reasonable.

33 C.F.R. Pt. 325, App. B at paragraph 7.a. ("The EA should normally be combined with other required documents (EA/404(b)(1)/SOF/FONSI).").

Second, and more importantly, Section 1344(r) has no relevance because the Corps did not invoke that provision here. Rather, the Corps recognized that, if the agency were to pursue beneficial use for the dredged materials that would result in a discharge into "waters of the United States," the Corps would have to comply with CWA Section 404 and its implementing regulations. This is why the Corps prepared an entire appendix to the EA that specifically addressed its Section 404 analysis: the Corps was considering an alternative that would involve depositing dredged materials into Condado Lagoon, a "water[] of the United States." *See also* USACE_001110-24 (App'x I to EA).

Plaintiffs cite *Board of Mississippi Levee Commissioners v. E.P.A.*, 674 F.3d 409, 418 (5th Cir. 2012), but this case supports the Corps' position that Section 1344(r) does not apply here. Pls.' Br. 10. In that case, the Board claimed that EPA lacked the ability to veto a project because the project was federally authorized under Section 1344(r). *Bd. of Miss. Levee Comm'r*, at 412. But the Fifth Circuit rejected this argument, concluding that because no final EIS was prepared or submitted to Congress, Section 1344(r) did not apply. *Id.* at 418. As further support for its conclusion, the court noted that the Corps had obtained a water quality certification from the State of Mississippi, which the Corps would not have done had it intended to seek an exemption under Section 1344(r), because the Corps would have also been exempt from the requirement of obtaining a state water quality certificate. *Id.* at 420.

The same considerations apply here. The Corps completed a Section 404 analysis when analyzing beneficial use alternatives and obtained a water quality certificate under Section 401.

The Corps did not invoke Section 1344(r), did not prepare an EIS and submit it to Congress, and plainly considered the CWA to apply.

### C.    The Corps complied with the Clean Water Act.

The Corps complied with all applicable obligations under the CWA. Although (as explained above) the disposal of dredged material into the ODMDS is not regulated by Section 404, the Corps has otherwise complied with its obligations under the CWA[6] and has committed to completing further analysis before approving any future deposit of dredged material in Condado Lagoon. And, the Corps' alternatives analysis also complied with the CWA. Under the Corps' regulations, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Here, the Corps considered a number of alternatives for depositing dredged materials, and ultimately decided that for the initial construction, all the dredged material will be placed in the existing ODMDS, which will not require expansion. The Corps also analyzed other alternatives for depositing portions of the dredged material, including depositing some dredged materials into Condado Lagoon to facilitate seagrass habitat restoration, developing a new dredged material management area, and depositing some dredged material on the Cataño shoreline. USACE_000142-43. For each alternative that involved depositing dredged material, the Corps completed a Section 404 Analysis. USACE_001110-24 (App'x I to EA). Notably, Plaintiffs fail to articulate any specific deficiencies with that analysis. For example,

---

[6] The Corps also complied with its obligations under Section 401 of the CWA. The Corps obtained a water quality certification for such disposal. USACE_028572-79; *see also* USACE_001284 (App'x K to the EA). And the Corps has committed to obtaining any other necessary water quality certifications in accordance with Section 401 of the CWA, 33 U.S.C. § 1341. USACE_000165.

Plaintiffs cite alternatives that the Corps allegedly should have considered, but none apply in the context of Section 404 of the CWA. Pls.' Br. 36-37. Plaintiffs do not assert that the Corps should have selected *any* other alternative for depositing dredged material, let alone a practicable alternative that is less environmentally adverse. *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1188-89 (10th Cir. 2002) is inapt. Pls.' Br. 37-38. In that case, the challenged federal project did not depend on water and the agency ignored an alternative that was feasible but less environmentally damaging. Here, no such alternative was rejected.

Similarly, Plaintiffs' criticisms of the Corps' Section 404 analysis as to coral reefs fail. Pls.' Br. 29-30. Plaintiffs reference 40 C.F.R. §§ 230.1(d), 230.44, and 230.11, to contend that the Corps failed to adequately assess the impact on corals, but Plaintiffs appear to be referencing the dredging site, not the disposal site. The Corps did not identify corals in the dredging site, does not anticipate impacts to corals, and has taken steps to ensure precautionary measures will prevent the leakage of dredged materials. *See infra* Argument Section II.E.3 and IV.A.

Under such circumstances, the Corps' discussion of practicable alternatives was reasonable and appropriate. *See Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, No. CV 20-3817 (CKK), 2022 WL 5434208, at *19 (D.D.C. Oct. 7, 2022) (upholding alternatives analysis based on overall project purpose).

In sum, to deposit dredged material in the ODMDS, as planned for the initial construction of the SJH Project, the Corps was not required to comply with Section 404 requirements but with Section 103 of the MPRSA, which the Corps did, and which Plaintiffs do not dispute. Further, the Section 1344(r) of the CWA does not require the Corps to prepare an EIS, and the Corps fully complied with its obligations under the CWA.

II.     **The Corps complied with NEPA's requirements.**

A.      **The SJH Project's purpose is to deepen and widen shipping channels into San Juan Harbor, not import foreign oil.**

As a threshold matter, Plaintiffs mischaracterize the SJH Project as "a big federal project to import foreign oil and LNG to Puerto Rico" that is "inconsistent" with Puerto Rico's plans to shift to renewable energy. Pls.' Br. 1. However, the Corps' statement regarding the SJH Project's purpose and need makes plain that the project's purpose is to increase harbor access for larger vessels and reduce overall congestion and shipping costs. Indeed, the Corps found that the proposed project is "needed as the existing depths and widths of the Federal channels place constraints on vessels currently [accessing] San Juan Harbor." USACE_000033. Due to the cargo and cruise industries' shift to larger vessels, the current depths in the harbor cause various problems, including: (1) maneuverability issues; (2) requiring vessels to carry lighter loads and/or make additional transits to offload cargo; (3) limiting port access to certain larger vessels altogether; and (4) increasing the cost for vessel operators who could otherwise use ships that currently lack access to the harbor. *Id.* Thus, the SJH Project addresses these issues by deepening and widening the harbor for all ships and not just for the "primary purpose of . . . large, long-range oil and LNG tankers to transit the bay." Pls.' Br. 4.

In the main, the project's benefits are twofold: (1) transportation savings using existing ships, as well as larger ones, to transport the projected cargo volumes; and (2) increased maneuverability of larger vessels. USACE_000035. To be sure, larger oil and LNG tankers stand to benefit from the project. One additional benefit of the project would include power generation cost reduction benefits, which would accrue only if San Juan's power generation converts primarily to LNG. *Id.* Nevertheless, the Corps found that the SJH Project is economically justified even without an LNG conversion. USACE_000038. Thus, the project does not prevent Puerto Rico

from meeting its goals for renewable energy. Rather, the project provides operators of larger vessels—including non-oil/LNG cargo and cruise ships—with greater access to the harbor and the ability to reduce costs.

> **B.     NEPA does not require the Corps to consider unrelated energy and dredging projects as "connected actions."**

Because the SJH Project requires no changes to San Juan's energy generation, NEPA does not require the Corps to consider the environmental impacts of potential changes to San Juan's use of fossil fuels. The scope of an agency's NEPA review must include both "connected actions" and "similar actions." 40 C.F.R. § 1508.25(a)(1), (3). Actions are "connected" if they trigger other actions, cannot proceed without previous or simultaneous actions, or are "interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1).

Plaintiffs assert that the Corps improperly segmented its environmental review by failing to evaluate connected actions, including "new" LNG infrastructure and other dredging projects. Pls.' Br. 13. Not so. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). Whether actions should be considered as connected turns on "whether one project will serve a significant purpose even if a second related project is not built." *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (quoting *Coal. On Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987)).

Here, LNG infrastructure is not "inextricably linked and interdependent" with the SJH Project, as Plaintiffs incorrectly assert. Pls.' Br. 14. Rather, the SJH Project would serve a significant independent purpose of allowing all vessels to navigate through the Army Terminal Channel to better maneuver and perform berthing operations. To wit, the Corps developed the SJH

Project's channel dimensions by projecting vessel traffic in San Juan Harbor and modeling vessel dimensions based on a container ship, cruise ship, and oil and LNG tankers. USACE_000034 (discussing the Corps' use of "HarborSym"). Moreover, the two existing power plants at San Juan Harbor were constructed and operational before the Corps' proposed project and currently use LNG (among diesel and other fuels). USACE_006513; USACE_002304-05 (letter from the Puerto Rico Electric Power Authority). Any changes to San Juan's use of diesel fuel, LNG, or renewables would not require any approval by the Corps. Thus, San Juan's LNG infrastructure is not dependent on the proposed SJH Project.

Further, the SJH Project is financially viable even without the uncertain conversion of the two San Juan area power plants from diesel fuel to LNG. The Corps determined that the project "reasonably maximizes net benefits both with and without the LNG conversion and associated power generation cost reduction benefits being included[.]" USACE_000867; *see* USACE_000115 (noting that the "benefits are expressed in terms of transportation costs saved by *all parties on all goods*, whether they are imported or exported") (emphasis added). Notably, the Corps found that the anticipated LNG conversion was surrounded in "uncertainty," USACE_000038, based on the significant investment associated with LNG infrastructure, questions regarding the future of the Puerto Rico Electric Power Authority, and damage caused by hurricanes Irma and Maria. USACE_000151. Accordingly, the Corps' economic analysis considered two scenarios: (1) one where San Juan power plants convert from using diesel fuel to LNG; and (2) another where diesel fuel continues to be used (thereby removing any power generation cost reduction benefits). USACE_022696. Under either scenario, the Corps found that the SJH Project was economically justified. USACE_022716. Thus, the economic feasibility of the Project does not depend on increased LNG importation into the harbor. *See Del. Riverkeeper*,

753 F.3d at 1316 (noting that courts must look to the "commercial and financial viability of a project when considered in isolation from other actions").

Plaintiffs make the conclusory assertion that the Corps did not consider the harms of LNG conversion, *see* Pls.' Br. 16, but they fail to specify any such harms. Moreover, Plaintiffs failed to raise this issue—or any other issues specific to LNG conversion—during the comment period and have therefore forfeited the right to raise those issues in this litigation. *See Pub. Citizen*, 541 U.S. at 764-65 (finding that respondents "forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives" because they failed to raise "particular objections to the EA" and did not give the agency "the opportunity to examine" the issue).

Plaintiffs gain no greater traction by pointing to other dredging projects that have not been proposed. For example, Plaintiffs claim that the U.S. Coast Guard will "dredge a proposed safety zone for vessels in the central part of the Bay[.]" Pls.' Br. 16 (citing USACE_004044, 004054). While the Coast Guard may decide to expand and deepen Anchorage Area F as a safety area for ships experiencing mechanical failures or other emergencies, the Coast Guard must first conduct a rulemaking process to change the purpose of Anchorage Area F from a location for ships carrying explosives to a safety zone for all commercial vessels. USACE_000067; *see also* USACE_004044 (noting rulemaking and funding prerequisites). Defendants are unaware of any proposed rulemaking by the Coast Guard to undertake this action. Moreover, the Corps noted that, in advance of such a project, the Coast Guard would be required to conduct its own environmental review, likely to include a diver identification of Anchorage Area F and consultation with the State Historic Preservation Officer on the findings. USACE_002501-04. Indeed, the Corps duly considered these issues in its cumulative effects analysis. USACE_000189. In any event, the Corps was not required to consider the Coast Guard's possible future action as a "connected action"

19

because "NEPA . . . does not require agencies to commence NEPA reviews of projects not actually proposed." *Del. Riverkeeper*, 753 F.3d at 1318 (citing *Weinberger v. Catholic Action of Haw.*, 454 U.S. 139, 146 (1981)).

Finally, the Corps was not required to conduct a detailed evaluation of other unrelated proposed dredging actions in the vicinity of the SJH Project. Those proposed projects include: (1) the expansion of the Sabana Approach by a private developer proposing to bring in compressed gas liquid, USACE_001347; (2) a petroleum company's maintenance dredging to restore the required depth for the safe maneuvering of ships approaching and berthing at the Cataño Oil Dock, USACE_005669-70; and (3) the Puerto Rico Port Authority's proposal to provide maintenance dredging and safety depth to avoid grounding of large cruise ships in berthing and adjacent areas of Panamerican Dock, USACE_005762-63, and two other locations, *see* USACE_005766-67 (Pier 3); USACE_005770-71 (Pier 4). These private projects are entirely independent from the SJH Project. Plaintiffs speculate that the SJH Project "begets more dredging" merely "because the dredge would be in town." Pls.' Br. 16-17. However, the Administrative Record does not support any meaningful connection between these independent proposals and the SJH Project. Moreover, looking beyond Plaintiffs' speculation, the independent utility of these other projects is apparent in light of the existing cruise ship, petroleum, and LNG industries within San Juan Harbor. Accordingly, NEPA does not require the Corps to consider other unrelated dredging proposals. *City of Bos. Delegation*, 897 F.3d at 252.

### C.   The Corps adequately considered reasonable alternatives.

The Corps fulfilled NEPA's requirement to consider reasonable alternatives. *See* 42 U.S.C. §§ 4332(2)(e)(iii), (E); 40 C.F.R. § 1508.9(b). In so doing, the Corps considered a variety of structural and nonstructural measures and formulated over 100 possible deepening or widening

alternatives before identifying a reasonable range of seven alternatives for detailed consideration. USACE_000124.

CEQ regulations require an agency to evaluate "all reasonable alternatives," including a no-action alternative. *See* 40 C.F.R. § 1502.14; *see also* 43 C.F.R. § 46.420(b) (defining "reasonable alternatives" as those alternatives "that are technically and economically practical or feasible and meet the purpose and need of the proposed action"). Courts in this Circuit evaluate an agency's selection of alternatives "in light of the objectives of the federal action[.]" *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999). Such an inquiry involves considerable deference to the agency's expertise and policy-making role. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

Here, the Corps developed five modeling "phases" based on measures that would: (1) trigger a transition of fleet influenced by the physical factors affecting larger vessels; (2) impact annual numbers of vessel calls; and (3) improve maneuverability, effectively reducing transportation costs. USACE_000124. The Corps used these five "phases" to assess widening and/or deepening certain areas within the harbor, *id*. The five phases evaluated by the Corps dovetail with the Corps' purpose and need statement, which (as noted above) reasonably identified the goals of the SJH Project.

In addition to various alternate proposals to deepen and/or widen areas within the harbor, the Corps also considered "nonstructural" mitigation measures that the Corps identified to improve navigation in San Juan Harbor. USACE_000119. Specifically, the Corps evaluated the use of additional tugboats, additional trucking, the use of an offshore port, and continued "light loading" of vessels to accommodate larger vessels under existing conditions," among other options. *Id*. The Corps considered those measures because they were identified to improve navigation in San Juan

Harbor (i.e., the overarching goal of the SJH Project) at existing depths. Ultimately, the Corps eliminated those alternatives from detailed consideration because they were either inefficient, ineffective, or would not account for all necessary investments or actions to achieve the project's objectives. USACE_000125-28. Thus, there is no merit to Plaintiffs' oversimplified assertion that the Corps ignored mitigation measures and limited their consideration of alternatives to those "nearly identical" to the project. Pls.' Br. 37.

Finally, the Corps properly considered the "no-action" alternative pursuant to 40 C.F.R. § 1502.14. USACE_000121; *see* Table 3-5 (USACE_000131-34). The Corps found that, in general, taking no action would result in a greater increase in ship transits as compared to other alternatives because more ships would ultimately be needed to carry the same amount of anticipated cargo. USACE_000131. Thus, the Corps found that the increased transits would result in a "greater risk to threatened and endangered species, and more air pollution." *Id.*[7]

### D.    The Corps' environmental justice analysis is adequate.

The Corps also reasonably concluded that "no group of people would bear a disproportionately higher share of adverse environmental consequences resulting from the proposed work." USACE_000196. The Corps conducted this review pursuant to Executive Order 12,898, *see* 59 Fed. Reg. 7,629 (Feb. 11, 1994), which requires federal agencies to conduct "environmental justice" analyses by "collect[ing], maintain[ing], and analyz[ing] information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health,

---

[7] Plaintiffs argue that the Corps failed to consider the "least environmentally damaging practical alternative" pursuant to CWA Section 404(b)(1) guidelines. Pls.' Br. 36. As established above, Plaintiffs misapprehend the Corps' CWA obligations for the SJH Project, and the Corps otherwise fully complied with the CWA.

or economic effect on the surrounding populations." 59 Fed. Reg. at 7,361 (§ 3-302(b)). Although E.O. 12,898 does not create a private right to judicial review, 59 Fed. Reg. at 7,632-33 (§ 6-609), the D.C. Circuit has recognized that a plaintiff may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).

Here, the Corps' environmental justice analysis complies with the Executive Order. The Corps considered data from the U.S. Census Bureau, which showed that nearly 4,800 individuals live within a one-mile radius of the project site. USACE_022648. Based on its evaluation of the data, the Corps determined that the population density of minorities living within the one-mile radius is lower than the rest of San Juan. *Id.* Further, households living under the poverty level for the one-mile radius are about the same compared to households in the immediate surroundings or municipalities. *Id.* Thus, the Corps concluded that the SJH Project would not cause disproportionately high and adverse effects on any minority or low-income populations. *Id.*

Plaintiffs challenge both the timing and scope of the Corps' analysis, *see* Pls.' Br. 17, but both challenges fail. *First*, Plaintiffs assert that the Corps "fast-tracked" its environmental review during a national disaster caused by Hurricanes Irma and Maria. *Id.* at 1, 17-18. However, this assertion is belied by the record. The Corps provided an initial notice of its intent to prepare a draft Feasibility Study and an environmental review in October 2015. USACE_007579 (noting that the Corps' welcomes the public's "views, comments and information about environmental and cultural resources"). The Corps received significant public comments in response to its initial notice. *See* USACE_001125-1283 (appendix of pertinent correspondence regarding the SJH Project received from 2015 to 2018). Nearly two years later, the Corps noticed the availability of

its Draft Feasibility Study and EA on August 8, 2017, USACE_002530, and provided for forty-five days for the public to comment. USACE_000202.

While the impacts of Hurricane Irma and Maria[8] were devastating, there is no evidence in the record that any groups were prevented from commenting or participating in the Corps' regulatory process for the SJH Project. Indeed, Plaintiffs do not suggest that they were prevented from commenting on the draft EA. Instead, Plaintiffs speculate that the Corps would have chosen a different alternative if it had extended the comment period. *See* Decl. of Mary Ann Lucking (ECF No. 20-6) ¶ 7. The Corps did not receive any specific requests to extend the comment period, and instead received an inquiry from the Sierra Club asking the Corps to "let [her] know the official deadline for public comment" and inquiring whether has "been extended due to Hurricane Maria's impact[.]" USACE_002302. That inquiry hardly demonstrates any difficulty of the local communities to participate in the Corps' public process for the EA, which took place largely before Hurricanes Irma and Maria impacted the area. In any event, the Administrative Record reflects that the agency took a step-by-step approach over several years to study and consider the SJH Project, along with meaningful opportunities for the public to participate and comment.

*Second*, Plaintiffs assert that the Corps omitted communities "near the oil and LNG docks," specifically the "Guaynabo neighborhoods Sabana, Amelia, and Vietnam," from their environmental review. Pls.' Br. 18-19. Plaintiffs point to no record evidence that these communities will be impacted by the Corps' proposed project and, instead, offer the conclusory assertion that these communities "will bear the brunt of the harm" based on their proximity to oil and LNG terminals. *Id.* at 21. More to the point, in 2023, the Corps supplemented its EA and, in response to public comments, enlarged its zone of analysis from one mile to five miles.

---

[8] Hurricanes Irma and Maria struck Puerto Rico in September 2017. USACE_000138.

USACE_024688. That expanded radius included the communities of San Juan, Guyanabo, Bayamon, Cantano, Santruce, Puerto Nuevo, and communities to the West, East and South of San Juan. USACE_024688. Ultimately, the Corps confirmed its prior determination that the SJH Project will not have disproportionately high or adverse impacts on low income or minority communities. USACE_024689.

Plaintiffs limit their argument regarding the Corps' supplemental environmental justice analysis to a footnote, in which they assert that the Corps may not rely on a "post hoc" analysis. Pls.' Br. 20-21, n.3. But Plaintiffs do not argue that supplementation of the Corps' analysis was inappropriate, *see Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989) (stating that an agency's decision whether to prepare a supplemental EIS requires "substantial agency expertise," and courts must defer to the agency's "informed discretion"). Nor do they explain what more the Corps' analysis must include, except to label its supplemental analysis as "conclusory." Pls.' Br. 21, n.3. The Court need not accept Plaintiffs' threadbare legal conclusions and, in any event, the Court cannot order the agency "to do something [it has] already done" and expand its radius for review. *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 91 (D.C. Cir. 1986).

Even setting aside the Corps' supplemental environmental justice analysis, the Corps' initial analysis based on the one-mile radius is reasonable. When conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be "reasonable and adequately explained," *Cmtys. Against Runway Expansion*, 355 F.3d at 689, and include "a rational connection between the facts found and the decision made," *id.* at 685 (quoting *State Farm*, 463 U.S. at 43). Here, the region of interest for the Corps' environmental justice analysis was determined based on the size of the proposed project, which is local to the harbor. USACE_00804. The project's area includes the entrance channel, the Federal inner harbor

channels, a disposal site for dredged material,[9] and local shorelines. USACE_000056. The Corps reasonably focused its environmental justice analysis to the local area surrounding these features.

Plaintiffs' reliance on *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers* to challenge the Corps' radius is inapposite. Pls.' Br. 20 (citing 255 F. Supp. 3d 101 (D.D.C. 2017)). The *Standing Rock* environmental justice analysis involved a much more limited area (a 0.5 mile buffer around a crossing with a focus on two census tracts in which horizontal directional drilling boreholes would be drilled), which excluded a Native American reservation by a mere eighty yards. 255 F. Supp. 3d at 137. Plaintiffs fail to show that the methodologies used here to identify and evaluate impacts were unreasonable. The Corps' analysis in this matter involved eight census block groups and an examination of the record shows that the Corps fully assessed and disclosed the potential effects on minorities and low-income populations. USACE_000796-97 (describing the applied methodologies); USACE_000805. This fulfilled the requirements of NEPA and the Corps' determination should be upheld. *Sierra Club v. FERC*, 867 F.3d 1357, 1368-69 (D.C. Cir. 2017) (upholding FERC's determination that the preferred route of several natural gas pipelines would not have a disproportionate impact on environmental justice communities, when 83.7% of the pipelines' length would cross through, or within one mile of, tracts with such communities).

### E.   The Corps adequately considered the environmental impacts of the SJH Project.

#### 1.   Cumulative Effects

The Corps' evaluation of the cumulative effects of the SJH Project also passes muster under NEPA. The D.C. Circuit has explained that "a meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that

---

[9] The disposal site is located in deep water "approximately 2.2 nautical miles north-northwest of the entrance to San Juan Harbor." USACE_000067.

are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002).

Here, the Corps reasonably considered the cumulative effects of past, present, and future actions. For example, the Corps considered the impacts of related actions by the U.S. Coast Guard, to include the relocation of buoys to aid in navigation and an expansion of the Anchorage Area F, noted above. USACE_000189. As for these actions, the Corps found that no negative cumulative impacts are anticipated because "benthic surveys and precautions are required per permit conditions prior to [buoy] relocation" and "the proportion of benthic habitat that would be affected by the USCG anchorage expansion dredging is very small relative to the hardbottoms and [submerged aquatic vegetation ("SAV")] available in the region, including natural fringing coral reefs along the north coast and SAV beds throughout San Juan Bay." *Id.*

The Corps also determined that the net contribution to cumulative adverse impacts due to the proposed project and the overall cumulative adverse impact will be appropriately minimized based on (1) efforts to avoid and minimize the environmental impact of the proposed action, and (2) Federal and State permitting requirements that will be required for any ongoing present and/or potential future actions. USACE_000189. Given the absence of evidence that SJH Project would produce significant environmental impacts anywhere—inside the harbor or otherwise—the Corps' conclusion that cumulative effects of other actions in the project area (including other dredging and disposal projects) would be "minimal" is reasonable. *See Sierra Club v. FERC*, 827 F.3d 36, 50 (D.C. Cir. 2016) (deeming that broader cumulative-impact analysis was not required where

there was "scant record evidence identifying any reasonably foreseeable and proximate effects"); *Minisink Residents for Env'l Pres. & Safety v. FERC*, 762 F.3d 97, 112-13 (D.C. Cir. 2014) ("[B]ecause the Minisink Project itself was expected to have minimal impacts, no significant cumulative impacts were expected to flow from the possible development of the CPV Valley power plant." (emphasis omitted)).

Finally, to the extent Plaintiffs assert that the Corps should have considered other specific cumulative impacts (e.g., from constructing and operating LNG infrastructure or the Corps' Río Puerto Nuevo Flood Control project, *see* Pls.' Br. 35), they failed to raise either of these concerns during the public comment period. *See, e.g.*, USACE_001257. Plaintiffs have therefore forfeited the right to press those arguments in this litigation. *Public Citizen*, 541 U.S. at 764-65; *see Nat. Res. Def. Council, Inc. v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir. 1994) (a party waives an argument by failing to raise the issue during notice and comment period).

## 2.    Air Quality

The Corps also adequately considered potential impacts to air quality in the EA. Specifically, the Corps noted that dredging operations are typically powered by diesel engines, so various emissions could be expected for the duration of the operation (which would occur in a project area compliant with Puerto Rico air quality standards). USACE_000180. Notably, the project would occur in a bay that "experiences nearly constant trade winds and sea breezes." *Id.*

As for air quality impacts from vessels transiting the harbor, the Corps found that "[t]here will be fewer vessel calls overall, albeit larger vessels with greater horsepower and emission potential." *Id.* In evaluating the impacts from these emissions, the Corps conducted a quantitative emissions analysis using EPA's "Compilation of Air Pollutant Emission Factors: AP-42" tool and

concluded that the difference between future without-project and future with-project in vessel emissions was minimal (i.e., between 0% to 10%). *Id.*

The Corps also considered that the SJH Project will "facilitate newer, larger, cleaner, and more efficient vessels to reach the port, including larger specialized vessels containing LNG to the Army Terminal Area." *Id.* The Corps noted that the future conversion of San Juan's power plants from bunker or diesel fuel oil to LNG would likely offset any additional emissions from related future commerce therein. *Id.*

Plaintiffs' challenges to the Corps' air quality analysis lack merit. For example, the SJH Project does not "lock in" fossil fuel imports, as Plaintiffs assert (Pls.' Br. 1), because the project does not necessitate any change in San Juan's energy choices. Moreover, the Corps' comparative analysis of the potential future emissions from larger ships was reasonable because those ships would lead to reduced ongoing emissions from energy production. In any event, the Corps lacks any control over Puerto Rico's energy production and the Supreme Court has held that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA." *Pub. Citizen*, 541 U.S. at 767. Instead, NEPA requires agencies to consider effects that have a "reasonably close causal relationship" with the agency action, and that are "useful[]" to consider in the agency's "decision-making process." *Id.* (citation omitted). Such effects do not include those that an agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action. 40 C.F.R. § 1508.1(g)(2). Where, as here, the Corps has a limited role in facilitating harbor access and otherwise lacks control over harbor traffic generally or the development of local industries (e.g., energy generation), NEPA does not require consideration of "all direct and indirect air pollution" as Plaintiffs assert. Pls.' Br. 24.

### 3.     Threatened or Endangered Corals

The Corps also adequately evaluated direct and indirect impacts on coral species and reasonably concluded that "[i]mpacts to listed corals from dredging and dredged material transport related turbidity are not anticipated." USACE_000034. The specific location of coral species was important to the Corps' analysis. Specifically, the Corps determined that coral habitat occurs near San Juan Harbor adjacent to the entrance channel, along the Cataño shoreline, and elsewhere on hard substrates (rocks, pilings, docks, bulkheads). USACE_000075. Coral has also been documented along the northern coastline. USACE_000075. In sum, the Corps determined that coral habitat is present adjacent the entrance channel and along the north coast.[10] USACE_000167.

In evaluating the SJH Project's direct impact on coral species, the Corps determined that dredging operations for the proposed project would not directly affect existing coral habitat. The Corps considered potential temporary indirect effects from the deepening and widening of the channels from elevated turbidity levels during construction and dredged material transport for disposal, but determined that impacts were not anticipated due to the distances between coral species and construction operations. USACE_000166. NMFS confirmed this conclusion in its Biological Opinion, which states that "the proposed action is not likely to adversely affect . . . elkhorn, staghorn, pillar, rough cactus, mountainous star, lobed star, and boulder star corals . . . and designated critical habitat for elkhorn and staghorn corals." NMFS_00004.

The Corps also considered potential indirect impacts to coral species near the dredging area caused by "turbidity" resulting from the dredging of material from the entrance channel.

---

[10] Plaintiffs inaccurately assert that critical habitat for elkhorn and staghorn coral has been designated across the harbor entrance. Pls.' Br. 34. Designated critical habitat does not cross the harbor entrance. *See* NMFS_00212 (Figure 19, showing that the closest habitat is 1,700 feet to the west of the channel entering the harbor).

USACE_000167. The Corps noted that recent consultations under Section 7 of the ESA with NMFS for two projects in Miami-Dade County concluded that the effects of sedimentation on the adjacent threatened coral would be insignificant since the rates of sedimentation documented in a similar offshore dredging project were within the bounds of sedimentation documented to occur naturally. *Id.* (noting that NMFS had concluded that due to this sedimentation rate and a 400-foot buffer between the dredging area and the threatened corals, the effects on the coral would be "insignificant"). Further, the Corps found that there is no coral habitat within 150 meters of the harbor's entrance channel that could experience minor temporary stress due to increased sedimentation. *Id.* The Corps' use of a 150-meter estimated indirect impact zone was reasonable because it is based on a review of the results of in-water coral sedimentation monitoring associated with the 1980-1981 Port Everglades deepening project and Key West dredging project in 2004. *Id.*; USACE_000166. Accordingly, the Corps reasonably concluded that indirect impacts to corals from turbidity and sedimentation due to construction activities are not anticipated. USACE_000167.

Plaintiffs dispute the Corps' methods in evaluating the indirect impact zone and point to an unrelated Corps project at the Port of Miami. Pls.' Br. 27. However, as discussed below with respect to Defendants' ESA compliance, the Port of Miami project involved an entirely different geographic and hydrodynamic situation, making a direct comparison nearly impossible. *See infra* Argument Section IV.A.1. Notwithstanding the significant difference between the two projects, the impacts at the Port of Miami were not ignored by NMFS but were instead considered in evaluating the SJH Project's impacts on corals. NMFS_00170-73 ("NMFS is concerned about the statements and conclusions drawn in the BA based on the reports from the Port of Miami project"). Indeed, this consideration led to a stricter turbidity monitoring plan and an adaptive management

plan that will allow the Corps to correct any problems, such as leaking scows, well before corals would be exposed to adverse effects. *Id.*; NMFS_00011-12; *see also* NMFS_00157-160. We discuss Plaintiffs' challenge to the turbidity monitoring plan below with respect to Plaintiffs' ESA claims regarding corals. *See infra* Argument Section IV.A.3.

While Plaintiffs assert that the proposed monitoring plan is "loosely defined," Pls.' Br. 28, Plaintiffs' challenge fails. "NEPA does not impose a duty on agencies 'to include . . . a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action.'" *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017) (emphasis omitted) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)). Rather, NEPA requires only that an agency "incorporate enough mitigation measures to provide a reasonably complete discussion of mitigation." *Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), *aff'd*, 651 F.3d 112 (D.C. Cir. 2011). Here, the monitoring plan is much more detailed than a "plan to make a plan." Pls.' Br. 28. Indeed, pursuant to the monitoring plan, the loading of each scow "is recorded approximately every 30-seconds to determine if there is any loss of material from the scow during transit. This data is reviewed after each load by the contractor and the Corps/EPA and if a barge has a net loss of more than one foot in draft between the dredge site and disposal site(s) (averaged between the bow and stern monitoring locations), this serves as a 'red flag' to investigate as to why the draft loss occurred." NMFS_00196-97; USACE_003469-70. If the loss is determined to not be a result of high seas and sloshing, "the barge is temporarily removed from the rotation and has the seals tested and repaired (if necessary)." *Id.* "If a particular barge demonstrates a trend of material loss that does not resolve itself after seal testing and repair, the barge is removed from the dredging operation." *Id.* These details meet the standard required under NEPA. Under similar circumstances, the D.C. Circuit has upheld an agency's decision to

use a "list of specific protective measures that [a] review team is to consider," with "exact application of mitigation measures [to] be determined on a site-specific basis." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 516 (D.C. Cir. 2010).

In sum, based on the lack of coral habitat in the immediate project area and the monitoring plan, the Corps reasonably determined that no significant impacts to existing coral would occur.

### 4.  **Cultural and Historic Resources**

The Corps adequately considered impacts to cultural and historic resources in its EA. Specifically, the Corps conducted a background investigation and a 2017 cultural resources remote sensing survey of the San Juan Harbor channel in consultation with the Puerto Rico State Historic Preservation Officer and the *Instituto de Cultura Puertorriqueña*. USACE_000183. While background research revealed numerous shipwrecks within the project vicinity, no previously identified cultural resources were located within the project area. USACE_000183.

The remote sensing survey of the San Juan Harbor did not identify any potentially significant anomalies in any of the areas surveyed except one. USACE_000184. The only potentially significant cultural resources identified by the Corps were located within Anchorage Area F, where four clustered "anomalies" (comprised of eighteen individual magnetic anomalies) and one individual anomaly were identified. *Id.* While these anomalies were recommended for avoidance or additional investigations, Anchorage Area F will not be dredged or otherwise maintained as a part of the SJH Project. *Id.* Accordingly, the State Historic Preservation Officer supported the Corps' finding that "no historic properties [are] affected within the project's area of potential effects." USACE_001646.

Plaintiffs incorrectly assert that the EA fails to consider the "influx" of LNG and long-range oil tankers. Pls.' Br. 31-32. Based on its economic analysis, the Corps found that fewer total

33

vessels would call on San Juan Harbor as a result of the SJH Project. USACE_000184. The Corps reasoned that, because fewer vessels would be calling on the port with the proposed project, there would be "no effect on the viewshed of historic properties, including Old San Juan Historic District." USACE_000184. This conclusion was supported by the Corps' finding that characteristics of the harbor (e.g., commercial and recreational vessel traffic patterns, shoreline land uses, and natural resources) would remain subject to the traffic and use trends that would impact the area with and without the project. *Id.*

Further, the Corps evaluated potential shoreline impacts but concluded that "[e]rosion of San Juan Harbor shorelines is controlled predominantly by wind waves and tidal currents." USACE_000184. The Corps reasoned that the "relative infrequency of cargo vessel wakes compared with wind waves makes them a minor factor contributing to shoreline changes and erosion." *Id.* What is more, the Corps found that the SJH Project would actually "reduce the shoreline impact of vessel wakes by reducing the number of vessels and increasing the range of tides during which vessels can transit the harbor." *Id.* Indeed, the Corps found that the deeper alternatives had a progressively smaller vessel wake impact on surrounding shorelines. *Id.*

In sum, the Corps' determination that historic and cultural resources would not be impacted is reasonable and duly supported by the record.

### 5.   Vessel Accidents

Finally, the Corps adequately considered the potential impacts of possible oil spills caused by tanker accidents. Specifically, the Corps considered the SJH Project's potential impacts on the overall risks for vessel accidents. In doing so, the Corps noted that San Juan Harbor has previously experienced many groundings, vessel strikes, and other collisions. USACE_003456. Indeed, some "groundings have occurred at the mouth of the entrance channel" which "also presents significant

navigational challenges including bar channel winds and waves causing ships to roll and heel[.]"*Id.* Moreover, "winds, waves and currents in the entrance channel cause ships to alter their speed resulting in squat and sinkage." *Id.*

Plaintiffs argue that "[t]he bigger tankers risk larger oil spills, explosions, and other accidents than the current fleet[,]" but they fail to cite any record evidence supporting their conclusory assertion besides their own public comments (which are themselves devoid of any support). Pls.' Br. 22 (citing USACE_002313-15). In any event, the Corps reasonably found that the SJH Project's widening and deepening of the harbor would improve the conditions that have factored into prior accidents. USACE_003456. Also, in the event San Juan's power plants converted to LNG (which, as noted, is uncertain), the Corps evaluated the "potential risk reduction for fuel oil spills, due to the expected reduction in the demand of fuel oil via the port[.]" USACE_000181. Accordingly, the Corps appropriately focused its consideration on the overall risks for vessel accidents and reasonably concluded that the SJH Project would lower those risks.

## III.   The Corps properly determined that no Environmental Impact Statement was necessary.

Plaintiffs allege that the Corps erroneously found that the SJH Project does not have significant environmental impacts. Pls.' Br. 38. According to Plaintiffs, the Corps should have prepared an EIS rather than an EA. *Id.* But the Corps reasonably determined that the SJH project would not have significant impacts on the environment and that an EIS was not required.

"An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Pub. Citizen*, 541 U.S. at 763 (citation omitted). Thus, the Court's "role in reviewing [the Corps'] decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably

35

significant consequences have been ignored.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019)).

Here, the Corps considered input received during scoping—including meetings with the public and resource agencies—and studied the impacts of the SJH Project on public health and safety and various resource areas, to include cultural and historic resources, and endangered or threatened species. USACE_003836-3844. The Corps also considered the unique characteristics of the San Juan Harbor area, any controversy or uncertainty of the project. *Id.* Based on these considerations, the Corps determined that the project was not likely to have a significant impact on the quality of the human environment and, therefore, prepared an EA and decided that the preparation of an EIS was unnecessary. *Id.*; *see also* USACE_000201-02.

NEPA regulations require agencies to consider both context and intensity in determining whether a project's effects are significant enough to require an EIS. 40 C.F.R. § 1508.27. Intensity "refers to the severity of impact," and the regulation identifies several factors that agencies should consider in assessing intensity. *Id.* § 1508.27(b).

Plaintiffs focus on several "intensity" factors within the definition of NEPA significance. Pls.' Br. 39. First, Plaintiffs assert that public health and safety are implicated from potential air pollution and tanker accidents. As discussed above, the Corps duly considered impacts from air pollution and reasonably concluded that the SJH Project would not adversely impact air quality. USACE_000180-81. Further, Plaintiffs speculate that larger vessels pose greater public safety risks within the harbor. To the contrary, the Corps found that the widening and deepening of the harbor would improve the conditions that lead to known safety risks (thereby reducing the overall risk of accidents). *See* USACE_003456. Notably, the Corps found that continuing the practice of "light loading" would reduce overall safety. USACE_000128. Second, Plaintiffs allege that the

project is proximate to "numerous" historic and cultural resources. Pls.' Br. 39. However, as discussed above, the Corps duly considered potential impacts to these resources and found that they would not be impacted. Plaintiffs fail to identify any impacts on cultural and historic resources the Corps failed to consider.

Third, Plaintiffs point to threats to threatened and endangered species as "*prima facie* evidence*" the Corps should have prepared an EIS, *id.* at 40 (quoting *Env't. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022)). But the Ninth Circuit has rejected this argument and held that an agency need not prepare an EIS every time there is a determination that an action is "likely to adversely affect" species, so long as the agency considered the impact on the species and found it would not be significant. *See, e.g., Env't. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012-13 (9th Cir. 2006) (citation omitted) ("Although EPIC seems to urge that any impact to a listed species requires an EIS, USFS correctly argues that the regulation's 'intensity' factor focuses on the 'degree to which an action may adversely affect' a threatened species or critical habitat." (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005))). Here, the Corps looked at the SJH Project's impacts on threatened and endangered species and reasonably determined that they would not be significant (particularly given the monitoring plan). The Corps thus acted reasonably in not preparing an EIS. *See Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (upholding agency decision not to prepare EIS when agency "reasonably concluded that the project will have no significant adverse environmental consequences") (quotation marks and citation omitted).

Fourth, and finally, Plaintiffs point to the cumulative effects of other federal projects. Pls.' Br. 42. However, the Corps adequately considered cumulative effects of other projects. As noted, the Corps' conclusion that such effects would be minimal is reasonable in light of the SJH Project's

minimal environmental impacts. Plaintiffs merely disagree with the Corps' conclusions, which is insufficient to show that the Corps was arbitrary and capricious under the APA. *Nat'l. Parks Conservation v. U.S. Forest Serv.*, 177 F. Supp. 3d 1, 34 (D.D.C. 2016) (an EIS was not warranted because the plaintiff failed to identify "any scientific criticism of the methods or data" relied upon by the agency; instead, the "disagreement concerns the conclusions that should be drawn from those methods and data").

In sum, the Corps' Integrated Feasibility Study, EA, and the additional documents, analyses, and public comments considered by the Corps show that the agency reached an informed and well-considered decision regarding the SJH Project. *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 558. Thus, Plaintiffs cannot show that an EIS is required, and Defendants are entitled to summary judgment on Plaintiffs' NEPA claims.

## IV.   The agencies fulfilled their ESA Section 7 consultation obligations.

### A.   NMFS reasonably determined that the SJH Project is not likely to adversely affect ESA-listed corals or their designated critical habitat.

Plaintiffs do not dispute that NMFS and the Corps completed consultation under ESA Section 7 on the potential impacts of the SJH Project to ESA-listed corals and their critical habitat. Specifically, the Corps issued a Biological Assessment, in which it determined that the project "is not likely to adversely affect" listed corals or their critical habitat, Pls.' Br. 43, and NMFS issued a Biological Opinion in which it concurred with the Corps' finding, Pls.' Br. 7. *See* 50 C.F.R. § 402.14(b)(1) ("A Federal agency need not initiate formal consultation if . . . the Federal agency determines, with the written concurrence of [NMFS], that the proposed action is not likely to adversely affect any listed species or critical habitat."); 50 C.F.R. § 402.13(c) ("If during informal consultation it is determined by the [acting] agency, with the written concurrence of [NMFS], that

the action is not likely to adversely affect listed species . . . the consultation process is terminated, and no further action is necessary.").[11]

Instead, Plaintiffs disagree with NMFS's conclusion that, based on its scientific expertise and the analysis set forth in its Biological Opinion, ESA-listed corals and critical habitat are not likely to be adversely affected by the project. Plaintiffs' disagreement with NMFS's finding, however, is irrelevant under the APA's standard of review, as they fail to identify any clear error in the agency's judgment. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (Review under the APA's "arbitrary and capricious" standard is "narrow and a court is not to substitute its judgment for that of the agency.").

    1.    **The SJH Project is different from the 2013 Port of Miami dredging project and involves significantly less potential for harm to corals.**

Plaintiffs claim that NMFS "failed to use the best scientific and commercial data available" in its Biological Opinion on the SJH Project because it reached a conclusion that contradicts record evidence of corals dying from a "similar dredging [project] at the Port of Miami." Pls.' Br. 44 (citing NMFS_00678). Plaintiffs are wrong. As an initial matter, the 2019 study that Plaintiffs cite on the Port of Miami dredging project was published one year after NMFS issued its 2018 Biological Opinion and was therefore not before agency decision-makers during the Section 7 consultation process on the SJH Project. NMFS_00678-92; *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 555 (judicial review of an agency action is limited to the documents that were considered at the time the agency's decision was made). Further, as discussed below in Argument Section IV.A.2., after the Port of Miami study was published, NMFS analyzed the information presented

---

[11] While NMFS was not required to issue a Biological Opinion to concur with the Corps' determination that the project "is not likely to adversely affect" listed corals or their critical habitat, it included its written concurrence in a Biological Opinion because a Biological Opinion was required for its analysis with respect to other species. *See* 50 C.F.R. §§ 402.13(c), 402.14(m)(1).

and evaluated whether it triggered a need to reinitiate consultation on the SJH Project's impact to corals. NMFS_00001-03. Based on the findings and context of the study, NMFS determined that reinitiation of consultation is not required under the ESA's implementing regulations. *Id.*; 50 C.F.R. § 402.16(a). Indeed, contrary to Plaintiffs' contentions, the record clearly establishes that the SJH Project is a very different project from the 2013 Port of Miami dredging and poses significantly less risk of harm to corals. NMFS_00002.

In its Biological Opinion on the SJH Project, NMFS determined that the project is "not likely to adversely affect" ESA-listed corals and critical habitat. NMFS_00019-22. Conversely, NMFS concluded in September 2011 that the Port of Miami project *was* "likely to adversely affect" ESA-listed corals. *See* 79 Fed. Reg. 6,545, 6,564 (Feb. 4, 2014). There are many differences between the two projects that led NMFS to reach opposite conclusions about their respective impacts to corals, including: the relative location of ESA-listed corals and critical habitat to the respective project areas; the different amount and composition of the material being dredged; and the sites' exposure to significantly different currents and hydrodynamic processes. *See* NMFS_00019-22.

The 2013 Port of Miami dredging project involved a channel that "traverse[d] through coral reef habitat" and "ESA listed corals and designated critical habitat occur[ed] throughout the project area," including corals "within 150 meters of the existing channel" that was being dredged. NMFS_00001-02. In contrast, "no corals of any species have been documented within the San Juan Harbor project area and the nearest designated critical habitat is approximately 2,500 feet away." NMFS_00002. The lack of ESA-listed corals or critical habitat in the SJH Project area is one of the many differences between the Miami dredging project and the SJH Project that led NMFS to reach different conclusions. Additionally, the Corps' proposed action for the SJH Project

accounts for the "possibl[ity] that ESA listed corals occur outside of the [San Juan] harbor to the east and west of the entrance"—an area that is outside of the dredging zone but may overlap the transit route of vessels carrying dredged material to disposal sites—by committing to conduct pre-construction "project specific coral surveys" to identify whether such corals are present. NMFS_00002, 229. The Corps further committed that "[i]f listed corals are found during the []surveys, the Corps will reinitiate [ESA Section 7] consultation as necessary." NMFS_00229. Unlike in Miami, the absence of ESA-listed corals and critical habitat in the SJH Project area, in combination with the Corps' surveys of surrounding areas and commitment to reinitiate consultation if any ESA-listed corals are found that may be affected by the dredging, led NMFS to reasonably determine that the SJH Project is "not likely to adversely affect" ESA-listed corals or their critical habitat.

The possibility of ESA-listed corals being present along the transit route for vessels transporting dredged material was relevant to NMFS's analysis only because of the potential for these vessels to leak sediment that may impact corals. However, Plaintiffs' contention that NMFS "anticipated that each of the [SJH] Project's [sediment-carrying vessels] . . . could leak . . . 'one foot of loss per trip, or more'" is incorrect and misleading. Pls.' Br. 44 (alteration omitted) (citing USACE_001647-48, 1709). As reflected in the Corps' meeting notes cited by Plaintiffs, while NMFS expressed concern over the general proposition that "[o]ne foot of loss per trip, or more, could amount to a significant amount of sediment," NMFS never expressed an expectation that such leakage would occur. USACE_001709. Indeed, in order to secure NMFS's expectation that harmful levels of leakage will *not* occur, NMFS and the Corps agreed to develop a sediment monitoring plan with triggers "to ensure that dredging or scow leakage overflow wouldn't impact [coral] reefs," such as a requirement that the Corps "shut down [operations] until [turbidity] returns

to background levels." USACE_001713-14. Specifically, NMFS and the Corps agreed that, as part of the SJH Project, the Corps "will work in conjunction with [] NMFS to develop a turbidity monitoring plan . . . [that] will include turbidity monitoring stations adjacent to ESA-listed corals (if any are found during the pre-construction resource surveys) and at the edges of the designated critical habitat for [ESA-listed] corals near the disposal vessel transit route." NMFS_00011.[12]

Plaintiffs also fail to appreciate that the SJH Project involves dredging only a fraction of the amount of material dredged in Miami, and that the composition of the sediment being dredged poses significantly less risk of harm to corals. Specifically, the Corps dredged about *three times* more sediment in the Port of Miami than it will dredge for the SJH Project; while the Miami project "removed approximately 6 million cubic yards of material," the Corps anticipates removing only "2.1 million cubic yards of material" for the SJH Project. NMFS_00001-02. Additionally, the material being dredged for the SJH Project is much coarser in composition than the fine sediment that was dredged in Miami, which means it is less likely to pose harm to corals. *See* NMFS_00232-33 ("Suspended sediments, especially when fine-grained, decrease the quality and quantity of incident light levels, resulting in a decline in photosynthetic productivity."); NMFS_00021 ("[S]ediment depths of 0.5cm (or more) of fine sediment precludes coral recruitment and fragment attachment."). Dredging contractors in Miami had to conduct "roller-chopping in order to 'pre-treat' or break up [hard consolidated limestone] rock . . . which caused particularly high levels of suspended solids," or "rock flour," which is known to settle slower and travel farther than coarser sediment, allowing it to "remain[] present for weeks/months after dredging." NMFS_00001;

---

[12] Plaintiffs' statement that the project will involve "977 scow trips" is misleading as well. Pls.' Br. 28. Plaintiffs pull this number from a Corps email which clarifies that the "number of scow trips can vary widely depending on each contractor and their equipment and the location of the project," and estimates 977 trips only by making various assumptions. USACE_001647-48.

NMFS_00173; NMFS_00706; NMFS_00724. In contrast, the material being dredged for the SJH Project is "primarily silts, soft clay, and stiff plastic clay with a small amount of unconsolidated limestone," which will not require blasting or roller chopping, and thus is significantly less likely to pose harm to corals. NMFS_00002; NMFS_00020.

Finally, the broad parallels that Plaintiffs attempt to draw between the SJH Project and the 2013 Port of Miami project fail because of the projects' very different locations and currents. The channel that was dredged in Miami is a "very long *outer* entrance channel," which means that it extends into the open ocean, where sediments are exposed to Florida's "strong velocity current which can have speed up to 4.9 knots" and can carry sediments, particularly fine sediments, for long distances beyond the dredging area. NMFS_00001-02 (emphasis added). These strong Florida Gulf Stream currents, which "generally run[] from south to north," combined with the design of Miami's outer entrance channel, which "creates strong east-west currents," created a high potential for harmful sediment transport. NMFS_00001. On the other hand, the dredging for the SJH Project is being conducted in an enclosed harbor, so it is not exposed to open ocean. *See* NMFS_00013-14, Figures 1-2. And moreover, the SJH entrance channel is subject to currents that flow "primarily from the northeast, which in conjunction with the east-west alignment of the coastline results in a westerly, alongshore current," making it much less likely for sediments to be carried long distances and cause harm to corals. NMFS_00002.

For all of these reasons, as well as many other differences between the 2013 Port of Miami dredging project and the SJH Project, Plaintiffs' cursory assumption that the SJH Project will have similar impacts to corals is incorrect.

2.      **NMFS reasonably determined that reinitiation of ESA Section 7 consultation is not required for ESA-listed corals and critical habitat.**

NMFS's September 2022 memorandum, NMFS_00001-03 ("Reinitiation Memorandum"), evaluates whether NMFS was required to reinitiate consultation based on the findings of a 2019 study by Cunning, et al. regarding the effects of the Port of Miami dredging project on corals, NMFS_00678-92 ("Miami Study"). The Reinitiation Memorandum is not, as Plaintiffs contend, a "post-hoc rationalization of the differences between San Juan Bay and Port of Miami." Pls.' Br. 48. Nor does it seek to "buttress[] [NMFS's] earlier position." *Id.* Rather, the Reinitiation Memorandum looks at findings from the Miami Study—which was published one year *after* NMFS and the Corps completed ESA Section 7 consultation on the SJH Project—and evaluates whether the study's findings impact NMFS's 2018 determination that the SJH Project is "not likely to adversely affect" ESA-listed corals or their critical habitat. NMFS_00001-03. In other words, the memorandum does not seek to "rationalize" or "buttress" previous finding, but rather evaluates new information that was not before agency decision-makers at the time NMFS issued its Biological Opinion, as required by the relevant regulations.

The implementing regulations of the ESA require that consultation under ESA Section 7 be reinitiated when discretionary federal control has been retained over the agency action (here, the SJH Project) and "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). By arguing that NMFS's Reinitiation Memorandum is a "post-hoc rationalization" that "does not live up to the rigor required of consultation," Pls.' Br. 48, Plaintiffs conflate the ESA Section 7 consultation process, which is guided by 50 C.F.R. § 402.13 (informal consultation) and 50 C.F.R. § 402.14 (formal consultation), with the separate process of *reinitiating* consultation under 50 C.F.R. § 402.16. In 2018, the agencies fully complied with the requirements for consultation under

ESA Section 7, which culminated in NMFS issuing a Biological Opinion concurring with the Corps' determination that the SJH Project is "not likely to adversely affect" ESA-listed corals or critical habitat. NMFS_00019-22; 50 C.F.R. § 402.13(c); 50 C.F.R. § 402.14(m)(1), (3). Separately, NMFS later executed its due diligence by analyzing whether the findings of the Miami Study revealed any effects of the SJH Project that may impact ESA-listed corals or their critical habitat in a manner or to an extent not previously considered by NMFS, in order to determine whether there was a requirement to reinitiate consultation. 50 C.F.R. § 402.16(a)(2); NMFS_00001-03.[13]

Plaintiffs' confusion regarding the ESA regulation pertaining to reinitiation of consultation is also apparent from their argument that Federal Defendants' "characterization of [NMFS's] Memorandum . . . as a 'Reinitiation of Consultation Memorandum'" is improper simply because the memorandum does not contain "the word 'reinitiation' nor the word 'consultation.'" Pls.' Br. 48. Meanwhile the conclusion of NMFS's memorandum—the subject line of which reads "San Juan Harbor Evaluation of New Information from Cunning et al. 2019"—mirrors the language of the applicable ESA regulation, 50 C.F.R. § 402.16(a), which sets forth the triggers that require agencies to reinitiate consultation. NMFS_00001-02. Specifically, the Reinitiation Memorandum concludes that "NMFS has analyzed all of the available information and determined that it does

---

[13] Plaintiffs' suggestion that NMFS's Reinitiation Memorandum is somehow invalid or insufficient because it is dated "after Plaintiffs' Endangered Species Act sixty-day notice letter and after litigation commenced" finds no basis in the law. Pls.' Br. 48. The very purpose of such a notice letter is to give agencies "an opportunity to review their actions and take corrective measures if warranted." *Conservation Force v. Salazar*, 811 F. Supp. 2d 18, 33 (D.D.C. 2011) (citation omitted), *vacated on other grounds and remanded sub nom. Conservation Force, Inc. v. Jewell*, 733 F.3d 1200 (D.C. Cir. 2013). There is also no requirement that an agency's evaluation of new information or a potential need to reinitiate consultation must end upon the commencement of litigation or receipt of a sixty-day notice letter. Nor do the cases cited by Plaintiffs hold otherwise.

not reveal effects of the proposed action that may affect ESA-corals or designated critical habitat in a manner or to an extent not previously considered." NMFS_00002.

Tellingly, while Plaintiffs take issue with the title and timing of NMFS's Reinitiation Memorandum, and (inaccurately) deem it a "post-hoc rationalization" of NMFS's previous determination, Plaintiffs do not identify any alleged flaws in the substantive analysis of the memorandum and stop short of disputing NMFS's conclusion that there is no requirement to reinitiate consultation. The Court should therefore reject Plaintiffs' claim alleging that NMFS failed to reinitiate ESA Section 7 consultation on the SJH Project's impacts to corals.

> **3.    The Turbidity Monitoring Plan serves as a safeguard against harm to ESA-listed corals and their critical habitat.**

In order to ensure that ESA-listed corals are not impacted by turbidity and sedimentation from dredging and/or disposal vessels, the Corps committed to "work in conjunction with [] NMFS to develop a turbidity monitoring plan for inclusion in the project," which will include "adaptive management measures to be implemented to mitigate turbidity in the event that turbidity exceeds 7 NTUs above background" levels ("Monitoring Plan"). NMFS_00011-12. Based, in part, on the inclusion of the Monitoring Plan as part of the Corps' proposed action, NMFS concluded that impacts from the SJH Project to ESA-listed corals and critical habitat will be discountable. NMFS_00020-21.

Generally speaking, "turbidity" is a measure of water cloudiness that is caused by suspended particles (i.e., sediment), which at certain levels, can be harmful to corals by smothering them, reducing feeding, and depleting energy reserves. *Id.* (scientific literature citation omitted). Natural "background" levels of turbidity vary from reef to reef depending on the reef's location and hydrodynamic setting, with higher natural background levels indicating a higher "tolerance of corals to elevated suspended sediment." NMFS_00235 (scientific literature citation omitted).

While anthropogenic, human-caused sedimentation can be harmful to corals, natural sedimentation can be beneficial. *See, e.g.,* NMFS_00934 ("increased natural reef sediment was found to be beneficial to juvenile corals"). The SJH Project action area is "subject to natural levels of turbidity due to its location near the mouth of the harbor and the associated runoff and inputs from nearby rivers emptying into the area," NMFS_00022, including "high levels of turbidity and sedimentation" from storms, which result in "significant runoff of land-based sediments," NMFS_00235.

To account for varying turbidity background levels and tolerances, "the Corps requires turbidity monitoring with all of its construction projects." *See id.* If "turbidity exceeds the approved level set by the Commonwealth [of Puerto Rico,] dredging operations in the area cease until levels return to the approved level." *Id.* Notwithstanding Puerto Rico's mandatory turbidity standard of 10 NTUs over background levels (which is already stricter than EPA's standard of 29 NTUs over background), the Corps went even further by committing to implement the Monitoring Plan. NMFS_00011-15. Specifically, the Corps committed to the following key elements of the Monitoring Plan, which will be jointly developed with NMFS:

- Turbidity monitoring stations will be placed "adjacent to ESA-listed corals if any are found during the resource surveys." NMFS_00020.
- Control monitoring locations will be "positioned 200 [meters] upstream of the dredge." *Id.*
- Turbidity at the monitoring stations "must not exceed 7 NTUs above background as measured at the control locations." *Id.*
- "[A]adaptive management measures [will] be implemented to mitigate turbidity in the event that turbidity exceeds 7 NTUs above background" at the monitoring stations. NMFS_00021.

Further, NMFS's Biological Opinion explicitly provides that, if for any reason the Monitoring Plan "is not completed prior to the beginning of construction, or turbidity persists at levels above 7

NTUs above background . . . [and] is not corrected by the adaptive management measures," the Corps is required to reinitiate ESA Section 7 consultation. *See id.*

Plaintiffs argue that the Court should vacate NMFS's finding that the SJH Project is "not likely to adversely affect" ESA-listed corals and critical habitat because NMFS "cannot rely on a plan to make a mitigation plan" to reach its finding. Pls.' Br. 46 (citations omitted). Plaintiffs' position is flawed for multiple reasons. First and foremost, the Monitoring Plan is not a "mitigation plan," as it is not intended to mitigate any expected harm. Rather, NMFS's expectation is that the project will cause *no* harm to corals or their habitat, and the Monitoring Plan is designed to ensure that expectation is correct (and requires additional analysis and possible mitigation, if it is not). Indeed, the Monitoring Plan's conservative turbidity standard of 7 NTUs above background is designed to trigger corrective action well before conditions reach a level that would cause harm to corals.[14]

Regardless of how the Monitoring Plan is characterized, its operative terms are set forth in sufficient detail in the Biological Opinion. By way of example, the ESA regulations for formal Section 7 consultation provide that, in formulating a biological opinion, NMFS must "give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency," and that "[m]easures included in the proposed action . . . that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require

_____

[14] Plaintiffs' statement that NMFS "admits sedimentation from the Dredging Project could have significant negative impacts to corals, including smothering corals, reducing feeding, [etc.]" is a mischaracterization of NMFS's Biological Opinion. Pls.' Br. 45 (citing NMFS_00020). Instead, the cited Biological Opinion section describes the general ways in which sedimentation can negatively impact corals. NMFS_00020 ("Sedimentation can directly smother corals, reduce feeding, and deplete energy reserves leading to lower calcification rates and reproductive output.") (citations omitted). Contrary to Plaintiffs' suggestion, based on its analysis of the SJH Project, NMFS determined that this project is *not* likely to have these impacts on corals. NMFS_00019-22.

any additional demonstration of binding plans." 50 C.F.R. § 402.14(g)(8); *see also* 84 Fed. Reg. 44,976, 44,979 (Aug. 27, 2019) ("Any type of action proposed by a Federal agency receives a presumption that it will occur" and must "be described in sufficient detail that [NMFS or FWS] can both understand the action and evaluate its adverse and beneficial effects."); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1114 (9th Cir. 2012) (When "conservation measures are part of the proposed action, their implementation is required under the terms of the consultation" and they are reasonably considered by the expert wildlife agency) (quotation marks and citation omitted); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 906 (5th Cir. 2021) (following the same principle). The key terms of the Monitoring Plan are spelled out in the "Proposed Action" of the Biological Opinion (i.e., that the maximum turbidity standard will be 7 NTUs above background level; monitoring stations will be placed adjacent to any identified ESA-listed corals or critical habitat; control locations will be positioned 200 meters upstream of the dredge; adaptive management measures will be triggered if the turbidity standard is exceeded; and the Corps commits to work in conjunction with NMFS to finalize the Monitoring Plan). NMFS_00011-12. The applicable regulations for Section 7 consultation envision a process whereby informal "discussions, correspondence, etc." between the action agency and the expert wildlife agency can result in "modifications to the action that the [action] agency . . . [can] implement to avoid the likelihood of adverse effects to listed species or critical habitat." 50 C.F.R. § 402.13(a)-(b). That is exactly what occurred here, resulting in the Corps incorporating the Monitoring Plan into the SJH Project, which NMFS appropriately considered in reaching its "not likely to adversely affect" finding.

Further, the record supports that NMFS reasonably determined a turbidity standard of 7 NTUs above background level will avoid negative impacts to corals. Plaintiffs argue that NMFS

should have, instead, set an absolute standard at 7 NTUs without any consideration of background turbidity levels. Pls.' Br. 46. But Plaintiffs' position that background levels should be ignored simply "[b]ecause the background level of turbidity is already high," Pls.' Br. 46, fails to consider science indicating that "[t]olerance of corals to elevated suspended sediment varies from reef to reef, and depends on background turbidity conditions and hydrodynamic setting." USACE_017470; *see also* NMFS_00934 (recognizing that natural sediment levels can have positive benefits on reefs affected by sediment caused by dredging); NMFS_00693-94 (noting that "[a]n increase in natural sediment significantly increased survival of coral recruits").

The record documents cited by Plaintiffs also fail to support their "one size fits all" approach. *See* USACE_001718 (a summary of turbidity monitoring from two San Juan Harbor dredging projects in 2007 and 2017, reflecting that turbidity reached a high of 14.56 NTUs in 2007, which was 4.75 above background, and 12.1 NTUs in 2017, which was 5.09 above background, providing no evidence of harm to corals); NMFS_00881-927 (an assessment of benthic communities in a different Puerto Rico waterway, with no discussion of turbidity levels or their impact on corals); NMFS_00693-700 (a study focused only on unnaturally occurring anthropogenic sedimentation, finding that maintenance of a turbidity level below 7 NTUs maximizes coral resilience to ocean warming, and providing no evidence that a turbidity level above 7 NTUs causes harm). In sum, because Plaintiffs fail to show any clear error in agency judgment, the Court should defer to NMFS's analysis and expertise. *Hüls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir 1996) (citation omitted) (an agency is afforded "an extreme degree of

deference . . . when it 'is evaluating scientific data within its technical expertise'") (citation omitted).[15]

The Corps' reliance on its 2011 Site Management and Monitoring Plan with EPA for the San Juan Harbor Puerto Rico Dredged Material Disposal Site, NMFS_00112-154 ("SMMP"), is appropriate and, contrary to Plaintiffs' suggestion, supports NMFS's finding that the SJH Project will not negatively impact ESA-listed corals or their critical habitat. Under Section 506 of the Water Resources and Development Act of 1992, 33 U.S.C. § 1412(c)(3), the Corps and EPA must prepare a Site Management and Monitoring Plan for each ocean dredged material disposal site and must update each SMMP at least every ten years. NMFS_00118. At the time the Corps prepared its Biological Assessment and NMFS prepared its Biological Opinion for the SJH Project, the 2011 SMMP was the operative SMMP. Plaintiffs' complaint that similar SMMP terms were relied on for the 2013 Port of Miami dredging project is inconsequential. Not only is the Corps *required* to comply with the SMMP, but for the reasons discussed *supra*, the Port of Miami project and SJH Project are very different operations, which NMFS determined would have different outcomes (i.e., Miami was "likely to adversely affect" ESA-listed corals, whereas the SJH Project is "not likely to adversely affect" them). Thus, even if the terms of the Miami SMMP somehow caused harm to corals (which was not the case and Plaintiffs fail to demonstrate otherwise), the SJH Project is subject to much stricter requirements that go above and beyond the SMMP standards to ensure that there is no harm to corals. *See, e.g.,* NMFS_00021-22.[16]

---

[15] Plaintiffs' "concern" over the lack of a monitoring plan for habitat of "four unlisted coral species" also fails to undermine NMFS's "not likely to adversely affect" determination. Pls.' Br. 47. NMFS and the Corps have no ESA Section 7 consultation obligations, nor do they have any "monitoring" obligations, for unlisted species or their habitat. Notably, Plaintiffs do not cite any legal basis for their concern.

[16] Plaintiffs' suggestion that NMFS is required to "quantify the reduction in harm" provided by the SMMP, Pls.' Br. 47, mistakenly assumes that the SMMP is intended to alleviate some

**B.    FWS reasonably determined that the SJH Project is not likely to adversely affect the Antillean manatee.**

Pursuant to ESA Section 7, the Corps submitted a Biological Assessment to FWS analyzing the potential impacts of the SJH Project to the ESA-listed Antillean manatee and requesting informal consultation. FWS_01349-68. After conducting its own analysis, including the development of project-specific measures to address any potential negative impacts to manatees, FWS issued a response concurring with the Corps' determination that the project is "not likely to adversely affect" the Antillean manatee ("Concurrence Letter"). FWS_00047-51. This concluded informal consultation and fulfilled the agencies' duties under ESA Section 7. *See* 50 C.F.R. § 402.13(c).

Plaintiffs argue that the Court should vacate FWS's finding in the Concurrence Letter because, according to Plaintiffs, FWS failed to sufficiently analyze the impacts of three threats to manatees: (1) noise pollution; (2) vessel strikes; and (3) seagrass destruction. But the record establishes otherwise.

**1.    The record does not support a conclusion that noise pollution will harm manatees.**

Plaintiffs' argument that "noise pollution from dredging will exceed levels that harass and harm" manatees, Pls.' Br. 49, rests entirely on a standard that expressly does not apply to manatees. Specifically, Plaintiffs rely on technical guidance issued by NMFS (not FWS) that "only addresses the effects of underwater anthropogenic sound on marine mammal species under NMFS' jurisdiction" and "does not pertain to marine mammal species under the []FWS's jurisdiction (e.g., walrus, polar bears, *manatees*, sea otters)." USACE_006239. Plaintiffs also misguidedly cite a

---

anticipated harm, when in fact, no harm is anticipated. Additionally, Plaintiffs' suggestion that the Corps does not plan to use "real-time turbidity loggers," is premature, as the details of the Monitoring Plan for the SJH Project have not yet been released. *Id.*

section of the Corps' EA addressing "Marine Mammals," USACE_000178—which is notably separate from the section addressing the "Antillean Manatee," USACE_000175—for the premise that noise levels may exceed NMFS's "Level B Criterion for harassment" of "120 dB." Pls.' Br. 49 (citing USACE_000179). There are several critical flaws with Plaintiffs' argument.

As an initial matter, the criterion referenced by Plaintiffs is a defined term under the Marine Mammal Protection Act (not the ESA), under which Plaintiffs do not bring any claims in this lawsuit. *See* 16 U.S.C. § 1362(18) (defining "Level A harassment" as an act that "has the potential to injure a marine mammal," and "Level B harassment" as an act that "has the potential to disturb a marine mammal . . . by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering"). But more importantly, even if the NMFS standards did apply to manatees—which they do not—Plaintiffs ignore the Corps' relevant analysis, in which it concludes that the SJH Project is unlikely to produce noise at harmful levels.

Specifically, the Corps analyzed a scientific study which found that "the majority of underwater sounds produced by hydraulic cutterhead dredging operations were of relatively low frequency," with the source of the sound reaching levels "between 170 and 175 dB" and the "levels decreased with increasing distance from the source." USACE_000181 (citing Reine et al. (2012a)). These findings have significant implications for the SJH Project because, while the dredging in the study involved "rock fragmentation and therefore represented a worst case scenario," the sediment being dredged in San Juan Harbor "is predominantly sand/silt/mud mixture" and will therefore generate less noise. USACE_000181. Based on this, the Corps reasonably concluded that "underwater sounds produced during the San Juan Harbor dredging project would not exceed NMFS Level A Criterion," USACE_000179 meaning noise levels will not pose a risk of injury to those species within NMFS's purview. *See* USACE_000096 (noting that NMFS's Level A

Criterion is 190 dB for pinnipeds and 180 dB for cetaceans). With respect to NMFS's Level B Criterion of 120 dB, which indicates noise levels will pose a risk of disrupting species' behavioral patterns (i.e. a step below causing injury), the Corps noted that whether the threshold is exceeded would depend on the type of dredging, and that "NMFS has not made a determination that sound generation associated with dredging operations, or any other vessel operations, will be considered type B harassment." USACE_000179.[17]

Additionally, noise pollution is expected to decrease after the SJH Project is completed. Since a deeper channel will allow larger vessels to fully load their cargo, "the number of vessels transiting in and out of San Juan Harbor would decrease as a result of the proposed project." USACE_000183. Whereas, absent the project, "a greater number of vessels would be required to deliver the same amount of petroleum products, which would have a greater impact on marine noise." *Id.* In sum, Plaintiffs' contention that noise pollution from the SJH Project is likely to adversely affect the Antillean manatee is based on a flawed understanding of applicable wildlife guidelines and finds no support in the record.

### 2. Vessel strikes are expected to decrease as a result of the SJH Project.

Plaintiffs' contention that "[m]anatee injuries and deaths from vessel strikes are likely to increase" because of the SJH Project similarly lacks support in the record. Pls.' Br. 50. While FWS thoroughly considered the possibility of a "post-construction increase in commercial boat traffic," FWS_00047, both FWS and the Corps reasonably concluded that the project would not result in

---

[17] The Washington district court case relied on by Plaintiffs is also inapposite. *See Pres. Our Island v. U.S. Army Corps of Eng'rs*, 2009 WL 2511953, at *7-13 (W.D. Wash. Aug. 13, 2009) (finding that NMFS's effects determination was based on an inadequate analysis where NMFS reached a "no effect" conclusion while recognizing that noise from the proposed action could result in "take" of salmon and that "'killer whales could be exposed to sound in excess of the levels currently [considered] by NMFS as having the potential to cause behavioral disruption'" to orcas).

increased vessel traffic. To the contrary, as reflected in the Corps' Biological Assessment and discussed above, the project's channel improvements are expected to enable "the current shipping fleet to fully load their vessels . . . which would reduce the number of port calls and reduce the potential for vessel strikes to manatees." FWS_01365.[18] In other words, if anything, the SJH Project is expected to result in a decrease in vessel strikes.

To ensure that there is no harm to manatees during construction of the SJH Project, FWS developed multiple conservation measures to protect manatees from vessel strikes during the period of construction activity. FWS_00047-51. Among other provisions, these measures include:

- Dedicated "day and night [manatee] observers" with "significant on-the job experience observing protected marine species during dredge operations" must be on site at all times work is being conducted.
- During the day, all activities must be shut down if a manatee "comes within 50 feet of the active construction site" and cannot resume "until the manatee has moved beyond the 50-foot radius of the project operation, or until 30 minutes elapses" with no reappearance of the manatee.
- During the night, all activities must be shut down "if a manatee moves closer than 75 feet" of the project area and cannot resume "until the manatee has moved beyond the 75-foot radius of the project operation, or until 30 minutes elapses" with no reappearance of the manatee.
- At any time, "[i]f a manatee is sighted within 100 yards of the project area, all appropriate precautions be implemented by the contractor to ensure protection of the manatees."
- Throughout the course of the project, "[a]ll vessels associated with the project construction will operate at 'no wake/idle' speed while in shallow waters (10 feet or less)."

FWS_00073-75. FWS's comprehensive conservation measures, which provide a conservative vessel speed limit as well as mandatory stop orders upon manatee sightings, clearly support FWS's "not likely to adversely affect" determination.

---

[18] The only support Plaintiffs offer for their broad contention that "[l]arger vessels . . . account for a disproportionate number of ship strikes," Pls.' Br. 51, is a comment letter submitted to the Corps by Plaintiff Center for Biological Diversity, which in turn cites an article on collisions between ships and whales—not manatees—that is not part of the record in this case, *see* USACE_002310.

Indeed, the record demonstrates that even FWS's standard recommended manatee conservation measures—which provide less protections than those developed for the SJH Project—have a successful track record of preventing vessel strikes during dredging operations. For example, while a total of sixteen manatees were observed within 100 feet of the 2017 San Juan Harbor Maintenance Dredging Project, there is not a single report of manatee mortality or injury during that time. FWS_00072. The only manatee deaths that Plaintiffs reference in their brief that did occur in San Juan Harbor, Pls.' Br. 50, were not connected to any dredging or construction operations. FWS_00071. Rather, the one referenced incident, which occurred in 2006, was caused by a vessel strike that FWS concluded "may have been prevented by following idle speed zones within the San Juan Bay and/or by having an observer on board while transiting in that area." FWS_00071. Based on FWS's conservation measures for the SJH Project—which include a "no wake/idle" speed limit and dedicated manatee observers throughout construction—there is thus no basis to vacate FWS's reasoned determination that the project will not pose an increased risk of vessel strikes to manatees.

### 3. The San Juan Harbor is not a significant source of seagrass.

Plaintiffs are incorrect that the SJH Project should be expected to cause harm to manatees though the destruction of seagrass (one of the manatee's food sources). Indeed, FWS considered this potential harm to manatees and found that the "[w]aters within San Juan [Harbor] were not associated with having a significant source of seagrass." FWS_00071. Plaintiffs' contention that the "[e]xpansion of the turning basin may impact 69 acres of sea grasses" is inaccurate because it relies on a 2015 analysis that was based on an outdated 2001 benthic habitat map, which even at the time, FWS acknowledged was flawed. Pls.' Br. 51 (citing FWS_01392); FWS_01392 ("[T]he distribution and extent of seagrass . . . within San Juan Bay are not well documented because of

56

the turbidity of the waters or outdated information. Thus, there is a need to better document the extent of marine habitats within San Juan Bay . . . . [B]enthic surveys along the proposed project site should be conducted."). Based on updated "benthic surveys conducted from January through December 2016," the Corps subsequently determined that the SJH Project will "not result in direct impacts to submerged aquatic vegetation," including seagrass, because it occurs only in "scattered areas of the San Juan Harbor . . . typically in less than 15'-20' water depths," USACE_000037, and is located over "150 meters from the deepening and widening of the channel," USACE_000166. Plaintiffs have failed to establish that seagrass destruction caused by the Project will rise to a level that causes harm to the Antillean manatee, and thus have failed to show any clear error in FWS's judgment.

**C.      The Corps lawfully relied on its ESA Section 7 consultations with NMFS and FWS.**

As discussed above, NMFS and FWS reasonably determined that the SJH Project is not likely to adversely affect the ESA-listed species and critical habitat within their respective jurisdictions. Plaintiffs have failed to identify any "clear error of judgment" or lack of record support for the agencies' conclusions that would warrant ignoring the substantial deference to which they are entitled. *Citizens to Pres.*, 401 U.S. at 416 (a reviewing court's only role is to determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). Even if either consultant agency had based its opinion on "admittedly weak" information—which is not the case—an action agency's "reliance on that opinion will satisfy its obligations under the [ESA]" unless Plaintiffs can point to "new information—*i.e.*, information the consultant agency did not take into account—which challenges the opinion's conclusions." *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75-76 (D.C. Cir. 2006) (citing and adopting rule established in *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of*

*Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)) (cleaned up). Plaintiffs point to no such "new information" that NMFS or FWS failed to consider. Thus, it "does not suffice" for Plaintiffs to "simply [] reargue factual issues [that] the consultant agenc[ies] already took into consideration" as a basis for undermining the Corps' reasonable and lawful reliance on NMFS's and FWS's ESA Section 7 consultation determinations. *Id.*

## V.   The Corps has no duty to confer on a proposed critical habitat designation that was issued two years after ESA Section 7 consultation was completed.

The Corps had no Section 7 consultation duties with respect to critical habitat that was not designated, or even proposed to be designated, under the ESA at the time the SJH Project was approved and consultation was completed. NMFS completed the consultation process and fulfilled its duties under Section 7 on May 29, 2018, upon issuing a Biological Opinion on the effects of the SJH Project to all species and critical habitat listed or designated under the ESA at that time, including: leatherback, green, hawksbill, and loggerhead sea turtles; sperm, sei, blue and fin whales; elkhorn, staghorn, pillar, rough cactus, mountainous star, lobed star, and boulder star corals; scalloped hammerhead sharks; Nassau grouper; giant manta ray; and designated critical habitat for elkhorn and staghorn corals. NMFS_00004-154; 50 C.F.R. § 402.14(m)(1) ("Formal consultation is terminated with the issuance of the biological opinion."); 50 C.F.R. § 402.13(c) (Informal consultation is terminated with the issuance of a written concurrence with an agency's not likely to adversely affect determination). Two and a half years later, NMFS issued a proposed rule, proposing to designate critical habitat for five threatened Caribbean corals (the boulder star, lobed star, mountainous star, pillar, and rough cactus corals). 85 Fed. Reg. 76,302 (Nov. 27, 2020).

Because review and authorization of the SJH Project, including ESA Section 7 consultation, was completed well before NMFS proposed to designate critical habitat for the corals, the Corps was not and could not have been under a duty to confer over effects to the

proposed critical habitat. The more appropriate question—which Plaintiffs do not raise—would be whether the Corps is required to *reinitiate* consultation on the project. However, the answer to that question is no for two reasons.

First, under the ESA regulations, a proposal to designate critical habitat is not one of the four triggers for reinitiating consultation. 50 C.F.R. § 402.16(a). By contrast, an agency is required to reinitiate consultation "[i]f a new species is listed or critical habitat [is] *designated* that may be affected by the identified action." *Id.* at § 402.16(a)(4) (emphasis added). In other words, the Corps and NMFS are not required to reinitiate consultation until proposed critical habitat is formally designated under the ESA. *Id.* This distinction between proposed and designated critical habitat especially makes sense because the boundaries of proposed critical habitat can change during the course of the rulemaking process. 50 C.F.R. § 424.16(c)(2). And even when new critical habitat is designated, reinitiation of consultation is only required if the newly designated habitat "may be affected by the identified action." *Id.* at § 402.16(a)(4).

Second, the SJH Project is not likely to destroy or adversely modify the proposed critical habitat, 50 C.F.R. § 402.10(a), because contrary to Plaintiffs' contentions, Pls.' Br. 53, there is no overlap between the proposed critical habitat and the project dredging site. To support their contention that proposed critical habitat "exists in much of the [SJH] Project area, including areas in San Juan Harbor," Pls.' Br. 53, Plaintiffs created a map using "ArcGIS Pro version 3.0.2 GIS software from ESRI" and data obtained "from downloading the [NMFS] [ESA] Critical Habitat database" from NMFS's website. Pls.' Br. Ex. 1 (Clauser Decl.); Pls.' Br. 25, Figure 3. However, the conclusions Plaintiffs draw from their map are incorrect. NMFS's proposed critical habitat rule explicitly states that certain "federally-authorized channels and harbors" are not included in its proposed critical habitat designation and specifically identifies "San Juan Harbor" on its list of

excluded "managed areas." 85 Fed. Reg. 76,302, 76,329. The express language of the proposed rule highlights the flaws in Plaintiffs' map:

> [GIS locational data] were not available for every managed area; however, regardless of whether the managed area is extracted from the maps depicting the specific areas being proposed as critical habitat, no managed areas are part of the specific areas that contain the essential feature [qualifying them as proposed as critical habitat].

*Id.* at 76,314. Accordingly, the Court should reject Plaintiffs' ESA claim regarding proposed critical habitat for the boulder star, lobed star, mountainous star, pillar, and rough cactus corals.[19]

## VI. Vacatur of the SJH Project decisional documents is not warranted and, should the Court grant any relief, Federal Defendant request supplemental briefing on remedy.

The Court should grant summary judgment in favor of Federal Defendants for the reasons set forth above. However, if the Court finds in favor of Plaintiffs with respect to any of their claims, the Court should reject Plaintiffs' request that it summarily vacate the Corps' Final Environmental Assessment, FONSI, and NMFS's and FWS's "not likely to adversely affect" determinations. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (citations and quotations omitted); *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) ("[T]he function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration.") (citations omitted).

---

[19] Despite additionally alleging that the "Corps and FWS failed to consult on the effects of the [SJH] Project on the roseate tern and yellow-shouldered blackbird" in their Seventh Claim for Relief (asserting ESA violations for "failure to consult and confer"), ECF No. 1 ¶¶ 160-166, Plaintiffs do not include any such argument in their Motion for Summary Judgment. *See New York*, 413 F.3d at 20 (A party waives arguments that it fails to raise in its opening brief).

In the event that a court's analysis of the merits reveals an agency action to be defective, the court has discretion over whether the action should be remanded with or without vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) ("An inadequately supported [agency action] . . . need not necessarily be vacated.") (citations omitted). Under the applicable *Allied-Signal* test, when remanding an agency action and deciding whether to vacate it during remand, the Court must assess: (1) "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly)"; and (2) "the disruptive consequences of an interim change that may itself be changed." *Id.* at 150-51 (citation omitted). Here, vacatur would likely not be warranted because, if a deficiency were identified in one of the agencies' decisions, the agency would likely be able to remedy it on remand through additional explanation or an amendment. This would avoid the disruptive consequences of nullifying the years' worth of work, analysis, and government resources that went into environmental compliance for the SJH Project, which is expected to increase security, safety, and efficiency for the "majority of the [Puerto Rico]'s waterborne cargo and cruise ships [which] pass through the Harbor." USACE_000052.

Accordingly, if the Court finds a violation of law, Federal Defendants request the opportunity to submit supplemental briefing to address the scope of the error and whether vacatur is warranted in these circumstances. *See, e.g., Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 388 (E.D. Cal. 2007) (ordering supplemental briefing on the appropriate remedy and noting that "it is not prudent to impose a remedy without further input from the parties.").

## <u>CONCLUSION</u>

For the foregoing reasons, Federal Defendants request that the Court deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

Dated: February 24, 2023                    Respectfully Submitted,


                                            United States Department of Justice
                                            Environment & Natural Resources Division
                                            TODD KIM, Assistant Attorney General
                                            S. JAY GOVINDAN, Chief
                                            BRIDGET KENNEDY McNEIL, Assistant Chief

                                            */s/ Michelle M. Spatz*
                                            Michelle M. Spatz, Trial Attorney
                                            D.C. Bar No. 1044400
                                            Wildlife & Marine Resources Section
                                            P.O. Box 7611
                                            Washington, D.C. 20044-7611
                                            Telephone: (202) 598-9741
                                            Email: michelle.spatz@usdoj.gov

                                            Christopher C. Hair, Trial Attorney
                                            PA Bar # 306656
                                            United States Department of Justice
                                            Natural Resources Section
                                            4 Constitution Square
                                            150 M Street, NE, Suite 3.1004
                                            Washington, D.C. 20002
                                            Telephone (202) 305-0420
                                            Email: christopher.hair@usdoj.gov

                                            Sarah Izfar, Trial Attorney
                                            D.C. Bar No. 1017796
                                            Environmental Defense Section
                                            P.O. Box 7611
                                            Washington, D.C. 20044-7611
                                            Telephone: (202) 305-0490
                                            Email: sarah.izfar@usdoj.gov

                                            *Attorneys for Federal Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 24, 2023, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the District of Columbia by using the

CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ, Trial Attorney
D.C. Bar No. 1044400
United States Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 598-9741; Fax: (202) 305-0275
E-mail: michelle.spatz@usdoj.gov

*Attorney for Federal Defendants*