**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EL PUENTE, et al.,

        *Plaintiffs*,

        v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

        *Defendants*.

Case No.: 1:22-cv-02430-CJN

**OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................... 2

    I.    THE CORPS VIOLATED THE CLEAN WATER ACT...................................... 2

        A.    The Clean Water Act Applies to the Corps' Approval of the
            Dredging Project ........................................................................ 2

        B.    The Corps Violated the Clean Water Act's 404(b)(1) Guidelines.............. 4

    II.    THE ENVIRONMENTAL ASSESSMENT IS INADEQUATE .......................... 7

        A.    The Channel Dredging and Construction of LNG Import
            Facilities Meet the Test for Connected Actions.......................................... 7

        B.    The Channel Dredging, Expansion of Anchorage F, and
            Other Related Dredging Projects Also Meet the Test
            for Connected Actions. .............................................................. 14

        C.    The Corps' Analysis of Environmental Justice Impacts
            Is Arbitrary.................................................................................. 15

        D.    The Corps Failed to Analyze Alternatives That Satisfy NEPA ............... 22

        E.    The Environmental Assessment's Analysis of Air Pollution
            Is Inadequate. ............................................................................ 24

        F.    The Corps Unlawfully Failed to Discuss Impacts to Corals.................... 25

        G.    The Corps Left Unexamined the Project's Cumulative Effects............... 30

        H.    The Corps Failed to Adequately Consider Impacts to
            Cultural Resources From Vessel Accidents, Vessel Traffic
            and Seabed Destruction.............................................................. 32

    III.    NEPA REQUIRED THE CORPS PREPARE A FULL
          ENVIRONMENTAL IMPACT STATEMENT ................................................. 33

IV.     DEFENDANTS ARE IN VIOLATION OF THE ENDANGERED
        SPECIES ACT ................................................................................................. 34

        A.    The Fisheries Service Failed to Use the Best Available
              Science and Arbitrarily Concluded the Dredging Project
              Is Not Likely to Adversely Affect Corals ................................... 35

              1.    The Fisheries Service's concurrence contradicted
                    the best available science ................................................ 36

              2.    The Fisheries Service cannot rely on a plan to
                    make a plan to discount the adverse effects of the
                    Dredging Project ......................................................... 42

              3.    The Fisheries Service's decision not to reinitiate
                    consultation on listed corals is arbitrary ....................... 46

        B.    The Fish and Wildlife Service's Manatee Concurrence
              Is Flawed ................................................................................. 49

         C.    The Corps Unlawfully Relied on the Services Not-Likely-
              to-Adversely-Affect Concurrences ........................................... 52

V.      DEFENDANTS FAILED TO CONFER ON PROPOSED
        CRITICAL HABITAT .................................................................................... 52

VI.    VACATUR IS THE APPROPRIATE REMEDY ................................................ 53

CONCLUSION .................................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**

*'Ilio'ulaokalani Coal. v. Rumsfeld,*
    464 F.3d 1083 (9th Cir. 2006) ............................................... 14

*ABA v. U.S. Dep't of Educ.,*
    370 F. Supp. 3d 1 (D.D.C. 2019) ........................................... 35

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) .............................................. 54

*Allina Health Servs. v. Sibelius,*
    746 F.3d 1102 (D.C. Cir. 2014) ............................................ 53

*Am. Rivers v. U.S. Army Corps of Eng'rs,*
    271 F. Supp. 2d 230 (D.D.C. 2003) ....................................... 45

*Am. Wildlands v. Norton,*
    193 F. Supp. 2d 244 (D.D.C. 2002) ....................................... 37

*Appalachian Voices v. U.S. Dep't of Interior,*
    25 F.4th 259 (4th Cir. 2022) ................................................. 49

*Better Gov't Ass'n v. Dep't of State,*
    780 F.2d 86 (D.C. Cir. 1986) ................................................ 20

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971) ..................................... 19, 31

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Just.,*
    No. 95-1702 (GK), 1995 WL 748246 (D.D.C. Dec. 8, 1995) ................................................. 10

*Citizen's Alert Regarding the Env't  v. U.S. Dep't of Just.,*
    No. 95-1702 (GK), 1995 WL 748246 (D.D.C. Dec. 8, 1995) ................................................. 15

*Citizens Against Burlington, Inc. v. Busey,*
    938 F.2d 190 (D.C. Cir. 1991) .............................................. 23

*City of Alexandria v. Slater,*
    198 F.3d 862 (D.C. Cir. 1991) .............................................. 23

*City of Bos. Coal. for Sensible Transp. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987) .......................................... 11, 12

*City of Bos. Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ........................................ 11, 12

*City of Tacoma v. FERC,*
460 F.3d 53 (2006)..................................................................................................... 52

*Clark Cnty. v. FAA,*
522 F.3d 437 (D.C. Cir. 2008) ................................................................................... 25

*Conner v. Burford,*
848 F.2d 1441 (9th Cir. 1988) ................................................................................... 34

*\*Ctr. for Biological Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) ...................................................................... 24, 43, 50

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
441 F. Supp. 3d 843 (D. Ariz. 2020) ................................................................. 41, 42

*Defs. of Wildlife v. Salazar,*
698 F. Supp. 2d 141 (D.D.C. 2010), *aff'd*, 651 F.3d 112 (D.C. Cir. 2011) ............ 28

*\*Del. Riverkeeper Network v. FERC,*
753 F.3d 1304 (D.C. Cir. 2014) ..................................................................... 11, 12, 21

*Dow AgroSciences v. Nat'l Marine Fish. Serv.,*
707 F.3d 462 (4th Cir. 2013) ..................................................................................... 40

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
36 F.4th 850 (9th Cir. 2022) ...................................................................................... 34

*Found. on Econ. Trends v. Heckler,*
756 F.2d 143 (D.C. Cir. 1985) ............................................................................ 13, 31

*Friends of Clearwater v. Dombeck,*
222 F.3d 552 (9th Cir. 2000) ............................................................................. 13, 32

*Friends of the Earth v. Haaland,*
583 F. Supp. 3d 113 (D.D.C. 2022) .......................................................................... 54

*Gerber v. Norton,*
294 F.3d 173 (D.C. Cir. 2002) ................................................................................... 40

*Gov't of Man. v. Salazar,*
691 F. Supp. 2d 37 (D.D.C. 2010) ............................................................................ 22

*Grand Canyon Tr. v. Fed. Aviation Admin.,*
290 F.3d 339 (D.C. Cir. 2002) ............................................................................ 30, 31

*Greenpeace Found. v. Mineta,*
122 F. Supp. 2d 1123 (D. Haw. 2000) ...................................................................... 40

*Idaho v. Interstate Com. Comm'n*,
   35 F.3d 585 (D.C. Cir 1994)...................................................................... 29

*Lemon v. McHugh*,
   668 F. Supp. 2d 133 (D.D.C. 2009) ......................................................... 32

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017).................................................................... 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).................................................................................... 34

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) .......................................................... 40

*Nat. Res. Def. Council v. EPA*,
   824 F.2d 1146 (D.C. Cir. 1987) (en banc) ............................................... 13

*Nat. Res. Def. Council v. Herrington*,
   768 F.2d 1355 (D.C. Cir. 1985)................................................................ 29

*Nat. Res. Def. Council v. Kempthorne*,
   506 F. Supp. 2d 322 (E.D. Cal. 2007) ...................................................... 45

*Nat. Res. Def. Council v. Rauch*,
   244 F. Supp. 3d 66 (D.D.C. 2017)............................................................ 44

*Ne. Md. Waste Disposal Auth. v. EPA*,
   358 F.3d 936 (D.C. Cir. 2004).................................................................. 13

*Nebraska v. EPA*,
   331 F.3d 995 (D.C. Cir. 2003).................................................................. 17

*Oceana, Inc. v. Evans*,
   384 F. Supp. 2d 203 (D.D.C. 2005) .......................................................... 36

*Or. Nat. Desert Ass'n v. Bureau Land Mgmt.*,
   625 F.3d 1092 (9th Cir. 2010) .................................................................. 22

*Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*,
   606 F. Supp. 2d 1122 (E.D. Cal. 2008) .................................................... 36

*\*Pres. Our Island v. U.S. Army Corps of Eng'rs*,
   No. C08-1353RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009)................... 41

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) .................................................................. 47

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ................................................................. 21, 22, 31

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ..................................................................... 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017) ................................................................... 20

*Surf & Env't Conservation Coal. v. Dep't of the Army*,
   322 F. Supp. 2d 126 (D.P.R. 2004) .................................................................... 45

*Sw. Ctr. for Biological Diversity v. Norton*,
   No. 98-934 (RMU/JMF), 2002 WL 1733618 (D.D.C. July 29, 2002) .................. 36

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ........................................................................... 28

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002) ........................................................................... 5

*\*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321 (D.C. Cir. 2021) .................................................................... 17, 20

Wash. Toxics Coal. v. EPA,
   413 F.3d 1024 (9th Cir. 2005) ............................................................................. 4

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
   790 F.3d 920 (9th Cir. 2015) ............................................................................ 25

*\*WildEarth Guardians v. U.S. Forest Serv.*,
   No. 14-828-MV/KK, 2018 WL 4627087 (D.N.M. Aug. 30, 2018) ...................... 52

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ..................................................................... 24

*Yurok Tribe v. U.S. Bureau of Reclamation*,
   231 F. Supp. 3d 450 (N.D. Cal. 2017) ............................................................... 47

## Statutes

16 U.S.C. § 1532(19) .......................................................................................... 42

16 U.S.C. § 1532(5)(A)(i) .................................................................................... 26

16 U.S.C. § 1536(a)(1)–(2) .................................................................................. 52

16 U.S.C. § 1536(a)(2) ................................................................................... 26, 37

16 U.S.C. § 1536(a)(4)........................................................................................................ 53

33 U.S.C. § 1411................................................................................................................... 3

33 U.S.C. § 1413................................................................................................................... 3

33 U.S.C. 1344...................................................................................................................... 3

54 U.S.C. § 306108............................................................................................................. 32

**Regulations**

33 C.F.R. § 336.1(a)............................................................................................................. 3

40 C.F.R. § 230.10(a).......................................................................................................... 5

40 C.F.R. § 230.10(c).......................................................................................................... 6

40 C.F.R. § 230.10(d).......................................................................................................... 6

40 C.F.R. § 230.2................................................................................................................. 3

40 C.F.R. § 230.2(b)........................................................................................................ 3, 4

40 C.F.R. § 230.44.............................................................................................................. 6

40 C.F.R. § 230.44(b).......................................................................................................... 6

40 C.F.R. § 1501.2(d)(2)................................................................................................... 19

40 C.F.R. § 1501.3(b)........................................................................................................ 33

40 C.F.R. § 1502.14...................................................................................................... 22, 24

40 C.F.R. § 1508.25(a)(1)............................................................................................. 10, 14

40 C.F.R. § 1508.25(a)(1)(i)............................................................................................. 14

40 C.F.R. § 1508.25(a)(1)(ii) –(iii)..................................................................................... 9

40 C.F.R. § 1508.25(a)(1)(iii)........................................................................................... 11

50 C.F.R. § 17.3.................................................................................................................. 42

50 C.F.R. § 402.10(a).......................................................................................................... 53

50 C.F.R. § 402.16.............................................................................................................. 47

50 C.F.R. § 402.16(a)(2)..................................................................................................... 47

**Other Authorities**

63 Fed. Reg. 32,701 (June 16, 1998) ................................................................ 6

Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994) ...................................... 20

Federal Emergency Management Agency (FEMA), Hurricanes Irma and Maria
    in Puerto Rico, FEMA P-2020 (October 2018), https://www.fema.gov/sites/default/
    files/2020-07/mat-report_hurricane-irma-maria-puerto-rico_2.pdf ....................................... 17

Memorandum for the Field from the U.S. EPA & Army Corps (Nov. 3, 1999),
    https://tinyurl.com/yc7dewfv ........................................................................ 6

U.S. Fish & Wildlife Serv. & Nat'l Marine Fish. Serv., Endangered Species
    Consultation Handbook  (March 1998) .................................................................... 42

* Cases and authorities on which Plaintiffs chiefly rely


** All regulations cited herein refer to those that were in effect in 2018, at the time the Corps
finalized its environmental assessment and feasibility report.

# INTRODUCTION

The San Juan Bay Dredging Project will have significant, harmful environmental effects that Defendants failed to meaningfully evaluate. Nothing in their brief explains away the inadequate environmental review for the massive expansion and deepening of shipping channels for liquefied natural gas (LNG) and oil tankers in San Juan Bay. Defendants rushed approvals for the Project while Puerto Rico was reeling from catastrophic hurricanes, evading proper scrutiny. The magnitude of the threats from dredging and fossil fuel tankers on the community and wildlife must be analyzed, made available for public examination, and thoughtfully considered. Only then can the agencies truly understand the environmental effects of the project and make a fully informed and careful decision.

Defendants' arguments rely heavily on post-hoc justifications for 2018 decisions that contradict the science and record evidence. For example, Defendants leverage a brand-new decision to shelve the Condado Lagoon dumping option in contending that the Clean Water Act does not apply; they proffer a 2023 environmental justice analysis newly prepared for an additional 15-acre dredging proposal; and lean on a 2022 "memo to file" to explain why they determined the project would not harm corals. Defendants' efforts to explain their decisions after-the-fact do not address the environmental justice burden of their action, fail to prevent damage to threatened coral reefs, and cannot substitute for the reasoned agency decisionmaking the law requires.

This brief responds to the arguments made in Defendants' cross-motion for summary judgment. First, because the Corps conducted a section 404 analysis and continues to invoke the Clean Water Act in its decisions, it must therefore comply with the Act. Second, we focus on the inadequacies of the environmental assessment under the National Environmental Policy Act (NEPA). Specifically, the Corps unlawfully omitted the environmental impacts of interconnected

LNG import infrastructure, which is not entirely independent or unrelated as portrayed by Defendants. The environmental assessment contains numerous other errors and conclusory statements that the project has no significant environmental justice, air pollution, coral reef, or cultural resources effects. Defendants' argument fails to include the contemporaneous, reasoned analysis and meaningful hard look at environmental effects that the law requires. Finally, under the Endangered Species Act, we show that the Fisheries Service's decision that dredging is not likely to adversely affect corals is contradicted by the best available science and its own agency scientists. Defendants' post hoc justification cannot cure the deficiencies in that decision or substitute for formal consultation.

For these reasons, Plaintiffs are entitled to summary judgment and request that the court vacate and remand the decisions for environmental analyses that comply with the Clean Water Act, NEPA, and the Endangered Species Act.

## ARGUMENT

## I.    The Corps Violated the Clean Water Act

### A.    The Clean Water Act Applies to the Corps' Approval of the Dredging Project

The Corps' contention that the Clean Water Act does not apply here is incorrect. While Defendants assert that "the *initial* construction of the [San Juan Harbor] Project will place all dredged material in the [Ocean Dredged Material Site], which the [Marine Protection, Research, and Sanctuaries Act], not the [Clean Water Act], governs." Defs.' Cross Mot. for Summ. J. 11, ECF No. 23 (Defs.' Br.) (emphasis added), their brief de-emphasizes the fact that this is a very recent, post-litigation pivot for the Corps. In fact, the Corps conducted a Clean Water Act analysis for the Dredging Project. USACE_001110–1124. It did so because an analysis was required given the Project parameters the agency chose. Distancing itself from the Clean Water

Act requirements, the Corps offers that it is not proceeding with the Condado Lagoon option "[a]t this time," which it acknowledges requires Clean Water Act compliance. Defs.' Br. 11. Yet, the Corps *did* consider the Condado Lagoon disposal option in its review of this Dredging Project, it *did* proceed to assess the Project and its alternatives under the Clean Water Act, and it *continues* to invoke the Clean Water Act legislative and regulatory overlay in its briefing because it is relevant to its approval of this Project.

The fact that the Marine Protection, Research, and Sanctuaries Act also applies to the Dredging Project does not relieve the Corps of its responsibility to comply with the Clean Water Act. There is nothing in the Congressional mandates of the Clean Water Act or Marine Protection, Research, and Sanctuaries Act that absolves the Corps of its responsibility to comply with both statutes. As the Corps acknowledges, "[w]hen the Corps itself seeks to undertake a project that will cause a discharge, the Corps follows 'all applicable substantive legal requirements' under Section 404, including an application of the Section 404(b)(1) Guidelines. 33 C.F.R. § 336.1(a); 40 C.F.R. § 230.2(b)." Defs.' Br. 2–3. Without explicitly contending Section 404 no longer applies, the Corps then states, "[f]or discharges into the ocean and into territorial seas, the Corps applies more stringent standards under the [Marine Protection, Research, and Sanctuaries Act] and its implementing regulations." Defs.' Br. 3 (citing 33 U.S.C. § 1413, 40 C.F.R. § 230.2). Both statutes prohibit the dumping of dredged material into the territorial sea without a permit, 33 U.S.C. 1344; 33 U.S.C. § 1411, and there is a well-recognized overlap of jurisdiction. That the Corps and Environmental Protection Agency have divvied up this overlap through a series of regulations and Memoranda of Understanding does not negate this overlapping jurisdiction or keep a project like this one from triggering the application of

both statutes. *See, e.g.*, 40 C.F.R. § 230.2(b).[1] It is well settled that compliance with one statute cannot substitute for compliance with the other. *See, e.g.*, *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005) ("[A]n agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives").

The conditional "at this time" language the Corps uses for its current choice of the Ocean Dredged Material Disposal Site highlights that the Corps is still very much considering Condado Lagoon disposal. Not only does this raise questions about why the Corps shelved the Condado Lagoon option in January 2023, after the commencement of this litigation, it also underlines the importance of this Court evaluating the adequacy of the environmental analysis the Corps conducted for the Dredging Project as a whole, under the Clean Water Act as well as NEPA and Endangered Species Act. The Corps cannot conveniently select the statutory and regulatory overlay that best suits its position at any given time. It must be held accountable for the analyses it conducted and decisions it reached under the laws and regulations that applied to its decision.

### B.     The Corps Violated the Clean Water Act's 404(b)(1) Guidelines

While on the one hand contending the Clean Water Act does not govern, Defendants proceed to argue that the Corps' alternatives analysis and Section 404 analysis as applied to coral reefs complied with the Act. Defs.' Br. 14–15. This too is incorrect. First, as explained below, *infra* at 22–24 (discussing NEPA alternatives), the Corps' action alternatives for the Dredging Project had nearly identical impacts—dredging depths of 41, 42, 43, 44, and 45 feet—and did

---

[1] The result is these agencies choose to primarily regulate dredged material disposed in the territorial sea under the Marine Protection, Research, and Sanctuaries Act, while regulating dredged material discharged as fill in the territorial sea (for beach nourishment, island creation, or other "beneficial uses") under the Clean Water Act.

not consider or analyze less environmentally damaging alternatives, such as a smaller project footprint or another Project design that would avoid or minimize discharges of dredged material and impacts to aquatic habitat and species, including corals. Even in its consideration of disposal site options, Defendants were singularly focused on where to dump, rather than alternatives to achieve the least environmentally damaging impacts as the Clean Water Act requires. 40 C.F.R. § 230.10(a); USACE_000034 (describing two disposal options: one at the Ocean Dredged Material Disposal Site and the second to fill artificial depressions in Condado Lagoon), USACE_000142–43 (describing four other disposal sites identified but "dropped out from further consideration").

Despite Defendants' protestations, *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1188–89 (10th Cir. 2002) applies here. The requirement to consider and adopt the least damaging practicable alternative under the Clean Water Act is not limited to non-water-dependent projects. Nor are practicable alternatives limited to the element of the Project that involves the disposal site for the dredged material (as opposed to considerations of project location, footprint, or design, for example). As the court explained:

> The [Clean Water Act] test is not . . . whether features of a proposal would make a more desirable project. Rather the Applicant and the [Corps] are obligated to determine the feasibility of the least environmentally damaging alternatives that serve the basic project purpose. If such an alternative exists—*like a highway configuration that is much narrower because it dispenses with the amenities*—then the [Act] compels that the alternative be considered and selected unless proven impracticable.

*Id.* (emphasis added). Here, Defendants did not evaluate less environmentally damaging practicable alternatives and certainly did not adopt the least damaging one.

Second, this Project also violated the Clean Water Act's requirements to avoid and minimize damage to corals from its dredging, transport, and disposal activities. *See, e.g.* 40

C.F.R. § 230.10(d) (discharges prohibited unless "steps have been taken which will minimize

potential adverse impacts of the discharge on the aquatic ecosystem"), 230.10(c) (discharges

prohibited if they "cause or contribute to significant degradation" of special aquatic sites).

Defendants' attempt to silo their analysis of the discharges from the dredging, transport, and

disposal undermines Congress's prohibition on discharges into the territorial seas from activities

as a whole.

The Clean Water Act's regulations specifically names corals as one of only five "special

aquatic sites" that deserve a higher level of scrutiny and protection. 40 C.F.R. § 230.44. The

regulations note that "[c]oral organisms are extremely sensitive to even slight reductions in light

penetration or increases in suspended particulates." *Id.* § 230.44(b). Similarly, Executive Order

13089 directs federal agencies whose actions may affect U.S. coral reefs, including the Corps, to

"ensure that any actions they authorize, fund, or carry out will not degrade the conditions of such

ecosystems." 63 Fed. Reg. 32,701 (June 16, 1998). The Corps and Environmental Protection

Agency even issued a joint Memorandum that directs agencies to be:

> particularly careful to consider potential direct, indirect, and cumulative impacts to
> coral reefs . . . . In particular, coral reefs are very sensitive to even small increases
> in turbidity and nutrient loading. Impacts to be considered should include those
> resulting from sediments from dredging or dredged material disposal... It is
> important to recognize that there are circumstances where the impacts of the
> proposed activity are so significant that even if alternatives are determined not to
> be available, the permit should be denied regardless of compensatory mitigation
> that is proposed.

Memorandum for the Field from the U.S. EPA & Army Corps (Nov. 3, 1999),

https://tinyurl.com/yc7dewfv. Here the Corps failed to be "particularly careful" when it came to

evaluating impacts on corals from the disposal, including overflow and leaking during transport,

under Section 404(b)(1). Contrary to Defendants' contentions that the analysis was adequate, it

does not even mention corals under section 7.1.4, *Effects on Special Aquatic Sites*.

USACE_001120. Then in one sentence under section 7.1.7, *Threatened and Endangered Species*, it dismisses impacts to corals by concluding without analysis, "[i]n or near the affected area are critical habitat Acroporid corals [sic] . . . the proposed project may affect but is not likely to adversely affect . . . stony corals." *Id.* In sum, the Corps did not evaluate the Project's dredging, transit, and disposal impacts. Nor did it ensure against leakage of dredged materials and sediment plumes during transport. *See* Pls.' Mot. Summ. J. 29–30, 37–38, 41, 44–47, ECF No. 20-1 (Pls.' Br.); *see also infra* at 25–30, 35–46 (discussing corals).

## II.     The Environmental Assessment Is Inadequate

This case seeks review of specific deficiencies of the Corps' environmental assessment. It does not, as Defendants imply, ask this Court to decide policy questions about energy sources for Puerto Rico. Defs.' Br. 16–17. Rather, like any other NEPA case, it is about whether the Corps took the hard look required by NEPA. The record shows the Corps did not.

Defendants' attempt to segment connected actions—construction of navigation channels from the adjacent, interdependent, and contemporaneous building of marine terminals for LNG imports and other dredging projects—is unavailing. Further, the Corps failed to discuss the Project's impacts on environmental justice, air pollution, coral reefs, and cultural resources, or those resulting from vessel collisions and seabed destruction. The environmental assessment must provide a hard look at the project's harmful effects, including meaningful alternatives and cumulative effects. These all must be considered in the environmental assessment to comply with NEPA.

### A.     The Channel Dredging and Construction of LNG Import Facilities Meet the Test for Connected Actions.

Defendants have not justified their failure to analyze the Dredging Project and LNG import facilities under NEPA as connected actions. The Corps' environmental assessment failed

to assess the environmental impacts of construction of the infrastructure necessary to handle LNG imports even though conversion to LNG fuel was incorporated into the Project's objectives, recommended plan details, and final recommendations:

| Key Environmental Assessment Components Include LNG Conversion: | |
|---|---|
| **3.1.3 Objectives** | "For clarity, and to assist in applying this objective, the primary planning objective is based upon known problems and opportunities and considers the following objective statements: <br><br> • "To reduce navigation transportation costs through San Juan Harbor ***and reduce regional power generation costs***" USACE_000114 (emphasis added). <br><br> "[Plan] benefits include origin-to-destination benefits, reduced congestions and turning time efficiencies, ***and power generation benefits***." USACE_000115 (emphasis added). |
| **4.1 Description of the Recommended Plan** <br><br> **4.1.3 Local Service Facilities** | "***The associated costs for local service facilities are approximately $350 million for infrastructure improvements associated with PREPA's conversion to LNG*** and $2,054,000 for berths at facilities, which benefit from the deeper channel." USACE_000138 (emphasis added). |
| **9.0 RECOMMENDATIONS** | "Prior to implementation, ***the non-Federal sponsor shall agree to: . . . . Provide, operate, and maintain, at no cost to the Government, the local service facilities*** in a manner compatible with the project's authorized purposes" USACE_000206–07 (emphasis added). |

**Table 1.**

Defendants rely on the Project's benefit-to-cost ratio to claim the LNG conversion is not a connected action. Defs.' Br. 17–18. While the Corps found a net benefit without LNG conversion, the record shows this smaller benefit means it is unlikely the Corps would prioritize the funding necessary to move the Project forward without LNG conversion. USACE_000152 ("progress of PREPA's LNG conversion will be assessed prior to any USACE budgetary actions"); USACE_030374 (without LNG the Administration's benefit-cost ratio assessment—

which uses a different discount rate than the Corps—is 0.98 to 1). In other words, the Corps preferred, recommended, and would more likely prioritize the Project with LNG.

More importantly, this question of net benefits with or without LNG conversion misses Plaintiffs' point entirely, which is that the Corps was obligated to evaluate the environmental impacts of the Project *with* LNG conversion. The Corps cannot dispute that the environmental assessment considers "changing terminal infrastructure" as a "possible impact[] from navigation improvements," thus demonstrating—albeit without adequate analysis—that the LNG infrastructure is connected. USACE_000186. The Corps mentions LNG without discussion of impacts. *See, e.g.,* USACE_000187 (predicting no changes in cargo from deepening "with the exception of LNG (which increases)"). Publicly disclosing impacts is the heart of NEPA, and nothing about the Corps' benefit-to-cost estimate excuses the Corps from its duty to discuss connected actions' impacts. The construction of LNG import facilities meets the regulatory test for connected actions: the construction is contemporaneous in time, and the LNG import facilities are interdependent with this Project's dredging of navigation channels. 40 C.F.R. § 1508.25(a)(1)(ii) –(iii) (2018).[2]

Defendants claim that dredging is independent from LNG infrastructure because it helps all vessels, but the largest cruise and cargo ships already use the Bay while LNG tankers cannot. USACE_001560. The LNG infrastructure is inextricably linked to the Dredging Project because it would not have been built without the Project; the vast majority of the world's fleet of LNG tankers are too big to call on San Juan Harbor. USACE_001280–81. The record makes clear the

---

[2] All regulations cited herein refer to those that were in effect in 2018, at the time the Corps finalized its environmental assessment and feasibility report.

Corps' implementation of the Dredging Project did not depend on non-LNG vessels as it did for the LNG import local service facilities.

Details throughout the environmental assessment show that construction and operation of the LNG import facilities qualify as connected actions, which are closely related and therefore should be discussed in the same impact statement. Actions are connected if they "(i) [a]utomatically trigger other actions which may require environmental impact statements[;] (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously[;] [or] (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification.[3] 40 C.F.R. § 1508.25(a)(1). Here, the dredging project cannot or will not proceed unless the LNG infrastructure proceeds. Namely, the Corps recommended that *prior to federal implementation of the project*, "the non-Federal sponsor shall agree to," among other things, "[p]rovide, operate, and maintain, at no cost to the Government," LNG import facilities. USACE_000206–07. This Corps recommendation belies Defendants' assertion that the project requires "no changes to San Juan's energy generation." Defs.' Br. 17. The Corps even included a hold harmless clause for the LNG import facilities. USACE_000206. This demonstrates the Corps believed the infrastructure improvements associated with the conversion to LNG were so closely tied to the Project that the Corps might face claims for damages.

Further, the project's "study-specific assumptions" include a schedule for beginning construction of LNG facilities in April 2021. USACE_000116–17. The Corps acknowledged that if those assumptions about timing proved false after submission of the Chief of Engineer's

---

[3] Actions need only trigger one of the three elements in 40 C.F.R. § 1508.25(a)(1) to qualify as "connected actions." *Citizen's Alert Regarding the Env't v. U.S. Dep't of Just.*, No. 95-1702 (GK), 1995 WL 748246, at *8 (D.D.C. Dec. 8, 1995) ("prison project and business park need only meet one of the three tests to qualify as 'connected actions.'").

Report, USACE_000151, the project would be a lower budgetary priority for the Corps. USACE_000152 (the Corps will assess progress in LNG conversion prior to any Corps budgetary actions). The D.C. Circuit has emphasized the importance of timing of connected actions. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1318 (D.C. Cir. 2014). The Corps' outline of the schedule for LNG infrastructure development tied it to the future implementation of dredging. USACE_000206; *Del. Riverkeeper*, 753 F.3d at 1318–19 (the agency "was undeniably aware that the . . . projects were also under construction or review, and that each phase of the development fit with the others like puzzle pieces").

The LNG import facilities are also interdependent parts of the larger San Juan Bay dredging action and depend on that larger action for their justification. 40 C.F.R. § 1508.25(a)(1)(iii). The record shows that the Corps designed the Dredging Project with Coast Guard regulations for LNG tankers in mind, which would be useless design considerations without LNG import facilities being built. *See* USACE_003907; USACE_003910; USACE_006225. The Dredging Project and LNG import facilities are more akin to gas pipelines in *Delaware Riverkeeper*, 753 F.3d at 1316–17, than those in *City of Boston Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018), which Defendants cite. *See* Defs.' Br. 17. And they are certainly unlike the highways involved in the case underpinning Defendants' reliance on *City of Boston Coalition for Sensible Transportation v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987). Specifically, in *Boston Delegation*, one pipeline project was considerably curtailed after the environmental review and another was withdrawn altogether, so the timing was unlike the facts here. 897 F.3d at 252–53. As discussed, the Dredging Project and LNG import facilities are occurring simultaneously and inextricably linked, unable to occur without the other. In *Sensible Transportation*, the court found each road facilitated movement on other roads but also had

independent utility, i.e., would serve a significant purpose even if a different road was not built. 826 F.2d at 69. That case is inapplicable here because Puerto Rico's LNG import facilities have no connected network other than federal shipping channels. They are dead ends rather than networks, and LNG tankers rely on the Project to access and transport imported fuel. USACE_001280–81 (saying expansion is needed because "requesting a much higher number of port calls of smaller vessels" would "result in a permitting challenge due to the already congested San Juan harbor transit.").

Further, like the pipeline upgrades in *Delaware Riverkeeper*, the justification for the Dredging Project hinges on the LNG import facilities, thus the Corps must look at the environmental impacts of both. 753 F.3d at 1316–17. The Puerto Rico Energy Power Authority said that if the "Project is not constructed, [the electricity provider] will be forced to convert its . . . oil-fired steam units . . . to use No. 2 light distillate oil (diesel)." USACE_023123. In other words, without the project, the electricity provider has no use for LNG import facilities.

Most problematic is that the Corps is moving to implement the federal portion of the Project to serve the LNG import facilities with no evidence of a separate environmental review completed under NEPA. This distinguishes the situation from *Boston Delegation*, in which independent projects had separate environmental assessments. 897 F.3d at 253. The Corps may start dredging as early as June 21, 2023. *See* Prop. Sched. Order 1, ECF No. 16. This eviscerates the NEPA requirement for an agency to consider "'connected, cumulative, or similar' actions before they are undertaken, so that it can assess the true [environmental] costs of an integrated project when it is best situated to evaluate 'different courses of action' and mitigate anticipated effects." *Id.* at 251–52 (quoting *Del. Riverkeeper*, 753 F.3d at 1313–14). Plus, the agency's "NEPA duty is more than a technicality; it is an extremely important statutory requirement to

serve the public and the agency before major federal actions occur." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (citations omitted).

Defendants' assertion that Plaintiffs waived the argument because they did not raise this issue fails for three reasons. First, comments covered concerns with LNG deliveries. Specifically, Ruth Santiago met with the Corps about concerns with LNG deliveries and followed up by sending related documents to the agency, including El Puente's brief opposing the Aguirre Offshore Gas Port due to concerns and risks of LNG terminals and imports. USACE_002409–10; *see Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004) (no waiver of the argument because it was raised during rulemaking and the agency retains the duty to examine key assumptions and explain itself even if no one objects). Second, there is no waiver if an agency is aware of the issue. *Nat. Res. Def. Council v. EPA*, 824 F.2d 1146, 1150–51 (D.C. Cir. 1987) (en banc) (not waived because the agency "actually did consider the issue"); *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 558–59 (9th Cir. 2000) ("the agency, not an environmental plaintiff, . . . has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions") (citation omitted). The record demonstrates the Corps was on notice of major issues concerning LNG, and it originally anticipated its NEPA document would evaluate impacts "from infrastructure changes needed to accommodate new and/or additional port throughput." USACE_005759. Third, it would be unfair to block review because two hurricanes prevented more robust public participation. *Heckler*, 756 F.2d at 156 ("Given the public importance of this issue, we refuse to find that the decision to hear plaintiffs' challenge is an abuse of judicial discretion, particularly in view of NEPA's clear policy favoring public scrutiny of environmental considerations" (citation omitted)). Notably, the Corps' 2021 draft supplemental environmental assessment on Condado Lagoon garnered significant concern

about the LNG terminal issues. USACE_028616 (El Puente and others describing the LNG segmentation problem), USACE_026794 (Corps' response). "[T]he agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (citation omitted).

**B.    The Channel Dredging, Expansion of Anchorage F, and Other Related Dredging Projects Also Meet the Test for Connected Actions.**

Similarly, the Coast Guard's dredging to expand Anchorage F and the Corps-permitted dredging of berths adjacent to the channel meet the test for connected actions, the impacts of which the Corps was required to discuss in the Dredging Project's environmental assessment. 40 C.F.R. § 1508.25(a)(1).

Defendants irrelevantly maintain that there is no "proposed rulemaking by the Coast Guard to undertake" dredging Anchorage Area F and that "in advance of such a project, the Coast Guard would be required to conduct its own environmental review." Defs.' Br. 19–20. There is no requirement for publication of a proposed rule before the Corps discusses dredging as a connected action, nor does *Delaware Riverkeeper* support that proposition as Defendants contend. Defs.' Br. 19–20. One of the prongs for connected actions is if they "automatically trigger other actions *which may require environmental impact statements.*" 40 C.F.R. § 1508.25(a)(1)(i) (emphasis added). This does not mean that a proposed rule and associated NEPA documents must already have been published.

Defendants' reliance on *Weinberger v. Catholic Action of Hawaii/Peace Education Project* is distinguishable because there, as a matter of national security, the Navy neither admitted nor denied it would store nuclear weapons at a certain location. 454 U.S. 139, 145–46

(1981). Defendants here cannot deny that the Corps included the proposed Anchorage F deepening in its environmental assessment though failed to discuss its impacts.

With respect to the dredging of berths and other projects adjacent to the channel, Defendants inaccurately imply these are unrelated, private activities. Defs.' Br. 20. To the contrary, these all require Corps permits and meet the test for connected actions. These projects are entirely interdependent with the Dredging Project, as the public notices in the record show. USACE_005669–72; USACE_005762–65; USACE_005766–69; USACE_005770–73 (public notices for various harbor projects). Without deepening the channels, these projects would have no independent utility.

These projects in San Juan Bay are intertwined with the Dredging Project, similar to those in *Citizen's Alert Regarding the Environment v. U.S. Department of Justice*, No. 95-1702 (GK), 1995 WL 748246, *8 (D.D.C. Dec. 8, 1995). There the Bureau of Prisons committed to siting a prison in a business park and provided millions of dollars for sewer and water lines, without which the business park could not be developed. *Id.* The court that the projects were connected actions considering the essential economic interdependence. *Id.* The other, adjacent dredging projects are similarly interdependent to the larger San Juan Bay Dredging Project—tied to its projected depths and timing it dictates—and are thus connected actions.

### C.     The Corps' Analysis of Environmental Justice Impacts Is Arbitrary.

Defendants have not complied with environmental justice requirements as required by law. The most glaring error is the environmental justice map that did not include the entire dredging footprint.



Figure 1. USACE_0000804.

The Corps irrationally excluded people who live near the Dredging Project and the new LNG import facilities from its environmental justice analysis. Defendants claim the relevant population for a compliant environmental justice analysis is the "nearly 4,800 individuals [who] live within a one-mile radius of the project site." Defs.' Br. 23 (citing USACE_022648). Yet this characterization of the Project site and affected communities omits many people who will be exposed to direct harms. These harms are evident from the record, and include noise and light pollution and air emissions, USACE_028648 (comments of the Environmental Law Clinic of the University of Puerto Rico School of Law), plus additional air emissions from ships at new terminals connected to this Project, USACE_027142 (a study of ports' contribution to poor air quality of port cities). The Corps' conclusion that the Dredging Project would not cause disproportionately high and adverse effects on any minority or low-income populations, *see* USACE_000134, USACE_000185, is thus arbitrary and capricious because the "project site," as

Pls.' Opp. to Defs.' Cross Mot. for Summ. J. & Reply in Supp. of Pls.' Mot.
Case No: 1:22-cv-02430-CJN

16

the Corps defined it, excludes much of the Project area and many affected people. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330–31 (D.C. Cir. 2021).

Defendants' insensitive allegation that there is no evidence people were prevented from participating in the Corps' process belies the reality that Category 5 Hurricane Irma hit during the Corps' thirty-day comment period, which was from August 8 to September 7, 2017.[4] USACE_002514–18. This provided insufficient opportunity for public comment. Hurricane Irma caused $50 billion in damage, making it the fifth-costliest hurricane in U.S. history.[5] Over one million residents lost power.[6] Hurricane Maria made a direct hit two weeks later, on September 20, killing 2,975 people, leaving most residents without power for months, knocking out of service 95 percent of the cellular sites, and making more than 92 percent of Puerto Rico's roads impassable for at least a month.[7] It cost $90 billion in damages, making it the third-costliest hurricane in U.S. history.[8] Together, the hurricanes destroyed several hundred thousand homes.[9] All of this impeded people's ability to ask for an extension until long after the comment period closed. But Defendants conclude a Sierra Club inquiry about whether the deadline was extended "hardly demonstrates any difficulty" in participating in the Corps' public process. Defs.' Br. 24.

The record is replete with evidence that communities were denied the opportunity to comment on the draft environmental assessment. The San Juan Bay Estuary Program

---

[4] Defendants claim there was a 45-day comment period, Defs.' Br. 36 (citing USACE_000202), but that is not what was announced in the public notice, USACE_002516.

[5] Plaintiffs request judicial notice of these facts from the Federal Emergency Management Agency (FEMA) report, Hurricanes Irma and Maria in Puerto Rico at iii, FEMA P-2020 (October 2018), https://www.fema.gov/sites/default/files/2020-07/mat-report_hurricane-irma-maria-puerto-rico_2.pdf. *See Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (taking judicial notice of government data ).

[6] FEMA, *supra note 5*, at i.

[7] *Id.* at i, 1-11.

[8] *Id.* at iii.

[9] *Id.* at iv.

(ESTUARIO), the federally funded cooperative partner for the National Estuary Program, wrote

in February 2022:

> The stakeholder engagement process is particularly disappointing when one considers that the last opportunity for the community to provide comments . . . was . . . in August 2018. At the time, ESTUARIO's priority, like the rest of the island, was the island's recovery after the disaster of Hurricane María.

USACE_026789. Similarly, the Environmental Law Clinic of the University of Puerto Rico

commented that the Corps "does not show that the Environmental Justice communities of the

Guaynabo and Cataño Municipalities [were] granted public participation opportunities before or

after" the final environmental assessment in 2018. USACE_028649. Indeed, the short comment

period and timing of hurricanes prevented engagement, and this was exacerbated by the lack of a

Spanish translation of the draft environmental assessment. The Corps offered Spanish translation

of parts of the environmental assessment in August 2017, USACE_002492–94, yet there is no

record evidence that it provided this Spanish translation.

The curtailed-to-nonexistent opportunity to comment on the environmental assessment

resulted in a project with disproportionate and adverse impacts to communities least able to bear

them. Because the "increased risk, air pollution, noise, and other adverse effects on the low-

income populations of the [Sabana, Amelia and Vietnam] Wards were not adequately

considered" by the 2018 environmental assessment, USACE_028648 (comments of the

Environmental Law Clinic of the University of Puerto Rico School of Law), the Corps did not

evaluate harms to these communities in its project.

The problem also pervaded the supplemental environmental assessment on Condado

Lagoon, as El Puente and other community and environmental groups noted:

> There are environmental justice concerns associated with the expanded dredging of San Juan Bay. The [2021 draft supplemental environmental assessment] and FONSI fail to document the impacts of increased imports of LNG and other fossil

fuels made possible by the expanded dredging projects on the high numbers of poor and Afro-descent population in Puerto Nuevo and Cataño where polluting electric power plants are located.

USACE_028620. The Corps failed to adequately discuss the impacts to these communities.

Defendants argue they cured problems in the original 2018 environmental justice analysis by finalizing a supplemental environmental assessment this year, during briefing, but this argument is unavailing because the supplemental assessment only addressed the 15-acre additional dredging for Condado Lagoon. *See* Defs.' Br. 8 (it "evaluated only the dredging of a new area"). Moreover, the supplemental assessment largely reiterates the hollow and conclusory reasoning of the original. Rather than meaningfully reevaluate the 2018 environmental justice analysis, the Corps in 2023 merely appended an analysis with a larger zone of impact without examining impacts—pollution, accidents, noise, or procedural access—on these additional communities. *See* Defs.' Br. 24–25. The new, larger circle shows the Project affects more disadvantaged communities than the Corps' recognized in 2018, USACE_024688, demonstrating the Corps' error.

In other words, the Corps simply expanded its purported assessment area on a map but never actually analyzed the Project's impacts to disadvantaged communities within that area. This post-hoc rationalization does not rectify the Corps' failure to inform the public and agency of the Project's effects before agency decisions are made. *See Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971) (EA should provide "evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own"); 40 C.F.R. § 1501.2(d)(2). The problem remains that the Corps did not discuss impacts to many affected environmental justice communities in 2018 when it made its decisions,

but instead in 2023 appended its conclusions to its supplemental environmental assessment on Condado Lagoon.

Defendants protest that the Court should defer to the agency, Defs.' Br. 25, but the obvious errors in the 2018 analysis and the Corps' limited attempt to fix it in the 2023 Condado Lagoon analysis preclude this. Similarly, *Better Government Association v. Department of State*, 780 F.2d 86 (D.C. Cir. 1986), is inapposite because Plaintiffs are not asking the agency to do something it has already done. *Cf.*, Defs.' Br. 25 (citing *Better Gov't*, 780 F.2d at 91). The 2023 Condado Lagoon environmental justice analysis—incorporating more communities than analyzed in 2018 environmental assessment—still failed to discuss impacts from the Dredging Project early enough to provide a comprehensive review of the Project. This half-hearted attempt falls short. *See* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994) (requiring environmental justice analyses); *Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1330–31; *see also High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014) ("post hoc justifications for agency decisions . . . cannot support the agencies' action") (citation omitted).

Defendants attempt to distinguish the present case from *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C. 2017), by pointing to the *Standing Rock* environmental justice analysis, which excluded a Native American reservation by a mere eighty yards. Defs.' Br. 26 (citing *Standing Rock* at 137). But here, Maritima Street of Barrio Sabana—excluded from the 2018 environmental justice analysis—is adjacent to an existing fossil fuel import dock that is within several feet of the channel dredging. USACE_025946 (aerial photo); USACE_024636 (comments of the Environmental Law Clinic of the University of

Puerto Rico School of Law). The implication that the San Juan environmental justice communities are at a distance from the Project is false.

In addition, these communities are already overburdened with port pollution. *See Del. Riverkeeper*, 753 F.3d at 1319–20 (discussing cumulative impacts). The "use of fuel oil in most of its plants has made PREPA non-compliant with air emissions regulations . . . affecting the health of hundreds of thousands of American citizens." USACE_002455; *see also* USACE_026796 ("Catano, San Juan, Toa Baja, and Guaynabo are non-attainment for SO2"). The public health effects are concentrated in the San Juan metropolitan area, meaning the Project disproportionately affects those already vulnerable to health problems. USACE_002455 ("environmental issues are particularly serious in the San Juan metropolitan area, where over 70% of Puerto Rico's population is located and pulmonary ailments are more prevalent than in the rest of the population"). The Corps fails to consider these relevant facts in the record.

Defendants try to rely on *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), to claim the Corps' analysis passes muster. Defs.' Br. 26. In *Sierra Club v. FERC*, however, the data on environmental justice communities "appeared not only in the section of the EIS specifically dedicated to environmental justice, but also in the chapter that compared the various alternative routes," weighing the data with "factors like total route length, wetlands impact, and the number of homes near the route." 867 F.3d at 1369. This is readily distinguishable from the Corps' environmental justice analysis here, which remains a separate and detached document, USACE_024477, and contains neither any examination of alternatives for the Dredging Project nor information about the varying impacts to the communities west, east, and south of San Juan. The court in *Sierra Club v. FERC* acknowledged "that it is unjust to locate a polluting facility in a community that already has a high concentration of polluting facilities, even if those older

facilities produce pollution of a different type or in different locations." 867 F.3d at 1370–71.

But the court found that FERC "took seriously commenters' concerns," *id.* at 1370, which could

not plausibly be said here. Though the Dredging Project increases tanker access to *four* oil

petroleum and LNG terminals in the southwest corner of the Bay, the 2018 environmental justice

analysis only addressed the populations, schools, and communities north of San Juan Bay, on the

San Juan Peninsula. USACE_024636.

###### D.    The Corps Failed to Analyze Alternatives That Satisfy NEPA

Defendants clarify that the Corps identified "a reasonable range of seven alternatives" for

detailed consideration. Defs.' Br. 20–21. Yet the environmental assessment does not analyze the

environmental effects of these seven alternatives (i.e. structural and non-structural measures plus

the no-action alternative) that are provided in the 2018 environmental assessment.

USACE_000127–28 (Tables 3-1 and 3-2). Instead, it only analyzed the environmental effects of

the various dredging depths. USACE_000131 (Table 3-5). In other words, the seven alternatives

Defendants point to were not truly alternatives because the Corps never even described their

environmental impacts, let alone compared the impacts of each. *Gov't of Man. v. Salazar*, 691 F.

Supp. 2d 37, 49–50 (D.D.C. 2010) (agency cannot gloss over "risks from a pipeline breach

simply because the potential for a breach does not vary under the agency's proposed

alternatives").

The alternatives analysis is the heart of an environmental review because it allows the

decisionmakers to consider environmentally preferable options for their actions. 40 C.F.R.

§ 1502.14 (analysis must "rigorously explore and objectively evaluate all reasonable

alternatives."); *Or. Nat. Desert Ass'n v. Bureau Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir.

2010). The alternatives requirement is upended here, with the environmental assessment only

examining alternatives that have nearly identical impacts. *See* USACE_000131–34.

Defendants cite *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1991), for the proposition that courts should evaluate the agency's selection of alternatives in light of the objectives of the federal action. Defs.' Br. 21. Yet by only evaluating the environmental impacts of different dredging depths, USACE_000131, the Corps evaluated action alternatives that are all fundamentally the same rather than analyzing actual alternatives that the Corps itself identified as meeting the Project's objectives. USACE_000127–28. For each of the five dredging depths, the environmental impacts are identical, except on occasions where the Corps added language saying that deeper dredging causes the "magnitude of these changes [to be] slightly greater than the 41' alternative," for example. USACE_000131 (row labeled "Currents"); *see also* USACE_000134 (row labeled "Noise"). This narrow range of "alternatives" for which the Corps minimally listed environmental impacts was vastly different from the viable alternatives the Corps identified—but did not analyze—for the Dredging Project.

Nor is Defendants' citation to *Citizens Against Burlington, Inc. v. Busey* persuasive because there the D.C. Circuit stated that it would "uphold [the agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." 938 F.2d 190, 196 (D.C. Cir. 1991). Here, the Corps nowhere discussed why it chose various dredging depths as its "Array of Alternatives" for which to examine environmental impacts. USACE_000131. Thus, the Court cannot uphold the alternatives based on the Corps' non-existent rationale.

Defendants' brief also mentions options eliminated from detailed consideration that it admits were not part of the seven alternatives, like "additional tugboats, additional trucking, the use of an offshore port, and continued 'light loading' of vessels," among others. Defs.' Br. 21 (citing USACE_000119). The Corps did not consider these as NEPA alternatives, by Defendants'

own admission. A NEPA analysis must "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. Ideas the Corps eliminated prior to detailed consideration cannot form the basis of a range of reasonable alternatives.

### E.   The Environmental Assessment's Analysis of Air Pollution Is Inadequate.

Defendants contend that the environmental assessment's mention of some diesel emissions and breezes somehow provides a sufficient air quality analysis. Such meager analysis does not meet NEPA's standards. The Corps failed to accurately assess the negative impacts to air quality from the Dredging Project. For example, ships emit air pollutants maneuvering in ports at arrival or departure and when moored at terminals. USACE_027142. Defendants' response that San Juan "experiences nearly constant trade winds and sea breezes," Defs.' Br. 28 (citing USACE_000180), does not sufficiently counter the environmental and public health impacts from poor port air quality. The Corps admitted that "[e]ven though primary wind direction is south to north, sending the power plant emissions to the Atlantic Ocean, Catano, San Juan, Toa Baja, and Guaynabo are non-attainment for $SO_2$," adding that emissions in Guaynabo are "potentially" from trucks and vessels operating in the harbor. USACE_026796. A more rigorous Corps air quality analysis could result in alternatives that could balance the harms of air pollution. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) (if agency ultimately concludes emissions "will be significant, it may well approve another alternative included in the EIS or deny the [project] altogether" (citation omitted)).

Nor does the Corps' allusion to a "quantitative emissions analysis" provide a defense, as that analysis does not appear in the administrative record. *See* USACE_000180. NEPA requires the agency disclose the amount and effects of emissions. *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 64–66 (D.D.C. 2019) (agency failed to take a hard look at greenhouse gas emissions; emissions related to drilling leased parcels had to be quantified and analyzed). The

Corps failed to meet NEPA's requirement to "provide the public adequate access to information about the impact[s]" of the project. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924, 927–28 (9th Cir. 2015) (citation omitted). A court must assess whether the agency "engaged in reasoned decisionmaking" by determining whether "its decision is adequately explained and supported by the record," *Clark Cnty. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (citations omitted).

Defendants get no further by arguing contradictory positions, claiming both that the conversion of San Juan's power plants to LNG will offset any emissions from future commerce and "the Corps lacks any control over Puerto Rico's energy production." Defs.' Br. 29. Defendants cannot have it both ways; they cannot explain away additional emissions produced from the Project by claiming it will facilitate an energy transition to LNG in Puerto Rico while also disputing that, in fact, LNG conversion is part of the project. As discussed above, the Corps recommended that prior to federal implementation of the project, the non-federal partner agrees to provide, operate, and maintain the local services facilities for LNG conversion, at no cost to the federal government. USACE_000207. Yet still Defendants maintain they lack control over the LNG conversion and thus do not have to consider its air pollution impacts.

### F.    The Corps Unlawfully Failed to Discuss Impacts to Corals

Defendants attempt to justify the environmental assessment's failure to describe adverse impacts of the Dredging Project on corals, including the location of corals, and on critical habitat. Defs.' Br. 30. In claiming "impacts were not anticipated due to the distances between coral species and construction operations," *id.* (citing USACE_000166), Defendants repeat their past mistakes that limited the zone of impacts to 150 meters from the dredging. NMFS_00704 (identifying a problematic "belief (or lack of acknowledgement) by all parties that dredging would not create turbidity or a sedimentation problem"). As it relates to corals, not only does the

dredging carry risk, but so does the transport of dredged materials to the offshore dumping site. This expands the footprint of the Dredging Project's impact beyond San Juan Bay to include the 2.2 nautical mile-long route to the dumping site. USACE_000067. Defendants say the Corps considered effects from dredged material transport, but again they relied on "distances between coral species and construction operations" to find it "would not directly affect existing coral habitats." Defs.' Br. 30. Barges full of sediment will travel a route nearly 1,000 times, with two to three trips daily, USACE_001648, and this route is adjacent—meaning not at all distant—to coral critical habitat. The Corps must protect critical habitat from adverse effects. *See* 16 U.S.C. § 1536(a)(2).

Though Defendants state that "[d]esignated critical habitat does not cross the harbor entrance," Defs.' Br. 30, n.10 (citing NMFS_00212), the issue is that NEPA requires discussing impacts to corals and coral habitat. That includes not only those in critical habitat—areas designated as "*essential* to the conservation of the species," 16 U.S.C. § 1532(5)(A)(i) (emphasis added)—but also individuals and their habitat. The following map shows how close the hardbottom habitat is to the dredging operations and dredged material transport route. The orange arrow, denoting a distance 1,700 feet to the west of the channel, is not the closest point that coral habitat exists to the Project.



Figure 2. Mapped hardbottom and reef habitat in the vicinity of the San Juan Harbor. NMFS_00212 (figure 19).

The Corps failed to consider impacts to all corals, and particularly so because it was aware of the presence of threatened corals, their habitat, and their critical habitat.

Other contradictions are equally arbitrary. Defendants dismiss the Corps' Port of Miami dredging as "unrelated," Defs.' Br. 31, but that dredging harmed the same species of threatened corals as are in Puerto Rico. The Port of Miami project, Defendants say, "involved an entirely different geographic and hydrodynamic situation, making a direct comparison nearly impossible." *Id.* Yet in the paragraph before, Defendants say "[t]he Corps' use of a 150-meter estimated indirect impact zone was reasonable," *id.*, when that zone came from two very different studies: a nearly forty-year-old study in Port Everglades, Florida, and a study of dredging in Key West in 2004 that found a decline in seagrass due to increased sedimentation from barge transport to the dredge disposal site. USACE_000167 (citing USACE_020451 and

USACE_014147, respectively). The environmental assessment also relies on data from the Baltic, United Kingdom, and Hong Kong regarding the distance that sediment plumes may extend. USACE_000166. The Corps thus cannot rationally exclude evidence of harm to corals from the Port of Miami.

Defendants' reliance on case law to defend its future monitoring plan to minimize (not prevent) loss of sediment during transport to the offshore dumping site is misplaced. Defendants cite three cases for the proposition that the Corps need not specify mitigation measures under NEPA. Defs.' Br. 32–33 (citing *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017); *Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), *aff'd*, 651 F.3d 112 (D.C. Cir. 2011); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 516 (D.C. Cir. 2010)). These cases are distinguishable because they all involve environmental impact statements that described harmful effects and found them significant before promising a mitigation plan during the action. *See Mayo*, 875 F.3d at 21 (EIS "specifically addressed the effects of hunting on species listed under the ESA, such as the grizzly bear")); *Defs. of Wildlife*, 698 F. Supp. 2d at 149 ("plaintiffs do not contend that the EIS lacks a detailed statement of the environmental impacts"); *Theodore Roosevelt*, 616 F.3d at 505 (EIS found the "Project will disturb so much surface area, the greater sage grouse may be expected to suffer a long-term decline in population, precluding [its] improvement").

Here, in contrast, the Corps' environmental assessment does not consider the effects of the project to corals—for example, the population-level impacts to corals of any quantity of sediment from the Project—before the Project begins. See Figure 3.



Figure 3. "Sediment accumulates in the lower portion of the coral colony which smothers and eventually kills coral tissue at the base of the colony . . . The colony after a diver fanned away sediment. Note the margins (or halo) surrounding the live coral tissue indicate dead coral calyx (or the cups within the scleractinian corals that hold polyps)." NMFS_00795.

Instead, the Corps provides a commitment for a soon-to-be designed monitoring plan in lieu of undertaking an environmental analysis of the Project's impacts to corals. This is insufficient. NEPA requires the Corps to discuss the coral impacts *in the environmental assessment* because impacts resulting later from an inadequate monitoring plan will not be publicly disclosed or weighed in a comprehensive review before the action occurs. *See Idaho v. Interstate Com. Comm'n*, 35 F.3d 585, 596 (D.C. Cir 1994) (rejecting agency's assertion that by monitoring "compliance with the six conditions, it will be able to conduct any further environmental analysis that may be necessary," because "piecemeal enforcement" would not provide an opportunity for comprehensive environmental review). The Corps has not contemplated any further public comment if the turbidity limit is exceeded during the Project. *See id.* (the agency "contemplated no further public comment" even while it retained jurisdiction to monitor compliance with conditions).

In sum, the Corps failed to take a hard look at the impacts to corals; and as to the problems studied and identified, failed to make a convincing case that the impact was insignificant. *See Nat. Res. Def. Council v. Herrington*, 768 F.2d 1355, 1430 (D.C. Cir. 1985)

(listing the four-part inquiry to evaluate the adequacy of an environmental assessment and finding of no significant impact (citations omitted)).

### G.     The Corps Left Unexamined the Project's Cumulative Effects

The Corps' dossier of dredging projects in San Juan Bay is large, including both its own dredging (deepening and widening channels; flood control projects), other federal agencies' projects (the Coast Guard's Anchorage F), and other projects that the Corps permits like the Guaynabo Oil Dock, Panamerican Dock, and Old San Juan Piers. USACE_005669–72; USACE_005762–65; USACE_005766–69; USACE_005770–73. Even if the Court finds these are not connected actions, it is still unlawful for the Corps not to examine the cumulative environmental impacts of these projects. *See Del. Riverkeeper*, 753 F.3d at 1319 ("the same points that support [plaintiff's] segmentation claim also sustain its contention that [the environmental assessment] is deficient in its failure to include any meaningful analysis of the cumulative impacts"). To be sure, the incentive for the Corps not to consider these cumulative impacts is ease and speed in permitting. But cumulative impacts—including turbidity and air pollution increases in San Juan Bay—may be significant if aggregated with Project impacts.

Defendants' conclusory statement that the absence of evidence of significant environmental harm from the Project means that "cumulative effects of other actions in the project area (including other dredging and disposal projects) would be 'minimal,'" Defs.' Br. 27 (citation omitted), does not hold up to the case law. The D.C. Circuit rejected a similar approach in *Grand Canyon Trust v. Federal Aviation Administration*, 290 F.3d 339 (D.C. Cir. 2002). There, the agency provided "no analysis of cumulative noise impact . . . against which the additional noise impact of the replacement airport can be evaluated," instead, "treat[ing] the identified environmental concern in a vacuum," rendering its EA inadequate. *Id.* at 345–47. In other words, failing to examine cumulative impacts does not make them insignificant; the

impacts may be additive and even synergistic. Thus, the Corps cannot escape its duty to consider cumulative impacts despite its estimation that impacts of the Project are minimal.

Defendants also claim the Corps is absolved from looking at cumulative impacts since federal and state permitting requirements will be required for ongoing and/or future actions. Defs.' Br. 27. Courts have long held that an agency's NEPA analysis must consider environmental impacts, even if those impacts are subject to regulation by another agency. *See Calvert Cliffs'*, 449 F.2d at 1122–23; *see also Sierra Club v. FERC*, 867 F.3d at 1375 (rejecting an agency's position that state and federal permitting processes for air emissions excused an agency from considering greenhouse gas emissions in its NEPA analysis). An interpretation otherwise—that allowed the Corps to defer consideration of environmental impacts until later permitting processes—would prevent the environmental assessment from serving its function, which is "at a minimum [to] address the considerations relevant to determining whether an EIS is required." *Grand Canyon Tr.*, 290 F.3d at 345.

Defendants attempt again to evade review of the environmental assessment by claiming that Plaintiffs failed to raise issues of cumulative impacts of Corps-permitted projects. Defs.' Br. 28. But Plaintiffs commented on the need for a cumulative impacts analysis. *See, e.g.,* USACE_001257 (the cumulative effects of numerous Corps projects must be evaluated). Moreover, the cumulative effects of dredging and building LNG terminals are so important and obvious that the Corps should know of these concerns independently. *Heckler*, 756 F.2d at 156. The Rio Puerto Nuevo flood control project is one of the Corps' own projects that is occurring in San Juan Bay. Dredged spoils from the flood control project will also be transported to and dumped at the offshore ocean site, just like the soils from the San Juan Bay Dredging Project. USACE_028793 ("Dredged material resulting from San Juan Harbor maintenance and deepening

projects is anticipated as well as dredged material from continued construction and maintenance

of the Rio Puerto Nuevo Flood Control Project."). The increase in turbidity from these projects,

which leads to sedimentation and harm to corals is cumulative, meaning the harm increases when

these projects' effects are aggregated. The Corps is not only aware of, but also in charge of, these

other dredging and material disposal projects, and Plaintiffs amply informed the Corps about the

dangers of sedimentation to wildlife. USACE_001205–06, USACE_001250–52. The Corps must

consider the cumulative effects regardless of whether comments raised the issues. *Friends of*

*Clearwater*, 222 F.3d at 558–59.

> **H.     The Corps Failed to Adequately Consider Impacts to Cultural Resources From Vessel Accidents, Vessel Traffic and Seabed Destruction.**

**Cultural Resources:** Defendants maintain that the environmental assessment adequately

considered impacts to cultural and historic resources because it consulted with the Puerto Rico

State Historic Preservation Officer, Defs.' Br. 33, but satisfying the National Historic

Preservation Act's Section 106 consultation requirement, 54 U.S.C. § 306108, does not relieve

the Corps of its duty to comply with NEPA. *Lemon v. McHugh*, 668 F. Supp. 2d 133, 144

(D.D.C. 2009). Further, Defendants' argument focuses on the direct construction impacts rather

than threats to the San Juan National Historic Site that Plaintiffs identified, including threats to

its viewshed and from erosion.

**Vessel Accidents:** The Corps' Dredging Project will indisputably change the size and

number of vessels using San Juan Bay, yet Defendants maintain that the impact of vessels would

occur with and without the Project. Defs.' Br. 34 (citing USACE_000184). Similarly,

Defendants claim that erosion from wind and waves makes vessel wakes a "minor factor

contributing" to erosion, *id.*, which admits impacts to historic resources but fails to discuss them

in sufficient detail to inform decisionmakers. The environmental assessment must discuss the

potential impact associated with larger, more powerful ships on the historic landmarks and cultural resources of San Juan Bay. The conclusory statements regarding these impacts violate NEPA's requirement for a hard look. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 108 (D.D.C. 2006).

Regarding the risks of vessel traffic and accidents, Defendants quote the San Juan Harbor history of groundings, Defs.' Br. 34–35 (citing USACE_003456), rather than pointing to a discussion of environmental impacts of collisions that would satisfy the hard look NEPA requires. Even the page that Defendants cite, USACE_003456, omits any mention of the potential effects to the environment of oil spills or LNG accidents. Defendants' failure to consider impacts on these affected resources violates NEPA. 40 C.F.R. § 1501.3(b).

**Seabed life:** Defendants do not address Plaintiffs' argument that the environmental assessment did not discuss damage to seabed life. *See* Pls.' Br. 33.

## III.   NEPA Required the Corps Prepare a Full Environmental Impact Statement[10]

Defendants' argument that it rationally determined that none of NEPA's intensity factors counsel toward preparation of an environmental impact statement is refuted by the record. The Dredging Project is an earth-moving, major construction project operating 24 hours a day for a year, USACE_000034, USACE_000165, resulting in 2.2. million cubic yards of sediment being dumped in the ocean, USACE_000139, USACE_000033–34, with about 977 trips to transport it, USACE_001648. It also takes place in a metropolitan area with environmental justice communities living within a couple of hundred meters of the construction dredging activities, as discussed above. Multiple endangered species live in San Juan Bay and have the potential to be

---

[10] Even if Clean Water Act Section 1344(r) did not alone require the Corps to prepare an Environmental Impact Statement (EIS) for the Dredging Project as Defendants contend, Defs.' Br. 12–13, NEPA clearly does, *see* Pls.' Br. 38–42.

impacted by the project: sea turtles, manatees, and corals. Despite all these facts, the Corps concluded there would be not a single significant environmental impact.

Moreover, Defendants illogically state that a 2006 case rejected a 2022 Ninth Circuit decision that a finding that an action would likely adversely affect a listed species, like the sea turtles here, is *prima facie* evidence that an environmental impact statement should have been prepared. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022); *see* Defs.' Br. 37. Plaintiffs showed that several intensity factors were met and the Project required a full environmental impact statement. *See* Pls.' Br. 38–42.

## IV.   Defendants Are in Violation of the Endangered Species Act

Defendants seek to shield their inadequate consultation on threatened corals and manatees from scrutiny by relying on the deference courts may allow agencies on technical matters. Defs.' Br. 50, 57. But that deference has limits, such as when an agency ignores the best available science or where a decision runs counter to the evidence and fails to consider an important aspect of the problem. *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Importantly, the Fisheries Service's coral decision lacks scientific or technical evidence supporting it, instead relying on an inadequate promise of monitoring.

Before addressing Defendants' arguments, we clarify the two paths for Endangered Species Act section 7 compliance: formal or informal consultation. Formal consultation requires that the expert agency develop a Biological Opinion with a robust evaluation of the project's effects on threatened or endangered species. Beyond evaluating the effects of the action, formal consultation should result in (1) reasonable and prudent measures to minimize impacts, (2) an incidental take statement that authorizes and limits the extent of take of listed species, (3) enforceable terms and conditions, and (4) conservation recommendations. In this case, sea turtles

get these added protections, but the corals do not because Defendants proceeded under informal consultation. Under the informal path, the action agency prepares a biological assessment, and the abbreviated consultation concludes if the expert agency concurs that the project is not likely to adversely affect a listed species or its critical habitat. The concurrence is usually in a letter, but here it appears within the 90-page Biological Opinion on sea turtles that includes a couple of pages about corals. NMFS_00019–22 (referred to as the "concurrence").

Defendants conflate the analysis and protections formal consultation provides with their informal process that rubber stamped the Corps' conclusion that corals or manatees are unlikely to be adversely affected. Stating that it is undisputed that consultation is complete, Defs.' Br. 38, does not get at the kernel of the debate—that the concurrence was arbitrary and failed to use the best available science.

A.    The Fisheries Service Failed to Use the Best Available Science and Arbitrarily Concluded the Dredging Project Is Not Likely to Adversely Affect Corals

The Fisheries Service erred by disregarding the best available science showing sediment from dredging harms corals. Its decision that the Dredging Project is not likely to adversely affect corals runs counter to the evidence, and the Fisheries Service's explanation is a post-hoc rationale with insufficient support.

Defendants' attempt to fault Plaintiffs for citing the administrative record's 2019 study that post-dates the decision must fail because this science—even if not that particular publication—was before the agencies at the time of their decisions. Plaintiffs cite Cunning (2019) because it is in the record and provides a concise explanation of the coral monitoring and mass mortality data before the agencies. This Court can consider it because it elucidates data before the agency and demonstrates the errors in the agency's decision. *See, e.g.*, *ABA v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 37–40 (D.D.C. 2019) (considering evidence that postdated

decision); *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 217 n.17 (D.D.C. 2005) (admitting a scientist's letter submitted four months after an agency's decision because it had direct bearing on whether the agency considered relevant factors and purported to undermine key evidence supporting the agency's decision); *Sw. Ctr. for Biological Diversity v. Norton,* No. 98-934 (RMU/JMF), 2002 WL 1733618, at *7 (D.D.C. July 29, 2002) (similar). Defendants cannot deny that science showing coral mortality from Miami dredging between 2013 and 2015 was in their possession at the time of the decision. NMFS_00235 (Corps' biological assessment mentions deleterious impacts to corals in Miami); NMFS_00770–88 (Fisheries Service study on sedimentation impacts to corals in Miami); NMFS_00173 (discussion of lessons learned from Miami in letter); USACE_001708 (same for meeting minutes).

Even setting aside Cunning (2019), ample pre-decisional evidence contradicts the Fisheries Service's concurrence as discussed below. Despite knowing about this contrary information, the Fisheries Service did not heed those lessons and concurred that the Dredging Project was not likely to adversely affect corals.

### 1.     The Fisheries Service's concurrence contradicted the best available science

While San Juan Bay may not be the same as Miami, the best available science undermines assumptions used both in Miami and San Juan Bay. Defendants cite no cases to support their position. Defs.' Br. 39–43. The Fisheries Service's concurrence runs contrary to significant scientific information—published by the agency's own scientists—that the dredging is likely to harm corals. *See Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1122, 1172–73 (E.D. Cal. 2008) (holding that the Fisheries Service disregarded the best available science showing an action would jeopardize listed steelhead and adversely modify critical habitat).

During consultation, the Endangered Species Act requires the agency to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The requirement to use the best available data prohibits the agency from relying on "speculation or surmise" or disregarding superior data. *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251–52 (D.D.C. 2002) (citation omitted).

The Fisheries Service did not base its concurrence on the best available science described in the chart below. To summarize, the key points that these studies demonstrate are (1) sediment disperses many hundreds of meters from dredging; (2) sediment from dredging causes coral morality, partial mortality, and impairs reproduction; and (3) vaguely defined monitoring fails to prevent coral damage.

| Fourney and Figueiredo (2017) (NMFS_00693–700) | Water & Air Research (2017) (NMFS_00701–69) |
|---|---|
| • "[d]redging is particularly stressful for corals as it increases turbidity and sedimentation," smothering them and impeding their ability to feed, grow, and reproduce. NMFS_00694.<br><br>• "the maximum allowable turbidity in coral reefs during short-term construction and nourishment events should be *less than* 7 NTU." NMFS_00696–97 (emphasis added).<br><br>• anthropogenic sediment (common in dredging) hindered the survival of baby corals *even at current temperatures*,[11] with 50% dying within a month as turbidity increased from 4.62 to 14.2 NTU. *Id*. If turbidity was restrained to less than 7 NTU then 80% of the baby corals survived. *Id*. | • report prepared for the Corps to analyze data and monitoring from deepening and widening Miami Harbor.<br><br>• identified numerous shortcomings of the turbidity monitoring protocols, a lack of scientific rigor in assessing the sedimentation impacts of dredging, and other problems.<br><br>• monitoring was insufficiently defined, including the following deficiencies of monitoring requirements: lacked turbidity sensor calibration, failed to specify where to monitor within the plume, resulted in unsuitable monitoring stations where currents swept the sediment out the traps. |

---

[11] Defendants attempt to discount this study as focused on climate change (Defs.' Br. 50), but it was not solely about climate change and examined current conditions. They also err in stating that it showed "no evidence that a turbidity level above 7 NTUs causes harm." *Id*.

| Miller et al. (2016) (authored by Fisheries Service scientists) (NMFS_00770–88) | National Marine Fisheries (2016) (NMFS_00789–847) |
|---|---|
| • post-dredging field studies indicated that sediment accumulation and partial mortality of corals extended 700 meters from the channel.<br><br>• inadequate monitoring only 50 meters from the channel failed to accurately assess dredging-related impacts, and noting the need for improvements to monitoring plans. NMFS_00784.<br><br>• locations with sediment had three to five times increased partial mortality of corals compared to control locations.<br><br>• "extended exposure to dredging project-related sediment plumes was a significant driver of increased occurrence of compromised conditions of reef corals." NMFS_00782.<br><br>• recommended that dredging not take place during seasonal spawning events and warm water conditions. | • moderate to severe impacts on many acres of coral reefs resulting from sediment deposition from dredging. NMFS_00790.<br><br>• sedimentation from dredging caused partial and complete mortality of corals at distances beyond 700 meters north of the channel.<br><br>• accumulations of fine and course sediments with average depths of 0.7 to 4.2 centimeters on reefs.<br><br>• adverse impacts to corals were not consistent with disease, but the pattern of disease was consistent with the highest plume exposure from dredging.<br><br>• threatened elkhorn and staghorn corals were adversely affected by sedimentation.<br><br>• reports of "lost reproductive output and recruitment resulting from sedimentation." NMFS_00832. |

**Table 2.**

    Defendants' attempt to differentiate dredging in Miami from that in San Juan Bay fails

for three reasons: (1) it does not cure the errors and wrong assumptions from the 2018 decision;

(2) the agency did not *in its decision* explain its departure from the best available science; and

(3) the record evidence shows corals demand formal consultation.

    First, the best available science undermines the assumptions in the Fisheries Service's

concurrence that coral habitat is far enough away to avoid sedimentation and ill-defined

monitoring prevents harm. NMFS_00020–22. Defendants' assertion that San Juan is different

than Miami does not explain why the agency continues to rely on assumptions that have been

proven wrong. For example, Defendants repeat that listed corals are not in the action area, but

the best available science shows that overlapping coral location is not determinative of harm.

The best available science shows severe partial mortality to corals 100 to 700 meters from

dredging and adverse impacts as far as 10 to 15 kilometers away. NMFS_00783; NMFS_00777

(see figure 4). In other words, impacts are not limited to the dredging area, or even to hundreds

of meters away. Here, there is suitable habitat and designated critical habitat 456 and 762 meters,

respectively, from the dredging area, USACE_000138, and corals are even closer to the disposal

transport route, NMFS_00020. The agency must, at the very least, explain its not-likely-to-

adversely-affect decision for corals in the face of evidence that the Project would harm corals.



**Figure 4.** Sediment cover on reef substrate. (A) Mean (±1 SE) percent cover of sediment over hardbottom (SOHB) and deep sediment over hardbottom (DSOHB; >4 cm depth) . . . (B) Mean (±1 SE) depth of sediment at 0.5 m intervals along the same transects . . . Each of the sediment assessment locations had significantly higher SOHB cover and sediment depth than the reference area . . . (C–D) Illustration of expanse of deep sediment at the 200 m location showing soft corals with several cm burial. NMFS_00777.

The agency even ignored its own scientists. The Fisheries Service's administrative record

includes Miller (2016), NMFS_00770–778, and National Marine Fisheries Service (2016),

NMFS_00789–847, both authored by the agency itself. Yet the concurrence does not explain

why its conclusion contradicts its own science. Moreover, the agency initially decided that it

would not concur with the biological assessment because of its shortcomings. NMFS_00175.

The Fisheries Service described numerous infirmities of the Corps' not-likely-to-adversely-affect determination for corals in a detailed letter. NMFS_000169–76.[12] Here, as in *Greenpeace Foundation v. Mineta*, 122 F. Supp. 2d 1123, 1133 (D. Haw. 2000), "the conclusion of 'not likely to adversely affect' does not square" with the agency's own data that indicates the action will have adverse effects on a listed species.

Second, the Fisheries Service had to contemporaneously provide its reasoning in its 2018 concurrence, and Defendants cannot fill these gaps with a 2022 "memo to file" that postdates the decision. Defendants cannot have it both ways, rebuking Plaintiffs for citing Cunning (2019) while citing their own 2022 "memo to file." Justifying its decision after-the-fact is improper and should not be given deference. *Gerber v. Norton,* 294 F.3d 173, 183 (D.C. Cir. 2002).

In *Dow AgroSciences v. National Marine Fisheries Service*, 707 F.3d 462, 467–68 (4th Cir. 2013), the Fourth Circuit reversed the district court's acceptance of new justifications that were not included in the agency's Biological Opinion about impacts of pesticides on salmon. In holding that the Fisheries Service's Biological Opinion was infirm, the Court of Appeals disregarded the agency's justifications because "a reviewing court may look only to . . . *contemporaneous* justifications." *Id.* (citation omitted); *See NAACP v. Trump*, 298 F. Supp. 3d 209, 237 (D.D.C. 2018) (courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency, [and] post hoc explanations that the agency did not articulate when it acted are insufficient" (citation and emphasis omitted)).

To the extent the Court allows the Fisheries Service to justify its not-likely-to-adversely-affect determination for the first time here in litigation, Plaintiffs address the shortcomings of Defendants' justifications offered based on the 2022 "memo to file" in subsection three below.

---

[12] The Corps nominally responded by email. NMFS_000157–60.

Third, the record demonstrates the Fisheries Service should have formally consulted with the Corps because the Dredging Project is likely to adversely affect listed corals and their critical habitat. Much less triggers formal consultation than the evidence of harm to corals and their critical habitat present here.[13] The Endangered Species Act calls for institutionalized caution. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., 441 F. Supp. 3d 843, 856 (D. Ariz. 2020). If any take of a listed species is likely, the agency must engage in formal consultation. *Pres. Our Island v. U.S. Army Corps of Eng'rs*, No. C08-1353RSM, 2009 WL 2511953, at *7 (W.D. Wash. Aug. 13, 2009). In *Preserve Our Island*, the court held the Corps and Fisheries Service violated the Endangered Species Act when they determined a barge construction project was not likely to adversely affect listed species "in the face of scientific evidence suggesting specific and serious effects." *Id*. Much like the evidence in that case showing salmon would be adversely affected by construction, evidence in the record here shows that dredging and the resulting sedimentation is likely to adversely affect corals and coral critical habitat—yet the Fisheries Service came to the opposite conclusion.[14] Defendants should have engaged in formal consultation over corals.

Moreover, if the action is likely to take corals, then by definition it is "likely to adversely affect" the species and require formal consultation. U.S. Fish & Wildlife Serv. & Nat'l Marine

---

[13] Defendants' claim that the Fisheries Service did not really expect 977 scow trips, but this is unsupported by the record. Plus, monitoring does not reduce the number of scow trips. They still dump the dredge spoils somewhere regardless of monitoring. Even if the number is not 977, it is something close to it, and that is the estimate in the record. One foot loss is what triggers the scow to check itself, and it carries 3,000 cubic yards. NMFS_00170 ("A 1-ft loss would be 10% of 3000 y$^3$ which is equal to 605,922 gallons (or 2,293,665 liters) of water mixed with dredged material.").

[14] Moreover, because the evidence of harm to corals from dredging is as robust as the evidence that sea turtles are harmed by dredging, it was inconsistent for the Fisheries Service to come to contradictory conclusions about the need for formal consultation.

Fish. Serv., Endangered Species Consultation Handbook, at xv (March 1998) (definitions). The Dredging Project is likely to take listed corals—by blocking light, preventing baby corals from settling on the reefs, and smothering them. NMFS_00694. Sedimentation amounts to prohibited take of corals under the Endangered Species Act. Take is broadly defined under the Act; it encompasses not only activities that kill species, but also those that harass and harm. 16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 17.3 (definition of harass and harm). Any such take must be authorized, but here the Fisheries Service failed to formally consult and provide an incidental take statement to permit take.

Indeed, the Fisheries Service originally stated it "is unable to concur with the determination that the project is not likely to adversely affect ESA-listed corals and coral critical habitat," and "[g]iven the potential project impacts to ESA resources, [the agency] agrees that a formal consultation is necessary for this project." NMFS_00169–75. Yet the Fisheries Service abandoned its request for formal consultation without providing a clear, reasoned defense for its reversal. This is unlawful. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d at 856) (citations omitted).

## 2. The Fisheries Service cannot rely on a plan to make a plan to discount the adverse effects of the Dredging Project

The Fisheries Service's misguided reliance on a promise of a future monitoring plan cannot support its not-likely-to-adversely-affect determination to avoid formal consultation. Not only is the monitoring plan too vague, but also monitoring does not replace take limits and enforceable measures that result from formal consultation.

Defendants admit the monitoring plan is part of their basis for concluding that impacts to the corals will be discountable. Defs.' Br 46. An agency may not rely on a vague plan or promise of mitigation to conclude that a federal activity will not harm endangered species. *Ctr. for*

*Biological Diversity v. Bernhardt*, 982 F.3d at 748. There is no monitoring plan in the record, even with Defendants' production of new record documents in 2023. In *Center v. Bernhardt,* the Ninth Circuit held the Fish and Wildlife Service acted arbitrarily in relying on unapproved and undefined mitigation measures to conclude polar bear habitat would not be adversely modified by an oil drilling plan. *Id.* at 743–48. In that case, the expert agency indicated that if polar bear dens were found in pre-construction surveys, then the applicant will cooperate on future mitigation with the agency. *Id.* at 744. Three other mitigation measures identified by the agency were also too poorly defined to suffice. *Id.* Here, the promise of pre-construction surveys and a future monitoring plan with adaptive management are likewise arbitrary, undefined mitigations.

Defendants mistakenly cite regulations and cases on formal consultation to support their promise of a monitoring plan. Under formal consultation, which results in an incidental take statement and enforceable terms and conditions, Plaintiffs agree corals could receive more robust protections. Indeed, that is the type of scrutiny and measures Plaintiffs expected the Fisheries Service to afford listed corals and critical habitat.

The bullet points that Defendants describe as an adequate plan must fail, because (1) the chosen threshold does not prevent coral harm and (2) the bullets do not include actual mitigation measures. The Fisheries Service ignores record evidence on why an inadequate monitoring plan will not avoid harm to corals. Water & Air (2017) and Miller (2016) describe numerous lessons learned from inadequate monitoring plans in Miami, including a lack of baseline coral conditions, lag between monitoring and reporting, and vague guidance on how to conduct turbidity monitoring, among other problems leading to coral damage. NMFS_00704–08; NMFS_00723–27; NMFS_00784. The agency does not explain why the same problems are not repeated here.

For example, the Fisheries Service erred by setting the turbidity limit at 7 NTUs *above background* when it relies on science that indicates it must be *less than* 7 NTUs. NMFS_00696–97. Deference is not due to an agency when it misinterprets an issue, even a technical one. *Nat. Res. Def. Council v. Rauch*, 244 F. Supp. 3d 66, 94 (D.D.C. 2017). In *Rauch*, the Fisheries Service interpreted a population model outcome of no trend (or null) as a stable fish population, and the court gave the Fisheries Service no deference. *Id.* It reasoned that the plaintiffs did not challenge the choices made in selecting the data or the design of the model, but instead the agency's interpretation of the outcome—which in turn had "an error of logic." *Id.* The Fisheries Service has a similar problem here.

Defendants say that 7 NTUs above background is fine because the tolerance of corals varies, Defs.' Br. 49–50, but this is debunked in the record. NMFS_00175 ("it is much more likely that locally growing ESA-listed corals are living at or near their threshold for turbidity and sedimentation and the addition of project-related sediments would have greater impacts to these corals than those in a more pristine environment").

Plus, listed elkhorn and staghorn corals are "much more susceptible to increases in water turbidity than some other coral species." USACE_015089. The record provides further support that corals at the mouth of San Juan Bay are stressed and have already suffered deleterious impacts. USACE_001624 (noting coral reefs near mouth are "significantly stressed" from sedimentation, pollution, and disease); USACE_001709 ("reef system on the north coast is stressed already"). Defendants' reference to record documents that do not document harm to corals from dredging in 2007 and 2017 is misleading because silence is not evidence of no harm. *See* Defs.' Br. 50. Since threatened corals straddling San Juan Bay already experience stress

from high turbidity, the monitoring plan's error to allow turbidity to exceed 7 NTUs fails to ensure that corals are not adversely affected.

More importantly, actual mitigation measures are missing. Instead, unknown "[a]daptive management measures [will] be implemented." Defs.' Br. 47 (quoting NMFS_00021). An adaptive management process that lacks required mitigation, measurable goals, action measures, and implementation to protect a species and its habitat is unacceptable under the Endangered Species Act. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 355–57 (E.D. Cal. 2007). In *Kempthorne*, the agency relied on mitigation measures that would be defined in an adaptive management process to conclude that endangered species would not be jeopardized, yet the court rejected those measures as uncertain and unenforceable. *Id.* Mitigation to be carried out by third parties is also unacceptable, especially here because past dredging contractors have improperly implemented monitoring. NMFS_00705; *See also Kempthorne*, 506 F. Supp. 2d at 353 ("mitigation measures have been found unlawfully uncertain because their implementation was not within the control of the relevant federal agencies").

Trust in Defendants' promises is unfounded given the prior monitoring deficiencies. *Am. Rivers v. U.S. Army Corps of Eng'rs,* 271 F. Supp. 2d 230, 254 (D.D.C. 2003) (granting preliminary injunction where Fish and Wildlife Service was "improperly and unreasonably relying on future actions by the Corps that are virtually certain *not* to occur" to protect listed species). The Miami project showed that despite monitoring, the ill-defined mitigation killed corals. NMFS_00723–27. Further, the Corps has a checkered history in Puerto Rico of improvised dumping of dredged materials near reefs. *See Surf & Env't Conservation Coal. v. Dep't of the Army*, 322 F. Supp. 2d 126, 138 (D.P.R. 2004). The Corps says it will stop operations, but even that provides little comfort. Will a leaky scow stop in transit? Will the scow

proceed to the ocean dump? Then what? Miami had "a contingency plan to halt dredging operations if suspended sediment concentrations exceeded acceptable levels; this was in place, but [it] was insufficiently robust." NMFS_00719.

Finally, the vague criteria proffered by the Fisheries Service appears to say monitoring for listed corals will only occur "if any are found during the pre-construction resource surveys." Defs.' Br. 42. This possible monitoring is too vague to be relied upon because there are no assurances of where the survey will look for corals or how baby corals will be detected. Indeed, the Corps says that the areas adjacent to the entrance channel of the Bay—the area most likely to have corals closest to the scow transit path—is unsafe for monitoring. USACE_004138–39; *see also* NMFS_00020. Likewise, Defendants' attempt to rely on a Site Management and Monitoring Plan, Defs.' Br. 51 (citing NMFS_00112–54), which includes the inadequacies found in Miami, also fails for the same reasons described above; the concurrence itself fails to provide justification for reliance on a faulty plan, which runs contrary to the best available science.

The proof is in the plan, and here the Fisheries Service's reliance on unwritten, vague, and unenforceable adaptive management mitigation measures in a to-be-developed monitoring plan cannot justify a not-likely-to-adversely-affect determination. The Fisheries Service does not heed the lessons learned from Miami or contemporaneously explain—in its concurrence—why it ignored the best available science.

### 3. The Fisheries Service's decision not to reinitiate consultation on listed corals is arbitrary

Plaintiffs do not conflate the requirements of consultation with those for reinitiation of consultation, *see* Defs.' Br. 44. In fact, Plaintiffs did not move for summary judgment on a reinitiation claim, but because Defendants raised this issue in the first instance, Plaintiffs will briefly respond to their arguments.

The parties appear to agree that Defendants have an ongoing consultation duty under the Endangered Species Act, yet they disagree that the Fisheries Service's 2022 "memo to file" satisfies this duty. Even at the end of consultation, there is an ongoing duty to consult where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). "The duty to reinitiate consultation lies with both the action agency and the consulting agency." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) (citing 50 C.F.R. § 402.16). Characterizing the 2022 "memo to file" as a decision not to reinitiate consultation on threatened corals is arbitrary, because it fails to consider important aspects of the problem and is unsupported by the record. Further, to the extent Defendants also use the memo to correct the errors made in the Fisheries Service's concurrence, their effort fails.

The "memo to file" is arbitrary and unsupported by evidence. There are no records that support the agency's conclusion that the circumstances here are sufficiently different from Miami to obviate the need to reinitiate consultation. Here, as in *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 474 (N.D. Cal. 2017), the agency's determination that the new information did not trigger reinitiation of consultation was wrong. In that case the Fisheries Service had data showing that disease rates in salmon were higher than previously anticipated, and it erroneously wrote a letter claiming its old biological opinion was still valid despite the change in disease rates. Similarly, here the agency fails to provide evidence or science to support its conclusion. It cannot rely on mere assertions, especially where, as here, it appears to be a convenient post-hoc rationalization.

The Fisheries Service repeats the underlying flaws of its earlier determination that assume the impacts of the agency action are discountable because of the location of the corals

and the plan to make a monitoring plan. Indisputably, key facts undermine the Fisheries

Service's position. Restating that there are not corals in the action area does not help Defendants

because it is undisputed that there are corals at the mouth of the Bay, suitable hardbottom 456

meters from the dredging site, and critical habitat "adjacent to the disposal routes."

USACE_000138; NMFS_00021. A central conclusion of Cunning (2019) was that the 150-meter

impact zone is untenable because sediment impacts will extend for kilometers. NMFS_00684.

Data in Cunning (2019) showed that sediment covered 50 to 90 percent of habitat 1.2 to 2.5

kilometers (3,937 to 8,202 feet) away from the channel. *Id*. Despite Defendants' statement that

critical habitat is 2,500 feet (762 meters) away from dredging, this does not change that there are

corals and habitat close enough to be smothered with sediment. According to Cunning (2019),

dredging-related impacts may extend as far as 15 kilometers—more than nine miles:

> Based on these data, probable dredging-related impacts within 2–3 km include a
> ~4- to 9-fold increase in fine sediment input …, a ~2- to 4-fold increase in benthic
> sediment … and a ~5- to 12-fold increase in coral partial mortality … Sediment
> plumes further predict a doubling in partial mortality out to ~5 km south and ~9 km
> north of the channel, and some level of impact as far as ~10 km south and ~15 km
> north (the full range of plume detection).

NMFS_00686. Defendants previously underestimated impacts by "(1) geographic area, by one to

two orders of magnitude; (2) severity, with hundreds of thousands to millions of corals either

partially or totally killed, including those listed as threatened on the Endangered Species Act;

and (3) permanence, lasting at least two years post-dredging." NMFS_00690. Thus, the impacts

of dredging near threatened corals are not discountable.

The differences between San Juan Bay and Miami do not excuse the Fisheries Service

from consulting to examine the extent of effects. Both projects have coral reefs along the

sediment disposal route, even if the Miami channel is longer. Both projects have sand, gravel,

silt, clay, and limestone, USACE_000071, even if Miami had more limestone.[15] Both projects

have strong winds and currents, USACE_000070, even if Miami has different currents. And even

if the project is smaller and fewer than a million corals die, Cunning (2019) demonstrates that

dredging is likely to adversely affect corals, thus triggering consultation. NMFS_00678–92.

### B.    The Fish and Wildlife Service's Manatee Concurrence Is Flawed

Defendants' arguments do not explain away their superficial concurrence that the

Dredging Project is not likely to adversely affect Antillean manatees. The agency relies on

standard in-water construction measures to protect manatees, and the efficacy of those mitigation

measures is not at issue here. FWS_00047–50. Instead, the Fish and Wildlife Service violated the

Endangered Species Act when it concurred without considering relevant impacts to manatees

from noise, vessel collisions, and degraded seagrass foraging areas.

Defendants misconstrue the Fish and Wildlife Service's consideration of effects on

manatees and call it "thorough," but it is encompassed in one conclusory sentence repeated

verbatim in its concurrence letter and Coordination Act Report:

> the potential effects of the widening and deepening of the San Juan Bay Harbor on
> the manatee and its habitat may include but are not limited to: vessel and
> construction equipment strikes with manatees; manatee harassment by construction
> activities; seagrass habitat impacts; possibility of a spill; post-construction increase
> in commercial boat traffic; blasting impacts and noise.

FWS_00047; FWS_00073. "Fish and Wildlife Service's one-sentence recitation of general

threats" does not suffice for an action-area analysis. *Appalachian Voices v. U.S. Dep't of

Interior*, 25 F.4th 259, 272 (4th Cir. 2022). An agency official even questioned concurring with

the Corps' biological assessment in an email because of the inadequacy of the information

---

[15] Note that highest turbidity from dredging was measured one week after dredging commenced
and "therefore did not occur during [cutter suction dredging] and/or roller-chopping,"
NMFS_00745, contradicting Defendants' assumption that roller-chopping caused the harm in
Miami to differentiate it from this Dredging Project.

provided. FWS_01345. But instead of proceeding with formal consultation, the Fish and Wildlife Service concurred with no actual evaluation of manatee impacts.

**Noise:** Defendants argue that the noise threshold for marine mammals does not apply to manatees despite the presence of marine mammals. Even if a more appropriate noise threshold exists or theoretically could be developed for manatees, the agency is not excused from analyzing dredging and vessel noise disturbance. Dredging noise increases the risk that manatees will be struck by vessels. USACE_026919; USACE_026944 ("Noise produced by dredging activities, in particular, effectively masks boat noise across a distance ≤4 km"). Contrary to what Defendants aver, whether an activity constitutes take under the Marine Mammal Protection Act or Endangered Species Act is of no consequence. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 742 (provisions governing take under the two laws are similar, and the Marine Mammal Protection Act is more restrictive).

**Vessel collisions:** Defendants' predicted decrease of vessels does not excuse them from considering vessel-manatee collisions. Defs.' Br. 66. The limited manatee measures they do propose, Defs.' Br. 55, only apply to construction vessels. The record shows there will be more LNG tankers and double the volume of LNG is needed to deliver the same energy compared to other fuel types. USACE_000064 (Table 2-5); USACE_000181; USACE_000187 (no change in cargo "with the exception of LNG (which increases)"). The Army Terminal Channel used by the LNG tankers overlaps with known occurrences of manatees. *See* Figure 5 (locations of tagged manatee). Plus, larger-capacity, larger-sized vessels are more deadly for manatees. USACE_026941 ("larger vessels . . . may be particularly lethal . . . Hydrodynamic forces created by these large vessel types may pull manatees underneath").



**Figure 5.** Left: tracking data for an individual manatee in San Juan Harbor, Oct. 14 to Nov. 15. Right: San Juan Harbor expansion showing the widening and deepening of channels, including Army Terminal Channel, the southern route. FWS_00060; FWS_00072.

**Seagrass:** Defendants now disclaim the extent of seagrasses in San Juan Bay, Defs.' Br. 56–57, but in several places the record demonstrates the Project overlaps with seagrass beds. *See, e.g.,* USACE_004240 (2017 map demarking seagrass beds). The record's estimate of 69 impacted seagrass acres, FWS_01392, may not be the same area covered in the 2016 survey that Defendants discuss. Defs.' Br. 57. Elsewhere the record states there are seagrass beds "throughout San Juan Bay." USACE_000189. On May 10, 2018, an agency official wrote that an expansion flare in Army Terminal Channel had the potential for an acre of direct seagrass impacts. FWS_00081. Lacking a video survey of that area, the Fish and Wildlife Service recommended additional surveys to calculate the impacts. *Id.*; FWS_00066. That calculation is absent from the record. Whether the area affected is throughout the Project area, 69 acres, or merely one acre, the omission undermines the conclusion that the action is not likely to adversely affect manatees, which depend on seagrass for food. Finally, as discussed above in the section on

corals, *infra* at 38 and 48, the 150-meter zone of impacts from sediment deposition is wrong, and thus the statement that seagrass "is located over '150 meters from the deepening and widening of the channel,'" Defs.' Br. 57 (quoting USACE_000166), does not cure the agency's failure to adequately consider impacts to manatee foraging areas.

### C.   The Corps Unlawfully Relied on the Services Not-Likely-to-Adversely-Affect Concurrences

The Corps argues it can rely on the not-likely-to-adversely-affect concurrences if Plaintiffs fail to identify errors or new information that challenges their conclusions. Defs.' Br. 57–58 (citing *City of Tacoma v. FERC*, 460 F.3d 53, 76 (2006)). But Plaintiffs have detailed significant errors and record information that challenge Defendants' conclusions: the highly underestimated zone of impact, the insufficiency of a yet-to-be-developed monitoring plan, the plain error in interpreting the proper turbidity threshold, and the missing analyses. The agencies have not adequately explained any of these errors. Thus, the Corps is in violation of the law even under the *Tacoma* case, in which the D.C. Circuit noted that "the ultimate responsibility for compliance with the [Endangered Species Act] falls on the action agency." *Tacoma,* 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)). Here, if the Court finds either the Fisheries Service's concurrence for corals or the Fish and Wildlife Service's concurrence for manatees inadequate, which they are, then the Corps' reliance on those concurrences is also unlawful.

## V.   Defendants Failed to Confer on Proposed Critical Habitat.

Defendants state they have no duties to confer on proposed coral critical habitat because the proposed rule issued after they completed their consultation. Defs.' Br. 58–59. But when a species or critical habitat is proposed, an agency has an ongoing duty to confer if it maintains discretionary control that can benefit the species or habitat. *WildEarth Guardians v. U.S. Forest Serv.*, No. 14-828-MV/KK, 2018 WL 4627087, at *11–12 (D.N.M. Aug. 30, 2018) (agency had

ongoing discretionary control to confer on proposed endangered listing and critical habitat designation of salamander). It should be undisputed that the agency maintains such discretion.

The Endangered Species Act mandates that each agency "shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any [proposed species] or result in the destruction or adverse modification of [proposed] critical habitat." 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10(a). Defendants admit they "did not hold a conference on the effects of the Project on proposed critical habitat for Caribbean boulder star coral, lobed star coral, mountainous star coral, pillar coral, or rough cactus coral." Answer ¶ 164, ECF No. 14. Here, the duty remains unmet despite ongoing agency action.

The Fisheries Service put threatened corals in harm's way when it signed off for purposes of Section 7 compliance—not just once in 2018, but again in its 2022 "memo to file," and a third time in a 2023 determination on the dumping site management plan—without conferring on proposed critical habitat. *See, e.g.,* USACE_024715 ("NMFS is not considering *Acropora* critical habitat or proposed critical habitat for the other ESA listed corals in our effects determination for the issuance and implementation of the SMMP.").

Even if the critical habitat ultimately excludes channels from final designation, as Defendants posit, Defs.' Br. 59–60, the plume from leaky scows is likely to deposit sediment in proposed critical habitat. The record shows that reefs may be impacted many kilometers from a channel, NMFS_00678, and Defendants repeat the same flaw arguing that there is no overlap between the proposed critical habitat and the Dredging Project. Thus, a conference was necessary to safeguard the proposed critical habitat.

## VI. Vacatur Is the Appropriate Remedy

Vacatur is the "normal remedy" when a federal agency has acted contrary to law. *Allina Health Servs. v. Sibelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). To determine whether departure

from vacatur is appropriate, courts weigh the seriousness of the agency's errors against "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). Defendants have not met their burden to show an exception to the default remedy of vacatur is appropriate.

A ruling for Plaintiffs on any of their claims would constitute serious legal error—not something that can be explained away on remand—and thus vacatur is necessary. The deficiencies in Defendants' decisions on the Dredging Project are serious and have concrete environmental consequences. *Friends of the Earth v. Haaland,* 583 F. Supp. 3d 113, 156–62 (D.D.C. 2022) (vacating an oil lease sale for agency's failure to adequately consider an issue under NEPA). Vacatur is necessary to deliver environmental protections that would arise from compliance with the law. Remand without vacatur, as Defendants seek, would be insufficient, signal a desire to paper over the decisionmaking infirmities, and evade the normal remedy.

Defendants attempt to exaggerate the consequences of vacatur as somehow impeding the majority of waterborne cargo and cruise ships from calling on San Juan Harbor. Defs.' Br. 61 (quoting USACE_000052). This is plainly false since even without the Project those ships regularly navigate San Juan Harbor. USACE_001941 ("[t]he largest cruise vessel class, the Oasis class, has been calling San Juan Harbor since 2016"); USACE_000827 ("container ships calling San Juan and the Puerto Nuevo Channel were not constrained by channel depth"). Moreover, without vacatur the decision risks causing environmental harm to communities of Guaynabo and Catano; water and air quality; corals; and other wildlife. *Pub. Emples. for Envtl. Resp. v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (vacating NEPA document to protect against seafloor construction while details were reevaluated). Vacatur would simply maintain the status quo and result in environmental benefits.

Unless the Corps agrees to avoid construction during briefing, Plaintiffs oppose any delay that additional briefing on remedy would bring to this case.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for summary judgment.


Dated:  March 24, 2023.                              Respectfully submitted,

                                                      /s/ *Catherine Kilduff*

                                                     Catherine Kilduff, DC Bar No. 1026160
                                                     Julie Teel Simmonds, DC Bar No. CO0091
                                                     Miyoko Sakashita, DC Bar No. CA00061
                                                     CENTER FOR BIOLOGICAL DIVERSITY
                                                     1212 Broadway, Suite 800
                                                     Oakland, CA 94612
                                                     (510) 844-7100
                                                     ckilduff@biologicaldiversity.org
                                                     jteelsimmonds@biologicaldiversity.org
                                                     miyoko@biologicaldiversity.org