# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

EL PUENTE, et al.,

    *Plaintiffs,*

  v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

    *Federal Defendants.*

Civ. No. 1:22-cv-02430-CJN

## FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................................1

I.      Plaintiffs' CWA claims fail. ..............................................................................1

      A.      The Corps complied with the MPRSA, which governs the deposit of dredged material in the Ocean Dredged Material Disposal Site. ...............1

      B.      Challenges to the Condado Lagoon disposal option are not ripe. ..............3

      C.      The Corps' alternatives analysis was reasonable. ......................................5

II.     The Corps' EA and FONSI complied with NEPA's requirements. .......................7

      A.      NEPA does not require the Corps to consider LNG infrastructure or other unrelated dredging projects as "connected actions." ........................8

      B.      The Corps' environmental justice analysis complied with NEPA. ...........14

      C.      The Corps adequately considered reasonable alternatives. ......................16

      D.      The Corps sufficiently considered air quality impacts. ............................18

      E.      The Corps sufficiently considered impacts on corals and coral habitat. ...................................................................................................19

      F.      The Corps' cumulative effects analysis is reasonable. ............................22

      G.      Plaintiffs' remaining NEPA claims regarding cultural and historic resources, potential accidents, and seabed life lack merit. .......................24

III.    The agencies fulfilled their ESA Section 7 consultation obligations. ..................26

      A.      NMFS reasonably determined that the SJH Project is not likely to adversely affect ESA-listed corals or their designated critical habitat. .....26

      B.      FWS reasonably determined that the SJH Project is not likely to adversely affect the Antillean manatee. ....................................................39

      C.      The Corps lawfully relied on its ESA Section 7 consultations with NMFS and FWS. ....................................................................................43

IV.    The Corps has no duty to confer on NMFS's critical habitat proposal. ...............43

V.    Vacatur is an inappropriate remedy, and, should the Court grant any relief, supplemental remedy briefing should be permitted. ...........................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Accord Food & Water Watch v. USDA,*
   451 F. Supp. 3d 11 (D.D.C. 2020) .................................................................23

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) .....................................................................45

*Center for Biological Diversity v. Bernhardt,*
   982 F.3d 723 (9th Cir. 2020) ......................................................................36

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ....................................................................................27

*City of Aurora v. Hunt,*
   749 F.2d 1457 (10th Cir. 1984) ..................................................................17

*City of Bos. Delegation v. FERC,*
   897 F.3d 241 (D.C. Cir. 2018) ................................................................8, 11

*City of New York v. Dep't of Transp.,*
   715 F.2d 732 (2d Cir. 1983) .......................................................................25

*City of Tacoma, Wash. v. FERC,*
   460 F.3d 53 (D.C. Cir. 2006).......................................................................43

*Defs. of Wildlife v. Salazar,*
   698 F. Supp. 2d 141 (D.D.C. 2010) ...........................................................21

*Del. Riverkeeper Network v. FERC,*
   753 F.3d 1304 (D.C. Cir. 2014)..............................................................10, 11

*Dep't of Transp. v. Pub. Citizen,*
   541 U.S. 752 (2004) ...............................................................................11, 19

*Dow AgroSciences v. NMFS,*
   707 F.3d 462 (4th Cir. 2013) .....................................................................33

*Enos v. Marsh,*
   769 F.2d 1363 (9th Cir. 1985) ...................................................................44

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
   36 F.4th 850 (9th Cir. 2022) ....................................................................7, 8

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) .........................................................................7, 8

*Foundation on Economic Trends v. Heckler*,
   756 F.2d 143 (D.C. Cir. 1985) ..............................................................................12

*Grand Canyon Trust v. Federal Aviation Administration*,
   290 F.3d 339 (D.C. Cir. 2002) ..............................................................................23

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) .............................................................................5

*Hormel v. Helvering*,
   312 U.S. 552 (1941) .............................................................................................12

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
   464 F.3d 1083 (9th Cir. 2006) ..............................................................................13

*Izaak Walton League of America v. Marsh*,
   655 F.2d 346 (D.C. Cir. 1981) .............................................................................20

*Johnson v. Panetta*,
   953 F. Supp. 2d 244 (D.D.C. 2013) ......................................................................18

*Minisink Residents for Env't Pres. & Safety v. FERC*,
   762 F.3d 97 (D.C. Cir. 2014) ...............................................................................23

*Nat. Res. Def. Council v. Kempthorne*,
   506 F. Supp. 2d 322 (E.D. Cal. 2007) .............................................................37, 38

*Nat'l Parks Conservation Ass'n v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019) .............................................................................8

*Nat'l Wildlife Fed'n v. NMFS*,
   254 F. Supp. 2d 1196 (D. Or. 2003) ....................................................................38

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) .................................................................................4

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005) .................................................................................16

*New York v. Nuclear Reg. Comm'n*,
   681 F.3d 471 (D.C. Cir. 2012) .............................................................................25

*N.C. Fisheries Ass'n v. Gutierrez,*
    550 F.3d 16 (D.C. Cir. 2008) ..................................................................................45

*Ocean Conservancy v. Gutierrez,*
    394 F. Supp. 2d 147 (D.D.C. 2005) .........................................................................20

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ..................................................................................................4

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
    898 F.2d 1410 (9th Cir. 1990) .................................................................................43

*Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers,*
    No. CV 20-3817 (CKK), 2022 WL 5434208 (D.D.C. Oct. 7, 2022)..........................6

*Sierra Club v. FERC,*
    827 F.3d 36 (D.C. Cir. 2016) ...................................................................... 22, 23, 24

*Stand Up for California! v. U.S. Dep't of Interior,*
    919 F. Supp. 2d 51 (D.D.C. 2013) ...........................................................................17

*Theodore Roosevelt Conserv. P'ship v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) .............................................................................21, 22

*Utahns for Better Transportation v. United States Department of Transportation,*
    305 F.3d 1152 (10th Cir. 2002) .................................................................................6

*Washington Toxics Coalition v. EPA,*
    413 F.3d 1024 (9th Cir. 2005) ...................................................................................3

*WildEarth Guardians v. U.S. Forest Serv.,*
    2018 WL 4627087 (D.N.M. Aug. 30, 2018) ...........................................................44

*Wyoming v. USDA,*
    661 F.3d 1209 (10th Cir. 2011) ...............................................................................13

*Yurok Tribe v. United States Bureau of Reclamation,*
    231 F. Supp. 3d 450 (N.D. Cal. 2017).....................................................................39

**Statutes**

16 U.S.C. § 1536(a)(2) ....................................................................................................27
16 U.S.C. § 1536(a)(4) ...............................................................................................43, 44

33 U.S.C. § 1413 ...............................................................................................................2
33 U.S.C. § 1413(e) ...........................................................................................................3

**Regulations**

33 C.F.R. § 336.2 ...................................................................................................................2

40 C.F.R. § 230.10(a) ...........................................................................................................5
40 C.F.R. § 230.2(b) .............................................................................................................2
40 C.F.R. § 1502.14(a) ........................................................................................................17
40 C.F.R. § 1508.25(a)(1) .....................................................................................................8
40 C.F.R. § 1508.27 ..............................................................................................................7

50 C.F.R. § 402.10(c) .........................................................................................................44
50 C.F.R. § 402.13(a) .........................................................................................................28
50 C.F.R. § 402.13(c) .........................................................................................................33
50 C.F.R. § 402.14(b)(1) .....................................................................................................26
50 C.F.R. § 402.14(c)(1)(i) ..................................................................................................37
50 C.F.R. § 402.14(g)(7) ...............................................................................................26, 35
50 C.F.R. § 402.14(g)(8) .....................................................................................................35
50 C.F.R. § 402.14(i)(1)(i) ..................................................................................................35
50 C.F.R. § 402.14(i)(ii) ......................................................................................................26
50 C.F.R. § 402.14(i)(iv) .....................................................................................................26
50 C.F.R. § 402.16(a)(2) .....................................................................................................32

45 Fed. Reg. 85,336 (Dec. 24, 1980) ....................................................................................2
79 Fed. Reg. 6,545 (Feb. 4, 2014) ......................................................................................39
84 Fed. Reg. 44,976 (Aug. 27, 2019) ..................................................................................38
85 Fed. Reg. 76,302 (Nov. 27, 2020) ..................................................................................43

**TABLE OF ACRONYMS**

| APA | Administrative Procedure Act |
|---|---|
| CWA | Clean Water Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FERC | Federal Energy Regulatory Commission |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| LNG | Liquefied Natural Gas |
| MPRSA | Marine Protection, Research, and Sanctuaries Act of 1972 |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NTUs | Nephelometric Turbidity Units |
| ODMDS | Ocean Dredged Material Disposal Site |
| SAV | Submerged Aquatic Vegetation |
| SJH Project | San Juan Harbor, Puerto Rico Navigation Improvements Project |

The United States Army Corps of Engineers ("Corps") has dedicated years' worth of effort to carefully ensuring full compliance with all environmental statutes applicable to the San Juan Harbor, Puerto Rico Navigation Improvements Project ("SJH Project"). As demonstrated by the administrative record, the Corps' efforts have included, among other things, comprehensive evaluation of the project's environmental impacts, analysis of reasonable alternatives to achieve the project's needed navigational improvements to increase efficiency and safety of vessels transiting the San Juan Harbor, soliciting and reviewing public comments, consideration of potential beneficial uses of dredged materials, and consultation with the expert federal wildlife agencies to ensure that no protected species or habitats are jeopardized by the project.

In an attempt to undermine the reasoned findings and conclusions of the Corps, the National Marine Fisheries Service ("NMFS"), and the United States Fish and Wildlife Service ("FWS"), Plaintiffs resort to superficial arguments about allegedly "post-hoc" justifications for the agencies' determinations. Plaintiffs' arguments are contradicted by the record, which abundantly supports the agencies' compliance with the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA"), and the Endangered Species Act ("ESA").

## ARGUMENT

I.  **Plaintiffs' CWA claims fail.**

   A.  **The Corps complied with the MPRSA, which governs the deposit of dredged material in the Ocean Dredged Material Disposal Site.**

Plaintiffs do not challenge the Corps' compliance with the MPRSA and abandon their argument that Section 1344(r) of the CWA requires the Corps to prepare an Environmental Impact Statement ("EIS"). Instead, Plaintiffs focus almost entirely on whether *both* the CWA and the MPRSA apply. *See* Pls.' Opp. to Def.' Cross-Mot. for Summ. J. ("Pls.' Opp.") 3-4, ECF No. 27.

Plaintiffs mischaracterize the thrust of the Corps' cross-motion, which did not contend that the CWA has no application whatsoever. Rather, the Corps explained that Section 103 of the MPRSA, 33 U.S.C. § 1413, not the CWA, governs what Plaintiffs challenge here—the deposit of dredged material in the Ocean Dredged Material Disposal Site ("ODMDS")—and that further, the Corps complied with its obligations under the MPRSA. In its 2018 Environmental Assessment ("EA"), the Corps recognized that the CWA would apply to the deposit of dredged material in Condado Lagoon or various other disposal site options. The Corps specifically explained its compliance with the CWA when evaluating those alternatives: the Corps obtained a water quality certificate, required by Section 401 of the CWA, and acknowledged in the EA that, where appropriate, compliance with the CWA was required. USACE_000073 (Section 2.4.6 of the EA); USACE_000192, USACE_001110-24 (App'x I to EA); *see also* Fed. Defs.' Cross-Mot. for Summ. J. ("Defs.' Br.") 11, ECF No. 22.

Plaintiffs' argument— that *both* the CWA and the MPRSA apply to the deposit of dredged material in the ODMDS—ignores both the Corps' longstanding practice and the specific Corps' regulations that explain how the Corps applies the two statutes of overlapping jurisdiction. 40 C.F.R. § 230.2(b), 33 C.F.R. § 336.2; USACE_001111; Defs.' Br. 9 (explaining that the Corps has deposited dredged material in the ODMDS since 1975). In particular, 40 C.F.R. § 230.2(b) explains which statute would govern in which location and has been effective since March 1981. 45 Fed. Reg. 85,336 (Dec. 24, 1980); *see also* Corps Reg. Guidance Ltr. 83-03 (issued January 28, 1983).[1] The EA was also clear as to the application of the CWA and the MPRSA. USACE_000192.

---

[1] *Available at*: https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Guidance-Letters/ (explaining the Corps' position since 1983 as to when a CWA or MPRSA permit is required).

Contrary to Plaintiffs' assertion, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005), does not suggest a different result. Pls.' Opp. 4. That case involved the application of two statutes, the ESA and the Federal Insecticide, Fungicide, and Rodenticide Act, that are complementary but serve different purposes. The Corps has not contended here that compliance with the CWA excuses compliance with statutes that serve a different purpose, like NEPA or the ESA. Rather, the Corps has applied the MPRSA and the CWA, two statutes with overlapping jurisdiction and similar processes for evaluating water quality, in different circumstances, in accordance with its regulations and practice, and as explained in the record.

Plaintiffs claim that even the MPRSA requires a permit, *id.* at 3, but 33 U.S.C. § 1413(e) expressly provides that, for federal projects "involving dredged material, the Secretary may, in lieu of the permit procedure, issue regulations which will require the application to such projects of the same criteria, other factors to be evaluated, the same procedures, and the same requirements which apply to the issuance of permits." The Corps has issued such regulations in 33 CFR Part 336 and complied with them here. In any event, Plaintiffs ignore that the MPRSA is *more* stringent than the CWA and requires concurrence from EPA, which the Corps obtained. Defs.' Br. 3, 11-12.

**B. Challenges to the Condado Lagoon disposal option are not ripe.**

Any challenge to the beneficial use of dredged material in Condado Lagoon is not ripe. The Corps ultimately rejected the option to deposit dredged material into Condado Lagoon during the initial construction for multiple reasons, including: (i) the Puerto Rico Planning Board did not concur with the proposed action; and (ii) the Corps had not yet obtained a new water quality certificate that it had requested.  *See* USACE_024432 (Supplemental Finding of No Significant Impact); USACE_024440, 024449 (Supplemental EA); 024694 (letter withdrawing

request for new water quality certificate); USACE_024893-94 (explaining why local authority could not issue water quality certificate).

Plaintiffs utterly fail to grapple with the Corps' explanation and do not meet their burden of showing that their challenge is ripe. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (declining to review forest management plan because of uncertainty whether and to what extent plan would be used to support future logging decisions); *Nevada v. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (withholding consideration of action, which was conditional and where additional NEPA analysis may be required). The same considerations in *Ohio Forestry* and *Nevada* apply here. The 2018 EA evaluated the Condado Lagoon disposal option for a small portion of the project's dredged material, but the Supplemental EA made clear that the Corps is not pursuing that option during the initial construction. The Corps has stated that it may pursue this option in the future and that, if it does, there will be supplemental analysis, including NEPA and CWA analysis. USACE_024430-33, 70-71. Thus, the Corps may never dispose dredged material from the SJH Project in Condado Lagoon, but if it does, Plaintiffs may challenge any such decision at the appropriate time.

Plaintiffs have no basis to speculate that the Corps' supplemental analysis was a "post-litigation pivot," Pls.' Opp. 2; Plaintiffs have long been aware that the Corps intended to supplement its analysis as the draft supplemental EA issued in October 2021, USACE_029564-695, was not yet final, but chose to proceed with the litigation anyway. *See* ECF No. 15-2 (certification to Dec. 5 Administrative Action noting no final action on Condado Lagoon alternative; ECF No. 18 (joint status report). And no evidence supports Plaintiffs' assertion that the Corps declined to pursue the Condado Lagoon option in the initial construction because of this litigation. The base plan was to always deposit all or at least the vast majority of dredged material

in the ODMDS, which the MPRSA governs. "Under the least cost disposal option, about 2.2 million cubic yards of dredged material would be placed in the [ODMDS]." USACE_000005. The question of whether to deposit some dredged material in alternate sites for beneficial restoration applied to roughly 10% of the dredged material. *Id*. Thus, the beneficial use in Condado Lagoon implicated only about 230,000 cubic yards of dredged material and would "be considered if a non-federal cost-sharing sponsor is identified and funding is available." *Id*. *See also* USACE_000034, 139, 141-42 (describing "base plan").

### C. The Corps' alternatives analysis was reasonable.

In any event, the CWA analyses completed in the 2018 EA were reasonable and well-supported by the record. Corps regulations prohibit discharge of dredged or fill material if there is a "practicable alternative" with less environmental impact, and here a non-dredging alternative would have been impracticable. *See* 40 C.F.R. § 230.10(a). Notably, these regulations relate to the *discharge* of dredged material and not what is challenged here—the actual dredging or the transportation of dredged material. In any event, "an agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *See Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012) (citation omitted).

The Corps has never disputed that it was required to comply with the CWA when analyzing alternatives and included a robust discussion of its analyses in the EA. Defs.' Br. 14-15. Plaintiffs assert that the Corps improperly focused on a narrow set of alternatives, such as a smaller project footprint or another project design, Pls.' Opp. 4-5, but the EA contains a wide range of options including a no action alternative and an alternative involving solely operational changes to the San Juan Harbor. Plaintiffs ignore the purpose and need of the project, which is to deepen and widen

shipping channels and necessarily requires dredging. The Corps reasonably screened out these other alternatives for a variety of reasons but primarily because they were impracticable. USACE_000110-134.

As explained, Defs.' Br. 15, this case is entirely distinguishable from *Utahns for Better Transportation v. United States Department of Transportation*, 305 F.3d 1152, 1187-90 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003), in which the government failed to consider a non-water alternative and approved environmentally adverse amenities that were not part of the purpose and need of the project. Rather, this case resembles *Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, No. CV 20-3817 (CKK), 2022 WL 5434208, at *19 (D.D.C. Oct. 7, 2022), where the court upheld the Corps' range of alternatives based on overall project purpose. And unlike in *Utahns for Better Transportation*, Plaintiffs utterly fail to identify what alternatives they contend should have been considered (but were not) for the placement of dredged material.

The Corps' analysis of the impacts on corals was also reasonable and satisfied any obligations under the CWA. *See* Defs.' Br. 15, 30-33, 38-43, 46-51. Plaintiffs claim that the Corps failed to consider the SJH Project's dredging, transit, and disposal impacts or to mention corals adequately in the EA, Pls.' Opp. 6-7, but ignore the analysis that the Corps completed in the Biological Assessment. USACE_004106-20. Notably, Plaintiffs do not meaningfully explain their concerns with impacts to corals *at the dredged site or at the disposal site*. Rather, Plaintiffs focus on alleged harms *from the transport of dredged material* due to leaking barges. The Corps specifically addressed best practices for transport and disposal in its MPRSA analysis and has ensured that compliance with the Site Management and Monitoring Plan, USACE_013098-148, will avoid and minimize impacts by controlling turbidity and scow leakage when transporting

6

dredged materials. *E.g.,* USACE_000091 ("by following the [Site Management and Monitoring Plan], turbidity and scow leakage would be controlled and there would be no adverse effects to listed corals."); *see also* USACE_000924-25 (EA App'x F: NMFS EFH ESA Consultation), USACE_001025-67 (monitoring plan).[2]

## II.    The Corps' EA and FONSI complied with NEPA's requirements.

Summary judgment is also proper on the NEPA claims. The Corps evaluated the potential environmental impacts of the SJH Project through an EA and determined that they would not be significant, *see* Defs.' Br. 35-38; therefore, notwithstanding the Corps' initial intention to prepare a draft EIS, *see* USACE_007577, the Corps issued a Finding of No Significant Impact ("FONSI"). USACE_003836-3844; *see also* USACE_000201-02. Plaintiffs fail to show that any of the "intensity" factors identified in NEPA's implementing regulations—which are applicable to decisions on whether to prepare an EIS—are triggered here. *See* 40 C.F.R. § 1508.27. For example, Plaintiffs provide no evidence for their claim that dredging will take place "24 hours a day" for the project's duration. Pls.' Opp. 33. Further, Plaintiffs cite no authority (nor are Defendants aware of any) to establish that the mere presence of environmental justice communities surrounding San Juan requires the Corps to prepare an EIS rather than an EA. *Id.* at 33-34. Finally, the Corps reasonably considered the "degree" of potential impacts to threatened and endangered species and reasonably concluded that the impacts would not be significant.[3] *Env't. Prot. Info. Ctr. v. U.S.*

---

[2] The Corps is taking steps to comply with the monitoring plan; its recent contract solicitation includes turbidity controls. *See* https://sam.gov/opp/f3a3763d48114b0da7be9ed91bdc1214/view#general.

[3] Plaintiffs' reliance on *Environmental Defense Center. v. Bureau of Ocean Energy Management* as requiring an EIS is misplaced. Pls.' Opp. 34 (citing 36 F.4th 850 (9th Cir. 2022)). In that case, after the agencies issued the EA and FONSI, they "belatedly commenced consultations" and concluded that certain species "were likely to be adversely affected[.]" *Env't Def. Ctr.*, 36 F.4th at 779. The court found that the "finding of adverse effects, especially after the EA was published, is

*Forest Serv.*, 451 F.3d 1005, 1012-13 (9th Cir. 2006). Thus, in keeping with the Court's "limited"

role in reviewing the Corps' decision not to prepare an EIS, *see Nat'l Parks Conservation Ass'n v.*

*Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019), the Court should grant dereference to the Corps'

reasoned decision not to prepare an EIS given that the SJH Project's environmental impacts would

not be "significant" under NEPA.

### A. NEPA does not require the Corps to consider LNG infrastructure or other unrelated dredging projects as "connected actions."

NEPA does not require the Corps to consider the environmental impacts of possible future

changes in San Juan's use of fossil fuels (*i.e.*, a "conversion" of San Juan's utilities to use a greater

proportion of Liquefied Natural Gas ("LNG")) as "connected actions." Defs.' Br. 17-19; *see* 40

C.F.R. § 1508.25(a)(1) (defining "connected" actions as "interdependent parts of a larger action

and depend on the larger action for their justification"). That is because, regardless of any potential

conversion to LNG in San Juan, the SJH Project serves a "significant purpose" of permitting larger

vessels—to include cruise and container ships, in addition to LNG and oil tankers—to access the

harbor and reduce overall vessel congestion. *See City of Bos. Delegation v. FERC*, 897 F.3d 241,

252 (D.C. Cir. 2018) (noting that courts look to the "commercial and financial viability of a project

when considered in isolation from other actions" (quotation omitted)). Neither the Corps action

here nor any other connected Corps action that Plaintiffs identify is aimed at converting San Juan

to LNG. Indeed, the SJH Project does not rely on (nor require) any changes to San Juan's energy

generation—including any potential LNG conversion.

Plaintiffs counter that one of the SJH Project's stated "objectives" is to "reduce regional

power generation costs[.]" Pls.' Opp. 8, Table 1 (citing USACE_000114). But Plaintiffs take this

---

*prima facie* evidence that an EIS should have been prepared." *Id.* Here, the Corps' determination

of no adverse impacts has not changed.

statement out of its relevant context. Consider the Corps' primary objective of the SJH Project: to "address[] the physical constraints and inefficiencies" in the harbor, including its "ability to efficiently serve the current and forecasted vessel fleet and process the forecasted cargo volumes." *Id.* In explaining this objective, the Corps clarified that it is "based upon known problems and opportunities[.]" USACE_000114. To be sure, the Corps noted that cost reductions based on power generation present but one "opportunity" of the SJH Project. *Id.* But the mere possibility of an additional project benefit—albeit one shrouded in uncertainty, *see* USACE_000038—fails to establish that the SJH Project is "inextricably linked" to LNG conversion. Pls.' Opp. 9.

Further, Plaintiffs are wrong that the SJH Project "cannot or will not proceed unless the LNG infrastructure proceeds." *Id.* at 10. For starters, the Corps is not responsible for constructing or funding any LNG-related infrastructure as part of the SJH Project. Moreover, Plaintiffs ignore the fact that San Juan's LNG terminal was built and operable *before* the SJH Project. *See* Defs.' Br. 6. Thus, Plaintiffs assertion that the majority of LNG tankers are "too big to call on San Juan Harbor" misses the point entirely, *see* Pls.' Opp. 9, and there is no merit to Plaintiffs' generalization that "LNG tankers cannot" use the Bay, *id.* As noted, LNG tankers can and do utilize the harbor.

Further, the fact that the Corps considered future fleet tankers in evaluating the SJH Project's dimensions does not otherwise link the project to LNG conversion. Future LNG tankers are just one of several larger vessels considered by the Corps in designing potential improvements to navigation in the harbor. USACE_000034 (discussing how the Corps modeled the SJH Project's channel dimensions using vessel dimensions of a container ship, cruise ship, and oil and LNG tankers). Plaintiffs also inappositely assert that cargo ships "already use the Bay[,]" Pls.' Opp. 9, but they ignore that maneuverability of those ships is limited, and that their berthing maneuvers

9

can negatively impact other vessels utilizing the harbor. *See* USACE_000033. The SJH Project will alleviate some of those concerns.

Plaintiffs gain no greater traction by citing the terms of the Project Partnership Agreement between the Corps and the Puerto Rico Ports Authority, the SJH Project's non-federal sponsor. *See* Pls.' Opp. 10 (citing USACE_000206-207). Those terms apply to all similar dredging projects by the Corps and provide a clear delineation between the roles and responsibilities of the federal government and the project sponsor (including which costs must be borne by the Ports Authority). Tellingly, nothing in the agreement's terms requires the Ports Authority to do anything with respect to LNG use or conversion. *See* USACE_000206-208. Plaintiffs make much of the fact that the Ports Authority must operate and maintain "local service facilities," Pls.' Opp. 8; USACE_000207, but the EA makes clear that costs related to those facilities are "100% non-Federal" and are not included in the project's costs. USACE_000138. Again, nothing in the agreement between the Corps and the Ports Authority requires the Corps (or, indeed, San Juan's power generation companies) to do anything related to LNG. Besides, the Project Partnership Agreement refers to "local service facilities" to mean various things, like harbor berthing areas. *See* USACE_000149.

Plaintiffs' citation to *Delaware Riverkeeper Network v. FERC* to support a relationship between the timing of the SJH Project and LNG infrastructure is misplaced. Pls.' Opp. 11 (citing 753 F.3d 1304 (D.C. Cir. 2014)). In that case, the D.C. Circuit noted that there was "no apparent logic to where one [pipeline] project began and the other ended." *Del. Riverkeeper*, 753 F.3d at 1318. Here, the record demonstrates no similar relationship between the timing of the SJH Project and the uncertain timeline for San Juan's potential conversion toward LNG. Significantly, Plaintiffs fail to grapple with the fact that the deepening project would remain cost beneficial under a "no-conversion" scenario because it would still allow for more efficient passage of diesel fuel

tankers and other larger vessels in addition to LNG tankers. Also, San Juan's utilities have *already* converted some of their generating units to LNG without the SJH Project. *See* USACE_021539-40. In response, Plaintiffs point out that the EA stated that the progress of LNG conversion "will be assessed [by the Corps] prior to any . . . budgetary actions[.]" Pls.' Opp. 8; USACE_000152. However, LNG conversion would not increase the federal investment in the project; rather, as analyzed in the EA, it would simply increase the SJH Project's benefits. USACE_000152. Unsurprisingly, any increase in the SJH Project's potential benefits may "increase the project's budgetary priority." *Id.* But that does not mean that the Corps would otherwise cancel the project or that the project lacks "financial viability" without any LNG conversion. *City of Bos. Delegation*, 897 F.3d at 252 (quoting *Del. Riverkeeper*, 753 F.3d at 1316).

Indeed, Plaintiffs ignore the Corps' discussion in the very same paragraph of the EA that "[e]ven with the uncertainty surrounding the LNG conversion, the consequence of [the Puerto Rico Electric Power Authority] not converting to LNG . . . is *low from a planning perspective*." USACE_000151 (emphasis added). As noted, the record reflects the Corps' awareness of the significant uncertainty as to LNG conversion, which obviously impacts the Project in terms of the cost/benefit ratio. *See Del. Riverkeeper*, 753 F.3d at 1316 (courts must look to the "commercial and financial viability of a project when considered in isolation from other actions"). Thus, Plaintiffs can only speculate that it is "unlikely" that the SJH Project would receive funding without LNG conversion. Pls.' Opp. 8.

Because Plaintiffs have failed to show that NEPA requires the Corps to consider LNG conversion as a connected action, the Court need not separately consider whether Plaintiffs' failure to raise those issues administratively results in a waiver in this litigation. *See* Defs.' Br. 28 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004)). Even so, Plaintiffs come up short

in their attempt to demonstrate that they properly raised and exhausted the issue with the Corps. Specifically, Plaintiffs assert that an individual named Ruth Santiago met with the Corps "about concerns with LNG deliveries" and provided "El Puente's brief opposing the Aguirre Offshore Gas Port[.]" Pls.' Opp. 13 (citing USACE_002409-10). Even assuming the Corps must consider all arguments potentially raised in Plaintiffs' brief filed in an unrelated proceeding, a closer look at the document merely demonstrates that Plaintiffs advocated for Puerto Rico's switch from fossil fuels to renewable energy sources. *See* USACE_002409-10. At no point during the public participation process for Corps' 2018 approval of the SJH Project did Plaintiffs assert that the EA should have considered the impacts of an uncertain energy future within Puerto Rico. *See, e.g.,* USACE002458-2508 (transcript of the Corps' public meeting, including comments made by Ms. Santiago regarding translations of materials in Spanish and impacts from a potential Coast Guard action). Indeed, Plaintiffs concede that they limited their concerns about LNG segmentation to the Corps evaluation of seagrass mitigation and beneficial use of dredge material in Condado Lagoon. Pls.' Opp. 13-14 (citing USACE_028616).

Plaintiffs' citation to *Foundation on Economic Trends v. Heckler* is unavailing. *See id.* at 12-13 (citing 756 F.2d 143 (D.C. Cir. 1985)). In that case, the D.C. Circuit noted that in "exceptional cases or particular circumstances . . . where injustice might otherwise result," the reviewing court may "consider questions of law which were neither pressed nor passed upon by the . . . administrative agency below." *Found. on Econ. Trends,* 756 F.2d at 156 (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)). There is no evidence that the Corps truncated its public participation process based on hurricane impacts. *See* Defs.' Br. 23-24. Thus, no unfairness would result in holding Plaintiffs accountable for their failure to properly raise issues regarding LNG conversion during the Corps' environmental review. Nor are the alleged deficiencies regarding the

impacts of an uncertain, non-federal project such as LNG conversion "so obvious" as to forgive Plaintiffs' failure—indeed, the EA noted that LNG conversion was anything but certain. *See 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006).

Next, Plaintiffs argue that NEPA requires the Corps to consider the impacts of the Coast Guard's dredging to expand Anchorage Area F and the Corps' permitted dredging of berths adjacent to the channel as connected actions. Pls.' Opp. 14. But Plaintiffs ignore the fact that the Corps *did* evaluate the Coast Guard's potential action in Anchorage Area F in its cumulative impacts analysis. And courts must consider the agency's NEPA document as a whole in determining the sufficiency of its evaluation. *See, e.g., Wyoming v. USDA*, 661 F.3d 1209, 1251 (10th Cir. 2011). Moreover, the Corps identified the resources in Anchorage Area F and explained that future development by the U.S. Coast Guard would require a permit and additional NEPA analysis. *See, e.g.*, USACE_002501-04. Notably, without sufficient available details of a future action or pending proposal by the Coast Guard, the Corps cannot meaningfully assess the potential future impacts of that project; thus, those impacts are not reasonably foreseeable.

Finally, Plaintiffs offer the conclusory argument that the other private dredging actions are "interdependent" on the action. Pls.' Opp. 15 (citing the public notices for each action). However, those notices fail to establish that these projects would not proceed on their own without, and thus do not have independent utility from, the SJH Project. For example, Plaintiffs fail to explain how "maintenance dredging" at the Cataño Oil Dock for the purpose of "restor[ing] depth for the safe maneuvering of ships approaching and berthing" at the dock is somehow interdependent of the SJH Project. USACE_005670; *see also* USACE005763 (proposing maintenance dredging for the safety of cruise ships berthing at Panamerican Dock). Maintenance dredging to maintain the safety and viability of specific berthing areas is fundamentally different from expanding vessel access to

the harbor generally. The administrative record shows no symbiotic relationship between the SJH Project and the private, unrelated actions cited by Plaintiffs.

**B. The Corps' environmental justice analysis complied with NEPA.**

Next, the Corps' conclusion that "no group of people would bear a disproportionately higher share of adverse environmental consequences resulting from the proposed work" is supported by the record. USACE_000196; USACE_022648; *see* Defs.' Br. 22-26. Plaintiffs make two primary arguments in response; both are unavailing. *First*, Plaintiffs assert that the Corps' description of the Project site and affected communities "omits many people who will be exposed to direct harms" like noise and light pollution and air emissions. Pls.' Opp. 16. However, the Corps' use of a 1-mile radius based on the geographical harbor area itself was reasonable. *See* Defs.' Br. 25-26. As noted by the Corps, the key to its initial environmental justice analysis is that it covers the most impoverished area within the project vicinity, *i.e.*, the "La Perla" area. USACE_024476. In both its initial and supplemental analysis, the Corps considered that the project would result in a "temporary and minor effect to human populations in the area from noise and air quality emissions associated with the deepening construction." USACE_024689.

Plaintiffs inappropriately discount the expanded radius utilized by the Corps in its environmental justice analysis. To begin, Plaintiffs are incorrect that the Corps' environmental justice analysis was an attempt to "cure" any possible defect in its initial analysis because it was limited to Condado Lagoon. *See* Pls.' Opp. 19. Rather, the Corps expanded its radius in response to public comments. USACE_024476 (noting that "in response to comments, the USACE updated the EJ footprint to cover a one- and five-mile radius around the full harbor deepening area"). Moreover, the Corps updated its environmental justice analysis for the *entire* SJH Project and not just related to Condado Lagoon. *See* USACE_024688 (indicating that the Corps "has updated its

14

EJ analysis for the [SJH] Project based on the newest tools available . . . using both a 1-mile buffer and a 5-mile buffer").

Notably, even after expanding its radius, the Corps did not identify a substantial change in the types of communities impacted by the SJH Project. Specifically, the Corps found that the average percentage of people of color within a 1-mile ratio and 5-mile ratio respectively were 97% and 99%. USACE_024688. And the percent of low-income population is greater than 50% of the population regardless of buffer zone (61%), but less than the Puerto Rico average (72%). *Id.* Against this backdrop, the Corps adequately considered potential environmental justice concerns and concluded that the project will not result in disproportionately high or adverse impacts on low income or minority communities. *Id.*

*Second*, Plaintiffs make much of the impact of Hurricanes Irma and Maria during the public comment process. Pls.' Opp. 17. But they omit the fact that no commenter requested an extension, even long after the comment period closed. Nor does the record indicate that any commenters were denied an opportunity to participate in the Corps' public process. Plaintiffs point to a 2022 comment from the San Juan Bay Estuary Program, *see id.* at 18 (citing USACE_026789), which stated that other unnamed organizations "were unaware of the opportunity to offer comments" on the Supplemental EA. USACE_026789. But the Supplemental EA was specific to Condado Lagoon and not the SJH Project itself. Notably, in commenting on the Supplemental EA, the San Juan Bay Estuary Program did not claim that itself—or any other group—was somehow prevented from submitting comments regarding the SJH Project.

The record does not evidence any member of the public trying to submit comments after the Corps' deadline or requesting to extend it. Had the Corps received such a request, it would have considered whether to accept late comments or extend the comment period. But, in the

absence of any such requests or a related denial by the Corps, Plaintiffs cannot argue that the Corps limited public comment. The Corps' public process consisted of a step-by-step approach spanning several years to study and consider the SJH Project. *See* Defs.' Br. 24. That process included various meaningful opportunities for the public to participate and comment.[4]

Finally, Plaintiffs assert that that the SJH Project will "disproportionately" affect those already vulnerable to health problems, but Plaintiffs fail to point to any evidence of this. Aside from the minor and temporary impacts from the dredging itself (which the Corps considered), the SJH Project neither will lead to nor allows for more air pollution in the San Juan area (which must import 100% of its fuel). As noted by the Corps, if San Juan were to convert its existing generation units fuel from oil to LNG, such a conversion would have an overall positive impact on air quality. USACE_000180. Focusing on the impacts from the SJH Project, the EA notes a similarly positive impact from facilitating the operation of fewer, more efficient vessels in the harbor. *Id.* This makes sense because the SJH Project does not necessarily mean an increase in overall fuel demand; rather, the project improves access for the existing and future fleet of vessels.

**C. The Corps adequately considered reasonable alternatives.**

The Corps also fulfilled NEPA's requirement to consider reasonable alternatives. Specifically, the Corps identified various project alternatives, to include "nonstructural" management measures (USACE_000119) and five modeling "phases" based on deepening and widening measures that would meet the SJH Project's objectives (USACE_000124). Plaintiffs take

---

[4] Plaintiffs' assertions that the Corps did not make available translations of key documents are made for the first time in Plaintiffs' opposition brief and were not properly raised with the Corps in the first instance. *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (A party waives arguments that it fails to raise in its opening brief.). Ms. Santiago asked whether there was a "summary" of the Corps' presentation materials in Spanish, *see* USACE_002492, to which the Corps replied that it would provide its presentation, *id.* The Corps also translated the scoping meeting's Project Fact Sheet into Spanish. *See* USACE_007243.

issue with the Corps' screening of certain alternatives (*i.e.*, nonstructural measures) from detailed review despite the fact they could also improve navigation in San Juan Harbor. Specifically, the Corps set aside some alternatives because they were either inefficient, ineffective, or would not account for all necessary investments or actions to achieve the project's objectives. *See* USACE_000125-28; Defs.' Br. 22. The Corps completed its screening analysis in accordance with the Corps' Planning Guidance Notebook (known as ER 1105-2-100), which provides guidance for all deep draft navigation feasibility studies. USACE_000116. As noted in the Corps' engineering appendix (*see* USACE_000226), several manuals and regulations guide the Corps' design and analysis of possible navigation improvements. *See, e.g.*, USACE_014507-718 (Engineer Manual 110-2-1613, Hydraulic Design of Deep-Draft Navigation Projects).

More to the point, the Corps' screening of certain alternatives complied with NEPA. NEPA's implementing regulations provide that an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which are eliminated from detailed study, briefly discuss the reasons for their having been eliminated," *Stand Up for California! v. U.S. Dep't of Interior*, 919 F. Supp. 2d 51, 77 (D.D.C. 2013) (quoting 40 C.F.R. § 1502.14(a)). NEPA does not require agencies to analyze "the environmental consequences of alternatives it has in good faith rejected as too . . . impractical or ineffective." *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir. 1984) (citations omitted). Here, it is undisputed that the Corps rejected impractical and ineffective alternatives and stated in the EA the Corps' reasons for doing so.

Tellingly, Plaintiffs do not engage on the specific reasons provided by the Corps to screen certain alternatives from detailed consideration. Nor do Plaintiffs take issue with the Corps' initial framing of possible alternatives against the backdrop of the SJH Project's purpose and need

statement. Rather, they argue that NEPA requires detailed consideration of all alternatives. Pls.' Opp. 24 (averring that "[i]deas the Corps eliminated prior to detailed consideration cannot form the basis of a range of reasonable alternatives"). But Plaintiffs' argument is in tension with the NEPA regulations and caselaw cited above.

Nor is there any merit to Plaintiffs' assertion that the EA limited its analysis to alternatives with "nearly identical impacts." *Id.* at 22. Here, the Corps developed five economic modeling phases based on groups of measures that would: (1) trigger a transition of a larger fleet of vessels; (2) impact annual numbers of vessel calls; and (3) improve maneuverability. USACE_000124; Defs.' Br. 21. After conferring with the Puerto Rico Ports Authority, shipping industry experts, harbor pilots, the U.S. Coast Guard, and other stakeholders, the Corps carried forward three of these phases for detailed review and evaluated the impacts of alternative dredging depths. USACE_000126-27. Plaintiffs fail to proffer any argument (or citation) to the Corps' detailed tables in the EA featuring its analysis of each alternative or the Corps' rationale for screening a particular alternative, *see* USACE_000127-134. Plaintiffs' failure to engage on any of the Corps' specific rationales is fatal. *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived").

**D.  The Corps sufficiently considered air quality impacts.**

Next, the Corps adequately considered potential impacts to air quality in the EA by discussing the emissions from dredging operations in the project area (subject to compliance with Puerto Rico air quality standards). USACE_000180. Plaintiffs assert that the Corps ignored pollutants emitted by ships "maneuvering in ports at arrival or departure and when moored at terminals" and from trucks and vessels operating in the harbor. Pls.' Opp. 24. But Plaintiffs gloss

over the Corps' conclusion that there will be fewer vessel calls overall in the harbor. USACE_000180. Moreover, the Corps also considered that the SJH Project will "facilitate newer, larger, cleaner, and more efficient vessels to reach the port, including larger specialized vessels containing LNG to the Army Terminal Area." *Id.* Further, as established above, the Corps was not required to consider the air quality impacts (or any others) from Puerto Rico's reliance on certain fuels (*e.g.*, LNG) for energy production, since those impacts would occur independently and regardless of the SJH Project.

Finally, Plaintiffs assert that the Corps' analysis contradicts its litigation position that the Corps does not control emissions from commerce. Pls.' Opp. 25. But Plaintiffs miss the point: there is no "but for" or "reasonably close" causal relationship between the SJH Project and overall harbor commerce to begin with; therefore, NEPA does not require the Corps to analyze the emissions from that commerce (which, again, would occur no matter what happens within the project). *Pub. Citizen*, 541 U.S. at 767. Plaintiffs fail to engage on this point and do not establish that the Corps acted arbitrarily in concluding that SJH Project will not increase overall emissions.

**E. The Corps sufficiently considered impacts on corals and coral habitat.**

In evaluating the SJH Project's potential impact on coral species, the Corps determined that dredging operations for the proposed project would not directly affect existing coral habitat. USACE_000166. Importantly, the Corps determined that no corals are present within the area to be dredged and coral habitat is limited to areas adjacent to the San Juan Harbor entrance channel, the Cataño and northern shorelines, and on some hard substrates (rocks, pilings, docks, bulkheads). USACE_000075. Because neither corals nor coral habitat occur within the project boundaries, the

Corps considered the potential indirect effects from elevated turbidity levels during construction and dredged material transport for disposal. USACE_000034; USACE_000166.

Plaintiffs' NEPA claim pertaining to coral fails. At the outset, the Corps does not dispute that NEPA requires the Corps to take a "hard look" at the potential impact of the project on corals—not just those species that are threatened or endangered (which are addressed further below with respect to Plaintiffs' ESA claims). *See* Pls.' Opp. 27. As relevant to NEPA and corals in general, Plaintiffs concede that coral habitat does not occur within the project's boundaries. *Id.* at 26 (asserting that hardbottom habitat is "*close* . . . to the dredging operations" (emphasis added)). Therefore, Plaintiffs appear to agree that any impacts would be indirect. While Plaintiffs challenge the Corps' use of a 150-meter estimated indirect impact zone, the Corps' use of that zone is reasonable because it is based on a review of other in-water coral sedimentation monitoring projects in Port Everglades and Key West. USACE_000166-67. Plaintiffs fail to undercut the Corps' reliance on these scientific studies dealing with the nature of sedimentation, which is the type of decision-making where "[d]eference is particularly warranted" because it involves "complex scientific or technical matters where the agency's expertise is clear." *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 162 (D.D.C. 2005) (citing *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 372 (D.C. Cir. 1981)). Further, Plaintiffs fail to show that the Corps' reliance on the buffer zone is somehow contradictory because of the impacts previously considered by the Corps as part of the dredging in the Port of Miami. Pls.' Opp. 27. As Plaintiffs acknowledge, the Corps has distinguished that project from this one, Defs.' Br. 31, 39-43, notably because the Port of Miami dredging involved a significantly greater risk to corals. NMFS_00002. Thus, there is nothing contradictory about the Corps' decision to consider a 150-meter buffer zone—*i.e.*, one used in an environment where the potential impacts were greater—when evaluating

the SJH Project's potential impact on corals. Based on the buffer zone (among other things), the Corps reasonably concluded that indirect impacts to corals from turbidity and sedimentation due to construction activities are not anticipated beyond this buffer zone. USACE_000167.

Plaintiffs also challenge the Corps' reliance on a monitoring plan in assessing the potential impacts on corals. Pls.' Opp. 28. Pursuant to the monitoring plan, the Corps will ensure that the loading of each scow "is recorded approximately every 30-seconds to determine if there is any loss of material from the scow during transit. This data is reviewed after each load by the contractor and the Corps/EPA and if a barge has a net loss of more than one foot in draft between the dredge site and disposal site(s) (averaged between the bow and stern monitoring locations), this serves as a 'red flag' to investigate as to why the draft loss occurred." NMFS_00196-97; USACE_000176-78; USACE_003469-70. Further, any indirect impacts from increased turbidity would be minimized because operations would be subject to a temporary shutdown if turbidity rises above a background threshold. *See* USACE_000131. Also, the Corps' monitoring plan also includes adaptive management measures to mitigate turbidity to prevent and avoid impacts on ESA-listed corals. *See* USACE_000178 (noting that adaptive management includes, among other things, measures to correct disposal vessel leakage and reduce overflow).

Courts have upheld monitoring plans like those described in the EA where they provide "a reasonably complete discussion of mitigation" as required by NEPA. *Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), *aff'd*, 651 F.3d 112 (D.C. Cir. 2011); *see also Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 516-17 (D.C. Cir. 2010) (finding that an "adaptive management plan" designed to "monitor . . . effects on the environment and mitigate those effects as necessary" fulfilled "NEPA's mandate to discuss mitigation measures"). Plaintiffs attempt to distinguish the Corps' cited authorities because they each involve an EIS where impacts

were otherwise significant. Pls.' Opp. 28. But the type of document (EA versus EIS) is irrelevant when, as here, the Corps has not issued a "mitigated FONSI." As noted, the Corps adequately described its approach to monitoring, minimizing, and (in the case of ESA-listed corals) preventing and avoiding any potential impacts on corals. NEPA requires "no more." *Theodore Roosevelt Conserv. P'ship*, 616 F.3d at 517.

Notably, Plaintiffs do not take issue with the Corps' monitoring plan directly; rather, they assert that the EA "does not consider the effects of the project to corals . . . before the Project begins." Pls.' Opp. 28. That makes no sense. The EA adequately documents the existing and "without-project" future condition of corals in San Juan Harbor. USACE_000075-76. And, as discussed above, the Corps adequately considered the indirect impacts from dredging operations on corals relying, in part, on a 150-meter buffer zone and monitoring. Thus, the Corps satisfied NEPA by taking a "hard look," as required, of the impacts on corals.

**F. The Corps' cumulative effects analysis is reasonable.**

The Corps' evaluation of the cumulative effects of past, present, and future actions complies with NEPA. *See* Defs.' Br. 26-28. Specifically, the Corps reasonably determined that the cumulative effects of other actions in the project area would be "minimal" because the SJH Project itself would not result in any significant environmental impacts. USACE_000189 (noting the SJH Project's efforts to avoid and minimize environmental impacts). In doing so, the Corps considered the cumulative impacts from "infrastructure changes needed to accommodate new and/or additional port throughput." USACE_003841.

The Corps' analysis is supported by D.C. Circuit precedent. *See, e.g., Sierra Club v. FERC*, 827 F.3d 36, 50 (D.C. Cir. 2016) (broader cumulative-impact analysis is not required where there was "scant record evidence identifying any reasonably foreseeable and proximate effects"). To

wit, the D.C. Circuit upheld an agency's determination that no cumulative environmental impacts were anticipated where the proposed project itself was expected to have minimal impacts. *See* Defs.' Br. 28 (citing *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 112-13 (D.C. Cir. 2014)). In *Minisink*, the court reviewed FERC's assessment of a natural gas compressor station's environmental impacts, and approved FERC's decision to omit in its cumulative-impact analysis a discussion of "the potential construction of a lateral pipeline from the Minisink compressor to a proposed power plant." *Minisink*, 762 F.3d at 112-13. The court reasoned that "because the Minisink Project itself was expected to have minimal impacts, no significant cumulative impacts were expected to flow from the possible development of the [proposed] power plant." *Id.* at 113; *see also Sierra Club*, 827 F.3d at 50 (recognizing that *Minisink* upheld "cumulative-impact analysis finding 'no significant *cumulative* impacts were expected' where the '[p]roject *itself* was expected to have minimal impacts'" (alteration and emphasis in original) (quoting *Minisink*, 762 F.3d at 113)).

Here, the Corps reasonably concluded that the SJH Project would not have any significant direct or indirect environmental impacts and, therefore, the project would not lead to significant cumulative impacts. *Accord Food & Water Watch v. USDA*, 451 F. Supp. 3d 11, 49 (D.D.C. 2020), *rev'd on other grounds*, 1 F.4th 1112 (D.C. Cir. 2021). Plaintiffs fail to address the authority cited above and in Defendants' opening brief. Instead, Plaintiffs improperly rely on an earlier case, *i.e.*, *Grand Canyon Trust v. Federal Aviation Administration*. Pls.' Opp. 30 (citing 290 F.3d 339 (D.C. Cir. 2002)). But in that case, the agency addressed only the incremental noise impacts of constructing a replacement airport near Zion National Park and not the cumulative noise impacts. *See Grand Canyon Trust*, 290 F.3d at 341. In the absence of any cumulative noise impact analysis, the court found the agency's NEPA analysis to be deficient. *Id.* at 347. Here, there is no dispute

that the Corps' EA considered both the cumulative and incremental impacts of the SJH Project and found them both to be insignificant. Plaintiffs' failure to engage on this point dooms their contentions related to the Corps' cumulative effects analysis.

### G. Plaintiffs' remaining NEPA claims regarding cultural and historic resources, potential accidents, and seabed life lack merit.

Plaintiffs' remaining contentions are primarily of the flyspecking variety. *See Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (noting that the Court's task "is not to "flyspeck" the agency's environmental analysis for "any deficiency no matter how minor" (internal quotation marks omitted)). *First*, Plaintiffs' contentions regarding the Corps' analysis of cultural and historic resources—which consist only of a few sentences, *see* Pls.' Opp. 32—fails. Here, the Corps identified no cultural or historic resources in the project area. USACE_000183-84. Plaintiffs fail to dispute this and instead argue that the Corps "focuses on the direct construction impacts rather than threats to the San Juan National Historic Site that Plaintiffs identified, including threats to its viewshed and from erosion." Pls.' Opp. 32. But Plaintiffs' assertion is belied by the record, which demonstrates that the Corps considered potential impacts on viewshed and erosion. *See* Defs.' Br. 34 (citing relevant portions of the EA). Specifically, the Corps reasoned that, because fewer vessels would be calling on the port with the proposed project, there would be "no effect on the viewshed of historic properties, including Old San Juan Historic District." USACE_000184. This conclusion was supported by the Corps' finding that characteristics of the harbor (*e.g.*, commercial and recreational vessel traffic patterns, shoreline land uses, and natural resources) would remain subject to the traffic and use trends that would impact the area with or without the project. *Id.*

Further, contrary to Plaintiffs' assertions, the Corps evaluated potential shoreline impacts and noted that erosion in the project area is "controlled predominantly by wind waves and tidal currents." USACE_000184. The Corps considered that the "relative infrequency" of vessel

wakes—as compared to those caused by wind—renders vessel wakes only a "minor factor" related to shoreline erosion. *Id.* And by reducing the number of vessels in the harbor, the SJH Project would result in a corresponding reduction of vessel wakes. Plaintiffs dispute none of this.

*Second*, the gravamen of the EA's analysis regarding potential oil spills is that the SJH Project will reduce the risk of spills caused by vessel accidents because the SJH Project would increase maneuverability within the harbor and make it safer, *see* USACE_003456. Also, the SJH Project has the potential to decrease the amount of fuel oil carried through the port. *See* USACE_000181. Indeed, Plaintiffs have not identified anything in the record to suggest that oil spills are more (as opposed to less) likely. As relevant here, an agency may find no significant impact if the probability is so low as to be "remote and speculative," or if the combination of probability and harm is sufficiently minimal. *New York v. Nuclear Reg. Comm'n*, 681 F.3d 471, 478-79 (D.C. Cir. 2012) (citing *City of New York v. Dep't of Transp.*, 715 F.2d 732, 738 (2d Cir. 1983). Thus, NEPA did not require the Corps to undertake any further analysis of the environmental impacts from possible oil spills in the harbor.

*Third*, and finally, Plaintiffs' assertions regarding impacts to seabed life are based on a fundamental misunderstanding of the Corps' analysis in the EA. Specifically, Plaintiffs assert that the Corps "acknowledges direct catastrophic impacts to seabed fauna," but that is incorrect. *See* Pls.' Mot. For Summ. J. 33, ECF No. 20-1 (cleaned up). The Corps merely noted that direct impacts could "include physical removal or smothering by the settlement of suspended materials[,]" USACE_000168, not that such impacts were likely in this case. Here, the EA reasoned that although "initial loss of benthic resources are likely, quick recovery between six months . . . to two years . . . is expected." *Id.* In reaching this conclusion, the Corps cited several supporting scientific studies for these recovery timeframes. *See id.* The Corps therefore complied with NEPA in

determining that "benthic communities are not anticipated to be significantly affected[.]" *Id.* Summary judgment should be granted in favor of Federal Defendants on the NEPA claims.

## III.   The agencies fulfilled their ESA Section 7 consultation obligations.

### A.   NMFS reasonably determined that the SJH Project is not likely to adversely affect ESA-listed corals or their designated critical habitat.

Plaintiffs make a point to (not quite accurately)[5] set forth the differences between formal and informal consultation under Section 7 of the ESA. Pls.' Opp. 34-35. Notably, however, they do not dispute that, when a federal agency prepares a biological assessment in which it determines that its "proposed action is not likely to adversely affect any [ESA-]listed species or critical habitat"—as the Corps did here with respect to ESA-listed corals (*see* NMFS_00229-240)—and the appropriate wildlife agency provides a "written concurrence" in response to that determination—like NMFS did here (*see* NMFS_00019-22)—the agency "need not initiate formal consultation." 50 C.F.R. § 402.14(b)(1). Nor do Plaintiffs contest that the Corps and NMFS completed informal consultation on the project's impacts to ESA-listed corals and critical habitat under ESA Section 7. Pls.' Opp. 35 (conceding that, under the ESA, informal consultation "concludes if the expert agency [here, NMFS] concurs that the project is not likely to adversely affect a listed species or its critical habitat").

Rather, Plaintiffs disagree with the result of that process. They argue that NMFS's concurrence with the Corps' determination in its 2017 Biological Assessment (that the SJH Project

---

[5] Plaintiffs list several "added protections" that they claim result from formal consultation, but their list lacks citation to any legal authority and is largely made up of inaccurate generalizations. Pls.' Opp. 34-35. For example, contrary to Plaintiffs' suggestions, even when formal consultation is required, preparation of an "incidental take statement" is required only when incidental take is "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7), and the "terms and conditions" and "reasonable and prudent measures" that Plaintiffs refer to are simply required parts of an incidental take statement, *id.* at § 402.14(i)(ii), (i)(iv). Thus, even if formal consultation on ESA-listed corals or coral critical habitat were required for the SJH Project—which it was not—such "protections" would not apply because the SJH Project is not expected to have adverse impacts on them, let alone result in incidental take. *See* NMFS_00019-22, 229-240.

is not likely to adversely affect ESA-listed corals or their designated critical habitat) was "arbitrary and failed to use the best available science." *Id.* at 35. Thus, the relevant question is not whether the agencies fulfilled their ESA Section 7 consultation obligations (as they indisputably have); but whether NMFS's concurrence with the Corps' "not likely to adversely affect" determination is "arbitrary or capricious" under the Administrative Procedure Act ("APA")—or, in other words, whether NMFS's concurrence "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The record clearly establishes that NMFS's concurrence was based on a reasoned analysis of all relevant factors and that the agency did not make any clear error of judgment. NMFS's concurrence should therefore be upheld.

### 1. The record supports NMFS's concurrence with the Corp's determination that the SJH Project is not likely to adversely affect ESA-listed corals or critical habitat.

Fulfilling its obligations under the ESA, NMFS considered the best scientific and commercial data available when evaluating the potential impact of sedimentation from the SJH Project on ESA-listed corals and their critical habitat. 16 U.S.C. § 1536(a)(2). As discussed previously, Defs.' Br. 44-46, after NMFS and the Corps completed Section 7 consultation on the SJH Project in May 2018, NMFS evaluated whether reinitiation of consultation was required based on a subsequently published study that assessed the impacts to corals from the 2013-2015 Port of Miami dredging project ("Miami Study"). *See* NMFS_00001-03 ("Reinitiation Memorandum"). Contrary to Plaintiffs' contentions, NMFS does not dispute that certain other data from the Port of Miami project was available and "in [its] possession at the time of the [consultation]." Pls.' Opp. 36. Indeed, the record demonstrates that NMFS considered such data in connection with reaching its determination that the SJH Project is not likely to adversely affect ESA-listed corals or critical habitat.

27

For example, in the Biological Assessment that the Corps submitted to NMFS when initiating consultation, the Corps provided a thorough analysis of the available information on the Port of Miami project's impact to corals. Specifically, the Corps evaluated, among other things:

> Recently completed monitoring associated with the Miami Harbor expansion project reviewed the long term health and survival of corals (including some listed corals) . . . in a pre-, during and post-construction project monitoring within 30 meters of the Miami Harbor channel. The effects with Miami Harbor were associated with very fine clay and silt materials. Long-term effects associated with sedimentation have not been fully assessed, however there was no change in the percent coverage in any reef functional group when compared to reference sites. The sedimentation effects were most noticed closest to the channel . . . .
>
> * * * *
>
> . . . . The recently completed project at Miami Harbor resulted in temporary effects to corals associated with dredging, however those corals were located immediately adjacent to the channel (within 30 meters), unlike SJH where dredging activities will not be directly adjacent to the hardbottom areas that are located no less than 182 meters (600 feet) to the west of the channel.

NMFS_00233-35 (citations omitted). During the informal consultation process—which "includes all discussions, correspondence, etc., between the [consulting agency] and [action] agency," 50 C.F.R. § 402.13(a)—NMFS provided its own analysis of the available data from the Port of Miami. *See, e.g.,* NMFS_00172-73. In a letter responding to the Corps' Biological Assessment, NMFS specifically considered, among other things, that a one-year post-construction report regarding the Port of Miami project found that "mean sand cover increased at channel-side sites from 13.6% to 29.3% (15.7% increase) . . . and it was later pointed out . . . that the math in that report was incorrect and actual sand cover increased by 115-215%." NMFS_00173 (citation omitted). NMFS also took into account that a 2016 study "indicate[d] that sediment impacts extended more than 700 feet from the channel," that there were recorded cases of "partial mortality to corals," and that coral critical habitat suffered impacts that ranged from "low" to "very severe." *Id.* (citation omitted); *see also* USACE_001703-20 (minutes from a meeting between NMFS and the Corps, reflecting that, to address NMFS's concerns, the Corps agreed to develop a turbidity monitoring plan with

triggers designed "to ensure that dredging or scow leakage overflow wouldn't impact [coral] reefs"). Based on NMFS's scientific expertise and its consideration of the best available information, including the available data from the Port of Miami Project, NMFS determined that the SJH Project—which incorporates the Corps' commitment to implement a turbidity monitoring plan with a conservative turbidity threshold (discussed further in Argument Section III.A.2 below)—is not likely to adversely affect ESA-listed corals or critical habitat.

The four studies that Plaintiffs paraphrase and excerpt from NMFS's administrative record are consistent with NMFS's determination. Pls.' Opp. 37-38, Table 2. Three of the four are specifically limited to looking at the impacts of the Port of Miami project on corals. *See* NMFS_00701-69 (Water & Air Research (2017)), NMFS_00770-88 (Miller (2016)), NMFS_00789-847 (NMFS (2016)). For the reasons discussed previously, *see* Defs.' Br. 39-43— including that the SJH Project incorporates an enhanced monitoring plan with a conservative turbidity threshold and specific requirements for the placement of monitoring stations, *see id.* at 46-51—the findings that Plaintiffs have excerpted from these studies do not undermine NMFS's "not likely to adversely affect" determination for the SJH Project. *See, e.g.,* Pls.' Opp. 37 (noting there were "numerous shortcomings of the turbidity monitoring protocols" for the Port of Miami project) (citing Water & Air Research (2017)); *id.* at 38 (noting that "inadequate monitoring . . . failed to accurately assess dredging-related impacts" from the Port of Miami project) (citing Miller (2016)). The fourth study cited by Plaintiffs is also consistent with NMFS's finding that a turbidity threshold of 7 Nephelometric Turbidity Units ("NTUs") above background levels will safeguard corals from harm during the SJH Project. *See* NMFS_00697 (Fourney and Figueiredo (2017)) (finding that "if sedimentation is limited to lower levels (30 mg.cm-2, <7 NTU), coral resilience to ocean warming is maximized").

Despite the significant differences between the SJH Project and Port of Miami project, Plaintiffs assert three arguments as to why data from the Port of Miami should have led NMFS to reach a different conclusion. Pls.' Opp. 38. Each one is unavailing.

### a. ESA-listed corals and their critical habitat are sufficiently far away from dredging activities.

First, Plaintiffs argue that the Port of Miami data indicates that "coral habitat is [not] far enough away to avoid sedimentation" from the SJH Project. *Id.* Specifically, Plaintiffs allege that the "best available science" shows that corals will suffer "partial mortality" if they are within "100 to 700 meters from dredging," and that corals will suffer "adverse impacts" if they are within "10 to 15 kilometers." *Id.* at 39 (citing NMFS_00777, NMFS_00783). But Plaintiffs' sweeping extrapolations do not hold up because they are based on a study that is specifically limited to analyzing the unique impacts of the Port of Miami project. *See* NMFS_00770-88 (Miller (2016)). As discussed, Defs.' Br. 39-43, many aspects of the Miami project presented a high risk of harm to corals from sedimentation which are absent from the SJH Project. Several of those factors are recognized in the study relied on by Plaintiffs, including: that the dredged "Port of Miami entrance channel traverses coral reefs," NMFS_00771; that the current "is dominated by the Florida Current" and subject to "common current reversals and multiscale vortices capable of transporting suspended material in complex patterns," *id.*; that the dredged material was "predominantly limestone and sand below a thin layer of silt," NMFS_00782[6]; and that the project utilized "a process known as 'roller chopping'' (punching the substrate with the cutterhead to pre-treat and fracture rocky substrate) with the suction deactivated," NMFS_00782. Moreover, Plaintiffs'

---

[6] Dredging of dense limestone is generally recognized as posing a higher risk of harm to corals because it can deposit "dense fine sediment 'rock flour' on the seabed" that can remain present longer than courser sediment. *See, e.g.,* NMFS_00715.

argument fails because, unlike in the Port of Miami, there are no ESA-listed corals within the SJH Project dredging area. NMFS_00020. Indeed, the closest ESA-listed corals are believed to be "near the mouth of the [San Juan Harbor]," *id.*, which is "approximately 2,500 ft north of the dredging area," NMFS_00021.[7] For these reasons, and the other significant differences between the two projects, *see* Defs.' Br. 39-43, Plaintiffs' broad generalizations cannot be applied to the SJH Project.

Contrary to Plaintiffs' contentions, NMFS's "not likely to adversely affect" determination is not undermined by interagency correspondence in which NMFS initially expressed concerns to the Corps over the completeness of data relied on in the Corps' Biological Assessment and requested further information to enable it to reach a determination. Pls.' Opp. 39-40 (citing NMFS_000169-76). In fact, the opposite is true. NMFS's letter demonstrates that NMFS carefully scrutinized the Corps' findings and took affirmative steps to fill informational gaps, thereby allowing NMFS to make a reasoned determination based on the best available information. *See, e.g.,* NMFS_00171-72 (requesting that the Corps provide "detailed sediment and turbidity monitoring plans" and that it conduct "new surveys to identify the number and location of ESA-listed corals in and around the project area").[8] Interagency letters like NMFS's are typical and crucial parts of the administrative process. Significantly here, NMFS's letter resulted in the Corps'

---

[7] The Corps has committed to conduct pre-construction "project specific coral surveys" to identify whether such corals are present near the mouth of the harbor. NMFS_00229. If any ESA-listed corals are identified in that area, they would be outside of the 700-meter (2,296-foot) zone that Plaintiffs allege there is a risk of "partial mortality" within, Pls.' Opp. 39 (citation omitted), and turbidity monitoring stations would be placed adjacent to them, NMFS_00011.

[8] NMFS did not, as Plaintiffs contend, "ignore[] its own scientists" by failing to address studies that are in its administrative record. Pls.' Opp. 39 (citing Miller (2016) and NMFS (2016)). *See, e.g.,* NMFS_00021 (NMFS Biological Opinion, citing and relying on NMFS (2016) for its evaluation of fine sediment impacts to corals).

commitment to conduct pre-construction coral surveys and incorporate a turbidity monitoring plan into its proposed action, which NMFS ultimately relied on, in part, for its conclusion that the SJH Project is not likely to adversely affect ESA-listed corals. NMFS_00011-12.

> **b. NMFS's evaluation of whether it was required to reinitiate consultation is not a justification of its "not likely to adversely affect" determination.**

Next, Plaintiffs rehash their argument that NMFS's Reinitiation Memorandum is an improper "new justification" for NMFS's concurrence with the Corps' "not likely to adversely affect" determination. Pls.' Opp. 40. For the reasons already discussed, *see* Defs.' Br. 44-46, this argument fails. The Reinitiation Memorandum does not, as Plaintiffs contend, seek to fill "gaps" in NMFS's initial concurrence, but rather evaluates information presented by the Miami Study that was not before agency decision-makers at the time NMFS issued its Biological Opinion. *See, e.g.,* NMFS_00001 (considering finding that "dredging activities resulted in a 10- to 100-fold increase in sediment cover on nearby reefs, and a likely loss of over a million corals from affected areas in the vicinity"); *see also* NMFS_00691 (Miami Study "establish[ing], for the first time, direct, quantitative links between remotely-sensed sediment plumes and in situ benthic impacts, revealing potential effects . . . along a 25 km segment of the northern Florida Reef Tract").

The Reinitiation Memorandum documented whether the findings of the Miami Study triggered a need to reinitiate consultation under the ESA's implementing regulations. *See* 50 C.F.R. § 402.16(a)(2) (requiring reinitiation of consultation where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"). NMFS's concurrence with the Corps' "not likely to adversely affect" determination

is a separate and distinct decision, which is supported by the science and information that was before agency decision-makers at the time NMFS issued the concurrence.[9]

### c. Formal consultation under ESA Section 7 was not required.

Under the ESA, "[i]f during informal consultation it is determined by the [action] agency, with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(c). Here, the Corps determined that the SJH Project is "not likely to adversely affect" ESA-listed corals, NMFS_00229-40, and NMFS concurred with that determination, NMFS_00019-22. Thus, formal consultation was not required.

Plaintiffs disregard the straightforward application of the ESA regulations and argue that NMFS should have formally consulted over the project's impacts to ESA-listed corals because the SJH Project "is likely to take listed corals." Pls.' Opp. 42 (citing NMFS_00694 (Fourney and Figueiredo (2017))). Federal Defendants agree that, if NMFS had determined the SJH Project was "likely" to result in take of ESA-listed corals, NMFS would not have concurred with the Corps' "not likely to adversely affect" determination. But NMFS did not make such a finding, nor does the study Plaintiffs cite support such a finding. Indeed, NMFS considered the same study and reached the opposite conclusion: that the SJH Project is unlikely to result in adverse impacts to ESA-listed corals or their critical habitat. *See* NMFS_00020-21 (NMFS Biological Opinion discussing the Fourney and Figueiredo (2017) study and concluding that limiting project turbidity

---

[9] Plaintiffs' reliance on *Dow AgroSciences v. NMFS*, 707 F.3d 462 (4th Cir. 2013) is thus misplaced, as the agency in that case acknowledged it was offering "arguments by counsel and a declaration from agency staff" as "post-decision explanations." 707 F.3d at 467.

to 7 NTUs above background at monitoring stations adjacent to coral critical habitat "will protect corals from project related effects" and "is consistent with the Fourney and Figueiredo paper").[10]

Plaintiffs' cherry-picked sentences from NMFS's letter to the Corps requesting additional information do not show that formal consultation was required. Pls.' Opp. 42. First, Plaintiffs' emphasis on NMFS's statement that "[g]iven the potential project impacts to ESA resources, NMFS agrees that a formal consultation is necessary for this project," NMFS_00175, ignores that NMFS *did* formally consult on the project's impacts to ESA resources—specifically ESA-listed sea turtles—and included its findings on ESA-listed corals in the same formal consultation document. *See* NMFS_00004-154. Plaintiffs also omit that, immediately after NMFS stated it was currently "unable to concur with the [Corps'] determination," it requested a list of information needed "to process the Section 7 consultation," NMFS_00169, which led to clarifications and additional information from the Corps that sufficiently supported its "not likely to adversely affect" determination. Specifically, the Corps provided information from prior dredging projects within the San Juan Harbor that never exceeded a turbidity of 7 NTUs above background levels and did not adversely affect ESA-listed corals, USACE_001718, and made modifications to the proposed action that included its commitment to the turbidity monitoring plan, NMFS_00011-12.

**2. The Monitoring Plan ensures that there will be no harm to ESA-listed corals and critical habitat.**

For the reasons set forth in the Corps' Biological Assessment and NMFS's Biological Opinion, the SJH Project is not anticipated to have adverse effects on ESA-listed corals or their critical habitat. NMFS_00229-40; NMFS_00019-22. In order to ensure this, the Corps committed

---

[10] By way of contrast, with respect to ESA-listed sea turtles, NMFS found the project is likely to result in "incidental take . . . of 6 sea turtles killed (3 observed and 3 unobserved) during hopper dredging," and therefore issued an incidental take statement for sea turtles. NMFS_00067.

to implement a turbidity monitoring plan, which requires adaptive management measures if turbidity exceeds a specific threshold, which, based on the best available science and its scientific expertise, NMFS determined will avoid adverse impacts ("Monitoring Plan"). NMFS_00011-12.

Plaintiffs contend that it was improper for NMFS to consider the Monitoring Plan as a basis for its "not likely to adversely affect" determination because the plan "does not replace take limits" and is "too vague." Pls.' Opp. 42. Both of these arguments fail. First, Plaintiffs' contention that the Monitoring Plan is not the equivalent of an ESA "take limit" is a red herring. Under the ESA's regulations, NMFS is required to issue an "incidental take statement" only if incidental take of the species "is reasonably certain to occur." 50 C.F.R. § 402.14(g)(7), (i)(1)(i). So even when agencies engage in formal consultation, an incidental take statement is not issued *when no take is anticipated*. As discussed, no take of ESA-listed corals is anticipated to result from the SJH Project. Thus, Plaintiffs' arbitrary comparison between the Monitoring Plan and a take limit is irrelevant.

Plaintiffs' argument that the Monitoring Plan is too "vague" for NMFS to rely on also fails. Not only is the most crucial aspect of the Monitoring Plan clearly defined—*i.e.,* a conservative turbidity threshold of 7 NTUs above background levels at monitoring stations adjacent to critical habitat[11]—the key elements needed for its implementation are defined as well. *See* Defs.' Br. 47 (list of Monitoring Plan specifications). Indeed, it would have been improper for NMFS not to consider the Monitoring Plan in its analysis. *See* 50 C.F.R. § 402.14(g)(8) (the expert consulting agency must "give appropriate consideration to any beneficial actions as proposed or taken by the [action] agency").

---

[11] Notably, the turbidity threshold that will be enforced by the Monitoring Plan is stricter than Puerto Rico's mandatory turbidity standard of 10 NTUs above background levels—which is itself already stricter than the EPA's standard of 29 NTUs over background. NMFS_00011-15.

Plaintiffs' reliance on *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) for their argument that NMFS improperly considered the Monitoring Plan is unavailing. Pls.' Opp. 42-43 (citing *Bernhardt*). In *Bernhardt*, the court found that a mitigation measure which provided that "FWS will be contacted for guidance" if a polar bear den was "detected within 1.6 km of the proposed locations of ice roads and pads" was "too vague." *Bernhardt*, 982 F.3d at 744, 747. Conversely, here, NMFS is not relying on some unspecified plan to protect ESA-listed corals. Under the Monitoring Plan, if turbidity levels exceed the threshold of 7 NTUs above background, and the Corps is unable to correct it through adaptive measures, the Corps will reinitiate Section 7 consultation with NMFS. NMFS_00021.

Plaintiffs' contention that the threshold of 7 NTUs above background levels is insufficient also fails. Pls.' Opp. 43. Plaintiffs dismiss the best available science on this point, arguing that, although "record documents . . . do not document harm to corals from dredging [in the San Juan Harbor] in 2007 and 2017" this evidence should be dismissed "because silence is not evidence of no harm." *Id.* at 44. But a lack of harm to corals when turbidity levels remained below 7 NTUs above background in the same location as the SJH Project is exactly the kind of evidence that NMFS should consider. Remarkably, Plaintiffs contend that, instead, NMFS should have relied on two studies regarding the Port of Miami project (Water & Air Research (2017) and Miller (2016)) which show there were "inadequate monitoring plans in Miami." *Id.* at 43. This suggestion makes little sense for multiple reasons: (1) the monitoring plan used for the Port of Miami project is irrelevant because it was less conservative than the SJH Project's 7 NTUs above background standard; (2) the Port of Miami monitoring plan did not include any specifications regarding the placement of monitoring stations; and (3) in addition to all the other significant differences between the two projects, *see* Defs.' Br. 39-43, unlike here, ESA-listed corals and critical habitat

were located *within the dredging area* at Port of Miami, NMFS_00771. Plaintiffs' faulty and selective reading of the record fails to undermine NMFS's assessment that a threshold of 7 NTUs above background levels is a sufficient safeguard for ESA-listed corals, which NMFS based on its scientific expertise in marine life and the best available science.

Plaintiffs' complaint that the Monitoring Plan provides "adaptive management measures" instead of "mitigation measures" misses the point. Pls.' Opp. 45. When an agency determines that its proposed action may affect an ESA-listed species or critical habitat, mitigation measures can be developed to "avoid, minimize, or offset effects of the action." *See, e.g.,* 50 C.F.R. § 402.14(c)(1)(i). However, here, the Corps determined, and NMFS concurred, that the SJH Project is "not likely to adversely affect" ESA-listed corals or critical habitat, meaning there is no anticipated harm to be mitigated. Thus, Plaintiffs' reliance on *Natural Resources Defense Council v. Kempthorne*, which addresses factors to be considered when evaluating a plan to mitigate harm from a proposed action, is irrelevant. Pls.' Opp. 45 (citing *Kempthorne*, 506 F. Supp. 2d 322 (E.D. Cal. 2007)). In *Kempthorne*, FWS determined that the agency's proposed action would "result in adverse effects" to an ESA-listed species but that those effects would be "avoided or minimized" by the relied-on mitigation plan. *Kempthorne*, 506 F. Supp. 2d at 350. The court found that the mitigation plan was not "reasonably specific, certain to occur, and capable of implementation," because it was, "in substance[,] an organizational flow chart that prescribes that certain . . . meetings[] will be held whenever a trigger criteria is met." *Id.* at 355 (citations omitted).

Even if the factors considered in *Kempthorne* were applied here, NMFS's consideration of the Monitoring Plan was reasonable. Not only has the Corps set forth "reasonably specific" terms for the Monitoring Plan—including a conservative turbidity threshold—the Monitoring Plan is sufficiently certain to be implemented. Contrary to Plaintiffs' suggestions, the fact that the

Monitoring Plan will be carried out by a Corps contractor does not mean its "implementation [is] not within the control of the relevant federal agencies" and is "unlawfully uncertain" to occur. Pls.' Opp. 45 (quoting *Kempthorne*, 506 F. Supp. 2d at 353). Under Plaintiffs' logic, the SJH Project itself would be "uncertain to occur" because it is also being carried out by Corps contractors. Tellingly, in the case relied on by Plaintiffs, the "third parties" conducting the challenged mitigation measures were "[an interstate agency], States, [a Native American] Tribe and private parties." *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196, 1213 (D. Or. 2003). They were not federal contractors. Indeed, when the "third party" implementing a mitigation measure is a contractor working on behalf of the federal action agency, it would be nonsensical to conclude that implementation is not sufficiently certain to occur. 84 Fed. Reg. 44,976, 44,979 (Aug. 27, 2019) ("Any type of action proposed by a [f]ederal agency receives a presumption that it will occur").[12]

### 3. NMFS reasonably determined that reinitiation of ESA Section 7 consultation is not required for ESA-listed corals and critical habitat.

Plaintiffs concede they "did not move for summary judgment on a reinitiation claim." Pls.' Opp. 46. Nevertheless, NMFS reasonably determined that the findings presented in the Miami Study did not trigger a duty to reinitiate consultation. NMFS_00001-03. NMFS reached this determination based on the reasons discussed in Federal Defendants' cross-motion, Defs.' Br. 44-46, and set forth in NMFS's Reinitiation Memorandum, NMFS_00001-03. Plaintiffs argue that the Reinitiation Memorandum is "arbitrary" because it "fails to consider important aspects of the problem" but, tellingly, fail to identify any "aspect of the problem" that the memorandum

---

[12] Relying on certain phrases pulled out of context, Plaintiffs also incorrectly surmise that "monitoring for listed corals will only occur 'if any are found during the pre-construction resource surveys.'" Pls.' Opp. 46 (quoting Defs.' Br. 42). To the contrary, the Monitoring Plan will be implemented with or without the discovery of ESA-listed corals during pre-construction surveys. NMFS_00011-12. The significance of the pre-construction surveys is simply that, if ESA-listed corals are found, the turbidity monitoring stations will be placed adjacent to those locations. *Id.*

supposedly ignores. Pls.' Opp. 47. In fact, Plaintiffs fail to substantively dispute any of the findings

from NMFS's Reinitiation Memorandum. Further, Plaintiffs reliance on *Yurok Tribe v. United*

*States Bureau of Reclamation* is unhelpful to their argument. *Yurok Tribe*, 231 F. Supp. 3d 450,

474-75 (N.D. Cal. 2017) (finding that reinitiation of consultation was required where—unlike

here—a threshold set by an incidental take statement had been exceeded).

Contrary to Plaintiffs' misleading declaration that "[a] central conclusion of [the Miami

Study] was that the 150-meter impact zone is untenable because sediment impacts will extend for

kilometers," the study's findings are limited to evaluating the impacts of the Port of Miami project

and were not extrapolated into guidelines for other dredging projects. Pls.' Opp. 48 (citing

NMFS_00684). Moreover, even if the Miami Study had extrapolated its findings into guidelines

for other projects, they would not apply to a project like the SJH Project due to fundamental

differences, including: the types of sediment involved (hard rock vs. silt and soft clay); the amount

of material to be dredged (6 million cubic yards vs. 2.1 million cubic yards); the dredging area

location (open ocean vs. enclosed harbor); the types of dredging (roller-chopping vs. no roller-

chopping); and the relative locations of the corals (dredging through reefs vs. corals 2,500 feet

away). *See* NMFS_00001-3.[13] In sum, the findings of the Miami Study did not trigger a

requirement for the agencies to reinitiate consultation under the ESA regulations.

**B. FWS reasonably determined that the SJH Project is not likely to adversely affect the Antillean manatee.**

Plaintiffs argue that FWS failed to consider "relevant impacts to manatees from noise,

vessel collisions, and degraded seagrass foraging areas," Pls.' Opp. 49, but the record fully

---

[13] These consequential differences highlight why, whereas NMFS has determined that the SJH Project is "not likely to adversely affect" ESA-listed corals, NMFS determined that the Port of Miami project was "likely to adversely affect" them. 79 Fed. Reg. 6,545, 6,564 (Feb. 4, 2014).

supports FWS's conclusion that the SJH Project is not expected to result in adverse impacts to Antillean manatees from such harms.

### 1. The record does not support a conclusion that noise pollution will harm manatees.

Plaintiffs begrudgingly concede that the noise threshold on which they based their argument has no application to manatees, but now argue that the agencies did not "analyz[e] dredging and vessel noise disturbance." *Id.* at 50. The record demonstrates otherwise. Indeed, the Corps considered a study which analyzed noise pollution caused by dredging through rock—which creates significantly more noise than dredging the "sand/silt/mud" in the San Juan Harbor will, *see* USACE_000181—and found that, even when dealing with rock fragmentation, "the majority of underwater sounds produced by hydraulic cutterhead dredging operations were of relatively low frequency" that did not reach levels generally considered harmful." *Id.* (also noting that noise "levels decreased with increasing distance from the source").[14] Thus, based on the evidence in the record, and especially given the project-specific commitment the Corps has made to shut down dredging if a manatee "comes within 50 feet of the active construction site," FWS_01366, Plaintiffs fail to undermine FWS's concurrence with the Corps' "not likely to adversely affect" determination.

### 2. Vessel strikes are expected to decrease as a result of the SJH Project.

The record shows that the number of vessels transiting in and out of San Juan Harbor will decrease as a result of the SJH Project. *See e.g.* USACE_000183; FWS_01365. Nevertheless,

---

[14] For their blanket assertion that "[d]redging noise increases the risk that manatees will be struck by vessels," Plaintiffs rely on two irrelevant documents from the Corps' administrative record on its Condado Lagoon beneficial use determination: (1) a study specifically limited to underwater acoustics in the St. Johns River in jacksonville, Florida; and (2) a 2021 study on in-water bridge construction that was not before agency decisionmakers, as it post-dates FWS's 2018 concurrence with the Corps' "not likely to adversely affect" determination. Pls.' Opp. 50 (citing USACE_026919; USACE_026944). Plaintiffs' reliance on these studies should be disregarded.

Plaintiffs attempt to muddle this well-established outcome by claiming that "there will be more LNG tankers and double the volume of LNG is needed to deliver the same energy compared to other fuel types." Pls.' Opp. 50 (citing USACE_000064 (Table 2-5); USACE_000181; USACE_000187). But Plaintiffs' misleading statements fail to undermine the agencies' analysis. Although it is true that there will be "more LNG tankers," Plaintiffs disregard the fact that there will be *fewer* oil tankers and that, when all is said and done, "the total number of vessels needed to transport the forecasted cargo volumes [including new projected volumes of LNG] would decrease, compared to the without-project conditions, as individual vessels would be able to load more cargo with a deeper navigation channel." USACE_000187.[15] Thus, Plaintiffs' argument that manatee vessel strikes will increase due to increased vessel traffic is without merit.

### 3. The San Juan Harbor is not a significant source of seagrass.

Plaintiffs' reliance on outdated information and cherry-picked phrases from the record fails to undermine FWS's reasoned conclusion that, based on its expertise and the best and most current data available, the SJH Project will not cause harm to the Antillean manatee through the destruction of seagrass. It is true that, in a 2015 letter to the Corps, FWS stated that the project "may impact a 69 acre area of sea grasses." FWS_01392. However, Plaintiffs omit that, in that very same sentence, FWS clarified that its hypothesis was based on a "preliminary assessment of [National Oceanic and Atmospheric Administration] benthic habitat maps [from] 2001," and explicitly acknowledged that "the distribution and extent of seagrass" was "not well documented" because it was based on "outdated information." FWS_01392. Further, within the same letter, FWS

---

[15] Plaintiffs rely on the same (irrelevant) post-decisional study on in-water bridge construction from the Corps' administrative record on the Condado Lagoon beneficial use option for their assertion that "larger-capacity, larger-sized vessels are more deadly for manatees." Pls.' Opp. 50 (citing USACE_026941). This 2021 study was not part of the record before FWS decision-makers (nor could it have been even if it were relevant) and should therefore be disregarded.

conveyed its finding from a 2012 study on manatee protection that the San Juan Bay area is "not associated with a seagrass hotspot," FWS_01391, and that, although "there are patches of aquatic vegetation and other habitats that remain in the area, the San Juan Harbor has been "extensively modified as a commercial port," FWS_01392. Similarly, Plaintiffs misleadingly excerpt a sentence from an interagency email chain between FWS and the Corps, in which "an agency official wrote that an expansion flare in Army Terminal Channel [has] the potential for an acre of direct seagrass impacts," Pls.' Opp. 51 (citing FWS_00081). But the full analysis provided by the agency biologist—which is omitted by Plaintiffs—indicates that, based on the best available science, no such impact is anticipated:

> The only proposed expansion feature with the potential for direct impacts [to submerged aquatic vegetation] (SAV) is the eastern army terminal channel flare. . . . The May 2016 sidescan survey of this area indicates it is muddy bottom with invertebrate burrows but no SAV . . . . Although we do not have towed video of this specific area, it is likely too deep for SAV colonization in the inner harbor and videos . . . from 2016 located north and south of this area corroborate the muddy bottom assumption based on the sidescan mosaic. **So direct impacts are not anticipated**.

FWS_00081.[16] In sum, Plaintiffs fail to point to any evidence in the record undermining FWS's finding that the SJH Project is unlikely to cause harm to seagrass that would result in adverse impacts to the Antillean manatee.

---

[16] Plaintiffs are incorrect that "[FWS] recommended additional surveys to calculate the impacts." Pls. Opp. 51 (citing FWS_00081). The email chain cited by Plaintiffs reflects that a Corps biologist suggested "the best way to calculate impacts [from potential sloughing of an adjacent slope which could indirectly impact SAV] would be to complete a pre-dredge survey." FWS_00081. In line with this, FWS's June 2018 report to Congress on the SJH Project represents that "the Corps proposes additional SAV surveys of the Army Terminal Channel eastern flare during the project's Preconstruction, Engineering and Design (PED) phase," FWS_00057, and that "if SAV are found . . . additional mitigation would be proposed," FWS_00076.

**C. The Corps lawfully relied on its ESA Section 7 consultations with NMFS and FWS.**

When determining whether an action agency has fulfilled its obligations under the ESA by relying on the conclusions of the relevant consulting agency, the D.C. Circuit has adopted the following rule:

> Even when the consultant agency's opinion is based on "admittedly weak" information, another agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging party can point to no "new" information—*i.e.*, information the consultant agency did not take into account—which challenges the opinion's conclusions.

*City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (adopting rule established in *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)) (cleaned up). As discussed *supra*, here, Plaintiffs have failed to point to any information that undermines the expert wildlife agencies' conclusions that the SJH Project is not likely to adversely affect the ESA-listed species and critical habitat within their respective jurisdictions. Accordingly, the Corps reasonably and lawfully relied on NMFS's and FWS's determinations.

**IV.    The Corps has no duty to confer on NMFS's critical habitat proposal.**

Plaintiffs do not dispute that NMFS's proposed rule to designate critical habitat for five threatened corals—which was issued over two years after the agencies completed Section 7 consultation on the SJH Project—expressly excludes the San Juan Harbor channel and harbor from its proposed designation. Pls.' Opp. 52-53; 85 Fed. Reg. 76,302 (Nov. 27, 2020). But despite the lack of overlap between the proposed designation and the project's dredging area, Plaintiffs still argue that the Corps has a duty to confer with NMFS on the project's potential impacts to the proposed critical habitat. Pls.' Opp. 53. The language of the ESA belies Plaintiffs' argument. The ESA provides that an agency "shall confer with the [appropriate consulting agency] on any agency action which is *likely to . . . result in the destruction or adverse modification* of critical habitat

43

proposed to be designated for [listed] species." 16 U.S.C. § 1536(a)(4).[17] Here, no duty to confer is triggered because there is no reasonable basis to conclude that the SJH Project is likely to destroy or adversely modify the proposed critical habitat.

The only case cited by Plaintiffs fails to demonstrate that such a duty applies. Pls.' Opp. 52-53 (citing *WildEarth Guardians v. U.S. Forest Serv.*, 2018 WL 4627087 (D.N.M. Aug. 30, 2018)). In that case, the plaintiffs did not challenge the agency's conclusion "that it was 'not necessary' to engage in conferencing" over the potential impacts of its action to a species proposed for listing and its proposed critical habitat. *WildEarth Guardians,* 2018 WL 4627087 at \*9. Specifically, the agency concluded that it did not have a duty to confer because, among other things, FWS's proposal to list the species was not issued until after the agency issued its decisional document on the proposed action, and the agency's "decision was not likely to jeopardize the continued existence of the species, or adversely modify or destroy [its] proposed critical habitat." *Id.* at n.9. Even more extreme, here, NMFS did not issue its proposed critical habitat rule until two and a half years after the agencies completed ESA Section 7 consultation on the SJH Project, and there is no overlap between the Corps' proposed dredging activities and NMFS's proposed critical habitat (whereas, in *WildEarth Guardians*, the agency's proposed action "designated roads within the [species'] habitat" that FWS acknowledged could "severely impact[]" the species if they were ultimately "listed on [] motor vehicle use maps"). *Id.* at \*12 (finding that the duty to *reinitiate consultation* was triggered after the species was *listed* and critical habitat was *designated*). The record simply does not support a conclusion that a duty to confer has been triggered.

---

[17] Distinct from the duty to "consult" under ESA Section 7, the duty to "confer" requires "federal agencies to enter into 'informal discussions' about the possible adverse impact of agency actions on *proposed* species" or *proposed* critical habitat. *Enos v. Marsh*, 769 F.2d 1363, 1369 (9th Cir. 1985) (emphasis added); 50 C.F.R. § 402.10(c). The full protections of the ESA do not apply until a species is listed or the critical habitat is formally designated. *Enos*, 769 F.2d at 1369.

**V.      Vacatur is an inappropriate remedy, and, should the Court grant any relief, supplemental remedy briefing should be permitted.**

Plaintiffs' argument that Federal Defendants "have not met their burden to show an exception to the default remedy of vacatur is appropriate" puts the cart before the horse. Pls.' Opp. 54. As an initial matter, vacatur is not a "default remedy." When a court determines that an agency has made an error of law, "the case must be remanded to the agency for further action consistent with the corrected legal standards." *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (citations and quotation marks omitted). The reviewing court retains discretion over whether the remanded action should be vacated. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). But even more significantly, *no errors have been identified* in the agencies' decisions, and neither Federal Defendants nor Plaintiffs can address the seriousness of those (hypothetical) errors or the scope of any disruptive consequences that would be caused by vacatur. *See* Pls.' Opp. 53-54 (acknowledging that the *Allied-Signal* test applies, under which a court must "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed'") (quoting *Allied-Signal*, 988 F.2d at 150-51). Plaintiffs' request for vacatur should be denied because, even if any of the challenged decisions contained an error of law—which they do not—any such deficiency could likely be addressed on remand through further explanation or an amendment that is tailored to the identified error. Consistent with the objectives set forth in *Allied-Signal*, such an approach would avoid the complete nullification of years' worth of work and resources expended by three federal agencies and the potential delay of a project that is designed to have many positive impacts. At the very least, if the Court finds an error of law, it should allow the parties an opportunity to submit supplemental briefing to address the scope of the error and whether vacatur is warranted.

Dated: April 21, 2023                              Respectfully Submitted,

                                                   United States Department of Justice
                                                   Environment & Natural Resources Division
                                                   TODD KIM, Assistant Attorney General
                                                   S. JAY GOVINDAN, Chief
                                                   BRIDGET KENNEDY McNEIL, Assistant Chief

                                                   */s/ Michelle M. Spatz*
                                                   Michelle M. Spatz, Trial Attorney
                                                   D.C. Bar No. 1044400
                                                   Wildlife & Marine Resources Section
                                                   P.O. Box 7611
                                                   Washington, D.C. 20044-7611
                                                   Telephone: (202) 598-9741
                                                   Email: michelle.spatz@usdoj.gov

                                                   Christopher C. Hair, Trial Attorney
                                                   PA Bar # 306656
                                                   United States Department of Justice
                                                   Natural Resources Section
                                                   4 Constitution Square
                                                   150 M Street, NE, Suite 3.1004
                                                   Washington, D.C. 20002
                                                   Telephone (202) 305-0420
                                                   Email: christopher.hair@usdoj.gov

                                                   Sarah Izfar, Trial Attorney
                                                   D.C. Bar No. 1017796
                                                   Environmental Defense Section
                                                   P.O. Box 7611
                                                   Washington, D.C. 20044-7611
                                                   Telephone: (202) 305-0490
                                                   Email: sarah.izfar@usdoj.gov

                                                   *Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ, Trial Attorney
D.C. Bar No. 1044400
United States Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel: (202) 598-9741; Fax: (202) 305-0275
E-mail: michelle.spatz@usdoj.gov

*Attorney for Federal Defendants*

47