## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EL PUENTE, et al.,

     *Plaintiffs*,

    v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

     *Defendants*.

Case No.: 1:22-cv-02430-CJN

---

## JOINT APPENDIX IN SUPPORT OF PARTIES'
## MOTIONS AND CROSS-MOTIONS FOR SUMMARY JUDGMENT

## VOLUME 7

Dated:  May 5, 2023

Respectfully submitted,

 s/ *Catherine Kilduff*

Catherine Kilduff, DC Bar No. 1026160
Julie Teel Simmonds, DC Bar No. CO0091
Miyoko Sakashita, DC Bar No. CA00061
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844 - 7100
ckilduff@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org
miyoko@biologicaldiversity.org

*Attorneys for Plaintiffs El Puente,*
*CORALations, and Center for*
*Biological Diversity*

# INDEX
# JOINT APPENDIX

| | VOLUME 1 | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| FWS_00026–FWS_00030 | FWS_00026–FWS_00030 | USFWS response re: supplemental EA and section 7 consultation |
| FWS_00047–FWS_00051 | FWS_00047–FWS_00051 | USFWS concurrence letter to USACE re: Biological Assessment |
| FWS_00052–FWS_00080 | FWS_00052–FWS_00080 | USFWS letter and Final Fish and Wildlife Coordination Act Report |
| FWS_00081–FWS_00085 | FWS_00081–FWS_00085 | Email exchange between USFWS and USACE, with attachment |
| FWS_01345–FWS_01348 | FWS_01345 | Internal FWS email re: Biological Assessment |
| FWS_01349–FWS_01368 | FWS_01349–FWS_01368 | USACE ESA Biological Assessment |
| FWS_01390–FWS_01418 | FWS_01390–FWS_01393 | USFWS letter responding to USACE's Notice of Intent |
| NMFS_00001–NMFS_00003 | NMFS_00001–NMFS_00003 | NMFS memo re: SJH evaluation of new information from Cunning 2019 |
| NMFS_00004–NMFS_00154 | NMFS_00004–NMFS_00154 | ESA Section 7 Biological Opinion |
| NMFS_00157–NMFS_00160 | NMFS_00157–NMFS_00160 | USACE email re: NMFS's request for information re: monitoring and management plan and dredge disposal site |
| NMFS_00169–NMFS_00176 | NMFS_00169–NMFS_00176 | NMFS letter requesting additional information for Biological Opinion |

| VOLUME 2 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| NMFS_00177– NMFS_00292 | NMFS_00177– NMFS_00292 | USACE letter requesting formal consultation from NMFS and attached biological assessment |
| NMFS_00678– NMFS_00692 | NMFS_00678– NMFS_00692 | Cunning et al. 2019. Extensive coral mortality and critical habitat loss following dredging |
| NMFS_00693– NMFS_00700 | NMFS_00693– NMFS_00700 | Fourney & Figueiredo 2017. Additive negative effects of anthropogenic sedimentation and warming on the survival of coral recruits |
| NMFS_00701- NMFS_00768 | NMFS_00701– NMFS_00768 | Water & Air 2017. Miami Harbor Phase III Dredging Project |
| NMFS_00770- NMFS_00788 | NMFS_00770– NMFS_00788 | Miller et al. 2016. Detecting sedimentation impacts to coral reefs resulting from dredging Port of Miami, Florida USA |
| NMFS_00789– NMFS_00847 | NMFS_00789– NMFS_00847 | NMFS letter and report re: Examination of Sedimentation Impacts to Coral Reef Along the Port of Miami Entrance Channel |
| NMFS_00881- NMFS_00927 | NMFS_00881– NMFS_00927 | Hernandez-Delgado & Rivera. Prelim. Determination of Acroporid Critical Habitats |
| NMFS_00928- NMFS_00967 | NMFS_00928, NMFS_00934–35 | Fourney 2015. Natural vs. Anthropogenic Sedimentation: Does Reducing a Local Stressor Increase Coral Resilience to Climate Change? |
| NMFS_00968- NMFS_00988 | NMFS_00968, NMFS_00969, NMFS_00982 | Jones et al. 2015. Effects of sediments on the reproductive cycle of corals |

| VOLUME 3 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_000001–USACE_000003 | USACE_000001–USACE_000003 | Finding of No Significant Impact |
| USACE_000004–USACE_000008 | USACE_000004–USACE_000008 | Chief of Engineer's Report on Feasibility Study |
| USACE_000023–USACE_000024 | USACE_000023–USACE_000024 | EPA letter to USACE re: response to integrated feasibility report and EA |
| USACE_000028–USACE_000217 | USACE_000028–USACE_000217 | Integrated Feasibility Report and EA |
| USACE_000761–USACE_000787 | USACE_000761–USACE_000787 | Feasibility Report and EA - Appendix B - Dredged Material Management Plan |
| USACE_000788–USACE_000883 | USACE_000788–90, USACE_000796–97, USACE_000803–05, USACE_000827, USACE_000867 | Feasibility Report and EA - Appendix C - Economics |
| USACE_000916–USACE_001070 | USACE_000916, USACE_000924–25, USACE_001025–67 | Feasibility Report and EA - Appendix F - NMFS EFH ESA Consultation |

| VOLUME 4 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_001110–USACE_001124 | USACE_001110–USACE_001124 | Feasibility Report and EA Appendix I – 404(b)(1) Evaluation |
| USACE_001125–USACE_001283 | USACE_001125–83, USACE_001205–06, USACE_001250–52, USACE_001257, USACE_001280–81 | Feasibility Report and EA Appendix J – Pertinent Correspondence |
| USACE_001284–USACE_001290 | USACE_001284–USACE_001290 | Feasibility Report and EA Appendix K – Condado Lagoon WQC |
| USACE_001337–USACE_001370 | USACE_001337, USACE_001347, USACE_001355–56 | USFS letter to USACE re: Coordination Act Report |
| USACE_001536–USACE_001545 | USACE_001537–38 | DNER letter and chart – Status of Pending Civil Works Projects |
| USACE_001548–USACE_001573 | USACE_001551, USACE_001554, USACE_001558, USACE_001560 | Powerpoint – Feasibility Study and EA Agency Decision Milestone Meeting |
| USACE_001574–USACE_001630 | USACE_001606, USACE_001624 | Report Summary for Integrated Feasibility Report and EA |
| USACE_001646–USACE_001646 | USACE_001646 | Letter to USACE re: finding of no historic properties |
| USACE_001647–USACE_001702 | USACE_001647–49 | Email exchange with USACE & NMFS re: additional information |
| USACE_001703–USACE_001720 | USACE_001703–USACE_001720 | Email and meeting minutes from Nov. 8, 2017 |
| USACE_001721–USACE_001725 | USACE_001721–USACE_001725 | Internal USACE email and revised document draft responses to PREPA |
| USACE_001937–USACE_001967 | USACE_001938–41 | Transcript – Puerto Rico Public Meeting, Aug. 22, 2017 |
| USACE_001968–USACE_001969 | USACE_001968–69 | PR Power Authority letter to USACE re: LNG Receiving, Storage & Gasification Facilities |
| USACE_001970–USACE_002293 | USACE_001970, USACE_002033 | SJH Submerged Cultural Resources Survey, Final Report |
| USACE_002302–USACE_002302 | USACE_002302 | Sierra Club email to USACE re: Q on deadline for public comment |

| Page Span of Original in AR | Page(s) in Appendix | Document Description |
|---|---|---|
| USACE_002303–USACE_002303 | USACE_002303 | Letter to USACE re: review of submerged cultural resources survey |
| USACE_002304–USACE_002305 | USACE_002304–05 | PR Power Authority letter re: request for information |
| USACE_002306–USACE_002318 | USACE_002306, USACE_002310, USACE_002313–16 | CBD email and comments re: EA and FONSI |
| USACE_002319–USACE_002323 | USACE_002319–USACE_002323 | USACE News Release |
| USACE_002324–USACE_002457 | USACE_002324–25, USACE_002397, USACE_002409–11, USACE_002455 | Santiago email and informational documents re: LNG deliveries to Puerto Rico |
| USACE_002458–USACE_002508 | USACE_002458–USACE_002508 | Transcript – Puerto Rico Public Meeting, Aug. 22, 2017 |
| USACE_002514–USACE_002521 | USACE_002514–18 | USACE email to Santiago re: requested letters |
| USACE_002530–USACE_002535 | USACE_002530–31 | USACE letter to public re: draft Feasibility Study and EA public comment opportunity |
| USACE_002538–USACE_002558 | USACE_002538–USACE_002558 | USACE email to USFW sending ESA Biological Assessment |
| USACE_002559–USACE_002789 | USACE_002559, USACE_002636, USACE_002643, USACE_002661, USACE_002672 | SJH Draft Feasibility Study and EA |
| USACE_003450–USACE_003465 | USACE_003450, USACE_003456, USACE_003469–70 | USACE letter to NMFS requesting consultation, with attachment (Draft Report and EA – Appendix F) |
| USACE_003566–USACE_003597 | USACE_003566, USACE_003597 | Draft Fish and Wildlife Coordination Act Report |
| USACE_003822–USACE_003835 | USACE_003822, USACE_003832 | 404(b)(1) Evaluation (Draft Report and EA – Appendix J) |
| USACE_003836–USACE_003844 | USACE_003836–USACE_003844 | Memo for Record re: NEPA determination (Draft Report and EA – Appendix K) |
| USACE_003845–USACE_003942 | USACE_003907 | USACE letter to Coast Guard requesting review of drawing and transmission of LNG regulations |
| USACE_003845–USACE_003942 | USACE_003910 | Email from Coast Guard re: review of drawing and LNG regulations |
| USACE_004017–USACE_004075 | USACE_004036, USACE_004044–54 | Powerpoint – Tentatively Selected Plan Milestone Presentation |

| VOLUME 5 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_004076– USACE_004192 | USACE_004076–78, USACE_004084, USACE_004096, USACE_004106–20, USACE_004128, USACE_004132–33, USACE_004138–39 | Email to NOAA re: ESA Consultation, with Biological Assessment and Cover Letter |
| USACE_004220– USACE_004304 | USACE_004220, USACE_004240 | Report Summary for Feasibility Report and EA (revised 6-16-17) |
| USACE_004220– USACE_004304 | USACE_004264, USACE_004272 | Powerpoint – Tentatively Selected Plan Milestone Presentation |
| USACE_005669– USACE_005672 | USACE_005669– USACE_005672 | Public Notice – Cataño Oil Dock, Application No. SAJ-2010-03574 |
| USACE_005673– USACE_005683 | USACE_005673, USACE_005677 | Final Meeting Minutes – Team Update on Preliminary Quantities/Costs Results |
| USACE_005753– USACE_005761 | USACE_005753, USACE_005759 | USACE Memo for the Record re: Determination of NEPA Documentation |
| USACE_005762– USACE_005765 | USACE_005762– USACE_005765 | Public Notice – San Antonio Channel, Application No. SAJ-2002-07089 |
| USACE_005766– USACE_005769 | USACE_005766– USACE_005769 | Public Notice – Pier 3 Old San Juan, Application No. SAJ-1997-06893 |
| USACE_005770– USACE_005773 | USACE_005770– USACE_005773 | Public Notice – Pier 4 Old San Juan, Application No. SAJ-2001-06025 |
| USACE_005811– USACE_005822 | USACE_005811, USACE_005815 | Final Meeting Minutes – Team Update on Environmental Resource Surveys |
| USACE_006225– USACE_006228 | USACE_006225 | USACE email re: Feasibility Study Design Vessels for Ship Simulation |
| USACE_006234– USACE_006265 | USACE_006235–39 | 81 Fed. Reg. 51,694 (Aug. 4, 2016), Guidance for Assessing Effects of Anthropogenic Sound |
| USACE_006501– USACE_006501 | USACE_006501 | EPA letter to USACE re: ocean dredged material disposal site |
| USACE_006511– USACE_006520 | USACE_006511–18 | Final Meeting Minutes (PREPA – LNG Terminal) |
| USACE_006717– USACE_006717 | USACE_006717 | USACE letter to EPA re: MPRSA Section 103 Sediment Testing and Analysis |

| Page Span of Original in AR | Page(s) in Appendix | Document Description |
|---|---|---|
| USACE_006722–USACE_006880 | USACE_006722–USACE_006880 | Final Report – SJH MPRSA Section 103 Sediment Testing and Analysis |
| USACE_007012–USACE_007014 | USACE_007012–13 | Email to agencies re: pilots' areas of concerns, with attached map |
| USACE_007018–USACE_007172 | USACE_007018, USACE_007035–36 | Miami Harbor Phase III Quantitative Post-Construction Analysis |
| USACE_007241–USACE_007242 | USACE_007241–USACE_007242 | Park Service letter to USACE re: comments on notice to prepare EIS |
| USACE_007243–USACE_007244 | USACE_007243–USACE_007244 | Project Fact Sheet in Spanish for Public Scoping Meeting |
| USACE_007577–USACE_007577 | USACE_007577 | 80 Fed. Reg. 60,657 (Oct. 7, 2015), Notice of Intent to Prepare EIS |
| USACE_007578–USACE_007581 | USACE_007579–80 | USACE letter initiating scoping process for EIS |
| USACE_007585–USACE_007653 | USACE_007585, USACE_007600 | Powerpoint – PR Electric Power Authority Integrated Resource Plan |
| USACE_008031–USACE_008062 | USACE_008031, USACE_008041–43 | Galway Energy Advisors – LNG and Natural Gas Delivery Options Evaluation |
| USACE_009002–USACE_009012 | USACE_009002, USACE_009008 | Species of Special Conservation Concern: Colonial Nesting Seabirds Guild |
| USACE_009293–USACE_009565 | USACE_009294, USACE_009562 | 79 Fed. Reg. 53,852 (Sept. 10, 2014), Final Listing Determinations |
| USACE_010316–USACE_010356 | USACE_010316, USACE_010336 | Biological Assessment for Impacts Associated with the Isla Grande Terminal Improvements |
| USACE_012229–USACE_012257 | USACE_012229 | Erftemeijer et al. 2012. Environmental Impacts of Dredging & Other Sediment Disturbances |

| VOLUME 6 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_013098– USACE_013148 | USACE_013098– USACE_013148 | EPA Letter and Site Management and Monitoring Plan |
| USACE_013195– USACE_013204 | USACE_013195–98 | NOAA letter re: Site Monitoring and Management Plan |
| USACE_013664– USACE_013988 | USACE_013664, USACE_013740 | Recovery Plan for NW Atlantic Population of Loggerhead Sea Turtle |
| USACE_013989– USACE_014019 | USACE_013989 | 73 Fed. Reg. 72,210 (Nov. 26, 2008), Critical Habitat for Elkhorn and Staghorn Corals |
| USACE_014399– USACE_014484 | USACE_014399, USACE_014436, USACE_014440 | West Indian Manatee 5-Year Review |
| USACE_014507– USACE_014718 | USACE_014507–631 | USACE Hydraulic Design of Deep-Draft Navigation Projects |
| USACE_015048– USACE_015249 | USACE_015048, USACE_015089 | Atlantic *Acropora* Status Review |
| USACE_017459– USACE_017473 | USACE_017459, USACE_017470 | Kleypas 1996. Coral reef development under naturally turbid conditions |
| USACE_019129– USACE_019205 | USACE_019129, USACE_019173–93 | Framework for Assessing Need for Seasonal Restrictions on Dredging & Disposal Operations |

| VOLUME 7 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_019590–USACE_019693 | USACE_019590–693 | Final EIS for Designation of Ocean Dredged Material Disposal Sites |
| USACE_021462–USACE_021500 | USACE_021462, USACE_021474 | Powerpoint – Update on Dredging Impacts on Sea Turtles in SE USA |
| USACE_021539–USACE_021540 | USACE_021539–40 | LNG World News. New Fortress Energy breaks ground for SJ micro fuel-handling facility |
| USACE_021667–USACE_021713 | USACE_021667, USACE_21684, USACE_021697–700 | Draft Supplemental EA – Seagrass Mitigation, Additional Sand Source |
| USACE_022631–USACE_022726 | USACE_022631, USACE_22646–48, USACE_022696–97, USACE_022715–16 | Final Feasibility Report and EA – Appendix C – Economics |
| USACE_022968–USACE_023126 | USACE_023121–24 | Power Authority letter re: LNG receiving, storage, & gasification facilities |
| USACE_024430–USACE_024433 | USACE_024430–33 | Finding of No Significant Impact – Seagrass Mitigation, Additional Sand Source |
| USACE_024434–USACE_024693 | USACE_024434, USACE_024439–49, USACE_024467, USACE_024470–76, USACE_024477, USACE_024518, USACE_024636, USACE_024688–93 | Final Supplemental EA – Seagrass Mitigation, Additional Sand Source (Jan. 2023) |
| USACE_024694–USACE_024695 | USACE_024694–95 | USACE Letter to PR Point Sources Permit Division Re: Water Quality Certification |
| USACE_024709–USACE_024717 | USACE_024709, USACE_024715 | NMFS Letter to EPA Re: Consultation on Site Management and Monitoring Plan |
| USACE_024893–USACE_024894 | USACE_024893–94 | DNER Letter to USACE Re: Water Quality Certification |
| USACE_025892–USACE_025927 | USACE_025892–927 | EPA Letter Re: Ocean Dredged Material Disposal and Memo Re: Review of Compliance |
| USACE_025928–USACE_025971 | USACE_025928, USACE_025946 | Powerpoint – SJH Construction Dredging 44-Foot & 36-Foot Project, Condado Lagoon |
| USACE_026782–USACE_026790 | USACE_026783, USACE_026789 | San Juan Bay Nat'l Estuary Program Email to Planning Board Re: Consistency Certification |

| Page Span of Original in AR | Page(s) in Appendix | Document Description |
|---|---|---|
| USACE_026791–USACE_026799 | USACE_026794–96 | Response Enclosure |
| USACE_026800–USACE_027394 | USACE_026917, USACE_026919 | Gerstein & Blue 2016. Underwater noise and zones of masking with respect to hopper dredging and manatees |
| USACE_026800–USACE_027394 | USACE_026938, USACE_026941–44 | Hieb et al. 2021. In-Water Bridge Construction Effects on Manatees |
| USACE_026800–USACE_027394 | USACE_027142 | Toscano & Murena 2019. Atmospheric ship emissions in ports |
| USACE_028572–USACE_028579 | USACE_028572–79 | DNER Letter to USACE Re: Water Quality Certificate |
| USACE_028611–USACE_028626 | USACE_028611, USACE_28616, USACE_28620 | Santiago email to USACE with comments from El Puente et al. on Draft Supplemental EA |
| USACE_028640–USACE_028651 | USACE_028641, USACE_028648–49 | Environmental Law Clinic of Univ. of PR – comments on Draft Supplemental EA |
| USACE_028748–USACE_028839 | USACE_028783, USACE_028793 | Site Management and Monitoring Plan (Draft) |

| VOLUME 8 | | |
|---|---|---|
| **Page Span of Original in AR** | **Page(s) in Appendix** | **Document Description** |
| USACE_029564–USACE_029695 | USACE_029564–695 | Draft Supplemental EA and Proposed Finding of No Significant Impact |
| USACE_029806–USACE_029806 | USACE_029806 | USACE letter to EPA requesting concurrence for ocean disposal |
| USACE_029807–USACE_029948 | USACE_029807–948 | Final MPRSA Section 103 Sediment Characterization Testing and Analysis |
| USACE_030374–USACE_030374 | USACE_030374 | OMB letter to Army re: submission to Congress |

United States
Environmental Protection Agency

EPA, Region II
New York, NY 10278

May 1988

 **EPA**

# Final Environmental Impact Statement for the Designation of Ocean Dredged Material Disposal Sites for Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico



USACE_019590

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II
26 FEDERAL PLAZA
NEW YORK. NEW YORK 10278

MAY 0 5 1988

To All Interested Government Agencies and Public Groups:

This is to inform you that the <u>Final Environmental Impact Statement for the Designation of Ocean Dredged Material Disposal Sites for Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico</u> will be available for public review at the following locations:

U.S. Environmental Protection Agency
Environmental Impacts Branch
26 Federal Plaza, Room 500
New York, New York

U.S. Environmental Protection Agency
Caribbean Field Office
1413 Avenida Fernandez Juncos - Stop 20
Santurce, Puerto Rico

U.S. Environmental Protection Agency
Public Information Reference Unit
Room 2904 (Rear)
401 M Street, S.W.
Washington D.C.

U.S. Army Corps of Engineers
Jacksonville District Office
400 W. Bay Street
Jacksonville, Florida

U.S. Army Corps of Engineers
San Juan Area Office
400 Avenida Fernandez Juncos
San Juan, Puerto Rico

Puerto Rico Department of
   Natural Resources
Oficina 204
Centro Gubernamental
Avenida Rotarios
Arecibo, Puerto Rico

Puerto Rico Department of
   Natural Resources
Oficina A
Centro Comercial
2 Alturas de Mayaguez Carr.
Mayaguez, Puerto Rico

Puerto Rico Department of
   Natural Resources
5 Calle Celenia
Humacao, Puerto Rico

Puerto Rico Department of
   Natural Resources
Hospital Sub-Regional
Ponce, Puerto Rico

This final environmental impact statement (EIS) was prepared by the U.S. Environmental Protection Agency (EPA) - Region II, with the assistance of Science Applications International Corporation, an environmental consulting firm under contract to Battelle Laboratories. The document has been prepared in accordance with the EPA regulations implementing the National Environmental Policy Act (NEPA), and in accordance with EPA's policy for voluntary preparation of EISs on significant regulatory actions (39 FR 37119).

2

A draft EIS regarding these proposed site designations was published on September 3, 1986. The draft EIS evaluated the environmental impacts associated with the designation of sites for ocean disposal of dredged material from the harbors of Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico, and utilized these evaluations in proposing particular sites for designation. The final EIS recapitulates the alternatives analysis, responds to comments on the DEIS, and presents the EPA's conclusions on these site designations.

In accordance with the EPA's Ocean Dumping Regulations (40 CFR Part 228), a proposed rule-making for designation of the four ocean disposal sites is also being issued concurrently with this final EIS. Copies of the proposed rule-making are also available for public review at the above repositories. Comments or questions on the proposed rule-making should be sent to Mario P. Del Vicario, Chief, Marine and Wetlands Protection Branch, U.S. Environmental Protection Agency, Room 837, 26 Federal Plaza, New York, New York 10278.

Comments concerning the content of the final EIS may also be submitted to the EPA for consideration. All comments must be received within 45 days after the date of publication of the proposed rule-making and the Notice of Availability for this final EIS in the Federal Register, which is expected to be _May 27, 1988_. Please address all comments concerning the final EIS to Ms. Barbara Pastalove, Chief, Environmental Impacts Branch, U.S. Environmental Protection Agency, Room 500, 26 Federal Plaza, New York, New York 10278.

If you require additional information regarding this final EIS, please contact Mr. Robert Witte, Project Monitor, at (212) 264-6681.

Sincerely,

Christopher J. Daggett
Regional Administrator

Final
Environmental Impact Statement
for the Designation of Ocean Dredged
Material Disposal Sites for Arecibo
Mayaguez, Ponce, and Yabucoa,
Puerto. Rico


Prepared by
U.S. Environmental Protection Agency
Region II

Abstract:  In accordance with the National Environmental Policy Act (NEPA) and
the regulations of the U.S. Environmental Protection Agency (USEPA), a final
environmental impact statement (EIS) has been prepared for the designation of
four ocean dredged material disposal sites for Puerto Rico.  The purpose of the
proposed action is the designation of environmentally acceptable ocean sites
for disposal of dredged material from the four harbors of Arecibo, Mayaguez,
Ponce, and Yabucoa.

The final EIS summarizes the purpose and need for the action, describes the
analytical methodology and the alternatives analysis conducted for each site,
provides a responsiveness summary concerning the comments received on the draft
EIS, and presents the conclusions of the final EIS regarding the four sites.

The final EIS concludes that for Arecibo, the interim site, located approximately
1.5 nautical miles (nmi) north of the harbor, should be designated as the
disposal site.  For Mayaguez, Alternate Site 1, approximately 6 nmi west of the
harbor, should be designated.  For Ponce, Alternate Site 1, approximately 4.5
nmi south of the harbor, should be designated.  For Yabucoa, Alternate Site 2,
approximately 6 nmi east of the harbor, should be designated as the disposal site.
A proposed rulemaking concerning designation of these four sites is being issued
concurrently with this final EIS.

USACE_019593

FINAL
ENVIRONMENTAL IMPACT STATEMENT
FOR THE DESIGNATION OF OCEAN DREDGED MATERIAL
DISPOSAL SITES FOR THE HARBORS OF
ARECIBO, MAYAGUEZ, PONCE, AND
YABUCOA, PUERTO RICO

May 1988

U.S. Environmental Protection Agency
Region II
26 Federal Plaza
New York, New York  10278

USACE_019594

**EXECUTIVE SUMMARY**

USACE_019595

## EXECUTIVE SUMMARY

The proposed action addressed by this final environmental impact state-
ment (FEIS) is the designation of four environmentally acceptable ocean
dumping sites for the disposal of dredged material from the harbors of
Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico, resulting from maintenance
or new dredging projects. The draft EIS (DEIS) for this action was published
by the U.S. Environmental Protection Agency (EPA) on September 3, 1986. This
FEIS has been prepared as a summary document because the comments received did
not require major changes or additions to the DEIS. Unless otherwise noted,
the DEIS is incorporated by reference into this document. Together, the DEIS
and this FEIS constitute the complete FEIS.

### BACKGROUND

Ocean dumping has been regulated by EPA since the Marine Protection,
Research, and Sanctuaries Act of 1972 (MPRSA) authorized EPA to establish and
apply criteria for reviewing and evaluating permit applications for the dump-
ing of waste material into ocean waters, and to designate sites where such
dumping may occur. In addition, Section 102(c) of the National Environmental
Policy Act of 1969 (NEPA), 42 U.S.C. 4321 et seq., requires that Federal
agencies prepare EISs on proposals for major Federal actions significantly
affecting the quality of the human environment. The objective of NEPA is to
build into the EPA decision-making processes careful consideration of all
environmental aspects of proposed actions. Although EPA activities under
MPRSA are statutorily exempt from compliance with NEPA, EPA has voluntarily
made a commitment to prepare EISs in connection with ocean dumping site
designations (39 FR 16186; May 7, 1974).

### SUMMARY OF ANALYSES

The purpose of this FEIS is to identify and select for designation four
environmentally acceptable ocean disposal sites for dredged material from the
four harbors. The designation of an ocean disposal site for dredged material
must be based on an evaluation of possible sites using the Criteria (40 CFR
228.5 - 228.6) of the Ocean Dumping Regulations (ODR). All candidate sites

USACE_019596

are evaluated for compliance with the criteria.  Of the sites that are
acceptable under the criteria, the site nearest the point of dredging is
selected unless there are significant environmental advantages in designation
of more distant sites.  If no site is found that satisfies the criteria, no
site is designated.  Two alternate sites for Arecibo and three alternate sites
each for Mayaguez, Ponce, and Yabucoa were identified using a site selection
methodology developed by EPA and the U.S. Army Corps of Engineers (COE).
Locations of the interim sites for the four harbors are as follows:

- Arecibo – 1.5 nautical miles (2.7 km) north of the harbor
- Mayaguez – 5 nautical miles (9.3 km) northwest of the harbor
- Ponce – 4 nautical miles (7.4 km) south of the harbor
- Yabucoa – 4.5 nautical miles (8.3 km) east of the harbor.

Normally, EPA ocean disposal sites are chosen in such a way that dumped
material is contained within the site after disposal as far as possible.  This
is generally feasible in those shallow water environments where valuable
natural resources will not be placed at risk.  In Puerto Rico, however,
shallow water environments typically are inhabited by corals.  To avoid direct
disposal on coral resources, deeper water sites are selected.  As a conse-
quence of selecting deeper water sites, some dredged material will be trans-
ported outside site boundaries.  However, the effects of transport will be
small.

The key factors used in deciding which site to designate for each
location considered in this FEIS are discussed below.

Arecibo

At Arecibo, the interim site is suitable for designation.  The site meets
all criteria of the ODR.  Dredged material is not expected to be transported
far from the site by ocean currents because the site is in water that has
depths between 101 and 417 meters and the dredged material to be disposed of
is primarily sand, which will be rapidly deposited on the sea floor.  No
adverse effects are expected on living resources, mineral resources, or
socioeconomic or cultural aspects of the environment from the continuing use
of this site.  There have been no operational problems encountered during
surveillance or monitoring activities at this site.

USACE_019597

Previous use of this interim site has resulted in more sand in the sediments in the area of the site than is found in other areas near the site. This has caused an increase in the number of animals that are adapted to live in coarser sediments at the site. The designation of the interim site therefore will result in less change in the composition of species of the local environment than would result from the use of any alternate site.

## Mayaguez

The interim site at Mayaguez is not suitable for designation. This site is over the insular shelf area; consequently, fine sediments from dredged material disposal are likely to be transported onto coral reefs and into areas of sport fishing and commercial fishing. It also is located within a few hundred meters of a shipwreck.

Alternate site 1 at Mayaguez is suitable for designation. This site is approximately 1.5 nautical miles (nmi) farther from Mayaguez harbor, and from the nearest shoreline, than the interim site. This location places the site in deeper water (almost twice as deep), and reduces the chance of dredged material inadvertently being transported onto coral reefs or into sport or commercial fishing areas. No adverse effects from the future use of this site are expected on living resources, mineral resources, or socioeconomic or cultural aspects of the environment. No problems were encountered during the baseline monitoring activities at this site and none are expected from future use of the site.

## Ponce

The Ponce interim site is not suitable for designation. Under appropriate conditions of wind and near-surface currents, dumping of the predominantly silty clay dredged material at this site would result in a high probability that fine sediments would be transported to coral reef areas located approximately 1.5 nmi northwest of the site. Although the dredged material transport and fate model does not predict this possible impact, uncertainty over the direction and velocity of currents likely to be experienced during individual disposal events makes the relocation of the site environmentally prudent.

USACE_019598

Alternate Site 1, the site recommended to be designated for Ponce, is 1.5 nmi farther than the interim site from the harbor, and 1 nmi farther than the interim site from the nearest shoreline.  However, it has the advantage of being 2.5 nmi farther than the interim site from the nearest coral reefs, substantially reducing the possibility of damage to the reefs caused by fines (particles in the dredged material <0.06 mm in diameter) transported by currents.  In other respects, the site also meets all of the criteria for site selection specified in the ODR.  No adverse effects are expected on living resources, mineral resources, or socioeconomic or cultural aspects of the environment from the future use of this site.  No problems were encountered during the baseline monitoring activities at this site and none are expected during future use of the site.

Yabucoa

The Yabucoa interim site is not suitable for designation.  The site is over shallow areas that may contain coral reefs.  Coral reefs are present in the general area, and a ridge of shallow bottom (depths of only 16 meters) runs through the site.  This sinuous ridge, which is identified on National Oceanic and Atmospheric Administration (NOAA) topographic maps of the area (NOAA 1983), has morphology and biota similar to a coral reef, although direct observations have not been made on this feature.

Similarly, Alternate Site 1 is not suitable for designation.  This site is essentially contained within the deeper portions of the interim site, but is sufficiently close to the coral-like feature that dredged material will be transported to that feature should dumping occur.

Alternate Site 2, which is the next closest alternate site evaluated, is suitable for designation.  This site is approximately 2.6 nmi farther from the harbor than the interim site, 1 nmi farther from the nearest coastline than the interim site, and 2 nmi farther from the coral-like features than the interim site.  Transport of dredged material after dumping would be primarily in the direction of very deep water, and consequently is expected to have little impact.  The site meets all of the criteria for site selection specified in the ODR.  No adverse effects are expected on living resources, mineral resources, or socioeconomic or cultural aspects of the environment.  No

USACE_019599

problems were encountered during the baseline monitoring activities at this site and none are expected from future use of this site.

## Land-Based Alternatives

Whereas the evaluation of land-based disposal alternatives is the responsibility of the COE as a part of the dredged material disposal permitting process, the EIS development process requires the consideration of a range of alternatives to the proposed action. Land-based disposal methods considered in the DEIS included placement of dredged material as hydraulic fill, use of dredged material to create wetlands, and use of dredged material as cover in landfills or barren areas.

## RESPONSIVENESS SUMMARY

On October 17, 1986, a notice of availability of the DEIS for public review and comment was published in the Federal Register (51 FR 37068). The public comment period on the DEIS closed December 15, 1986. Nine comment letters were received on the DEIS. Of these nine letters, two made no comments, two requested additional copies of the DEIS without comment, and two agreed with the proposal to relocate three of the disposal sites to alternate sites.

The U.S. Department of Health and Human Services requested additional existing information on pathogenic organisms that might be in the dredged material. Testing for pathogenic species is not conducted without some evidence to support the presence of harmful organisms, but if determined to be necessary, the COE could require such testing as part of the permit evaluation process.

The Commonwealth of Puerto Rico Department of Natural Resources requested that creation of wetland habitat be considered as an alternative. Land-based alternatives to ocean dumping are considered by the COE at the time of permit decisions on ocean dumping. Site designation does not authorize use of the site, but only provides an environmentally acceptable location for the ocean dumping of dredged material should the COE issue a dumping permit. Thus, further evaluations of land-based alternatives are not considered appropriate in the FEIS.

USACE_019600

The COE made several comments on the purpose and need for an EIS, the evaluation of land-based alternatives in the EIS, and the technical justification and economic aspects of moving the designated sites from the interim locations to locations farther offshore. The COE input was incorporated into this FEIS. Discussions on the technical justification for moving the disposal site locations have resulted in no change in the proposed action to designate three alternate sites.

## CONCLUSIONS

As a result of the analyses conducted pursuant to the preparation of this EIS, the EPA proposes to designate four dredged material disposal sites located offshore of Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico for the disposal of dredged material removed from the Arecibo, Mayaguez, Ponce, and Yabucoa harbors, respectively. This action is necessary to provide acceptable ocean dumping sites for the current and future disposal of this material.

The analyses conducted for this FEIS indicate that for Arecibo, the interim site, approximately 1.5 nmi north of the harbor, should be designated as the ocean site for dredged material disposal. For Mayaguez, Alternate Site 1, approximately 6 nmi west of the harbor, should be designated as the disposal site. For Ponce, Alternate Site 1, about 4.5 nmi south of the harbor, should be designated as the disposal site. For Yabucoa, Alternate Site 2, approximately 6 nmi east of the harbor, should be designated as the disposal site. As a result of the confirmation and refinement of the site mapping and distance measuring process, the distances given here for the Mayaguez and Ponce sites are 1 mile less than the distances presented in the DEIS. These proposed site designations are for an indefinite period of time, and the sites will be subject to continuing monitoring and site management by EPA to ensure that unacceptable adverse environmental impacts do not occur.

It should be emphasized that the designation of a site for ocean dumping of dredged material does not imply that dumping will occur at the site. Decisions on the acceptability of ocean dumping are made on a case-by-case basis during permitting or review of Federal projects. During the decision-making process on permit issuance, land-based alternatives are also considered as disposal alternatives. Ocean dumping is chosen only when it is the environmentally preferred alternative.

USACE_019601

TABLE OF CONTENTS

USACE_019602

TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . .   S-1

1.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . .   1-1

     1.1   BACKGROUND . . . . . . . . . . . . . . . . . . . . .   1-1
     1.2   STATEMENT OF PURPOSE AND NEED FOR THE ACTION . . . . . . . . .   1-3
     1.3   ANALYTICAL METHODOLOGY FOR ANALYSIS OF ALTERNATIVES. . . . . .   1-9

2.   ALTERNATIVES ANALYSIS . . . . . . . . . . . . . . . . . . .   2-1

     2.1   ALTERNATIVES ANALYSIS FOR ARECIBO. . . . . . . . . . . . .   2-2

           2.1.1   Alternatives Considered . . . . . . . . . . . . .   2-2

                   2.1.1.1  Land-Based Disposal Options for Arecibo. . . .   2-2
                   2.1.1.2  Ocean Disposal Site Options for Arecibo. . . .   2-3

           2.1.2   Description of the Recommended Alternative. . . . . . .   2-3
           2.1.3   Basis for the Selection of the Recommended Alternative.   2-3
           2.1.4   Impacts of the Recommended Alternative. . . . . . . . .   2-5

     2.2   ALTERNATIVES ANALYSIS FOR MAYAGUEZ . . . . . . . . . . . .   2-8

           2.2.1   Alternatives Considered . . . . . . . . . . . . .   2-8

                   2.2.1.1  Land-Based Disposal Options for Mayaguez . . .   2-8
                   2.2.1.2  Ocean Disposal Site Options for Mayaguez . . .   2-8

           2.2.2   Description of the Recommended Alternative. . . . . . .   2-8
           2.2.3   Basis for the Selection of the Recommended Alternative.   2-10
           2.2.4   Impacts of the Recommended Alternative. . . . . . . . .   2-10

     2.3   ALTERNATIVES ANALYSIS FOR PONCE. . . . . . . . . . . . . .   2-13

           2.3.1   Alternatives Considered . . . . . . . . . . . . .   2-13

                   2.3.1.1  Land-Based Disposal Options for Ponce. . . . .   2-13
                   2.3.1.2  Ocean Disposal Site Options for Ponce. . . . .   2-14

           2.3.2   Description of the Recommended Alternative. . . . . . .   2-14
           2.3.3   Basis for the Selection of the Recommended Alternative.   2-14
           2.3.4   Impacts of the Recommended Alternative. . . . . . . . .   2-16

     2.4   ALTERNATIVES ANALYSIS FOR YABUCOA. . . . . . . . . . . . .   2-19

           2.4.1   Alternatives Considered . . . . . . . . . . . . .   2-19

                   2.4.1.1  Land-Based Disposal Options for Yabucoa. . . .   2-19
                   2.4.1.2  Ocean Disposal Site Options for Yabucoa. . . .   2-20

USACE_019603

## TABLE OF CONTENTS (Continued)

Page

2.4.2 Description of the Recommended Alternative. . . . . . . 2-20
2.4.3 Basis for the Selection of the Recommended Alternative. 2-20
2.4.4 Impacts of the Recommended Alternative. . . . . . . . 2-22

3.   RESPONSIVENESS SUMMARY. . . . . . . . . . . . . . . . . . . . . 3-1

3.1 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.2 COMMENTS AND RESPONSES . . . . . . . . . . . . . . . . . . 3-1
3.3 OTHER COMMUNICATIONS CONCERNING THE DEIS . . . . . . . . . 3-8

4.   CONCLUSIONS OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT . . . . . 4-1

4.1 ARECIBO. . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
4.2 MAYAGUEZ . . . . . . . . . . . . . . . . . . . . . . . . . 4-2
4.3 PONCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 4-2
4.4 YABUCOA. . . . . . . . . . . . . . . . . . . . . . . . . . 4-3

5.   CONTRIBUTORS TO THE FINAL ENVIRONMENTAL IMPACT STATEMENT. . . . . 5-1

6.   COORDINATION. . . . . . . . . . . . . . . . . . . . . . . . . . 6-1

APPENDIX A.   COMMENT LETTERS . . . . . . . . . . . . . . . . . . . . A-1

APPENDIX B.   ABBREVIATIONS AND ACRONYMS. . . . . . . . . . . . . . . B-1

APPENDIX C.   REFERENCES. . . . . . . . . . . . . . . . . . . . . . . C-1

APPENDIX D.   GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . D-1

USACE_019604

LIST OF FIGURES

| Figure | | Page |
|--------|--|------|
| 1-1 | Map of Puerto Rico. . . . . . . . . . . . . . . . . . . . . . | 1-3 |
| 1-2 | Base Map for Arecibo Study Area . . . . . . . . . . . . . . | 1-6 |
| 1-3 | Base Map for Mayuguez Study Area. . . . . . . . . . . . . . | 1-7 |
| 1-4 | Base Map for Ponce Study Area . . . . . . . . . . . . . . . | 1-8 |
| 1-5 | Base Map for Yabucoa Study Area . . . . . . . . . . . . . . | 1-9 |
| 2-1 | Zone of Siting Feasibility and Interim and Alternate Sites for Arecibo . . . . . . . . . . . . . . . . . | 2-5 |
| 2-2 | Zone of Siting Feasibility and Interim and Alternate Sites for Mayaguez. . . . . . . . . . . . . . . . . | 2-10 |
| 2-3 | Zone of Siting Feasibility and Interim and Alternate Sites for Ponce . . . . . . . . . . . . . . . . . . | 2-15 |
| 2-4 | Zone of Siting Feasibility and Interim and Alternate Sites for Yabucoa . . . . . . . . . . . . . . . . . | 2-22 |

USACE_019605

# 1. INTRODUCTION

USACE_019606

# 1.  INTRODUCTION

The purpose of this final environmental impact statement (FEIS) is to identify and designate four environmentally acceptable dredged material disposal sites located offshore of Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico for the disposal of dredged material removed from the Arecibo, Mayaguez, Ponce, and Yabucoa harbors, respectively.  Figure 1-1 shows the locations of these four harbors.  This action is necessary to provide an acceptable ocean dumping site for the current and future disposal of dredged material when ocean disposal is the preferred alternative.

The draft EIS (DEIS) was published by the U.S. Environmental Protection Agency (EPA) on September 3, 1986.  It identifies the interim and alternate ocean disposal sites for each harbor, characterizes the affected environments and types of materials to be released at the sites, and analyzes potential consequences of the proposed action.  Because the comments received did not require major changes or additions to the DEIS, this FEIS has been prepared as a summary document.  Unless otherwise noted, the DEIS is incorporated by reference into this document.  Together, the DEIS and this FEIS constitute the complete EIS.

This section of the FEIS provides background information, states the purpose and need for the action, and presents the analytical methodology used to complete the analyses that constitute the findings of this FEIS.  Section 2 summarizes information on the analysis of alternatives for each harbor. Section 3 provides EPA's responses to comments received on the DEIS.  Section 4 presents the conclusions of this FEIS.  Section 5 lists those parties contacted by EPA for input to the FEIS development process.

## 1.1  BACKGROUND

Section 102(c) of the Marine Protection, Research, and Sanctuaries Act of 1972, (MPRSA) as amended, 33 U.S.C. 1401 et seq., gives the Administrator of EPA the authority to designate sites where ocean dumping of dredged material may be permitted.  On December 24, 1986, the Administrator delegated the authority to designate ocean dredged material dumping sites to the Regional

USACE_019607

Administrator of the EPA Region in which the site is located.  This site designation is being made pursuant to that authority.

Section 103 of MPRSA gives authority to the Secretary of the Army to issue dredged material permits.  Such permits are evaluated according to criteria promulgated in the EPA Ocean Dumping Regulations (ODR) (40 CFR Chapter I, Subchapter H, Part 227) and are reviewed by EPA for concurrence before issuance.  In all cases, a need for ocean disposal must be established before issuance of a disposal permit.  Section 103 of the Act also requires the Secretary to use recommended sites designated by EPA to the extent feasible.

The harbors of Arecibo, Mayaguez, Ponce, and Yabucoa are periodically dredged to maintain the authorized depths.  In the past, materials from these dredging operations were disposed of at interim designated ocean disposal sites and at land-based sites.

The ODR (Section 228.4) state that ocean dumping sites will be designated by publication in Part 228.  A list of "Approved Interim and Final Ocean Dumping Sites," including the interim sites for Arecibo, Mayaguez, and Ponce, was published on January 11, 1977 (42 FR 2461 et seq.).  The interim site for Yabucoa was added to the list on May 11, 1979 (44 FR 27662).  This EIS identifies and recommends the interim site at Arecibo and alternate sites at Mayaguez, Ponce, and Yabucoa for designation.  The designation of the recommended sites is being published as a proposed rulemaking in accordance with Section 228.4(e) of the ODR, which permits the designation of ocean disposal sites for dredged material.  EPA generally is not required to designate ocean disposal sites for dredged material, but does so when it believes ocean disposal may be a reasonable disposal alternative.

In 1980, the National Wildlife Federation (NWF) challenged the practice of using interim ocean disposal sites pending completion of long-term studies and final designation pursuant to MPRSA.  In resolving the lawsuit, the EPA and the U.S. Army Corps of Engineers (COE) entered into a consent decree with the NWF to take steps to designate final ocean dredged material disposal sites (DMDSs) for certain sites with interim designation.  Although these four

USACE_019608

USACE_019609



FIGURE 1-1.  MAP OF PUERTO RICO

Puerto Rican interim disposal sites were not covered by the consent decree, EPA is responding to the need to have designated ocean dredged material disposal sites in Puerto Rico.

Section 102(c) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 et seq., requires that Federal agencies prepare an EIS on proposals for major Federal actions significantly affecting the quality of the human environment.  The objective of NEPA is to build into the EPA decision-making process careful consideration of all environmental aspects of proposed actions.  Although actions under MPRSA are specifically exempt from NEPA compliance, EPA has voluntarily made a commitment to prepare EISs in connection with ocean dumping site designations (39 FR 16186; May 7, 1974). Figures 1-2 through 1-5 show the study areas and interim ocean disposal sites for each harbor.

## 1.2  STATEMENT OF PURPOSE AND NEED FOR THE ACTION

The harbors of Arecibo, Mayaguez, Ponce, and Yabucoa are essential to the continued commercial and industrial growth of Puerto Rico.  Ocean-going ships require channels, berths, and turning basins that are, at a minimum, about 11 meters (6 fathoms) deep.  Each harbor is subject to gradual shoaling and filling as a result of sediment deposition from rivers and storm-waves. Without dredging, the harbors would eventually become inaccessible to large commercial vessels.  Periodic maintenance dredging is an ongoing activity and is essential for the continued use of these harbors.  Future dredging may include both maintenance dredging and harbor channel deepening.

Since 1977, the COE has used ocean dredged material disposal sites in Puerto Rico that were designated by EPA on an interim basis.  Use of these sites has been an essential element of COE compliance with the requirements of MPRSA and its ability to carry out its statutory responsibility for maintaining safe navigation in the harbors of Puerto Rico.

To continue to maintain these waterways, COE considers it essential that EPA identify, evaluate, and permanently designate environmentally acceptable

USACE_019610

ocean dredged material disposal sites. These sites will be used after reviews
of each project and permit application have established that the proposed
activity is in compliance with the criteria and requirements of EPA and COE
regulations.

Although the evaluation of land-based disposal alternatives is the
responsibility of the COE as a part of the dredged material disposal
permitting process, the EIS development process allows for the consideration
of a range of alternatives to the proposed action. Land-based disposal
methods considered in the DEIS included placement of dredged material as
hydraulic fill, use of dredged material to create wetlands, and use of dredged
material as cover in landfills or barren areas. Beach nourishment is
generally not feasible for the materials dredged from the harbors considered
in this EIS. Because of their small grain size, the sediments of these
harbors are unsuitable for beach nourishment.

## 1.3 ANALYTICAL METHODOLOGY FOR ANALYSIS OF ALTERNATIVES

The decision to designate an ocean disposal site for dredged material is
based on an evaluation of possible sites using the Criteria (40 CFR 228.5 -
228.6) of the ODR. All candidate sites are evaluated for compliance with the
criteria. Of the sites that are acceptable under the criteria, the site
nearest the point of dredging is selected unless there are significant
environmental advantages in designation of more distant sites. If no site is
found that satisfies the criteria, no site is designated.

Alternate ocean dredged material disposal sites that were evaluated in
the DEIS were selected using a map overlay screening methodology developed by
EPA and the COE (EPA/COE 1983). The interim and two alternate sites for
Arecibo and the interim and three alternate sites each for Mayaguez, Ponce,
and Yabucoa were identified using this methodology. A brief description of
the EPA/COE recommended site-designation process follows:

- ● Phase 1: Establish Zones of Siting Feasibility (ZSFs)

    - - A preliminary screening of environmental factors, based on the nine
      evaluation factors specified in MPRSA Section 102a and the criteria
      specified in the ODR (Part 228), to eliminate conflicts with areas
      having protected resources and with existing uses of the ocean.

USACE_019611



FIGURE 1-2.  BASE MAP FOR ARECIBO STUDY AREA

USACE_019612



* Depths in fathoms

FIGURE 1-3.  BASE MAP FOR MAYAGUEZ STUDY AREA

USACE_019613



FIGURE 1-4.  BASE MAP FOR PONCE STUDY AREA

USACE_019614



FIGURE 1-5.   BASE MAP FOR YABUCOA STUDY AREA

1-9

USACE_019615

- Phase II:  Select Alternate Sites

  - Evaluate interim dredged material disposal sites, and identify other possible ocean disposal sites believed to be in accordance with the ocean dumping criteria.

- Phase III:  Evaluate Interim and Alternate Sites

  - Evaluate the suitability of each of the sites and select, based on ODR criteria, a site for designation as the Dredged Material Disposal Site (DMDS) for continuing use.

Normally, EPA selects ocean disposal sites in such a way that dumped dredged material is contained within the site after disposal.  This is generally feasible in shallow water environments where valuable natural resources will not be placed at risk.  In Puerto Rico, shallow water environments typically are inhabited by corals.  To avoid direct disposal on coral resources, deeper water sites are selected.  As a consequence of selecting deeper water sites, some dredged material will be transported outside site boundaries.  However, the effects of transport will be small.

To supplement the site identification process, sediment transport and fate modeling was conducted to simulate sediment deposition characteristics for dump events at each of the interim and alternate sites.  Because Puerto Rico has well-developed coral reef areas, and a substantial portion of local fish populations depends on the reef ecosystems for food and habitat, particular ecological concern was paid to identifying potential adverse impacts of the dumping of dredged spoil materials on live corals.  The model results indicated that, for the four harbors studied, bottom topography and subsurface currents are critical factors in determining dispersion of the dredged material and the pattern of its deposition on the sea floor.  Using the model results, sites were evaluated, and recommendations were made based on the ability to predict the transport of dumped dredged material to deeper water and its dispersion to negligible concentrations.

To further support an evaluation of existing environments offshore of the four harbors, a survey of the ocean floor was conducted using the OSV P.W. Anderson.  The results of this cruise also were incorporated into the analyses of interim and alternate sites.

USACE_019616

# 2.   ALTERNATIVES ANALYSIS

USACE_019617

2.  ALTERNATIVES ANALYSIS

INTRODUCTION

This section of this final environmental impact statement (FEIS) addresses the alternatives considered by the U.S. Environmental Protection Agency (EPA) for the disposal of dredged material from Arecibo, Mayaguez, Ponce, and Yabucoa harbors, Puerto Rico.  The proposed action addressed in this FEIS is the permanent designation of ocean dredged material disposal sites for these four harbors.

Alternatives to the proposed action were considered and evaluated under the requirements of the National Environmental Policy Act of 1969 (NEPA).  All alternative disposal methods must be evaluated by the U.S. Army Corps of Engineers (COE) during the consideration of permit applications for dredged material disposal projects.  The selection and permanent designation of environmentally acceptable ocean dredged material disposal sites for the four harbors is independent of individual project requirements.  Consequently, the non-ocean disposal alternatives presented in this section provide a general overview of the potential availability of land-based disposal methods rather than a definitive assessment of each method.  The alternatives considered in the draft EIS (DEIS) for each harbor were:

- No-Action:  The no-action alternative to final designation is to refrain from designating ocean disposal sites to continue disposal activities at the interim ocean disposal sites until their interim status expires.

- Land-Based Disposal:  The land-based disposal alternatives considered in the DEIS included placement of dredged material as hydraulic fill, use of dredged material to create wetlands, and use of dredged material as cover in landfills or barren areas.

- Designation of the interim ocean disposal site as the site for continuing use.

- Designation of an alternate ocean disposal site as the site for continuing use.

NO-ACTION ALTERNATIVE

The no-action alternative to the proposed action would be to refrain from designating permanent ocean sites for the disposal of dredged material from

USACE_019618

the harbors and nearby areas of Arecibo, Mayaguez, Ponce, and Yabucoa. This would result in the termination of the use of the interim sites when their interim designations expire. The net result of the no-action alternative would be that the COE would not have EPA-approved, final designated ocean sites for disposal of the operation and maintenance material from these harbors. Therefore, the COE would be required to either: (1) justify an acceptable alternate disposal method (e.g., land-based), (2) develop information sufficient to select an acceptable ocean site for disposal, or (3) modify or cancel operation and maintenance dredging projects that depend on ocean disposal as the only feasible method for disposal of the dredged material. Adoption of the no-action alternative was not considered to be an acceptable alternative because such an approach would be counter to the intent of the consent decree entered into by EPA and COE with the National Wildlife Federation (NWF) in 1980, to take steps to designate final ocean dredged material disposal sites for sites with interim designations, even though these particular sites are not affected by that consent decree.

The following subsections summarize the disposal alternatives considered for each harbor and address land-based disposal, use of the interim ocean disposal site, and use of an alternate ocean disposal site. A summary is presented addressing the basis for the selection of the recommended alternative and the expected impacts.

## 2.1  ALTERNATIVES ANALYSIS FOR ARECIBO

### 2.1.1  Alternatives Considered

The alternatives considered for the disposal of dredged material from Arecibo harbor included the use of ocean disposal sites and land-based disposal alternatives.

### 2.1.1.1  Land-Based Disposal Options for Arecibo

The locations of landfills and barren areas near Arecibo were identified and evaluated in the DEIS as potential dredged material disposal sites, taking into account the location of each site relative to Arecibo and sensitive resources such as mangroves, its distance from the coast, its elevation, its

USACE_019619

geohydrology, and other factors.  There are significant disadvantages associated with all of the possible land-based disposal options.  Fill locations, if any suitable sites can be located and acquired, are likely to be limited in size and very expensive.  Construction of viable wetlands is considered infeasible due to ocean conditions (high wave energies) and a lack of suitable sites.  The only option that might be technically, environmentally, and economically feasible would be use of one of the barren areas because one area appears to contain a series of abandoned sand pits.  Environmental studies would have to be conducted to determine whether such a barren area would have the capacity to receive Arecibo dredged material.

### 2.1.1.2  Ocean Disposal Site Options for Arecibo

Using the EPA/COE approved ocean disposal site selection methodology discussed previously, the interim site and two alternate sites were selected for evaluation as candidate sites for designation.  Figure 2-1 presents the zone of siting feasibility (ZSF) for Arecibo and the locations of the interim site and alternate sites 1 and 2.  These sites were evaluated and compared in the DEIS, using the criteria of the Ocean Dumping Regulations (ODR) to determine their environmental suitability as ocean disposal sites.

### 2.1.2  Description of the Recommended Alternative

The proposed action for Arecibo is to designate the interim site as the ocean disposal site for continuing use.  This site is located approximately 1.5 nautical miles (nmi) north of the Arecibo harbor, and occupies an area of approximately 1 square nmi.  Water depths within the site range from 101 to 417 meters (55 to 228 fathoms).  The corner coordinates of the site are as follows:

> 18°30'00" N, 66°42'45" W
> 18°30'00" N, 66°43'47" W
> 18°31'00" N, 66°43'47" W
> 18°31'00" N, 66°42'45" W.

### 2.1.3  Basis for the Selection of the Recommended Alternative

At Arecibo, the interim site is suitable for designation as the site suitable for continuing use.  The site meets all criteria of the ODR.  Dredged

USACE_019620

material is not expected to be transported by ocean currents any significant distance outside of the proposed site because of the depth of the water at the site and because the dredged material to be disposed of is primarily sand. Very little transport of materials away from the proposed DMDS is expected. Materials released at this site will tend to be deposited on the sea floor, rather than dispersed, because currents are weak and the sea floor is not sufficiently deep for prolonged transport of sinking materials to occur.

The two alternate sites shown in Figure 2-1 also were considered for designation. All of the sites met all the criteria of the ODR. However, the interim site was 1 nmi closer to Arecibo harbor than Alternate Site 1 and 2 nmi closer than Alternate Site 2. Because the interim site had been used previously, its use should result in less of a change in the ecology of the site than that which would result from use of either of the alternate sites.

### 2.1.4  Impacts of the Recommended Alternative

No adverse effects are expected on biotic and mineral resources, or on socioeconomic or cultural aspects of the environment, from the continuing use of this site. There have been no operational problems encountered during surveillance or monitoring activities at this site, and none would be expected in the future.

Approximately 150,000 cubic yards (cu yds) of fine-grained, predominantly sandy dredged material expected to be disposed of at the Arecibo site once every 3 to 5 years. The material will be generated in the maintenance of navigational channels and berthing areas in Arecibo harbor. The dumping would occur from hopper dredges or barges, depending on the availability of equipment when dredging occurs.

The site is at least 1 to 2 nmi from the nearest significant breeding, spawning, or nursery area of nearshore organisms. There is no evidence to suggest that the proposed site has any unique importance to feeding or passage areas of marine fauna because it is typical of nearby well-flushed open ocean locations. However, the 1984 survey cruise detected an increase in the percentage of silty sand at the proposed Arecibo site compared with nearby

USACE_019621

USACE_019622



FIGURE 2-1.   ZONE OF SITING FEASIBILITY AND INTERIM AND ALTERNATE SITES FOR ARECIBO

sediments.  A total of 584,477 cu yds of dredged material has been disposed of previously at the Arecibo interim site.  Because the proposed site historically has been used for dumping, it is presumed that the differences in sediment types are due to previous dumping.  Except for previous dredged material disposal at this site, there are no other current or previous dischargers at or near the site.  Historical use at the existing Arecibo site has not resulted in substantial adverse effects to living resources of the ocean or to other uses of the marine environment.

Dredged material disposed of at the proposed Arecibo site will be deposited on the sea floor and will bury benthic organisms.  The types of benthic organisms that were collected at the site reflect the increased sand content of the site (due to previous disposal operations) over that of the surrounding area.  Among polychaete worms and crustaceans, the percentage of species and individuals of ecological types suited to sandy environments was found to be higher at the proposed site than at nearby locations.  Therefore, the fauna at the proposed site are well-adapted for recolonizing the type of materials expected to be deposited during future disposal operations.  Since only part of the site will be affected during any particular disposal operation, organisms from surrounding, unaffected portions of the site are expected to be able to rapidly recolonize the affected area.  Impacts of dredged materials will be limited primarily to the sea floor, and disposal is not likely to interfere with other uses of the ocean.

Endangered sea turtles and the brown pelican inhabit coastal Puerto Rico. Available information indicates that these species are most active in the nearshore coastal environment and are only transients in oceanic environments. Consequently, oceanic dredged material disposal is not expected to adversely affect these species.

Previous disposal at the proposed Arecibo site has not caused any development of nuisance species at the site.  In the unlikely event that pathogens were contained in the dredged material, it is considered unlikely that they could survive and reproduce in the cold, deep-water environment of the sea floor at the site.

USACE_019623

The waters near the site are characterized by weak (3 to 5 cm/s) subsurface currents moving in a westerly direction. Dispersal and horizontal mixing of the water column are weak because of the low current speeds. The dispersal, horizontal transport, and vertical mixing characteristics of the site are such that dumped dredged material is nearly all confined at the site. Because of the decreasing water depth in the westerly direction, dumped materials are expected to be deposited within the dump site or a short distance west of the dump site within a short time after disposal.

Water quality at the Arecibo site is good, typical of the well-flushed open ocean conditions in Puerto Rican coastal areas. The water is optically clear with little suspended material, and there is no evidence of organic enrichment or eutrophication. Oxygen concentrations are high and nutrient concentrations are low.

The Arecibo site is about 6 nmi from the nearest recreational beach. Since virtually all dredged material will settle to the bottom near the release point, it is not anticipated that any released material would adversely affect the nearby shoreline. No dredged material is expected to be transported to beaches by ocean currents should the site be used for disposal.

Similarly, little impact is expected on other uses of the ocean. Ships from Arecibo do not traverse specified shipping lanes. Fishing areas are located to the east and south (inshore) of the proposed site. The weak prevailing currents would tend to transport any dredged material away from these areas. No mineral extraction or fish and shellfish culture exist or are planned near the dumpsite. Desalination does not occur near the site. No dredged materials are expected to be transported toward shore-based recreational areas. There are no known cultural or historical features in the vicinity of the site that could be affected by dredged material disposal. Dumping activities at the proposed Arecibo site will not effect any areas of special scientific importance or impact any recreational activities.

U.S. Coast Guard surveillance by shipriders, separate vessels, or helicopter overflights would not be difficult at the proposed Arecibo site because of its proximity to shore. Water depths are not sufficient to impede either water quality sampling or benthic sampling during monitoring activities.

USACE_019624

## 2.2  ALTERNATIVES ANALYSIS FOR MAYAGUEZ

### 2.2.1  Alternatives Considered

The alternatives considered for the disposal of dredged material from Mayaguez included the use of ocean disposal sites and land-based disposal alternatives.

### 2.2.1.1  Land-Based Disposal Options for Mayaguez

The locations of landfills and barren areas near Mayaguez were identified and evaluated in the DEIS as potential dredged material disposal sites. The use of land-based disposal alternatives near Mayaguez may be technically feasible. No potential sites for hydraulic filling were identified. However, one potential marsh construction site, two possible landfills, and one possible barren area (quarry) site were identified. Prior to the use of any of these sites as dredged material disposal sites, site-specific field studies would be required. In addition, site-specific evaluations of dredged material disposal and monitoring costs would be necessary to determine the economic feasibility of each potential location as a dredged material disposal site.

### 2.2.1.2  Ocean Disposal Site Options for Mayaguez

Using the EPA/COE approved ocean disposal site selection methodology discussed previously, the interim site and three alternate sites were selected for evaluation as candidate sites for designation. Figure 2-2 presents the zone of siting feasibility for Mayaguez and the locations of the interim site and Alternate Sites 1, 2, and 3. In the DEIS, these sites were evaluated and compared using the ODR criteria to determine their environmental suitability as ocean disposal sites.

### 2.2.2  Description of the Recommended Alternative

The proposed action for Mayaguez is to designate Alternate Site 1 as the ocean disposal site for continuing use. This site is located approximately 6 nmi west of the Mayaguez harbor, and occupies an area of approximately

USACE_019625

1 square nmi.  Water depths within the site range from 351 to 384 meters (192 to 210 fathoms).  The corner coordinates of the site are as follows:

18°15'30" N, 67°16'13" W
18°15'30" N, 67°15'11" W
18°14'30" N, 67°15'11" W
18°14'30" N, 67°16'13" W.

## 2.2.3  Basis for the Selection of the Recommended Alternative

The site proposed for designation at Mayaguez is Alternate Site 1.  This site is between 1 and 2 nmi farther from the Mayaguez harbor, and from the nearest shoreline, than the interim site.  This location places the site in deeper water (almost twice as deep as the interim site), and reduces the chance of dredged material inadvertently being transported onto coral reefs or into sport or commercial fishing areas.  No operational problems were encountered during the baseline monitoring activities at this site and none are expected from future use of the site.

The interim site was eliminated from consideration because it is in relatively shallow water close to shore, where released dredged materials are likely to be transported into a coral reef area, and into sport and commercial fishing areas.  Also, it is located within a few hundred meters of a shipwreck.  Use of the interim site could potentially expose coral reef areas that begin 1 to 2 km southeast of the site to sedimentation rates sufficient to damage living corals and consequently decrease reef productivity.

The other two alternate sites shown in Figure 2-2 also were considered for designation.  Alternate Sites 2 and 3 met all the criteria of the ODR.  However, Alternate Site 2 was eliminated because it is farther from Mayaguez harbor than the proposed site, and Alternate Site 3 was eliminated because dredged material dumped at that site would be deposited in shallower water, and prevailing currents could transport the dumped material closer to the shelf break than at the proposed site.

## 2.2.4  Impacts of the Recommended Alternative

No adverse effects from the future use of this site are expected on biotic resources such as corals, fisheries, or on nursery grounds.  Alternate

USACE_019626



FIGURE 2-2.  ZONE OF SITING FEASIBILITY AND INTERIM AND ALTERNATE
SITES FOR MAYAGUEZ

USACE_019627

site 1 has no unique ecological or environmental characteristics, being
similar in sediment type and benthic biological community to most other sites
in the Mayaguez study area.  No effects are expected on any mineral resources
or socioeconomic and cultural aspects of the environment from use of the
proposed site.  There should be no problems conducting surveillance
activities.

Approximately 53,500 cu yds of mixed sand, silt, and clay dredged
material are expected to be disposed of at the Mayaguez site once every 2
years.  The material is generated in the maintenance of navigational channels
and berthing areas in Mayaguez harbor.  The dumping would occur primarily from
hopper dredges.

The proposed Mayaguez site is at least 3 nmi from the nearest significant
breeding, spawning, or nursery area of nearshore living resources.  The site
is located approximately 3.5 nmi west of the nearest coastline.  There is no
evidence to suggest that the proposed site has any unique importance to
feeding or passage areas of marine or avian biota since it is typical of
nearby well-flushed open ocean locations.

Benthic organisms at the proposed site are primarily deposit feeders, an
ecological type well-adapted to living in the high turbidity that might be
caused by dredged material disposal.  It is not likely that use of the
proposed site will have a detrimental effect on benthic communities outside of
the immediate mound caused by disposal.

Endangered sea turtles and the brown pelican inhabit coastal Puerto Rico.
Available information indicates that these species are most active in the
nearshore coastal environment and are only transients in oceanic environments.
Consequently, oceanic dredged material disposal is not expected to adversely
affect these species.

There has been no known dumping of dredged material at the proposed
Mayaguez site.  Previous dredged material disposal has occurred at the nearby
interim site.  There are no other current or previous discharges at or near
the proposed site.  The 1984 survey cruise detected no difference in species

USACE_019628

composition of bottom fauna between the proposed site and nearby areas.
Dredged material disposal at the proposed Mayaguez site primarily will be
deposited on the sea floor at and near the site. This deposition will bury
benthic organisms. Because of the relatively fine nature of the dredged
material, burial is not expected to have long-term impacts because the dumped
material can be recolonized easily by nearby communities. Impacts of dredged
material will be limited primarily to the sea floor.

Because the proposed Mayaguez site is in deep ocean waters well-flushed
by currents, nuisance species of plants, animals, or pathogens are unlikely to
survive or reproduce at the disposal site. The dredged material to be
disposed of would be similar in type to that existing at the site and would
result in a similar fauna at the site.

The waters near the proposed Mayaguez site are characterized by moderate
(15 cm/s) generally southwesterly subsurface currents. Dispersal and
horizontal mixing of the water column are weak because of the slow current
speeds. Silt and clay would be carried the farthest. The dumped dredged
materials are expected to be deposited within the dump site or within 1.5 nmi
southwest of the dumpsite within a short time of disposal.

Water quality at the proposed Mayaguez site is good, typical of the
well-flushed open water conditions in Puerto Rican coastal areas. The water
is optically clear with little suspended material, and there is no evidence of
organic enrichment or eutrophication. Oxygen concentrations are high and
nutrient concentrations are low.

The proposed Mayaguez site is about 4 nmi from the nearest recreational
beach. Modeling of the fate of dumped material at the proposed Mayaguez site
indicated that dredged material would not be transported to the shoreline and,
consequently, there would be no impacts at the shoreline. No dredged material
is expected to be transported to this area by ocean currents should the site
be used for disposal.

There are no fish or shellfish culture operations or desalination plants
near the proposed Mayaguez site. It is not expected that disposal of dredged

USACE_019629

materials at the proposed site would damage coral reefs or their associated fish or shellfish assemblages, on which local fisheries are based.  There will be no interference with shipping lanes because there are no designated shipping lanes in Puerto Rican waters.  Dumping activities at the proposed Mayaguez site are not expected to effect any areas of special scientific importance, or impact any recreational activities.

There is a shipwreck within 1 nmi of the proposed Mayaguez site, but predominant currents are expected to carry dumped dredged material away from this location.  Other known shipwrecks in the area are very unlikely to be affected by dredged material disposal.

U.S. Coast Guard surveillance by shipriders, separate vessels, or helicopter overflights would not be difficult at the proposed Mayaguez site because of its proximity to shore.  Water depths are not sufficient to impede either water quality sampling or benthic sampling during monitoring activities.

## 2.3  ALTERNATIVES ANALYSIS FOR PONCE

### 2.3.1  Alternatives Considered

The alternatives considered for the disposal of dredged material from Ponce included the use of ocean disposal sites and land-based disposal alternatives.

### 2.3.1.1  Land-Based Disposal Options for Ponce

The locations of landfills and barren areas near Ponce were identified and evaluated in the DEIS as potential dredged material disposal sites.  The use of land-based disposal alternatives near Ponce may be technically feasible.  One potential diked containment area site for hydraulic fill and one potential wetland formation area were identified.  No existing landfills were found suitable, though four small sand-mining pits could be suitable if they were permanently inactive.  Prior to the use of any of these sites as dredged material disposal sites, an extensive, site-specific field study would be required.

USACE_019630

2.3.1.2  Ocean Disposal Site Options for Ponce

Using the EPA/COE approved ocean disposal site selection methodology discussed previously, the interim site and three alternate sites were selected for evaluation as candidate sites for designation.  Figure 2-3 presents the zone of siting feasibility for Ponce and the locations of the interim site and Alternate Sites 1, 2, and 3.  In the DEIS, these sites were evaluated and compared in the DEIS using the ODR criteria to determine their environmental suitability as ocean disposal sites.

Figure 2-3 indicates both an original and an extended zone of siting feasibility for Ponce.  The original zone of siting feasibility was conservatively placed over 8 nmi offshore when preliminary feasibility studies raised concern over possible sediment transport into sensitive fishing areas east of the interim site.  The subsequent availability of additional data to characterize physical transport conditions permitted an improved estimation of expected transport conditions in the area.  The results of this analysis indicated that some locations inshore from the original zone of siting feasibility would not necessarily result in sediment transport into these fishing areas and an extended zone of siting feasibility was added to include areas farther inshore than originally mapped.

2.3.2  Description of the Recommended Alternative

The proposed action for Ponce is to designate Alternate Site 1 as the ocean disposal site for continuing use.  This site is located approximately 4.5 nmi south of the Ponce harbor, and occupies an area of approximately 1 square nmi.  Water depths within the site range from 329 to 457 meters (180 to 250 fathoms).  The corner coordinates of the site are as follows:

        17°54'00" N, 66°37'43" W
        17°54'00" N, 66°36'41" W
        17°53'00" N, 66°36'41" W
        17°53'00" N, 66°37'43" W.

2.3.3  Basis for the Selection of the Recommended Alternative

The site proposed for designation at Ponce is Alternate Site 1, which is located 4.5 nmi south of the harbor.  This site is 1.5 nmi farther than the

USACE_019631



FIGURE 2-3.   ZONE OF SITING FEASIBILITY AND INTERIM AND ALTERNATE
SITES FOR PONCE

USACE_019632

interim site from the harbor, and 1 nmi farther than the interim site from the
nearest shoreline.  However, it has the advantage of being 2.5 nmi farther
than the interim site from the nearest coral reefs, substantially reducing the
possibility of damage to the reef caused by fine sediments transported by
currents.  The site also meets all of the criteria for site selection
specified in the ODR.  The sediment transport and fate model predicts that all
sediment deposition would occur in deep water for alternate site 1 after
accounting for bottom topography and currents, a result not predicted for the
interim site and the other alternate sites studied for Ponce.

The interim site at Ponce is not suitable for designation.  Dumping of
the predominantly silty-clay dredged material at the interim site would have
the greatest potential among the sites considered for the transport of fine
sediments to coral reef areas (located approximately 1.5 nmi northwest of the
site) under the influence of random variations in the conditions of wind and
near-surface currents.  Although the dredged material transport and fate model
does not predict this possible impact, uncertainty over the direction and
velocity of currents likely to be experienced during an individual disposal
event makes the relocation of the site environmentally prudent.

The other two alternate sites shown in Figure 2-3 also were considered
for designation.  Alternate Sites 2 and 3 met all the criteria of the ODR.
However, these sites were not recommended for designation over Alternate
Site 1 because they required an additional 1.5 nmi travel to the sites without
gaining any significant environmental advantages.

## 2.3.4  Impacts of the Recommended Alternative

No adverse effects are expected on living resources, mineral resources,
or socioeconomic or cultural aspects of the environment from the future use of
this site.  The site has no unique ecological or environmental character-
istics, being similar in sediment type and benthic biological community to
most other sites in the Ponce study area.  Benthic sampling at deep water
sites presents difficulties; however, these difficulties have been overcome at
previous sampling activities at the site.

USACE_019633

Between 250,000 and 290,000 cubic yards of silty dredged material would be disposed of at the Ponce site once every 2 years.  The material is generated in the maintenance dredging of navigational channels and berthing areas in Ponce harbor.  The dumping would occur primarily from clamshell unloading of scows, but hopper dredges might be used if available.

The proposed Ponce site is at least 4 nmi from the nearest coastline and significant breeding, spawning, or nursery area of nearshore living resources. There is no evidence to suggest that the proposed site has any unique importance to feeding or passage areas of biota because it is typical of nearby well-flushed open ocean locations.

There has been no known dumping of dredged material at the proposed Ponce site.  Previous dredged material disposal has occurred at a nearby interim disposal site.  There are no other current or previous discharges at or near the site.  The 1984 survey cruise detected no difference in bottom fauna or sediments between the proposed site and nearby areas.  Dredged material disposal at the proposed Ponce site will be widely distributed over the sea floor.  Because it is widely distributed, only thin layers of dredged material will be deposited at a given sea floor location.  The effects of deposition of this material on the benthic biota and the physical environment are expected to be negligible.  Impacts of dredged material will be primarily limited to the sea floor.

Benthic organisms at the proposed site are primarily deposit feeders, an ecological type well-adapted to living in the high turbidity that might be caused by dredged material disposal.  The wide dispersal of the material makes it unlikely that use of the proposed site will have a detrimental effect on benthic communities.

Endangered sea turtles and the brown pelican inhabit coastal Puerto Rico. Available information indicates that these species are most active in the nearshore coastal environment and are only transients in oceanic environments. Consequently, oceanic dredged material disposal is not expected to adversely affect these species.

USACE_019634

Because the proposed Ponce site is in deep ocean waters well-flushed by currents, nuisance species of plants, animals, or pathogens are unlikely to survive or reproduce at the disposal site or any area nearby on the perimeter of the disposal site where dredged material may settle. The dredged material to be disposed of would be similar in type to that existing at the site and at nearby areas, and would result in a similar fauna at the site and at nearby areas.

The waters near the proposed Ponce site are characterized by weak (5 to 10 cm/sec) deep water (i.e., 100 to 300 meters) west-northwesterly currents. Because of the fine nature of the dredged material, it is expected to be transported over considerable distances (potentially up to 10 nmi) before settling to the bottom. Transport in the direction of the coastline would be limited because significant transport only occurs at depths in excess of 300 meters. Dredged material would settle on the bottom as shallower depths are encountered if transport toward the shore occurs. The proposed site has the least potential for dispersion affecting nearshore areas that may contain coral reefs. Over the distances traveled, dispersion would be extensive even though the general nature of the water column is not dispersive.

Water quality at the Ponce proposed site is good, typical of the well-flushed open water conditions in Puerto Rican coastal areas. The water is optically clear with little suspended material, and there is no evidence of organic enrichment or eutrophication. Oxygen concentrations are high and nutrient concentrations are low.

The proposed Ponce site is several nautical miles from the nearest recreational beach. Modeling of the fate of dumped material at the proposed Ponce site indicated that dredged material would not be transported to the shoreline and, consequently, there would be no impacts at the shoreline. No dredged material is expected to be transported to this area by ocean currents should the site be used for disposal.

There are no fish or shellfish culture operations or desalination plants near the proposed Ponce site. Even though dumped dredged material will be dispersed over a wide area, it is not expected that disposal of dredged

USACE_019635

materials at the proposed site would damage coral reefs or their associated
fish or shellfish assemblages, on which local fisheries are based. There will
be no interference with shipping lanes because there are no designated
shipping lanes in Puerto Rican waters. There are no features of cultural or
historical significance near the site that may be affected by dredged material
disposal. Dumping activities at the proposed Ponce site are not expected to
effect any areas of special scientific importance, or impact any recreational
activities.

U.S. Coast Guard surveillance by shipriders, separate vessels, or
helicopter overflights would not be difficult at the proposed Ponce site
because of its proximity to shore. Water depths are not sufficient to impede
either water quality sampling or benthic sampling during monitoring
activities. Benthic sampling at deep water sites presents difficulties;
however, these difficulties have been overcome at previous sampling activities
at the site.

## 2.4   ALTERNATIVES ANALYSIS FOR YABUCOA

### 2.4.1   Alternatives Considered

The alternatives considered for the disposal of dredged material from
Yabucoa included the use of ocean disposal sites and land-based disposal
alternatives.

### 2.4.1.1   Land-Based Disposal Options for Yabucoa

The locations of landfills near Yabucoa were identified and evaluated in
the DEIS as potential dredged material disposal sites. No sand or gravel
pits, or quarries, were identified in this area. The use of land-based
dredged material disposal alternatives at Yabucoa may be technically feasible.
Sites suitable for hydraulic fill may be available, although no specific sites
for diked containment areas were identified. There is sufficient land of
suitable topography for diked containment areas near the coast in the Yabucoa
Valley. However, this use of these low-lying coastal locations would compete
with the use of undeveloped areas as farmland. No sites suitable for wetland
formation, landfill cover material application, or barren area cover material
application were identified near Yabucoa.

USACE_019636

2.4.1.2  Ocean Disposal Site Options for Yabucoa

Using the EPA/COE approved ocean disposal site selection methodology discussed previously, the interim site and three alternate sites were selected for evaluation as candidate sites for designation.  Figure 2-4 presents the zone of siting feasibility for Yabucoa and the relative locations of the interim site and Alternate Sites 1, 2, and 3.  For Yabucoa, rather than using the 100-fathoms line as the shoreward side of zone of siting feasibility, the boundary was extended farther offshore to a point where a true shelf break was identified and much deeper waters could be obtained.  In the DEIS, these sites were evaluated and compared using the Criteria of the ODR to determine their environmental suitability as ocean disposal sites.

2.4.2  Description of the Recommended Alternative

The proposed action for Yabucoa is to designate Alternate Site 2 as the ocean disposal site for continuing use.  This site is located approximately 6 nmi east of the Yabucoa harbor, Puerto Rico, and occupies an area of approximately 1 square nmi.  Water depths within the site range from 549 to 914 meters (300 to 500 fathoms).  The corner coordinates of the site are as follows:

18°03'42" N, 65°42'49" W
18°03'42" N, 65°41'47" W
18°02'42" N, 65°41'47" W
18°02'42" N, 65°42'49" W.

2.4.3  Basis for the Selection of the Recommended Alternative

The interim site at Yabucoa is not suitable for designation.  The site is over shallow areas that may contain coral reefs.  Coral reefs are present in the general area, and a ridge of shallow bottom runs through the site with depths of only 16 meters (9 fathoms).  This sinuous ridge, which is identified on National Oceanic and Atmospheric Administration (NOAA) topographic charts of the area (NOAA 1980), has morphology apparently similar to a coral reef, though no direct observations have been made on this feature.  Because it includes these areas of quite shallow water, the site does not meet the ODR criterion of being off the shelf.

USACE_019637

Alternate Site 1 is not suitable for designation for the same reasons as the interim site.  A portion of this site is contained within the deeper portions of the interim site, and is sufficiently close to the coral-like feature that dredged material may be transported to that feature should dumping occur.  Transport and fate modeling results have predicted that disposal at either the interim site or Alternate Site 1 would likely result in transport of suspended sediments into the very narrow nearshore shelf areas to the southwest, and thus adversely impact an important nearshore commercial fishing area.

Alternate Site 2, which is 6 nmi east of the harbor, was selected as the proposed site.  The site is approximately 2.6 nmi farther from the harbor than the interim site, 1 nmi farther from the nearest coastline than the interim site, and 2 nmi farther from the coral-like features present at the interim site.  Transport of dredged material after dumping will be primarily in the direction of very deep water, and consequently is expected to have little impact.  The site meets all of the criteria for site selection specified in the ODR.  No problems were encountered during the baseline monitoring activities at this site and none are expected from future use of this site.

Alternate Site 3 also was considered for designation.  This site met all the criteria of the ODR.  However, because Alternate Site 3 required an additional 3 miles farther travel to the site, without providing any significant environmental advantage, it was not recommended for designation over Alternate Site 2.

### 2.4.4  Impacts of the Recommended Alternative

No adverse effects are expected on biota, including corals, and fisheries and nursery grounds, from use of the proposed DMDS.  No effects are expected on any mineral resources or socioeconomic and cultural aspects of the environment from future use of the proposed site.

Approximately 150,000 cu yds of predominantly silty dredged material mixed with some sand are expected to be disposed of at the Yabucoa site once every 3 to 5 years.  The material will be generated in the maintenance of

USACE_019638



FIGURE 2-4. ZONE OF SITING FEASIBILITY AND INTERIM AND ALTERNATE
SITES FOR YABUCOA

USACE_019639

navigational channels and berthing areas in Yabucoa harbor.  The dumping would occur primarily from clamshell unloading of scows, but hopper dredges might be used if available.

The proposed site is located approximately 4.5 nmi east of the nearest coastline.  Modeling of the fate of dumped material at the proposed Yabucoa site indicated that dredged material would not be transported to the shoreline and, consequently, there would be no impacts at the shoreline.  The bottom of the site slopes sharply from 549 to 914 meters.

The proposed Yabucoa site is at least 4 nmi from the nearest significant breeding, spawning, or nursery area of nearshore living resources.  There is no evidence to suggest that the proposed site has any unique importance to feeding or passage areas of biota, because it is typical of nearby well-flushed open ocean locations.

There has been no known dumping of dredged material at the proposed Yabucoa site.  Previous dredged material disposal has occurred at a nearby interim disposal site.  There are no other current or previous discharges at or near the site.  The 1984 survey cruise detected no difference in bottom fauna or sediments between the proposed site and nearby areas.  Dredged material disposed of at the proposed Yabucoa site will be widely distributed over the sea floor.  Because it is widely distributed, only thin layers of dredged material will be deposited at a given sea floor location.  The effects of deposition of this material on the benthic biota and the physical environment are expected to be negligible.  Impacts of dredged material will be primarily limited to the sea floor.

Benthic organisms at the proposed site are primarily deposit feeders, an ecological type well-adapted to living in the high turbidity that might be caused by dredged material disposal.  The wide dispersal of the material makes it unlikely that use of the proposed site will have a detrimental effect on benthic communities.

Because the proposed Yabucoa site is in deep ocean waters well-flushed by currents, nuisance species of plants, animals, or pathogens are unlikely to

USACE_019640

survive or reproduce at the disposal site or any area where dredged material may settle.  The dredged material to be disposed of would be similar in type to that existing at the site and at nearby areas, and would result in a similar fauna at the site and at nearby areas.

Endangered sea turtles and the brown pelican inhabit coastal Puerto Rico. Available information indicates that these species are most active in the nearshore coastal environment and are only transients in oceanic environments. Consequently, oceanic dredged material disposal is not expected to adversely affect these species.

The waters near the proposed Yabucoa site are characterized by moderate (15 cm/s) deep water (100 to 500 meters) west-southwesterly currents.  Because of the fine nature of the dredged material, it is expected to be transported over considerable distances (potentially up to 10 nmi) before settling to the bottom.  Transport in the direction of the coastline would be limited because significant transport only occurs at depths in excess of 300 meters.  Dredged material would settle on the bottom as shallower water is encountered if transport toward the shore occurs.  Over the distances traveled, dispersion would be extensive even though the general nature of the water column is not dispersive.  Because of the wide dispersion of the material, and the limiting effect of depth on shoreward sediment transport, impacts to the benthic habitat are expected to be insignificant.

Water quality at the proposed Yabucoa site is good, typical of the well-flushed open water conditions in Puerto Rican coastal areas.  The water is optically clear with little suspended material, and there is no evidence of organic enrichment or eutrophication.  Oxygen concentrations are high and nutrient concentrations are low.

The proposed Yabucoa site is between 4 and 5 nmi from the nearest recreational beach.  No dredged material from dumping at the proposed site is expected to be transported to this area by ocean currents.

There are no fish or shellfish culture operations or desalination plants near the proposed site.  Even though dumped dredged material will be dispersed

USACE_019641

over a wide area, it is not expected that disposal of dredged materials at the proposed site would damage nearshore shallow water coral reefs or their associated fish or shellfish assemblages, on which local fisheries are based. There will be no interference with shipping lanes because there are no designated shipping lanes in Puerto Rican waters. Dumping activities at the proposed Yabucoa site are not expected to effect any areas of special scientific importance, or impact any recreational activities.

One shipwreck has been identified near the interim site for Yabucoa. Use of the proposed site will have no effect on this feature because Alternate Site 1 is 1 nmi from the shipwreck and prevailing currents are directly away from the feature.

U.S. Coast Guard surveillance by shipriders, separate vessels, or helicopter overflights would not be difficult at the proposed Yabucoa site because of its proximity to shore. Water depths are not sufficent to impede either water quality sampling or benthic sampling during monitoring activities. Benthic sampling at deepwater sites presents difficulties; however, these difficulties have been overcome during previous sampling activities at the site.

USACE_019642

3. RESPONSIVENESS SUMMARY

USACE_019643

## 3. RESPONSIVENESS SUMMARY

### 3.1 INTRODUCTION

The purpose of this section is to address comments received in response to the draft environmental impact statement (DEIS). The DEIS was made available for public review on September 3, 1986, and the comment period was open for a period of 60 days. The comment period for the Environmental Quality Board of the Commonwealth of Puerto Rico was extended through January 31, 1987.

Discussions were conducted with several commentors, including the government of the Commonwealth of Puerto Rico and the U.S. Army Corps of Engineers (COE).

### 3.2 COMMENTS AND RESPONSES

Letters that included written comments on the DEIS for which responses are provided in this section were received from various federal, state, and local organizations. Complete copies of these letters are presented in Appendix A. Letters also are included in Appendix A from other commentors that do not address technical issues. Since these letters did not address technical issues, responses have not been prepared for this FEIS.

Substantive comments for which responses have been prepared are presented in the following listing, and the relevant paragraph(s) in each of these letters are marked and numbered in Appendix A to identify the source of each comment. The individual and/or organization making particular comments is identified in this section before the comment listed.

### 3.2.1   Ruth D. Carreras, Assistant Secretary for Permits Area
Department of Natural Resources
Puerto Rico
(November 24, 1986)

Comment 1:   Regulation No. 13 of the Planning Board classifies the site at Santa Isabel as Zone I (floodable), in which the disposal of fill material is not permitted unless a hydrologic-hydraulic study supports it.

Response 1:   Since fill material is not planned to be disposed of at the land site, the concern expressed by this comment is not applicable to the actions addressed in the DEIS.

USACE_019644

**Comment 2:**   The creation of wetland habitats for wildlife should be evalu-
ated as a desirable alternative.  This kind of dredged material
is adequate in the formation of wetlands.

**Response 2:**   Whereas the DEIS development process allows for the
consideration of a broad range of alternatives to the proposed
action, the detailed analyses of specific land-based disposal
options is a responsibility of the COE under its authority to
issue permits for the ocean dumping of dredged material.
Consequently, the U.S. Environmental Protection Agency (EPA)
considers such a comprehensive analysis of the creation of
wetland habitats from dredged material to be outside the scope
of the DEIS.

**3.2.2**   Santos Rohena, Jr., Chairman
Environmental Quality Board
Commonwealth of Puerto Rico
Office of the Governor
(November 24, 1986)

**Comment 3:**   The EIS should be translated into the Spanish language (accord-
ing to the Environmental Public Policy Act).

**Response 3:**   Section 1.4 of the regulations cited in Mr. Rohena's letter
indicates that these regulations apply to departments, agencies,
government corporations, municipalities, and instrumentalities
of the Commonwealth.  Thus, these regulations do not apply to
Federal agencies.  Federal agencies are subject to the
environmental review requirements of the National Environmental
Policy Act of 1969 (NEPA).  NEPA does not require translation of
environmental review documents into Spanish.  However, EPA has
done so in certain cases where EPA believed that participation
and review by individual citizens was necessary (e.g., EIS on
Culebra Wastewater Facilities).  In other cases (e.g., San Juan
Harbor Dredged Material Disposal Site EIS), the level of
interest expressed by the general public did not justify the
expenditure of time and public funds necessary to publish a
translated version; consequently, the EPA did not prepare a
Spanish-language version.  The level of public interest
concerning the DEIS has not been substantial enough to justify
the publication of a Spanish version.

**3.2.3**   James H. Lee, Regional Environmental Officer
United States Department of the Interior
Office of Environmental Project Review
(December 2, 1986)

**Comment 4:**   Some of the present interim sites for ocean dumping could have
detrimental effects on near-shore wildlife habitats.  The pro-
posed alternate sites for Mayaguez, Ponce, and Yabucoa are
farther away from shore, in much deeper water, and are more
likely to avoid harmful impacts to coastal wildlife habitats.
We agree with the document's proposal to keep the Arecibo site
at its present (interim site) location.

USACE_019645

Response 4:    The EPA agrees with Mr. Lee.  The site selection process used
               for this DEIS involved the development of a zone of siting
               feasibility for each harbor.  An EPA/COE approved map overlay
               methodology (EPA/COE 1983) was used to identify areas in which
               candidate disposal sites could be located.  By design, these
               sites were to be located in areas free from conflicts with
               sensitive resources or incompatible uses of the ocean.  Once the
               candidate sites for each harbor were identified, various
               analyses were conducted, including computer modeling of the
               sediment deposition characteristics for each site.  As a result
               of these analyses, alternate sites for Mayaguez, Ponce, and
               Yabacoa were recommended over continued use of the interim sites
               for those harbors.

3.2.4    Vernon N. Houk, M.D., Assistant Surgeon General
         Director
         Center for Environmental Health
         (December 11, 1986)

Comment 5:     Section 2.4.2(8), page 2-31, of the DEIS states that beaches (at
               Arecibo) will not be reached by any sediments released at the
               disposal sites and, therefore, there will be no effects on
               recreational swimming, diving, or fishing at the shore.  How was
               this determined?  Was the Dredged Material Transport and Fate
               Model used?

Response 5:    The transport and fate model described in the DEIS was used to
               assess sediment deposition characteristics at all candidate
               sites, including Arecibo.  Due to the depth of the water and the
               density of the material dumped, the neutral buoyancy point was
               not achieved at the proposed Arecibo site.  Consequently, unlike
               the other three harbors, dredged material dumped at Arecibo is
               expected to remain within the boundaries of the dump site, and
               adverse impacts on recreational swimming, diving, and fishing at
               the shore are not expected to occur.

Comment 6:     Additional information should be provided on the statement in
               Section 2.4.2(10), page 2-32, of the DEIS that any human disease
               organisms that may be present in the dumped materials are
               unlikely to survive and reproduce in the cold, high-pressure
               environment of the sea floor at the site because of well-flushed
               currents.  Information should be provided regarding the iden-
               tification of the suspected organisms.  If the organisms have
               not been identified, analyses of the dredged materials should
               include identification of the organisms.

Response 6:    The DEIS did not identify any human disease organism as being
               found in the dredged material.  As a matter of practice, tests
               for human disease organisms are not conducted on dredged
               materials to be transported to ocean disposal sites when
               pathogens are not expected in the dredged material.  Without
               evidence that suggests the presence of harmful organisms

USACE_019646

(e.g., proximity to sewage outfalls), the expense of such testing is not justified. In any case, such testing, if determined to be necessary, normally would be conducted as a part of the permit evaluation process under Section 103 of the Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA), as amended.

3.2.5  George R. Kleb, Colonel
       U.S. Army Corps of Engineers
       Commander and Director
       (December 17, 1986)

Comment 7:   The EPA's purpose and mandate is to locate and designate environmentally acceptable and economically feasible ocean disposal sites for each coastal project area where a continuing need for ocean disposal has been defined by the COE. Each such site is considered on a case-by-case basis by the Corps, along with land-based options in the Corps' project NEPA documents. The stated purpose of paragraph 1 of the report abstract is not correct. The purpose, as presently stated, is a COE responsibility, through a separate NEPA action.

Response 7:  The EPA agrees with Colonel Kleb. The DEIS states incorrectly in the abstract that "the purpose of the action is to provide environmentally acceptable alternatives for the disposal of dredged material..." The purpose of the action addressed in the EIS, as correctly expressed in the executive summary, is to identify and designate environmentally acceptable ocean disposal sites for dredged material from the four harbors. The responsibility to address alternatives to ocean disposal is a COE responsibility as a part of the COE permitting process, specified in Section 103 of MPRSA.

Comment 8:   As a followup to Comment 7, alternatives addressed in the EIS must be confined exclusively to alternative ocean disposal site locations and the no-action alternative. An evaluation of land-based alternatives is a COE responsibility and has been discussed separately in a Corps NEPA document. All such discussions of land-based alternatives should be deleted from consideration as specific alternatives addressed by this document and should be discussed instead under the appropriate sections that address purpose and need.

Response 8:  The EPA agrees with the COE that the evaluation of land-based alternatives is a COE responsibility as a part of the dredged material permitting process. However, it is the responsibility of EPA to inform the public of its rationale for identifying and designating environmentally acceptable ocean disposal sites. The presentation of an analysis of land-based disposal options as given in Appendix C is not inconsistent with NEPA. Whereas the DEIS development process allows for a consideration of a broad range of alternatives to the proposed action of designating ocean disposal sites, the detailed analyses addressed by

USACE_019647

the DEIS are focused on assessments of environmental impacts associated with dredged material disposal at various candidate ocean disposal sites. Consequently, EPA believes that the existing discussions of alternatives are appropriate.

**Comment 9:** The EIS recommends that three of the four interim sites be abandoned for environmentally preferred alternatives. From figures in the report, each of these alternative sites appears to be about 2 miles farther into the ocean than its associated interim site. The level of economic impact on dredging costs resulting from these changes should be discussed in the EIS. The Jacksonville District office of the Corps should assist in evaluating these impacts.

**Response 9:** The EIS does recommend relocation of the dredged material disposal sites from the interim site to an alternate site for Mayaguez, Ponce, and Yabucoa. Continued use of the interim site is recommended for Arecibo. The additional distances (beyond the interim sites) required to reach the recommended alternate site are 1.5, 1.5, and 2.75 nautical miles, respectively, for Mayaguez, Ponce, and Yabucoa. Such distances cannot be considered as cost prohibitive. Information was supplied by the COE for costs associated with the typical Island Class hopper barge historically used for these dredging applications. The cost per additional 1-mile round trip would be $.32 per cu yd, or approximately $316 per 1,000 cu yds full (effective) barge load (Hanson 1988). EPA considers the incremental cost associated with transport of dredged material to an environmentally preferred alternate site to be acceptable and consistent with the intent of the site designation process.

**Comment 10:** The evaluation of environmental consequences in the EIS does not indicate any documented evidence of negative impacts from past use of the interim sites. If available, this information would provide a stronger basis for making a determination to select alternate sites in lieu of the interim sites at three locations. This would be particularly helpful in light of some of the questionable predictions of adverse impacts discussed in the document.

**Response 10:** Candidate ocean disposal sites were selected based on an EPA/COE approved map overlay methodology (EPA/COE 1983) that focused on the identification of environmentally preferable site locations rather than the evaluation of one existing site. EPA generally selects an interim site as one of three or more alternate sites to be evaluated for designation unless previous use of the interim site has caused unacceptable impacts. When the interim site is considered as one of the possible alternatives, it is usually the prime candidate for designation unless environmental advantages would be attained through designation of an alternate site.

USACE_019648

The site selection methodology used for the DEIS was designed to emphasize the mitigation of future environmental impacts rather than looking primarily at past activities. If information from past activities had been available, it would have been used to assist in the evaluation process. Unfortunately, such evaluations of impacts due to past activities usually require, except where impacts have been determined to be severe or catastrophic in nature, extensive analysis and verification beyond what is normally justified for the designation process. Since such data are often difficult to obtain, decisions must be based primarily on a comparative analysis of the potential for future impacts.

The interim sites for all four locations (Arecibo, Mayaguez, Ponce, and Yabucoa) were evaluated as part of the DEIS for possible selection. Alternate sites were designated for Mayaguez, Ponce, and Yabucoa because EPA believes that the designation of alternate sites at these locations will achieve environmental advantages over the interim sites at only small additional operational cost.

Comment 11:   Figure 2-11, page 2-43, of the DEIS shows the interim site and all alternates to Ponce to be outside the zone of siting feasibility (ZSF). Although the reasons for this are explained on page 2-3, paragraph 2.3.1.3, Figure 2-11 can nonetheless be confusing. Figure 2-11 should be footnoted with a reference to paragraph 2.3.1.3 to ensure the reader's understanding as to why the sites are located outside the depicted ZSF.

Response 11:  A map showing the extended ZSF for Ponce is presented on page 3-66 of the DEIS, and the explanation of the reason it was extended is given on page 2-23 of the DEIS. The extended ZSF shown on page 3-66 of the DEIS is discussed and illustrated on pages 2-14 and 2-15, respectively, of this FEIS.

Comment 12:   Based on the DEIS, the Corps is not convinced that several of the actions proposed are adequately justified from a technical point of view, nor do they necessarily reflect the most cost-effective, environmentally acceptable solutions.

Response 12:  The EPA believes that the existing analyses in the DEIS adequately support the recommendations made from a technical point of view. Recommendations for all sites were based on the most environmentally acceptable option available to decision-makers. The recommendations were based, at least in part, on the results of model predictions. In each case where a site was relocated, however, the decision to relocate was not based solely on model predictions. The model is based on average currents that predominate over long periods of time. With significant short-term variations in current directions and velocities, the probability that dredged material would be carried to shallow coral reefs was considered to be high for some of the sites studied. When this was possible for an interim site, the interim site was not selected in order to minimize adverse impacts.

USACE_019649

3.2.6   Santos Rohena, Jr., Chairman
        Environmental Quality Board
        Commonwealth of Puerto Rico
        Office of the Governor
        (January 29, 1987)

Comment 13:    The EIS must be prepared in Spanish and in such a way as to be
               objective, analytical, concise, and in terms that can be easily
               understood by the community, but with enough information to
               orient specialists on particular problems in their fields of
               specialized knowledge.

Response 13:   The DEIS is not available in a Spanish language version.  See
               response to Comment 3.

Comment 14:    Section 5.5.2.2 (Processing Requirements) of Article 4(c) of the
               Environmental Public Policy Act states that when the Preliminary
               EIS is circulated for comments, the lead agency shall notify the
               public about its availability for inspection, as well as of its
               right to comment on the same.  This notification shall be made
               by means of an environmental notice in a newspaper of general
               circulation for one day.  This notice shall be published within
               ten (10) calendar days from the date that Preliminary EIS was
               submitted to the Board.  The lead agency shall pay the cost of
               such notice and shall submit copy of the payment voucher to the
               Board.  The Board will not issue comments on the Preliminary EIS
               until it has received evidence that the cost of said notice has
               been paid.

Response 14:   Section 1.4 of the regulations cited in Mr. Rohena's letter
               indicates that these regulations apply to departments, agencies,
               government corporations, municipalities and instrumentalities of
               the Commonwealth.  Thus, these regulations do not apply to
               federal agencies.  Federal agencies are subject to the environ-
               mental review requirements of NEPA.  All requirements for public
               notices under NEPA have been met by EPA.

3.2.7   Jose S. Rodriguez Mercado, Director
        Land Use Planning Bureau
        Puerto Rico Planning Board
        (April 3, 1987)

Comment 15:    Draft Environmental Impact Statements should be submitted to the
               Puerto Rico Environmental Quality Board for their evaluation and
               determination of compliance with procedures established by Act
               No. 9 of June 1970, as amended.

Response 15:   Mr. Rodriguez was contacted by telephone on several occasions
               and an understanding was reached that a coastal zone management
               program determination by the Puerto Rico coastal zone management
               authority is not required for site designation.  However, when a
               dredging permit is issued it will have to be certified by the

USACE_019650

appropriate Puerto Rico authority as consistent with the Puerto Rico Coastal Zone Management Program.

## 3.3  OTHER COMMUNICATIONS CONCERNING THE DEIS

### 3.3.1  Telephone Questions

One commentor telephoned the EPA Regional Office to question the date of a reference in the DEIS concerning shipwrecks and statements in the DEIS on the number of shipwrecks adjacent to candidate ocean disposal sites. The following pages in the DEIS should be modified to reflect EPA's response to this comment:

- Page 3-55, Paragraph 3.2.8 is changed to read as follows:

  "There are two shipwrecks located near the Mayaguez interim site (Figure 3-25, University of Puerto Rico 1976). One shipwreck is 1 nmi east of the interim site. The other wreck is immediately adjacent to the northwest corner of the interim site and is also 1 nmi east of Alternate Site 1. No other wrecks have been identified at or near any of the other alternate sites. No other features of historical or cultural importance have been identified in the Mayaguez ZSF."

- Page 3-108, Paragraph 3.4.8 is changed to read as follows:

  "There is one shipwreck 2 nmi south of the southern corner of the Yabucoa interim site and 1.5 nmi southeast of Alternate Site 1 (Figure 3-53). All other shipwrecks reported in this area are two or more nautical miles from the ZSF (University of Puerto Rico 1976). No other features of historical or cultural importance have been identified in the Yabucoa ZSF."

- Page 7-19, Reference for University of Puerto Rico

  University of Puerto Rico. 1976. A Marine Atlas of Puerto Rico, Department of Marine Sciences Contributions, Mayaguez, PR: University of Puerto Rico.

### 3.3.2  Endangered Species Act

In accordance with the requirements of Section 7 of the Endangered Species Act, and 50 CFR Part 402, the EPA initiated informal consultation with the Protected Species Management Branch of the Marine Fisheries Service to ensure compliance with all relevant endangered species laws. Their response is presented on page A-18 of Appendix A and concurs with the EPA conclusion that no populations of endangered or threatened species would be adversely affected by the proposed action.

USACE_019651

4   CONCLUSIONS OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

USACE_019652

## 4.   CONCLUSIONS OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

The purpose of the final environmental impact statement (FEIS) is to identify and designate environmentally acceptable ocean disposal sites for dredged material from the harbors of Arecibo, Mayaguez, Ponce and Guayanilla, and Yabucoa, Guayama and Roosevelt Roads harbors, Puerto Rico.  This section summarizes the conclusions of the FEIS for each of these harbors.

The decision to designate an ocean disposal site for dredged material is based on an evaluation of possible sites using the Criteria (40 CFR 228.5 – 228.6) of the Ocean Dumping Regulations (ODR).  In this evaluation, any interim site (listed in 40 CFR 228.12) is evaluted first.  If the interim site does not satisfy the criteria, a comparative evaluation of the alternate site is carried out to determine which site is the most acceptable with respect to the criteria.  This becomes the preferred site for final designation.  If no site is found that satisfies the criteria, no site is designated.

The following subsections summarize the important information used in determining which site to designate for each harbor.

### 4.1   ARECIBO

At Arecibo, the interim site is suitable for designation.  The site meets all criteria of the ODR.  Dredged material is not expected to be transported far from the site by ocean currents because the site is in relatively shallow water and the dredged material to be disposed of is primarily fine-grained sand.  No long-term adverse effects are expected on biota, mineral resources, or socioeconomic or cultural aspects of the environment from the continuing use of this site.  There have been no problems encountered during surveillance or monitoring activities at this site.

Previous use of this site has resulted in more sand in the sediments on the site than is found in surrounding areas.  This has caused an increase in the number of animals that are adapted to live in coarser sediments at the site.  The designation of the interim site will therefore result in less change in the species composition of the local environment than would result from the use of any alternate site.

4-1

USACE_019653

## 4.2   MAYAGUEZ

The interim site at Mayaguez is not suitable for designation.  Fine sediment from dredged material disposal are likely to be transported onto coral reefs and into areas of sport fishing and commercial fishing.  It is also located within a few hundred meters of a shipwreck.

Alternate Site 1 at Mayaguez is suitable for designation.  This site is approximately 1.5 nautical miles (nmi) farther from the Mayaguez harbor, and from the nearest shoreline, than the interim site.  This location places the site in water almost twice as deep as the interim site, and reduces the chance of dredged material inadvertently being transported onto coral reefs or into sport or commercial fishing areas.  No long-term adverse effects from the future use of this site are expected on biota, mineral resources, or socioeconomic or cultural aspects of the environment.  No problems were encountered during the baseline monitoring activities at this site and none are expected from future use of the site.

## 4.3   PONCE

The interim site at Ponce is not suitable for designation.  Under appropriate conditions of wind and near-surface currents, there is a high probability that dumping of the predominantly silty-clay dredged materials at the site would result in the transport of fine sediments to the coral reef areas located approximately 1.5 nmi northwest of the site.  Although the dredged material transport and fate model does not predict this possible impact, uncertainty over the direction and velocity of currents likely to be experienced during individual disposal events makes the relocation of the site environmentally prudent.  The potential for navigational error or of short dumps during inclement weather also indicates that relocation of the site will be environmentally beneficial.

Alternate Site 1, the site to be designated for Ponce, is 1.5 nmi farther than the interim site from the harbor, and 1 nmi farther than the interim site from the nearest shoreline.  However, it has the advantage of being 2.5 nmi farther than the interim site from the nearest coral reefs, substantially reducing the possibility of damage to the reefs caused by fine sediments

USACE_019654

transported by currents.  In other respects, the site also meets all of the criteria for site selection specified in the ODR.  No adverse effects are expected on living resources, mineral resources, or socioeconomic or cultural aspects of the environment from the future use of this site.  No problems were encountered during the baseline monitoring activities at this site and none are expected from future use of the site.

## 4.4  YABUCOA

The interim site at Yabucoa is not suitable for designation.  Coral reefs are present in the general area, and a ridge of shallow bottom (depths of only 16 meters) runs through the site.  This sinuous ridge, which is identified on National Oceanic and Atmospheric Administration (NOAA) topographic maps of the area (NOAA 1983), has morphology and biota similar to a coral reef, though no direct observations have been made on this feature.

Similarly, Alternate Site 1 is not suitable for designation.  A portion of this site is contained within the deeper portions of the interim site, but is sufficiently close to the coral-like feature that dredged material could be transported to that feature should dumping occur.

Alternate Site 2, which is the next closest alternate site evaluated, is suitable for designation.  This site is approximately 2.6 nmi farther from the harbor than the interim site, 1 nmi farther from the nearest coastline than the interim site, and 2 nmi farther from the coral-like features than the interim site.  Transport of dredged material after dumping primarily will be in the direction of very deep water and consequently is expected to have little impact.  The site meets all of the criteria for site selection specified in the ODR.  No adverse effects are expected on biota, mineral resources, or socioeconomic or cultural aspects of the environment.  No problems were encountered during the baseline monitoring activities at this site and none are expected from use of this site.

USACE_019655

# 5. CONTRIBUTORS TO THE ENVIRONMENTAL IMPACT STATEMENT

USACE_019656

## 5.0   CONTRIBUTORS TO THE ENVIRONMENTAL IMPACT STATEMENT

This section summarizes the backgrounds and qualifications of the primary contributors to this Final Environmental Impact Statement (FEIS).  Project direction was provided by the Environmental Impacts Branch of the U.S. Environmental Protection Agency (EPA), Region II.

This FEIS was prepared with the assistance of the technical and scientific staff of Science Applications International Corporation (SAIC) of McLean, Virginia through EPA's contract with Battelle New England (Contract No. 68-03-3319).

LIST OF CONTRIBUTORS

U.S. Environmental Protection Agency, Region II

| | |
|---|---|
| Barbara Pastalove | Chief, Environmental Impacts Branch (EIB) |
| William Lawler, P.E. | Chief, Environmental Analysis Section, EIB |
| Robert Witte | Work Assignment Manager, EIB |
| Frank Csulak | Environmental Scientist, Marine and Wetlands Protection Branch |

Science Applications International Corporation (SAIC)

Jeffrey Weiler

Mr. Weiler was the Work Assignment Leader and Technical Coordinator for the EIS.  He holds an M.S. in Resource Economics/Environmental Management from the University of Maryland.  As Work Assignment Manager and Technical Coordinator, Mr. Weiler directed the technical staff in the organization and writing of the FEIS.  Mr. Weiler has been involved with the preparation of the EIS and the site designation rulemaking since 1983.

Robert Kelly

Dr. Kelly provided technical imput to the project in the areas of assessments of aquatic pollution and ocean dumping site designation and permitting. He holds a Ph.D. in Zoology/Biology from Hobart College.  Dr. Kelly is the author of EPA's Ocean Dumping Permit Writers' Guide and Ocean Dumping Site Designation Delegation Handbook for Dredged Material.

USACE_019657

**6. COORDINATION**

USACE_019658

# 6.  COORDINATION

Public participation is an integral part of the EPA decision-making process for permitting ocean disposal activities, EIS preparation, and the ocean disposal site designation process.  During the data-gathering efforts performed in preparation of this FEIS, numerous government agencies, non-government organizations, and individuals were provided with copies of the DEIS.  These parties are listed below.

## Federal

Resident Commissioner of Puerto Rico, House of Representatives, Washington, DC, 20515

U.S. Army Corps of Engineers, Mr. David Mathis, Water Resources Support Center, Kingman Building, Fort Belvoir, Virginia, 22060

U.S. Army Corps of Engineers, District Engineer, Jacksonville District, 400 West Bay Street, P.O. Box 4970, Jacksonville, Florida, 32232

U.S. Army Corps of Engineers, Division Engineer, 510 Title Building, 30 Pryor Street, SW, Atlanta, Georgia, 30303

U.S. Army Corps of Engineers, San Juan Area Office, Deputy District Engineer, P.O. Box 4970, 400 Fernandez Juncos Avenue, San Juan, Puerto Rico, 00901

U.S. Army Corps of Engineers, Jacksonville District, Lloyd Saunders, Ph.D., P.O. Box 4970, Jacksonville, Florida, 32232

U.S. Army Corps of Engineers, San Juan Area Office, Puerto Rico Planning Branch, Chief, 400 Fernandez Juncos Avenue, San Juan, Puerto Rico, 00901

U.S. Coast Guard, Captain of the Ports, Marine Safety Office, P.O. Box S-3666, San Juan, Puerto Rico, 00904

U.S. Coast Guard, Environmental Impacts Branch, GWEP/62, 400 7th Street, NW, Washington, DC, 20590

U.S. Department of Agriculture, Institute of Tropical Forestry, University of Puerto Rico, Agricultural Experiment Station, Box AQ, San Juan, Puerto Rico, 00928

U.S. Department of Commerce, Administrator, Maritime Administration, Washington, DC, 20230

U.S. Department of Commerce, Assistant Secretary for Policy, Washington, DC, 20230

U.S. Department of Health and Human Services, Regional Environmental Officer, 26 Federal Plaza, New York, New York, 10278

USACE_019659

U.S. Department of the Interior, Bureau of Land Management, Washington, DC, 20240

U.S. Department of the Interior, Office of Environmental Project Review, 18th and C Streets, NW - Room 4239, Washington, DC, 20240

U.S. Department of the Interior, U.S. Geological Survey, Reston, Virginia, 22092

U.S. Federal Emergency Management Agency, Mr. Michael Chivinski, Chief, Disaster Assistance Programs Division, 26 Federal Plaza, New York, New York, 10278

U.S. Fish and Wildlife Service, Mr. Paul E. Gertler, Field Supervisor, Caribbean Field Office, P.O. Box 491, Boqueron, Puerto Rico, 00622

U.S. Fish and Wildlife Service, Region IV Director, Mr. Richard B. Russell, Federal Building, 25 Spring Street, SW, Atlanta, Georgia, 30303

U.S. Geological Survey, District Chief, Puerto Rico District Office, GPO Box 4424, San Juan, Puerto Rico, 00936

U.S. National Marine Fisheries Service, Chief, Protected Species Management Branch, Southeast Regional Office, 9450 Koger Boulevard, St. Petersburg, Florida, 33702

U.S. National Marine Fisheries Service, Environmental Assessment Branch, 3500 Delwood Beach Road, Panama City, Florida, 32407

U.S. National Park Service, Heritage Conservation and Recreation Service, 440 G Street, NW, Washington, DC, 20243

U.S. Naval Station, Commanding Officer, Roosevelt Roads, Fleet Post Office, Miami, Florida, 34051

U.S. Public Health Service, Chief, Center for Environmental Health, Centers for Disease Control, Atlanta, Georgia, 30333

U.S. Soil Conservation Service, Director, Caribbean Area Office, Federal Office Building, Hato Rey, San Juan, Puerto Rico, 00917

Commonwealth

Autoridad de los Puertos, GPO Apartado 2829, San Juan, Puerto Rico, 00936

Caribbean Fishery Management Council, Executive Director, Suite 1108-Banco De Ponce Building, Hato Rey, Puerto Rico, 00918

Department of Physical Planning, Engineer Adelberto Colon, Puerto Rico Planning Board, Minillas Government Center, P.O. Box 4119, Santurce, Puerto Rico, 00940

Estacion Environmental, Sociedad de Historica Natural, Apartado AQ, Rio Piedras, Puerto Rico, 00928

USACE_019660

Federal Assistance Programs, Director, Puerto Rico Planning Board, P.O.
    Box 4119, San Juan, Puerto Rico, 00940

Institute de Cultura Puertoriquena, Mr. Luis M. Morales, GPO Box 4184, San
    Juan, Puerto Rico, 00905

Puerto Rico Administrator de Parques y Recro, Administrator, GPO Apartado
    3207, San Juan, Puerto Rico, 00904

Puerto Rico de Fomento Economico, Administrator, GPO Apartado 2350, San Juan,
    Puerto Rico, 00936

Puerto Rico Department of Health, Secretary, P.O. Box 9342, Santurce, Puerto
    Rico, 00908

Puerto Rico Department of Natural Resources, Centro Comercial Oficina A,
    2 Alturas de Mayaguez Carr., Mayaguez, Puerto Rico, 00708

Puerto Rico Department of Natural Resources, Centro Gubernamental Oficina 204,
    Avenida Rotarios, Arecibo, Puerto Rico, 00612

Puerto Rico Department of Natural Resources, Hospital Sub-Regional, Ponce,
    Puerto Rico, 00731

Puerto Rico Department of Natural Resources, Secretary, P.O. Box 5887, Puerto
    de Tierra, Puerto Rico, 00906

Puerto Rico Department of Social Services, 1633 Ponce de Leon Avenue,
    Stop 24 1/2 - Edificio Saldana, Santurce, Puerto Rico, 00910

Puerto Rico Department of Transportation and Public Works, Torre Sur Building,
    De Deigo Avenue, Stop 22, Santurce, Puerto Rico, 00904

Puerto Rico Environmental Quality Board, Chairman, P.O. Box 11488, Santurce,
    Puerto Rico, 00910

Puerto Rico Environmental Quality Board, Water Quality Area, Director,
    P.O. Box 11488, Santurce, Puerto Rico, 00910

Puerto Rico Natural History Society, P.O. Box 1393, Hato Rey, San Juan, Puerto
    Rico, 00919

Puerto Rico State Historic Preservation Officer, Office of the Governor, P.O.
    Box 82-La Fortaleza, San Juan, Puerto Rico, 00901

Puerto Rico Water Resources Authority, Executive Director, P.O. Box 4267,
    San Juan, Puerto Rico, 00905

University of Puerto Rico, Director, Planning Office, Recinto Ciencas Medicas,
    Centro Medio, Rio Piedras, Puerto Rico, 00928

Water Resources Institute, Director, University of Puerto Rico, Mayaguez,
    Puerto Rico, 00708

USACE_019661

## Other

American Littoral Society, Building ZZ, Fort Hancock, New Jersey, 07732

Colorado State University, Ms. Beverly Rauch, The Library, Fort Collins, Colorado, 80523

Council on Environmental Quality, 722 Jackson Place NW, Washington, DC, 20206

Environmental Defense Fund, 1525 18th Street NW, Washington, DC, 20036

Great Lakes Dredge and Dock Company, Mr. Andy Johnson, 2122 York Road, Oakbrook, Illinois, 60521

National Academy of Sciences, 2101 Constitution Avenue, NW, Washington, DC, 20037

National Audubon Society, 1511 K Street, NW, Washington, DC, 20005

National Ocean Services, Ocean Assessment Division, Acting Chief, NOAA-N/MOS 33, Rockwall Building – Room 652, Rockville, Maryland, 20850

National Science Foundation, Committee on Environmental Affairs, Room 641, 1800 G Street, NW, Washington, DC, 20550

National Wildlife Federation, Assistant Director for Pollution and Toxic Substances, 1421 16th Street, NW, Washington, DC, 20036

Resources for the Future, 1755 Massachusetts Avenue, NW, Washington, DC, 20036

Science Applications International Corporation, Mr. Jeffrey Weiler, 8400 Westpark Drive, McLean, Virginia, 22102

Sierra Club, 330 Pennsylvania Avenue, SE, Washington, DC, 20003

Sun Refining and Marketing Company, Mr. Tom Zale, 1801 Market Street – 15th Floor, Philadelphia, Pennsylvania, 19103

Water Pollution Control Federation, 2626 Pennsylvania Avenue, NW, Washington, DC, 20037

Water Resources Research Center, Mr. Henry Smith, Caribbean Research Institute, College of the Virgin Islands, St. Thomas, Virgin Islands, 00801

Yabucoa Sun Oil Company, Mr. Bruce Hawthorne, P.O. Box 186, Yabucoa, Puerto Rico, 00767

USACE_019662

APPENDICES

USACE_019663

APPENDIX A
COMMENT LETTERS

USACE_019664



DEPARTMENT OF HEALTH & HUMAN SERVICES

October 31, 1986

Ms. Barbara Pastalove
Chief, Environmental Impacts Branch
Room 702
U.S. Environmental Protection Agency
26 Federal Plaza
New York, New York  10278

Dear Ms. Pastalove:

We have reviewed the Draft Environmental Impact Statement for the Designation of Ocean Dredged Material Disposal Sites for Aricebo, Mayaguez, Ponce, and Yabucoa, Puerto Rico. We are responding on behalf of the U.S. Public Health Service.

We have reviewed this Draft EIS on behalf of the U.S. Public Health Service and believe that this document adequately addresses these issues.  Therefore, we have no comments to offer at this time.

Thank you for the opportunity to review this EIS.  Please send us a copy of the Final EIS when it becomes available.

Sincerely yours,

Jeffrey A. Lybarger, M.D.
Acting Chief
Environmental Affairs Group
Center for Environmental Health

A-1

USACE_019665



November 14, 1986

Ms. Barbara Pastalove
Chief
Environmental Impacts Branch
Room 702
U. S. Environmental Protection Agency
26 Federal Plaza
New York, N. Y.   10278

Dear Ms. Pastalove:

Reference is made to the draft of the Environmental Impact Statement for the designation of ocean dredge material disposal sites for Arecibo, Mayaguez, Ponce, and Yabucoa harbors in Puerto Rico, submitted with circular letter dated September 3, 1986.

We want to inform that no objections are interposed to the selection of the proposed sites in the indicated ports.

Cordially yours,

Guillermo F. Valls
Executive Director

A–2

USACE_019666



# DEPARTMENT OF NATURAL RESOURCES

November 24, 1986

Ms. Barbara Pastalove
Chief, Environmental Impact Branch
Room 702
U.S. Environmental Protection Agency
26 Federal Plaza
New York, N.Y. 10278

Subject: Draft Environmental
Impact Statement for the
Designation of Ocean Dredged
Material Disposal Sites for
Arecibo, Mayaguez, Ponce and
Yabucoa, Puerto Rico

DIA 1086-011 EPA

Dear Ms. Pastalove:

Reference is made to the Draft Environmental Impact Statement mentioned above.

The Department of Natural Resources has no objection to the proposed disposal sites. Nevertheless, the Regulation #13 of the Planning Board classify the site at Santa Isabel as Zone I (floodable) in which the disposal of fill material is not permmited unless a Hydrologic-Hydraulic study support it. ⌉ 1

Also, we understand that the creation of wetland habitats for wildlife should be evaluated as a desirable alternative. This kind of dredged material is adecuate in the formation of wetlands. ⌉ 2

Cordially yours,

Ruth D. Carreras
Assistant Secretary
for Permits Area

A-3

USACE_019667

√1630/86



COMMONWEALTH OF PUERTO RICO / OFFICE OF THE GOVERNOR

Environmental
Quality Board

November 24, 1986

Ms. Barbara Pastalove
Chief
Environmental Impacts Branch
Room 702
U.S. Environmental Protection Agency
26 Federal Plaza, New York N.Y.   10278

              Subject:   Draft E.I.S. for the Designation
                       of Ocean Dredged Mat.
                       Disposal Sites for Arecibo,
                       Mayaguez, Ponce and Yabucoa, P.R.

Dear Ms. Pastalove:

    The Environmental Quality Board (EQB) has received a copy of the above
mentioned document.  In order to evaluate the overal impact of the project,
the applicant must submit to our Agency six (6) more copies of the E.I.S.
as required by Article 4c of the Environmental Public Policy Act (law number
9 approved on June 18th 1970 as amended).

    At least two (2) of the copies must be in Spanish language.         } 3

                         Sincerely yours,

                         Santos Rohena, Jr.
                         Chairman

USACE_019668

OFFICE OF THE BOARD: 204 DEL PARQUE ST. CORNER OF PUMARADA / MAILING ADDRESS: P.O. BOX 11488,
SANTURCE PUERTO RICO 00910 / TELEPHONE: 725-5140



# United States Department of the Interior

## OFFICE OF ENVIRONMENTAL PROJECT REVIEW

Southeast Region / Suite 1360
Richard B. Russell Federal Building
75 Spring Street, S.W. / Atlanta, Ga. 30303

Telephone 404/221-4524 - FTS: 242-4524

DEC  2 1986

ER-86/1290

Ms. Barbara Pastalove, Chief
Environmental Impacts Branch
U.S. Environmental Protection Agency
26 Federal Plaza, Room 702
New York, New York  10278

Dear Ms. Pastalove:

We have reviewed the draft environmental statement (DEIS), Designation
of Ocean Dredged Material Disposal Sites for Arecibo, Mayaguez, Ponce,
and Yaboucoa, Puerto Rico, and have the following comments.

The DEIS is well written and informative.  Some of the present interim
sites for ocean dumping could have detrimental effects on near-shore
wildlife habitats.  The proposed alternate sites for Mayaguez, Ponce,
and Yabucoa are further away from shore, in much deeper water, and are
more likely to avoid harmful impacts to coastal wildlife habitats.

— 4

We agree with the document's proposal to keep the Arecibo site at its
present location.  The site does not pose a problem to near-shore
habitat.

We do not foresee any adverse effects to threatened or endangered
species nor designated critical habitat under the jurisdiction of the
Fish and Wildlife Service.  The National Marine Fisheries Service is
responsible for assessing potential offshore impacts on oceanic
species such as sea turtles and whales.

Thank you for the opportunity to comment on this DEIS.

Sincerely yours,

James H. Lee
Regional Environmental Officer

A-5

USACE_019669

**NATIONAL SCIENCE FOUNDATION**

WASHINGTON. D.C. 20550

December 9, 1986



**OFFICE OF THE
ASSISTANT DIRECTOR
FOR GEOSCIENCES**

Ms. Barbara Pastalove
Chief, Environmental Impacts Branch
Room 702
U.S. Environmental Protection Agency
26 Federal Plaza
New York, New York 10278

Dear Ms. Pastalove:

The National Science Foundation has no comment on the Draft Environmental
Impact Statement for the Designation of Ocean Dredged Material Disposal
Sites for Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico.  We believe
that the offshore disposal of dredged material will in no way affect the
operation of the NSF-sponsored National Astronomy and Ionosphere Center
in Arecibo, Puerto Rico.

Thank you for the opportunity to review this DEIS.

Sincerely,

Adair F. Montgomery
Staff Associate for Budget and
    Environmental Policy

A–6

USACE_019670



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

_____

                                          Centers for Disease Control
                                          Atlanta GA 30333

                                          December 11, 1986


Ms. Barbara Pastalove
Chief
Environmental Impacts Branch
Room 702
U.S. Environmental Protection Agency
26 Federal Plaza
New York, New York  10278

Dear Ms. Pastalove:

Thank you for sending us a copy of the Draft Environmental Impact
Statement (EIS) for Designation of Ocean Dredged Material Disposal Sites
for Arecibo, Mayaguez, Ponce, and Yabucoa, Puerto Rico.  We are responding
on behalf of the U.S. Public Health Service.

In general, we are in agreement with the actions proposed in this document
to designate an environmentally acceptable ocean disposal site for dredged
material from the four harbors listed above.  Since the harbors will
require dredging every three or four years to permit continuing access to
freight traffic and large ocean-going commercial vessels, it seems prudent
to select an environmentally acceptable site rather than continue using
interim disposal sites.

We were pleased to note the criteria for designating these permanent sites
will be consistent with the London Dumping Convention (LDC) of 1975 and
the U.S. Ocean Dumping Regulations of 1977.

Some specific questions we have are as follows:  In Section 2.4.2 (8),
page 2-31, it states beaches will not be reached by any sediment released
at the disposal sites and therefore there will be no effects on
recreational swimming, diving, or fishing at the shore.  How was this          5
determined?  Was the Dredged Material Transport and Fate Model used?
Also, we would like additional information on the statement in Section
2.4.2 (10), page 2-32, that any human disease organisms that may be
present in the dumped materials are very unlikely to survive and reproduce    6
in the cold, highpressure environment of the sea floor at the site because
of well flushed currents.  If the suspected organisms have been
identified, we would like to know what they are.  If not, analyses of the
dredged materials should include identification of the organisms.

USACE_019671

Page 2 - Ms. Barbara Pastalove

We appreciate the opportunity to review this Draft EIS.  Please send us
one copy of the final document when it becomes available.

Sincerely yours,

Vernon N. Houk, M.D.
Assistant Surgeon General
Director
Center for Environmental Health

A-8

USACE_019672



COMMONWEALTH OF PUERTO RICO
OFFICE OF THE GOVERNOR
PUERTO RICO PLANNING BOARD

Minillas Governmental Center, North Bldg.
De Diego Ave, Stop 22
P.O. Box 41119, San Juan, P.R. 000940 - 9985

December 11, 1986

Mr. Robert Witte
Environmental Analysis Section
Environmental Impacts Branch
Room 702
26 Federal Plaza
New York, 10278

Re: Draft Environmental Impact
Statement for the Designation
of Ocean Dredge Material
Disposal Sites for Arecibo,
Mayaguez, Ponce and Yabucoa
Puerto Rico

Dear Sir:

According with the standard procedure for the Coastal
Zone Management Program Consistency determination, we
circulate the documents sent by the applicants to different
agencies.

In order to comply with this procedure, we are
requesting seven (7) additional copies of the referred
document.

Thank you for your assistance in this matter.

Cordially yours,

José S. Rodriguez
Director
Land Use Planning Bureau

Enclosure: Application for Certification of Consistency with
the Puerto Rico Coastal Management Program

USACE_019673

JP-833
Sept. 84

COMMONWEALTH OF PUERTO RICO
OFFICE OF THE GOVERNOR
PUERTO RICO PLANNING BOARD
PHYSICAL PLANNING AREA
LAND USE PLANNING BUREAU

APPLICATION FOR CERTIFICATION OF CONSISTENCY WITH THE
PUERTO RICO COASTAL MANAGEMENT PROGRAM

**General Instructions:**

A. Attach a 1:20,000 scale, U.S. Geological Survey topographic quadrangular base map of the site.

B. Attach a reasonably scaled plan or schematic design of the proposed project, indicating the following:

1. Peripheral areas
2. Bodies of water, tidal limit and natural systems

C. You may attach any further information you consider necessary for proper evaluation of the proposal.

D. If any information requested in the questionaire does not apply in your case, indicate by writing "N/A" (not applicable).

E. Submit a minimum of seven (7) copies of this application.

---

**DO NOT WRITE IN THIS BOX**

Type of application:                    Application number:

Date received:                          Date of certification:

Evaluation result: ☐ objection ☐    acceptance ☐ negotiation

Technician:                             Supervisor:

Comments:

---

1. **Name of Federal Agency:**

2. **Federal Program Catalog Number:**

3. **Type of Action:**

   ☐ Federal Activity   ☐ License or permit   ☐ Federal assistance

4. **Name of Applicant:**

   Postal Address:

   Telephone:

5. **Project Name:**

6. **Physical Description of Project Location:**

   (area, facilities such as vehicular access, drainage, storm and sanitary sewer placement, etc.)

A-10

USACE_019674

- 2 -

7. Type of construction or other work proposed:

drainage ( )    channeling ( )    landfill [ ]    sand extraction ( )    pier ( )

bridge   ( )    residential( )    tourist ( )

Other (specify and explain)

Construction of a sea wall and 5 piers 3' x 80' dredge of piers area to depth of 5 feet.

Description of proposed work:

8. Natural, artificial, historic or cultural systems likely to be affected by the project

Place an X opposite any of the systems indicated below that are in the project area or its surroundings which are likely to be affected by the activity. Indicate the distance from the project to any outside system that would likely be affected.

| System | Within Project | Outside Project | Distance (meters) | Local name of affected system |
|---|---|---|---|---|
| beach, dunes | | | | |
| marshes | | | | |
| coral, reefs | | | | |
| river, estuary | | | | |
| bird sanctuary | | | | |
| pond, lake, lagoon | | | | |
| agricultural unit | | | | |
| forest, wood | | | | |
| cliff, breakwater | | | | |
| cultural or tourist area | | | | |
| other (explain | | | | |

Describe the likely impact of the project on the identified system (s) .

Positive ▱              Negative ▱

Explain:    Better the fiscal aspect of the area

9. Indicate permits, approvals and endorsements of the proposal by Federal and Puerto Rican government agencies. Evidence of such support should be attached to the proposal.

| | Yes | No | Pending | Application Number |
|---|---|---|---|---|
| a. Planning Board | ( ) | ( ) | ( ) | |
| b. Regulation and Permits Administration | ( ) | ( ) | ( ) | |

A-11

USACE_019675

- 3 -

|  | | Yes | No | Pending | Application Number |
|---|---|---|---|---|---|
| c. | Environmental Quality Board | ( ) | ( ) | ( ) | _____ |
| d. | Department of Natural Resources | ( ) | ( ) | ( ) | _____ |
| e. | State Historic Preservation Office | ( ) | ( ) | ( ) | _____ |
| f. | U. S. Army Corps of Engineers | ( ) | ( ) | ( ) | _____ |
| g. | U. S. Coast Guard | ( ) | ( ) | ( ) | _____ |
| h. | Other (s) (specify) | ( ) | ( ) | ( ) | _____ |

CERTIFICATE:   I certify that (project name) _____

is consistent with the Puerto Rico Coastal Zone Management Program,

and that to the best of my knowledge the above information is true.

(Signed) _____

(Position) _____

DATE: _____

A-12

USACE_019676



**DEPARTMENT OF THE ARMY**
WATER RESOURCES SUPPORT CENTER, CORPS OF ENGINEERS
CASEY BUILDING
FORT BELVOIR VA. 22060

REPLY TO
ATTENTION OF:

**1 7 DEC 1986**

WRSC-D

Ms. Barbara Pastalove, Chief
Environmental Impacts Branch (Room 702)
U. S. Environmental Protection Agency
26 Federal Plaza
New York, New York  10278

Dear Ms. Pastalove:

   This responds to your office's Draft Environmental
Impact Statement for the Designation of Ocean Dredged
Material Disposal Sites for Arecibo, Mayaguez, Ponce,
and Yabucoa, Puerto Rico.

   The U. S. Army Corps of Engineers offers the
following general comments on this document:

   a.  Purpose of Document:  EPA's purpose and mandate
is to locate and designate environmentally acceptable
and economically feasible ocean disposal sites for each
coastal project area where a continuing need for ocean
disposal has been defined by the Corps of Engineers.
Each such site is considered on a case-by-case basis by
the Corps, along with land-based options in our project
NEPA documents.  The stated purpose of paragraph 1 of
the report abstract is not correct.  The purpose, as
presently stated, is a Corps of Engineers
responsibility, through a separate NEPA action.

7

   b.  EIS Alternatives:  As a follow-up to point (a)
above, alternatives addressed in this document must be
confined exclusively to alternative ocean disposal site
locations and the no action alternative.  An evaluation
of land-based alternatives is a Corps of Engineers
responsibility which has been covered separately in a
Corps NEPA document.  We request that all such
discussions of land-based alternatives (e.g., S2-S3 and
Chapter 2) be deleted from consideration as specific
alternatives addressed by this document and discussed
instead under the appropriate sections which address
purpose and need.

8

USACE_019677

-2-                                                    **1 7 DEC 1966**

    c.  The EIS recommends that three of the four
interim sites be abandoned for environmentally preferred
alternatives.  From figures in the report, each of these
alternative sites appears to be about two miles further
into the ocean than its associated interim site.  The
level of economic impact on dredging costs resulting
from these changes should be discussed in the EIS.  Your
staff should contact our Jacksonville District office
for assistance in evaluating these impacts
(Lloyd Saunders, FTS 946-2202).                                    ⎤
                                                                   ⎬ 9
                                                                   ⎦

    d.  The evaluation of environmental consequences
does not indicate any documented evidence of negative
impacts from past use of the interim sites.  This
information, if available, would provide a stronger
basis for making a determination to select alternate
sites in lieu of the interim sites at three locations.
This would be particularly helpful in light of some of
the questionable predictions of adverse impacts
discussed in the document (e.g., adverse impacts to
beaches some 10 miles distant from the point of
disposal).                                                         ⎤
                                                                   ⎬ 10
                                                                   ⎦

    e.  Figure 2-11, page 2-43, shows the interim site
and all alternates to Ponce to be outside the Zone of
Siting Feasibility (ZSF).  While the reasons for this
are explained on page 2-3, paragraph 2.3.1.3.,
Figure 2-11 can nonetheless convey in itself a confusing
picture to the reader.  We recommend that Figure 2-11 be
footnoted with a reference to paragraph 2.3.1.3. to
ensure the reader's understanding as to why the sites
are outside the depicted ZSF.                                      ⎤
                                                                   ⎬ 11
                                                                   ⎦

    We fully recognize the unique environmental
attributes that must be considered in the management of
dredged material disposal activities at these Puerto
Rico harbors.  However, based on the present document,
we are not convinced at this time that several of the
actions proposed in this EIS are adequately justified
from a technical point of view, nor do they necessarily
reflect the most cost-effective, environmentally
acceptable solutions.                                              ⎤
                                                                   ⎬ 12
                                                                   ⎦

    Please contact Mr. David Mathis of my staff
(FTS 385-3099) if you require additional clarification
of our review comments.  We would encourage your staff
to meet with our Jacksonville District Office at your
earliest convenience to discuss these concerns in
detail.

                Sincerely,

                *George R. Kleb*

A-14  George R. Kleb
     Colonel, Corps of Engineers
     Commander and Director

USACE_019678



COMMONWEALTH OF PUERTO RICO / OFFICE OF THE GOVERNOR  DADA/108/87

Environmental
Quality Board

January 29, 1987

Mrs. Barbara Pastalove, Chief
Environmental Impacts Branch
Room 702, U.S. Environmental
  Protection Agency
26 Federal Plaza
New York, N.Y.  10278

                      RE:  Draft EIS for the Designation
                           of Ocean
                           Dredge Material Disposal Sites
                           for Arecibo, Mayaguez, Ponce
                           and Yabucoa, P.R.

Dear Mrs. Pastalone:

     This acknowledges receipt of your comments of our letter of November 24,
1986 requesting six additional copies of the spanish version of the DEIS for
the project referred to above.

     According to the submitted information six (6) additional copies of the
english version for the aforementioned project were enclosed as the spanish
version was not available.

     The Regulation for the Environmental Impact Statement of June 4, 1984
has been promulgated to establish the content requirements and administrative
procedures to comply with the process of Environmental Impact Statement (EIS),
established by Article 4 (c) of the Environmental Public Policy Act. (Law
No. 9, approved on June 18th, 1970, as amended) Section 5.3.1 (Content Require-
ments) of the Regulation for the Environmental Impact Statement read as follows:

          -"The EIS must be prepared in Spanish and in such a ways
            as to be objective, analytical, concise, and in terms
            that can be easily understood by the community, but
            with enough information to orient specialists on par-
            ticular problems on their fields of specialized know-
            ledge".

13

A-15

USACE_019679

Page #2
Mrs. Barbara Pastalone

...as for Section 5.5.2.2 (Processing Requirements) read as follows:

-"When the Preliminary EIS is circulated for comments, the lead agency shall notify the public about its availability for inspection, as well as of its right to comment on the same. This notification shall be made by means of an evironmental notice in a newspaper of general circulation for one day. This notice shall be published within ten (10) calendar days from the date that Preliminary EIS was submitted to the Board. The lead agency shall pay the cost of such notice and shall submit copy of the payment voucher to the Board. The Board will not issue comments on the Preliminary EIS until it has received evidence that the cost of said notice has been paid."

— 14

We understand that the DEIS should be also translated into spanish in order to give the public a better chance to understand it. Furthermore we esteemed your agency should fully comply with section 5.5.2.2 of the aforementioned regulation.

Cordially yours,

Santos Rohena, Jr.
Chairman

A—16

USACE_019680



COMMONWEALTH OF PUERTO RICO
OFFICE OF THE GOVERNOR
PUERTO RICO PLANNING BOARD

Minillas Governmental Center, North Bldg.
De Diego Ave, Stop 22
P.O. Box 41119, San Juan, P.R. 000940 - 9985

April 3, 1987


Mr. Robert Witte
Environmental Analysis Section
Environmental Inspect Branch
Room 702
26 Federal Plaza
New York, 10278

Re:  Draft Environmental Impact
     Statement for the Designation
     of Ocean Dudge Material Disposal
     Sites for Arecibo, Mayaguez, Ponce
     and Yabucoa

Dear Mister Witte:

As you recall it was agreed in our telephone conversation of
March, 1987 that you are not presently requesting a Coastal
Zone Management Program (CZMP) determination of consistency for
the documents in reference.  A determination of consistency, as
previously indicated, will not be entertain until such a time as
specific projects for particular areas are submitted to this
Planning Board for evaluation.

As a rule, Draft Environmental Impact Statements (DEIS) should be
submitted to the Puerto Rico Environmental Quality Board for their
evaluation and determination of compliance with procedures esta-
blish by Act No. 9 of June 1970, as amended.                            ⎤
                                                                        ⎥ 15
                                                                        ⎦

Based on the above, we are not presently, commenting on the
different alternatives for interim ocean disposal sites included
in the DEIS.

Please, contact us if we can be of further assistance.

Cordially,

José S. Rodríguez Mercado
Director
Land Use Planning Bureau


A-17                                    USACE_019681



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Southeast Regional Office
9450 Koger Boulevard
St. Petersburg, FL 33702

January 22, 1988   F/SER23:TAH:td

Barbara Pastalove, Chief
Environmental Impacts Branch
U.S. Environmental Protection Agency
Region II, 26 Federal Plaza
New York, New York 10278

Dear Ms. Pastalove:

This responds to your December 22, 1987, letter regarding the
proposed designation of sites for disposal of maintenance
dredging materials from the harbors of Arecibo, Mayaguez, Ponce
and Guayanilla, and Yabucoa, Puerto Rico.  An Environmental
Impact Statement (EIS) was transmitted pursuant to Section 7 of
the Endangered Species Act of 1973 (ESA).

We have reviewed the EIS and concur with your determination that
populations of endangered/threatened species under our purview
would not be adversely affected by the proposed action.

This concludes consultation responsibilities under Section 7 of
the ESA.  However, consultation should be reinitiated if new
information reveals impacts of the identified activity that may
affect listed species or their critical habitat, a new species is
listed, the identified activity is subsequently modified or
critical habitat determined that may be affected by the proposed
activity.

If you have any questions, please contact Dr. Terry Henwood,
Fishery Biologist at FTS 826-3366.

Sincerely yours,

Charles A. Oravetz

Charles A. Oravetz, Chief
Protected Species Management Branch

cc:   F/PR2
      F/SER1

A-18



USACE_01...

**APPENDIX B**
**ABBREVIATIONS AND ACRONYMS**

USACE_019683

## LIST OF ACRONYMS AND ABBREVIATIONS

COE     – U.S. Army Corps of Engineers

cm/s    – centimeter per second

cu yds  – cubic yards

CZM     – Coastal Zone Management

DEIS    – Draft Environmental Impact Statement

DMDS    – Dredged Material Disposal Sites

EPA     – U.S. Environmental Protection Agency

f       – fathom

FEIS    – Final Environmental Impact Statement

FR      – Federal Register

km      – kilometer

LDC     – London Dumping Convention

m       – meter

MPRSA   – Marine Protection, Research, and Sanctuaries Act

NEPA    – National Environmental Policy Act

nmi     – nautical mile

NOAA    – National Oceanic and Atmospheric Administration

NWF     – National Wildlife Federation

ODMDS   – Ocean Dredged Material Disposal Site

ODR     – Ocean Dumping Regulations (EPA)

OMEP    – Office of Marine and Estuarine Protection (EPA)

PL      – Public Law

RA      – Regional Administrator (EPA)

USC     – United States Code

USCG    – U.S. Coast Guard

ZSF     – Zone of Siting Feasibility

USACE_019684

APPENDIX C

REFERENCES

USACE_019685

# REFERENCES

Hanson, P.  1988.  U.S. Army Corps of Engineers, Jacksonville District, FL.
    2/2/88.  Personal communication.

National Oceanic and Atmospheric Administration.  1980.  Virgin Passage and
    Sonda De Viequez, West Indies, National Ocean Survey Map No. 25650.
    U.S. Government Printing Office.  Washington, DC.

U.S. Environmental Protection Agency and U.S. Army Corps of Engineers
    (EPA/COE).  1983.  Draft Technical Guidance for the Designation of Ocean
    Dredged Material Disposal Sites.  Washington, DC:  U.S. Environmental
    Protection Agency and U.S. Army Corps of Engineers.  Draft Report.

University of Puerto Rico.  1976.  A Marine Atlas of Puerto Rico, Department
    of Marine Sciences Contributions, Mayaguez, Puerto Rico:  University of
    Puerto Rico.

USACE_019686

APPENDIX D

GLOSSARY

USACE_019687

# GLOSSARY

ABUNDANCE
The number of individuals of a species inhabiting a given area. Normally, a community of several species will be present. Measuring the abundance of each species is one way of estimating the comparative importance of each species.

ADSORB
To adhere in an extremely thin layer of molecules to the surface of a solid or liquid.

AMBIENT
Pertaining to the undistorted or unaffected conditions of an environment.

APPROPRIATE SENSITIVE BENTHIC MARINE ORGANISMS
Pertaining to bioassays required for ocean dumping permits, "at least one species each representing filter-feeding, deposit-feeding, and burrowing species chosen from among the most sensitive species accepted by EPA as being reliable test organisms to determine the anticipated impact on the site" (40 CFR § 227.27).

APPROPRIATE SENSITIVE MARINE ORGANISMS
Pertaining to bioassays required for ocean dumping permits, "at least one species each representative of phytoplankton or zooplankton, crustacean or mollusk, and fish species chosen from among the most sensitive species documented in the scientific literature or accepted by EPA as being reliable test organisms to determine the anticipated impact of the wastes on the ecosystem at the disposal site" (40 CFR § 227.27).

ASSEMBLAGE
A group of organisms sharing a common habitat.

BACKGROUND LEVEL
The naturally occurring concentration of a substance within an environment that has not been affected by unnatural additions of that substance.

BASELINE CONDITIONS
The characteristics of an environment before the onset of an action that can alter that environment; any data serving as a basis for measurement of other data.

BASELINE SURVEYS, BASELINE DATA
Surveys and data collected prior to the initiation of actions that may alter an existing environment.

BENTHOS
All marine organisms (plant or animal) living on or in the bottom of the sea.

BIOACCUMULATION
The uptake of substances (e.g., heavy metals) leading to elevated concentrations of those substances within plant or animal tissue.

BIOTA
Plants and animals inhabiting a given region.

USACE_019688

CONTINENTAL SHELF — That part of the Continental Margin adjacent to a continent extending from the low water line to where the Continental Slope begins.

CONTINENTAL SLOPE — That part of the Continental Margin consisting of the declivity from the edge of the Continental Shelf down to the Continental Rise.

CONTOUR LINE — A line on a chart connecting points of equal elevation above or below a reference plane, usually mean sea level.

CONTROLLING DEPTH — The least depth in the approach or channel to an area that determines the maximum draft of vessels that can obtain passage.

DIFFUSION — Transfer of material (e.g., salt) or a property (e.g., temperature) under the influence of a concentration gradient; the net movement is from an area of higher concentration to an area of lower concentration.

DISCHARGE PLUME — A region of water that can be distinguished from the surrounding water due to a discharge of waste.

DISPERSION — The dissemination of discharged matter over large areas by natural processes (e.g., currents).

DIVERSITY (species) — A statistical measurement that generally combines a measure of the total number of species in a given environment with the number of individuals of each species.  Species diversity is high when there are many species with a similar number of individuals; low when there are fewer species and when one or two species dominate.

DOMINANT SPECIES — A species or group of species which, because of their abundance, size, or control, strongly affect a community.

EBB CURRENT, EBB TIDE — The tidal current moving away from land or down a tidal stream.

ECONOMIC RESOURCE ZONE — The oceanic area within 200 nmi from shore; coastal states possess exlusive rights to living and non-living marine resources in this zone.

ECOSYSTEM — The organisms in a community together with their physical and chemical environments.

ENDEMIC — Restricted or peculiar to a locality or region; found at a locality.

ESTUARY — A semi-enclosed coastal body of water that has a free connection to the sea within which the mixing of saline and fresh water occurs.

USACE_019689

| | |
|---|---|
| FAUNA | The animal life of any location, region, or period. |
| FINFISH | Term used to distinguish true fish from shellfish. |
| HALOCLINE | A level in the water column where a salinity gradient is stronger than in the waters above or below that level. |
| HOPPER DREDGE | A self-propelled vessel with capabilities to dredge, store, transport, and dispose of dredged materials. |
| HYDROGRAPHY | That part of science that deals with the measurement of the physical features of waters and their marginal land areas. |
| INDIGENOUS | Having originated in or living naturally in a particular region or environment; native. |
| INFAUNA | Animals that live in the bottom sediment. |
| INITIAL MIXING | Dispersion of liquid, suspended particulate, and solid phases of a waste material that occurs within 4 hours of dumping. |
| IN SITU | (Latin) in the original or natural setting (in the environment). |
| INTERIM DISPOSAL SITES | Ocean disposal sites tentatively approved for use by the EPA. |
| INVERTEBRATES | Animals that lack a backbone. |
| ISOBATH | A line on a chart connecting points of equal depth. |
| ISOTHERMAL | Of the same temperature. |
| LITTORAL | Of or pertaining to the seashore, especially the regions between tide lines. |
| LONGSHORE CURRENT | A current that flows parallel to a coastline. |
| MAIN SHIP CHANNEL | The designated shipping corridor leading into a harbor. |
| MAINTENANCE DREDGING | Periodic dredging of a waterway necessary to maintain depth for ship passage. |
| MESOPELAGIC | Pertaining to free-living organisms found at depths of 200 to 1,000 meters below the open ocean surface. |
| MIXED LAYER | The upper layer of the ocean, which is normally well-mixed by wind and wave activity; the deepest extent of the mixed layer is usually a halocline or thermocline. |
| MONITORING | As used herein, observation of environmental effects of disposal operations through biological and chemical data collection and analysis. |

USACE_019690

| | |
|---|---|
| NUISANCE SPECIES | Organisms of no commercial value, which, because of predation or competition, may be harmful to commercially important organisms; pathogens; pollution tolerant organisms present in large numbers that are not normally considered dominant in the area. |
| PARAMETER | Values or physical properties that describe the characteristics or behavior of a set of variables. |
| PATHOGEN | An entity producing or capable of producing disease. |
| PELAGIC | Pertaining to free-living organisms of the open ocean beyond the Continental Shelf. |
| PERTURBATION | A disturbance of a natural or regular system; any departures from the usual state of a system. |
| PLUME | A region of water that can be distinguished from surrounding water because of its characteristics; usually turbid. |
| PRECIPITATE | A dissolved substance that becomes solid through chemical or physical change and separates from a solution or suspension. |
| PRIMARY PRODUCTIVITY | The amount of organic matter synthesized by organisms (primarily plants) from inorganic substances per unit time and volume of water. |
| QUALITATIVE | Pertaining to the non-numerical assessment of a parameter. |
| QUANTITATIVE | Pertaining to the numerical assessment of a parameter. |
| RECRUITMENT | Addition to a population of organisms by reproduction or immigration of new individuals. |
| RELEASE ZONE | An area defined by the locus of points 100 meters from a vessel engaged in dumping activities. |
| RUNOFF | That portion of precipitation upon land that ultimately reaches streams, rivers, lakes, or oceans. |
| SALINITY | The amount of salts dissolved in water; expressed in parts per thousand. |
| SEA STATE | The description of wind-generated waves on the surface of the sea; ranges from 1 (smooth) to 8 (mountainous). |
| SHELF WATER | Water that occurs at, or can be traced to, the Continental Shelf; identified by characteristic temperatures and salinities. |
| SHELLFISH | An invertebrate having a rigid outer covering, such as a shell or exoskeleton; includes some molluscs and anthropods; term is the counterpart of finfish. |

USACE_019691

| | |
|---|---|
| SHIPRIDER | A shipboard observer who ensures that a waste-laden vessel is dumping in accordance with permit specifications. |
| SHORT DUMPING | The discharge of waste from a vessel anywhere outside designated disposal sites. |
| SLOPE WATER | Water that occurs at, or can be traced to, the Continental Slope; identified by characteristic temperatures and salinities. |
| SPECIES | A group of morphologically similar organisms capable of interbreeding and producing fertile offspring. |
| STANDING STOCK | The biomass or abundance of living organisms per unit volume of water or area of sea-bottom. |
| SUBSTRATE | The solid material upon which an organism lives or to which it is attached (e.g., rocks, sand). |
| SURVEILLANCE | Systematic observation of an area by visual, electronic, photographic, or other means for the purpose of ensuring compliance with applicable laws, regulations, and permits. |
| SUSPENDED SOLIDS | Finely divided particles of a solid temporarily suspended in a liquid (e.g., soil particles in water). |
| THERMOCLINE | A temperature gradient in a layer of a body of water that is appreciably greater than the gradients above or below it; a layer in which such a gradient occurs. |
| TRACE METAL | An element found in the environment in extremely small quantities; usually bioaccumulative or toxic. |
| TRANSMITTANCE | A measure of water clarity, measured by an instrument that transmits a known quality of light to a collector. The percentage of the beam's energy that reaches the collector is the water's transmittance. |
| TREND ASSESSMENT SURVEYS | Surveys conducted over long periods of time to detect shifts in environmental conditions within a region. |
| TURBIDITY | Cloudy or hazy appearance in a naturally clear liquid caused by a suspension of colloidal liquid droplets, fine solids, or small organisms. |
| VECTOR | A straight or curved line representing both direction and magnitude. |
| WATER MASS | A body of water, identified by its temperature-salinity values or chemical composition. |
| ZOOPLANKTON | Weakly swimming animals whose distribution in the ocean is ultimately determined by current movements. |

USACE_019692

4.   CONCLUSIONS OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

USACE_019693

# An Update on Dredging Impacts on Sea Turtles in the Southeastern USA

## A Historical Review of Protection and An Introduction to the USACE Sea Turtle Data Warehouse



**D. Dickerson**
U.S. Army Corps of Engineers
**D. Pommer**
U.S. Army Corps of Engineers

USACE_021462

USACE_021474

# Incidental Takes

## Only Hopper Trailing Suction








Photo: Image courtesy of New Fortress Energy (LinkedIn)

<u>Home</u> ❯ <u>Clean fuel</u>

# New Fortress Energy breaks ground for San Juan micro fuel-handling facility

March 26, 2019, by LNG World News

**New York City-based New Fortress Energy (NFE) has held a groundbreaking ceremony for a micro fuel-handling facility in San Juan.**

The micro fuel-handling facility, which has been under development for more than a year, will provide natural gas to the San Juan power plant.

The facility will also conduct truck loading operations that will deliver LNG to industrial companies and microgrids, New Fortress Energy said in a brief statement through its social media.

To remind, New Fortress Energy's Puerto Rico unit NFEnergía signed a deal with the Puerto Rico Electric Power Authority (PREPA) for the supply of natural gas and conversion of Units 5 and 6 of the San Juan power plant <u>earlier this month</u> <u>(https://www.lngworldnews.com/new-fortress-energy-to-convert-san-juan-plant-to-</u> <u>natural-gas/).</u>

USACE_021539

PREPA estimates that the conversion of these units from diesel to natural gas will generate an estimated $750 million in fuel cost savings over five years for PREPA and significantly reduce emissions.

The conversion of San Juan Units 5 and 6 and the development of the micro fuel handling facility are anticipated to be complete by mid-2019.

**OCTOBER 2021**

# Draft Supplemental Environmental Assessment

## SAN JUAN HARBOR, PUERTO RICO SEAGRASS MITIGATION, ADDITIONAL SAND SOURCE

USACE_021667



**U.S. Army Corps
of Engineers**
JACKSONVILLE
DISTRICT

# 3   AFFECTED ENVIRONMENT AND ENVIRONMENTAL EFFECTS

The affected environment succinctly describes the existing environmental resources which have the potential to be affected as a result of implementing the alternatives considered. The affected environment forms the base-line conditions for determining the environmental consequences of the proposed action and reasonable alternatives. The environmental resources, as discussed within 2015 Mitigation EA as well as the 2018 IFR/EA, have been analyzed and a FONSI was executed. Therefore, only resources which have the potential to be affected from the Preferred Alternative or are relevant to the decision to be made were carried forward for further discussion and analysis of environmental consequences in this section. Refer to Section 1, Table 1-1, for resources that were considered, but not carried forward for detailed analysis in this section.

The general environmental setting for SJH was described in Section 1.2.1, Study Area and described in considerable detail in the 2015 Mitigation EA and the 2018 IFR/EA. The following environmental resource sections include information summarized from the 2015 Mitigation EA, the 2018 IFR/EA, and have been updated with relevant 2021 information.

## 3.1   NAVIGATION

SJH is a federal navigation channel for the Commonwealth of Puerto Rico (Figure 1-3). Over half the commerce of Puerto Rico passes through SJH. The principal cruise tourism facilities are on the south side of Old San Juan and on the north side of Isla Grande. Puerto Rico's cruise ships, containerized cargo, dry bulk grains, general cargo (including automobiles), and petroleum products pass through SJH. Container cargo terminals are located at Puerto Nuevo in the southeast part of the bay. It also provides navigation through the San Antonio Channel which is connected tidally to Condado Lagoon.

### 3.1.1   NO ACTION ALTERNATIVE

No effects to navigation would be expected with this alternative.

### 3.1.2   PREFERRED ALTERNATIVE

The Preferred Alternative would have no adverse effects to navigation. The 15-ac area outside of Cut-6 would be sloped to match depths of Cut-6 and the Anegado Channel. This area would not be incorporated into the approved Federal SJH navigation channel; therefore, over time sedimentation accumulation within this 15-ac area would be expected.

Methods to transport dredged material to Condado Lagoon may involve a floating or submerged pipeline, or combination thereof. Effects to navigation from the pipeline or other methods to transport dredged material would be construction related. Therefore, adverse effects would be minor as marine vessels would have to temporarily avoid pipelines, barges, or other dredged material transportation equipment. During construction the project Contractor would be responsible for appropriate markers, lighting, or signs in compliance with Puerto Rico and federal laws regarding equipment used in SJH, San Antonio Channel, marina, and Condado

15

*USACE_021684*

effects to hardbottom EFH within these areas would be minor and associated to temporary increases in turbidity and suspended solids from dredge operations. Dredge operations would not be permitted to violate Puerto Rico's water quality standards as discussed in Section 3.5. Therefore, suspended sediments are not expected to be within levels that would result in substantial adverse long-term effects to hardbottom habitat at Sites 2, 3, and 4.

The 2015 and 2018 EAs determined no significant impacts to EFH related to fill in Condado Lagoon. However, the 2021 benthic survey identified grass beds throughout Condado Lagoon and east of the terminus of the San Antonio Channel (Figure 3-5). As described in Section 3.6, the Preferred Alternative is expected to have minor, temporary adverse effects to seagrass habitat and long-term ecological benefits associated to filling artificial depressions. The Preferred Alternative would avoid existing seagrass EFH (Figure 3-5) to the extent practical. Furthermore, any adverse effects would be offset from approximately 18 ac of seagrass EFH establishment that is expected within the placement areas. Thus, expanding EFH and benefiting NMFS listed species (Table 1-1) in Condado Lagoon.

## 3.8   PROTECTED SPECIES

The USFWS and NMFS have responsibilities under the Endangered Species Act of 1973 (16 U.S.C. §1531 *et seq.*) (ESA) to protect certain species. There are many threatened and endangered (T&E) species known to occur near SJH. However, not all of them would be affected by the currently proposed action. Accordingly, in 2015, 2018 and 2021 the USACE coordinated with USFWS Field Office in Boquerón, Puerto Rico, as well as the NMFS Southeast Regional Office in St. Petersburg, Florida, to focus on the species listed in Table 3-1. This list includes the federally listed T&E species that could be present in the area based upon their geographic range, except for whales due to their offshore/deep water tendencies. Refer to Section 1.8, regarding whales. The actual occurrence of a species in the area would depend upon the availability of suitable habitat, the season of the year relative to a species' temperature tolerance, migratory habits, and other factors.

As part of the 2018 IFR/EA, the USFWS concurred with the USACE may affect, not likely to adversely affect determination for the Antillean manatee via informal consultation letter dated June 21, 2018. In addition, USACE received a Biological Opinion (BO) (2018) from the NMFS evaluating potential effects of listed species from the SJHNI Project. In the 2018 NMFS BO, the NMFS determined that the proposed action (2018 IFR/EA recommended plan) is not likely to adversely affect leatherback sea turtles, sperm, sei, blue, and fin whales, elkhorn, staghorn, pillar, rough cactus, mountainous star, lobed star, and boulder star corals, scalloped hammerhead sharks, Nassau grouper, giant manta rays and is not likely to adversely modify designated critical habitat for elkhorn and staghorn corals. However, NMFS concluded that the proposed action (2018 IFR/EA recommended plan) may adversely affect but is not likely to jeopardize the continued existence of the green, loggerhead, and hawksbill sea turtles. Species information provided in this section has be taken directly from the 2018 NMFS BO and/or the 2018 IFR/EA. For addition details regarding T&E and EFH listed species refer to Appendix F and G of the 2018 IFR/EA.

28

**TABLE 3-1: SELECTED FEDERALLY THREATENED AND ENDANGERED SPECIES POTENTIALLY PRESENT IN THE VICINITY OF SAN JUAN HARBOR, PUERTO RICO**

| Common Name | Scientific Name | Status | Year Listed |
|---|---|---|---|
| Marine Mammals | | | |
| Antillean Manatee | *Trichechus manatus* | T | 2017 |
| Marine Turtles | | | |
| Leatherback turtle | *Dermochelys coriacea* | E | 1970 |
| Loggerhead turtle | *Caretta caretta* | Northwest Atlantic Ocean DPS; T | 2011 |
| Hawksbill turtle | *Eretmochelys* | E | 1970 |
| Green turtle | *Chelonia mydas* | Northwest Atlantic DPS; T | 2016 |
| Fish | | | |
| Scalloped hammerhead shark | *Sphyrna lewinii* | Northwest Atlantic DPS; TT | 2014 |
| Nassau grouper | *Epinephelus striatus* | T | 2016 |
| Giant manta ray | *Manta birostris/ M.* | T (proposed) | 2017 |
| Corals | | | |
| Elkhorn coral | *Acropora palmata* | T | 2006 |
| Staghorn coral | *Acropora cervicornis* | T | 2006 |
| Pillar coral | *Dendrogyra cylindrus* | T | 2014 |
| Rough Cactus Coral | *Mycetophyllia ferox* | T | 2014 |
| Lobed Star Coral | *Orbicella annularis* | T | 2014 |
| Mountainous Star Coral | *Orbicella faveolata* | T | 2014 |
| Boulder Star Coral | *Orbicella franksi* | T | 2014 |

E – federally-endangered
T – federally-threatened
Endangered: A taxon "in danger of extinction throughout all or a significant portion of its range."
Threatened: A taxon "likely to become endangered within the foreseeable future throughout all or a significant portion of its range."

Additionally, in July 2021 USACE contacted the USFWS, NMFS, and National Oceanic and Atmospheric Administration (NOAA) regarding the proposed project modifications concerning this SEA. Based on agency discussions and the mutual understanding that the proposed action would not result in any major modifications, the agencies tentatively indicated that coordination and determinations from 2018 would likely be applicable to the currently proposed project. Draft coordination letters (Appendix D) have been prepared stating the proposed project would have no major modifications and will be sent concurrently with the public noticing of this SEA. Furthermore, these agencies were provided the draft results of the 2021 benthic survey. The draft 2021 benthic survey indicated that no ESA listed species were observed; however, coordination with these agencies is ongoing based on the presence of hardbottom and seagrass habitat in the study area.

Scalloped hammerhead sharks, giant manta ray, and Nassau grouper are unlikely to be found within SJH and have not been reported within the San Juan Bay. The final rule listing distinct

*USACE_021698*

population segments of scalloped hammerhead shark as threatened, including the Southwest Atlantic distinct population segment where Puerto Rico is located, indicated that that the NMFS has not been able to establish that the species is present in waters around Puerto Rico (80 FR 71774). The giant manta ray is typically found in offshore in the open ocean and sometimes may be found around nearshore reefs and estuarine waters; none of these conditions are found within SJH or Condado Lagoon. Giant manta ray may transit the area around the ODMDS or vessel disposal routes. Nassau grouper are found in offshore waters among coral and hardbottom. These conditions are not present with the SJH or Condado Lagoon, but the species may be found transiting near the disposal routes in areas where hardbottom is present.

Loggerhead sea turtles are not common and do not nest in Puerto Rico. Over a period of more than 20 years only four strandings of loggerheads have been reported around Puerto Rico. Past aerial surveys around the entire Island of Puerto Rico estimated that loggerheads represented only 0.5% of all sea turtle species observed.

No leatherbacks have been reported within the San Juan Bay and they are not expected within the Harbor because their life history, sheltering, and foraging requirements would not be met. Leatherback sea turtles inhabit pelagic waters where they forage primarily on jellyfish. However, nesting by leatherbacks has been reported on the sandy beach north of the Avenida Ashford (Dos Hermanos) Bridge northwest of Condado Lagoon (Harberer 2005).

Based on historic aerial surveys around Puerto Rico, green sea turtles comprised approximately 30% of the sightings and hawksbill turtles comprise approximately 8%. From 1992 to 2008 there have been several reports of green and hawksbill sea turtles near the project area, all of which stranded due to incidental or targeted capture by fishers or for unknown reasons. From 2013 to 2018, reported sightings within the areas of SJH include six juvenile or sub-adult green turtles and one adult hawksbill turtle. Green sea turtle nesting activity is low in Puerto Rico when compared to other areas of the Caribbean and Atlantic and there has been no reported nesting near La Esperanza Peninsula. However, hawksbill sea turtle nesting has been reported on the sandy beach north of the Avenida Ashford (Dos Hermanos) bridge northwest of Condado Lagoon (Harberer 2005).

The Antillean manatee inhabits the coastal waters of Puerto Rico and has been documented both feeding and traveling in the SJH and Condado Lagoon. Seagrass beds in the Lagoon provide suitable foraging habitat for the species. Furthermore, the location of the Lagoon provides suitable shelter for the species. In addition to being protected under the Marine Mammal Protection Act (MMPA) (Public Law 92-522), this species is protected by Puerto Rico Law Number 241 of August 15, 1999 (Wildlife Law of the Commonwealth of Puerto Rico) and Puerto Rico Regulation Number 6766 of February 11th, 2004, which regulates the management of threatened and endangered species in Puerto Rico. USFWS has not designated critical habitat for this species in the project area.

USACE_021699

All seven species of ESA-listed corals have been found on the fringing reefs along the north coast of San Juan. However, in relation to the study area, the closest known location of coral(s), to include listed species, are located near Cut-2 (Figure 1-2) at the entrance of SJH and offshore of the north entrance to Condado Lagoon. No corals have been recorded by the USACE or NMFS habitat conservation division staff during towed video surveys within the dredging areas of the SJHNI Project (2018). Furthermore, 2021 benthic surveys results confirm no listed corals exist within the area of potential effect (Figure 3-4).

Of the seven listed coral species, only elkhorn and staghorn have designated critical habitat pertaining to the study area. Designated critical habitat for elkhorn and staghorn corals is located near Cut-2, approximately 2,500 ft north of the dredging area and adjacent to the ODMDS disposal routes. Furthermore, under 50 CFR Part 223 a 4(d) rule (16 U.S.C. §1533(d)) establishing "take" prohibitions for elkhorn and staghorn corals went into effect on November 28, 2008 for these areas.

### 3.8.1   NO ACTION ALTERNATIVE

Overall, the effects to protected species would be as described in the 2015 EA and the 2018 IFR/EA.  The habitat improvements within Condado Lagoon would be less than previously assessed due to the lack of suitable material from the SJHNI Project construction and the entire 18-ac of habitat would likely not be restored within Condado Lagoon as envisioned.  Protected species would receive some benefit from habitat improvements as described in the 2018 IFR/EA, but not the full extent of habitat restoration.

### 3.8.2   PREFERRED ALTERNATIVE

The Preferred Alternative would have less than or similar effects to T&E listed species as determined under the 2018 IFR/EA. The 2018 IFR/EA concluded that the SJHNI Project would not result in significant adverse impacts to ESA listed species in the study area. The NMFS concurred with the USACE determination that the proposed project, "may affect, but is not likely to adversely affect" scalloped hammerhead shark, Nassau grouper, giant manta ray, leatherback sea turtles, Antillean manatee, sperm, sei, blue, or fin whales, elkhorn, staghorn, pillar, rough cactus, lobed star, mountainous star or boulder star corals, and would not adversely modify designated critical habitat for Acropora corals. During project construction, dredging operations "may affect" green and hawksbill sea turtles if a hopper dredge is used for construction. Project plans have been refined to minimize potential effects to the extent feasible. Furthermore, applicable agency coordination and consultation determinations would be completed prior to implementation of Preferred Alternative. Construction avoidance and minimization measures established in 2018 would be carried forward and applied the Preferred Alternative. If additional measures are needed, a mutual agreement between the agency and USACE would be established.

Direct, physical injury effects to T&E listed species (except possible hopper dredging effects to swimming green and hawksbill sea turtles) are not expected from construction machinery or materials because these species are able to detect and move away from dredge and disposal

31

# SAN JUAN HARBOR, PUERTO RICO NAVIGATION IMPROVEMENTS STUDY

## Final Integrated Feasibility Report & Environmental Assessment

### APPENDIX C
### Economics
June 2018



US Army Corps
of Engineers
Jacksonville District

USACE_022631

*Table 2: Regional Income and Poverty*

| Geography | Median Household Income (in 2014 dollars) | Per Capita Income | Individuals Below Poverty Level |
|---|---|---|---|
| | | | |
| Bayamón | $24,597 | $12,975 | 35.4% |
| Caguas | $24,083 | $13,149 | 37.5% |
| Canóvanas | $20,494 | $10,304 | 44.1% |
| Carolina | $28,660 | $14,937 | 30.1% |
| Cataño | $18,625 | $10,592 | 49.6% |
| Dorado | $27,924 | $14,753 | 36.1% |
| Guaynabo | $34,450 | $21,992 | 27.7% |
| Gurabo | $27,909 | $14,523 | 34.7% |
| Manatí | $18,796 | $10,390 | 45.3% |
| Naranjito | $17,478 | $9,481 | 49.7% |
| San Juan | $22,266 | $16,931 | 40.9% |
| Toa Alta | $29,183 | $13,197 | 32.9% |
| Toa Baja | $23,642 | $11,736 | 37.8% |
| Trujillo Alto | $30,687 | $15,182 | 30.8% |
| Vega Baja | $16,625 | $9,145 | 50.4% |
| Puerto Rico | $19,686 | $11,331 | 45.2% |
| USA | $53,482 | $28,555 | 15.6% |

Source: U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates, Selected Economic Characteristics

## 2.3 Environmental Justice (EJ)

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," directs Federal agencies to address environmental and human health conditions in minority and low-income communities.  The evaluation of environmental justice is dependent on determining if high adverse impacts from a proposed project would disproportionately affect minority or low-income populations in the affected communities.[7] Figure 6 presents the Environmental Justice communities by census blocks.

---

[7] See IFR/EA for discussion of potential adverse impacts from the recommended plan.

USACE_022646



*Figure 6. Environmental Justice Communities of San Juan Harbor*

Based on the size of the proposed project, the region of interest for environmental justice analysis was determined to be the area within a one-mile radius of the project.  The demographic characteristics of persons living within the buffer were identified and summarized using the digital Census block group layers for the San Juan Municipality.   A geospatial analysis tool was used to create a one-mile buffer from the centerline of the San Juan Municipality.  A summary of the population demographics (racial and socioeconomic data) for persons living within the one-mile buffer is presented in Table 3.

9

USACE_022647

*Table 3: Demographic and Socioeconomic Data of 15 Census Block Groups*

| Census Block Groups | San Juan | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 0005062 | 0004002 | 0006003 | 0006001 | 0005061 | 0006002 | 0004001 | 0007001 |
| Total Population | 963 | 756 | 245 | 714 | 500 | 595 | 332 | 694 |
| White | 805 | 489 | 144 | 519 | 409 | 501 | 200 | 528 |
| % White | 84% | 65% | 59% | 73% | 82% | 84% | 60% | 76% |
| Minority | 158 | 267 | 101 | 195 | 91 | 94 | 132 | 166 |
| % Minority | 16% | 35% | 41% | 27% | 18% | 16% | 40% | 24% |
| | | | | | | | | |
| % of individuals under age 5 | 7% | 5% | 0% | 14% | 5% | 2% | 0% | 2.0% |
| % of individuals over age 64 | 9% | 3% | 11% | 6% | 7% | 9% | 12% | 36% |
| | | | | | | | | |
| % of households living under poverty level | 31% | 37% | 86% | 77% | 31% | 7% | 71% | 71% |

Source: U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates

The U.S. Census Bureau's 2010-2014 American Community Survey estimates indicate that a total of 4,799 individuals live within one-mile radius of the project site.  A total of 25 percent of this population (1,204 individuals) is minorities.   Approximately 32 percent of San Juan Municipality's population is identified as belonging to minority a group. The population density of minorities living in the one-mile buffer area is lower than the rest of San Juan. The highest concentration of minority population is located in Census Block Group 0006003 (41 percent) and the lowest is in Census Block Groups 0005062 and 0006002 (16 percent).

Approximately 46.5 percent of households in the one-mile radius live below the poverty level compared to 42.3 percent in San Juan and 45.5 percent in the Commonwealth of Puerto Rico. Census Block Group 0006001 has the highest number of people living below poverty level (77 percent) compared to 7 percent for 0006002, which is the lowest.  In all, households living under the poverty level for the one-mile radius are about the same compared to households in the immediate surroundings or municipalities.

As shown in Figure 6 above, the racial minority population within the one-mile radius (25 percent) is lower than that of San Juan Municipality (32 percent) and about the same compared to the Commonwealth-wide average (24.2 percent) for the same groups.  Thus, the San Juan Harbor Improvements Project would not be expected to cause disproportionately high and adverse effects on any minority or low income populations in accordance with Executive Order 12898.

USACE_022648

## 8.2 Economic Modeling Phases

This section explains the measures and assumptions associated with each economic modeling phase. Due to risks and uncertainties associated with PREPA's conversion to LNG at the San Juan and Palo Seco power plants[41], two alternative future with-project conditions are presented and used for plan formulation:

- FWP Sc1 (scenario one, with LNG conversion): Conversion from use of diesel fuel to LNG in power generation at the San Juan area power plants takes place. Power generation cost reduction benefits are included in project benefits.
- FWP Sc2 (scenario two, without LNG conversion): Diesel fuel continues to be used in power generation at the San Juan area power plants. Power generation cost reduction benefits are NOT included in project benefits.

Table 29 and Table 30 summarize the screening level results of each economic modeling phase assuming that a conversion to LNG does take place (FWP Sc1) and does not take place (FWP Sc2) and uses rough order of magnitude (ROM) costs provided by SAJ Cost EN.  Costs are presented at FY17 price levels, and the FY18 Federal Water Resources Discount rate of 2.75 percent is assumed. Table 31 summarizes the final array results. The final array analysis utilized refined costs at FY18 price levels and the FY18 Federal Water Resources Discount rate of 2.75 percent. Details of each phase are discussed in Sections 8.2.1 through 8.2.3.

*Table 29: Screening Level Economic Analysis Results by Phase – FWP Sc1*

| ECONOMIC ANALYSIS SUMMARY | | | EXPECTED VALUE BENEFITS, COSTS, & NET BENEFITS | | | |
|---|---|---|---|---|---|---|
| Phase | Description | Alternative | AAEQ  BENEFITS | AAEQ COSTS | AAEQ NET BENEFITS | BCR |
| Phase-1 | Alt 1: Army Terminal Channel 100-foot Widening @ Existing 40-foot Depth* | 100-foot Army Terminal Channel Widener | $   72,391,000 | $   13,347,000 | $  59,045,000 | 5.4 |
| Phase-2 | Alt 2: Deepen Cut-6 to 2' > Projet Depth; Deepen Anegado, Army Terminal Channel and Turning Basin | 41 feet | $     306,000 | $     381,000 | $     (76,000) | 0.8 |
| | | 42 feet | $     747,000 | $     514,000 | $     233,000 | 1.5 |
| | | 43 feet | $   1,191,000 | $     631,000 | $     560,000 | 1.9 |
| | | 44 feet | $   1,447,000 | $     824,000 | $     623,000 | 1.8 |
| | | 45 feet | $   1,447,000 | $   1,006,000 | $     441,000 | 1.4 |
| Phase-5 | Alt 7: Cruise Ship Basin East & San Antonio Channels and Deepening | 36 feet (assumes 43 feet AT) | $   1,418,000 | $     302,000 | $   1,117,000 | 4.7 |
| | | 36 feet (assumes 44 feet AT) | $   1,438,000 | $     302,000 | $   1,136,000 | 4.8 |
| Full Plan | Cut-6 @ 45 feet, Anegado @ 43 feet; 100-foot Army Terminal Channel Widener, 43-foot Army Terminal Channel Deepening; 36-foot San Antonio & Cruise Ship Basin East Deepening* | | $   74,934,000 | $   14,279,000 | $  60,650,000 | 5.2 |
| | Cut-6 @ 46 feet, Anegado @ 44 feet; 100-foot Army Terminal Channel Widener, 44-foot Army Terminal Channel Deepening; 36-foot San Antonio & Cruise Ship Basin East Deepening* | | $   75,269,000 | $   14,472,000 | $  60,790,000 | 5.2 |

*Power generation benefits included
NOTES: All costs are preliminary.
- Costs at are FY17 price levels. All $ values rounded to the $1,000's.
- Costs above do NOT include PED or construction management.  A subsequent calculation to include these costs led to the same plans (43-foot and 44-foot depths) being carried forward to the final array.
- Only Phase-1 and Full Plan costs include mob/demob.  It is assumed that Phase-2 and Phase-5 will piggyback on Phase-1 by taking advantage of that mob/demob.
- IDC NOT included for ~$346 million LNG infrastructure investment.

---

[41] See Section 11 for further discussion of risks and uncertainties.

USACE_022696

*Table 30: Screening Level Economic Analysis Results by Phase – FWP Sc2*

| ECONOMIC ANALYSIS SUMMARY | | | EXPECTED VALUE BENEFITS, COSTS, & NET BENEFITS | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Phase** | **Description** | **Alternative** | **AAEQ BENEFITS** | **AAEQ COSTS** | **AAEQ NET BENEFITS** | **BCR** |
| Phase-1 | Alt 1: Army Terminal Channel 100-foot Widening @ Existing 40-foot Depth | 100-foot Army Terminal Channel Widener | $ 1,438,000 | $ 519,000 | $ 919,000 | 2.8 |
| Phase-2 | Alt 2: Deepen Cut-6 to 2' > Projet Depth; Deepen Anegado, Army Terminal Channel and Turning Basin | 41 feet | $ 305,000 | $ 381,000 | $ (76,000) | 0.8 |
| | | 42 feet | $ 747,000 | $ 514,000 | $ 233,000 | 1.5 |
| | | 43 feet | $ 1,191,000 | $ 631,000 | $ 560,000 | 1.9 |
| | | 44 feet | $ 1,447,000 | $ 824,000 | $ 623,000 | 1.8 |
| | | 45 feet | $ 1,447,000 | $ 1,006,000 | $ 441,000 | 1.4 |
| Phase-5 | Alt 7: Cruise Ship Basin East & San Antonio Channels and Deepening | 36 feet (assumes 43 feet AT) | $ 1,418,000 | $ 302,000 | $ 1,117,000 | 4.7 |
| | | 36 feet (assumes 44 feet AT) | $ 1,438,000 | $ 302,000 | $ 1,136,000 | 4.8 |
| Full Plan | Cut-6 @ 45 feet, Anegado @ 43 feet; 100-foot Army Terminal Channel Widener, 43-foot Army Terminal Channel Deepening; 36-foot San Antonio & Cruise Ship Basin East Deepening | | $ 3,986,000 | $ 1,452,000 | $ 2,530,000 | 2.7 |
| | Cut-6 @ 46 feet, Anegado @ 44 feet; 100-foot Army Terminal Channel Widener, 44-foot Army Terminal Channel Deepening; 36-foot San Antonio & Cruise Ship Basin East Deepening | | $ 4,321,000 | $ 1,645,000 | $ 2,670,000 | 2.6 |

NOTES: All PREPA calls were removed from the benefit analysis by post-processing HarborSym outputs to take out transportation costs associated with calls to the PREPA dock in both the FWOP and FWP conditions.

- Costs at are FY17 price levels. All $ values rounded to $1,000's.
- All costs are preliminary.
- Costs above do NOT include PED or construction management.  A subsequent calculation to include these costs led to the same plans (43-foot and 44-foot depths) being carried forward to the final array.
- Only Phase-1 and Full Plan costs include mobilization (mob)/demobilization (demob).  It is assumed that Phase-2 and Phase-5 will piggyback on Phase-1 by taking advantage of that mob/demob.

USACE_022697

appropriate if sufficient landside storage capacity exists to store the additional product[60] and there are sufficient LR1 vessels available in the world fleet. Addition of more LR1 tankers and reduction of MR tanker calls could impact transportation costs savings associated with Economic Modeling Phase 2 deepening.

- Based on historical data, modeling currently assumes that a percentage of MR tankers and LR1 tankers call San Juan not utilizing all existing available channel depth and will continue this practice in the future. Because these vessels are not currently taking advantage of all existing channel depth, the analysis assumes that such vessels cannot benefit from channel deepening even when the design drafts of the vessels and the densities of the products carried could theoretically allow for additional loading. Information received at May 2017 meetings with port users suggested that construction of additional landside petroleum storage capacity (to be completed before the 2026 project base year in both the with- and without-project conditions) in San Juan could potentially reduce the occurrence of partial loading seen in the historical record and assumed to continue in the existing, FWOP, and FWP conditions. Reduction in the number of partially loaded 50K and/or 70K tanker calls (i.e., increase in fully loaded 50K and/or 70K tanker calls) could result in an increased number of benefitting vessels in the Phase 2 deepening of the Army Terminal Channel.

## 11.2   Power Generation Cost Reduction Benefits

Uncertainty exists around several assumptions supporting the calculation of power generation cost reduction benefits. These risks include the following:

- <u>Variation in the price spread over time between LNG and diesel fuel</u>: Diesel fuel and LNG prices fluctuate and thus the spread between the prices of these two commodities varies over time. When LNG prices are lower and diesel prices are higher, then Economic Modeling Phase 1 power generation cost reduction benefits will appear larger. When the opposite is true and LNG and diesel prices converge, the Economic Modeling Phase 1 power generation cost reduction benefits will decrease. Assuming that the historical price data (2010 through March 2015) used in the 2015 draft IRP was also used in the power generation cost calculations for diesel and LNG, the current analysis uses a historical period over which the spread between natural gas and diesel prices is relatively wide and sustained, a risk that should be acknowledged as use of this time period leads to significant project benefits. However, it is also important to note that the prices used by PREPA in the 2015 draft IRP are based on a period of more than five years, which was the best available information at the time of that report. Furthermore, although the magnitude of the price differential has varied, natural gas prices have been consistently lower than diesel prices between 2000 and 2016 with only a few exceptions. Given the Phase 1 BCR of 5.0:1.0 at 2.75 percent, some decrease in the spread between diesel and LNG prices can occur and still result in Phase 1 justification with the LNG conversion.

Also, while power generation cost reduction is the largest source of project benefits, it is also the largest source of project costs. As shown in FWP Sc2 (without PREPA conversion), the

---

[60] Landside storage capacity is assumed to be sufficient to accommodate the MR, LR1, and LR2 FWP fleet established in the primary analysis described throughout this appendix. However, if there were a shift to less MR calls and more LR1 calls and if the same number of LR2 calls was assumed, then presumably additional analysis would be needed to ensure that the landside storage capacity could accommodate this increased average tonnage/call.

USACE_022715

project is economically justified if both the costs and benefits associated with LNG conversion are removed and it is assumed that diesel is used for power generation both with and without a Federal navigation project. Thus, from a planning perspective, the risk in price fluctuations between diesel and LNG is borne by PREPA and not by the Federal government since the cost to the Federal government remains the same both with and without the LNG conversion and the project remains justified in both scenarios.

- Changes in power generation technology and/or EPA policy between now and conversion to LNG: First, changes in technology that lead to changes in the efficiency rates between diesel and LNG could possibly lead to changes in which fuel is preferred from a profitability perspective. For example, if technology were developed that allowed the BTU content of diesel to be used more efficiently than the BTU content of LNG, then diesel may become cheaper option and the advantages of using LNG may diminish. As mentioned previously, the risk associated with changes in technology are borne by PREPA rather than by the Federal government since the Federal cost remains unchanged and the project remains justified both with and without a conversion to LNG in the San Juan area power plants.

    Second, a major driving force behind PREPA's conversion to LNG is environmental regulations that restrict emissions by power plants.  If the EPA were to scale back requirements of the MATS or other environmental standards, then incentives to convert to LNG may diminish and other fuels for generating power such as fuel oil #6 may again become viable options.  Changes in environmental standards are possible due to factors such as policy shifts and legal challenges, several of which have been brought against MATS since its 2013 adoption. *Volume I: Supply Portfolios and Futures Analysis* of PREPA's 2015 draft IRP acknowledges the legal uncertainty but states that "MATS is currently in force, until such time that is vacated by the courts, and it is likely that by the time the decisions recommended in this IRP are implemented, MATS in its current form or substantially in its current form will be in place" (page xiii). In the case that PREPA were to abandon the conversion to LNG, then both project benefits and costs would decrease.  As stated above, even in the absence of a conversion to LNG, the measures included in Economic Modeling Phase 1 would be justified based on the partial transition from MR to LR2 tankers.

- Use of methods other than those proposed in the current study to supply LNG to the northern coast of Puerto Rico: Efforts to pipe LNG from the south to the north have been made in the past but the project was cancelled in large part due to concerns by opponents that the pipeline through the islands undeveloped central mountains may have negative environmental impacts.[61] In October of 2012 PREPA withdrew the permit application for this project known as the Via Verde Natural Gas Pipeline while the application was under review by USACE.  At this time USACE was in the process of finalizing an Environmental Assessment for the project after receiving public comments.[62]

---

[61] Source: U.S. Energy Information Administration (EIA). July 2017, https://www.eia.gov/state/print.php?sid=RQ. Accessed 27 July 2017.

[62] Source: Sticht, Nancy J. "Busy year for nation's largest regulatory program." U.S. Army Corps of Engineers Jacksonville District, 10 January 2013, http://www.saj.usace.army.mil/Media/News-Stories/Article/479590/busy-year-for-nations-largest-regulatory-permitting-program/. Accessed 27 July 2017.

USACE_022716



## Government of Puerto Rico
Puerto Rico Electric Power Authority

January 11, 2018

Mr. Eric Summa
Chief, Planning and Policy Division
Jacksonville District Corps of Engineers
701 San Marco Boulevard
Jacksonville, Florida 32207-8175

Dear Mr. Summa:

**Re:  LNG Receiving, Storage & Gasification Facilities at San Juan**

Consistent with previous communications by the Puerto Rico Electric Power Authority (PREPA) regarding the above referenced project, PREPA takes this opportunity to offer more details on the process for project approval, as well as the financial scheme envisioned to establish a Public-Private Partnership (P3) for its development.  As mentioned before, the project for a terminal in San Juan harbor for receiving, storing and gasification of Liquefied Natural Gas (LNG) is key to comply with the Mercury and Air Toxic Standards (MATS), as regulated by the US Environmental Protection Agency (EPA).  The use of natural gas will also contribute to reduce and stabilize Puerto Rico's electricity rates, hence contributing to the economic growth potential of Puerto Rico.



The above referenced project requires both local and federal approvals.  The provision of LNG to the northern plants is included in PREPA's Integrated Resources Plan (IRP) and this project is acknowledged by the Puerto Rico Energy Commission (PREC) as our selected project to provide the LNG to the northern power plants.  Project submission to the PREC will take place alongside with project filing to the Federal Energy Regulatory Commission (FERC), which must provide the ultimate approval for a terminal in San Juan harbor for receiving, storing and gasification of LNG.  FERC is the leading agency regarding the construction of new LNG terminals within the United States.

Regarding permit application for the LNG terminal to the FERC, and as directed by that federal agency, simultaneous filings on other federal and local government agencies will be required in order to achieve a 2.5 to 3 year final approval.  Engineering and design is also to be performed in that 2.5 to 3 year timeline on a parallel basis, and once approved by FERC, an estimated additional 3 year period for construction and commissioning period is expected, which will pose the project into commercial operation by early 2024 and not later than 2025.

Chief Executive Officer
G.P.O. Box 364267
San Juan, Puerto Rico 00936-4267

☐ 787.521.4666
🖷 787.521.4665



"We are an equal opportunity employer and do not discriminate on the basis of race, color, gender, age, national or social origin, social status, political ideas or affiliation, religion; for being or perceived to be a victim of domestic violence, sexual aggression or harassment, regardless of marital status, sexual orientation, gender identity or immigration status; for physical or mental disability, for veteran status

Mr. Eric Summa
Page 2

As stated earlier, PREPA will pursue a P3 for this project, which will be an agreement between a private company and Puerto Rico's government, including PREPA. The agreed term is currently envisioned to be from 15 to 20 year operation, where at the end of the term all the facilities and infrastructure title and ownership shall be vested upon the Government of Puerto Rico. As part of the agreement, Puerto Rico's government will provide port, portside land and necessary easements for the infrastructure and will start studies for design and permitting, being PREPA who will file the permit application to FERC. On the other side, the private company will engineer, design, construct, operate, and own-to-transfer the maritime terminal for receiving, storing, and gasification of LNG.

The private company shall provide the new dock and LNG unloading facilities, LNG transferring infrastructure (cryogenic pipeline, etc.), storage tank(s), gasifiers, and all related auxiliaries as well as gas transfer and supply lines. PREPA will purchase the LNG and the private company will unload, receive, store, gasify, and transfer natural gas to PREPA's facilities. Tolling fees shall be composed of initial CAPEX, maintenance CAPEX, OPEX, and margin. It is estimated that the tolling fee will be in the range to $1.25 to $1.50 per million BTU's managed in the facility.

The aforementioned project is similar to the P3 arrangement between PREPA and Excelerate Energy (Excelerate) for the Aguirre Offshore Gas Port (AOGP), as Excelerate will provide engineering, procurement, and construction services for the terminal. Excelerate will also provide the O&M services on the terminal, gasifying facilities, and the Floating Storage Regasification Unit vessel (FSRU). The main differences between the AOGP concept and the LNG terminal in San Juan harbor is that the FSRU is a unit under a rental agreement with no title transfer option to the government, and PREPA shall borne the cost of the off shore terminal and in-shore facilities.

The LNG terminal in San Juan harbor project estimate, approaching $350 million, has been previously submitted to the United States Corps of Engineers (USACE). For clarification purposes, profit margins included in the $350 million investment are considered for all the involved parties (permitting/regulatory advisors, designers, legal, demolition, construction, equipment, as well as the private company's overhead allocation from its project financing, if any), except the private company entering into the P3 agreement. As a P3 project, where only the private company is investing and starts to produce earnings with the tolling fee scheme, profit margins are to be included in the P3 contract terms and conditions, which it is envisioned that will be included in the tolling fee.

Mr. Eric Summa
Page 3

Timeline for issuing the request for proposal (RFP) for the project is scheduled to start on April 2018, alongside with permits and commencement of detailed studies for design. PREPA's current implementation schedule for the project is as follows:

| | Project Task | Schedule |
|---|---|---|
| 1. | Planning | Will resume on February 2018 |
| 2. | Procurement of the private company for the P3 | Start date: April 2018 |
| 3. | Permitting (detailed studies for filing) | Start date: April 2018 |
| 4. | Conceptual design and required studies | Starting month: May 2018 |
| 5. | P3 contract establishment | March 2019 |
| 6. | Detailed design | Start date: March 2019 |
| 7. | Detailed design completed all systems | September 2020 |
| 8. | Permitting final approval | February 2021 |
| 9. | Construction | From April 2021 to April 2024 |
| 10. | Commercial Operation | April 2024 |



The above mentioned schedule describes the development of the terminal in San Juan harbor for receiving, storing, and gasification of LNG project. However, PREPA has already been investing in converting the existing units for natural gas use. As an example, dual fuel combustors have already been purchased for San Juan combustion turbine units 5 & 6, for both natural gas and distillate No. 2 oil use. Also, modifications to the inside housing auxiliaries on each combustion turbine are on-going considering space requirements of natural gas piping and auxiliaries.

PREPA hereby confirms that the Federal Navigation Project, which includes the Army terminal widening and deepening, is of outmost importance and hence required for both permitting and the cost benefit of the San Juan LNG project to our end customers, which is the entire people of Puerto Rico. If the Federal Navigation Project is not constructed, in order for PREPA to sustain the reliability of the electric grid in the north area of Puerto Rico, PREPA will be forced to convert its existing No. 6 fuel oil-fired steam units in San Juan and Palo Seco Power Plants to use No. 2 light distillate oil (diesel).

The Federal Navigation Project channel widening and deepening is required for PREPA to pursue the use of currently available 125,000 to 135,000 cubic meter capacity LNG vessels or larger. Larger LNG vessels will translate in fewer port calls to San Juan harbor (about 1 per month or less, but no more than two per month). Not having the Federal Navigation Project, without the corresponding channel widening and deepening, will prevent these LNG large vessels to transit through the San Juan harbor, which will result in requesting a much higher

USACE_023123

Mr. Eric Summa
Page 4

number of port calls of smaller vessels. This will in turn result in a permitting challenge due to the already congested San Juan harbor transit.

PREPA is not optimistic in achieving permitting for frequent port calls of smaller LNG vessels, as it is well expected that the United States Coast Guard (USCG) would be reluctant to authorize a higher number of port calls for LNG vessels to enter San Juan harbor, as LNG exclusions zones will still apply to the harbor's transit. Moreover, due to the unavailability of smaller LNG carriers in the market, the only option would be to secure fabrication of not less than two vessels for continuous and dedicated use for PREPA. Such vessel costs are not included in the $350 million estimate, which would make the project not feasible for lowering electricity costs.

In terms of cost benefit to our clients, the project's importance goes beyond any return-of-investment on a project development, it is the resulting kilowatt-hour rate to Puerto Rico's residential, commercial, and industrial customers. A lower and feasible electricity rate using LNG can only be achieved with reliable LNG availability and adequate receiving means. In fact, transporting and receiving LNG in large or bulk quantities will greatly reduce transportation costs, which are also lower with a higher number of available market vessels. An adequate number of vessels in the LNG industry require the widening and deepening of San Juan harbor, which can be achieved with the Federal Navigation Project. The return-of-investment for this project will be its positive contribution to the economic growth of Puerto Rico.

We are confident that the details provided above will provide the USACE with more information on this important project for Puerto Rico. If you need more information or would like to further discuss this or other matters related to the San Juan LNG project, please contact engineer José Vázquez-Vera at (787) 521-7749 or by email at jvazquez12333@aeepr.com.

Sincerely,

Justo L. González-Torres
Acting Executive Director

c   Efran Paredes-Maisonet
    William Ríos-Mera

# FINDING OF NO SIGNIFICANT IMPACT
## SAN JUAN HARBOR, PUERTO RICO
## SEAGRASS MITIGATION, ADDITIONAL SAND SOURCE
## SAN JUAN HARBOR, PUERTO RICO

The U.S. Army Corps of Engineers, Jacksonville District (Corps) has conducted an environmental analysis in accordance with the National Environmental Policy Act of 1969, as amended.  The final Supplemental Environmental Assessment (SEA) dated January 2023, for the San Juan Harbor, Puerto Rico Seagrass Mitigation, Additional Sand Source Project addresses the dredging of an area outside the Federal channel as an additional sand source for seagrass mitigation in Condado Lagoon in San Juan, Puerto Rico.  The final recommendation is contained in this SEA and FONSI dated January 2023.

The final SEA, incorporated herein by reference, evaluated various alternatives that would provide an additional suitable sand source for the use of dredged material for seagrass mitigation and beneficial use of dredge material in Condado Lagoon. The Preferred Alternative is now the No Action Alternative.

Since issuance of the draft SEA, the Corps has decided that none of the dredged material from the initial construction of the San Juan Harbor, Puerto Rico Project, will be placed in Condado Lagoon. Instead, all of the dredged material from the initial construction will be placed in the Ocean Dredged Material Disposal Site.[1] The Corps is deferring implementation of the seagrass mitigation in Condado Lagoon associated with the construction of the Puerto Nuevo Channel in 2001 (see 2015 San Juan Harbor, Puerto Rico Submerged Aquatic Vegetation Mitigation Environmental Assessment).

The Preferred Alternative is the No Action Alternative and includes:

No dredging of an additional sand source outside the Federal channel would occur during construction of the San Juan Harbor Navigation Improvements Project. The No Action Alternative is consistent with the preferred alternative in the San Juan Harbor Puerto Rico Integrated Feasibility Report & Environmental Assessment dated August 2018 (2018 IFR/EA). Under the No Action Alternative, and in accordance with the authorized Project evaluated in the 2018 IFR/EA, the Corps may consider using dredged material from future Project operation and maintenance dredging to implement the seagrass mitigation. As described in the Chief of Engineers' Report dated August 23, 2018, the beneficial use of approximately 230,000 cubic yards of dredged material from the Project in Condado Lagoon will be considered as a placement option if a non-federal cost-sharing sponsor is identified and funding is available.

Because the first maintenance dredging event is not anticipated until 2028, at the earliest, the Corps has determined that it would conduct a supplemental NEPA analysis

---

[1] The San Juan Harbor, Puerto Rico Project includes deepening of channels with associated channel widening and turning basins, to increase security, safety, and efficiency. The San Juan Harbor, Puerto Rico Project was authorized by Congress in Section 1401(1) of the Water Resources Development Act of 2018 (Public Law 115-270) and approved in the Corps' Finding of No Significant Impact (FONSI) dated November 5, 2018.

USACE_024430

before proceeding (if at all) with a beneficial use disposal option for the SJHNI Project. In addition, in the future, if required, the Corps could propose to use an additional sand source from an undetermined location, and that proposed action would be subject to all applicable environmental compliance requirements, including supplemental NEPA.

In addition to a "no action" plan, **two** alternatives were evaluated to complete the mitigation and beneficial use of dredge material.  The alternatives included beneficial use of dredge material from La Esperanza Peninsula and use of dredge material from west of Cut-6 (described in the 2015 EA and 2018 EA).

***SUMMARY OF POTENTIAL EFFECTS:***

For all alternatives, the potential effects were evaluated, as appropriate.  A summary assessment of the potential effects of the Preferred Alternative are listed in Table 1:

**Table 1: Summary of Potential Effects of the Preferred Alternative**

|  | Insignificant effects | Insignificant effects as a result of mitigation* | Resource unaffected by action |
|---|---|---|---|
| Navigation | ☒ | ☐ | ☐ |
| Sea level change | ☐ | ☐ | ☒ |
| Geotechnical | ☐ | ☐ | ☒ |
| Hardbottom Habitat | ☒ | ☐ | ☐ |
| Water Quality | ☒ | ☐ | ☐ |
| Mangroves and Seagrass | ☐ | ☐ | ☒ |
| Essential Fish Habitat | ☒ | ☐ | ☐ |
| Protected Species | ☐ | ☒ | ☐ |
| Marine Mammals | ☒ | ☐ | ☐ |
| Cultural and historic resources | ☐ | ☐ | ☒ |

All practicable and appropriate means to avoid or minimize adverse environmental effects were analyzed and incorporated into the Preferred Alternative. Best management practices (BMPs) as detailed in the 2018 EA will be implemented, as appropriate, to minimize Project impacts.

Public review of the draft SEA and FONSI was completed in a thirty-day period from November 1, 2021 to November 30, 2021.  All comments submitted during the public review period were responded to in the Final SEA and FONSI.  As a result of public review, the final SEA identifies the Preferred Alternative to be the No Action Alternative. Public and agency comments received during the comment period requested additional information related to the beneficial use of dredged material in Condado Lagoon. The main concerns identified in the comments were related to the lack of chemical testing of the additional sand source area and the results of the one composite chemical sample from San Juan Harbor used for the chemical constituent's analysis of the proposed fill material in the draft SEA.

Pursuant to section 7 of the Endangered Species Act of 1973, as amended, the National Marine Fisheries Service (NMFS) issued a biological opinion, dated May 29, 2018, that

2

determined that the Project evaluated in the 2018 IFR/EA may affect but is not likely to adversely affect the following federally listed species or their designated critical habitat: leatherback sea turtles, scalloped hammerhead sharks; Nassau grouper; giant manta ray, sperm, sei, blue, and fin whales; elkhorn, staghorn, pillar, rough cactus, lobed star, mountainous star, and boulder star corals; and critical habitat for elkhorn and staghorn corals. In addition, NMFS determined the Project will not jeopardize the continued existence of the loggerhead, green, and hawksbill sea turtles. All terms and conditions, conservation measures, and reasonable and prudent alternatives and measures resulting from these consultations shall be implemented in order to minimize take of endangered species and avoid jeopardizing the species.  The U.S. Fish and Wildlife Service (USFWS) determined that the Project may affect but is not likely to adversely affect the Antillean manatee and nesting sea turtles by letter dated June 21, 2018. Additionally, the Corps contacted the USFWS and NMFS regarding the proposed action described in the draft SEA. By later dated December 1, 2021, USFWS concurred that a new consultation was not warranted for the proposed additional sand source.

Pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended, the U.S. Army Corps of Engineers determined that Project evaluated in the 2018 IFR/EA and, therefore, the Preferred Alternative (No Action) has no effect on historic properties. The Puerto Rico State Historic Preservation Office concurred with this determination by letters dated September 18, 2017 and August 30, 2022.

Pursuant to the Clean Water Act of 1972, as amended, the Corps has determined that the potential discharge of dredged or fill material associated with the Project evaluated in the 2018 IFR/EA and, therefore, the Preferred Alternative (No Action) are compliant with Section 404(b)(1) Guidelines (40 CFR 230), are not contrary to the public interest, and no alternative is both practicable and has a lesser impact on the aquatic environment. See Appendix I of the 2018 EA.

Another water quality certification (WQC) pursuant to section 401 of the Clean Water Act will no longer be pursued because, under the selected No Action Alternative, the proposed additional sand source area will not be utilized to supplement the beneficial use of dredged material for restoration of Condado Lagoon.  The Puerto Rico Department of Natural and Environmental Resources issued a WQC for the Project on February 2, 2022.  All conditions of the water quality certification shall be implemented in order to minimize adverse impacts to water quality.

The Puerto Rico Planning Board did not concur that the proposed action in the draft SEA was consistent with the Puerto Rico Coastal Management Program. Because the Corp is selecting the No Action Alternative, the Corps will no longer pursue a determination of consistency for the additional sand source area. The Corps previously received concurrence determination of consistency with the Puerto Rico Coastal Management program pursuant to the Coastal Zone Management Act of 1972, from the Puerto Rico Planning Board. The Puerto Rico Planning Board concurred with the Corps Federal consistency determination with the Puerto Rico Coastal Management program under the Coastal Zone Management Act of 1972 for the Project via letter dated January 4, 2018 (*See* Appendix H of 2018 SEA.)

All applicable environmental laws have been considered and coordination with appropriate agencies and officials has been completed. All applicable laws, executive orders, regulations, and local government plans were considered in evaluation of alternatives.  Based on this SEA, the reviews by other Federal, State and local agencies, Tribes, input of the public, and the review by my staff, it is my determination that the Preferred Alternative, the No Action

USACE_024432

Alternative, would not cause significant adverse effects on the quality of the human environment; therefore, preparation of an Environmental Impact Statement is not required.

BOOTH.JAMES.LAFAYETTE.1186925935
Digitally signed by BOOTH.JAMES.LAFAYETTE.1186925935
Date: 2023.01.18 22:32:31 -05'00'

_____
Date

_____
James L. Booth,
Colonel, U.S. Army
District Commander

USACE_024433

**January 2023**

# Final Supplemental Environmental Assessment

## SAN JUAN HARBOR, PUERTO RICO SEAGRASS MITIGATION, ADDITIONAL SAND SOURCE



**U.S. Army Corps of Engineers**

**JACKSONVILLE DISTRICT**

i

USACE_024434

# 1   PROJECT PURPOSE AND NEED

## 1.1   INTRODUCTION

The project study area includes San Juan Harbor (SJH), and surrounding areas as identified in the Recommended Plan in the 2018 San Juan Harbor Puerto Rico Integrated Feasibility Report & Environmental Assessment (2018 IFR/EA) and the 2015 San Juan Harbor, Puerto Rico Submerged Aquatic Vegetation Mitigation Environmental Assessment (2015 Mitigation EA).

The Puerto Nuevo Channel widening portion of the 2001 SJH expansion dredging project impacted an estimated 1.2 acres (ac) of shoal grass (*Halophila decipiens*) and marine macro-algae. Subsequently the USACE completed the 2015 Mitigation EA and in a March 2, 2015 Finding of No Significant Impact (FONSI), USACE approved compensating for the submerged aquatic vegetation (SAV) impacts by filling 4 ac using suitable sandy material in artificial depressions in Condado Lagoon (Figure 1-1) to reach the target mitigation of 1.2 ac at -12 to -15 ft. Although construction of this mitigation was included in advertisements for past SJH Operation & Maintenance dredging (O&M) events, contract bids have consistently exceeded the awardable thresholds and the mitigation remains unconstructed.

The 2018 IFR/EA for navigation improvements at SJH analyzed a beneficial use of dredged material option to fill approximately 18-ac of the artificial depressions in Condado Lagoon for seagrass restoration. The beneficial use option would fill a greater acreage of artificial depressions in Condado Lagoon then the required previous mitigation plan (2015 EA). Filling the depressions, with depth contours of -12 to -15 ft, would restore the natural bathymetry and improve the overall marine ecology within the Lagoon. The Recommended Plan from the 2018 IFR/EA, including the beneficial use option, was recommended in the Chief of Engineers' Report dated August 23, 2018, authorized by Congress in Section 1401(1) of the Water Resources Development Act (WRDA) of 2018 (Public Law 115-270), and approved in the USACE Finding of No Significant Impact (FONSI) dated November 5, 2018. This project is referred to as the "SJHNI Project" in this SEA.

Section 1122 of the WRDA of 2016 required the USACE establish a pilot program to recommend ten projects for the beneficial uses of dredged material. In a FONSI dated December 4, 2018, the Assistant Secretary of the Army (Civil Works) selected ten projects for the Section 1122 pilot program, including a project to restore the degraded aquatic ecosystem in Condado Lagoon by using dredged material from the San Juan Harbor, Puerto Rico navigation project to reestablish historic lagoon bathymetry. However, updated geotechnical investigations indicate there is less material suitable for beneficial use (coarse grain size) within the authorized channel expansion footprint for the San Juan Harbor, Puerto Rico project than anticipated in the 2018 IFR/EA.

This Supplemental Environmental Assessment (SEA) evaluates only the dredging of a new area outside the Federal channel west of Cut-6 (Figure 1-3) as an additional sand source for the seagrass mitigation. The effects of dredging Cut-6 and the other channel expansion areas, and the effects of placement into Condado Lagoon for seagrass habitat restoration were previously

6

evaluated in the 2018 IFR/EA and 2015 Mitigation EA. All discussions, consultations, effects determinations, and conclusions contained in the 2018 IFR/EA and 2015 Mitigation EA are hereby incorporated by reference into this SEA.



**FIGURE 1-1: 2015 PROPOSED SEAGRASS MITIGATION SITE, CONDADO LAGOON**

## 1.2   PROJECT AUTHORITY

The San Juan Harbor project was originally authorized under the River and Harbor Act of 1907 (Public Law 59-168) with modifications throughout the 20th century. In WRDA of 1986 (Public Law 99-662), Congress authorized the San Juan Harbor deep draft navigation project recommended in the 1982 Phase I General Design Memorandum. That project was re-authorized to include the recommendations made in the 1994 General Reevaluation Report (GRR) and Environmental Assessment (EA) by Section 301 of WRDA of 1996 (Public Law 104-303).

In 2001, the San Juan Harbor improvements were completed as reauthorized by Section 301 of WRDA of 1996. In addition, House Resolution 2764 of the Committee on Transportation and Infrastructure, U.S. House of Representatives, adopted September 20, 2006, authorized the Secretary of the Army to determine the feasibility of providing navigation improvements at San Juan Harbor, Puerto Rico to increase security, safety, and efficiency (USACE 2018). In Section 1401(1) of the WRDA of 2018 (Public Law 115-270), Congress approved navigation improvements for San Juan Harbor, Puerto Rico to be carried out substantially in accordance with the Chief of Engineers' Report dated August 23, 2018. The Chief's Report explains that the least cost option for dredged material would be disposal in the Ocean Dredged Material Disposal Site (ODMDS), but that USACE may consider the beneficial use of dredged material in Condado Lagoon if a non-federal cost-sharing sponsor is identified, and funding is available.

USACE_024440

The non-Federal sponsor for the project is the Puerto Rico Ports Authority (PRPA).

## 1.3   PROJECT LOCATION

SJH and Condado Lagoon are located on the northeast coast of Puerto Rico. SJH is the Island's principal port (Figure 1-2). The entrance channel accesses the Atlantic Ocean to the north between Isla de Cabras and Isla San Juan (Old San Juan) at Boca del Morro.



**FIGURE 1-2: LOCATION MAP OF SAN JUAN HARBOR**

### 1.3.1   STUDY AREA

The project study area includes SJH, and surrounding areas as identified in the 2018 IFR/EA Recommended Plan (Figure 1-2) and the 2015 Mitigation EA. The harbor is home to various marine and terrestrial species and their associated habitats. It is the only harbor on the north coast which affords protection in all-weather because of the relatively high elevations of Old San Juan to the north and adjacent low mangrove swamps of the Puerto Rico mainland to the south, east, and west. The southeastern area of San Juan Bay is approximately three miles wide and varies in width from 0.6 to 1.6 miles, but the entire southwest side of the bay is comprised shoals. The southwest shore is divided into two large bights by Punta Cataño, the point which extends about 0.6 miles northeast into the harbor. Additionally, Puerto Rico is a tropical island and is subject to tropical temperatures, precipitation, and storms, such as hurricanes.

Metropolitan San Juan, the capital and principal port of Puerto Rico, includes Old San Juan on the north side of Bahia de San Juan and the communities surrounding the bay. Commercial and

8

government activities are located here, and San Juan is the primary tourist capital of the commonwealth with over half of the Island's hotels located in the metropolitan area. Furthermore, over half the commerce of Puerto Rico passes through SJH. The principal cruise tourism facilities are on the south side of Old San Juan and on the north side of Isla Grande. Puerto Rico's cruise ships, containerized cargo, dry bulk grains, general cargo (including automobiles), and petroleum products pass through SJH. Container cargo terminals are located at Puerto Nuevo in the southeast part of the bay.



**FIGURE 1-3: PROJECT STUDY AREA**

### 1.3.2   HISTORICAL PERSPECTIVE

SJH has been in use since the colonization of the Island by the Spanish. As a United States territory, authorization for Federal improvements began in 1907 by the River and Harbor Act of 1907 (Public Law 59-168) (USACE 2018). The existing navigation project was authorized in Section 202(a) of the Water Resources Development Act of 1986 (Public Law 99-662) as amended by Section 301(a)(12) of the Water Resources Development Act of 1996 (Public Law 104-303).

9

The authorized navigation features described in the GRR and Environmental Assessment dated March 1994, revised June 1994, were approved by the Acting Assistant Secretary of the Army (Civil Works) on July 8, 1994. The last federally constructed navigation improvements under this authority included deepening the bar channel (Cuts 1-3, Figure 1-2) to project depths of 56-51 feet, the Entrance Channel to 48-42 feet, Anegado Channel to 40 feet, Army Terminal and Turning Basin to 40 feet, Puerto Nuevo Channel to 39 feet, Graving Dock Channel to 36 feet, Graving Dock Turning Basin to 30 feet, Anchorage Area E to 36 feet, Anchorage Area F to 30 feet, San Antonio Channels to 35 feet, Cruise Ship Basin West to 36 feet and Cruise Ship Basins East to 30 feet, and the San Antonio Channel Extension to 30 feet. Refer to Figure 1-2 for locations of forementioned navigational features.

In the 1994 GRR, USACE deferred the authorized deepening of the Cruise Ship Basin, the San Antonio Channel, and the San Antonio Extension to 36 feet because these improvements could not be economically justified at that time. Authorized deferred features were reconsidered in the 2018 IFR/EA.

## 1.4   PROJECT BACKGROUND

### 1.4.1   2015 SAV MITIGATION ENVIRONMENTAL ASSESSMENT

From 1962 to 1965, the SJH Navigation Project was constructed in San Juan Bay and included, among other works, the construction of the Puerto Nuevo Port facilities and the deepening and widening of the harbor's entrance channel, as well as the dredging of a new navigation channel, known today as the Puerto Nuevo Channel. A substantial amount of the dredged material from the development of these channels was side cast at the northwestern section of the harbor. The side cast dredged material eventually formed what is known today as La Esperanza Peninsula.

The 2001 Puerto Nuevo Channel widening activities impacted seagrass which resulted in a requirement for compensatory mitigation for 1.2 ac of shoal grass (*Halophila decipiens*) and marine macro-algae. Subsequent discussions between USACE, PRPA, U.S. Fish and Wildlife Service (USFWS), and the National Marine Fisheries Service (NMFS) were conducted regarding concerns with the two mitigation sites, as proposed in 2003, located next to the Army Terminal and Puerto Nuevo Turning Basins. These included: 1) material stabilization to create and maintain the proposed shoal area, 2) impacts/perturbations to the mitigation from navigation and operation activities, 3) potential future expansion/widening of the channel that may impact the mitigation, and 4) likelihood of mitigation success at the proposed sites. As a result, USACE signed a Finding of No Significant Impact (FONSI) for the 2015 Mitigation EA which relocated mitigation construction to Condado Lagoon (Figure 1-3).

In 2005, the La Esperanza Peninsula was dredged by the USACE under the authority of Section 1135 of WRDA of 1986 as amended, to restore water quality of the Esperanza Cove and wildlife habitat on the Esperanza Peninsula. The 2015 Mitigation EA proposes to use material from shoaled areas of La Esperanza to fill 4-ac of artificial depressions in Condado Lagoon. Subsequent contract bids exceeded award thresholds and the mitigation remains unconstructed.

USACE_024443

### 1.4.2   2018 SAN JUAN HARBOR NAVIGATION IMPROVEMENTS STUDY IFR/EA

In 2018 the USACE signed a FONSI for the SJH navigation improvements as generally described in the 2018 IFR/EA, approved by the Chief of Engineers on August 23, 2018, and authorized by Congress in WRDA of 2018.  The authorized improvements consist of modifying general navigation features within SJH. General navigation features include channels, jetties, and basins or water areas for vessel maneuvering, turning, passing, mooring, or anchoring incidental to transit of the channels. A majority of the improvements consist of deepening and widening by dredging.

Approximately 2.2 million cubic yards (cy) of material would be dredged and require disposal to complete the improvements project. Several disposal options were considered; however, due to the anticipated fines content (mostly clay), only two placement options were determined feasible: 1) placement of the majority of the fine material at the existing ODMDS, located approximately 2.2 nautical miles north-northwest of the entrance to SJH and 2) beneficial use of any appropriate quality (sandy) dredged material in Condado Lagoon to restore seagrass habitat. However, as discussed in the 2018 IFR/EA, appropriate quality sandy material is limited in quantity and only occurs in Cut-6.

### 1.5   PROJECT PURPOSE AND NEED

The purpose and need of the proposed action is to identify sufficient suitable sandy material for use during construction of the seagrass habitat restoration in Condado Lagoon as identified under the 2015 Mitigation EA and the additional beneficial use of dredged material described in the 2018 IFR/EA. At this time, to succeed with seagrass habitat restoration in Condado Lagoon, additional suitable sandy material is needed beyond what would be provided from dredging within the authorized channel expansion footprint. Therefore, appropriate quality sandy dredged material from an additional sand source is needed to reconcile outstanding seagrass mitigation and complete the SJHNI Project's beneficial use option. Filling the large eastern artificial depressions to -12 feet to -15 feet depth contours would create stable conditions for seagrass establishment. The additional borrow area material would be added to the construction material from Cut-6 to restore approximately 18 ac of seagrass habitat improving the overall marine ecology within the Lagoon.

### 1.6   RELATED ENVIRONMENTAL DOCUMENTS

Related NEPA, design, and planning reports for dredging SJH and the beneficial use of dredged material for Condado Lagoon seagrass habitat restoration includes the following:

- San Juan Harbor Puerto Rico Integrated Feasibility Report and Environmental Assessment. U.S. Army Corps of Engineers, Jacksonville District. August 2018.
- San Juan Harbor, Puerto Rico Submerged Aquatic Vegetation Mitigation Environmental Assessment. U.S. Army Corps of Engineers, Jacksonville, FL. February 2015.
- The Hydrodynamics of the Condado Lagoon. Determination of Stable Sand Grain Size for Restoration Initiative. Tetra Tech. October 2011.
- An Environmental Review of the Condado Lagoon Ecosystem Restoration Project. A Capstone Review Paper Submitted in Partial Fulfillment of the Requirements for the Degree of Master of Science: Coastal Zone Management. Nova Southeastern University Oceanographic Center. December 2005.

USACE_024444

- Section 204 Beneficial Use of Dredged Material. Preliminary Restoration Plan. Condado Lagoon. San Juan, Puerto Rico. U.S. Army Corps of Engineers, Jacksonville, FL. March 2003.
- San Juan Harbor Mitigation Sand Source, San Juan, Puerto Rico Benthic Resource Survey Report. LG2 Environmental Solutions, Inc. and CSA Ocean Sciences Inc. Prepared for U.S. Army Corps of Engineers, Jacksonville District. November 2021.

All discussions, consultations, effects determinations, and conclusions contained in the two EAs above are hereby incorporated by reference into this EA. These NEPA documents, which include specific project details, can be accessed via the internet from the USACE, Jacksonville District website (https://www.saj.usace.army.mil/About/Divisions-Offices/Planning/Environmental-Branch/Environmental-Documents/).

## 1.7    DECISIONS TO BE MADE

This SEA evaluates the proposed action of using a borrow area west of Cut-6, outside the Federal navigation channel, as an additional source of fill material for restoration of seagrass habitat in Condado Lagoon. Based on the analysis in this SEA, the USACE will decide which project alternative best realizes the purpose and need for the project while minimizing impacts to the environment.

## 1.8    RELEVANT ISSUES AND ENVIRONMENTAL RESOURCES EVALUATED

The following issues were identified as relevant to the proposed action and are appropriate for further evaluation: navigation; relative sea level change; geotechnical; water quality; seagrass; essential fish habitat; protected species including sea turtles, Antillean manatee, and listed hard corals; marine mammals; and cultural resources.

### 1.8.1    ISSUES INCORPORATED BY REFERENCE

The proposed action is expected to have little or no effect on soils, housing, or population dynamics. In addition, this SEA supplements the 2015 and 2018 EA and FONSI documents listed in Section 1.6 and provides an evaluation of the effects of dredging suitable quality material from an approximately 15-ac area adjacent to Cut-6 only (see Figure 1-2). The previous NEPA documents evaluated issues of concern related to construction and maintenance dredging, and material placement options which included the ODMDS (Figure 1-3), and beneficial use for seagrass habitat restoration in Condado Lagoon. These evaluations have been determined to be still valid since the project area and potential construction methodologies essentially remain the same. The information presented in these evaluations is complete and relevant Federal laws have not changed in a manner that would require re-evaluation of these resources. Table 1-1 presents a summary of the environmental factors evaluated in the previous NEPA documents and incorporated by reference in this SEA.

USACE_024445

**TABLE 1-1: SUMMARY OF ENVIRONMENTAL FACTORS EVALUATED IN NEPA DOCUMENTS PREPARED IN 2015 AND 2018 THAT ARE ELIMINATED FROM FURTHER ANALYSIS IN THIS SEA**

| ENVIRONMENTAL FACTOR | 2015 Mitigation EA | 2018 IFR/EA |
|---|---|---|
| AIR QUALITY | In attainment area for pollutants. Temporary adverse impacts, contribution to air pollution would be negligible. No significant adverse impacts. | No long-term accumulation of particulates. No significant adverse impacts. Temporary increase in emissions related to the construction of the project. |
| FISHERIES AND WHALE SPECIES  *NMFS managed species: Banded Butterflyfish, Red Hind, Coney, Mutton Snapper, Schoolmaster, Gray Snapper, Yellowtail Snapper, White Grunt, Queen Triggerfish, Redtail Parrotfish, Squirrelfish, Sand Tile Fish, Spiny Lobster, Queen Conch* | No effect with implementation of standard protection conditions. Whales were not evaluated. | No substantial adverse effect on essential fish habitat (EFH) or federally managed fisheries. Minor, temporary effects associated with dredging. Dredging would have no effect on whales. Protective measures would be implemented. |
| FISH AND WILDLIFE | The proposed action would provide habitat for fish, invertebrates, manatees, sea turtles, and birds. | No substantial adverse effects. Minor, temporary effects associated with dredging. Beneficial disposal option would have habitat benefits through restoring seabed in Condado Lagoon. |
| BIRDS | Create beneficial habitat. | No effect is anticipated from construction. Beneficial use disposal option may positively affect bird foraging habitat in Condado Lagoon. |
| INVASIVE SPECIES | May reduce shoaling and rate of Australian Pine invasion at La Esperanza borrow site. | No increased threats from invasive species. Regulations will help control aquatic invasive species. |
| WETLANDS | Not evaluated. | No effect. |
| COASTAL BARRIER RESOURCES | No impact. | No effect to CBRA Zones as a result of improvements. |
| WIND AND WAVE CLIMATE | Not evaluated. | No significant adverse impacts. |

USACE_024446

| ENVIRONMENTAL FACTOR | 2015 Mitigation EA | 2018 IFR/EA |
|---|---|---|
| CURRENTS AND TIDES | Not evaluated. | No effect to tidal range is predicted. Currents will generally remain the same. Some areas of the harbor may experience a reduction in currents due to wider deeper channels. |
| SHORELINE EROSION | No change. | Reduction in shoreline erosion through deepening actions. |
| NOISE | No significant adverse impacts. | Minor adverse effects to aquatic species due to displacement. Temporary and minor effect to human populations due to the construction of project. |
| HAZARDOUS, TOXIC, AND RADIOACTIVE WASTE (HTRW) | No HTRW would be encountered or released. | No HTRW is expected to be encountered or released. |
| NATIVE AMERICANS | No federally recognized Indian Tribes in Puerto Rico. | No federally recognized Indian Tribes in Puerto Rico. |
| SOCIOECONOMICS | Benefits from dredging La Esperanza. No substantial effects. | Complies with Executive Orders 12898 and 13045 and would not cause disproportionately high and adverse effects to minority populations, low-income populations, and sensitive populations such as the elderly, or children. |
| ENERGY REQUIREMENTS AND CONSERVATION | Energy will be expended to dredge and transport material. | Improves transportation efficiencies; promotes Executive Order 13783. |
| CUMULATIVE IMPACTS | Temporary degradation in water quality at dredging site and some loss of organisms at dredge site. Repopulation of organisms anticipated. | Temporary degradation in water quality at dredging site and some loss of organisms at dredge site. Repopulation of organisms anticipated. |

## 2   ALTERNATIVES

### 2.1   DESCRIPTION OF ALTERNATIVES

This SEA evaluates: 1) the No Action Alternative, 2) the Action Alternative 1, – Use of Dredged Material from Area West of Cut-6 for Seagrass Mitigation, and 3) other alternatives that were considered, but eliminated from further analysis in this SEA. Section 3 (Affected Environmental and Environmental Effects) compares the alternatives in greater detail, providing a clear basis for choice to the decision maker.

USACE_024447

### 2.1.1   NO ACTION ALTERNATIVE

Under the No Action Alternative, USACE would not use an additional sand source outside of the Federal channel (adjacent/west of Cut-6) to obtain dredged material to accomplish seagrass mitigation in Condado Lagoon.

As part of the 2018 SJHNI Project (navigation improvements authorized in WRDA 2018), the USACE may consider using dredged material to implement seagrass mitigation in Condado Lagoon. However, the USACE has decided not to pursue the Condado Lagoon fill option during the initial construction of the 2018 SJHNI Project.[1] Therefore, the seagrass mitigation described in the 2015 Mitigation EA is being deferred.

If the USACE decides to use dredged material from the 2018 SJHNI Project during a future operation and maintenance dredging event, then an additional sand source could be proposed at that time. Any such proposed action would be subject to all applicable environmental compliance requirements.

### 2.1.2   ACTION ALTERNATIVE 1 –USE OF DREDGED MATERIAL FROM AREA WEST OF CUT-6 FOR SEAGRASS MITIGATION

This alternative includes the use of a new borrow area, adjacent/west of Cut-6 to obtain the additional sand/dredged material required to create approximately 18 ac of seagrass habitat through filling artificial depressions in Condado Lagoon.  The remainder of the material would be obtained as described in the 2018 IFR/EA from the dredging of the SJHNI Project construction. This approximately 15-ac borrow area adjacent (west) of Cut-6 would match slopes and depths of the entrance channel's transition into the Anegado Channel. Potential methods to obtain the sand include a hydraulic cutterhead dredge, hopper dredge, or mechanical excavator.

Placement of dredged material in Condado Lagoon (Figure 1-2) is expected to begin in the southeast portion of the lagoon and transition to the northwest. However, attempts would be made to fill as many of deeper dredged holes as possible. Placement operations would fill to a target depth of -13, thereby meeting the desired -12 to -15 depths. Thus, potentially creating up to 18 ac of seagrass habitat. Furthermore, a silt curtain/turbidity screen would be used to confine suspended sediments and reduce turbidity levels during material placement operations. Another method may include fluctuating placement rates to allow time for suspended sediments to settle.

## 2.2   ALTERNATIVES CONSIDERED BUT ELIMINATED FROM FURTHER ANALYSIS

To meet project purpose and need, the USACE considered other sources of beneficial use material within SJH for Condado Lagoon. Locations include areas within the dredge footprint of the Army Terminal Channel (2018 IFR/EA) as well as within La Esperanza Peninsula. As a

---

[1] The USACE has decided that all dredged material from the initial construction of the San Juan Harbor, Puerto Rico Project, currently scheduled to begin in 2023, will be placed in the Ocean Dredged Material Disposal Site.

USACE_024448

mutual project benefit, La Esperanza Peninsula was considered because it currently is in need of operations and maintenance dredging (O&M) related to shoaling and sedimentation and was previously approved for source material. These two areas remain viable options under the 2015 Mitigation EA and the 2018 IFR/EA; however, they were removed from further analysis within this SEA for the following reasons:

The SJHNI Project will generate approximately 2.2. million cy of material as a result of construction dredging operations. However, only suitable material with grain sizes greater than 0.21mm would benefit the lagoon based on tidal and current flows. The area west of Cut-6 contains suitable material, is closer to Condado Lagoon, and the dredge will already be operating in the vicinity. However, due to shallow water depths, it was determined to be cost ineffective to extract material from La Esperanza Peninsula due to the need to mobilize a different (smaller) dredge plant.

Areas within the SJHNI Project were reviewed for potential deposits of suitable material. Based on sediment studies, an area approximately 1,500 linear feet by ten-foot-deep within the Army Terminal Channel was considered. However, laboratory results show the material at this location is unsuitable. Though the desired average grainsize was relatively large (approximately 0.64mm), the average silt concentration was substantial (approximately 33.4 %). Thus, when homogenized, the overall dredge slurry grain size was estimated to be near the threshold of the 0.21mm size needed. Additionally, the orientation of the suitable material relative to the channel would make extraction more difficult and more costly when compared to the area west of Cut-6.

## 2.3   PREFERRED ALTERNATIVE

The Preferred Alternative has been changed, after public comment was received, from Action Alternative 1 to the No Action Alternative. The commenters' main concerns about Action Alternative 1 were the lack of chemical constituent's analysis and sediment sampling from the proposed additional sand source.

As described above, the USACE will not include the beneficial use of dredged material at Condado Lagoon as an option during the initial construction of the SJHNI; instead, all dredged material will be placed in the ODMDS. Therefore, an additional sand source, as proposed in the draft SEA is not needed at this time. The USACE will complete the seagrass mitigation associated with the construction of the Puerto Nuevo Channel (see 2015 Mitigation EA) at a later date.

USACE_024449

of the SJHNI Project (2018). Furthermore, 2021 benthic surveys results confirm no listed corals exist within the area of potential effect (Figure 3-4).

Of the seven listed coral species, only elkhorn and staghorn have designated critical habitat pertaining to the study area. Designated critical habitat for elkhorn and staghorn corals is located near Cut-2, approximately 2,500 ft north of the dredging area and adjacent to the ODMDS disposal routes. Furthermore, under 50 CFR Part 223 a 4(d) rule (16 U.S.C. §1533(d)) establishing "take" prohibitions for elkhorn and staghorn corals went into effect on November 28, 2008 for these areas.

In November 2020, NMFS proposed critical habitat for Caribbean boulder star coral, lobed star coral, mountainous star coral, pillar coral, and rough cactus coral (85 FR 76301). In the Federal Register Notice, NMFS stated at page 76317: "Designation of critical habitat for the five corals is unlikely to result in any new section 7 consultations. Given the listing of the five corals, and the fact that the proposed critical habitat overlaps, in part, with Acropora critical habitat, section 7 consultations are already likely to occur for activities with a Federal nexus throughout the proposed critical habitat areas." The NMFS, in their 2018 Biological Opinion, concurred with the USACE determination that the proposed project, would not adversely modify designated critical habitat for Acroporid corals. Therefore, the effects of the Preferred Alternative (No Action) to the proposed critical habitat would be the same as the determination for the Acroporid corals.

In October 2022 USACE updated its consultation with USFWS to include the endangered, yellow-shouldered blackbird (*Agelaius xanthomus*) and the threatened roseate tern (*Sterna dougallii dougallii*) and to review previous consultation on endangered species within the project area.

The latest 5-year review by U.S. Fish and Wildlife Service (USFWS) of the yellow-shouldered blackbird (USFWS 2018) state that the species' primary occurrence in Puerto Rico is in eastern, southern, and southwestern Puerto Rico, which is outside the project area. San Juan is not located within the yellow-shouldered blackbird's Puerto Rico range or critical habitat.

The Caribbean roseate tern is a migratory bird that arrives at breeding areas in Puerto Rico and U.S. Virgin Islands (USVI) in April and departs by October (pers. comm with USFWS October 11, 2022). In both Puerto Rico and the USVI the roseate tern nest mainly on small cays or islets with rocky, grassy, coral rubble, or sand substrates. While not nesting, the species can be observed in mixed flocks of seabirds, feeding, and loafing in bays, shorelines, or open ocean. Documented nesting distribution of the roseate tern in Puerto Rico is limited primarily in remote areas to the Southwest of the Island, Cayo Media Luna East, and West, Cayo Turrumote I and II, Cayo San Cristobal, Cayo El Palo, and on east Puerto Rico Cays (Culebra Island, Cayo Matojo) (USFWS 2022). Predation and abandonment were cited as the most common cause of nesting mortality (Byerly et al 2021) followed by large storms. USACE understands that the project area is within the range of the Caribbean population of the roseate tern, but the project area is not within documented breeding sites and sightings of the roseate tern are a rare occurrence.

34

## 3.10  CULTURAL AND HISTORIC RESOURCES

A background investigation and cultural resources remote sensing survey of the SJH Channel area of potential effect (APE) was conducted for the 2018 proposed project in consultation with the Puerto Rico State Historic Preservation Officer (SHPO) and the Instituto de Cultura Puertorriqueña (ICP). Background research revealed numerous shipwrecks within the project vicinity, though none previously identified cultural resources were located within the APE. SEARCH, Inc. (SEARCH) conducted a remote sensing survey of the SJH between June 1 and June 6, 2017. Based on the results of this survey, the USACE determined no historic properties were located within the APE. At that time, USACE determined that the SJHNI Project, including placement of material in Condado Lagoon, posed no effect to historic properties listed or eligible for listing in the National Register of Historic Places (NRHP). The Puerto Rico SHPO concurred with the determination.

In 2021, the expanded areas surrounding Cut-6 was investigated for cultural and historic resources. The USACE contracted with SEARCH to conduct a remote sensing survey of Cut-6 and the surrounding area. This survey was conducted in March 2021. SEARCH documented a collection of magnetic anomalies (designated M67) as part of this survey that are consistent with a historic shipwreck. The area was omitted from the proposed dredge area, allowing the USACE to determine the proposed Project would pose no adverse effects to historic properties. The USACE provided a copy of the draft SEARCH report and consulted on this finding with SHPO by letter on July 22, 2021; the ICP was also provided with a copy of the report and the USACE finding. On August 30, 2021, USACE received concurrence from the SHPO regarding the determination of no adverse effects to historic properties (Appendix B).

### 3.10.1  NO ACTION ALTERNATIVE

Effects would be as described in the 2015 EA and 2018 IFR/EA.

### 3.10.2  ACTION ALTERNATIVE 1

Based on the results of 2018 and 2021 cultural resources assessment surveys, the Action Alternative 1 poses no effect to cultural resources or historic properties.

### 3.11  SELECTED ALTERNATIVE

The No Action Alternative was selected as the Preferred Alternative. Action Alternative 1 identified an additional borrow area to restore depressions in Condado Lagoon. However, based in part on public comment (Appendix B), the USACE has decided not to proceed with use of an additional sand source to construct seagrass mitigation in Condado Lagoon at this time. Therefore, the USACE has not selected Action Alternative 1. The USACE is deferring completion of the seagrass mitigation in Condado Lagoon; for the initial construction of the SJHNI Project, all dredged material will be disposed at the ODMDS. These actions are covered by the 2018 IFR/EA and associated environmental compliance.

USACE may consider the beneficial use of dredged material in Condado Lagoon during future maintenance dredging of the SJHNI Project, if a non-federal cost-sharing sponsor is

USACE_024470

identified and funding is available. However, because the first maintenance dredging event is not anticipated until 2028, at the earliest, the Corps has determined that it would conduct a supplemental NEPA analysis before proceeding (if at all) with a beneficial use disposal option for the SJHNI Project. In addition, in the future, the Corps could propose to use an additional sand source from an undetermined location, and that proposed action would be subject to all applicable environmental compliance requirements, including supplemental NEPA.

## 3.12   SUMMARY AND COMPARISON OF THE POTENTIAL ENVIRONMENTAL CONSEQUENCES

Table 3-2 summarizes the anticipated environmental effects of the Action Alternative 1 versus the No Action Alternative, encompassing direct, indirect, and cumulative effects.

**TABLE 3-2: SUMMARY AND COMPARISON OF THE POTENTIAL ENVIRONMENTAL CONSEQUENCES ASSOCIATED ALTERNATIVES CONSIDERED**

| Environmental Factor/Resource | No Action Alternative | Action Alternative 1 – Beneficial use of Dredge Material from Surrounding Areas of Cut-6 |
|---|---|---|
| Navigation | Insignificant effects. | Short-term benefits from depth/width increases near Cut-6. Avoidance measures in place during dredged material transport. No adverse effects. |
| Relative Sea Level Change | No effect. | Project modifications would not affect local sea levels or contribute to local flooding within the Harbor or the Lagoon. |
| Geotechnical | No effect. | Project modifications would have no adverse effects on the local geology or geomorphologies. Condado Lagoon seabed would improve from fill activities. |
| Hardbottom Habitat | Insignificant effects. | Direct impacts of 7 ac of hardbottom, however side-cast material would re-create hardbottom conditions. |
| Water Quality | Insignificant effects. | Project modifications would cause temporary increases in turbidity; Operations would not exceed 10 NTU above background levels or be temporarily shut down. No long-term effects are anticipated in the Harbor; however, long-term water quality benefits are expected in the Lagoon. |
| Mangroves and Seagrass | No effect. | No significant adverse impacts. Existing seagrass habitat would be avoided or protected to the extent practical. Long-term benefit in Condado Lagoon. |

38

| | | |
|---|---|---|
| Essential Fish Habitat | Insignificant effects. | Temporary effects from construction related turbidity. Temporary loss of 7-ac of low-quality hardbottom habitat. Recolonization expected post dredge. Long-term benefit in Condado Lagoon. |
| Protected Species (Threatened and Endangered Species) | Insignificant effects as a result of conditions required from section 7 consultations. | Effects would less than or similar to effects determined in 2018; no significant adverse impacts to protected species. Agency determinations related to coordination conducted 2018 would be applicable; to include all recommendations, protection measures, and guidance therein. Long-term benefits from seagrass habitat improvements. |
| Marine Mammals | Insignificant effects. | Dredging and disposal may affect marine mammals. Protective measures as set in 2018 would be implemented. Affects would be temporary and isolated to the dredging and placement activities. Long-term benefits from seagrass habitat improvements. |
| Cultural Resources | No effect. | No effect. |

## 3.13  IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

### 3.13.1  IRREVERSIBLE

An irreversible commitment of resources is one in which the ability to use and/or enjoy the resource is lost forever. No irreversible adverse impacts are expected.

### 3.13.2  IRRETRIEVABLE

An irretrievable commitment of resources is one in which, due to decisions to manage the resource for another purpose, opportunities to use or enjoy the resource as they presently exist are lost for a period of time. If Action Alternative 1 were selected, material mobilized from the area west of Cut-6 and areas of the Anegado Channel, would not be available for other purposes within SJH, i.e., shorelines, beaches, habitat creation, etc.

## 3.14  CONFLICTS AND CONTROVERSY.

The Puerto Rico Planning Board did not issue concurrence under Coastal Zone Management Act for the action proposed in the draft SEA (Action Alternative 1).

## 3.15  COMPLIANCE WITH ENVIRONMENTAL REQUIREMENTS

Table 3-3 provides a list and compliance status of Federal laws and executive orders considered for this SEA.  Compliance is summarized for the Preferred Alternative (No Action Alternative).

USACE_024472

**TABLE 3-3: COMPLIANCE WITH ENVIRONMENTAL STATUTES**

| Environmental Act or E.O. | Project Compliance Status |
|---|---|
| Anadromous Fish Conservation Act, 16 U.S.C. 757a | No anadromous fish species would be affected by preferred alternative. Therefore, this act is not applicable. |
| Clean Air Act, as amended, 42 U.S.C. 7401-7671g, et seq. | SJH is not designated as a nonattainment or maintenance area for any criteria pollutant and therefore USEPA's General Conformity Rule to implement Section 176(c) of the CAA [42 U.S.C. §7506(c)] does not apply. No air quality permits, nor a conformity determination are required for this project. |
| Clean Water Act (Federal Water Pollution Control Act), 33 U.S.C. 1251, et seq. | A CWA Section 404(b)(1) evaluation for placement of dredged material associated with the additional sand source is no longer needed because the preferred alternative is the No Action Alternative and covered under the analysis prepared for the 2018 IFR/EA. A new WQC will not be sought from DNER for the dredging associated with the additional sand source because the USACE is selecting the No Action Alternative. The SJHNI Project is covered under a WQC issued on February 2, 2022. |
| Coastal Zone Management Act, 16 U.S.C. 1451, et seq. | To implement the CZMA and to establish procedures for compliance with its Federal consistency provisions, NOAA promulgated regulations which are contained in 15 CFR Part 930. As per 15 CFR §930.37, a Federal agency may use its NEPA documents as a vehicle for its consistency determination. The Puerto Rico Planning Board did not grant its CZMA concurrence for the proposed dredging of an additional sand source. The Puerto Rico Planning Board concurred with USACE's Federal consistency determination for the proposed action in the 2015 Mitigation EA by letter dated August 22, 2014, and for the SJHNI Project by letter dated January 4, 2018. |
| Coastal Barrier Resources Act and Coastal Barrier Improvement Act, 16 U.S.C. 3501 et seq. | There are no designated coastal barrier resource units in the project area that would be affected by the proposed action. These acts are not applicable. |
| Endangered Species Act, 16 U.S.C. 1531, et seq. | The effects of the Preferred Alternative (No Action) would be the same as described in the 2018 IFR/EA. The NMFS, in their 2018 BO, concurred with the USACE determination that the proposed project, "may affect, but is not likely to adversely affect" scalloped hammerhead shark, Nassau grouper, giant manta ray, leatherback sea turtles, Antillean manatee, sperm, sei, blue, or fin whales, elkhorn, staghorn, pillar, rough cactus, lobed star, mountainous star or boulder star corals, and would not adversely modify designated critical habitat for Acroporid corals. The USFWS determined the SJHNI Project may affect, not likely to adversely affect the Antillean manatee and nesting sea turtles in a letter dated June 21, 2018. In October 2022, USACE contacted USFWS to provide a no effect determination for two ESA-listed birds. USFWS responded by letter on October 25, 2022 (see Appendix B). The project is in compliance with this act. |
| Estuary Protection Act, 16 U.S.C. 1221, et seq. | The SJHNI Project and, therefore, the Preferred Alternative (No Action), may have adverse temporary effects to water quality during dredging and placement. These effects are expected to be temporary and minor and will not result in long-lasting negative effects on the San Juan Bay. The project complies with this Act. |
| Federal Water Project Recreation Act, 16 USC 460l et seq. | Short term impacts may occur under the Preferred Alternative (No Action) during construction of the SJHNI Project. The project complies with this Act. |
| Fish and Wildlife Coordination Act, 16 U.S.C. 661, et seq. | The USFWS issued a Final Coordination Act Report (CAR) on June 21, 2018, for the SJHNI Project. The USFWS continues to support Condado Lagoon restoration using construction dredged material. |
| Marine Protection Research and Sanctuary Act, 33 U.S.C. 1401, et seq. | For the SJHNI Project, the Corps obtained EPA's concurrence under Section 103 of the Marine Protection, Research, and Sanctuaries Act on April 14, 2022. |

USACE_024473

| Environmental Act or E.O. | Project Compliance Status |
|---|---|
| Marine Mammals Protection Act, 16 U.S.C. §§ 1361 et seq. | The MMPA prohibits the take of marine mammals including the Antillean manatee, bottlenose dolphin, and humpback, sperm, sei, finback, and blue whales. Protective measures for marine mammals would be implemented for the SJHNI Project. The project was coordinated with USFWS and NMFS. The SJHNI Project, as conditioned, is in compliance with this act and no incidental harassment would occur. |
| Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq. | An EFH Assessment is incorporated into this integrated document in Section 3 and was coordinated with NMFS HCD concurrent with the public review of the draft SEA. EFH consultation with NMFS HCD was completed via NMFS email concurrence on November 11, 2021. |
| Migratory Bird Treaty Act 16 U.S.C. §§ 703-712, July 3, 1918, as amended | The USACE does not anticipate migratory birds would be adversely (directly or indirectly) affected by the No Action Alternative. Coordination with the USFWS was completed October 25, 2022 (see Appendix B). |
| National Environmental Policy Act, 42 U.S.C. 4321, et seq. | This Draft SEA was made available for a 30-day public review period from November 1, 2021, to December 1, 2021. All comments received have been addressed in the development of the Final SEA and are included in Appendix B (Correspondence). Upon completion of the Final SEA and signing of the FONSI, the project will be in full compliance with the NEPA. |
| National Historic Preservation Act of 1966, as amended, 54 U.S.C. 300101, et seq. | The proposed action is in compliance with Section 106 of the National Historic Preservation Act (NHPA), as amended. As part of the USACE compliance with the requirements and consultation process contained within the NHPA implementing regulations of 36 CFR Part 800, the USACE has ensured that the proposed project is also in compliance with the Archaeological Resources Protection Act (16 U.S.C. 470aa-470mm) (Public Law 96-95), American Indian Religious Freedom Act (42 U.S.C. 1996 and 1996a) (PL 95-341), Native American Graves Protection and Repatriation Act (NAGPRA) (25 U.S.C. §3001 et. seq.) (Public Law 101-601) and its implementing regulations, Executive Orders (EO) 11593, 13007, and 13175, the Presidential Memo of 1994 on Government-to-Government Relations and appropriate Puerto Rico Statutes, and the Abandoned Shipwrecks Act (43 U.S.C. 2101-2106). Consultation with the Puerto Rico State Historic Preservation Office (SHPO) is complete. Pertinent correspondence can be found in Appendix B. The project complies with this Act. |
| Rivers & Harbors Act, 33 U.S.C. § 403 | The SJHNI Project could temporarily obstruct navigable waters of the U.S. during construction. The project complies with this Act. |
| Submerged Lands Act, 43 U.S.C. § 1301 et seq. | The SJHNI Project would occur on submerged lands of Puerto Rico. This project is in compliance with the WQC, issued February 2, 2022, and Puerto Rico water quality standards. The project complies with this Act. |
| Wild and Scenic River Act, 16 U.S.C. 1271, et seq. | No designated Wild and Scenic River reaches would be affected by the No Action Alternative; therefore, the Act is not applicable. |
| Farmland Protection Policy Act, 7 U.S.C. 4201, et. seq. | No prime or unique farmland will be affected by implementation of the No Action Alternative. This Act is not applicable. |
| Coral Reef Protection (Executive Order 13089) | Benthic surveys are complete. The SJHNI Project and, therefore, the Preferred Alternative (No Action) may affect, but is not likely to adversely affect coral reefs. |
| Environmental Justice (Executive Order 12898) | Refer to Table 1-1; previously covered by the analysis in the 2018 IFR/EA. Updated Environmental Justice Analysis is included in Appendix C. |
| Floodplain Management (Executive Order 11988) | Based on the analysis in this final SEA and the 2018 IFR/EA, the USACE concludes that the No Action Alternative will not result in harm to people, property, and floodplain values, will not induce development in the floodplain, and the project is in the public interest. The project complies with the Order. |
| Invasive Species (Executive Order 13112) | Benthic surveys complete; existing invasive aquatic species identified; standard avoidance measures would be implemented. |

USACE_024474

| Environmental Act or E.O. | Project Compliance Status |
|---|---|
| Protection of Wetlands (Executive Order 11990) | No wetlands would be affected by the No Action Alternative. |

.

# 4   PUBLIC INVOLVEMENT

## 4.1   SCOPING AND DRAFT EA

The draft SEA and Proposed Finding of No Significant Impact (FONSI) was made available to the public by notice of availability in November 2021.

## 4.2   AGENCY COORDINATION

This proposed project was coordinated with the following agencies, among others: USFWS, NMFS, U.S. Environmental Protection Agency (EPA), State Historic Preservation Officer (SHPO), Department of Natural and Environmental Resources, Puerto Rico Environmental Quality Board and OGPe.

## 4.3   LIST OF RECIPIENTS

Copies of the Draft SEA were available to the public on the Jacksonville District website in November 2021 and the Final SEA will also be available on the Jacksonville District website:

http://www.saj.usace.army.mil/Divisions/Planning/Branches/Environmental/DocsNotices_OnLine_DadeCo.htm

The Notice of Availability (NOA) of the Draft SEA and Proposed FONSI was mailed to applicable public and governmental organizations as well as made available in Puerto Rico within the surrounding areas of SJH. The mailing list was created based the 2018 IFR/EA (Appendix J) mailing list. Public comments have been incorporated into Appendix B.

## 4.4   PUBLIC AND AGENCY COMMENTS

The following are general comments received on the draft SEA, individual detailed comments and response are available in Appendix B.

1)   Comment: There is a lack of information available about the benthic materials to be dredged, and a lack of toxicity information, including heavy metals and particle size of material to be placed in into Condado Lagoon.

Response: Currently the channels in SJH are very stable, with minimum shoaling, producing small amounts of sediments (in comparison with other harbors in the U.S.) per dredging cycle.  The SJH channels are maintained on an approximately 5-year cycle. The USACE coordinates with EPA and obtains EPA's concurrence under Section 103 of the Marine Protection, Research, and Sanctuaries Act prior to ocean dumping. Even though the SJH sediments contain traces of metals and organic material, they are of suitable

USACE_024475

grainsize to be used to fill the Condado Lagoon artificial depressions.   The SJH cuts to be deepened and widened contain primarily a natural hard clay except for the material within and adjacent to Cut-6.  During the initial construction of the project, the USACE was planning to use this clean material from within and adjacent to Cut-6 to restore appropriate elevations to promote the growth of seagrass in the Condado Lagoon. However, material from the SJHNI Project will now go to the ODMDS and there will be no fill of Condado Lagoon during the SJHNI's initial construction.

2)  Comment: Lack of public meeting or public participation has been provided by USACE prior to the Draft SEA.

    Response: Public input has been received in response to the noticing of the draft SEA.

3)  Comment: Draft SEA has been prepared without consultation or formal opinion from federal agencies (NMFS, USFWS).

    Response: As described in Section 3.8, Section 7 consultation under the ESA has been completed.

4)  Comment: This SEA does not consider or discuss environmental justice (EJ) concerns associated with the dredging in the borrow area.

    Response: The 2018 IFR/EA includes an environmental justice analysis in Appendix C, Section 2.3. The SJHNI Project, including the option of beneficial use of dredged material for Condado Lagoon restoration, would not be expected to cause disproportionately high and adverse effects on any minority or low-income populations in accordance with Executive Order 12898.  The delineation for the EJ footprint depicts the centroid of the one-mile radius at the cruise terminal.   The key to the EJ analysis is that it covers the most impoverished area within the project vicinity, the La Perla area. Expanding this footprint would only incorporate more affluent coastal residences and hotels.  However, in response to comments, the USACE updated the EJ footprint to cover a one- and five-mile radius around the full harbor deepening area and has included the results in Appendix C. Based on this updated EJ analysis, the USACE has still determined that the project will not result in disproportionately high or adverse impacts on low income or minority communities. The proposed activity will not (a) exclude persons from participation in, (b) deny persons the benefits of, or (c) subject persons to discrimination because of their race, color, or national origin, nor will the proposed action adversely impact "subsistence consumption of fish and wildlife." Therefore, the project is in compliance with this E.O.

USACE_024476

5) Comment: The 2021 SEA and 2018 IFR/EA need to be considered jointly in an EIS. Tiering and fragmentation has been abused and an EIS avoided.

Response: The draft SEA only evaluates the dredging of a newly proposed sand source outside the Federal Channel limits. Per 40 CFR §1502.4 and §1502.20, the draft SEA tiers off the 2015 Final Environmental Assessment San Juan Harbor Submerged Aquatic Vegetation Mitigation and 2018 San Juan Harbor Navigation Improvements Study Final Integrated Feasibility Report and Environmental Assessment and incorporates by reference issues discussed in more detail in those documents (See table 1-1). The draft SEA also indicates where the earlier documents are available to the public on the internet. The SEA is to evaluate dredging outside the Federal channel. All other actions and their effects were addressed in the 2015 and 2018 NEPA, and no significant potential impacts on the quality of the human environment were identified.

# 5   LIST OF PREPARERS

| Name | Organization | Role in EA |
|---|---|---|
| Paul DeMarco | USACE | Biologist |
| Chris Name | USACE | Biologist |
| Rachel Case | USACE | Biologist |
| Alberto Alvarado | USACE | Biologist, Water Quality |
| Chris Altes | USACE | Archeologist |
| Barbara Nist | USACE | Geologist |

USACE_024477



Photo 17.  A red lionfish (*Pterois volitans*) among encrusted mangrove roots along the northern shore of Condado Lagoon.

## 3.4    SUMMARY

Hardbottom sites worthy of quantitative survey were identified on either side of the San Juan Harbor Federal channel (Survey Areas 1A and 1B). Three hardbottom sites were delineated in Survey Area 1A by towed video reconnaissance. These sites comprised 19.6 ha in total, about 52% of the Survey Area 1A. Two of the sites (Sites 1 and 3) were composed of mostly side cast rocks and other debris covered primarily by cyanobacteria and sponges with no stony corals present. The other site (Site 2) consisted of natural, eroded limestone with considerable structural complexity. Biotic cover was dominated by turf algae composed mostly of red (Rhodophyte) taxa. This site was assessed quantitatively with three transects. A diverse assemblage of epibiota consisting of sponges, crustose coralline algae, hydroids, stony corals, sessile annelids, and bryozoans was present. At least five stony coral species were sparsely distributed throughout this site, but no ESA-listed species were observed. Long-spined urchins and spiny lobsters were observed within and outside the transects as were various reef fishes.

In Survey Area 1B a hardbottom site (Site 4) composed of natural limestone with what appeared to be construction-related boulders and rubble was sampled with quantitative transects. This site was at the top of a north-south facing, scarp-like feature at the channel margin and was estimated to encompass 10,734.2 m². The hardbottom was mostly covered with filamentous cyanobacteria which trapped fine sediment resulting in a mat-like cover. Sponges, hydroids, and stony corals sparsely contributed to the biotic cover of the site. Larger colonies of the stony corals *P. strigosa*, *P. clivosa*, *M. cavernosa*, and *S. siderea* were present in the area, but no ESA listed coral species were observed. Larger motile invertebrates such as long-spined urchins, pencil urchins, spiny lobsters were present within and adjacent to the survey transects. Various reef fishes were also observed throughout the site.

b) The SJH works would entail providing increased tanker capacity to four oil petroleum and LNG terminals all in the south-west corner of the SJH: Cataño Oil Dock, New Fortress – PREPA Dock; PUMA Dock and PREPA Dock, all very close to one another. The risks of this has not been considered.

c) A significant Environmental Justice population resides in close proximity to this south west corner in Guaynabo and Cataño and also along the path of fossil fuel tankers of increased capacity, including the Sabana, Amelia and Vietnam Wards.  These Environmental Justice communities will also be exposed to all the consequences of the dredging operations during years to come including air and noise pollution.

d) As an example, the Maritima Street of Barrio Sabana lies adjacent to the excisting PUMA dock and just about 400-500 meters from the New Fortress-PREPA dock where larger incoming LNG tankers are projected.

e) This situation is not recognized and much less evaluated in the FEA 2018. The increased risk, air pollution, noise, and other adverse effects on the low income populations of the above mentioned Wards were not adequately considered by the FEA 2018 (See FEA 2018, at sec. 5.4.20). The only or main concern of the FEA 2018 are the populations, schools, etc., north of the SJH, that is "San Juan Peninsula" (Id, at 5-33).  This is a serious NEPA and public policy issue which needs to be addressed in a EIS.

f) Also, neither the FEA 2018 nor the Draft SA properly consider or discuss the effects, implications, restrictions and other consequences of Climate Change, contrary to current policies and law.

USACE_024636

- is at least 50 percent of the total population; or
- is meaningfully greater than the low-income population percentage in the general population or other appropriate unit of geographic analysis.

Step 1: Study Area's People of Color and Low-Income Population Average Percentages

The Corps has updated its EJ analysis for the SJHNI Project based on the newest tools available including the U.S. Environmental Protection Agency (USEPA) EJScreen and the newly released EJ tool from the Council on Environmental Quality (CEQ). Using the U.S.  USEPA EJScreen Tool, the project area was user-defined (Figure 1 and 2) using both a 1-mile buffer and a 5-mile buffer to calculate the average percentages for the EJ criteria. The goal of the USACE EJ analysis is to capture all potential direct and indirect effects on EJ communities. Public comment from the 2021 draft SEA requested additional EJ analysis. Therefore, the area evaluated for this Project was extended to 5-miles, which should encompass all potential project effects to surrounding communities. The extended 5-mile buffer area includes the communities of San Juan, Guyanabo, Bayamon, Cantano, Santruce, Puerto Nuevo and communities to the West, East and South of San Juan. It is unlikely that communities outside of the 5-mile buffer zone would be affected by the project. Table 1 compares the average percentages for the user-defined project areas, Puerto Rico, and U.S. Based on this information the average people of color from a 1-mile ratio and 5-mile ratio respectively were 97% and 99%. This is higher than the US average of 40%, but the 1-mile percentage is slightly lower than the Puerto Rico average of 99%. The percent of low-income population is greater than 50% of the population regardless of buffer zone (61%), but less than the Puerto Rico average (72%).  However, this area is considered an EJ community because both people of color and low-income populations exceed fifty percent, regardless of the buffer zone.

The Council on Environmental Quality (CEQ) has released a new EJ tool that is in testing stages. This Climate and Economic Justice Screening Tool assists in identifying communities with environmental justice concerns. The tool uses census tracts, which are small units of geography, and datasets as indicators of burdens which include environment, climate, or socioeconomic. The CEQ EJ tool identified many of the communities in the areas surrounding the San Juan Harbor Navigation Improvements (SJHNI) Project as disadvantaged (Table 2 and Figure 3), using several indicators that met more than 1 burden threshold and the associated socioeconomic threshold.

Step 2: Preferred Alternative's Effect on EJ Community

The Preferred Alternative identified in the final SEA is the No Action Alternative. The No Action Alternative is consistent with the authorized SJHNI Project.

Under the No Action Alternative, the Corps would not dredge an additional sand source outside the Federal channel during construction of the SJHNI Project. During the initial construction of the SJHNI Project, all dredged material will be placed in the Ocean Dredged Material Disposal Site. However, the beneficial use of dredged material in Condado Lagoon could be considered during future maintenance events if a non-federal cost-sharing sponsor is identified and funding is available. Future actions will require subsequent NEPA and coordination with the public and agencies.

The Project will increase the security, safety, and efficiency of San Juan Harbor through the deepening of channels with associated channel widening and turning basins. The Project will not affect existing safety standards, which are enforced by the U.S. Coast Guard within the harbor including the safety and security zones for LNG ships.  Operational efficiency will increase by allowing newer, larger, and more modern vessels (including LNG vessels) to replace older, smaller, and less efficient vessels.

There will be a temporary and minor effect to human populations in the area from noise and air quality emissions associated with the deepening construction. No long term adverse direct or indirect impacts from noise or air emissions are expected as a result of the SJHNI Project. Therefore, the Project will not have disproportionately high or adverse impacts on low income or minority communities. The proposed activity will not (a) exclude persons from participation in, (b) deny persons the benefits of, or (c) subject persons to discrimination because of their race, color, or national origin, nor will the proposed action adversely impact "subsistence consumption of fish and wildlife." Therefore, the project is in compliance with this E.O. This environmental justice analysis supplements the analysis in Appendix C and Section 2.3 of the 2018 IFR/EA which remains valid.



Figure 1.  User-defined project area with a 1-mile buffer used for EJ analysis conducted in USEPA's EJScreen. SOURCE: https://ejscreen.epa.gov/mapper



Figure 2. User-defined project area with a 5-mile buffer used for EJ analysis conducted in USEPA's EJScreen. SOURCE: https://ejscreen.epa.gov/mapper

USACE_024690

Table 1. USEPA EJScreen Environmental Justice Criteria Percentages for the San Juan Harbor, Puerto Rico Project.

|  | User-defined Project Area 1 mile % | User-defined Project Area 5 mile % | Puerto Rico average % | U.S. Average % |
|---|---|---|---|---|
| People of color | 97% | 99% | 99% | 40% |
| Low-income population | 61% | 61% | 72% | 30% |
| Unemployment rate | 13% | 15% | 15% | 5% |

USACE_024691

Table 2. Council on Environmental Quality (CEQ) Climate and Economic Justice Screening tool. Below are 12 of the highlighted areas by the CEQ as being disadvantaged near the SJHNI Project. Map ID correlates to Figure 3.

| Map ID | Census tract 2010 ID | County Name | Percent Black or African American alone | Percent two or more races | Percent White | Percent Hispanic or Latino | Percent other races | Identified as disadvantaged | Total population | Is low income? | Wastewater discharge (percentile) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 72033020200 | Cataño Municipio | 12 | 2 | 1 | 98 | 25 | YES | 3870 | YES | 20 |
| 2 | 72033020423 | Cataño Municipio | 11 | 4 | 0 | 99 | 16 | YES | 3786 | YES | 97 |
| 3 | 72061040101 | Guaynabo Municipio | 14 | 4 | 0 | 99 | 15 | YES | 1445 | YES | 36 |
| 4 | 72061040102 | Guaynabo Municipio | 13 | 2 | 0 | 98 | 17 | YES | 1592 | YES | 35 |
| 5 | 72127000400 | San Juan Municipio | 1 | 1 | 1 | 95 | 9 | YES | 1549 | YES | 93 |
| 6 | 72127000506 | San Juan Municipio | 8 | 12 | 1 | 89 | 4 | YES | 1515 | YES | 93 |
| 7 | 72127000600 | San Juan Municipio | 13 | 13 | 3 | 95 | 6 | YES | 1288 | YES | 86 |
| 8 | 72127000700 | San Juan Municipio | 15 | 3 | 2 | 97 | 7 | YES | 2395 | YES | |
| 9 | 72127004200 | San Juan Municipio | 28 | 6 | 0 | 100 | 11 | YES | 1929 | YES | 93 |
| 10 | 72127007004 | San Juan Municipio | 13 | 1 | 0 | 100 | 10 | YES | 1864 | YES | 97 |
| 11 | 72127980200 | San Juan Municipio | 0 | 0 | 29 | 70 | 14 | YES | 61 | YES | 93 |
| 12 | 72137120200 | Toa Baja Municipio | 16 | 1 | 0 | 100 | 10 | YES | 3753 | YES | 35 |

USACE_024692

USACE_024693



Figure 3. This map displays highlighted (gray) areas by the Council on Environmental Quality (CEQ) Climate as disadvantaged by the Climate and Economic Justice Screening tool. The numbered areas surround the SJHNI Project and are evaluated in Table 3.



**DEPARTMENT OF THE ARMY**
**CORPS OF ENGINEERS, JACKSONVILLE DISTRICT**
**701 SAN MARCO BOULEVARD**
**JACKSONVILLE, FLORIDA 32207-8175**

22 Dec 2022

Planning and Policy Division
Environmental Branch

Ms. Annette Feliberty Ruiz, Chief
Point Sources Permits Division
Water Quality Area
*Via E-mail*: annettefeliberty@drna.pr.gov

Dear Ms. Feliberty:

This letter is regarding the water quality certification (WQC) request that is currently under review in accordance with Section 401 of the Clean Water Act, 33 U.S.C. § 1341, for use of approximately 260,000 cubic yards of material from surrounding areas west of Cut-6 adjacent to San Juan Harbor navigation channel to accomplish the San Juan Harbor seagrass mitigation at the Condado Lagoon, San Juan, Puerto Rico.  The U.S. Army Corps of Engineers, Jacksonville District (Corps) filed the WQC request on July 15, 2022 with the Water Quality Area (WQA) of the Department of Natural and Environmental Resources (DNER).

The WQA determined that this WQC request did not include evidence of compliance with Article 4(B)(3) of the Environmental Public Policy Act, Law No. 416-2004, as amended. Therefore, a Request for Additional Information (RAI) was issued by the WQA on August 2, 2022 requesting evidence of compliance with Article 4(B)(3).

The Puerto Rico Ports Authority (PRPA) began consultation with the Permit Management Office (OGPe) on May 10, 2022, as the sponsor of the project.  The OGPe responded on July 11, 2022 instructing the PRPA to submit a *Solicitud de Recomendación de Medioambiente* (SRM) or Request for Environmental Recommendation from DNER.  PRPA began coordination with DNER on July 13, 2022.  DNER provided a response on September 16, 2022 stating that the agency is not in favor of the project at this time based on the concerns described in Enclosure 1 – OGPe Denial Letter for the Condado Lagoon Seagrass Mitigation Project.  On September 21, 2022, the OGPe issued a denial letter for the compliance with Article 4(B)(3) based on the DNER recommendation.

The OGPe office included the following statement in their letter:

"Estos comentarios son solamente aplicable a la situación de hechos los datos según presentados y evaluados en el caso, y el Secretario se reserva el derecho de reevaluar, variar o modificar el mismo en cualquier momento anterior a la emisión del cumplimiento o la acción administrativa correspondiente por parte de la agencia solicitante o proponente cuando surja nueva información oficial específica estableciendo que el derecho aplicable o las condiciones ambientales en el predio han cambiado sustancialmente, o cuando el endoso original se emitió bajo premisas falsas o fraudulentas."

USACE_024694

2

The above statement is translated as follows:

   These comments are only applicable to the factual situation, and the data as presented and evaluated in the case. The Secretary reserves the right to reevaluate, vary or modify it at any time prior to the issuance of the compliance or the corresponding administrative action by the requesting or proposing agency when new specific official information arises establishing that the applicable law or the conditions environmental issues on the property have changed substantially, or when the original endorsement was issued under false or fraudulent pretenses.

   The OGPe denial letter prevents the Corps from providing the required information requested in the RAI.  Due to this denial, as well as other unresolved environmental coordination issues related to the additional sand source that are outside of the purview of this certification request, the Corps has decided to withdraw the WQC request for the San Juan Harbor Seagrass Mitigation, Additional Sand Source.

   We take this opportunity to express our appreciation for your attention and consideration in this matter.  Please note, the Corps may decide in the future to file a WQC request when the pending issues and questions are resolved.  If you have any questions concerning this matter, please contact Marielys Ramos by email at Marielys.ramos-villanueva@usace.army.mil or by telephone at 787-379-7146.

Sincerely,

EHLINGER.GRETC  Digitally signed by
HEN.SARAH.1286  EHLINGER.GRETCHEN.SARAH.
                1286927234
927234          Date: 2022.12.22 06:19:12
                -05'00'

Gretchen Ehlinger, Ph.D.
Chief, Environmental Branch

Enclosure:

cc:
Jeffrey Schwindaman
Jason Spinning
Michael Hollingsworth
DNER Fuentes Precisadas

USACE_024695



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
**NATIONAL MARINE FISHERIES SERVICE**
Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida 33701-5505
https://www.fisheries.noaa.gov/region/southeast

09/16/2022

F/SER31:KBD
SERO-2021-03097

Mark Reiss, Chief
Dredging Sediment and Oceans Section
Division of Water
U.S. Environmental Protection Agency
Region 2
290 Broadway
New York, New York 10007

Dear Mr. Reiss:

This letter responds to the Environmental Protection Agency's (EPA) request for consultation with us, the National Marine Fisheries Service (NMFS), pursuant to Section 7 of the Endangered Species Act (ESA) for the following action.

| Action Agencies | SERO Number | Consultation Subject |
|---|---|---|
| EPA, USACE | SERO-2021-03097 | Combined Site Management and Monitoring Plan (SMMP) for five Ocean Dredged Material Disposal Sites (ODMDSs) in Puerto Rico |

**Consultation History**
We received the letter requesting consultation on November 29, 2021, and initiated consultation that day. This consultation has been assigned a tracking number in our NMFS Environmental Consultation Organizer, SERO-2021-03097. Please refer to this number in any future inquiries regarding this consultation.

On July 5, 2022, the United States District Court for the Northern District of California issued an order vacating the 2019 regulations that adopted changes to 50 CFR part 402 (84 FR 44976, August 27, 2019). This consultation was initiated when the 2019 regulations were still in effect. As reflected in this letter, we are now applying the Section 7 regulations that governed prior to adoption of the 2019 regulations (https://www.govinfo.gov/content/pkg/CFR-2018-title50-vol11/pdf/CFR-2018-title50-vol11-part402.pdf). For purposes of this consultation, we considered whether the substantive analysis and its conclusions regarding the effects of the proposed action articulated in the concurrence letter would be any different under the 2019 regulations. We have determined that our analysis and conclusions would not be any different.



star, lobed star, rough cactus and pillar); however, designated and proposed to be designated coral critical habitat with the following essential feature (substrate of suitable quality and availability) is located along the navigational routes used to access the ODMDSs. Because this consultation is only for the issuance and implementation of the SMMP and the locations of the dredging and vessel transport activities that may use the ODMDSs are not known at this time, NMFS is not considering *Acropora* critical habitat or proposed critical habitat for the other ESA-listed corals in our effects determination for the issuance and implementation of the SMMP for the 5 ODMDS sites. Future dredging projects that are not covered by SARBO will require individual ESA Section 7 consultation that will include an analysis of transit routes between the dredging sites and the ODMDS where designated and proposed to be designated coral critical habitats are likely to be present. As explained further below, the proposed SMMP would maintain a restriction on navigational routes that would minimize the potential for losses of dredged material within areas identified to support corals.

**Analysis of Potential Routes of Effects to Species**
As noted above, issuing the SMMP does not authorize future disposal authorizations. Future dredging projects and associated disposal activities will either be covered by SARBO or require individual ESA Section 7 consultation. Future consultations on planned activities will consider effects to ESA-listed sea turtles, fish, invertebrates, and whales. Those consultations may consider the risk of direct physical impact from dredged material, vessel transport, and other in-water construction activities, taking into account the protective measures in the SMMP and any additional protective measures required in the site-specific context.

For those future ESA Section 7 consultations, we note that humpback whales are commonly reported and could transit near the ODMDSs infrequently during their winter migration through the Caribbean, roughly from November to April. Hawksbill sea turtles are common year-round in Puerto Rico as this species nests year-round. Nearshore waters provide habitat for juveniles as they grow to sub-adult stage. Leatherback sea turtles may be present near the ODMDSs foraging for prey and may be present in greater numbers during nesting season when adult females and hatchlings transit between nesting beaches and offshore areas. Green sea turtles are also common year-round residents in nearshore waters that have a combination of seagrass and coral habitats.

Fishery landings indicate that oceanic whitetip shark and scalloped hammerhead sharks are also likely to be present in offshore waters including the ODMD sites and noted transit routes in the SMMP. Giant manta ray have been observed near channel marker buoys and in deeper waters over deep reefs and nearshore reefs, which are present near the ODMDS sites. Known Nassau grouper spawning aggregation sites are located off the west coast of Puerto Rico near the Mayaguez ODMDS. Adult Nassau grouper could transit through the ODMDS sites, particularly during spawning seasons. Furthermore, according to information provided by EPA, ESA-listed corals including elkhorn, staghorn, lobed star, mountainous star, boulder star, pillar, and rough cactus coral, are present in waters along the navigational routes prescribed in the SMMP and in other areas near the ODMDSs.

Effects to ESA-listed sea turtles, fish, and whales include the risk of direct physical impact from dredged material vessel transport and other in-water construction activities. We believe the risk of physical injury is extremely unlikely to occur due to the ability of these species to move away from the ODMDS sites and transit routes and into adjacent suitable habitat, if disturbed.

7



**GOVERNMENT OF PUERTO RICO**
DEPARTMENT OF NATURAL AND ENVIRONMENTAL RESOURCES

VIA ELECTRONIC MAIL (Angela.E.Dunn@usace.army.mil)

August 2, 2022

Ms. Angela E. Dunn
Chief, Environmental Branch
Department of the Army
Corps of Engineers, Jacksonville District
701 San Marco Boulevard
Jacksonville, Florida 32207-8175

Dear Ms. Dunn:

Re:   **Water Quality Certification Request**
      **San Juan Harbor Seagrass Mitigation Project**
      **at the Condado Lagoon**
      **San Juan, Puerto Rico**

Reference is made to the Clean Water Act Section 401 Certification request for the afore-mentioned project, dated and submitted by the Corps of Engineers (COE) via email on July 15, 2022, to the Water Quality Area (WQA) of the Department of Natural and Environmental Resources (DNER).

After reviewing the submitted request, the WQA has determined that it does not comply with all the requirements established in the 40 CFR Part 121.5 (Certification Request). Such request does not include evidence of compliance with Article 4(B)(3) of the Environmental Public Policy Act, Law No. 416-2004 as part of the list of all other federal, interstate, tribal, state, territorial, or local agency authorizations required for the proposed project, including all approvals or denials already received; required by the 40 CFR Part 121.5(b)(6). As established in Part III of the DNER's Anti-degradation Policy Implementation Procedure (Attachment A of the Puerto Rico Water Quality Standards Regulation), any point source of pollution subject to the 401 certification/anti-degradation review process shall comply with the aforementioned Article of the Law.

Therefore, the WQA grants you a period of thirty (30) days from the date of receipt of this letter to submit an amended certification request in compliance with the requirements of the 40 CFR Part 121.5, including the evidence of compliance with Article 4(B)(3) of the Environmental Public Policy Act, Law No. 416-2004, as amended. If you do not submit a complete certification request, the WQA will not be able to proceed with the issuance of the corresponding water quality certificate.

Ms. Angela E. Dunn
Water Quality Certification Request
San Juan Harbor Seagrass Mitigation Project
at Condado Lagoon
Page 2

If you have any doubt or question regarding this matter or need additional information regarding the water quality certificate procedure, do not hesitate to contact Eng. Hery J. Correa Alvarado, of the Point Sources Permits Division, at (787) 999-2200 extension 6175, or via email at herycorrea@drna.pr.gov, at your convenience.

Cordially,

Wanda E. García Hernández
Sub-Manager
Water Quality Area

HJCA/dcc

c:     Mr. Michael J. Hollingsworth, COE (Michael.J.Hollingsworth@usace.army.mil)
       Ms. Marielys Ramos Villanueva, COE (Marielys.Ramos-Villanueva@usace.army.mil)
       Mr. Jason J Spinning, COE (Jason.J.Spinning@usace.army.mil)

G:\División de Permisos para Fuentes Precisadas\WORD\Hery Joel\JPA\USACE-NOD Section 401 Request - San Juan Harbor Seagrass.docx

USACE_024894



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

April 14, 2022

Rebecca Lee-Duffell
Chief, Environmental and HTRW Section
Geosystems Branch
Jacksonville District Corps of Engineers
701 San Marco Boulevard
Jacksonville, FL 32207

Dear Ms. Lee-Duffell:

This letter responds to your letter of June 09, 2021 requesting our concurrence with your determination that sediments that are proposed to be dredged from areas of the San Juan Federal Navigation Project are suitable for ocean disposal at the San Juan Harbor, PR Ocean Dredged Material Disposal Site (ODMDS). We have reviewed the provided material and concur with your determination that the referenced materials are suitable for disposal at the San Juan Harbor, PR ODMDS. Copies of memoranda documenting our determination are attached.

National policy allows dredged material testing data to be used to make suitability determinations regarding ocean placement for three years. The three-year window for the subject concurrence will expire on April 14, 2025. After three years, the Agencies are required to review available information to determine whether changed circumstances (e.g., spills, discharges) might have altered the character of the sediment sufficiently to warrant the retesting of the material. The reevaluation does not, in itself, automatically trigger a requirement for new sampling or testing.

If you have any questions, please contact me at (212) 637-3799. Alternatively, you may have your staff contact Julia Perzley at (212) 637-3798.

Sincerely,

Mark Reiss
Digitally signed by Mark Reiss
Date: 2022.04.14 17:36:17 -04'00'

Mark Reiss
Chief, Dredging Sediments and Oceans Section
Water Division

USACE_025892



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

April 14, 2022

**MEMO FOR THE RECORD**

**SUBJECT:**  Review of Compliance with the Testing Requirements of 40 CFR 227.6 and 227.27 for San Juan Harbor Federal Navigation Project Maintenance and Improvement Maintenance Army Terminal Widener Reach: D-ATw-S-20-COMP

**FROM:**  Mark Reiss, Chief
Dredging, Sediments and Oceans Section
Water Division
U.S. Environmental Protection Agency, Region 2

## I.  <u>SUMMARY</u>

The U.S. Army Corps of Engineers, Jacksonville District (CESAJ) is proposing to dredge the San Juan Harbor Federal Navigation Project Maintenance and Improvement Army Terminal Widener Reach: D-ATw-S-20-COMP (herein referred to as "Army Terminal Widener Reach").

This memorandum provides comprehensive review and analysis of the Army Terminal Widener Reach test results.  This memorandum addresses compliance with the regulatory testing criteria of 40 CFR Sections 227.6 and 227.27, and the requirements set out in Section 228.15(d)(10). These requirements hereinafter are referred to as the "Regulations." Project dredged material meets the non-testing regulatory criteria of Subparts B, C, D, and E of 40 CFR § 227 pertaining to: environmental impacts, need, impact on esthetic, recreational and economic values, and other uses of the ocean (EPA/USACE 2019).

This memorandum documents the suitability of more recently deposited sediment that was obtained in the upper segments of core samples taken from the dredging area (i.e., sediments that overlay a discernible transition to clay strata). Sediments below this interface were composed of stiff clays that have been previously sampled and tested in 1999 in support of Phase 2 deepening of the San Juan Harbor Federal Navigation Project. The suitability of this clay for ocean disposal was documented by EPA in a memorandum dated January 6, 2000 (EPA 2000). There have been no changed circumstances that would alter our earlier determination regarding these sediments.

This evaluation confirms that: 1) all tests required under the Regulations were conducted; 2) this project meets the criteria at 40 CFR Section 227.6 for trace contaminants and Section 227.27 for

USACE_025893

Limiting Permissible Concentration (LPC); and 3) the dredged material is suitable for placement at the San Juan Harbor, PR, Ocean Dredged Material Disposal Site (ODMDS) (the SJS).


## II.  PROJECT DESCRIPTION

The proposal is to dredge the Army Terminal Widener Reach along with three other reaches from federal navigation channels, turning basins, and anchorage areas in San Juan Harbor and place a total of approximately 1,090,177 cubic yards of material including allowable overdepth (based on a 2020 survey) at the SJS. The Army Terminal Widener Reach consists of sediment above clay/sand interface from the widening area along the Army Terminal Channel. The Army Terminal Widener Reach project sediment is represented by five sediment core samples and was tested as D-AT-S-20 composite (see sampling plan; EPA 2020). Clay material located below maintenance material in all the reaches was analyzed and considered separately.


## III.  REGULATORY REQUIREMENTS

For dredged material to be suitable for placement at the SJS, it must conform to the Regulations. The Marine Protection, Research, and Sanctuaries Act (MPRSA) or "The Act" prohibits dumping of materials into the ocean except as authorized by EPA or, in the case of dredged materials, by the U.S. Army Corps of Engineers (USACE). Section 102 of the Act directs the EPA to establish and apply criteria for reviewing and evaluating permit applications (33 U.S.C. Section 1412). The EPA has adopted such criteria in the Regulations. 40 CFR Section 227.6(a) lists constituents that are prohibited from being placed in the ocean unless only present as trace contaminants in material otherwise suitable for dumping (hereinafter referred to as "listed constituents"). Section 227.27 addresses compliance with the LPC. See also, Section 227.13(c).

Section 227.6(b) states that constituents are considered to be present as trace contaminants only when they are present in such forms and amounts that the "dumping of the materials will not cause significant undesirable effects, including the possibility of danger associated with their bioaccumulation in marine organisms." The regulations set forth criteria for determining the potential for significant undesirable effects in Section 227.6(c). To be found environmentally acceptable for ocean placement, it must be found that the liquid phase does not contain any of the listed constituents in concentrations that would exceed applicable marine water quality criteria after allowance for initial mixing (Section 227.6(c)(1)). For the suspended particulate phase (Section 227.6(c)(2)) and the solid phase (Section 227.6(c)(3)), bioassay results must not indicate occurrence of significant mortality or significant adverse sublethal effects due to the ocean placement of wastes containing the listed constituents.

Section 227.27 of the regulations addresses the LPC. For the liquid phase, Section 227.27(a) provides that the LPC is that concentration which does not exceed applicable marine water quality criteria after initial mixing, or when there are no applicable marine water criteria, that concentration of material that, after initial mixing, would not exceed 0.01 of a concentration shown to be acutely toxic to appropriate sensitive marine organisms in a bioassay carried out in accordance with procedures approved by EPA and USACE. For the suspended particulate phase and the solid phase, Section 227.27(b) provides that the LPC is that concentration of material which will not cause unreasonable acute or chronic toxicity or other sublethal adverse effects based on results of bioassays using appropriate sensitive organisms and conducted according to

procedures that have been approved by EPA and USACE, and which will not cause accumulation of toxic materials in the human food chain.


IV.  **GUIDANCE FOR TESTING AND EVALUATION OF DREDGED MATERIAL**

The discussion below describes how the material proposed to be dredged from Army Terminal Widener Reach was evaluated for disposal at the SJS and evaluated for compliance with the requirements of 40 CFR 227.6 and 227.27. Testing of the material was followed procedures approved by EPA and USACE and contained in the joint EPA/USACE national guidance "Evaluation of Dredged Material Proposed for Ocean Dumping - Testing Manual" (the "Green Book") (EPA/USACE, 1991), and the regional implementation manual developed by the EPA Region 2 and CENAN (EPA/CENAN, 2016).

These test results were analyzed in accordance with the Regulations to ensure that the proposed placement meets the criteria of Part 227.

Applying the EPA Region 2/CENAN guidance to this project, the material would be suitable for ocean disposal if it meets the Part 227 criteria (including the requirements regarding acute toxicity) and:

<    bioaccumulation test results do not exceed the regional Matrix levels for cadmium, mercury, total PCBs (clam), and total DDT (USACE 1981); and
<    bioaccumulation test results do not exceed the Polychlorinated Biphenyl Worm Tissue Criterion of 113 ppb; and
<    bioaccumulation test results for the other bioaccumulative chemicals of concern identified in EPA/CENAN (2016) do not indicate a potential for undesirable effects using conservative assessment techniques.

Sediments that meet this definition are suitable for placement at the SJS as they will not cause significant undesirable effects. Sediments that do not meet this definition are not suitable for placement at the SJS.


V.  **RESULTS OF EVALUATION OF THE MATERIAL**

A.  **Evaluation of the liquid phase**

The liquid phase of the material was evaluated for compliance with Sections 227.6(c)(1) and 227.27(a). There are applicable marine water quality criteria for constituents in the material, including listed constituents, and the applicable marine water quality criteria would not be exceeded after initial mixing. In addition, liquid phase bioassays run as part of the suspended particulate phase on three appropriate sensitive marine organisms, show that after initial mixing (as determined under 40 CFR 227.29(a)(2)), the liquid phase of the material would not exceed a toxicity threshold of 0.01 of a concentration shown to be acutely toxic to appropriate sensitive marine organisms. Accordingly, it is concluded that the liquid phase of the material complies with 40 CFR 227.6(c)(1) and 227.27(a). The specific test results and technical analysis of the data underlying this conclusion are described and evaluated in Anamar (2021).

## B.   Evaluation of the suspended particulate phase

The suspended particulate phase of the material was evaluated for compliance with Sections 227.6(c)(2) and 227.27(b). Bioassay testing of the suspended particulate phase of the material has been conducted using three appropriate sensitive marine organisms: inland silversides (*Menidia beryllina*), mysid shrimp (*Americamysis bahia*, formerly *Mysidopsis bahia*), and the planktonic larvae of the blue mussel (*Mytilus edulis)*. That information shows that when placed at the SJS and after initial mixing (as determined under 40 CFR 227.29(a)(2)), the suspended particulate phase of this material would not result in significant mortality; i.e. concentrations of suspended particulate phase exceeding a toxicity threshold of 0.01 of a concentration shown to be acutely toxic in the laboratory bioassays (LC/EC$_{50}$) would not extend beyond the site boundaries at any time or persist anywhere in the water column four hours after disposal. The specific test results and technical analysis of the data underlying this conclusion are described in Anamar (2021).

The factor of 0.01 was applied to ensure that there would be no significant adverse sublethal effects. Moreover, the fact that after placement, the suspended particulate phase would only exist in the environment for a short time, means the suspended particulate phase would not cause significant undesirable effects, including the possibility of danger associated with bioaccumulation, since these impacts require long exposure durations (see EPA, 1994). Accordingly, it is concluded that the suspended phase of the material complies with 40 CFR 227.6(c)(2) and 227.27(b).

## C.   Evaluation of the solid phase

The solid phase of the material was evaluated for compliance with Sections 227.6(c)(3) and 227.27(b). This evaluation was made using the results of two specific types of evaluations on the solid phase of the material, one focusing on the acute (10-day) toxicity of the material, and the other focusing on the potential for contaminant bioaccumulation in test organisms exposed to the dredged material as compared to those same endpoints in test organisms exposed to a reference sediment. Both types of tests were conducted following procedures approved by EPA and the USACE (EPA/USACE 1991).

Reference sediment serves as a point of comparison to identify potential effects of contaminants in the dredged material (EPA/USACE, 1991). Exposing test organisms to this sediment allows for the prediction of toxicity and bioaccumulated contaminant levels that would be expected to result in the test organisms were they "in the wild" at the area from which the reference sediment was taken. The reference sediment used for this project was collected at the Reference Site, in an area of sediments with low contamination levels located near the SJS, where the sediments are unaffected by prior dredged material disposal.

To make a statistically valid determination that exposure to the project sediment does or does not cause greater toxicity or bioaccumulation than the reference sediment, laboratory exposures to several sub-samples (i.e., replicates) of the dredged material and reference sediment are run concurrently. Means and standard deviations are calculated for each set of exposures and compared using standard statistical approaches to determine, with 95% confidence, whether exposure to project sediment results in significantly higher toxicity or bioaccumulation than exposure to reference sediment. Throughout this memorandum, statements regarding project

USACE_025896

sediment having "greater" or "less" toxicity or bioaccumulation are referring to calculated differences which are statistically significant at the 95% confidence level.

A statistically significant difference between test and reference bioaccumulation is not itself a quantitative prediction that an impact would occur in the field. A key to understanding bioaccumulation and potential adverse impacts is the fact that bioaccumulation does not necessarily result in an effect. At low exposure (concentration and duration), bioaccumulation may cause no harm. On the other hand, as exposure and/or bioaccumulation increases, the potential for adverse effects increases.

The following sections address the results of those tests and further analyze compliance with the regulatory criteria of Sections 227.6(c)(3), 227.27(b), and with EPA Region 2 guidance.

### Solid phase toxicity evaluation

Ten-day acute toxicity tests were conducted on project materials using mysids (*Americamysis bahia*) and amphipods (*Ampelisca abdita*), which are appropriate sensitive benthic marine organisms. These organisms are good predictors of adverse effects to benthic marine communities (see EPA, 1996a). The results of these tests show that the solid phase of the material would not cause significant mortality (statistically different project sediment-exposed mortality exceeding mortality in the reference sediment exposures by 10% for mysid shrimp or 20% for amphipods) and meets the solid phase toxicity criteria of Sections 227.6 and 227.27.

### Solid phase bioaccumulation evaluation

28-day tests were conducted on the solid phase of the project material to assess the potential for bioaccumulation of contaminants of concern identified in the project sampling plan (EPA 2020) using two appropriate sensitive benthic marine organisms, sand worm (*Alitta virens,* formerly *Nereis virens*) and bent-nosed clam (*Macoma nasuta*). These species are good representatives of the phylogenetically diverse base of the marine food chain. Contaminants of concern identified in the project sampling plan (EPA 2020), including organic compounds with the potential to bioaccumulate ($K_{ow}$ of approximately 4 or greater), are included on the bioaccumulation testing list when expected to be present in project sediments based upon contaminant inputs and previous sediment sampling results.

There are FDA Action Levels for seven compounds (aldrin, dieldrin, a-chlordane, heptachlor, heptachlor epoxide, PCBs, and mercury; see Table 4, Column 18). Bioaccumulation of any of these contaminants to levels exceeding an FDA Action Level (see EPA/USACE 1991) results in a conclusion that ocean disposal of the dredged material would cause significant adverse effects and exceed the LPC as per 40 CFR 227.27. Therefore, dredged material causing bioaccumulation of any of these contaminants to levels exceeding FDA Action Levels is not suitable for ocean disposal. None of the contaminants for which there are FDA Action Levels exceed such thresholds in the tissues of organisms exposed to sediments from this project.

When bioaccumulation of a specific contaminant or class of contaminants in organisms exposed to project sediments is not significantly greater than bioaccumulation in organisms exposed to reference sediments, that contaminant is concluded to be present in forms and amounts that do not result in bioaccumulation that would cause unreasonable degradation of the environment or human health, or significant adverse effects. These contaminants are not considered further in the evaluation unless they contribute to a mixture that is evaluated against a single combined guideline value or criterion (i.e., total PCBs, PAH mixtures, total DDT, total chlordane and total

endosulfans). In cases where bioaccumulation levels are statistically greater (at the 95% confidence limit) in project sediment-exposed organisms than in reference sediment-exposed organisms, further evaluation for potential effects is warranted to evaluate any risk that might be associated with accumulated contaminants.

EPA Region 2 uses a framework to evaluate project sediment bioaccumulation results that follows national guidance described in the Green Book (EPA/USACE 1991). This guidance outlines a series of evaluations to consider risks associated with project sediment bioaccumulation results that exceed reference. The framework used for ocean disposal suitability determinations includes the following evaluations:

- *Comparison of the 28-day bioaccumulation results to Regional Matrix Values*. PCBs, DDTs, cadmium and mercury that bioaccumulate to concentrations greater than reference are evaluated by comparing 'steady state'-adjusted concentrations to Regional Matrix Values (USACE 1981) and the Region 2 PCB Worm Tissue Criterion (40 CFR 228.15(d)(6)(v)(E)) (listed in Table 4, Column 20; steady state adjustment is discussed in Section 1 of Appendix A). Bioaccumulation test results that exceed the Regional Matrix Values or the Region 2 PCB Worm Tissue Criterion indicate that the sediment is not suitable for disposal at the SJS.

- Risk-based assessments are conducted to evaluate concentrations of compounds that bioaccumulate above reference for which Regional Matrix Values do not exist. These evaluations are made using 'steady state'-adjusted concentrations and include comparisons to risk values protective of benthic organisms and upper-level trophic receptors, including humans.

- The final evaluation uses all available information and results of the individual chemical evaluations to evaluate the solid phase of the dredged material as a whole.

The remainder of this memorandum documents the assessment conducted using the described framework to evaluate risks associated with contaminants that bioaccumulated to greater than reference levels in tissues of organisms exposed to Army Terminal Widener Reach sediment. Bioaccumulation test results for this project are summarized in Table 4.

_Solid Phase Bioaccumulation Evaluation-Comparison to Reference Sediment Bioaccumulation_

Contaminants for which bioaccumulation from the dredged material in tissue was statistically greater than the reference in the clam and/or worm are indicated by an asterisk in the applicable column of Table 1.

Table 1. Statistically Significant Bioaccumulation of Contaminants in
Organisms Exposed to Project Sediments vs. Reference Sediments

| CONTAMINANT | CLAMS | WORMS |
|---|---|---|
| **PAHs** | | |
| **PESTICIDES** | | |
| **METALS** | | |
| Arsenic | | * |
| Cadmium | | * |
| Chromium (total) | | * |
| Copper | | * |
| Nickel | | * |
| Zinc | | * |

*Solid Phase Bioaccumulation Evaluation- Comparison to Regional Matrix Values and the
Region 2 PCB Worm Tissue Criterion*

Bioaccumulation test results (adjusted for steady state, as described in Section 1 of Appendix A)
were below all Regional Matrix Values (USACE 1981) for both test organisms and the mean
'steady state'-adjusted worm PCB tissue concentration was below the Region 2 PCB Worm
Tissue Criterion (40 CFR 228.15(d)(6)(v)(E)). Therefore, no further evaluation of these
contaminants is required in accordance with EPA Region 2/CENAN guidance.

*Solid Phase Bioaccumulation Evaluation- Risk-based Evaluations*

Risk associated with compounds that bioaccumulated to greater than reference in test organisms
exposed to project sediment for which Regional Matrix Values (USACE 1981) do not exist are
evaluated using risk-based assessments, as discussed below. Contaminants that fall into this
group for this project include: arsenic, chromium, copper, nickel, and zinc.

Contaminants bioaccumulated from dredged material can present risks to organisms that are
directly exposed to the sediment and to species at upper trophic levels of the marine food web
(e.g., predatory fish). Human exposure can potentially result via consumption of fish that has
been dietarily exposed to contaminants. Risk to directly exposed ecological receptors, risk to
dietarily exposed ecological receptors, and human risk are examined separately in the EPA
Region 2 framework.

   *a.  Risks to Directly Exposed Organisms*

Metals, Pesticides, and Industrial Chemicals

Water Quality Criterion Tissue Levels (WQCTL) are established for aldrin, dieldrin, total
chlordane, total endosulfan, arsenic, chromium, copper, lead, nickel, silver and zinc (see
Appendix, Section 2, A). For this project, none of the WQCTLs were exceeded.

PAHs

To assess direct exposure risks of PAHs, a direct comparison is made of total measured PAH
tissue residue to the Critical Body Residue (CBR) associated with narcosis, which is the primary
non-cancer effect of PAHs. The CBR approach, described by McCarty (1991), was used to
evaluate the potential impacts of total PAHs accumulated in the dredged material

USACE_025899

bioaccumulation test organisms and is discussed in the Appendix. As shown in Table 4, total PAH levels in tissues from the dredged material bioaccumulation test were below levels at which chronic adverse effects might be expected from a narcotic mode of action in sensitive aquatic organisms (i.e., fish) as estimated by the CBR.

Therefore, these bioaccumulation test results do not indicate a potential for undesirable effects to directly exposed organisms resulting from disposal of this material at the SJS.

   *b.  Risks to Upper Trophic Level Ecological Receptors*
To properly assess risks to upper trophic level species (including humans) the efficiency with which a contaminant is transferred through the diet and the propensity of those compounds to accumulate to higher concentrations in the tissues of the consumer must be considered. The potential movement of contaminants through the food chain was considered and appropriate trophic transfer factors applied to adjust the data accordingly to reflect the propensity of specific contaminants or contaminant groups to accumulate to higher (or lower) concentrations in upper trophic level organisms (including humans). Data and/or methods used to develop these trophic transfer adjustment factors are discussed in the Appendix.

Effects of Mutagenic, Carcinogenic and Teratogenic PAHs
Applying an uncertainty factor (UF) of 10 to account for interspecies differences in sensitivities and a trophic transfer factor of 0.1 to the no-effects level for BaP calculated from Hannah, *et al.* (1982), as discussed in the Appendix results in a no-effect level for BaP of approximately 8,000 ppb in benthic tissue, which is considerably greater than the highest steady state-adjusted tissue concentration of BaP measured in organisms exposed to project sediment (12.3 ppb for BaP only and 38.8 ppb for total BaP equivalents) project tissue concentrations would still be below this no-effect level if the higher trophic transfer factor (0.23) reported by McElroy, *et al*. (1991) was used.

Hall and Oris (1991) reported on experiments that exposed fathead minnows to anthracene during long-term exposures and observed adverse effects on reproduction. The paper reported that a concentration of anthracene in the tissue of the egg in the range of 3,750 to 8,000 ppb resulted in no significant effects on egg hatching or survivorship. Using the same approach for accounting for species-to-species uncertainty and food chain transfer yields a conservative benthic tissue level of 3,750 ppb. Anthracene tissue concentrations from the project bioaccumulation tests are well below this level.

As stated above, PAHs did not accumulate to greater than reference in test organisms exposed to project sediments. The most relevant aquatic effects information reviewed indicates that the highest tissue PAH levels accumulated in the dredged material bioaccumulation tests are below mutagenic, carcinogenic, and teratogenic no-effect levels.

   *c.  Consideration of Potential Carcinogenic and Non-carcinogenic Effects on Human Health*
Benthic tissue screening levels for human carcinogenic risk and non-carcinogenic hazard were developed for those contaminants that do not have Regional Matrix Values (USACE 1981). The approach used to derive these screening levels (described in the Appendix) uses standard EPA risk-assessment approaches and assumptions (fish and shellfish consumption rates; whole body to fillet contaminant ratios) to back calculate a fish tissue concentration that corresponds to specific levels of cancer risk or non-cancer hazard. The fish tissue concentration is then

converted to a corresponding benthic prey concentration using the trophic transfer factors discussed in the Appendix.

Because the analysis implicitly incorporates various conservative assumptions regarding exposure (e.g., 100% of consumed seafood is fish taken from the ODMDS; fish has fed exclusively at the ODMDS long enough prior to capture to be at equilibrium with benthic prey tissue contaminant concentrations), the resulting benthic tissue concentrations represent conservative estimates of risk, or what are in effect plausible upper-bound estimates. Thus, the true risk is highly unlikely to be greater than estimated and could be much lower.

Table 4, Column 14 lists conservative human cancer protection levels in benthic organisms for the chemicals which are known or suspected carcinogens that correspond to a human cancer risk level of $1 \times 10^{-4}$. None of the human health cancer protection levels were exceeded in the bioaccumulation test results.

The potential for non-cancer impacts can be expressed as a hazard quotient (HQ), which is the ratio of the average daily intake divided by the toxicological reference dose for the chemical. Table 4, Column 15 includes the noncancer protection levels in benthic organisms for the chemicals requiring further analysis that are known to cause, or suspected of causing, non-carcinogenic effects, that would result in a human HQ equal to unity (i.e., 1). If the HQ is less than unity, an adverse noncarcinogenic effect is highly unlikely to occur. The higher the HQ, the more likely that an adverse noncarcinogenic effect will occur as a result of exposure to the contaminant in the dredged material after placement.

The concentrations of all contaminants in test organisms' tissues were below their respective non-cancer protection level (HQs for all contaminants were less than unity).

**D. Evaluation of Bioaccumulation Results for Dredged Material as a Whole**

As a final step in the evaluative process, it is appropriate to go beyond assessing the individual test results to evaluate the bioaccumulation test results as a whole to provide an opportunity for an integrated assessment of the individual test results (see Figure 1, Box d). EPA/USACE (1991) provides additional factors to be considered in making an integrated assessment of dredged material test results. The recommended factors are:

*Magnitude of toxicity and number and phylogenetic diversity of species exhibiting greater mortality in the dredged material than in the reference material*

As discussed above, project dredged material would not cause significant mortality (statistically different project sediment-exposed mortality exceeding mortality in the reference sediment exposures by 10% for mysid shrimp or 20% for amphipods) and meets the solid phase toxicity criteria of Sections 227.6 and 227.27.

*Number and magnitude of contaminants for which bioaccumulation from the dredged material is statistically greater than bioaccumulation from the reference material and number and phylogenetic diversity of species in which bioaccumulation from the dredged material is statistically greater than bioaccumulation from the reference material*

The magnitudes by which compounds bioaccumulated to levels greater than reference are shown in Table 2.

USACE_025901

Table 2. Magnitude of Bioaccumulation of Contaminants in Organisms Exposed to
Project Sediments vs. Reference Sediments

| CONTAMINANT | CLAMS | WORMS |
|---|---|---|
| PAHs | | |
| PESTICIDES | | |
| METALS | | |
| Arsenic | | 1.3 |
| Cadmium | | 1.4 |
| Chromium (total) | | 1.7 |
| Copper | | 1.4 |
| Nickel | | 1.5 |
| Zinc | | 1.9 |

All contaminants accumulated to less than two times reference.

Exceeding reference concentrations is common when reference concentrations are very low or
"non-detect." Because the reference sediment has only trace levels of contamination,
reference-exposed organisms tend to exhibit very low or undetectable levels of
bioaccumulation.

*Toxicological importance of the contaminants whose bioaccumulation from the dredged material
exceeds that from the reference material, including their propensity to biomagnify within aquatic
food webs*

Although some of the contaminants that bioaccumulated to levels greater than reference in
organisms exposed to the project sediment can be toxicologically important, they did not
accumulate to toxicologically important concentrations. Levels of these contaminants were all
below the acceptable human health risk range and acceptable aquatic effects range using
conservative approaches and analyses as described above to evaluate those test results,
including through their potential transfer through the food web.

*Magnitude by which contaminants whose bioaccumulation from the dredged material exceeds
that from the reference material also exceed the concentrations found in comparable species
living in the vicinity of the proposed site.*

Organisms collected from a broad area of the sea floor in the New York Bight have been
collected and analyzed for tissue concentration of bioaccumulative contaminants of concern
(Charles and Muramoto 1990; USACE 1994; EPA 1996f; EPA 1997b). These data provide a
measure of the tissue residues for organisms living in ambient ocean areas. Table 4, Columns
16 and 17 summarize the most recent background data.

The magnitude by which compounds that bioaccumulated to levels greater than reference
bioaccumulated to greater than background levels (where background values exist) are
reported in Table 3. All other compounds accumulated in test organisms to steady state levels
below background.

Table 3. Magnitude of Bioaccumulation above Background in Organisms
Exposed to Project Sediments

| CONTAMINANT | CLAMS | WORMS |
|---|---|---|
| PAHs | | |
| PESTICIDES | | |
| Zinc | 1.2 | 1.3 |

All contaminants, except for zinc accumulated to less than background. Zinc accumulated to less than 1.5 times background.

When bioaccumulation in organisms exposed to project sediments is not greater than tissue concentrations in organisms from the vicinity of the remediation site (the background levels), this indicates that placement of the material would not result in bioaccumulation above existing ambient levels in the general area and thus does not have a potential to cause undesirable effects. However, bioaccumulation in organisms exposed to project sediments greater than these levels is not necessarily predictive of adverse effects. It may, for example, reflect extremely low background levels.

Although zinc did bioaccumulate to levels greater than background in organisms exposed to the project sediment, it did not accumulate to toxicologically important concentrations. Levels of zinc were all below the acceptable human health risk range and acceptable aquatic effects range using conservative approaches and analyses as described above to evaluate those test results, including through its potential transfer through the food web.

## VI.  OVERALL CONCLUSION ON THE PROPOSED PROJECT

Based upon this review of the results of testing of the sediments proposed for dredging and ocean placement from Army Terminal Widener Reach, the material meets the criteria for acceptability for ocean placement as described in Sections 227.6, and 227.27 of the Regulations, and is suitable for placement at the SJS.

USACE_025904

## Table 4. Bioaccumulation and Comparison Data for Army Terminal Widener Reach

| | PROJECT DATA | | | | | | | | | | | | COMPARISON DATA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Col.1 | Col.2 [10] | Col.3 [10] | Col.4 [10] | Col.5 | Col.6 [10] | Col.7 [1] | Col.8 | Col.9 | Col.10 | Col.11 | Col.12 | Col.13 | Col.14 | Col.15 | Col.16 | Col.17 | Col.18 | Col.19 | Col.20 |
| Sample ID | Reference | Reference | Test Sed. | Test Sed. | Test Sed. | Conv Fac. clam/worm [1] | Conv Fac. [2] | Test Sed. SS | Test Sed. SS | Carcinogenic | Test Sed. BaP Tox. Conc (clam)[3] | Test Sed. BaP Tox. Equiv. Conc. (worm)[3] | Human Health Cancer (1E-4) Level[4] | Human Health Non-Cancer Level (HQ=1) [6] | Background | Background | FDA Limits[8] | Ecological Effects Level | Regional Non-Specific Matrix |
| Compound | (clam) (ug/Kg) | (worm) (ug/Kg) | (clam) (ug/Kg) | (clam) (ug/Kg) | (worm) (ug/Kg) | | [2] | SS (clam) (ug/Kg) | SS (worm) (ug/Kg) | TEF [3] | (ug/Kg) | (ug/Kg) | (ug/Kg) | (ug/Kg) | (clam) (ug/Kg) | (worm) (ug/Kg) | (ug/Kg) | (ug/Kg) | (ug/Kg) |
| **PAHs** | | | | | | | | | | | | | | | | | | | |
| Acenaphthene | 5,710 | 5,710 | 5,710 | 5,710 | 5,710 | | 1/1 | 5,710 | 7,990 | | | | | | 8.1 | 0.5 | 300 | | [13] |
| Acenaphthylene | 10,800 | 10,800 | 10,800 | 10,800 | 10,800 | | 1/1 | 10,800 | 15,200 | | | | | [5] | 4.6 | 1.3 | | | [13] |
| Anthracene | 8,710 | 8,710 | 8,710 | 8,710 | 8,710 | | 1/1 | 8,710 | 12,200 | | | | 43,605,000 | 43,605,000 | 10.0 | 1.6 | | 3,750 | [13] |
| Fluorene | 6,310 | 6,310 | 6,310 | 6,310 | 6,310 | | 1/1 | 6,310 | 8,830 | | | | 5,805,000 | 5,805,000 | 7.4 | 0.3 | | | [13] |
| Naphthalene | 12,800 | 12,800 | 12,800 | 12,800 | 12,800 | | 1/1 | 12,800 | 17,900 | | | | | | 26.4 | 4.5 | | | [13] |
| Phenanthrene | 10,100 | 10,100 | 10,100 | 10,100 | 10,100 | | 1/1 | 10,100 | 14,200 | | | | | | 32.7 | 4.7 | | | [13] |
| Benzo(a)anthracene** | 8,240 | 8,240 | 8,240 | 8,240 | 8,240 | | 1/1 | 16.5 | 23,000 | 0.1 | 1.65 | 2,300 | 114 | 135 | 25.1 | 4.8 | | | [13] |
| Benzo(a)pyrene** | 6,140 | 6,140 | 6,140 | 6,140 | 6,140 | | 1/1 | 12.28 | 17,200 | 1 | 12.3 | 17,200 | | [5] | 24.2 | 7.6 | | | [13] |
| Benzo(b)fluoranthene** | 10,700 | 10,700 | 10,700 | 10,700 | 10,700 | | 1/1 | 32.10 | 44,700 | 0.1 | 2.74 | 3,840 | | [5] | 22.2 | 7.6 | | | [13] |
| Benzo(k)fluoranthene** | 13,700 | 13,700 | 13,700 | 13,700 | 13,700 | | 1/1 | 27.40 | 38,400 | 0.01 | 0.152 | 0.212 | | [5] | 40.6 | 16.5 | | | [13] |
| Benzo(g,h,i)perylene | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | | 1/1 | 21.0 | 21,200 | 0.01 | 0.0210 | 0.0264 | | [5] | 81.6 | 5.6 | | | [13] |
| Chrysene** | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | | 1/1 | 17,820 | 29,400 | 0.001 | 17.82 | 29.00 | | [5] | 29.4 | 6.7 | | | [13] |
| Dibenzo(a,h)anthracene** | 8,910 | 8,910 | 8,910 | 8,910 | 8,910 | | 1/1 | 4.7 | 25,000 | 1 | 4.7 | | | [5] | 8.5 | 1.1 | | | [13] |
| Fluoranthene | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | | 1/1 | 4.7 | 6,580 | | 1 | | 5,805,000 | 5,805,000 | 43.8 | 10.6 | | | [13] |
| Indeno(1,2,3-cd)pyrene** | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | | 1/1 | 31,500 | 44,100 | 0.1 | 3,150 | 4,410 | | [5] | 16.6 | 4.4 | | | [13] |
| Pyrene | 6,260 | 6,260 | 6,260 | 6,260 | 6,260 | | 1/1 | 6.3 | 8.8 | | | | 4,387,000 | 4,387,000 | 51.3 | 26.6 | | | [13] |
| **TOTAL PAHs** | | | | | | | | 226 | 331 | | 38.8 | 53.0 | 2,000 (BaP rev.) | | 104.60 | | | 40,000 [8] | |
| **PESTICIDES** | | | | | | | | | | | | | | | | | | | |
| Aldrin | 0.37 | 0.37 | 0.37 | 0.37 | 0.37 | | 2/2 | 0.74 | 0.740 | | | | 33 | 167 | 0.9 | 0.1 | 300 | 299 [9] | |
| Dieldrin | 0.120 | 0.120 | 0.120 | 0.120 | 0.120 | | 2/2 | 0.22 | 0.240 | | | | 65 | 518 | | 0.1 | 300 | 4.37 [9] | |
| a-Chlordane | 0.110 | 0.110 | 0.110 | 0.110 | 0.110 | | 2/2 | 0.22 | 0.220 | | | | | | 0.7 | 0.7 | 300 | | |
| Trans-nonachlor | 0.30 | 0.30 | 0.30 | 0.30 | 0.30 | | 2/2 | 0.10 | 0.060 | | | | | | | | 300 | | |
| Heptachlor | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | | 2/2 | 0.10 | 0.200 | | | | | | 0.05 | 0.05 | 300 | | |
| Heptachlor epoxide | 0.17 | 0.17 | 0.17 | 0.17 | 0.17 | | 1/1 | 0.34 | 0.170 | | | | | | 0.2 | 0.2 | 300 | | |
| Total Residual | | | | | | | | 1,120 | 18.59 | | | | 114 | 135 | | 1.7 | | 648 [9] | |
| Chlordane/Heptachlor | | | | | | | | | | | | | | | | | | | |
| Endosulfan I | 0.070 | 0.070 | 0.070 | 0.070 | 0.070 | | 1/1 | 0.070 | 0.070 | | | | | [5] | | 0.2 | | | |
| Endosulfan II | 0.31 | 0.31 | 0.31 | 0.31 | 0.31 | | 1/1 | 0.310 | 0.310 | | | | | [5] | | 0.1 | | | |
| Endosulfan sulfate | 0.12 | 0.12 | 0.12 | 0.12 | 0.12 | | 1/1 | 0.120 | 0.120 | | | | | [5] | | 0.1 | | | |
| Total Endosulfans | | | | | | | | 0.500 | 0.500 | | | | | [5] | | 0.4 | | 2.86# [9] | |
| 4,4-DDT | 0.33 | 0.33 | 0.330 | 0.330 | 0.33 | | 11/11 | 3.520 | 3.630 | | | | | | 0.6 | 1.0 | | | |
| 2,4-DDT | 0.190 | 0.19 | 0.19 | 0.19 | 0.190 | | 2/2 | 0.380 | 0.380 | | | | | | | 0.1 | | | |
| 4,4-DDD | 0.320 | 0.320 | 0.320 | 0.320 | 0.320 | | 3/3 | 0.960 | 0.960 | | | | | | | 3.9 | | | |
| 2,4-DDD | 0.20 | 0.200 | 0.200 | 0.200 | 0.20 | | 2/2 | 0.380 | 0.400 | | | | | | | 1.4 | | | |
| 4,4-DDE | 0.140 | 0.140 | 0.140 | 0.140 | 0.140 | | 2/2 | 0.280 | 0.260 | | | | | | 3.5 | 4.3 | | | |
| 2,4-DDE | 0.25 | 0.250 | 0.250 | 0.25 | 0.25 | | 1/1 | 0.500 | 0.500 | | | | | | | 0.1 | | | |
| Total DDT | | | | | | | | 6.00 | 6.15 | | | 4,410 | | | | 11.1 | | 2,868 [9] | |
| **TOTAL PCBs** | 8.80 | 11.0 | 8.8 | 8.8 | 10.6 | | 1/2 | 8.8 | 21.2 | | | | 60,000 | [5] | 106.6 | 88.1 | 2,000 | 11,820 [9] | |
| 1,4-Dichlorobenzene | 0.000 | | | | | | 1/1 | 0.000 | 0.000 | | | | | | | | | | |
| **METALS** | | | | | | | | | | (mg/Kg) | | | (mg/Kg) [14] | (mg/Kg) [14] | (mg/Kg) | (mg/Kg) | | (mg/Kg) | (mg/Kg) |
| Arsenic | 3.60 | 2.92 | 3.76 | 3.76 | 3.60 | * | 1/1 | 3.76 | 2.54 | | | | | | 1.21 | 4.89 | | 12.6 [9] | 0.3 |
| Cadmium | 0.038 | 0.026 | 0.038 | 0.038 | 0.038 | * | 1/1 | 0.038 | 0.036 | | | | | 73 | 1.28 | 1.31 | | | |
| Chromium (total) | 0.415 | 0.191 | 0.340 | 0.340 | 0.340 | * | 1/1 | 0.340 | 0.205 | | | | | [5] | 5.58 | 2.78 | | 118.6 [9] | |
| Copper | 3.441 | 1.47 | 3.48 | 3.48 | 3.48 | * | 1/1 | 3.48 | 2.04 | | | | | 540 | 1.41 | 1.64 | | 9.6 [9] | |
| Lead | 0.228 | 0.119 | 0.154 | 0.154 | 0.154 | * | 1/1 | 0.154 | 0.092 | | | | | 1.3 | 0.04 | 0.93 | | 119.9 [9] | 0.2 |
| Mercury | 0.013 | 0.019 | 0.010 | 0.010 | 0.010 | | 1/1 | 0.010 | 0.021 | | | | | [5] | 0.04 | 0.03 | 1 | | |
| Nickel | 0.450 | 0.114 | 0.375 | 0.375 | 0.375 | * | 1/1 | 0.375 | 0.169 | | | | | 290 | 3.5 | 1.10 | | 3.8 [9] | |
| Silver | 0.033 | 0.012 | 0.038 | 0.038 | 0.038 | * | 1/1 | 0.038 | 0.009 | | | | | 73 | | 0.77 | | 1.4 [9] | |
| Zinc | 13.4 | 14.5 | 27.3 | 27.3 | 27.3 | * | 1/1 | 27.3 | 14.1 | | | | | 4,400 | 11.50 | 20.61 | | 1,517 [9] | |

**FOOTNOTES FOR TABLE 4:**

\*\*: Carcinogenic PAHs.

#: Levels represent the conservative level of protection for the sum of the related compounds and their metabolites.

1.  An "\*" in this column indicates that the analyte concentration in the test sediment-exposed organisms is statistically greater than in those exposed to reference sediment. Means and statistical comparisons were determined conservatively using 1x the detection limit to estimate concentrations of analytes that were below the detection limit.

2.  Conversion factors from 28-day bioaccumulation results to steady state (see discussion in Appendix)

3.  Toxic equivalencies (TEFs) for the carcinogenic PAHs are from EPA (1993).

4.  This value represents the $10^{-4}$ cancer risk level for the carcinogenic PAHs. The total concentration of carcinogenic PAHs is expressed in BaP equivalents (see discussion in the text of the memo).

5.  Cancer risk factor or reference dose are not assigned by EPA in IRIS (EPA 1995).

6.  FDA limits are from EPA/USACE (1991).

7.  This value represents the benthic level expected to result in a no-effect level for possible mutagenic and teratogenic effects in fish from exposure to BaP, which is the most toxic PAH.

8.  This value represents the non-specific narcosis effects level (see discussion in Appendix). This value is compared to the sum of all PAHs measured.

9.  Calculations are included in Appendix.

10. Means of five tissue replicates calculated using 1/2 detection limits to estimate concentrations of analytes that were not detected; "U" indicates that all five replicates were not detected.

11. For this PAH, the no-effect level for possible mutagenic and teratogenic effects in fish is estimated from exposure to BaP, which is the most toxic PAH.

12. Cancer and non-cancer protection levels, based on inorganic arsenic as contained in EPA's IRIS database, are not appropriate for evaluating the potential human health impacts of arsenic bioaccumulation from dredged material, and therefore, are not included in Table 4 (see discussion in Appendix).

USACE_025905

## VII.  **REFERENCES**

Anamar. 2021.  San Juan Harbor MPRSA Section 103. Sediment Characterization Testing and Analysis. San Juan, Puerto Rico. Prepared for U.S. Army Corps of Engineers, Jacksonville District. Dated May 2021.

Brown, B., and J. Neff. 1993. Bioavailability of Sediment-Bound Contaminants to Marine Organisms. Report #PNL-8761 UC-000 by Battelle/Marine Sciences Laboratory prepared for the National Ocean Pollution Program Office, NOAA.

CESAJ. 2021. Email request from Javier Cortes, USACE-JD to Mark Reiss, EPA-CWD-CWRB-DSOS requesting review of project data for San Juan Harbor, Puerto Rico. Dated June 9, 2021.

Charles, JB and J. Muramoto. 1990.  Assessment of Contaminants in Sediment and Biota at the Mud Dump Site, New York Bight. Report No. SAIC-91/7608&256 by Science Applications International Corp. (SAIC) for EPA - Region 2.

EPA. 1989. Interim Procedures for Estimating Risks Associated with Mixtures of Chlorinated Dibenzo-p-Dioxins and -Dibenzofurans (CDDs and CDFs) and 1989 Update. U.S. Environmental Protection Agency, Risk Assessment Forum, Washington, DC. EPA/625/3-89/016.

EPA. 1993. Provisional Guidance for Qualitative Risk Assessment of Polycyclic Aromatic Hydrocarbons. EPA/600/R-93/089.

EPA. 1994. Final clarification of suspended particulate phase bioaccumulation testing requirements for material dumped in ocean waters. *Federal Register* Vol. 59: 52650. October 18, 1994.

EPA. 1995. On-Line. Integrated Risk Information System (IRIS). Cincinnati, OH: Office of Research and Development, Environmental Criteria and Assessment Office.

EPA. 1996a. Ocean dumping testing requirements; final rule. *Federal Register*, Vol. 61, No. 190, 51196. September 30, 1996.

EPA. 1996f. Battelle Body Burden Study. Report prepared by Battelle Ocean Sciences, Duxbury, MA, for EPA - Region II.

EPA. 1997b. Contaminants in Polychaetas from the Mud Dump Site and Environs. March 4, 1997. Report prepared by Battelle Ocean Sciences, Duxbury, MA, for EPA - Region II.

EPA. 1997c. Supplemental to the Environmental Impact Statement on the New York Dredged Material Disposal Site Designation for the Designation of the Historic Area Remediation Site (HARS) in the New York Bight Apex. U.S. Environmental Protection, Region 2, New York, May 1997.

EPA. 2000. Memorandum for the Record entitled "Review of Compliance with the Testing Requirements of 40 CFR 227.6 and 227.27 for Phase 2 San Juan Harbor federal nbavigation Project Improvement (Army Terminal Channel and Turning Basin, Anegado Channel, Bar Channel). San Juan Bay, Puerto Rico." Dated January 6, 2000.

EPA. 2020. Sampling and Testing Form/Letter from Mark Reiss to Javier Cortes, dated March 11, 2020. EPA Region 2, Clean Water Division.

EPA. 2020. Sampling/Testing Plan for the San Juan Federal Navigation Project, dated March 10, 2020.

EPA/CENAN. 2016. Guidance for Performing Tests on Dredged Material Proposed for Ocean Disposal. New York District Corps of Engineers, U.S. Environmental Protection Agency -Region 2.

EPA/CENAN. 2019. Non-Testing Related Regulatory Issues: Subparts B, C, D, and E of 40 CFR Section 227 for the placement of Remediation Material at the Historic Area Remediation Site. Dated 8/8/2019.

EPA/USACE. 1991. Evaluation of Dredged Material Proposed for Ocean Disposal - Testing Manual. (Green Book). EPA - 503/8-91/001.

Hall, A.T. and J.T. Oris.  1991.  Anthracene reduces reproductive potential and is maternally transferred during long-term exposure in fathead minnows.  *Aquatic Toxicol*.  19,249-264.

Hannah, JB, J.E. Hose, M.L. Landolt, B.S. Miller, S.P. Felton, and W.T. Iwaoka. 1982. Benzo(a)pyrene-induced morphologic and developmental abnormalities in rainbow trout. *Arch. Environ. Contam. Toxicol.* 11,167-171.

McCarty, L.S. 1991. Toxicant body residues: implications for aquatic bioassays with some organic chemicals. *In:* Aquatic Toxicology and Risk Assessment: Fourteenth Volume, ASTM STP 1124; M.A. Mayes and M.G. Barron, Eds., American Society for Testing and Materials, Philadelphia; pp. 183-192.

McElroy, A.E., J.M. Cahill, J.D. Sisson, and K.M.Kleinow. 1991. Relative bioavailability and DNA adduct formation of Benzo[a]pyrene and metabolites in the diet of the winter flounder. *J. Comp. Biochem. Physiol.* 100C:1-2,29-33.

Squibb, K.S., J.M. O'Connor, and Kneip, T.J.  1991.  Toxics Characterization Report, Module 3.1. Report prepared by Institute of Environmental Medicine, NY Univ. Medical Center for the NY/NJ Harbor Estuary Program.

Steimle, F.W., V.S. Zdanowicz, S.L. Cuneff and R. Terranova.  1994. Trace metal concentrations in common benthic macrofaunal prey form the New York Bight.   US National Marine Fisheries Service, NOAA.  *Marine Pollution Bulletin.* 28, 12, pp. 760-765.

USACE. 1981.  Final Interpretive Guidance for Bioaccumulation of Petroleum Hydrocarbon, DDT, Cadmium, and Mercury in the New York Bight. Memorandum from North Atlantic Division Corps of Engineers to G.R. Tobertson, Deputy Director of Civil Works, Dept. of Army.

USACE. 1994. Bioaccumulation Guidance Values for Selected Contaminants in Sediments and Biota of the Sandy Hook Reference Site for the New York Bight Apex Mud Dump Site. (draft) Report by Corps of Engineers Waterways Experiment Station (WES) for the New York District Corps.

# Appendix

## I.   CORRECTION OF 28-DAY BIOACCUMULATION RESULTS TO ACCOUNT FOR STEADY STATE (Column 8-10)

Bioaccumulation tests were conducted using 28-day exposure of appropriate sensitive benthic marine organisms to sediment. Following placement of the material at the ODMDS, exposures to any contaminants would continue beyond 28 days, therefore, assessment of risks associated with accumulations must consider the extent to which the 28-day measured tissue concentration approximate the 'steady state' concentration of each contaminant that could occur in organisms at the ODMDS after extended exposure. Therefore, comparisons to guidance values or criteria for given contaminants that reflect 'steady state' conditions (as opposed to comparisons to other 28-day tissue concentrations such as comparison to reference) may require that a correction factor be applied to the 28-day concentration to account for incomplete attainment of steady state accumulation.

Steady state may be defined operationally as the lack of any significant difference (ANOVA, alpha = 0.05) among tissue residues taken at three consecutive sampling intervals (Lee, *et al.* 1989). The 28-day test exposure period was selected as appropriate because most chemicals of concern will reach at least 80% of steady state in benthic marine organisms within that time frame (Boese and Lee 1992). For the few chemicals that may not meet steady state tissue concentrations in 28 days, a factor is used to adjust the data to steady state.

Steady state considerations for specific contaminants (or contaminant classes) and the derivation of correction factors (listed in Column 8) to account for incomplete uptake are discussed in the remainder of this section. Steady state-adjusted concentrations for clams and worms are presented in Columns 9 and 10, respectively.

### A.   Metals
In general, metals bioaccumulate more rapidly than organics and 28-day tests are sufficient to evaluate potential effects (see EPA/USACE 1991), for example, arsenic (Naqvi, *et al*. 1990; Riedel, *et al.* 1987; Oladimeji, *et al.* 1984).

Cadmium and mercury are not regulated in marine organisms as are essential metals, and, thus, no adjustment for steady state is applicable. Bioaccumulation of these metals is affected by many complex factors, and is essentially linear (Dethlefsen 1978; Giesy, *et al.* 1980; V-Balogh and Salanka 1984). Therefore, there are no adjustments that can be made to reproduce steady state. The Regional Matrix Values for cadmium and mercury, therefore, do not represent steady state conditions and so 28-day test results are used to compare to the Regional Matrix Values.

### B.   Organic Contaminants
a.   Pesticides
Uptake of non-polar organic contaminants from food is highly dependent on their hydrophobicity, a property measured by the octanol/water partition coefficient, $K_{ow}$. The higher the value of $K_{ow}$, the longer it takes to reach steady state in benthic marine organisms. Organochlorine compounds that have log $K_{ow} > 6$ (i.e., aldrin, dieldrin, heptachlor, trans nonachlor, and alpha-chlordane), may not attain steady-state within 28 days of exposure to sediment.

Information contained in Boese and Lee (1992) indicates that aldrin, dieldrin, and a-chlordane achieve at least 50% of steady-state in 28-day bioaccumulation tests. Heptachlor and trans nonachlor, were not addressed in Boese and Lee (1992). However, the fraction of steady state achieved for these compounds after 28-days was estimated using the equations contained in McFarland (1995). Results of such calculations indicate heptachlor and trans nonachlor reach approximately 50% of steady state after 28 days. Calculating the fraction of steady state achieved for the remaining pesticides with log $K_{ow} < 6$ (heptachlor epoxide) indicates that these compounds reach steady state within 28 days, so no adjustment is necessary.

The degree to which DDT and its metabolites reach steady state in test organisms after 28 days was evaluated using data reported by Lee *et al.* (1994). To assess the rate of bioaccumulation, they exposed the clam *Macoma nasuta*, to sediments collected from the vicinity of the United Heckathorn Superfund site in Richmond California to study tissue residues and uptake kinetics associated with exposure to pesticide-contaminated sediments. Results of the study indicate that one parent compound, 4,4-DDT, bioaccumulates much more slowly than 2,4-DDT and the DDT metabolites. The results range from approximately 9 percent of steady state after 28 days for 4,4-DDT, to 55 percent of steady state after 28 days for 2,4-DDT (Lee, et al. 1994). Based on these results, 28-day test tissue concentrations of DDT compounds and their metabolites are adjusted by multiplying the 28-day result by a factor of 11 for 4,4-DDT, a factor of three for 4,4-DDD, and a factor of two for 2,4-DDT and the remaining DDT metabolites before they are compared to Regional Matrix Values (USACE 1981).

b.  PCBs

The degree to which PCBs reach steady state in test organisms after 28 days was evaluated using data reported by Lee, *et al.* (1994). To assess the rate of bioaccumulation of PCBs and other compounds, Rubinstein, *et al.* (1990) and Pruell, *et al.* (1993) exposed three species of organisms, the grass shrimp *Palaemonetes pugio*; the sandworm *Nereis virens*, and the clam *Macoma nasuta*, to sediments collected from the Passaic River, N.J. Sub-samples of the exposed organisms were removed on various days into the study including days 0, 10, 28, 42, 84, and 180.

For the clam tissue, the variance in the concentrations on day 28 and day 84 (by which point the maximum concentration had been reached) overlap, thus indicating that the two are not statistically different and the bioaccumulation on day 28 is at or very close to steady state. Thus, the clam bioaccumulation for the project sediments using 28-day exposures is acceptable for use as steady state tissue levels.

For the worm tissue, variances for days 28 and 180 do not overlap, thus indicating that steady state was probably not reached in 28 days. Variance in the data makes it difficult to quantify a real difference; means for days 28 and 180 from Rubinstein *et al*. (1990) (approximately 1,750 ng/g (nanograms per gram or parts per billion, ppb) for 28 days, and 3,000 ng/g for 180 days) suggest approximately 58% of steady state would have been reached in 28 days. On this basis, worm project data are conservatively adjusted by a factor of two to calculate a steady state tissue concentration for comparison to the Region 2 PCB Worm Tissue Criterion (40 CFR 228.15(d)(6)(v)(E)).

c.   PAHs

The degree to which PAHs reach steady state in test organisms after 28 days was evaluated using data reported by McFarland (1995) and Meador, *et al.* (1995). The time required for a given PAH to attain a steady-state concentration following exposure to bedded sediments ($t_{ss}$) is determined primarily by the log $K_{ow}$ of the compound in question (McFarland 1995; Meador, *et al.* 1995). Meador, *et al.* (1995) reviewed nine studies that investigated the attainment of steady-state tissue concentrations of PAHs by various marine invertebrates. In each case, tissue concentrations approached steady state within several days to two weeks after initiating exposure to both low molecular weight PAHs and high molecular weight PAHs. McFarland (1995) estimated $t_{ss}$ values ranging from 3.5 to 326 days for 15 PAHs based on their hydrophobicities. The estimated steady-state concentration of the sum total of the 15 PAHs analyzed by McFarland for sediments collected from typical harbor areas revealed that the mean concentration attained after 28-day bioaccumulation tests was approximately 86% of steady-state. McFarland (1995) concluded that 28-day tests are likely to reflect steady-state. Despite this conclusion, steady state total PAH concentrations were estimated by summing individual PAH concentrations that were conservatively adjusted by a factor of 1, 2, or 3 based on their hydrophobicities and McFarland (1995).

## II.   <u>CONSIDERATION OF FOOD-CHAIN TRANSFER</u>

To properly assess risks to upper trophic level species (including humans) the efficiency with which a contaminant is transferred through the diet and the propensity of those compounds to accumulate to higher concentrations in the tissues of the consumer must be considered. The potential movement of contaminants through the food chain was considered and appropriate trophic transfer factors applied to adjust the data accordingly to reflect the propensity of specific contaminants or contaminant groups to accumulate to higher (or lower) concentrations in upper trophic level organisms (including humans). Data and/or methods used to develop these trophic transfer adjustment factors are discussed in the remainder of this section.

Metals

Trophic transfer of most metals is not sufficient to qualify as biomagnification (Brown and Neff 1993). The lack of observed biomagnification for such metals as arsenic, cadmium, lead, mercury, and zinc is the result of incomplete absorption of metals across the gut, rapid excretion, and dilution in muscle, which represents a large part of the total body weight of most marine animals (Fowler 1982; Suedel *et al.* 1994). For purposes of conducting the human health and ecological evaluations below, a conservative trophic transfer coefficient equal to one will be used for these non-biomagnifying metals (Suedel *et al.* 1994 and references cited therein).

Pesticides and Industrial Chemicals

The potential for these chemicals to biomagnify was also evaluated. Although organic contaminants with values of log $K_{ow} > 4$ tend to biomagnify in the marine food chain, studies (USACE 1995) have shown that this is not true for higher molecular weight compounds such as the most highly chlorinated PCBs or for easily metabolized compounds such as PAHs. Those organic compounds which are not efficiently excreted, such as certain pesticides, can biomagnify in the food chain. For the organic constituents with a potential to biomagnify in the marine food chain, trophic transfer factors were calculated, using the approach described by Gobas (1993). The values are summarized in Attachment B.

PAHs

With regard to the potential for biomagnification of PAHs, feeding studies show that assimilation rates from ingested food are extremely low, e.g., more than 98% of the target contaminant remained in an undigested form in fish gut 48 hours after feeding squid containing radio-labeled benzo[a]pyrene to young cod (Corner, *et al.* 1976) and juvenile Atlantic herring (Whittle, *et al.* 1977). PAH metabolites are also transferred through the marine food chain; however, they are absorbed even less efficiently than their parent compounds (McElroy and Sisson 1989; McElroy, *et al.* 1991). Up to 99% of the PAH compounds taken up by fish are metabolized and excreted into bile, the usual elimination mode, within 24 hours of uptake (Varanasi, *et al.* 1989). Similar results are described in Brown and Neff (1993) who evaluated various studies describing trophic transfer. The studies cited in Brown and Neff (1993) indicate a trophic transfer rate for BaP from invertebrates to fish of between 0.02 and 0.23 times the concentration in the ingested invertebrates (Corner, *et al*. 1976, O'Connor, *et al*., 1988, McElroy, *et al*. 1991). This was considered when assessing the ecological and human health effects of the project material as discussed below.

### III.     CONSIDERATION OF ECOLOGICAL EFFECTS

#### A.     Potential for ecological effects based on Water Quality Criteria (Column 19)

The potential for ecological impacts due to bioaccumulation of several compounds of concern was evaluated by calculating a Water Quality Criterion Tissue Level (WQCTL). The WQCTL is calculated by multiplying the Clean Water Act Section 304(a)(1) Federal water quality criterion chronic value (CV) for the chemical by the empirically determined bioconcentration factor (BCF) for the chemical for a representative marine organism (Lee, *et al.* 1989). A BCF is the ratio of the concentration of a contaminant in an organism to the concentration of the contaminant in water. Thus, the WQCTL represents the tissue concentration that would be expected in an organism exposed to water containing the chemical at the CV concentration. The CV level is set to protect 95% of all tested organisms included in the water quality criterion database, thus representing a conservative level of protection (EPA 1985b). Table 4 lists the calculated WQCTLs. Sources of CVs and BCFs are from EPA ambient water quality criteria documents (EPA 1980b, 1980c, 1980d, 1980e, 1980f, 1984a, 1984b, 1985a, 1985c, 1986, 1987b and 1992a) and Calabrese (1984; for silver). Calculations are shown in Attachment A.

Several pesticides were evaluated based on the sum of their primary constituents and associated metabolites (e.g., total chlordane, total endosulfan, and total DDT). Alpha(trans)-chlordane, trans nonachlor, heptachlor and heptachlor epoxide represent the primary components of technical chlordane and its metabolites found in the tissue of aquatic organisms (Jarman, et. al. 1996; Verschueren 1983; Sweeney, *et. al.* 1993). These constituents are summed as total chlordane as is consistent with current practice for chlordane (Jarman, *et. al.* 1996) and total DDT. The WQCTL for total chlordane was calculated using the WQC for chlordane as a conservative level of protection. While water quality criteria exist, and WQCTLs can be calculated, for heptachlor (133 ppb) and chlordane (64 ppb), the total chlordane is compared to the WQCTL for chlordane in order to be more environmentally conservative. The chlordane WQCTL provides a conservative level of protection as indicated by published residue effects levels (Sweeney, *et. al.* 1993; Bauman, *et. al.* 1987; Feroz, *et. al.* 1979; Parrish, *et. al.* 1976). Consistent with the above approach, the tissue concentration for endosulfan I, endosulfan II and endosulfan sulfate were also summed as total endosulfan and compared to the WQCTL for total endosulfan.

USACE_025911

The WQCTLs were also calculated for all metals of concern which do not have Matrix values. For total chromium, the WQCTL was calculated based on chromium (VI), which is substantially more toxic than chromium (III) and elemental chromium in order to provide a conservative level of environmental protection.

**B.      Potential for ecological effects based on PAH toxicity (Column 19)**.

The Critical Body Residue (CBR) approach described by McCarty (1991) was used to derive values for use in evaluating the potential impacts of PAHs accumulated in the dredged material bioaccumulation test organisms. CBRs are concentrations of chemical residues in organisms which elicit a deleterious biological response associated with narcosis, which is the primary non-cancer effect of PAHs. Narcotic responses measured can be acute (e.g., immobilization or death) or chronic endpoints (e.g., reduced reproduction, fecundity or growth). CBRs are represented as the ratio of the mass of toxicant to the mass of the organism, such as millimoles or micrograms of toxicant per kilogram (mmole or ug/kg) of organism. For the narcosis endpoint, each molecule of individual PAH congeners is generally equipotent, thus the total PAH concentration is compared to the CBR. A 400-ppb dose of naphthalene would elicit a similar toxicity response as a 400-ppb dose of fluorene; if both chemicals are present together at these concentrations, then the combined dose would be approximately equal to 800 ppb of either contaminant alone.

McCarty (1991) states that an average critical body residue of 400,000 - 1,200,000 ppb can be used as an estimate for acute effects for a narcosis-producing chemical (e.g., PAHs) on fish populations. (Note: McCarty reports the CBR in units of millimoles per kilogram; this value has been converted to ppb for PAHs using the average molecular weight of the PAHs analyzed in the bioaccumulation test). Chronic effect critical body residues can be estimated by applying an acute to chronic ratio of 10 to the acute CBR (McCarty 1986; Call, *et al.* 1985). Therefore, the chronic critical body residue for PAHs can be estimated at 40,000 - 120,000 ppb of PAHs in organism tissue, and Table 4 thus uses the 40,000-ppb level.

These CBRs were based on fish data. The use of CBRs based on fish toxicity represents a conservative estimate of potential toxicity due to exposure to dredged material because: (1) it is extremely unlikely that a fish would get its whole diet from the ODMDS, and (2) fish are generally more sensitive than the benthic organisms in direct contact with the dredged material placed at the ODMDS (e.g., Landrum, *et al.* (1988) estimated an acute CBR for crustaceans of 800,000 ppb - 42,000,000 ppb).

**C.      Potential ecological impacts of mutagenic, carcinogenic and teratogenic PAHs (Column 19)**

EPA and the USACE reviewed eleven scientific journal articles that reported the results of laboratory experiments that sought to relate the concentration of a PAH contaminant(s) in water, as injected doses, or tissue concentrations, to mutagenic, carcinogenic, teratogenic and/or reproductive effects to fish. These studies all used fish species which are among the most sensitive organisms in the marine environment to exhibit the above effects (EPA 1996c). In addition, most of these studies focused on the PAH most believed to cause such effects for which there is data, benzo(a)pyrene (BaP). One study (Breteler 1984), discussed the possible sources and distribution of PAHs in the Hudson/Raritan estuary, and ranked the threat of PAHs to aquatic biota and humans. The main threat was believed to be carcinogenicity, with a greater

threat ranking assigned to humans than biota. However, Breteler (1984) did not provide specific effects-based levels that could be used in the following analysis. Two articles evaluated the effects of crude oil, and thus were not useful for evaluating the effects of specific PAHs measured in the bioaccumulation test (Rice, *et al.* 1987; Lee, *et al.* 1981). Three studies considered the effects of specific PAHs, but did not synoptically measure tissue concentrations in the organisms (Ward, *et al.* 1981; Holcombe, *et al.* 1983; Finger, *et al.* 1985) and were not used, because the lack of tissue data for these studies makes their utility in evaluating the tissue concentration resulting from the dredged material bioaccumulation tests highly uncertain.

The remaining five papers reported measured tissue concentrations and observed reproductive effects in organisms exposed to PAH-spiked water. One article reported the tissue concentrations of adult fish and the observed effect on survival and health of the fish's offspring. Hose, *et al.* (1981) reported that adult English sole injected with benzo(a)pyrene (BaP) accumulated the chemical in the gonad and mature gametes. The amount of BaP taken up by the ovary ranged from 16,800 to 49,700 ppb. Two samples of ripe eggs contained 51,200 and 263,000 ppb of BaP and its metabolites. No adverse effects were reported for these concentrations. Hose, *et al.* (1981) also reported the results of injecting female flathead sole with BaP. Adverse effects to egg hatching success were reported for each female. The paper does not report tissue concentrations in either the parent fish or the egg of the flathead sole. Effects on reproductive success were reported but could only be correlated with the external dose injected into the parent. Therefore, since concentrations and effects were not synoptic in this report, it was not useful in the evaluation of the dredged material bioaccumulation results.

Three papers reported the results of experiments which measured fish egg or alevin concentrations of BaP and associated reproductive or carcinogenic effects (Hose, *et al.* 1982; Hannah, *et al.* 1982; Black, *et al.* 1988). Hose, *et al.* (1982) exposed three species of sole, sand sole, English sole, and flathead sole, to BaP-spiked water. Tissue concentrations of 2,100 ppb were measured in sand sole on day 6 (24 hours after hatching) and were associated with reduced hatching success. However, we did not consider the results to be appropriate for use in setting effects levels because they may have been compromised by the methods of replication used in the experimental design.

Another study considered the carcinogenicity of BaP in rainbow trout resulting from embryo microinjection (Black, *et al.* 1988). A statistically significant number of liver neoplasms was found at a concentration of approximately 200,000 ppb, with non-significant effects at up to one half that concentration. Therefore, using the above across-species UF of 10 and trophic transfer factor of 0.1 results in an aquatic no-effect level of 100,000 ppb.

Hannah, *et al.* (1982) estimated a concentration of BaP in tissue that caused abnormalities in development of rainbow trout eggs, using aqueous exposures and actual measured tissue concentrations in alevin tissues. An exposure to a 2.4 ppb mean aqueous BaP concentration accumulated an average of 12,340 ppb in alevins. This concentration was associated with an increase in percentage of abnormalities from approximately 6% at lower water concentrations (0.08, 0.21, 0.37 and 1.48 ppb) to approximately 13% at higher concentrations. From 0.08 to 1.48 ppb in the water, there were no increasing effects exhibited, therefore, the effects were apparently "real" (i.e., significantly greater than the threshold effect level of 6%) only at the aqueous 2.4 ppb concentration. The Hannah, *et al.* (1982) study is considered the most reliable study for this evaluation since it used exposure series and measured tissue concentrations

USACE_025913

associated with observed effects, and therefore allows for the calculation of a no-effects level directly from the measured results.

In applying these studies to evaluations of dredged material, consideration must be given to uncertainties in converting these kinds of results to concentrations protective of other biota. Three uncertainties needing to be considered are: (1) those associated with converting effect to no-effect concentrations, (2) across-species uncertainties, and (3) uncertainties in estimating the dose of contaminants to which the organism is exposed. These uncertainties are discussed below.

With respect to uncertainty when converting effect to no-effect concentrations, an uncertainty factor of one order of magnitude is often used when only an effect measure is reported. However, in Hannah, *et al.* (1982), the no-effect level can be estimated to be the next lowest concentration below the lowest-observed effect level, since the range of concentrations below this level did not exhibit significantly different responses. In this case, the no-effect level occurred at the water exposure concentration of 1.48 ppb. Although a tissue concentration was not measured at the 1.48 ppb water concentration, it can be calculated from the concentration measured at the effect level (i.e., the no-effect water concentration (1.48 ppb) is close to 65 percent of the observed effect concentration (2.4 ppb) so the no-effect tissue concentration should be about 65 percent of the lowest-observable effect tissue concentration (0.65 x 12,340 ppb = 8,021 ppb)). Thus, a factor to adjust these data from lowest observed effect tissue concentration to the calculated no-observed effect tissue concentration is obtained directly from the data.

There can also be uncertainty as to the proximity to the site of toxic action in the organism that a dose or concentration is measured, and with respect to species-to-species variability. Hannah (1982) reported dose concentrations in the tissue and, therefore, there is no need to account for variability associated with the large uncertainties encountered in typical water-only exposure studies where the actual concentration at the site of toxic action is unknown. When measured in the tissues, as was done for this project, concentrations of narcotic chemicals causing effects (i.e., critical body residues, CBRs) in aquatic organisms are reported to range only from 1.4 to 21 umoles/g wet weight (a factor of about one order of magnitude) for organisms as diverse as insects, crustaceans, and fish (McCarty, *et al*. 1992). Therefore, from a tissue concentration perspective, the species-to-species uncertainty factor appropriate for both total PAHs operating as narcotics and individual PAHs having teratogenic effects would be one order of magnitude, or a value of 10 (EPA 1996d).

In summary, a factor of 10 (representing species to species uncertainty) is an appropriate UF to use in these evaluations. Also, as described Appendix Sections I and II, Brown and Neff (1993) show that trophic transfer of PAHs up the food chain to fish decrease tissue levels by over an order of magnitude. Given this data and the fact that these studies included fish that spent 100% of their time feeding in the test sediment, whereas this would be highly unlikely to occur at an ocean site, a trophic transfer factor of 0.1 is used in this analysis. Applying this UF of 10 and a trophic transfer factor of 0.1 to the no-effects level for BaP calculated from Hannah, *et al.* (1982), as discussed above (8,021 ppb) results in a no-effect level for BaP of approximately 8,000 ppb in benthic tissue.

USACE_025914

IV.     **CONSIDERATION OF POTENTIAL EFFECTS ON HUMAN HEALTH (Columns 14 and 15)**

Human effects screening levels were developed with risk-based methods using conservative estimates of exposure to assess whether these contaminants would accumulate to levels in fish and shellfish that could lead to significant adverse effects to humans. The approach assessed consumption of fish and shellfish to derive conservative estimates of contaminant concentrations in benthic tissue protective of human health using the following EPA standard risk-assessment assumptions: 70-kilogram adult eats 6.5 grams of fish and shellfish per day over a 70-year lifetime. This assessment considered potential for both cancer and non-cancer effects in humans. EPA IRIS (EPA 1995) and effects information from EPA's National Toxics Rule (EPA 1992b) were used in the human health assessment to calculate acceptable levels in fish and shellfish to protect human health. Trophic transfer factors, as discussed earlier, were then used to convert these fish and shellfish levels into benthic tissue concentrations.

For regulatory purposes, EPA utilizes $10^{-4}$ to $10^{-6}$ (one in ten thousand to one in one million) as an acceptable incremental risk range for activities with potential for causing cancer in human beings (EPA 1980a; EPA 1988; EPA 1987a; Thomas 1987; EPA 1991). EPA considers a cancer risk within this range to be safe and protective of public health. This is supported by the World Health Organization Guidelines for Drinking Water Quality (WHO 1993), where it selected a $10^{-5}$ guideline value, and then explained that the application could vary by a factor of ten (e.g., $10^{-4}$ to $10^{-6}$). Since this analysis uses conservative methods, the results represent conservative estimates of risk, or what are in effect plausible upper-bound estimates. Thus, the true risk is highly unlikely to be greater than estimated and could be much lower.

Table 4, Column 14 lists human cancer protection levels in benthic organisms for chemicals which are known or suspected carcinogens that would lead to a human cancer risk level of $10^{-4}$. For PAHs, this analysis used BaP-equivalents derived from the toxic equivalence factor for each carcinogenic PAH (from EPA (1993); note: these factors are listed in Column 11 of Table 4 for each of the compounds).

The potential for non-cancer impacts can be expressed as a hazard quotient (HQ), which is the ratio of the average daily intake divided by the toxicological reference dose for the chemical. If the HQ is less than unity (e.g., 1), an adverse noncarcinogenic effect is highly unlikely to occur. If the HQ exceeds unity, an adverse health impact may occur. The higher the HQ, the more likely that an adverse noncarcinogenic effect will occur as a result of exposure to the contaminant in the dredged material after placement. Table 4, Column 15 lists noncancer protection levels in benthic organisms for the chemicals that are known to cause, or suspected of causing, non-carcinogenic effects, that would result in a human HQ equal to unity. Those numbers were derived using the conservative assumptions and source materials described in the introductory paragraph to this section.

For the following compounds, the following special considerations were used in evaluating the results in Table 4.

a.   Metals

No reference dose has been established for lead. EPA has adopted a blood lead level of 10ug/dl as the level of concern and EPA policies are that regulatory programs should seek to minimize

the number of children with blood lead levels above a target of 10 ug/dl (Final Rule for Lead and Copper NPDWR, 56FR26468, June 7, 1991), and this value was used to calculate the effects level in Table 4 (see EPA 1996e).

When interpreting the importance of arsenic tissue concentrations for human health, consideration was given to the arsenic form present (i.e., inorganic vs. organic). Arsenic is found in marine organisms as an organic complex which includes such compounds as arsenobetaine and arsenocholine (Abel and Axiak 1991). Organic arsenic in the tissues of aquatic organisms is not metabolized by predators or humans and is readily eliminated from the body through excretion (Hrudey *et al.* 1995). As a result, the toxicity of organic arsenic ingested from seafood is low and appears to pose no significant hazard (Abernathy and Ohanian 1992). For this reason, cancer and non-cancer protection levels, based on inorganic arsenic as contained in EPA's IRIS database, are not appropriate for evaluating the potential human health impacts of arsenic bioaccumulation from dredged material, and therefore, are not included in Table 4.

### b.  Pesticides

Alpha(trans)-chlordane, trans nonachlor, heptachlor and heptachlor epoxide represent the primary components of technical chlordane and its metabolites found in the tissue of aquatic organisms (Jarman, *et. al.* 1996; Verschueren 1983; Sweeney, *et. al.* 1993). These constituents are summed as total chlordane as is consistent with current practice for chlordane (Jarman, *et. al.* 1996) and other pesticides (e.g., total DDT). Total chlordane is evaluated using the $10^{-4}$ cancer risk level and non-cancer level for heptachlor epoxide, which has the greatest potency of the chlordane constituents or metabolites. Similarly, endosulfan I, endosulfan II, and endosulfan sulfate are summed and the total is compared to the conservative non-cancer protection level for endosulfan.

### c.  PAHs

For PAHs, this analysis used BaP-equivalents derived from the toxic equivalence factor for each carcinogenic PAH (from EPA (1993); note: these factors are listed in column 11 of Table 4 for each of the compounds)

ATTACHMENT A

Tissue concentration is calculated using BCF * Water Quality Criteria (WQC) ambient aqueous concentration, and assuming the conversion factor of 1 kg=1L.

| Compound | Ambient Conc. (ug/L)[1] | BCF | Tissue Conc. (ug/Kg) | Remarks |
|----------|------------------------|-----|---------------------|---------|
| Aldrin | 0.13 | 2,300 | 299 | WQC was reduced by a factor of 10 to account for chronic effects; BCF estimate is based on Dieldrin since Aldrin rapidly transformed to Dieldrin in the |
| Dieldrin | 0.0019 | 2,300 | 4.37 | BCF is based on 1.1% lipid level for marine fish, Spot (*Leiostomus xanthurus*). |
| Total Chlordane | 0.004 | 16,000 | 64 | Total Chlordane includes alpha-chlordane, trans nonachlor, heptachlor, heptachlor epoxide; WQC for Chlordane is used for Total Chlordane; BCF is based |
| Total Endosulfan | 0.0087 | 328 | 2.85 | Total Endosulfan includes endosulfan I, endosulfan II and endosulfan sulfate; WQC for Endosulfan is used for Total Endosulfan; BCF is based on 3.6% lipid |
| Arsenic | 36 | 350 | 12600 | Ambient conc. is based on the saltwater criteria continuous conc. for arsenic (III); BCF is based on the Eastern Oyster (*Crassostrea virginica*). |
| Chromium | 50 | 236 | 11800 | Ambient conc. is based on Chromium (VI) since it is substantially more toxic than Chromium (III); BCF is based on polychaete worm. |
| Copper | 2.9 | 3,300 | 9570 | WQC is based on a hardness value of 100; BCF is based on soft shell clam. |
| Lead | 8.5 | 1,400 | 11900 | Ambient conc. is based on saltwater criteria continuous conc.; BCF is based on the Eastern Oyster (*Crassostrea virginica*). |
| Nickel | 8.3 | 458 | 3802 | Ambient conc. is based on saltwater criteria continuous conc.; BCF is based on the Eastern Oyster (*Crassostrea virginica*). |
| Silver | 0.23 | 6,500 | 1495 | Water Quality Criterion (WQC) was reduced by a factor of 10 to account for chronic effects; BCF is based on the Blue Mussel (*Mytilus edulis*). |
| Zinc | 86 | 17,640 | 1517040 | Ambient conc. is based on saltwater criteria continuous conc.; BCF is based on Eastern Oyster (*Crassostrea virginica*). |

[1].The following documents were used to obtain the water quality criteria values.

Calabrese, A. 1984. "Effects of Long-Term Exposure to Silver and Copper on Growth, Bioaccumulation and Histopathology in the Blue Mussel (Mytilus edulis)." *Mar. Envir. Res.* 1, 253-274.

USACE_025917

EPA. 1980b. Ambient Water Quality Criteria for Aldrin/Dieldrin; EPA 440/5-80-019; December 1980.

EPA. 1980c. Ambient Water Quality Criteria for Chlordane; EPA 440/5-80-027; October 1980.

EPA. 1980d. Ambient Water Quality Criteria for Heptachlor; EPA 440/5-80-052; October 1980.

EPA. 1980e. Ambient Water Quality Criteria for Endosulfan; EPA 440/5-80-046; October 1980.

EPA. 1984a. Ambient Water Quality Criteria for Lead - 1984; EPA 440/5-84-027; January 1985.

EPA. 1984b. Ambient Water Quality Criteria for Copper - 1984; EPA 440/5-84-031; January 1985.

EPA. 1985a. Ambient Water Quality Criteria for Chromium - 1984; EPA 440/5-84-029; January 1985.

EPA. 1985c. Ambient Water Quality Criteria for Arsenic - 1984; EPA 440/5-84-033; January 1985.

EPA. 1986. Ambient Water Quality Criteria for Nickel - 1986; EPA 440/5-86-004; September 1986.

EPA. 1987b. Ambient Water Quality Criteria for Zinc - 1987; EPA 440/5-87-003.

EPA. 1992a. Draft Ambient Water Quality Criteria for Silver.

ATTACHMENT B
**Benthic Cancer Protection Level Calculations for the Protection of Human Health**
**from the Consumption of Fish Exposed to Dredged Material at the Historic Area Remediation Site**

Basis[fn1]:

$$10^{-4} \text{ Benthic Tissue Level (ug/kg)} = \frac{[10^{-4} \text{ Conc. in Fish}] \times [\text{Whole Body/fillet Factor (1.35)}]^{fn5}}{\text{Trophic Transfer Factor}^{fn2}}$$

$$10^{-4} \text{ Conc. in Fish (ug/kg)} = \frac{\text{Toxicological Dose (ug/day)}}{[\text{Seafood Consumption (6.5 g/day)}^{fn3}] \times [10^{-3} \text{kg/g}]}$$

$$\text{Toxicological Dose (ug/day)} = \frac{[\text{Risk Level } (10^{-4})] \times [\text{Body Weight (70 kg)}^{fn3}] \times [10^{3} \text{ ug/mg}]}{\text{Potency Factor, } q_1^{*} \text{ (kg-day/mg)}^{fn4}}$$

| | Cancer Potency Factor $q_1^{*}$ (kg-day/mg) | Acceptable Concentration in Fish (ug/kg) | Trophic Transfer Factor | Benthic Protection Level (ug/kg) |
|---|---|---|---|---|
| **Pesticides** | | | | |
| Aldrin | 17 | 63 | 2.6 | 33 |
| Chlordane | 1.3 | 828 | 2.3 | 486 |
| Dieldrin | 16 | 67 | 1.4 | 65 |
| Heptachlor | 4.5 | 239 | 2.7 | 120 |
| Heptachlor epoxide | 9.1 | 118 | 1.4 | 114 |
| | | | | |
| **Industrial Organics** | | | | |
| | | | | |
| **PAHs** | | | | |
| Benzo(a)pyrene | 7.3 | 147 | 0.1 | 2,000 |
| | | | | |
| **METALS** | | | | |
| Arsenic | 1.5 | 718 | 3 | 323 |

Army Terminal Widener Reach - 27

USACE_025919

ATTACHMENT C
**Benthic Non-Cancer Protection Level Calculations for the Protection
of Human Health from the Consumption of Fish Exposed to Dredged Material
at the Historic Area Remediation Site**

| | Basis[fn1]: |
|---|---|
| Benthic Tissue Level (ug/kg) = | [Conc. in Fish] x [Whole Body/fillet Factor (1.35)][fn5] |
| | Trophic Transfer Factor[fn2] |
| Conc. in Fish (ug/kg) = | Toxicological Dose (ug/day) |
| | [Seafood Consumption (6.5 g/day)[fn3] x [$10^{-3}$kg/g] |
| Toxicological Dose (ug/day) = | [Reference dose[fn4]] x [Body Weight (70 kg)[fn3] |

| | Reference Dose RfD (ug/kg-day) | Acceptable Concentration in Seafood (ug/kg) | Trophic Transfer Factor | Benthic Protection Level (ug/kg) |
|---|---|---|---|---|
| **Metals** | | | | |
| Arsenic | 0.3 | 3,231 | 3 | 1,454 |
| Chromium | 5 | 54,000 | 1 | 73,000 |
| Copper | 37.1 | 400,000 | 1 | 540,000 |
| Nickel | 20 | 215,000 | 1 | 290,000 |
| Silver | 5 | 54,000 | 1 | 73,000 |
| Zinc | 300 | 3,230,769 | 1 | 4,361,538 |
| **Pesticides** | | | | |
| Aldrin | 0.03 | 323 | 2.6 | 167 |
| Chlordane | 0.06 | 592 | 2.3 | 350 |
| Dieldrin | 0.05 | 538 | 1.4 | 518 |
| Endosulfan | 6 | 64,615 | 1 | 87,231 |
| Heptachlor | 0.5 | 5,385 | 2.7 | 2,692 |
| Heptachlor epoxide | 0.013 | 140 | 1.4 | 135 |
| **PAHs** | | | | |
| Acenaphthene | 60 | 650,000 | 0.1 | 8,775,000 |
| Fluorene | 40 | 430,000 | 0.1 | 5,805,000 |
| Phenanthrene | 300 | 3,230,000 | 0.1 | 43,605,000 |
| Anthracene | 300 | 3,230,000 | 0.1 | 43,605,000 |
| Fluoranthene | 40 | 430,000 | 0.1 | 5,805,000 |
| Pyrene | 30 | 325,000 | 0.1 | 4,387,000 |

Army Terminal Widener Reach - 28

NOTES:

[fn1] Human health cancer and non-cancer assessments adapted from *Guidance for Assessing Chemical Contaminant Data for use in Fish Advisories: Volume II: Risk Assessment and Fish Consumption Limits.* U.S. Environmental Protection Agency, EPA823-B-94-004, Office of Science and Technology, Washington, DC, June 1994.

[fn2] Trophic transfer factors were calculated by Mr. Lawrence Burkhard, EPA Duluth, using the food chain transfer model developed by Gobas (1993).

[fn3] Default values were taken from EPA's national toxics rule for setting water quality criteria, EPA (1992b).

[fn4] Cancer potency factors and non-cancer reference doses are taken from EPA (1995).

[fn5] The acceptable concentration in seafood is defined on the basis of the fillet or edible portion for humans. Trophic transfer, however, was defined based on whole-body characteristics, including lipid concentrations. Experience in New York State indicates a whole body to fillet ration ranging from 1.2 to 1.5 is applicable to lipophilic substances. The mid-range value of 1.35 is used in this analysis.

USACE_025921

## V. **REFERENCES (APPENDIX)**

Abel, P.D. and V. Axiak. 1991. Ecotoxicology and the marine environment. Ellis Horwood, New York, pp. 269.

Abernathy, C.O. and E.V. Ohanian. 1992. Non-carcinogenic effects of inorganic arsenic. Environ. Geochem. Health 14: 35.

Baumann, P.C., W.D. Smith, W.K. Parland. 1987. Tumor Frequencies and Contaminant Concentrations in Brown Bullheads from an Industrialized River and a Recreational Lake. *Transactions of the American Fisheries Society* 116:79-86.

Black, JB, A.E. Maccubbin, and C.J. Johnston. 1988. Carcinogenicity of benzo(a)pyrene in rainbow trout resulting from embryo micro injection. *Aqua Tox*. 13, 297-308.

Breteler, R. (ed.). 1984. Chemical Pollution of the Hudson-Raritan Estuary. NOAA Technical Memorandum NOS OMA 7. National Oceanic and Atmospheric Administration, National Ocean Service. Rockville, Md.

Brown, B., and J. Neff. 1993. Bioavailability of Sediment-Bound Contaminants to Marine Organisms. Report #PNL-8761 UC-000 by Battelle/Marine Sciences Laboratory prepared for the National Ocean Pollution Program Office, NOAA.

Bryan, G.W. and W.J. Langston. 1992. Bioavailability, accumulation and effects of heavy metals in sediments with special reference to United Kingdom estuaries: A review. *Environmental Pollution* 76: 89-131.

Calabrese, A. 1984. "Effects of Long-Term Exposure to Silver and Copper on Growth, Bioaccumulation and Histopathology in the Blue Mussel (Mytilus edulis)." *Mar. Envir. Res.* 1, 253-274.

Call, D.J., L.T. Brooke, M.L. Knuth, S.H. Poirler, and M.D. Hoglund. 1985. Fish subchronic toxicity prediction model from industrial organic chemicals that produce narcosis. *Environ. Tox. Chem.* 4, 335-341.

Corner, E.D.S., R.P. Harris, K.J. Whittle, and P.R. Mackie. 1976. Hydrocarbons in marine zooplankton and fish. *In*: Effects of Pollutants on Aquatic Organisms, Lockwood APM (ed), pp. 71- 106. Cambridge University Press, Cambridge, England.

de Bruijn, J., Busser, F., Seinen, W., and Hermens, J. 1989. Determination of octanol/water partition coefficients for hydrophobic organic chemicals with the "slow stirring" method. *Environ. Toxicol. Chem.*, 8:499-512.

Dethlefsen, V. 1978. Uptake, retention, and loss of cadmium by brown shrimp. 1978. *Meeresforschung*, 26:137 (reported in Giesy *et al.* 1980).

EPA. 1980a. Water quality criteria documents: availability. *Federal Register*, Vol. 45, No. 231. November 28, 1980.

EPA. 1980b. Ambient Water Quality Criteria for Aldrin/Dieldrin; EPA 440/5-80-019; December 1980.

EPA. 1980c. Ambient Water Quality Criteria for Chlordane; EPA 440/5-80-027; October 1980.

Army Terminal Widener Reach - 30

EPA. 1980d. Ambient Water Quality Criteria for Heptachlor; EPA 440/5-80-052; October 1980.

EPA. 1980e. Ambient Water Quality Criteria for Endosulfan; EPA 440/5-80-046; October 1980.

EPA. 1984a. Ambient Water Quality Criteria for Lead - 1984; EPA 440/5-84-027; January 1985.

EPA. 1984b. Ambient Water Quality Criteria for Copper - 1984; EPA 440/5-84-031; January 1985.

EPA. 1985a. Ambient Water Quality Criteria for Chromium - 1984; EPA 440/5-84-029; January 1985.

EPA. 1985b. Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Uses. NTIS # PB85-227049.

EPA. 1985c. Ambient Water Quality Criteria for Arsenic - 1984; EPA 440/5-84-033; January 1985.

EPA. 1986. Ambient Water Quality Criteria for Nickel - 1986; EPA 440/5-86-004; September 1986.

EPA. 1987a. National primary drinking water regulations - synthetic organic chemicals; monitoring for unregulated contaminants; final rule. *Federal Register*, Vol. 52, No. 130, 25690. July 8, 1987.

EPA. 1987b. Ambient Water Quality Criteria for Zinc - 1987; EPA 440/5-87-003.

EPA. 1988. Guidance for state implementation of water quality standards for CWA section 303(c)(2)(B). *Federal Register*, Vol. 54, No. 346. November 12, 1988.

EPA. 1991. National Primary Drinking Water Regulations; Final Rule. 40 CFR Part 141. January 30, 1991.

EPA. 1992a. Draft Ambient Water Quality Criteria for Silver.

EPA. 1992b. Water quality standards; establishment of numeric criteria for priority toxic pollutants; states compliance. *Federal Register, Vol.* 57: 60848.

EPA. 1993. Provisional Guidance for Qualitative Risk Assessment of Polycyclic Aromatic Hydrocarbons. EPA/600/R-93/089.

EPA. 1995. On-Line. Integrated Risk Information System (IRIS). Cincinnati, OH: Office of Research and Development, Environmental Criteria and Assessment Office.

EPA. 1996c. Memo to File from A. Lechich. Subject: Issues Regarding Exposure and Uptake Mechanisms for PAHs. (Discussion with V. McFarland). December 5, 1996.

EPA. 1996d. Memo to File from A. Lechich. Subject: Discussion of PAHs With Regard to East River Memo. (Discussion with D. Hansen). December 5, 1996.

EPA. 1996e. Memo to File from C. Vogt. Subject: Acceptable Levels of Lead: East River Bioaccumulation Tests. December 13, 1996.

USACE_025923

Feroz, M. And M.A.Q. Khan, 1979. Fate of [14]C-cis-chlordane in goldfish, *Casassius auratus* (L.). *Bulletin of Environmental Contamination and Toxicology* 23:64-69.

Finger, E.F., E.F. Little, M.G. Henry, J.F. Fairchild and T.P. Boyle. 1985. Comparison of laboratory and field assessment of fluorene - Part 1: effects of fluorene on survival, growth, reproduction, and behavior of aquatic organisms in laboratory tests. *In:* Validation and Predictability of Laboratory Methods for Assessing the Fate and Effects of Contaminants in Aquatic Ecosystems. ASTM STP865, Philadelphia, pp. 120-133.

Fowler, S.W. 1982. Biological transfer and transport processes. *In:* Pollutant Transfer and Transport in the Sea. Vol. II, ed. G. Kullenberg, pp. 1-65. CRC Press, Boca Raton, Florida.

Giesy, J.P., Bowling, J.W., and Kania, H.J. 1980. Cadmium and zinc accumulation and elimination by freshwater crayfish. *Arch. Environm. Contam. Toxicol.*, 9:683-697.

Gobas, F. 1993. A Model for predicting the bioaccumulation of hydrophobic organic chemicals in aquatic food webs: application to Lake Ontario. *Ecological Modeling.* 69:1-17.

Hannah, JB, J.E. Hose, M.L. Landolt, B.S. Miller, S.P. Felton, and W.T. Iwaoka. 1982. Benzo(a)pyrene-induced morphologic and developmental abnormalities in rainbow trout. *Arch. Environ. Contam. Toxicol.* 11,167-171.

Holcombe, G.W., G.L. Phipps, and J.T. Fiandt. 1983. Toxicity of selected priority pollutants to various aquatic organisms. *Ecotoxicol. Environ. Safety*. 7:400-409.

Hose, J.E., J.B. Hannah, M.L. Landolt, B.S. Miller, S.P. Felton, and W.T. Iwaoka. 1981. Uptake of benzo(a)pyrene by gonadal tissue of flatfish (family Pleuronectidae) and its effects on subsequent egg development. *J. Toxicol. Environ. Health.* 7:991-1000.

Hose, J.E., J.B. Hannah, D. Dijulio, M.L. Landolt, B.S. Miller, W.T. Iwaoka, and S.P. Felton. 1982. Effects of benzo(a)pyrene on early development of flatfish. *Arch. Environ. Contam. Toxicol.* 11:167-171.

Hrudey, S.E., W. Chen, and C.G. Rousseaux. 1996. Bioavailability in environmental risk assessment. CRC Press, Inc., Boca Raton, Florida, pp.294.

Jarman, W; K. Hobson, W. Sydeman, C. Bacon and E. McLaren. 1996. Influence of Trophic Position and Feeding Location on Contaminant Levels in the Gulf of the Farallones Food Web Revealed by Stable Isotope Analysis. *Environmental Science & Tech.* 30(2):654-660.

Landrum P.E., B.J. Eadie, and W.R. Faust. 1988. Toxicity and toxicokinetics for a mixture of sediment associated polycyclic aromatic hydrocarbons to the amphipod Pontoporeia hoyi. *In:* Poster Abstracts, SETAC Ninth Annual Meeting, Society of Environmental Toxicology and Chemistry, Washington D.C. p. 29.

Lee, R.F., J. Stolzenbach, S. Singer, and K.R. Tenore. 1981. Effects of crude oil on growth and mixed function oxygenase activity in polychaetes, Nereis sp. *In:* Biological Monitoring of Marine Pollutants. Ed. Vernburg, F.A. Calabrese, F. Thurberg, and W. Vernberg. Academic Press. pp. 323-334.

Army Terminal Widener Reach - 32

Lee, H., II, Boese, B.L., Pelletier, J., Winsor, M., Specht, D.T., and Randall, R.C., 1989. Guidance Manual: Bedded Sediment Bioaccumulation Test. EPA Pacific Ecosystem Branch Bioaccumulation Team, Newport, OR.

Lee, H., II, A. Lincoff, B.L. Boese, F.A. Cole, S.P. Ferraro, J.O. Lamberson, R.J. Ozretich, R.C. Randall, K.R. Rukavina, D.W. Schults, K.A. Sercu, D.T. Specht, R.C. Swartz, D.R. Young. 1994. Ecological Risk Assessment of the Marine Sediments at the United Heckathorn Superfund Site. EPA Pacific Ecosystem Branch Bioaccumulation Team, Newport, OR., EPA Region IX, San Francisco, CA.

Lunde, G. 1977. Occurrence and transformation of arsenic in the marine environment. *Environmental Health Perspectives* 19: 47-52.

McCarty, L.S. 1986. The relationship between aquatic toxicity QSARs and bioconcentration for some organic chemicals. *Environ. Toxicol. Chem.* 8:1071-1080.

McCarty, L.S. 1991. Toxicant body residues: implications for aquatic bioassays with some organic chemicals. *In:* Aquatic Toxicology and Risk Assessment: Fourteenth Volume, ASTM STP 1124; M.A. Mayes and M.G. Barron, Eds., American Society for Testing and Materials, Philadelphia; pp. 183-192.

McCarty, L.S., D. MacKay, A.D. Smith, G.W. Ozburn, and D.G. Dixon. 1992. Residue-based interpretation of toxicology bioconcentration QSARs from aquatic bioassays: neutral narcotic organics. *Environ. Tox. Chem.* 11: 917-930.

McElroy. A.E. and J.D. Sisson. 1989. Trophic transfer of Benzo[a]pyrene metabolites between benthic marine organisms. *Mar. Environ. Res.* 28, 265-269.

McElroy, A.E., J.M. Cahill, J.D. Sisson, and K.M.Kleinow. 1991. Relative bioavailability and DNA adduct formation of Benzo[a]pyrene and metabolites in the diet of the winter flounder. *J. Comp. Biochem. Physiol.* 100C:1-2,29-33.

McFarland, V.A. 1995. Evaluation of Field-Generated Accumulation Factors for Predicting the Bioaccumulation Potential of Sediment-Associated PAH Compounds. USACE - WES Technical Report D-95-2. July 1995.

Meador J.P., J.E. Stein, W.L. Reichert, and U.Varanasi. 1995. Bioaccumulation of polycyclic aromatic hydrocarbons by marine organisms. *Rev. Environ. Contam. Toxicol*. 143, 79-165.

Naqvi, S.M., Flagge, C.T., and Hawkins, R.L. 1990. Arsenic uptake and depuration by Red Crayfish, *Procambarus clarkii*, exposed to various concentrations of monosodium methanearsonate (MSMA) herbicide. *Bull. Environ. Contam. Toxicol.*, 45:94-100.

O'Connor, J.M., A.R.Schnitz, and K.A. Squibb. 1988. In vivo kinetics of Benzo[a]pyrene and 7,12-dimethylbanz[a]anthracene assimilation and metabolism in rainbow trout. *Mar. Environ. Res.* 24:63-67.

Oladimeji, A.A., Qadri, S.U., and deFreitas, S.W. 1984. Long-term effects of arsenic in rainbow trout, *Salmo gairdneri*. *Bull. Environ. Contam. Toxicol.*, 32:732-741.

Parrish, P.R., S.C.Schimmel, D.J. Hansen, J.M. Patrick, J. Forester. 1976. Chlordane: Effects on Several Estuarine Organisms. *Journal of Toxicology and Environmental Health*, 1:485-494.

USACE_025925

Pruell, R.J., N.I. Rubinstein, B.K. Taplin, J.A. LiVolsi, R.D. Bowen. 1993. Accumulation of polychlorinated organic contaminants from sediment by three benthic marine species. *Arch. Envir. Contam. Toxicol.* 24, 290-297.

Rice, D.R., M.M. Babcock, C.C. Brodersen, J.A. Gharrett and S. Korn. 1987. Uptake and depuration of aromatic hydrocarbons by reproductively ripe pacific herring and the subsequent effect of residues on egg hatching and survival. *In:* Pollution Physiology of Estuarine Organisms. Ed. Vernberg, W., A. Calabrese, F. Thruberg, and F. Vernberg. University of South Carolina Press. pp. 139-154.

Riedel, G.F., Sanders, J.G., and Osman, R.W. 1987. The effect of biological and physical disturbances on the transport of arsenic from contaminated estuarine sediments. *Estuarine, Coastal and Shelf Science*, 25:693-706.

Rubinstein, N.I., Lores, E., and Gregory, N.R. 1983. Accumulation of PCBs, mercury and cadmium by *Nereis virens, Mercenaria mercenaria* and *Palaemonetes pugio* from contaminated harbor sediments. *Aquatic Toxicol.*, 3:249-260.

Rubinstein, N. I., R. J. Pruell, B. K. Taplin, J. A. LiVolsi, and C. B. Norwood. 1990. Bioavailability of 2,3,7,8-TCDD, 2,3,7,8-TCDF, and PCBs to marine benthos from Passaic River sediments. *Chemosphere*, 20, 1097-1102.

Suedel, B.C., J.A. Boraczek, R.K. Peddicord, P.A. Clifford, and T.M. Dillon. 1994. Trophic transfer and biomagnification potential of contaminants in aquatic ecosystems. *Reviews of Environmental Contamination and Toxicology* 136: 21-89.

Sweeney, B., D. Funk and L. Standley. 1993. Use of the Stream Mayfly *Cloeon triangulifer* as a Bioassay Organism: Life History Response and Body Burden Following Exposure to Technical Chlordane. *Environ. Tox. and Chem.* 12:115-125.

Syracuse Research Corporation, Environmental Science Center. 1996. Experimental Log P (Octanol/water partition coefficient database). http://esc.syrres.com/~ESC/kowexpdb.htm

Thomas, L.M. 1987. Letter from Lee M. Thomas, Administrator, U.S. Environmental Protection Agency to Honorable Henry A. Waxman, Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives. May 29, 1987.

USACE. 1995. Trophic transfer and biomagnification potential of contaminants in aquatic ecosystems. *In:* Environmental Effects of Dredging Technical Notes. EEDP-01-33. USACE Waterways Experiment Station (WES).

Varanasi U., J.E. Stein, and M. Nishimoto. 1989. Biotransformation and disposition of polycyclic aromatic hydrocarbons (PAH) in fish. *In:* Varanasi U. (ed) Metabolism of Polycyclic Aromatic Hydrocarbons in the Aquatic Environment. CRC Press, Boca Raton, Fl, pp 94-149.

V-Balogh, K., and Salanka, J. 1984. The dynamics of mercury and cadmium uptake into different organs of *Anodonta cygnea* L. *Water res.*, 18(11):1381-1387.

Veith, G. D., DeFoe, D.L., and Bergstedt, B.V. 1979. Measuring and estimating the bioconcentration factor of chemicals in fish. *J. Fish. Res. Board Can.*, 36(9):1040-1048.

USACE_025926

Verschueren, K. 1983. Handbook of Environmental Data on Organic Chemicals, second edition. Van Nostrand Reinhold Company.

Ward, G.S., P.R. Parrish, and R.A. Rigby. 1981. Early life stage toxicity tests with a saltwater fish: Effects of eight chemicals on survival, growth, and development of sheepshead minnows (Cyprinidon variegatus). *J. Toxicol. Environ. Health*. 8:225-240.

Whittle K.J., J. Murray, P.R. Mackie, R. Hardy, and J. Farmer. 1977. Fate of hydrocarbons in fish. *In:* Petroleum Hydrocarbons in the Marine Environment. *Cons. Intern. Explor. Mer*. Vol. 171, McIntyre A.D. and Whittle K.J. (eds), pp 139-142. Charlottenlund Slot, Denmark.

WHO. 1993. Guidelines for Drinking Water Quality. World Health Organization. Geneva.

USACE_025927





# SAN JUAN HARBOR CONSTRUCTION DREDGING 44-FOOT & 36-FOOT PROJECT, CONDADO LAGOON SAV HABITAT RESTORATION, AND MAINTENANCE DREDGING, SAN JUAN, PUERTO RICO

Industry Day Presentation

Presented by:
Jacksonville District

2, 2022





US Army Corps
of Engineers ®

USACE_0259

# NON-FEDERAL BERTHING AREAS (ATTB)



*ATTB non-federal berthing area*

...ting engineering
...sis of existing
...tures from the non-
...al sponsor.
...struction dredging
... several feet of the
...a Energy dock is
...cted.



February 16, 2022


Loida Soto Nogueras
Secretary
**Puerto Rico Planning Board**
Torre Norte
299 Av. de Diego
San Juan, PR  00912

**APPLICATION FOR FEDERAL CONSISTENCY CERTIFICATION WITH THE PUERTO RICO
COASTAL ZONE MANAGEENT PROGRAM CZ-2022-1109-029**

Dear Ms. Soto-Nogueras:

The San Juan Bay Estuary Program (ESTUARIO) thanks you for the opportunity to submit
comments, concerns, and recommendations to Puerto Rico Planning Board regarding the
application for federal consistency with Puerto Rico Coastal Zone Management Program for the
seagrass mitigation in the Condado Lagoon associated with navigational improvements to the
San Juan Harbor, from now on referred to as the "CLC."

The United States Environmental Protection Agency (US EPA) designated the San Juan Bay
Estuary (the Estuary) as a resource of national importance in 1992. As a result, since 1994,
ESTUARIO has shouldered the responsibility of restoring and conserving the quality of the
natural waters and related ecosystems within the Estuary and its watershed as a sustainable
axis for economic and social development. Both the San Juan Bay and the Condado Lagoon
are critical components of the Estuary.

In 2000, the Commonwealth of Puerto Rico and the federal government adopted the
Comprehensive Conservation and Management Plan (CCMP) for the San Juan Bay Estuary as
part of their official public policy. Any action within the Estuary and its watershed must be
consistent with the actions established in the CCMP and Law #112 of 2013 for establishing the
Condado Lagoon Estuarine Natural Reserve.

The restoration of the Condado Lagoon is one of the CCMP's main priorities. ESTUARIO
applauds the US Army Corps of Engineers (USACE) commitment to mitigating the impacts of
dredging the San Juan Harbor by restoring the seagrass beds in the Condado Lagoon.
However, we have several questions and serious concerns regarding USACE's plan for
implementing the project to ensure that the benefits to the ecosystem and communities come to
fruition.

USACE_026783



staghorn, pillar, rough cactus, lobed star, mountainous star, or boulder star corals, and would not adversely modify designated critical habitat for Acroporid corals.

ESTUARIO recommends that an Antillean Manatee Watch Program and Sea Turtles Watch Program be implemented simultaneously in the sediment burrow sites in San Juan Bay, sediments transport route, and Condado Lagoon. ESTUARIO also requests a detailed description that categorically establishes which protection measures USACE will implement. The DESCRIPTION should also address mitigation measures to address the impact on giant manta rays and Nassau grouper found in or near the ODMDS or vessel disposal routes.

**Impacts on the Entire Ecosystem**

On page 19, the SEA establishes that "sediments from the mainland are continuously deposited in the Harbor requiring periodic maintenance dredging of the navigational channel." We invite USACE to reconsider the design of projects within the estuarine system that will significantly impact the success of this project, such as the Río Puerto Nuevo Flood Control Project. Integrating gray and green infrastructure measures would improve the hydrological- hydraulic conditions in the estuary that promote sedimentation and increase the speed and flow of water.

Additionally, implementing the Caño Martín Peña Ecosystem Restoration Project will reinstate the connection between the San José Lagoon and the San Juan Bay, significantly improving water flow in the estuary and also, potentially, the sedimentation issues in the navigation channel.

**Stakeholder Engagement**

ESTUARIO understands that the stakeholder engagement for this project was insufficient and inadequate. Many organizations and close collaborators of ESTUARIO, who are concerned with the environmental health of the San Juan Bay and the Condado Lagoon in particular, were unaware of the opportunity to offer comments on this SEA.

The stakeholder engagement process is particularly disappointing when one considers that the last opportunity for the community to provide comments on the San Juan Harbor Navigation Improvement Study was the Integrated Feasibility Report and Environmental Assessment in August 2018. At the time, ESTUARIO's priority, like the rest of the island, was the island's recovery after the disaster of Hurricane María. Indeed, ESTUARIO was working on the #EstuarioRevive campaign, providing direct support to communities in the clearing of aquatic debris from waterways, and monitoring water quality, amongst others. We understand the importance of these projects and the need to continue moving them forward. Still, it is just as important to consider the context in which these projects are happening and adjust as necessary to ensure ample stakeholder engagement.

We submitted the above comments to the USACE on a letter dated December 1,2021. Furthermore, we requested to the USACE a frank and constructive dialogue regarding restoring the Condado Lagoon and other projects within the estuarine system. We believe ESTUARIO and USACE can collaborate in a way that fulfills USACE's mission and mitigation requirements

7

**Comment**: The Draft SEA and the USACE web page do not indicate the date of publication of the Draft SEA, the period for public comments for the Draft SEA, or to whom the comments should be addressed.

**Corps Response**: The draft SEA was made available to the public on the Corps Jacksonville District 's Public NEPA Documents website (https://www.saj.usace.army.mil/About/Divisions-Offices/Planning/Environmental-Branch/Environmental-Documents/), which indicated the 1 November 2021 Notice of Availability (NOA) release date. In addition, the NOA indicated comments were to be submitted within 30-days to Chief, Environmental Branch, USACE, P.O. Box 4970, Jacksonville, FL 32232-0019.

**Comment**: The community and environmental groups that join in these comments object to the dredging project as proposed and request that the USACE prepare an Environmental Impact Statement that analyzes all the significant impacts of the expanded dredging project including the San Juan Harbor Navigation Improvement project to enable larger Liquified Natural Gas ("LNG") carriers to deliver LNG imports to San Juan as opposed to the segmented approach encompassed in the Draft SEA.

**Corps Response**: The draft SEA evaluates the dredging of a newly proposed sand source outside the Federal Channel limits. Per 40 CFR §1502.4 and §1502.20, the draft SEA tiers off the 2015 Final Environmental Assessment San Juan Harbor Submerged Aquatic Vegetation Mitigation and 2018 San Juan Harbor Navigation Improvements Study Final Integrated Feasibility Report and Environmental Assessment and incorporates by reference issues discussed in more detail in those documents (See table 1-1). The draft SEA also indicates where the earlier documents are available to the public on the internet.

**Comment**: The groups further urge USACE to reconsider its determination to remove the Esperanza Peninsula project from further analysis as an alternative for fill material for the Condado Lagoon.

**Corps Response**: The La Esperanza 1135 project was identified as a potential sand source for Condado fill in the 2015 and 2018 NEPA documents. The La Esperanza 1135 project is subject to sediment transport which impedes tidal exchange within the embayment formed behind the peninsula. Coarse sandy sediments of appropriate grain-size for Condado fill have been documented at La Esperanza. However, that project's maintenance is the responsibility of the local sponsor Puerto Rico Department of Natural and Environmental Resources (DNER). For purposes of construction of mitigation required for the San Juan Harbor project, it is not economically viable to use La Esperanza as a sand source in conjunction with channel construction and maintenance because the shallow depths would require a separate dredge vessel mobilization.

USACE_026794

- 2 -

**Comment**: The expanded dredging proposed by USACE presents a high risk of significant impacts to endangered species and the environment. The business-as-usual approach encompassed in the Draft SEA and the Finding of No Significant Impact ("FONSI") for the original dredging projects, is what has led to the extinction of many species.

**Corps Response**: Section 7 consultation under the Endangered Species Act (ESA) has been completed. The U.S. Fish and Wildlife Service (USFWS) concurred with the Corps' determination that the proposed action may affect but is not likely to adversely affect the Antillean manatee by letter dated December 1, 2021 (FWS/R4/CESFO/72127-002). The National Marine Fisheries Service (NMFS) concurred with the Corps' determination by letter dated May 29, 2018 (Consultation Number SER-2017-18763) that the proposed action may affect but is not likely to adversely affect leatherback sea turtles, sperm, sei, blue, and fin whales, elkhorn, staghorn, pillar, rough cactus, mountainous star, lobed star, and boulder star corals, scalloped hammerhead sharks, Nassau grouper, and designated critical habitat for elkhorn and staghorn corals. NMFS also concurred that the proposed action may affect but would not jeopardize the continued existence of green, loggerhead, and hawksbill sea turtles. Because there were no major proposed modifications to the project, the Corps will follow the terms and conditions of the 2018 NMFS consultation (SER-2017-18763). These consultation documents are included in the 2015 and 2018 NEPA documents available on the internet (https://www.saj.usace.army.mil/About/Divisions-Offices/Planning/Environmental-Branch/Environmental-Documents/).

**Comment**: The Draft SEA promotes segmentation of the environmental analysis.

**Corps Response**: The draft SEA incorporates prior discussions by reference and tiers off the 2015 and 2018 NEPA. The SEA only evaluates dredging outside the Federal channel at the newly identified location for purposes of mitigation. All other actions and their effects were addressed in the 2015 and 2018 NEPA.

**Comment**: Environmental review and consultation with relevant agencies is left entirely within USACE's discretion.

**Corps Response**: As the Federal action agency, the Corps prepares appropriate NEPA documentation and conducts legally required consultations, which are guided by NEPA and ESA regulations and guidance. Since no major modifications to the project are proposed (only dredging outside Federal channel Cut-6 is proposed) and recent NEPA exists for project components, a supplemental environmental assessment has been prepared.

**Comment**: Public access to information is piecemeal and unduly limited; and public input and informed and meaningful participation is undercut.

USACE_026795

- 3 -

**Corps Response**: Public input has been received in response to the noticing of availability of the draft SEA and the comment/response matrix will be included as an appendix to the final SEA.

**Comment**: In this case, the Draft SEA and the FONSI fail to consider the foreseeable consequences and impacts of greater LNG imports made possible by the extensive dredging of the San Juan Harbor Navigation Channel.

**Corps Response**: The consequences of greater liquefied natural gas (LNG) imports made possible by the expansion dredging of the San Juan Harbor Navigation Channel were evaluated in detail in the 2018 Integrated Feasibility Report and Environmental Assessment. Adverse effects resulting from the presently permitted air emissions would be reduced if the harbor is deepened because of the reduction in the number of vessels, as well as a shift to more modern and efficient vessels. In addition, a conversion to LNG would provide a more efficient and cleaner burning fuel source than the bunker fuel and diesel fuel combination currently used to power the Palo Seco and San Juan Power Plants in San Juan, Puerto Rico. With LNG, the two power plants would be expected to produce the same amount of electricity as would be produced with diesel fuel, while using fewer metric tons of fuel. Per table 1-1 of draft SEA, these analyses are incorporated by reference into the SEA and not discussed further.

**Comment**: The Draft SEA falsely alleges that SJH is not designated as a nonattainment or maintenance area for any criteria pollutant and therefore "USEPA's General Conformity Rule to implement Section 176(c) of the CAA [42 U.S.C. § 7506(c)] does not apply.

**Corps Response**: Thank you for the comment on the non-attainment status. The air quality analysis will be revised in the final SEA. Even though primary wind direction is south to north, sending the power plant emissions to the Atlantic Ocean, Catano, San Juan, Toa Baja, and Guaynabo are non-attainment for SO2. Catano SO2 emissions are potentially from the power plant while Guaynabo, San Juan SO2 emissions are potentially from the trucks, and vessels operating in the harbor/port (https://www3.epa.gov/airquality/greenbook/anayo_pr.html. Puerto Rico Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants | Green Book | US EPA.

**Comment**: USACE was obligated to consider environmental justice in drafting the SEA and the FONSI.

**Corps Response**: The 2018 IFR/EA includes an environmental justice analysis in Appendix C, Section 2.3. The San Juan Harbor Improvements Project, including beneficial use of dredged material for Condado lagoon restoration, would not be expected to cause disproportionately high and adverse effects on any minority or low-income populations in accordance with Executive Order 12898. The Corps determined

Case 1:23-cv-02430-CJN Document 30-7 Filed 05/05/23 Page 221 of 244

 

MENU

SIGN IN/REGISTER

---

## Start Download

3 Steps: 1. Click The Button 2. Start Download 3.

dl.gowavebrowser.com

---



**The Journal of the Acoustical Society of America**

---

HOME　　　　　　　BROWSE　　　　　　　MORE ▼

---

Home > The Journal of the Acoustical Society of America > Volume 120, Issue 5 > 10.1121/1.4787832

[ ‹ PREV ]　　　　　　　　　　　　　　　　　　[ NEXT › ]

🔓 Free

Published Online: 24 October 2006

# Underwater noise and zones of masking with respect to hopper dredging and manatees in the St. Johns River in Jacksonville, FL

The Journal of the Acoustical Society of America **120**, 3153 (2006);
https://doi.org/10.1121/1.4787832



USACE_026917

Underwater noise characteristics and masking in the west Indian manatee from hopper dredging in Jacksonville, FL:…

**Meeting abstract. No PDF available.**

## ABSTRACT

Underwater noise radiating from dredging can effectively obscure or mask biological and other important sounds. This study recorded underwater acoustic characteristics of hopper dredging in the St. Johns River, Jacksonville, FL, to evaluate noise impacts in the waterway with respect to the endangered West Indian manatee. Of particular interest was the extent and range that dredging noise may mask the sounds of approaching commercial and recreational vessels. Vertical hydrophone arrays and a multi-channel PC-based recording system were used to measure dredging noise at various distances. Ambient noise surveys, active propagation of calibrated sources, and controlled boat noise measurements were conducted along the waterway. These data were integrated with behavioral hearing data to estimate zones of masking surrounding dredging. Three discernable noise sources that masked boat noise were (1) cavitation from dredge propellers, (2) draghead vacuuming, and (3) noise from submerged slurry pipelines. Sustained high ambient noise levels from dredging can significantly increase the risk of manatee-boat collisions by masking the sounds of approaching vessels over large radii (up to 2.5 miles). Mitigations suggested include ship quieting, reducing propeller cavitation, insulating or elevating slurry pipelines, and minimizing transects to pump out stations. [Work funded by the City of Jacksonville Waterways Commission.]

© 2006 Acoustical Society of America.



USACE_026919



*Review*

# In-Water Bridge Construction Effects on Manatees with Implications for Marine Megafauna Species

ELIZABETH E. HIEB,[1] *Dauphin Island Sea Lab, 101 Bienville Boulevard, Dauphin Island, AL 36528, USA*

EDEM A. ENIANG, *Biodiversity Preservation Center, Grace of God Villa, Afaha Idoro, Idoro Road, 520103, Uyo, Nigeria*

LUCY W. KEITH-DIAGNE, *African Aquatic Conservation Fund, BP 80 Joal, 23015, Senegal, West Africa*

RUTH H. CARMICHAEL,[2] *Dauphin Island Sea Lab, 101 Bienville Boulevard, Dauphin Island, AL 36528, USA*

**ABSTRACT** Globally, increasing coastal development requires construction and maintenance of transportation infrastructure that affects terrestrial and aquatic ecosystems. Construction of bridges as part of transportation networks introduces a series of risks to aquatic species near construction zones. We reviewed relevant literature and obtained exemplary case studies to synthesize potential effects of bridge construction on the West Indian manatee (*Trichechus manatus*), a nearshore megafauna species vulnerable to human activities. Stages of bridge construction including dredging, pile driving, and installation and assembly of bridge components each involve potential direct and indirect effects on manatees. Direct effects such as vessel interactions, entanglement or ingestion, and entrainment may result in acute physical injury or mortality. Indirect effects from construction such as habitat obstruction or degradation and increased noise from construction activities can alter behavior and intraspecies communication and reduce access to essential resources. Some effects of construction may be immediately difficult to quantify, but cumulative effects through time can result in major habitat and species loss. To prevent large-scale negative effects of construction on manatees and other aquatic species, use and evaluation of mitigation strategies should be implemented pre-, during, and post-construction. As the global human population increasingly occupies coastal zones, effective planning of coastal development, including bridge and other in-water construction, will be essential to support conservation and recovery efforts for manatees and other species at risk in these areas. © 2021 The Wildlife Society.

**KEY WORDS** boat strikes, coastal development, dredging, noise, pile driving, West Indian manatee.

Increased urbanization in coastal areas requires transportation infrastructure networks to sustain commercial, residential, and tourist activities (Bulleri and Chapman 2010). A growing body of literature on road ecology addresses the significant effects of roads and traffic on terrestrial wildlife and their habitats (Forman and Alexander 1998, Spellerberg 1998, Benítez-López et al. 2010, van der Ree et al. 2011); however, effects on aquatic systems have received less attention (Trombulak and Frissell 2000, Bulleri and Chapman 2010). Laying of road networks across aquatic environments requires bridge construction, which introduces a series of threats to biota near construction zones. Stages of bridge construction and subsequent maintenance typically include dredging for foundation placement, driving piles or drilling steel-reinforced concrete shafts as supportive elements, placing bridge spans and

connecting bearings, laying and curing the bridge surface or deck, and installing railing (Chen and Duan 2014). Because each stage of construction and its associated activities can have various direct and indirect negative effects on aquatic wildlife, environmental or ecological impact assessments are often required prior to construction activities in the United States and other developed countries (Chatzimikes 1982, Glasson et al. 2005). These assessments are especially valuable in areas occupied by endangered and vulnerable species because road presence, construction, and maintenance are highly associated with species vulnerability and loss (Czech et al. 2000).

In this review, we focus on potential effects of bridge construction on the West Indian manatee (*Trichechus manatus*), a representative nearshore marine megafauna species that is vulnerable to in-water construction activities. In the United States, West Indian manatees most commonly occur within coastal and riverine waters in peninsular Florida, a hotspot for species endangerment linked to economic growth and urbanization (Dobson et al. 1997, Czech et al. 2000). In recent years, manatee occurrence in areas outside of Florida, including the northern Gulf of Mexico

Received: 1 April 2020; Accepted: 20 January 2021

[1]E-mail: ehieb@disl.org
[2]Second affiliation: University of South Alabama, Department of Marine Sciences, Life Sciences Building Room 25, Mobile, AL 36688, USA

USACE_026938

mitigation strategies through review of International Union for Conservation of Nature (IUCN) red list assessments and key word searches of each threat type (e.g., boat strike, entanglement, entrainment). We obtained exemplary case studies through consultation with colleagues from the USFWS, African Aquatic Conservation Fund, and Biodiversity Preservation Center, and through data requests to the FWC-managed, publicly available, manatee mortality database.

## RESULTS

### Direct Effects

*Vessel interactions.*—Increased boating and barge activity are associated with various stages of bridge construction including transport of building materials, construction workers, and debris and operation of dredgers and construction platforms. Increased boating activity and boat density have been predictably linked to higher probability of manatee-boat collisions, especially in areas with high manatee occurrence (Bauduin et al. 2012). Collisions with watercraft account for the largest percentage (~25%) of human-related manatee deaths recorded during the last 4 decades in Florida waters and present an increasing concern in neighboring states such as Alabama and Georgia where 13–28% of historically documented mortalities are attributed to boat strikes (Hieb et al. 2017, Runge et al. 2017, Cloyed et al. 2019, FWC 2019, Georgia Department of Natural Resources 2019). Watercraft-related manatee injuries and deaths can be caused by sharp-force trauma from propeller blades and skegs, blunt-force trauma from boat hulls or keels, or crushing by large vessels, resulting in acute and immediate death or chronic injuries that can eventually cause mortality (Lightsey et al. 2006). Strategies that have been used to reduce the risk of watercraft collisions with manatees include operating construction-associated vessels at idle speed (i.e., no wake) to allow manatees more time to respond to approaching vessels and similarly allow boat operators longer reaction times to avoid manatees (Calleson and Frohlich 2007, Rycyk et al. 2018). If a manatee-boat collision does occur, the severity of injuries may also be reduced if the boat is operating at a slower speed (Clifton 2005, Calleson and Frohlich 2007, Rycyk et al. 2018).

Documented manatee mortalities have been caused by various vessel types. Vessels ranging from 4.9–36.5 m in length with planing or displacement type hulls cause mortality (Calleson and Frohlich 2007); however, based on analysis of propeller wounds on manatee carcasses, larger vessels (>12 m), such as tugboats and barges used during construction operations, may be particularly lethal in cases of propeller-caused, sharp-force trauma (Rommel et al. 2007). Hydrodynamic forces created by these large vessel types may pull manatees underneath vessels, making it more difficult for manatees to escape and increasing the risk of harm (Silber et al. 2010). Larger vessels operating in construction areas or moored to each other or to vertical structures (e.g., bulkheads, pilings) may also crush manatees

between them, resulting in acute death caused by skeletal fractures or other internal injuries (Odell and Reynolds 1979, Lightsey et al. 2006, FWC 2017). To avoid crushing manatees between vessels or other construction equipment, use of fenders or buoys that provide a standoff distance ≥1.2 m at maximum compression between structures is recommended (USFWS 2011, FWC 2017). Manatees are acutely at risk from vessels in shallow water where they cannot submerge to avoid collisions, making them more likely to sustain potentially fatal injuries or become trapped on the bottom and drown (Nowacek et al. 2004, Calleson and Frohlich 2007, Miksis-Olds et al. 2007b, Rycyk et al. 2018). Hence, use of deep-water routes by construction-associated vessels whenever possible can also reduce risks to manatees (FWC 2011c). Additional mitigation measures that have been successfully implemented to avoid manatee deaths caused by vessels or other construction equipment include placing trained observers at construction sites and halting operations when manatees are observed near construction zones (FWC 1999, USFWS 2011).

*Entanglement and ingestion.*—Human-introduced products and debris are major causes of manatee injury or death either by entanglement or ingestion (Beck and Barros 1991, Adimey et al. 2014, FWC 2019). During construction, siltation barriers used to control sediment dispersal into and out of the construction site introduce the risk of entanglement for manatees in the area. Manatees have limited vision especially at short distances and rely heavily on tactile sensitivity to recognize objects in their environment, making them particularly susceptible to entanglement in lines, nets, or other obstacles (Bauer et al. 2003, Kikuchi et al. 2011, Adimey et al. 2014). Manatees assess objects by using sensory vibrissae, primarily located on the snout, or actively touching with flippers (Reep et al. 2002, Bauer et al. 2003). Consequently, manatees most often become entangled at the flippers, leading to inhibited movement, necrosis, and constriction that can eventually result in self-amputation and potentially fatal secondary infections (Beck and Barros 1991, Halvorsen and Keith 2008, Adimey et al. 2014, Reinert et al. 2017). Entanglements can also result in drowning if they prevent manatees from surfacing to breathe (Reinert et al. 2017). Documented cases of manatees entangled in floating construction booms or anchor lines associated with siltation barriers illustrate the need for mitigation measures to avoid these potentially fatal outcomes (Reid et al. 1991, Reinert et al. 2017). To avoid entanglements, siltation barriers can be made of materials that are less likely to entangle manatees (FWC 2011c). Plastic fencing with mesh size ≤2.5 cm has been effectively used with manatees during exclusionary experiments (Hauxwell et al. 2004a, b; Kikuchi et al. 2011); however, these studies did not make comparisons among types of exclusionary materials. Most existing studies on sources of manatee entanglement focus on fisheries bycatch data (Moore et al. 2010, Adimey et al. 2014), and further study is needed to assess risks associated with various types of construction-related materials. Existing recommendations to reduce risks to

manatees also include adequately securing and regularly monitoring siltation barriers for possible entanglements (FWC 2011c, USFWS 2011).

In addition to entanglement, ingestion of intentionally or accidentally discarded human products is a major risk factor for manatees, with studies finding ingested debris in 10–15% of examined manatee carcasses (Beck and Barros 1991, Reinert et al. 2017). As manatees forage, they are prone to incidental ingestion of debris trapped in mats of aquatic vegetation, leading to potentially fatal impactions or punctures in the digestive tract (Buergelt et al. 1984, Beck and Barros 1991, Reinert et al. 2017). Construction materials including net, twine, rope, wire, and various plastics have been documented in the gastrointestinal tracts of necropsied manatees (Beck and Barros 1991, Reinert et al. 2017, Carmichael et al. 2019). Other debris potentially introduced by construction workers is well documented to put manatees and other aquatic animals at risk if not properly discarded (e.g., plastic wrappers, straws, lids, bottles, cans; Provencher et al. 2017, Reinert et al. 2017, Claro et al. 2019). Ingestion and entanglement risks at construction sites may be reduced by implementing project-specific waste management plans (Fishbein 1998, Chen et al. 2002). Use of such strategic plans significantly reduces the amount of waste generated at construction sites by more effectively storing and disposing of various types of waste, recycling and reusing materials, and substituting single-use packaging with reusable containers when possible (Fishbein 1998, Chen et al. 2002). Previous researchers suggest that to be most effective, waste management plans should also include educating and engaging all construction participants on the importance of waste prevention and responsible disposal (Fishbein 1998, Chen et al. 2002, Liyin et al. 2006).

*Entrainment.*—Initial phases of bridge and other in-water construction often include dredging operations to excavate sediment so that foundation structures can be buried at elevations necessary to support the bridge design (Chen and Duan 2014). Some dredgers and similarly operating airlifts remove sediment by creating suction fields through large pipes that transport sediment away from the construction site to a designated waste area. Currents created by the suctioning force put manatees at risk of fatal entrainment because manatees may be forced underwater by strong currents and subsequently drown (Reine and Clarke 1998, Todd et al. 2015). Dredging activities have been documented to potentially attract curious manatees, putting them at even greater risk of construction-related mortalities (Provancha and Provancha 1989, Adimey et al. 2014). At least 2 mortalities associated with dredging operations have been documented for African manatees in Nigeria and Democratic Republic of the Congo, where manatees face a variety of increasing threats to their survival, including poaching for human consumption (Awobamise 2008, Keith-Diagne 2015). During construction of the Calabar-Itu bridge over the Cross River, Nigeria in September 1978, for example, an adult manatee was entrained in the suction pipe of a dredger

and forced down the pipeline to the sand landing point >1 km away (E. A. Eniang, Biodiversity Preservation Center, personal observation). The manatee carcass was opportunistically consumed by local fishermen, and the incident led to the adoption of new manatee hunting techniques using metal pipes discarded during construction operations (E. A. Eniang, personal communication). Similarly, in Muanda, a coastal city in the Democratic Republic of the Congo, a manatee was found dead near sand dredging operations in April 2018 (Fig. 2B). Although the manatee was not seen in contact with dredging equipment, no other cause of mortality was found (S. Mbungu, University of Muanda, personal communication). These incidents demonstrate the potential for dredging and entrainment-related fatalities of aquatic megafauna in developed and developing coastal areas globally.

In the United States, manatee mortalities due to entrainment have been documented in association with flood-control gates and navigation-canal locks (Odell and Reynolds 1979). Younger, smaller manatees, especially calves, are at greater risk of entrainment because they are less able to resist the suctioning force (Odell and Reynolds 1979). In 1 case, a newborn manatee calf was found dead at a dredging site near Tampa, Florida (FWC 2011a). A necropsy determined the cause of death was drowning, but the mortality could not be conclusively linked to entrainment during dredging operations (FWC 2011a). Additional mortalities related to dredging operations in Florida include an adult manatee killed during a bridge construction project when hit by a backhoe (Fig. 2C; FWC 2011b) and a second manatee crushed in a spread claw used to excavate sediment during an unspecified project (FWC 2015d). Three other manatee mortalities caused by blunt force trauma have been documented near port construction projects in Florida; however, the actual number of construction-related deaths is unknown because it is difficult to determine if death or injury result from construction activity or other watercraft operating in the area (FWC 2015b, c). To reduce mortalities due to dredging, exclusionary devices, such as properly sized grates or pilings, have been used to prevent manatees from entering areas of risk (Odell and Reynolds 1979, USFWS 2011, FWC 2015a). Specially designed deflectors that more effectively direct suction fields toward the substrate instead of the water column have also been successfully implemented during construction to prevent deaths among fish, sea turtles, and other species for which dredging effects have been documented (Banks and Alexander 1994, Reine and Clarke 1998, Smolowitz et al. 2012, Ramirez et al. 2017, Wenger et al. 2017).

## Indirect Effects

*Habitat obstruction and degradation.*—Manatees require access to freshwater and abundant submerged and emergent aquatic vegetation as food resources, with adult manatees capable of consuming roughly 7% (50 kg) of their body weight in aquatic vegetation daily (Hartman 1979, Bengtson 1983, Etheridge et al. 1985, Ortiz et al. 1998,

USACE_026942

Reich and Worthy 2006). Both during and post-construction, structures including siltation barriers, barge platforms, pilings or other foundation elements, and dredge spoils have the potential to negatively affect manatees by blocking entry and exit from important areas of habitat use (FWC 2011c). Additionally, foundation-building phases of bridge construction including dredging and pile driving can negatively affect food resources. Dredging involves physical excavation of substrate causing direct removal of vegetation in dredged areas, and disposal of dredged materials can bury plant life at nearby disposal sites (Hirsh et al. 1978, Newell et al. 1998, Erftemeijer and Lewis 2006). Dredging and disposal also increase turbidity and reduce light availability, affecting growth and survival of submerged vegetation (Onuf 1994, Erftemeijer and Lewis 2006). Potential effects may be propagated 2–3 km from the construction site causing prolonged recovery or loss of plant communities (Giesen et al. 1990, Onuf 1994, Newell et al. 1998, Erftemeijer and Lewis 2006). Multiple studies have linked extensive loss of seagrasses to reduced reproduction and recruitment and increased mortality due to starvation in dugongs (Preen and Marsh 1995, Marsh and Kwan 2008). Manatees may similarly experience nutritional stress and reduced carrying capacity near construction sites if they must seek alternative food sources, potentially incurring higher energetic costs and causing shifts in distribution (Preen and Marsh 1995, Smethurst and Nietschmann 1999, Bonde et al. 2004).

Lack of access to food can be especially detrimental when manatees increase consumption in anticipation of limited foraging opportunities during colder months (Bengtson 1983, Deutsch et al. 2003). During periods of prolonged water temperatures below approximately 20°C, manatees are largely restricted to warm-water refuge sites, including natural and anthropogenic sources, such as freshwater springs or power plant discharges (Irvine 1983; Deutsch et al. 2003; Laist and Reynolds 2005a, b; Laist et al. 2013). Manatees exhibit high fidelity to warm-water refuge sites and show resistance to relocating when known warm-water sources are interrupted or eliminated (e.g., power plant closures; Packard et al. 1989; Laist and Reynolds 2005a, b). Many winter refuge sites in Florida are already highly occupied, and future availability is uncertain. Power plants built between the 1940s and 1970s currently provide warm-water refuge for approximately 60% of the manatee population in the United States but are likely to close within the next 2–3 decades (Laist and Reynolds 2005a, b). Similarly, thermal springs and other natural warm-water sources face increasing threats from human development, including groundwater withdrawal for human use and construction of dams that block refuge access (Laist and Reynolds 2005a, Laist et al. 2013, Marsh et al. 2017). Hence, alternative sites that offer adequate space, temperature, or food resources to sustain manatees may be limited (Laist and Reynolds 2005a, Laist et al. 2013). If access to refuge sites is blocked by construction activities or placement of structures, then manatees may be unwilling or unable to find suitable alternatives, putting them at risk of potentially fatal cold stress (Laist et al. 2013). To minimize effects, construction-related barriers should allow safe passage of manatees to and from necessary resources, and final structure design should not permanently block habitats needed for survival (FWC 2011c).

Construction activities can be strategically timed during environmental windows to minimize effects on manatees based on seasonal resource use (Suedel et al. 2008). For example, during warmer months, when manatees disperse along the northern Gulf of Mexico and central Atlantic coasts (Deutsch et al. 2003, Fertl et al. 2005, Cummings et al. 2014, Hieb et al. 2017), construction plans will need to more heavily consider potential effects on manatees throughout their range. During colder months, current permitting regulations in Florida preclude blocking or disrupting use of primary refugia where most manatees overwinter. Use of secondary or passive refuge sites, such as thermal basins and temperature inverted haloclines, is less studied, and many sites likely are unidentified (Stith et al. 2011, 2012; Laist et al. 2013), making it difficult to protect them during construction activities. Secondary refuge sites may be especially important during extreme cold events and as migratory stopovers and have been increasingly used by manatees in states outside of Florida in recent years (Deutsch et al. 2003, Stith et al. 2012, Leslie 2017, Carmichael et al. 2019). Construction operations during colder seasons will benefit from considering proximity to potential warm-water sources and prioritizing projects in other areas that are not overwintering sites. The potential for construction activities to alter water temperature or increase freshwater flow at any time of year should be considered during the pre-construction phase to avoid incidentally attracting manatees into dangerous construction zones (Provancha and Provancha 1989).

In addition to effects on food and habitat resources, construction activities can also release potentially harmful environmental toxins and pollutants. Dredging and similar activities disturb bottom sediments and remobilize contaminants accumulated in sediments through time (Hirsh et al. 1978, Seiyaboh et al. 2013, Todd et al. 2015). Contaminants such as heavy metals and organic pollutants remobilized into the water column can be consumed by manatees while grazing on submerged vegetation (Bonde et al. 2004, Wetzel et al. 2008, Todd et al. 2015). The toxic effects of such contaminants on manatees are not well understood; however, evidence of hemolytic anemia and inhibition of liver enzyme activity in free-ranging manatees sampled in Florida, Mexico, and Belize have been linked to lead (Pb) and organophosphate exposure, respectively (Belanger and Wittnich 2008, Wetzel et al. 2008, Anzolin et al. 2012). In some studies, levels of other heavy metals and organic pollutants measured in live manatees during health assessments and fresh dead carcasses have exceeded toxic thresholds to induce immunosuppression, reproductive failure, and nervous system degeneration in other marine mammals and related terrestrial species (O'Shea et al. 1984, Wetzel et al. 2008, Siegal-Willott et al. 2013). Additionally, resuspended heavy metals affect photosynthesis and growth

rates of some seagrass species, which may further affect recovery of manatee food resources post-construction (Ralph et al. 2007, Ambo-Rappe et al. 2011). Toxic thresholds for contaminant exposure in manatees and effects on food sources warrant further study (Belanger and Wittnich 2008, Wetzel et al. 2008, Anzolin et al. 2012, Romero-Calderón et al. 2016).

To prevent large-scale negative effects of construction on manatee habitat, impact prediction models can be implemented during the pre-construction phase to inform best use of mitigation measures for specific operations (Erftemeijer and Lewis 2006). Such models are often recommended or required during permitting processes to predict effects of construction activities on water quality parameters, such as turbidity, dissolved oxygen, and nutrient or contaminant concentrations, and determine if planned operations will exceed threshold values that are considered detrimental to aquatic habitats or species (Erftemeijer and Lewis 2006, Wenger et al. 2018). Construction plans can then be modified to ensure operations do not exceed these thresholds, which are often defined by national, regional, and local regulatory agencies that issue operational permits (Erftemeijer and Lewis 2006). Water quality is monitored throughout construction to ensure that critical parameters remain below harmful levels and that operations are suspended if permitted impact thresholds are exceeded (Hirsh et al. 1978, Erftemeijer and Lewis 2006, Wenger et al. 2018). Additional mitigation strategies, including use of properly designed and installed siltation barriers, disposal of dredged materials at land-based sites, and restrictions on operations during flowering and growing seasons, have been used to reduce construction effects on vegetation and limit release of toxins and pollutants to the environment (Hirsh et al. 1978, Erftemeijer and Lewis 2006, Suedel et al. 2008, Todd et al. 2015, Wenger et al. 2018). Ongoing impact assessment and restoration efforts post-construction are considered essential to quantify the effectiveness of mitigation strategies and monitor recovery of affected areas (Erftemeijer and Lewis 2006).

*Increased noise.*—Nearly all stages of bridge construction involve increased noise that may have negative effects on manatees. Anthropogenic noise broadly affects the biology and ecology of marine species through changes in behavior, vocalization, and distribution, and increased stress, hearing loss, and mortality (Weilgart 2007, Slabbekoorn et al. 2018). Manatees, in particular, avoid or reduce foraging in areas with increased noise and in 1 study decreased use of a warm-water refuge site during an adjacent construction project (Miksis-Olds et al. 2007a, Miksis-Olds and Wagner 2011, Viragh 2012, Tellechea et al. 2013). As with habitat obstruction and degradation, noise can lead to nutritional and energetic stress if manatees must relocate to find suitable habitat (Bonde et al. 2004, Miksis-Olds and Wagner 2011). If other resources are unavailable, manatees face a cost-benefit trade-off and may remain in proximity to construction activities, putting them at risk of other direct or indirect effects (Miksis-Olds et al. 2007a, Weilgart 2007, Miksis-Olds and Wagner 2011).

Increased noise associated with construction activities can disrupt manatee communication and behavior by masking or reducing transmission distance of vocalizations (Miksis-Olds and Miller 2006, Miksis-Olds et al. 2007a, Weilgart 2007, Miksis-Olds and Tyack 2009). These disruptions may be especially harmful to mother-calf pairs who maintain long-term social bonds for the first 1–3 years after birth, when calves are entirely nutritionally and socially dependent on their mothers (Hartman 1979, Rathbun et al. 1995, Bonde et al. 2004, O'Shea and Poché 2006). Construction noise may result in separation between cow-calf pairs that depend on individually recognizable vocalizations to maintain contact and reunite if separated (O'Shea and Poché 2006). Dependent calves that are separated from their mothers experience high mortality (Bonde et al. 2004, O'Shea and Poché 2006). Communication also plays an important role in manatee social interactions, with manatees exhibiting increased vocalization during group travel and other social behaviors (Bengtson and Fitzgerald 1985, O'Shea and Poché 2006). Documented decreases in social behaviors among manatees in high noise environments may ultimately affect breeding interactions and reproductive success (Miksis-Olds et al. 2007a, Weilgart 2007, Miksis-Olds and Wagner 2011). A combination of increased energy expenditures to effectively communicate and reduction in resting behavior in the presence of increased noise may affect overall manatee fitness (Miksis-Olds et al. 2007a, Weilgart 2007, Miksis-Olds and Wagner 2011).

Construction noise that masks sounds of approaching vessels may increase the chance of watercraft collisions with manatees (Gerstein et al. 2001, Gerstein et al. 2006, Miksis-Olds et al. 2007b, Erbe et al. 2016). Noise produced by dredging activities, in particular, effectively masks boat noise across a distance ≤4 km (Gerstein et al. 2006). Delayed or negated detection of approaching vessels may not allow manatees time to change behavior to avoid potentially fatal collisions (Gerstein et al. 2001, Nowacek et al. 2004, Miksis-Olds et al. 2007b, Rycyk et al. 2018). Noise mitigation strategies currently used for construction activities include insulating pile drivers and similar equipment in casings containing foam, air, or bubbles that reflect and absorb sound and therefore reduce propagation into the environment (Jefferson et al. 2009, Koschinski and Lüdemann 2013). Similarly, elevating construction operations above the waterline, when possible, and using foam or rubber mats as buffers between noisy equipment reduces noise transmission distance and limits the affected area (Miksis-Olds and Miller 2006, Jefferson et al. 2009). These noise mitigation strategies can be combined with idle speed operation of construction vessels to reduce noise disturbance and risk of watercraft collisions due to noise interference.

## DISCUSSION

The success of recovery actions implemented for West Indian manatees in recent decades was recognized by a 2017 reclassification of the species from endangered to threatened status under the United States Endangered Species Act

USACE_026944

ATMOSPHERIC ENVIRONMENT: X 4 (2019) 100050



Contents lists available at ScienceDirect

# Atmospheric Environment: X

journal homepage: http://www.journals.elsevier.com/atmospheric-environment-x



# Atmospheric ship emissions in ports: A review. Correlation with data of ship traffic

D. Toscano [*], F. Murena

*Department of Chemical, Materials and Production Engineering, University of Naples "Federico II", 80125, Naples, Italy*

ARTICLE INFO

*Keywords:*
Ship emissions
Ports
NOx
PM10
Traffic data
Regression

ABSTRACT

Ports represent a source of atmospheric pollutants that can contribute significantly to jeopardise air quality of port cities. NOx, SOx, PM and VOCs (Volatile Organic Compounds) are emitted by ships during manoeuvring in ports at arrival or departure and during hotelling when moored at wharves. Several methods exist to estimate emissions in function of ships' activity and engine parameters. However, there is still a significant uncertainty in these calculations. This is a severe limitation to develop effective plans of mitigation of air pollution in port cities. In this paper data of NOx and PM10 emitted in port and traffic of passenger and commercial ships have been reviewed and critically analysed. All vessels are lumped into three categories: cruise, passenger ships other than cruise and commercial ships. Emissions have been correlated with traffic data per year: passengers, hours at hotelling and manoeuvring, calls and tons of goods transported. The result is a summary of regression equations that can be used for the estimation of ship emissions in ports based on traffic data. The analysis does not consider emissions of all the ancillary activities that take place at land inside a port like: upload and download of goods, vehicular traffic, manipulation of containers and others.

## 1. Introduction

The maritime sector is becoming a more and more important role in the transport of goods and persons all over the world. In fact, over 80 per cent of global trade by volume and more than 70 per cent of its value being carried on board ships and handled by seaports worldwide (UNCTAD, 2017). On 1st January 2018, the world commercial fleet comprised 94,171 ships, with a combined tonnage of 1.92 billion dwt (dead weight tonnage). Dry bulk carriers represent the largest share in tons of dead weight and most of the total load capacity, at 42.5%, followed by tankers, which carry crude oil and its products (29.2%), and container ships (13.1%). Moreover, projections of world seaborne trade for the medium term also point to continued expansion, with volumes growing at an estimated compound annual growth rate of 3.2 per cent up to 2022 (UNCTAD, 2017). Therefore, the size of the ships for new deliveries continued to be greater than the existing fleet.

A similar situation is also observed for passenger traffic recording maximum growth rate at 2.2% in 2017, (UNCTAD, 2018). In particular, cruise sector is characterized by a continuous growth for over three decades (Pallis and Vaggelas, 2018). In 2017, the number of passengers of cruise ships around the world were 24 million. This number will likely

increase to 25 million by 2019, and 30 million by 2024 (Peisley, 2014).

Together with the growth of maritime traffic the attention toward the effect of ships on the environment is rising. The impact of ship emissions on air quality has different aspects. It can be studied on a global or local scale. The effect on the global scale depends mainly on emissions during navigation between ports, while the local effects depend mainly on emission in ports or in their proximity. Emissions of $CO_2$ contribute significantly to the global warming effect while emissions of NOx, SOx, PM and VOCs impact mainly on human health of port cities.

With respect to the global warming problem emissions of carbon dioxide due to maritime transport are estimated around 1 billion tons per year, and the contribution of global greenhouse gas emissions are about 2.5 per cent of the fuel combustion sector (UNCTAD, 2017; Smith et al., 2015). H. Liu et al. (2016a) estimate for East Asia that 16% of global $CO_2$ emissions are due to maritime transport. Very high is also the contribution of ship sector to anthropogenic emissions: NOx (15%) and SOx (5–8%) (Eyring et al., 2005; Corbett et al., 2007) on a global scale. With reference to East Asia the contribution is 9% (NOx) and 5% (SOx) (H. Liu et al., 2016a). About 70% of ship emissions are estimated to occur within 400 km of land (Endresen et al., 2003). Therefore, ships can

* Corresponding author.
  *E-mail address:* domenico.toscano@unina.it (D. Toscano).

https://doi.org/10.1016/j.aeaoa.2019.100050
Received 4 June 2019; Received in revised form 9 September 2019; Accepted 5 October 2019
Available online 30 October 2019
2590-1621/© 2019 The Author(s). Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

USACE_027142



# GOVERNMENT OF PUERTO RICO
DEPARTMENT OF NATURAL AND ENVIRONMENTAL RESOURCES

**RETURN RECEIPT REQUESTED**

FEB 0 2 2022

## Ms. Angela E. Dunn
Chief, Environmental Brach
Department of the Army
Jacksonville District Corps of Engineers
701 San Marco Boulevard
Jacksonville, Florida 32207-8175

Dear Ms. Dunn:

Re:     Water Quality Certificate
        San Juan Harbor Improvements Project and Maintenance Dredging
        San Juan, Puerto Rico

We have received and reviewed a request for a Water Quality Certificate (WQC) from the United States Army Corps of Engineers (COE) to perform dredging activities in waters of the United States as part of the San Juan Harbor Improvements Project (SJHIP) and Maintenance Dredging.  The project will be located in the Municipality of San Juan.



The SJHIP will consist of deepening the Federal Channel to 44 feet Mean Lower Low Water from the Anegado Channel to the Army Terminal Channel (ATC), including the Turning Basing. The ATC will be widened by 50 feet on both sides of the channel from an existing width of 350 to 450 feet as well as the eastern and western flares at the southern terminus of the channel.  In addition, Cut - 6 (approximate area between coordinates 18° 27′ 49.72″/-66° 7′ 38.10″ and 18° 27′ 50.23″/-66° 7′ 26.82″) of the Entrance Channel (Bar Channel) will be deepened to 46 feet.  The San Antonio Channel (including the Approach Channel and the Channel Extension) and Cruise Ship Basin East will be deepened to 36 feet. Also, an additional 1-foot of required overdepth and 1-foot of allowable overdepth will be dredged in all the deepening areas.  All these improvements will result in the dredged of approximately 2.1 million cubic yards of material and will require up to fourteen months to finish the project.

After completion of the improvements project, the COE will to perform maintenance dredging within the Federal Channel to 44 feet + 1 foot overdepth from the Anegado Channel to the ATC. The Cut - 6 will be maintained to a 46 feet + 1 foot overdepth; the San Antonio Channel (including the Approach Channel and the Channel Extension) and Cruise Ship Basin East will be maintained to 36 feet + 1 foot overdepht.  The maintenance dredging will be performed at intervals of approximately 5 to 7 years and the amount of material to be removed will be estimated considering an average accumulation of approximately 170,000 cubic yards per year.

Ms. Angela E. Dunn
Water Quality Certificate
U.S. Army Corps of Engineers
San Juan Harbor Improvements Project and Maintenance Dredging
Page 2

FEB 0 2 2022

The improvements project and maintenance dredged material will be extracted using mechanical or hydraulic dredges and it will be placed in an Ocean Dredged Material Disposal Site (ODMDS). The ODMDS is an approximately 1 square mile area with an average depth of 965 feet, located at approximately 2.2 nautical miles northwest of the entrance to the San Juan Harbor in the Atlantic Ocean. Scow barges or Hopper Dredges will be needed to transport and dump the material into the ODMDS. Also, there is the opportunity for a beneficial use of taking approximately 230,000 cubic yards of the material dredged from the San Antonio Channel and the Cruise Ship Basin East during the SJHIP to Condado Lagoon to fill the artificial depressions and thereby restore the Lagoon's water quality and seagrass habitat. Although the disposal on the dredged material in the Condado Lagoon is not being considered at this time due to lack of funds, if a non-federal sponsor is identified during the construction of the project that provide the cost-share of the incremental costs above the base proposal, the COE could use this disposal alternative.

The purpose of the project is to allow ships to transit efficiently through the Federal Channels by reducing or eliminating transportation cost inefficiencies while minimizing and avoiding environmental impacts. The project is needed because the existing depths and widths of the channels place constraints on larger more efficient carriers and cruise ships. In order to reach port terminals, some of the existing ships must light load, which results in additional transits to provide the required supplies and petroleum products for the Island.

The project is located on the San Juan Bay in the Municipality of San Juan, Puerto Rico, at latitude 18°26'59.67" North and longitude 66°06'51.35" West.

The receiving water body, San Juan Bay, is classified as SB by the Puerto Rico Water Quality Standards Regulation (PRWQSR), as amended.

Pursuant to Section 401 (a) (1) of the Federal Clean Water Act (the Act), after due consideration of the applicable provisions established in the PRWQSR, as amended, and in Sections 301, 302, 303, 306 and 307 of the Act, it is certified that there is reasonable assurance, as determined by the Department of Natural and Environmental Resources (DNER), that the discharges resulting from the proposed project will comply with the applicable water quality requirements if the Special Conditions of this WQC are met.

This certification applies only to the effects that this activity may have on water quality, and not for other ecological, biological or environmental effects that may result from the project. We reserve the right to comment at a later date concerning any other environmental aspects of the project.

*Rafael A. Marchargo Maldonado, Esq.*
Secretary
Department of Natural and Environmental Resources

HJCA/dcc

c:      Mr. Alberto O. Alvarado, COE (Alberto.O.Alvarado@usace.army.mil)
        Mr. Michael J. Hollingsworth, COE (Michael.J.Hollingsworth@usace.army.mil)

G:\División de Permisos para Fuentes Preciadas\WORD\Mary Joel\JPA\USACE - CCA San Juan Harbor Improvements and Maintenance.docx

USACE_028573

Ms. Angela E. Dunn
Water Quality Certificate
U.S. Army Corps of Engineers
San Juan Harbor Improvements Project and Maintenance Dredging
Page 3

FEB 0 2 2022

## A. SPECIAL CONDITIONS

The following Special Conditions are authorized by Article 9 of the Environmental Public Policy Act, Law No. 416-2004, as amended.

1.  The DNER, by the issuance of this WQC, does not relieve the permittee from its responsibility to obtain additional permits or authorizations from the DNER or other state and federal agencies, as required by law. The issuance of the WQC shall not be construed as an authorization to conduct activities not specifically covered in the WQC, which will cause water pollution as defined by the PRWQSR, as amended.

2.  The permittee must develop and implement a Pollution Prevention Plan that includes, but is not limited to, the following:

    a.  measures to prevent and control the spills of pollutants, including all necessary measures to prevent residues of organic and inorganic substances, such as oils, fuels or other chemical substances, from being carried away by runoff and gaining access to a water body;

    b.  countermeasures to be implemented in case of emergencies.

3.  The permittee shall install, maintain, and operate all water pollution control equipment in such manner as to be in compliance with the Applicable Rules and Regulations. These Applicable Rules and Regulations include the water quality standards and all other requirements established by the PRWQSR or by other laws or regulations of Puerto Rico, concerning the conservation and protection of the natural resources that may affect the quality of the water resources.

4.  The permittee shall take all necessary control measures to avoid violations of the water quality standards applicable to any water body that may be affected by the activity. These measures should include, but limited to, the following parameters:

    *   Color
    *   Dissolved Oxygen
    *   Oil and Grease
    *   pH
    *   Solids and Other Matter

    *   Surfactants as MBAS
    *   Suspended, Colloidal or Settleable Solids
    *   Taste or Odor Producing Substances
    *   Turbidity

## B. CITATION AND JUSTIFICATION FOR SPECIAL CONDITIONS

| Special Condition | Statement explaining why the condition is necessary | Citation to federal or state law that authorizes the condition |
|---|---|---|
| 1 | This special condition is necessary to establish the extent and coverage of the WQC in compliance with the requirements of the PRWQSR and Law No. 416-2004. | • Rule 1306.1.B of the PRWQSR<br>• Law No. 416-2004 |

USACE_028574

Ms. Angela E. Dunn
Water Quality Certificate
U.S. Army Corps of Engineers
San Juan Harbor Improvements Project and Maintenance Dredging
Page 4

FEB 0 2 2022

| Special Condition | Statement explaining why the condition is necessary | Citation to federal or state law that authorizes the condition |
|---|---|---|
| 2 | This special condition is necessary to require the permittee to establish the Best Management Practice to prevent pollutants coming from the proposed activities gaining access to the water body, in such manner that the permitted activity comply with the applicable water quality requirements established in the PRWQSR and Section 303 of the CWA. | • Rule 1306.5 of the PRWQSR<br>• Law No. 416-2004 |
| 3 | This special condition is necessary to require the permittee to establish control measures to prevent pollutants coming from the proposed activities gaining access to the water body, in such manner that the permitted activity comply with the applicable water quality requirements established in the PRWQSR and Section 303 of the CWA. | • Rule 1306.1.B.1 of the PRWQSR<br>• Rule 1306.6.A.1 of the PRWQSR<br>• Law No. 416-2004 |
| 4 | This special condition is necessary to require the permittee to establish control measures to prevent pollutants coming from the proposed activities gaining access to the water body, in such manner that the permitted activity comply with the applicable water quality requirements established in the PRWQSR and Section 303 of the CWA. | • Rule 1301 of the PRWQSR<br>• Rule 1303 of the PRWQSR<br>• Rule 1306.2 of the PRWQSR<br>• Law No. 416-2004 |

USACE_028575



## GOBIERNO DE PUERTO RICO
DEPARTAMENTO DE RECURSOS NATURALES Y AMBIENTALES

**CERTIFICADA CON ACUSE DE RECIBO**

0 2 FEB 2022

## Sra. Angela E. Dunn
Jefa, Rama Ambiental
Cuerpo de Ingenieros del Ejército de los Estados Unidos
Distrito de Jacksonville
701 Boulevard San Marco
Jacksonville, Florida 32207-8175

Estimada señora Dunn:

**Re:     Certificado de Calidad de Agua**
**Proyecto de Mejoras y Dragado de Mantenimiento al Puerto de San Juan**
**San Juan, Puerto Rico**

Hemos recibido y evaluado la solicitud de Certificado de Calidad de Agua (CCA) del Cuerpo de Ingenieros del Ejército de los Estados Unidos (*COE*, por sus siglas en inglés), para realizar actividades de dragado en aguas de los Estados Unidos como parte del Proyecto de Mejoras en el Puerto de San Juan (PMPSJ) y Dragado de Mantenimiento. El proyecto estará localizado en el Municipio de San Juan.



El PMPSJ consistirá en la profundización del Canal Federal a 44 pies de profundidad media desde el Canal Anegado hasta el Canal de la Terminal del Ejército (Army Terminal Channel, ATC), incluyendo la Zona de Viraje. El ATC se ampliará unos 50 pies a ambos lados del canal, pasando de un ancho actual de 350 a 450 pies, al igual que las zonas este y oeste en el extremo sur del canal. Además, el Segmento - 6 (Cut - 6) del Canal de Entrada (Bar Channel) (área aproximada entre las coordenadas 18° 27' 49.72"/-66° 7' 38.10" y 18° 27' 50.23"/-66° 7' 26.82") se profundizará a 46 pies. El Canal San Antonio (incluyendo el Canal de Aproximación y la Extensión del Canal) y el Muelle Este para Cruceros se profundizarán a 36 pies. También, se dragará un (1) pie adicional de sobreprofundidad requerida y un (1) pie de sobreprofundidad permitida en todas las áreas que se profundizarán. Todas estas mejoras supondrán el dragado de aproximadamente 2.1 millones de yardas cúbicas de material y requerirán hasta catorce meses para culminar el proyecto.

Una vez completado el proyecto de mejoras, el COE realizará el dragado de mantenimiento dentro del Canal Federal a 44 pies + 1 pie de sobreprofundidad desde el Canal Anegado hasta el ATC. El Segmento - 6 se mantendrá a 46 pies + 1 pie de sobreprofundidad; el Canal San Antonio (incluyendo el Canal de Aproximación y la Extensión del Canal) y el Muelle Este para Cruceros se mantendrán a 36 pies + 1 pie de sobreprofundidad. El dragado de mantenimiento se realizará en intervalos de aproximadamente 5 a 7 años y la cantidad de material a ser removido se estimará considerando una acumulación promedio de aproximadamente 170,000 yardas cúbicas al año.

El material dragado como parte del proyecto de mejoras y del mantenimiento se extraerá utilizando dragas mecánicas o hidráulicas y se colocará en un Lugar de Disposición de Material Dragado en el Océano (LDMDO). El LDMDO es un área de aproximadamente 1 milla cuadrada con una profundidad promedio de 965 pies, ubicada a aproximadamente 2.2 millas náuticas al noroeste de la entrada del Puerto de San Juan en el Océano

Sra. Angela E. Dunn
Certificado de Calidad de Agua
Cuerpo de Ingenieros del Ejército de los Estados Unidos
Proyecto de Mejoras y Dragado de Mantenimiento al Puerto de San Juan
Página 2
0 2 FEB 2022

Atlántico.  Se necesitarán barcazas de arrastre o dragas de tolva para transportar y verter el material en el
LDMDO.  Además, existe la oportunidad de un uso beneficioso de llevar aproximadamente 230,000 yardas
cúbicas del material dragado del Canal San Antonio y el Muelle Este para Cruceros durante el PMPSJ a la
Laguna del Condado para rellenar las depresiones artificiales y así restaurar la calidad del agua y el hábitat de
las hierbas marinas en la Laguna.  Aunque la disposición del material dragado en la Laguna del Condado no
se está considerando en este momento debido a la falta de fondos, si se identifica un patrocinador no federal
durante la construcción del proyecto que proporcione el pareo de los costos incrementales por encima de la
propuesta base, el COE podría utilizar esta alternativa de disposición.

El propósito del proyecto es permitir que los barcos transiten eficientemente a través de los Canales
Federales, reduciendo o eliminando las ineficiencias de los costos de transporte, minimizando y evitando los
impactos ambientales.  El proyecto es necesario porque las profundidades y anchuras actuales de los canales
imponen limitaciones a los barcos de carga y cruceros más grandes y eficientes.  Para llegar a las terminales
portuarias, algunos de los barcos existentes deben aligerar su carga, lo que resulta en tránsitos adicionales
para proporcionar los suministros y los productos de petróleo necesarios para la Isla.

El proyecto está localizado en la Bahía de San Juan en el Municipio de San Juan, Puerto Rico, en la latitud
18°26'59.67" Norte y longitud 66°06'51.35" Oeste.

El cuerpo de agua receptor, Bahía de San Juan, está clasificado como SB por el Reglamento de Estándares de
Calidad de Agua (RECA) de Puerto Rico, según enmendado.

Conforme a la Sección 401 (a) (1) de la Ley Federal de Agua Limpia (la Ley), luego de la debida consideración
de las disposiciones aplicables establecidas en el RECA, según enmendado, y en las Secciones 301, 302, 303,
306 y 307 de la Ley, se certifica que existe una seguridad razonable, según determinada por el Departamento
de Recursos Naturales y Ambientales (DRNA), de que las descargas resultantes del proyecto propuesto
cumplen con los requisitos de calidad de agua aplicables si se satisfacen las Condiciones Especiales de este
CCA.

Esta certificación aplica solamente a los efectos que esta actividad pudiera tener en la calidad de las aguas, y
no a otros efectos ecológicos, biológicos o ambientales que puedan resultar del proyecto.  Nos reservamos el
derecho de comentar en fecha posterior sobre algún otro aspecto ambiental del proyecto.

Lcdo. Rafael Machargo Maldonado
Secretario
Departamento de Recursos Naturales y Ambientales

HJCA/dcc

c:   Sr. Alberto O. Alvarado, *COE* (Alberto.O.Alvarado@usace.army.mil)
     Sr. Michael J. Hollingsworth, *COE* (Michael.J.Hollingsworth@usace.army.mil)

G:\División de Permisos para Fuentes Precisadas\WORD\Hery Joel\PA\USACE - CCA San Juan Harbor Improvements and Maintenance.docx

USACE_028577

Sra. Angela E. Dunn
Certificado de Calidad de Agua
Cuerpo de Ingenieros del Ejército de los Estados Unidos
Proyecto de Mejoras y Dragado de Mantenimiento al Puerto de San Juan
Página 3

0 2 FEB 2022

## A.  CONDICIONES ESPECIALES

Las siguientes Condiciones Especiales están autorizadas por el Artículo 9 de la Ley sobre Política Ambiental, Ley Núm. 416-2004, según enmendada.

1.  El DRNA al emitir este CCA, no releva al peticionario, de su responsabilidad de obtener permisos y/o autorizaciones adicionales del DRNA u otras agencias estatales o federales, según requerido por ley. La emisión del CCA no puede considerarse como una autorización para llevar a cabo actividades que no estén específicamente cubiertas en el CCA, las cuales pueden causar contaminación de agua, según definido en el RECA, según enmendado.

2.  El peticionario deberá desarrollar e implementar un Plan de Prevención de Contaminación que incluya, pero no se limite a, lo siguiente:

    a.  medidas para prevenir y controlar derrames de contaminantes, incluyendo todas las medidas necesarias para evitar que residuos de sustancias orgánicas e inorgánicas, tales como aceites, combustibles u otras sustancias químicas, puedan ser arrastradas por la escorrentía y ganen acceso a un cuerpo de agua;

    b.  medidas de contingencia que se implantarán en caso de emergencia.

3.  El peticionario deberá instalar, mantener y operar todo equipo de control de contaminación de agua de forma tal que le permita cumplir con las Reglas y Reglamentos Aplicables.  Estas Reglas y Reglamentos Aplicables incluyen los estándares de calidad de agua y todos los demás requisitos establecidos por el RECA o por otras leyes o reglamentos de Puerto Rico, concernientes a la conservación y protección de los recursos naturales que puedan afectar la calidad de los recursos de agua.

4.  El peticionario deberá tomar todas las medidas de control necesarias para evitar violaciones a los estándares de calidad de agua aplicables a cualquier cuerpo de agua que pueda ser afectado por la actividad. Dichas medidas deberán incluir, pero no limitarse a, los siguientes parámetros:

    - Aceite y Grasa
    - Agentes Tensoactivos como Sustancias Reactivas con Azul de Metileno
    - Color
    - Oxígeno Disuelto
    - pH
    - Sólidos Suspendidos, Coloidales o Sedimentables
    - Sólidos y Otras Materias
    - Substancias que Provocan Sabor u Olor
    - Turbiedad

Sra. Angela E. Dunn
Certificado de Calidad de Agua
Cuerpo de Ingenieros del Ejército de los Estados Unidos
Proyecto de Mejoras y Dragado de Mantenimiento al Puerto de San Juan
Página 4

0 2 FEB 2022

## B. CITACIÓN Y JUSTIFICACIÓN DE LAS CONDICIONES ESPECIALES

| Condición Especial | Explicación de por qué es necesaria la condición | Cita de la ley federal o estatal que autoriza la condición |
|---|---|---|
| 1 | Esta condición especial es necesaria para establecer el alcance y la cobertura de la CCA en cumplimiento de los requisitos del RECA y la Ley Núm. 416-2004. | • Regla 1306.1.B del RECA<br>• Ley Núm. 416-2004 |
| 2 | Esta condición especial es necesaria para requerir al peticionario que establezca las Mejores Prácticas de Manejo para evitar que los contaminantes procedentes de las actividades propuestas accedan al cuerpo de agua, de manera que la actividad permitida cumpla con los requisitos de calidad de agua aplicables establecidos en el RECA y en la Sección 303 de la *CWA*. | • Regla 1306.5 del RECA<br>• Ley Núm. 416-2004 |
| 3 | Esta condición especial es necesaria para requerir al peticionario que establezca medidas de control para evitar que los contaminantes procedentes de las actividades propuestas accedan al cuerpo de agua, de manera que la actividad permitida cumpla con los requisitos de calidad de agua aplicables establecidos en el RECA y en la Sección 303 de la *CWA*. | • Regla 1306.1.B.1 del RECA<br>• Regla 1306.6.A.1 del RECA<br>• Ley Núm. 416-2004 |
| 4 | Esta condición especial es necesaria para requerir al peticionario que establezca medidas de control para evitar que los contaminantes procedentes de las actividades propuestas accedan al cuerpo de agua, de manera que la actividad permitida cumpla con los requisitos de calidad de agua aplicables establecidos en el RECA y en la Sección 303 de la *CWA*. | • Regla 1301 del RECA<br>• Regla 1303 del RECA<br>• Regla 1306.2 del RECA<br>• Ley Núm. 416-2004 |

USACE_028579

| From: | Ruth Santiago |
|---|---|
| To: | DeMarco, Paul M CIV USARMY CESAJ (USA) |
| Cc: | Brenda Torres; Pablo A Mendez Lazaro; garcia.lisa; Guerrero, Carmen; susan_silander@fws.gov; Pedro Saade Llorens; Laura Arroyo; Raghu Murthy; Jordan Luebkemann; Lorena Velez |
| Subject: | [Non-DoD Source] Comments to Draft SEA San Juan Bay |
| Date: | Wednesday, December 1, 2021 4:34:05 PM |
| Attachments: | Comments SEA San Juan Bay Dredging Project USACE.pdf |

Dear Mr. DeMarco,

Attached please find comments to the Draft Supplemental Environmental Assessment for expanded dredging in San Juan Bay submitted on behalf of the following community and environmental groups: El Puente de Williamsburg, Inc – Enlace Latino de Acción Climática, Hermandad Pastoral de Puerto Nuevo, Mayagüezanos por la Salud y el Ambiente, Alianza Comunitaria Ambientalista del Sureste, Sierra Club Puerto Rico, Comité Yabucoeño Pro-Calidad de Vida, CAMBIO PR, and Comite Dialogo Ambiental, Inc.

Regards,

--
Ruth Santiago, JD, LLM
P.O.Box 518
Salinas, Puerto Rico 00751
787-312-2223

import of fossil fuels and larger LNG carriers to fuel the electric power plants that impact environmental justice communities. The dredging of San Juan Bay to allow for larger LNG carriers would perpetuate an import-dependent fossil-fueled electric system and should not be allowed to block the preparation of an EIS. The dredging project not only excludes viable alternatives such as adoption of distributed renewable energy and battery energy storage systems but fails to consider the environmental effects of the preferred and/ or considered alternatives. Among those effects are the inevitable negative environmental justice consequences of perpetuating import dependent fossil-fueled energy generation and delaying or eliminating distributed renewable energy options.

The current operations of large, centralized fossil-fired power plants emit pollutants regulated under the Clean Air Act ("CAA") and the National Ambient Air Quality Standards ("NAAQS"), harming the health of the communities near these plants.[3] The proposed dredging of San Juan Bay would perpetuate fossil fuel generation. The additional LNG imports would impose even more air-polluting emissions of Volatile Organic Compounds ("VOCs") and impacts on communities near the power plants in Puerto Nuevo and Catano, whereas customer-sited rooftop solar and storage systems would remove these impacts.

USACE erroneously concludes that the proposed dredging will have negligible to minor adverse impacts to the Coastal Zone Management Area ("CZMA"). A determination of the extent and magnitude of the projects in the CZMA that allows for public information and participation is required.

The Draft SEA and the FONSI fail to adequately consider the negative effects of Liquefied "Natural" Gas infrastructure. "Natural" (Methane) Gas which in its liquid state is a highly flammable material that poses hazards to human health and the environment. Burning methane gas at multiple facilities throughout Puerto Rico would increase public health risks. Methane gas combustion also emits increased Volatile Organic Compounds (VOCs) such as formaldehyde, benzene, toluene, hexane, and styrene. Renewables avoid the multiple public health and safety risks of fossil fuel combustion including fuel releases that increase during disasters.

For both an EA or an EIS, the purposes of NEPA require the agency to "consider and disclose" the environmental effects of the actions it certifies. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 96 (1983). The agency takes a "hard look" at the environmental consequences under NEPA. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's "hard look" doctrine requires "discussion of the 'significance' of [an] indirect effect . . . as well as 'the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.'" *Sierra Club v. FERC*, 867 F.3d 867 F.3d 1357, 1374 (D.C. Cir. 2017). Indirect effects "are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *N.Y. v. Nuclear Regul. Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (internal citations omitted). An environmental impact is reasonably foreseeable "if it is sufficiently likely that a person of ordinary prudence would take it into account

---

[3] *See* U.S. Envtl. Prot. Agency, Green Book, Puerto Rico Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants (data current as of Nov. 30, 2021), https://www3.epa.gov/airquality/greenbook/anayo_pr.html.

USACE_028616

issued an Environmental Justice (EJ) guidance document, including 6 principles for agency EJ analyses.[11]

There are environmental justice concerns associated with the expanded dredging of San Juan Bay. The Draft SEA and FONSI fail to document the impacts of increased imports of LNG and other fossil fuels made possible by the expanded dredging projects on the high numbers of poor and Afro-descent population in Puerto Nuevo and Cataño where polluting electric power plants are located.[12]

## IV.   Specific Comments to the Draft SEA

The Draft SEA acknowledges that the proposed expanded dredging of San Juan Bay may affect multiple threatened and endangered species including scalloped hammerhead shark, Nassau grouper, giant manta ray, leatherback sea turtles, Antillean manatee, sperm, sei, blue, or fin whales, elkhorn, staghorn, pillar, rough cactus, lobed star, mountainous star or boulder star corals, but alleges that it is not likely to adversely affect them and further alleges that the expanded and extensive dredging would not adversely modify designated critical habitat for Acroporid corals. USACE acknowledges that during project construction, dredging operations may affect green and hawksbill sea turtles if a hopper dredge is used for construction which is apparently the plan. Similarly, the Draft SEA alleges that the expanded dredging "will not adversely affect water quality and will be compliant with Federal and local standards." The magnitude of the dredging belies USACE's unfounded allegations. The dredging will require approximately 260,000 cubic yards of dredged material in addition to the original dredging proposed in the FONSI. The dredged material would be transported within the bay to the Condado Lagoon to fill 1.2 acres impacted by the construction of the Puerto Nuevo Channel in 2001. The overall dredging project would apparently involve the filling of approximately 18 acres in Condado Lagoon. Draft SEA at 1.

The Draft SEA indicates that the project study area includes San Juan Harbor (SJH), and "surrounding areas" which are not specified in the draft. Reference is made to the Recommended Plan in the 2018 San Juan Harbor Navigation Improvements (SJHNI) Study Integrated Feasibility Report & Environmental Assessment (2018 IFR/EA) and the 2015 San Juan Harbor Submerged Aquatic Vegetation Mitigation Environmental Assessment (2015 Mitigation EA) which is indicative of the fragmented and incomplete analysis in the Draft SEA.

The justification for the expanded dredging is based on the damage caused by the Puerto Nuevo Channel widening of the 2001 SJH expansion dredging project which impacted submerged aquatic vegetation (SAV) such as marine macro-algae and seagrass. The dredging damage required a compensatory mitigation requirement for 1.2 acres of shoal grass (*Halophila decipiens*) habitat restoration. The USACE 2015 Mitigation EA relocated the seagrass mitigation area from the inner harbor to deep, artificial depressions in Condado Lagoon.

---

[11] *See* n. 9, *supra*.

[12] *See* U.S. Dept. of Homeland Sec., Fed. Emergency Mgmt. Agency, Finding of No Significant Impact — Programmatic Environmental Assessment: Utility Repair, Replacement, and Realignment (June 17, 2021) [hereinafter "FEMA FONSI"]) https://www.fema.gov/sites/default/files/documents/fema_oehp-fonsi-utilities-repair_06-17-21.pdf (disregarding or failing to answer with any specificity in its responses to comments on this issue).

9

November 29, 2021


United States Army Corps of Engineers
NEPA Section
701 San Marco Boulevard
Jacksonville, FL 32207
paul.m.demarco@usace.army.mil


Re:    Draft Supplemental Environmental Assessment
       San Juan Harbor, Puerto Rico
       Seagrass Mitigation, Additional San Source (2021)
       ("Draft SA")

       San Juan Harbor Puerto Rico
       Integrated Feasibility Report &
       Environmental Assessment
       August 2018 ("FEA 2018")

Dear Mr. Demarco:

The Environmental Law Clinic of the University of Puerto Rico, School of Law,
hereby submits comments regarding the above "Draft SA" and "FEA 2018". The ELC
provides legal advice and representation to non-profit organizations and
individuals who are affected or could be affected due to environmental and health
problems, which is the case here because of the far reaching consequences of the
San Juan Harbor dredging and other public works improvement project referred to
here regarding communities residing nearby.

1.  The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 et seq.,
    requires federal agencies to identify and evaluate impacts of "major Federal

b) The SJH works would entail providing increased tanker capacity to four oil petroleum and LNG terminals all in the south-west corner of the SJH: Cataño Oil Dock, New Fortress – PREPA Dock; PUMA Dock and PREPA Dock, all very close to one another. The risks of this has not been considered.

c) A significant Environmental Justice population resides in close proximity to this south west corner in Guaynabo and Cataño and also along the path of fossil fuel tankers of increased capacity, including the Sabana, Amelia and Vietnam Wards.  These Environmental Justice communities will also be exposed to all the consequences of the dredging operations during years to come including air and noise pollution.

d) As an example, the Maritima Street of Barrio Sabana lies adjacent to the exccising PUMA dock and just about 400-500 meters from the New Fortress-PREPA dock where larger incoming LNG tankers are projected.

e) This situation is not recognized and much less evaluated in the FEA 2018. The increased risk, air pollution, noise, and other adverse effects on the low income populations of the above mentioned Wards were not adequately considered by the FEA 2018 (See FEA 2018, at sec. 5.4.20). The only or main concern of the FEA 2018 are the populations, schools, etc., north of the SJH, that is "San Juan Peninsula" (Id, at 5-33).  This is a serious NEPA and public policy issue which needs to be addressed in a EIS.

f) Also, neither the FEA 2018 nor the Draft SA properly consider or discuss the effects, implications, restrictions and other consequences of Climate Change, contrary to current policies and law.

    g)  Recent Presidential Executive Orders issued by President Biden address the need to consider the reality and severity of Climate Change, greenhouse emissions and Environmental Justice, particularly E014008, Jan. 27, 2021 of a ("Tackling the Climate Crisis at Home and Abroad"); E013990 of Jan. 20, 2021 ("Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis"). Though Environmental Justice has been addressed since E012898, and referenced in the FEA 2018, it has been ignored in its application regarding Environmental Justice communities nearest the dredging operations and increased tanker-capacity activity.  See also EO 14030 of May 20, 2021 ("Climate Related Financial Risks) and EO14027 of May 7, 2021 ("Establishment of the Climate Change Support Office"), both reflecting the concerns with Climate Change by the Executive.  An EIS would be the proper instrument to update and consider the consequences and implications of Climate Change.

21. The USACOE has the legal duty to comply with the National Environmental Policy Act (42USC sec. 4332 (c)] which in this case means preparing an EIS which fully considers an integrated fashion all environmental effects of the actions referred to in both the Draft SA and the FEA 2018, which are significant. (42 USC Sec. 4332{c}.

22. The available record does not show that the Environmental Justice communities of the Guaynabo and Cataño Municipalities where ever granted public participation opportunities before or after the FEA 2018 and the Draft SA.





Site Management and Monitoring Plan for
Arecibo Harbor,
Mayagüez Harbor,
Ponce Harbor,
San Juan Harbor, &
Yabucoa Harbor
Puerto Rico Dredged Material Disposal Sites

DRAFT November 22, 2021

U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232

U.S. Environmental Protection Agency
Region 2
290 Broadway
New York, New York 10007

USACE_028783

Since their designation, no significant violations and/or enforcement actions have been taken (i.e. actions resulting in fines and/or criminal proceedings) at any of the other PR ODMDSs. However, both EPA-R2 and the USACE-SAJ have taken corrective actions to bring specific disposal projects into compliance with permit conditions.

### 3.4 Past and Anticipated Use and Quantity of Material Disposed at ODMDSs

Disposal volumes (cy) at the five Puerto Rico ODMDSs in past ten years along with total volumes and averages since interim designation in 1977 and 1986. Source: USACE Ocean Dredged Material Disposal Site Database and USACE records.

| Year | Arecibo Harbor | Mayagüez Harbor | Ponce Harbor | San Juan Harbor | Yabucoa Harbor | Total All Sites |
|---|---|---|---|---|---|---|
| 2011 | | | | 378,352 | | 378352 |
| 2012 | 185,673 | | | 92,538 | | 278211 |
| 2013 | | | | | | 0 |
| 2014 | | | | 8,333 | | 8333 |
| 2015 | | | | | | 0 |
| 2016 | | | | 986,324 | | 986324 |
| 2017 | | | | 139,302 | | 139302 |
| 2018 | | | | | | 0 |
| 2019 | | | | | | 0 |
| 2020 | 96,896 | 94,843 | | 284,444 | | 476183 |
| Total 1976-2020 | 526,839 | 156,181 | 1,400,000 | 14,279,569 | 0 | 16,362,589 |
| Average/year 1976-2020 | 11,708 | 3,471 | 31,111 | 317,324 | 0 | 363,613 |
| Total 2011-2020 | 282,569 | 94,843 | 0 | 1,889,293 | 0 | 2,266,705 |
| Average/year 2011-2020 | 28,257 | 9,484 | 0 | 188,929 | 0 | 226,671 |
| Average/dredging year 2011-2020* | 141,285 | 94,843 | NA | 314,882 | NA | 377,784 |

*Calculated only considering years where there was dredged material disposed of at a particular ODMDS, or any ODMDS for all sites average

The USACE-SAJ anticipates similar volumes for dredging and disposal at the Puerto Rico ODMDSs in FY21-FY30 as are reported for 2010-2020 in the above table. Dredged material resulting from San Juan Harbor maintenance and deepening projects is anticipated as well as dredged material from continued construction and maintenance of the Rio Puerto Nuevo Flood Control Project. Dredged material from these projects will be placed at the SJS. Materials will consist of variable percentages of silt, clay, and sand. There is a potential dredging project associated with a private facility in Guayanilla Harbor that would result in dredged material being transported to the PS. The quantity of material is not known at this time. There are no known plans for dredging in the harbors associated with the three other Puerto Rico ODMDSs (AS, MS, and YS). There are no proposed limitations on the quantity of material that may be placed at the sites.

USACE_028793