**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EL PUENTE, et al.,

       *Plaintiffs*,

    v.

U.S. ARMY CORPS OF ENGINEERS, et al.,

       *Defendants*.

Civil Action No. 1:22-cv-02430 (CJN)

## <u>MEMORANDUM OPINION</u>

The U.S. Army Corps of Engineers approved the San Juan Harbor Navigation Improvements Project in response to the House of Representative's request to consider and develop navigation improvements that might increase the Harbor's safety, security, and efficiency. The Project involves deepening and widening current shipping channels by dredging and then disposing of the dredged material in a designated ocean disposal site. Plaintiffs, a cohort of environmental groups, contend that the government violated various federal environmental laws in approving the Project. For the reasons discussed below, the Court rejects those challenges, denies Plaintiffs' Motion for Summary Judgment, ECF No. 20, and grants Defendants' Cross-Motion for Summary Judgment, ECF No. 22.

### I.      BACKGROUND

#### A.    Statutory Background

Plaintiffs El Puente, CORALations, and the Center for Biological Diversity (hereinafter "El Puente") challenge the government's approval of the Project under the Clean Water Act, the

National Environmental Policy Act, and the Endangered Species Act.  The Court therefore begins a with brief overview of these statutes and the government's obligations relating to the Project.

The Clean Water Act (CWA) is "the principal federal law regulating water pollution in the United States."  *Sackett v. Env't Prot. Agency*, 143 S. Ct. 1322, 1329 (2023) (citing 33 U.S.C. § 1251 *et seq.*).  It "prohibits 'the discharge of any pollutant' into 'navigable waters,'" *id.* at 1330 (quoting 33 U.S.C. §§ 1311(a), 1362(12)(A)), and is jointly enforced by the EPA and the Army Corps of Engineers, *id.*  Section 404 of the CWA sets forth a framework for the regulation of the discharge of dredged or fill material into "navigable waters"—or "waters of the United States, including the territorial seas."  *See* 33 U.S.C. §§ 1344, 1362(7).  That section allows the Corps to issue permits for the discharge of dredged or fill material into the waters of the United States when certain conditions are met.  *See* 33 U.S.C. § 1344; 40 C.F.R. §§ 230 *et seq.*

A related statute—the Marine Protection, Research and Sanctuaries Act (MPRSA)—governs the discharge of dredged material into ocean waters.  *See* 33 U.S.C. §§ 1402(b), 1411(b). The MPRSA generally prohibits the dumping of dredged material into territorial seas or ocean waters within twelve nautical miles from territorial seas without a permit, *see id.* §§ 1411, 1413(a), although the Corps may issue regulations about dredged materials in lieu of the permit procedure, *id.* § 1413(e).  The MPRSA also empowers the EPA to designate certain ocean dumping sites or Ocean Dredged Material Disposal Sites (hereinafter "Ocean Disposal Sites").  *See id.* § 1412(a). By regulation, the dumping of dredged material into territorial seas is governed by the MPRSA, while the dumping of fill material into territorial seas is governed by the CWA.  *See* 40 C.F.R. § 230.2(b).

The National Environmental Policy Act (NEPA) is an "essentially procedural" statute that is designed to ensure that agencies make "fully-informed and well-considered decision[s]"

regarding environmental impacts of federal projects.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978); *accord Am. Rivers v. Fed. Energy Regul. Comm'n*, 895 F.3d 32, 49 (D.C. Cir. 2018) ("NEPA's primary function is 'information-forcing,' compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions." (citations omitted)).  "To that end, the statute requires that each agency assess the environmental consequences of major federal actions by following certain procedures during the decision-making process."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 474 (D.C. Cir. 2009) (quotations omitted) (alterations adopted).

NEPA requires agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  But if an agency is "unsure whether its proposed action will have significant environmental impacts, it may first prepare an [environmental assessment]."  *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (quotation omitted).  An environmental assessment is a "'concise, public document' providing 'sufficient evidence and analysis' for the agency to determine 'whether to prepare an environmental impact statement.'"  *Id.* (quoting 40 C.F.R. § 1508.9(a)(1)).  It is not meant to replace an environmental impact statement, but rather is "intended to help an agency decide if an [environmental impact statement] is warranted."  *Id.*  If, after conducting an environmental assessment, the agency determines that an environmental impact statement is not required, the agency must issue a "finding of no significant impact" and briefly explain its reasoning.  *See* 40 C.F.R. § 1508.9.

The Endangered Species Act (ESA) protects endangered and threatened species and their critical habitats.  Under this statute, an agency is "required to ensure that any action undertaken by the agency 'is not likely to jeopardize the continued existence of any endangered species or

threatened species or result in the destruction or adverse modification' of critical animal habitats." *Ctr. for Biological Diversity*, 563 F.3d at 474 (quoting 16 U.S.C. § 1536(a)(2)).   For "major construction activities," an agency is required to prepare a biological assessment to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat" and to determine whether any of those species or habitats are "likely to be adversely affected by the action."   50 C.F.R. § 402.12(a)–(b).   Agencies are required to fulfill these requirements "us[ing] the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

Under the ESA, "[i]f an agency concludes that its action 'may affect' a listed species or critical habitat, then the agency must pursue either formal or informal consultation" with the National Marine Fisheries Service or the Fish and Wildlife Service (depending on the species or habitat).  *See Ctr. for Biological Diversity*, 563 F.3d at 474–75 (citing 50 C.F.R. §§ 402.13, 402.14).  Informal consultation entails correspondence between the agency proposing government action and the relevant wildlife agency to determine whether the action "may affect listed species or critical habitat" and therefore requires formal consultation.  *See* 50 C.F.R. §§ 402.13(a), 402.14(a).  "During informal consultation, the [wildlife agency] may suggest modifications to the action that the [f]ederal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat."  *Id.* § 402.13(b).  If the wildlife agency determines that the action is not likely to adversely affect the listed species or critical habitat, it generally provides a written concurrence and ends consultation.  *See id.* §§ 402.13(c); *see also* 402.14(b)(1) (defining an exception to the formal consultation requirement when a federal action is "not likely to adversely affect any listed species or critical habitat").  Formal consultation, in turn, requires a more thorough evaluation and "culminates in the wildlife agency issuing a 'biological opinion'" in which "the wildlife agency comprehensively examines the proposed

action's anticipated effect on listed species and critical habitat." *Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy Regul. Comm'n*, 992 F.3d 1071, 1079 (D.C. Cir. 2021) (citing 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14).

### B.    Factual Background

The San Juan Harbor is located on Puerto Rico's northern coast and is home to the territory's largest port.  *See* Answer ¶ 1, ECF No. 14.  The Harbor "requires periodic maintenance dredging" every five to seven years "to maintain authorized depths."  USACE_000067.  Since 1975, the dredged material has been deposited in an Ocean Disposal Site approximately 2.2 nautical miles north-northwest of the entrance to the Harbor.  *Id.*  The dredged material is transported from the Harbor to the Ocean Disposal Site using "scows" that all "leak to some extent."  USACE_000178; *see also* USACE_000091.

In 2006, the U.S. House of Representatives tasked the Secretary of the Army with determining the feasibility of improving navigation in the Harbor to "increase security, safety, and efficiency."  *See* USACE_000032, 54.  Thereafter, the Corps conducted a study and identified three primary navigation problems in the Harbor:  "difficult wind and wave conditions, limited channel and turning basin widths, and insufficient [f]ederal channel depths."  USACE_000033. The Corps determined that these problems created several concerns for vessels using the Harbor. Restrictive channel depths required petroleum tankers to "light load," resulting in "additional transits to provide the required quantities of gasoline, jet fuel, diesel fuel, and other petroleum products for the island" and forcing vessel operators to forego potential "cost savings from the economies of scale associated with existing and larger ships drafting deeper."  *Id.*  Current channel widths limited access of larger petroleum tankers, including those used for liquid natural gas (LNG).  *Id.*  And cruise ships struggled to maneuver or turn, "increasing transit time within the harbor."  *Id.*

Before recommending a plan for the Project, the Corps engaged in a variety of environmental analyses and procedural processes.  The Court details only the steps relevant to El Puente's claims here.

### 1.    NEPA and CWA Analysis

In the fall of 2015, the Corps published a letter of intent to prepare a feasibility study and an environmental impact statement regarding potential navigation improvements in the Harbor. *See* USACE_007577.  The Corps subsequently held a scoping meeting, solicited views and comments from the public and experts, and coordinated with other agencies. *See* USACE_000201. The Corps issued a draft environmental assessment and requested public comments in August 2017. USACE_000191.  During the public comment period, Hurricanes Irma and Maria hit Puerto Rico. *See* USACE_002530; Answer ¶ 71.

In August 2018, the Corps published its finalized Environmental Assessment. USACE_000028–217.  The Assessment addressed the comments, explained the Corps's analyses of the various environmental issues, and recommended proceeding with the Project. *See* USACE_000206.

The Project involves deepening, widening, and expanding several channels in the Harbor. USACE_000034.  It includes a "base plan" for the disposal of 2.2 million cubic yards of dredged material into an existing Ocean Disposal Site about two miles offshore, as well as options to place the dredged material elsewhere (such as Condado Lagoon) if there would be a "beneficial use" for such materials. *See* USACE_000034, 136.  Pursuant to the MPRSA, the Corps applied the Site Management and Monitoring Plan developed in 2011 for disposal into the Ocean Disposal Site. USACE_013099–148.

According to the Corps, the Project is not aimed at increasing the Harbor's capacity, but at enabling the Harbor to handle current traffic more efficiently.  USACE_000153.  The Corps

concluded that the "entire project is economically justified," as the estimated cost of the Project is approximately $54 million, while projected net benefits are $60 million if Puerto Rico converts two San-Juan area power plants from diesel fuel to liquified natural gas (LNG) and $2 million if Puerto Rico continues to rely on diesel fuel.  USACE_000034–35.  The Corps also explained the "uncertainty surrounding the anticipated conversion" of the two San Juan power plants to LNG.  USAACE_000038, 151–52.

The Corps engaged in various environmental analyses, including regarding environmental justice, air pollution, and the impact on corals.  With respect to environmental justice, the Corps analyzed the population within a one-mile radius of the Project site and found that population density of minorities in that radius was lower than the rest of San Juan and that the percent of households living under the poverty line in that area was about the same as households in the surrounding areas.  USACE_022648.  The Corps concluded that "no group of people would bear a disproportionately higher share of adverse environmental consequences resulting from the proposed work."  USACE_000196.

As for air quality, the Corps analyzed the potential effects of the Project using EPA's Compilation of Air Pollutant Emission Factors:  AP-42 tool and concluded that the difference between future without-project and with-project vessel emissions was minimal (0–10%).  USACE_000180.  The Corps acknowledged that emissions could be expected for the duration of the Project, but concluded that those emissions would be offset by the long-term decrease in emissions once the Project improved navigation of commercial vessels and "facilitate[d] newer, larger, cleaner, more efficient vessels to reach the port."  *Id.*

For corals, the Corps completed an informal consultation with the National Marine Fisheries Service, *see infra* at Part I(B)(2)(a), considered the direct effects of dredging and disposal

on the corals, and assessed the indirect effects using a 150-meter estimated indirect impact zone. *See* USACE_000167.  The 150-meter zone was chosen "based on a review of the results of in-water coral sedimentation monitoring associated with the 1980-81 Port Everglades deepening project . . . and Key West dredging project in 2004." *Id.*

The Corps also considered risks to historic and cultural resources.  The Corps found that "[e]rosion of San Juan Harbor shorelines is controlled predominantly by wind waves and tidal currents" and that "[t]he relative infrequency of cargo vessel wakes compared with wind waves makes them a minor factor contributing to shoreline changes and erosion."  USACE_000184.  The Corps concluded that, because the Project would result in fewer cargo vessels in the Harbor, "all of the deepening alternatives would generally result in *lower* impacts to shorelines and existing protective revetments" and thus "no adverse impacts to historical properties, including *Castillo de San Felipe del Morro*, are anticipated."  *Id.* (emphasis added).  For similar reasons, the Corps concluded that there would be no adverse effect to the viewshed of historic properties because the Project is expected to result in fewer total ships in the Harbor.  *See id.*

The Corps analyzed the potential seabed damage and the impact of the Project on vessel collisions in the Harbor.  The Corps determined that the expected effects of the Project on benthic life would be the same as during maintenance dredging, USACE_000134, and, after considering six scientific studies, concluded that although "initial loss of benthic resources [is] likely, quick recovery between six months . . . to two years . . . is expected."  USACE_000168.  The Corps explained that the Harbor "is known to have many groundings, allisions[,] and collisions" and that the "entrance channel also presents significant navigational challenges including bar channel winds and waves causing ships to roll and heel and winds, waves[,] and currents in the entrance channel caus[ing] ships to alter their speed resulting in squat and sinkage"; the Project, the Corps

8

concluded, "will help improve these conditions for vessels transiting the entrance channel." *See* USACE_003456.

Finally, the Corps looked at the cumulative impact of the Project with "past, present, and reasonably foreseeable actions" in the same area, *see Grand Canyon Tr. v. Fed. Aviation Admin.*, 290 F.3d 339, 345 (D.C. Cir. 2002), and alternatives to the Project's proposed parameters. The Corps considered the Project in light of the U.S. Coast Guard's plan for the expansion of another part of the San Juan Bay—Anchorage Area F—and concluded that the cumulative effects on benthic resources would be minimal. *See* USACE_000189. The Corps further concluded that "the net contribution to cumulative adverse impacts due to the proposed project and the overall cumulative adverse impact will be appropriately minimized based on" efforts to avoid and mitigate environmental impacts and federal and state permitting requirements for the proposed and potential future actions. *Id.* The Corps considered three potential beneficial-use sites as alternative disposal sites to the Ocean Disposal Site, *see* USACE_000141–42, and "100 possible deepening and widening alternatives" which it narrowed down to seven by considering technical constraints, completeness, effectiveness, efficiency, and acceptability, *see* USACE_000125–26, 128. The Corps also considered a "no action" alternative, USACE_000121, but determined that taking no action would result in a "greater increase in ship transits, . . . result[ing] in greater risk to threatened and endangered species, and more air pollution," USACE_000131.

### 2.   ESA Analysis

#### a.   Corals

As required by Section 7 of the ESA, the Corps submitted a Biological Assessment in July 2017 to the National Marine Fisheries Service, requesting formal consultation for certain species and informal consultation as to others, including seven listed corals. *See* NMFS_00177, 200. The Corps concluded in the Biological Assessment that the Project "may affect, but is not likely to

adversely affect listed corals in the project area." NMFS_00237.  According to the Corps, "[a]ll seven of the listed corals are found in the Caribbean and have the potential to be found on the hardbottom habitats near and surrounding the entrance to San Juan Harbor."  NMFS_00207. Although there is a designated critical habitat for elkhorn and staghorn corals around the Puerto Rican coast, the Corps explained that "the portion of the harbor that is inside San Juan Bay is not [designated critical habitat] for" those species.  NMFS_00211.  Additionally, the designated critical habitat is "at least 1,700 feet to the west of the entrance channel and approximately 3,000 feet" from the "closest area to be dredged."  NMFS_00235–36.  And there was not a designated critical habitat for the other five species of corals.  NMFS_00220.

The Corps acknowledged that, in general, dredging "may affect light penetration into the water column as a result of turbidity, and may also result in burial from sedimentation, which can destabilize the benthic community."  NMFS_00232.  But the Corps explained that the "corals that may have recruited to the rock areas to the east and west of the channel entrance are [already] exposed to very high levels of background sedimentation" and therefore "are more tolerant to these conditions than those located in clearer, less turbid waters."  NMFS_00237.  The Corps also explained why the "temporary effects to corals associated with dredging" experienced in a recent dredging project in Miami wouldn't necessarily occur in San Juan Harbor, in part because the corals in Miami "were located immediately adjacent to the channel."  NMFS_00235.  Additionally, the Corps explained that "while the potential exists for sedimentation from the project to be carried out of the [Harbor] on an outgoing tide and deposited on the [designated critical habitat], it will likely be a very low volume of material, as only the smallest of grain sizes will remain in the water column for that distance."  NMFS_00236.  The Corps concluded that disposing of the dredged materials in the Ocean Disposal Site "will have no effect on the listed corals" or the designated

critical habitat.  NMFS_00239.  And the Corps explained that turbidity monitoring is required for all its projects.  NMFS_00238.

In May 2018, the National Marine Fisheries Service issued a written concurrence that the Project was not likely to adversely affect the listed corals or their critical habitat.  NMFS_00019–22.  The Fisheries Service explained that because no listed corals were found within the dredging area, the Project would not result in the direct removal of listed corals.  NMFS_00020.  As to indirect effects, the type of sediment in the Harbor—as well as the turbidity monitoring plan limiting project-related turbidity to 7 NTU[1] or less above background levels and implementing adaptive-management measures—led the Fisheries Service to conclude that any effects on corals would be "discountable."  NMFS_00020–21.  And for the designated critical habitat "2,500 [feet] north of the dredging area and adjacent to the disposal routes," the Fisheries Service concluded that with the implementation of the turbidity monitoring plan, the effects would also be "discountable."  NMFS_00021–22.

b.    Manatees

The Corps also submitted a Biological Assessment to the Fish and Wildlife Service and requested informal consultation as to the Antillean manatee in August 2017.  FWS_01349.  The Corps concluded that the Project may affect, but was not likely to adversely affect, manatees.  FWS_01349–50.  The Corps acknowledged that the Antillean manatee "inhabits the coastal waters of Puerto Rico, and has been documented both feeding and traveling in the San Juan Bay and Harbor," where seagrass and other submerged aquatic vegetation grows.  FWS_01364.  But the Corps concluded that the Project would have "negligible effects on manatee foraging habitat" because the mangrove wetlands and submerged aquatic vegetation were too far from the dredging

---

[1] "NTU," or "Nephelometric Turbidity Units," is a measure of cloudiness.  *See* Pls.' Mot. at 28.

area to experience direct or indirect effects.  *See* FWS_01365.  The Corps also concluded that the Project would result in fewer ships calling to port by allowing both larger ships and fully-loaded ships to reach the port, which would, in turn, "reduce the potential for vessel strikes to manatees." *Id.*  During the dredging and disposal operations, "observers would be required to monitor for the presence of Antillean manatees" and "operations would be shut[ ]down should a manatee come within 50-feet or closer to in-water operations."  *Id.*; *see also* FWS_1366–67 (identifying other environmental commitments that would be in place to reduce the potential effects of the dredging project on manatees).

In June 2018, the Fish and Wildlife Service issued a written concurrence that the Project was not likely to adversely affect manatees.  FWS_0047–51.  The Wildlife Service's concurrence included a Coordination Action Report for the Project that included specific measures to address potential effects on manatees and their habitat.  FWS_00047.  For example, the Project must have a "protective species watch plan"; all in-water activities must be shut down if a manatee comes within 50 feet of the active construction site during daytime hours or within 75 feet during nighttime construction; certain lights will be used during nighttime dredging to permit the continued observation of manatees; and all vessels in shallow waters must operate at "no wake/idle" speed.  FWS_00048–49.

### 3.    Project Authorization

The Project was recommended by the Chief of Engineers in August 2018. USACE_000004–08.  Congress authorized the Project in October 2018.  *See* America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, 132 Stat. 3765.  The Corps finally approved the Project in November 2018 with a finding that it would have no significant impact to the human environment, and therefore an environmental impact statement would not be required. USACE_000001–03.

A few events have occurred since authorization.  First, in November 2020, the National Marine Fisheries Service proposed a critical habitat for certain threatened corals in the Caribbean.[2] Endangered and Threatened Species; Critical Habitat for the Threatened Caribbean Corals, 85 Fed. Reg. 76,302 (Nov. 27, 2020).  The Corps did not re-initiate consultation with the National Marine Fisheries Service to consider the effects of the Project on the newly proposed critical habitat.  *See* Defs.' Reply at 43–44, ECF No. 29.  Second, in January 2023, the Corps supplemented its environmental assessment and clarified that during initial construction, the Corps will deposit dredged material only in the Ocean Disposal Site and not in Condado Lagoon.  USACE_024449. The Supplemental Environmental Assessment also explained that in response to public comments, the Corps expanded its environmental justice analysis area to a five-mile radius and still concluded that the Project "will not have disproportionately high or adverse impacts on low income or minority communities."  USACE_024688–89.

### C.    Procedural History

El Puente sued the Corps, the National Marine Fisheries Service, the Fish and Wildlife Service, and other federal defendants in August 2022.  *See* Compl., ECF No. 1.  El Puente later filed a Motion for Summary Judgment, ECF No. 20,[3] and the government responded with a Cross-Motion for Summary Judgment, ECF No. 22.  The Court held a hearing on the motions on June 5, 2023.

---

[2] The parties dispute whether this proposed habitat overlaps with the Project's dredging sites. *Compare* Pls.' Mot. at 53, *with* Defs.' Cross-Mot. at 59.

[3] El Puente's complaint includes nine claims for relief but it seeks summary judgment only as to seven of them.  *Compare* Compl. *with* Pls.' Mot.

13

## II.    LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under the Administrative Procedure Act, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency."  *Id.*  In reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (quotation omitted).  The scope of this review is "narrow" and the reviewing court "is not to substitute its judgment for that of the agency."  *Id.*

NEPA requires agencies to "take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019) (internal citation omitted).  And when consulting on the impacts of an agency action on a listed species and their critical habitat, the ESA requires agencies to "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

### III.   ANALYSIS

**A.   The Corps and the Wildlife Agencies Complied With the Endangered Species Act.**

> **1.   The National Marine Fisheries Service Reasonably Concluded That the Project Is Not Likely to Adversely Affect the Listed Corals.**

El Puente argues that the National Marine Fisheries Service's determination that the Project was not likely to adversely affect ESA-listed corals was arbitrary and capricious. *See* Pls.' Mot. at 42; *accord* Compl. at ¶¶ 150–55 (Count 5). El Puente claims that the Fisheries Service "anticipated that each of the . . . Project's 977 scow trips" could leak up to "[o]ne foot of loss per trip, or more," leading to a significant amount of sediment leakage. Pls.' Mot. at 44 (citing USACE_001647–48, 1709). El Puente urges that the monitoring plan is not specific enough to avoid formal consultation, and also that the plan will provide insufficient protection to the listed corals. *See id.* at 46. El Puente also criticizes the Fisheries Service's reliance on "outdated and generic measures from 2011 that failed to prevent leaking scows in Miami," *id.* at 47, and contends that the Fisheries Service erred in failing adequately to consider the results of the Port of Miami dredging project, *id.* at 44, 48.

The Court concludes that the Fisheries Service's not-likely-to-adversely-affect determination was not arbitrary and capricious. The Fisheries Service used the best-available science, considered all the relevant factors, and made no clear errors of judgment.

To start, El Puente misreads the record as to the estimated scow leakage per trip. The government did not predict "[o]ne foot of loss per trip, or more" for the scows, but rather warned that "[o]ne foot of loss per trip, or more, *could* amount to a significant amount of sediment on the reef there." USACE_001709 (emphasis added). El Puente points to no evidence of a predicted or expected loss amount of a foot or more per trip, and the Court has not been able to find such evidence in the administrative record.

Additionally, the monitoring plan is not just "a plan to make a mitigation plan to avoid formal consultation."  *See* Pls.' Mot. at 46.  Instead, the plan contains specific guardrails, such as the limit of 7 NTU above background before mitigation measures are triggered; the placement of "turbidity monitoring stations adjacent to ESA-listed corals" and "at the edges of the designated critical habitat for elkhorn and staghorn corals near the disposal vessel transit route"; and the requirement that the monitoring plan include adaptive management measures should turbidity exceed 7 NTU above background.  NMFS_00011–12.  That turbidity limit was chosen based on the background turbidity levels in the Harbor, scientific studies indicating that "[t]olerance of corals to elevated suspended sediment varies from reef to reef, and depends on background turbidity conditions and hydrodynamic setting," *see* USACE_017470, past dredging projects where the Corps successfully limited turbidity to the Puerto Rican limit of 10 NTU above background and the turbidity variance during construction "rarely exceeded 5 NTU," USACE_001718, and several scientific studies, *see, e.g.*, NMFS_00693–700 (Fourney & Figueiredo study).[4]

---

[4] El Puente relies on a 2017 Fourney & Figueiredo study to contend that "the proposed trigger for management at 7 NTUs *above background* will not prevent coral harm" and "[t]o avoid deleterious effects, the maximum allowable turbidity near coral reefs during short-term construction events should be 7 NTU *or less*."  Pls.' Mot. at 46.  But that study is not as straightforward as El Puente makes it seem.  *See* NMFS_00693–700.  The suggested turbidity limit of 7 NTU in the study was both responsive to potential ocean warming above current temperatures and limited to anthropogenic, as opposed to natural, sedimentation, even though natural sedimentation contributes to the total turbidity level.  *Id.*  Importantly, the study—which demonstrated that natural sedimentation "aided the survival of corals recruits"—only considered ideal levels of anthropogenic sedimentation *without* any natural sedimentation.  *See* NMFS_00698.  It is also not clear that the study's suggested limit maps on to the corals in San Juan Harbor, which are tolerant of high background levels of turbidity.  *See, e.g.*, USACE_001718 (background turbidity of 9.81 NTU in 2007 and 7.01 in 2017 during past dredging projects).  Therefore, although the study has some import for determining ideal turbidity limits at current temperatures, it was not a clear error in judgment for the Fisheries Service to decline to adopt the 7 NTU total limit suggested by the study.

The Fisheries Service also did not act arbitrarily or capriciously in relying on the 2011 Site Management and Monitoring Plan developed by the Corps and EPA for the Ocean Disposal Site. The Corps and the EPA are required to prepare such a plan every ten years by statute, *see* 33 U.S.C. § 1412(c)(3), and so the 2011 Plan was the operative plan at the time that the Fisheries Service issued its concurrence in 2018, *see* NMFS_00113, 118.

Finally, the Fisheries Service's consideration of data and information from the Port of Miami dredging project was not arbitrary and capricious. The Fisheries Service *did* consider the Port of Miami project during the initial ESA consultation about corals.[5] But it determined that there were reasons to believe that dredging in San Juan would not have the same results as in Miami. First, the two locations have materially different geographies. The Port of Miami project involved a "very long outer entrance channel" extending into the open ocean and a "strong velocity current which can have speed up to 4.9 knots" running south to north that can carry sediments far beyond the dredging area. NMFS_00001–02 (2022 Memorandum). The San Juan Harbor, on the other hand, "lacks a long entrance channel" and "is not subjected to the same hydrodynamic processes . . . which can lead to sediment being carried long distances from the dredging area." NMFS_00002. Second, there is "significantly less material to be dredged at San Juan Harbor"— about one third of the material dredged from the Port of Miami—"and it is of a different composition." NMFS_00001–02 Third, the Port of Miami project used rock-chopping methods that create fine sediment known to cause greater harm to corals, and these methods will not be

---

[5] *See, e.g.*, USACE_001709 ("The scows themselves have sensors on them that indicate if there is leakage. . . . We'll indicate quantities and if there is a loss. We did see that in Miami. It was looked at very carefully and considered as we were moving forward. We took some scows offline and determined if there was something keeping them from closing. Based on conditions out there we will implement lessons learned from Miami and follow up on what the sensors indicate."); NMFS_00172 ("NMFS is concerned about the statements and conclusions drawn in the B[iological] A[ssessment] based on the reports from the Port of Miami project.").

used in the Harbor. *See id.* In sum, the government neither "entirely failed to consider an important aspect of the problem" nor "offered an explanation for its decision that runs counter to the evidence." *See State Farm*, 463 U.S. at 43.[6]

### 2. The Fish and Wildlife Service Reasonably Concluded That the Project Is Not Likely to Adversely Affect the Antillean Manatee.

El Puente argues that, in providing its concurrence that the Project is not likely to adversely affect the Antillean manatee, the Fish and Wildlife Service failed to sufficiently consider the impacts of noise pollution, vessel strikes, and seagrass destruction. Pls.' Mot. at 49–51; *accord* Compl. at ¶¶ 156–59 (Count 6). El Puente further argues that the predicted decrease in vessel traffic following completion of the Project did not excuse the Wildlife Service from analyzing vessel-manatee collisions, as "larger-capacity, larger-sized vessels are more deadly for manatees." Pls.' Reply at 50 (citing USACE_026941), ECF No. 26. And El Puente similarly contends that the Wildlife Service was not excused from considering the Project's impacts to seagrass just because the Harbor is not a significant source of seagrass. *Id.* at 51.

Again, the Wildlife Service's determination was not arbitrary and capricious. El Puente has not identified an important factor that the Wildlife Service failed to consider or a clear error in judgment. The administrative record instead reflects that the Wildlife Service reasonably concluded that the Project will ultimately result in less vessel traffic (and thus fewer manatee strikes), as well as a commitment to protect manatees during construction. *See* FWS_01365–67. The study cited by El Puente to assert that "larger-capacity, larger-sized vessels are more deadly

---

[6] The Fisheries Service's 2022 Memorandum outlining the reasons to treat the Harbor differently than the Port of Miami is not a post-hoc rationalization. Instead, it memorializes the determination that the 2019 Miami study—which was published after ESA consultation about the corals—did not require re-initiation of consultation between the Corps and the Fisheries Service, *see* NMFS_00001–02. El Puente does not argue in its Motion for Summary Judgment that the failure to re-initiate consultation was unlawful.

for manatees" was published after the Wildlife Service issued its concurrence and therefore was not in the record considered by the agency.  *See* Defs.' Reply at 41 n.15 (citing USACE_026941).[7] The administrative record also reflects that the Wildlife Service considered the Project's effects on seagrass and determined that the effects on manatee foraging habitat would be "negligible." FWS_01365.  And the noise pollution threshold identified by El Puente does not apply to animals within the purview of the Wildlife Service.  USACE_006239 (technical guidance specifying that it "does not pertain to marine mammal species under the []FWS's jurisdiction (*e.g.*, walrus, polar bears, manatees, sea otters)").[8]

### 3.   The Corps Was Not Required to Confer With the National Marine Fisheries Service On the Proposed Critical Habitat.

El Puente also argues that the Corps unlawfully failed to confer with the Fisheries Service on a proposed critical habitat for five threatened corals in Puerto Rico.  Pls.' Mot. at 52; Compl. at ¶¶ 162–166 (Count 7).  In particular, in November 2020—two years after the Fisheries Service issued its written concurrence that the Project was not likely to adversely affect the listed corals or their critical habitat—the Fisheries Service proposed a rule that would designate approximately

---

[7] The study also does not support El Puente's argument that the Corps's decision was unreasonable. The study explains that "[i]ncreased boating activity and boat density have been predictably linked to higher probability of manatee-boat collisions," which is consistent with the government's conclusion that decreased vessel traffic will be safer for manatees, even if the vessels are larger. *See* USACE_026941.  And the study explains that manatees are "acutely at risk from vessels in shallow water" and so the "use of deep water routes by construction-associated vessels whenever possible also reduce risks to manatees," suggesting that the deeper channels post-construction will make the Harbor safer for manatees in the future.  *See id.*  In other words, the study, taken as a whole, would not have rendered the Corps's decision unreasonable, even if it had been published before the concurrence was issued.

[8] El Puente argues that because the Services' concurrences were flawed, it was unlawful for the Corps to rely on them.  Pls.' Mot. at 52; *accord* Compl. at ¶¶ 167–68 (Count 8).  The Court disagrees:  because the concurrences were not arbitrary and capricious, it was lawful for the Corps to rely on them.

15,000 square kilometers of the Caribbean as a designated critical habitat for certain corals.  85 Fed. Reg. 76,302.  El Puente acknowledges that the proposed rule was published after the concurrence, but argues that the Corps was required to confer with the Fisheries Service on the impacts to the critical habitat because the Service "continued to consult on impacts to endangered species through 2021."  Pls.' Mot. at 54.

The Court disagrees.  Because the proposed rule was published long after the Fisheries Service's concurrence was issued and consultation was terminated, *see* 50 C.F.R. §§ 402.14(m)(1) (formal consultation), 402.13(c) (informal consultation), the Corps was only required to confer with the Fisheries Service if the proposed rule triggered what is known as re-initiation, *see id.* § 402.16(a).  But proposals to designate critical habitats do not trigger a requirement to re-initiate consultation, *id.*, and so the Corps acted lawfully.

**B.    The Corps Complied With the National Environmental Policy Act.**

El Puente claims both that the Corps's Environmental Assessment is inadequate under NEPA and that NEPA independently required the Corps to complete an environmental impact statement.  Pls.' Mot. at 12, 38; *accord* Compl. at ¶¶ 133–42 (Counts 1 & 2).

**1.    The Environmental Assessment Was Adequate Under NEPA.**

With respect to the Environmental Assessment, El Puente contends that it was inadequate because the Corps failed to take a "hard look" at (1) connected actions, particularly new LNG infrastructure that may be built in the Harbor and potential additional dredging; (2) environmental justice communities; (3) air pollution; (4) impacts to corals; (5) risks to historic resources; (6) seabed damage and risks of oil spills and LNG accidents; (7) cumulative impacts; and (8) a reasonable range of alternatives.  *See* Pls.' Mot. at 13.  Because the Corps adequately considered all these environmental considerations, the Court concludes that the Environmental Assessment was adequate.

Starting with connected actions, it is undisputed that an agency must consider "connected actions" in its NEPA review.  40 C.F.R. § 1508.25(a)(1).  Actions are "connected" if, among other things, they "[c]annot or will not proceed unless other actions are taken previously or simultaneously" or they are "interdependent parts of a larger action and depend on the larger action for their justification."  *Id.* § 1508.25(a)(1)(ii)–(iii).  Courts consider several factors to determine whether actions are "connected," including "whether one project will serve a significant purpose even if a second related project is not built" and the "commercial and financial viability of a project when considered in isolation from other actions."  *City of Boston Delegation v. Fed. Energy Regul. Comm'n*, 897 F.3d 241, 252 (D.C. Cir. 2018) (quotations omitted).

In El Puente's view, LNG infrastructure is a "connected action" in the context of the Project—and thus the Corps was required to assess the environmental impact of that action.  *See* Pls.' Mot. at 13–16.  More specifically, El Puente argues that "[t]he LNG infrastructure has no independent utility without the dredging, which is necessary for most LNG tankers to navigate the Bay."  *Id.* at 15.  And El Puente asserts that "[b]oth projects were planned to be constructed around the same time" and "require federal approvals."  *Id.*

The Corps did not improperly segment the Project from LNG infrastructure.  To start, potential LNG infrastructure in Puerto Rico is not a wholly federal affair.  Although the conversion of power plants to LNG would require approval from the Federal Energy Regulatory Commission, whether an application is ever filed is in the hands of the Puerto Rico Electric Power Authority (PREPA) and the private organizations partnering with PREPA.  *See* USACE_001722.  No such application had been filed at the time of the Environmental Assessment, *see* USACE_000151, so it could not have been considered a FERC project at that time.  Because "[t]he connected-actions doctrine does not require the aggregation of federal and non-federal actions," *see Big Bend*

*Conservation All. v. Fed. Energy Regul. Comm'n*, 896 F.3d 418, 424 (D.C. Cir. 2018), the

possibility of LNG infrastructure did not need to be considered as a "connected action" to the

Project.

Puerto Rico's conversion to LNG is also uncertain.  Although PREPA did state that its

$350 million investment into LNG infrastructure would be dependent on the Project's happening,

*see* USACE_001722, the Corps reasonably concluded that whether PREPA will move forward

with this conversion was subject to great "uncertainty" at the time of the Environmental

Assessment, *see* USACE_000038, 151.  The Corps detailed this uncertainty in the Environmental

Assessment itself:

> The combination of PREPA's 2017 bankruptcy, frequent changes to
> plans including a 2018 announcement by the Governor of Puerto
> Rico calling for privatization of PREPA, and the damage caused by
> Hurricanes Irma and Maria have created a climate of uncertainty
> surrounding if and when the LNG investment and conversion will
> occur.

USACE_000151; *see also id.* ("There is a level of uncertainty surrounding PREPA's conversion

to LNG and the timing of the conversion.").  The Corps also decided that "[r]egardless of which

scenario actually occurs, the Recommended Plan remains the same, the exact same Federal

navigation improvements are proposed."   USACE_000152.   "In view of the uncertainty

surrounding the [LNG infrastructure], and the difference in timing between the two projects, this

discussion suffices under NEPA." *See Minisink Residents for Env't Pres. & Safety v. Fed. Energy

Regul. Comm'n*, 762 F.3d 97, 113 (D.C. Cir. 2014).

To be sure, the Corps did discuss the possibility that Puerto Rico would convert some of

its energy usage to LNG in its consideration of whether to move forward with the Project.  But the

Corps did so to ensure that the Project was economically justified.  *See* USACE_000034–35.  In

particular, the Corps considered the economics of the Project with and without LNG conversion,

and concluded that the Project was economically justified either way.  *See id.*  Other references to potential LNG benefits throughout the Environmental Assessment do not prove that the conversion to LNG (and the construction of related infrastructure) is a connected action; LNG benefits were never used as the sole justification or counterweight to potential negative effects of the Project, and the Corps has no control over whether Puerto Rico ultimately decides to convert to LNG.  *See, e.g.*, USACE_000033.  The Corps therefore reasonably concluded that the Project will "serve a significant purpose even if [the LNG infrastructure is] not built" and that the Project has "commercial and financial viability . . . when considered in isolation."  *See City of Boston Delegation*, 897 F.3d at 252.[9]

As for potential effects of the Project on environmental justice communities, the Corps did take a "hard look" at the question—twice.  The Corps first looked at the environmental justice factors within a one-mile radius of the project site; later, in response to public comments, the Corps analyzed the question using a five-mile radius.  *See* USACE_022648, 24688–89.  El Puente argues that the supplemental analysis was limited to a consideration of the effects of dredging Condado Lagoon, but that analysis itself makes clear that the Corps was considering the environmental-justice effects of the *entire* project.  *See* USACE_024688 ("Public comment from the 2021 draft

_____

[9] For similar reasons, the Court rejects El Puente's "dredging begets more dredging" arguments about Anchorage Area F and additional dredging at the docks.  The Coast Guard is considering additional dredging in Anchorage Area F "for safety purposes as a safety area for ships experiencing mechanical failures or other emergencies."  USACE_000067.  If the Coast Guard decides to further dredge Anchorage Area F, the Coast Guard will have to engage in the rulemaking process—which, as far as the record shows, has not begun—and comply with its own legal obligations.  *See id.*  The Corps considered the possibility of such dredging in its cumulative effects analysis, USACE_000189, but the uncertainty, timeline, and independent purpose of that potential project lead this Court to conclude that it is not a "connected action" to the San Juan Harbor Project.  *See City of Boston Delegation*, 897 F.3d at 252.  Likewise, the potential additional dredging at the docks by "private parties," *see* Pls.' Mot. at 17, would not be federal actions and therefore are excluded from the connected-action analysis, *Big Bend Conservation All.*, 896 F.3d at 424.

SEA requested additional EJ analysis.  Therefore, the area evaluated for this Project was extended to 5-miles, which should encompass all potential project effects to surrounding communities.").  El Puente also contends that the timing of the hurricanes limited public participation in the process, but has proffered no evidence of late-submitted comments that weren't considered by the government or of any request to extend the comment period.  *See* Defs.' Cross-Mot. at 24.

The Corps also adequately considered the Project's potential impacts on air quality.  El Puente argues that the Corps's comparative analysis was unreasonable and that the Corps should have instead disclosed and analyzed the aggregate air emissions and their effects on health.  Pls.' Mot. at 22–23; *accord id.* at 23 ("NEPA requires disclosure of cumulative pollution impacts; an incremental comparison is insufficient."  (citing *Grand Canyon Tr.*, 290 F.3d at 345–46)).  But the cases on which El Puente relies do not undermine the Corps's decision to do a comparative analysis.  In *Grand Canyon Trust v. Federal Aviation Administration*, the Court of Appeals rejected the use of an incremental analysis where the agency claimed that the new airport would only contribute a 2% increase in overflights near Zion Park, but failed to consider whether that 2% increase would "significantly affect" the quality of human environment.  290 F.3d at 345–46 (alteration adopted).  Here, in contrast, the Corps *did* consider whether the increase in air pollutants would "significantly impact" the quality of the human environment.  In particular, the Corps predicted that if all other operations in the Harbor remained the same, the Project would cause a vessel emissions increase of 0–10%, but that the Project "will also facilitate newer, larger, cleaner, and more efficient vessels to reach the port."  USACE_000180.  As the Corps put it, because "large vessel access to the port terminals will not be restricted, some of the non-monetary benefits of the proposed action include reduced and less concentrated air emissions, noise, and vessel traffic."

USACE_000187.[10]  These newer, cleaner vessels include but are not limited to LNG vessels, and with respect to LNG vessels, the Corps further predicted that "future conversion of the Power Plants from bunker or diesel fuel oil to LNG will improve the air quality of the harbor and also offset any additional emissions from the future commerce therein."  USACE_000180.  The Corps also noted that the area "experiences nearly constant trade winds and sea breezes," USACE_000180, analyzed the project under the Clean Air Act regulations, and determined that the Project "would not exceed *de minimis* . . . levels of direct or indirect emissions of a criteria pollutant or its precursors," USACE_000181.  This analysis satisfied the Corps's obligations under NEPA.

*WildEarth Guardians v. Zinke* is also inapposite.  There, the Court determined that the U.S. Bureau of Land Management failed to quantify predicted aggregate greenhouse gas emissions that would result from reasonably foreseeable future drilling projects on leased parcels of land.  368 F. Supp. 3d 41, 71 (D.D.C. 2019).  Here, in contrast, the Corps did consider the effects of potential future projects by considering the possibility that Puerto Rico would convert to LNG, which it reasonably concluded would result in *lower* emissions.  *See* USACE_000180; *see also WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 248–49 (D.D.C. 2020) (same).

As for corals, as discussed above, the Corps thoroughly considered the potential impacts of the Project in consultation with the Fisheries Service.  *See supra* Part III(A)(1).  El Puente complains that the 150-meter impact zone used by the Corps was unreasonably small, relied on outdated data, and ignored the results of the Port of Miami project on corals.  Pls.' Mot. at 25–28.

---

[10] More specifically, based on the same consumption of petroleum "commodities per year," the Corps predicts a "reduction in the number of vessels used to transport petroleum products each year," *id.*, and thus that "total air emissions within the harbor and at each terminal would decrease in a given year as a result of the harbor widening and deepening," *id.*

But again, the Corps meaningfully and reasonably differentiated the Miami project and therefore did not act unreasonably by relying on other past projects that occurred in locations more like the Harbor. *See supra* Part III(A)(1).

As for the Project's potential effect on historic and cultural resources, El Puente contends that the Corps failed to consider the effect that larger (even if fewer) ships would have on erosion and the Harbor's viewshed. Pls.' Mot. at 30–32. El Puente also argues that the Corps should have analyzed the "additive contribution of larger ship wakes" rather than "dismiss[ing] erosion from ship wakes as negligible by comparing it to that caused from waves and wind." Pls.' Mot. at 31 (citing *Grand Canyon Tr.*, 290 F.3d at 345). But the Corps did sufficiently consider these issues; rather than merely engage in an incremental analysis, the Corps concluded that the Project would "reduce the shoreline impact of vessel wakes by reducing the number of vessels and increasing the range of tides during which vessels can transit the harbor." USACE_000184. And the Corps concluded that fewer, larger ships would not negatively impact the viewshed as compared to the current vessel traffic in a Harbor already characterized by commercial and recreational vessel traffic. *See id.* Without a "clear error of judgment," the Court cannot "substitute its judgment for that of the agency." *See State Farm*, 463 U.S. at 43.

With respect to potential seabed damage and risks of oil spills and LNG accidents, El Puente characterizes the Corps's treatment of risks to benthic life as "flippant" and "cursory." Pls.' Mot. at 33. But to support its conclusion that "initial loss of benthic resources [is] likely, quick recovery between six months . . . to two years . . . is expected," the Corps cited six scientific studies that supported the recovery time frame. *See* USACE_000168. El Puente also argues that the environmental assessment "omits analysis of vessel traffic," Pls.' Mot. at 33, but the Corps detailed why widening and deepening of the Harbor would improve the conditions that have historically

led to accidents.  *See* USACE_003456 (explaining that the Harbor "is known to have many groundings, allisions[,] and collisions" and that the "entrance channel also presents significant navigational challenges including bar channel winds and waves causing ships to roll and heel and winds, waves[,] and currents in the entrance channel cause ships to alter their speed resulting in squat and sinkage" and that the Project "will help improve these conditions for vessels transiting the entrance channel").  And El Puente does not identify what other occurrences—other than the collisions, groundings, and allisions the government addressed—would constitute vessel accidents.

Finally, contrary to El Puente's contentions, the Corps took a "hard look" at the cumulative impacts of the Project and reasonable alternatives.  As detailed previously, the Corps considered the Project in light of the U.S. Coast Guard's plan for the expansion of Anchorage Area F and concluded that the cumulative effects on benthic resources would be minimal.  *See* USACE_000189; *supra* n.9.  The Corps also concluded that "the net contribution to cumulative adverse impacts due to the proposed project and the overall cumulative adverse impact will be appropriately minimized based on" efforts to avoid and mitigate environmental impacts and federal and state permitting requirements for the proposed and potential future actions. USACE_000189.  And as for alternatives, the Corps considered three potential beneficial-use sites as alternative disposal sites to the Ocean Disposal Site, *see* USACE_000141–42, and "100 possible deepening and widening alternatives" which it narrowed down to seven by considering technical constraints, completeness, effectiveness, efficiency, and acceptability, *see* USACE_000125–26, 128.  The Corps also considered a "no action" alternative, USACE_000121, but determined that taking no action would result in a "greater increase in ship transits, . . . result[ing] in greater risk

to threatened and endangered species, and more air pollution," USACE_000131.  These analyses were sufficiently "hard looks" at the relevant factors.

### 2. NEPA Did Not Separately Require an Environmental Impact Statement.

As explained above, NEPA requires agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  "Whether a project has significant environmental impacts, thus triggering the need to produce an [environmental impact statement], depends on its 'context' (region, locality) and 'intensity' ('severity of impact')."  *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019), *amended on reh'g on other grounds by* 925 F.3d 500 (D.C. Cir. 2019) (quoting 40 C.F.R. § 1508.27).  Intensity, in turn, requires the consideration of ten enumerated factors that "should be considered," including the "degree to which the proposed action affects public health or safety."  *See* 40 C.F.R. § 1508.27(b), (b)(2).  Actions that will not "significantly affect[] the quality of the human environment" require only an environmental assessment.  *See Env't Def. Ctr.*, 36 F.4th at 872 (quotation omitted).

El Puente argues that NEPA required the preparation of an environmental impact statement because the Project may have a significant impact on the quality of the human environment.  Pls.' Mot. at 38.  El Puente highlights the context of the Project—the San Juan Bay Estuary and San Juan National Historic Site—and four "intensity factors"—public health and safety, proximity to numerous historic and cultural resources, threats to threatened and endangered species, and cumulative effects.  *Id.* at 38–42.  More specifically, El Puente argues that public health and safety will be adversely affected by the air pollution and the risk of oil and LNG accidents, that the Project's location is close to historic landmarks, that the Project includes dredging that injures and

kills sea turtles, corals, and manatees, and that the cumulative effects from other federal actions in San Juan Bay exacerbate the effects from the Project.  *Id.*

The Court's role here is "limited," "designed primarily to ensure that no arguably significant consequences have been ignored."  *Semonite*, 916 F.3d at 1082 (quoting *Myersville Citizens for a Rural Cmty., Inc. v. Fed. Energy Regul. Comm'n*, 783 F.3d 1301, 1322 (D.C. Cir. 2015)).  To determine whether the Corps's decision was arbitrary and capricious, the Court asks "whether the Corps is 'able to make a convincing case for its finding' of no significant impact." *Id.* (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985)).

El Puente has not identified any intensity factors that the Corps failed to consider.  Instead, El Puente argues that, in considering several intensity factors, the Corps should have weighed certain evidence more heavily.  *See* Pls.' Mot. at 39–42.  The Court is unpersuaded.

As explained above, the Corps took a hard look at potential air pollution and safety risks from the Project, effects on historic resources, and cumulative impacts.  *See supra* Part III(B)(1). Likewise, the Corps thoroughly considered the impacts on endangered species, engaged in formal and informal consultation as required, and reasonably determined that the effects on corals and manatees would not be significant.  *See supra* Part III(A).  As to sea turtles, the National Marine Fisheries Service concluded after formal consultation that the Project "may adversely affect but is not likely to jeopardize the continued existence of green, loggerhead, and hawksbill sea turtles." NMFS_00004.  But "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species," *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006), and it was not arbitrary and capricious for the agencies to "determine that although there will be some effect on individual" animals, the Project "will not

cause a significant adverse effect on the species and require an [environmental impact statement]," *see id.*

Finally, the Corps was not bound by its original statement that it would prepare an environmental impact statement. *See* USACE_007577. The announcement that the Corps was initiating all the environmental procedural requirements for the Project did not lock the Corps into an environmental impact statement, as agencies are permitted to first prepare an environmental assessment if the agency is "unsure whether its proposed action will have significant environmental impacts." *See Env't Def. Ctr.*, 36 F.4th at 872. And there is no evidence that the Corps had originally decided that such an impact may occur when it made its original announcement.

## C.     The Corps Complied With the Clean Water Act.

El Puente argues that the Corps failed to comply with the requirements of the CWA. *See* Pls.' Mot. at 9; *accord* Compl. at ¶¶ 145–49 (Count 4).[11] According to El Puente, the Corps violated the guidelines for section 404(b)(1) of the CWA by failing to "consider or analyze less environmentally damaging alternatives, such as a smaller project footprint or another Project design that would avoid or minimize discharges of dredged material and impacts to aquatic habitat and species, including corals." Pls.' Reply at 4–5. El Puente further argues that the Corps "violated the Clean Water Act's requirements to avoid and minimize damage to corals from its dredging, transport, and disposal activities." *Id.* at 5–6 (citing 40 C.F.R. § 230.10(c)–(d)).

But as noted above, the record shows that the Corps considered "100 possible deepening and widening alternatives" which it narrowed down to seven by considering technical constraints,

---

[11] El Puente originally contended that the Corps were required to prepare an environmental impact statement by the plain language of the CWA, *see* Pls.' Mot. at 9 (citing 33 U.S.C. § 1344(r)), but this argument was later abandoned. *See* Defs.' Reply at 1.

completeness, effectiveness, efficiency, and acceptability. *See* USACE_000125–26, 128. The Corps also considered a "no action" alternative, USACE_000121, but determined that taking no action would result in "greater increase in ship transits, . . . result[ing] in greater risk to threatened and endangered species, and more air pollution," USACE_000131. The Corps also considered multiple alternatives for where to deposit the dredged material, including Condado Lagoon, but decided for the initial construction that all material would be placed in the Ocean Disposal Site. USACE_000140–43, 24449. The Corps completed a CWA Section 404 analysis for the disposal alternatives. *See* USACE_001110–24. The Biological Assessment regarding corals shows that the Corps properly considered the potential effects on corals from dredging, transport, and disposal. *See* NMFS_00229–39. And the Court notes that El Puente does not challenge the Corps's compliance with the MPRSA for the disposal in the ODMDS.

## CONCLUSION

For the forgoing reasons, the Court grants the Defendants' Cross-Motion and denies Plaintiffs' Motion. An appropriate order will accompany this opinion.

DATE:  July 24, 2023

_____
CARL J. NICHOLS
United States District Judge